[ORAL ARGUMENT NOT YET SCHEDULED]
No. 25-5057

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

GWYNNE A. WILCOX,

*Appellee*,

v.

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE
UNITED STATES, et al.,

*Appellants*.

*On Appeal from the United States District Court
for the District of Columbia*

## BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER
## AS *AMICUS CURIAE* IN OPPOSITION TO APPELLANTS' EMERGENCY
## MOTION FOR A STAY PENDING APPEAL

Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
Smita Ghosh
Margaret Hassel
CONSTITUTIONAL
  ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

## STATEMENT REGARDING CONSENT TO FILE
## AND SEPARATE BRIEFING

Pursuant to D.C. Circuit Rule 29(b), undersigned counsel for *amicus curiae* Constitutional Accountability Center (CAC) represents that counsel for all parties have consented to the filing of this brief.[1]

Pursuant to D.C. Circuit Rule 29(d), undersigned counsel for *amicus curiae* certifies that a separate brief is necessary.  *Amicus* is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history.  CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and to protect the rights, freedoms, and structural safeguards that our nation's charter guarantees.  CAC has filed *amicus* briefs in multiple cases about the constitutionality of for-cause removal protections in the Supreme Court and other federal courts, including on the merits in this case in the District Court, and has accordingly developed expertise in the relevant constitutional text and history.

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amicus curiae* or its counsel made a monetary contribution to its preparation or submission.

i

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

## CERTIFICATE AS TO PARTIES, RULINGS,
## AND RELATED CASES

I.      PARTIES AND *AMICI*

        Except for *amicus* Constitutional Accountability Center and any other

*amici* who had not yet entered an appearance in this case as of the filing of

Appellants' motion, all parties, intervenors, and *amici* appearing in this

Court are listed in Appellants' motion.

II.     RULINGS UNDER REVIEW

        Reference to the ruling under review appears in Appellants' motion.

III.    RELATED CASES

        Reference to any related cases pending before this Court appears in

Appellants' motion.


Dated:  March 11, 2025                        */s/ Brianne J. Gorod*
                                              Brianne J. Gorod

                                              *Counsel for Amicus Curiae*

# TABLE OF CONTENTS

                                                                        **Page**

TABLE OF AUTHORITIES ................................................................... v

INTEREST OF *AMICUS CURIAE* .................................................. 1

INTRODUCTION ............................................................................. 1

ARGUMENT .................................................................................... 3

    I.    Binding Precedent Affirms the Legitimacy of Multimember
        Independent Agencies ........................................................... 3

    II.   Established Practice Confirms the Validity of Multimember
        Independent Agencies ........................................................... 8

    III.  Constitutional Text and History Underscore the Legitimacy of
        Multimember Independent Agencies .................................... 10

CONCLUSION ............................................................................... 13

iv

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*City of Arlington v. FCC,*
    569 U.S. 290 (2013)..................................................... 9

*Collins v. Yellen,*
    594 U.S. 220 (2021)..................................................... 4

*Exela Enter. Sols., Inc. v. NLRB,*
    32 F.4th 436 (5th Cir. 2022) ..................................... 6

*Free Enter. Fund v. PCAOB,*
    561 U.S. 477 (2010)..................................................... 4, 9

*Humphrey's Ex'r v. United States,*
    295 U.S. 602 (1935) ................................................... 5, 9

*In re Hennen,*
    38 U.S. 230 (1839)....................................................... 10, 11

*Mallory v. Norfolk S. Ry. Co.,*
    600 U.S. 122 (2023)..................................................... 3, 7

*Marbury v. Madison,*
    5 U.S. 137 (1803)......................................................... 12

*Mistretta v. United States,*
    488 U.S. 361 (1989)..................................................... 8

*Morrison v. Olson,*
    487 U.S. 654 (1988)..................................................... 9

*NLRB v. Noel Canning,*
    573 U.S. 513 (2014)..................................................... 2, 8

*Parsons v. United States,*
    167 U.S. 324 (1897)..................................................... 12

*Seila Law LLC v. CFPB,*
    591 U.S. 197 (2020)..................................................... 1-7, 9, 10

*Stuart v. Laird,*
    5 U.S. 299 (1803)......................................................... 10

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Va. Off. for Prot. & Advoc. v. Stewart*,
563 U.S. 247 (2011) ................................................................. 4

*Wiener v. United States*,
357 U.S. 349 (1958) ................................................................. 6

*Zivotofsky v. Kerry*,
576 U.S. 1 (2015) ................................................................. 2, 7

<u>Constitutional Provisions, Statutes, and Legislative Materials</u>

Act of July 27, 1789, ch. 4, 1 Stat. 28 .......................................... 11

Act of Feb. 25, 1863, ch. 58, 12 Stat. 665 .................................... 12

Act of June 29, 1906, ch. 3591, 34 Stat. 584 ............................... 8

An Act to Create a Federal Trade Commission, ch. 311, 38 Stat. 717
(1914) ................................................................................... 9

An Act to Regulate Commerce, Pub. L. No. 49-104, ch. 104, 24 Stat. 379
(1887) ................................................................................ 5, 8

1 Annals of Cong. (1789) ............................................................ 12

*Hearing on S. 195 Before the S. Comm. on Educ. & Lab.*, 74th Cong.
(1935) ................................................................................... 7

National Labor Relations Act, ch. 372, 49 Stat. 449 (1935) .......... 5

29 U.S.C. § 153 .......................................................................... 1

29 U.S.C. § 153(a) .................................................................... 5, 6

U.S. Const. art. I, § 8, cl. 18 ....................................................... 11

U.S. Const. art. II, § 2 ............................................................... 11

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Books, Articles, and Other Authorities

Daniel D. Birk, *Interrogating the Historical Basis for a Unitary Executive*, 73 Stan. L. Rev. 175 (2021) ................................................... 10

Marshall J. Breger & Gary J. Edles, *Established by Practice: The Theory and Operation of Independent Federal Agencies*, 52 Admin. L. Rev. 1111 (2000) ................................................................................. 8

Edward S. Corwin, *Tenure of Office and the Removal Power Under the Constitution*, 27 Colum. L. Rev. 353 (1927) .................................... 12

David P. Currie, *The Constitution in Congress: The First Congress and the Structure of Government, 1789–1791*, 2 U. Chi. L. Sch. Roundtable 161 (1995) ............................................................................. 11

*The Federalist No. 39* (Clinton Rossiter ed., 1961) ................................... 11

*The Federalist No. 77* (Clinton Rossiter ed., 1961) ................................... 10

Danielle Kaye & Rebecca Davis O'Brien, Trump Firings at Labor Board Paralyze the Agency, N.Y. Times (Jan. 28, 2025) ................................. 6

Saikrishna Prakash, *New Light on the Decision of 1789*, 91 Cornell L. Rev. 1021 (2006) ..................................................................................... 12

*Records of the Federal Convention of 1787* (Max Farrand ed., 1911) ....... 2, 10

## INTEREST OF *AMICUS CURIAE*

Constitutional Accountability Center is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history. CAC works to improve understanding of the Constitution and accordingly has an interest in this case.

## INTRODUCTION

Congress has been creating multimember independent agencies for most of the nation's history, and nearly a century of judicial precedent affirms their constitutionality. The National Labor Relations Board (NLRB) is one such agency, and the statute creating it explicitly provides that its members can be removed only for cause. 29 U.S.C. § 153. President Trump's attempt to remove Gwynne Wilcox from the NLRB without cause violates that statute, and Appellants' argument that the statute is unconstitutional is at odds with Supreme Court precedent, established practice, and the Constitution's text and history.

In making this argument, Appellants rely on *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020). But that decision addressed "a new situation" involving something "wholly unprecedented": an independent agency led "*by a single individual*." *Id.* at 238, 220, 213 (emphasis added). Making clear that it was not "revisit[ing] [its] prior decisions," the Supreme Court found "compelling reasons not to extend those precedents to th[at] novel context." *Id.* at 204.

*Seila Law* distinguished single-director independent agencies from "a traditional independent agency, run by a multimember board," *id.* at 205-06, in three respects. First, such agencies had "no foothold in history or tradition." *Id.* at 222. Second, in the Court's view, a single-director structure encroached further on presidential oversight than that of a multimember board. *Id.* at 225. Third, according to the Court, empowering a single director with "no colleagues to persuade" "clashe[d] with constitutional structure by concentrating power in a unilateral actor." *Id.* at 225, 204. None of those features describe the NLRB.

Moreover, established practice has settled the constitutional legitimacy of multimember independent agencies. In separation-of-powers cases, courts place "significant weight upon historical practice," *Zivotofsky v. Kerry*, 576 U.S. 1, 23 (2015) (quotation marks omitted), including practice that "began after the founding era," *NLRB v. Noel Canning*, 573 U.S. 513, 525-26 (2014). Multimember independent agencies have wielded executive power and undertaken adjudications for generations, with judicial approval.

Finally, multimember independent agencies are fully consonant with the Constitution's original meaning. The constitutional text is silent with respect to the removal of officers, as the Framers rejected a plan to specify in the Constitution that certain department heads would serve "during pleasure," 2 *Records of the Federal Convention of 1787*, at 335-36 (Max Farrand ed., 1911). And while

discussions in the First Congress may have concluded that the President enjoyed

removal authority, those debates did not resolve whether Congress could limit that

authority.  Indeed, subsequent to those discussions, removal authority was

generally not viewed as extending to officers with fixed terms.  Against that

backdrop, Congress began conditioning the President's power to remove members

of expert bodies in the nineteenth century, and the Supreme Court consistently

recognized the legality of that practice.

This Court must abide by that "directly control[ling]" precedent.  *Mallory v.

Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) (quotation marks omitted).  There is

thus no reason to stay the District Court's decision.

## ARGUMENT

I.    **Binding Precedent Affirms the Legitimacy of Multimember**
      **Independent Agencies.**

A.    ***Seila Law* Addressed Only the Innovation of an Independent**
      **Agency Led by a Single Director.**

President Trump says *Seila Law* supports his view that he can remove

Wilcox without cause.  But *Seila Law*'s holding was narrow: "[T]he CFPB's

leadership *by a single individual* removable only for inefficiency, neglect, or

malfeasance violates the separation of powers."  591 U.S. at 213 (emphasis added).

In refusing to extend *Humphrey's Executor*'s holding that Congress may

"create expert agencies led by a *group* of principal officers removable by the

3

President only for good cause" to the "new configuration" of a single-director agency, the Court was clear that "we need not and do not revisit our prior decisions allowing certain limitations on the President's removal power." *Id*. at 204. Removal protection for "principal officers who, *acting alone*, wield significant executive power" was unlawful only because it constituted a "*novel* impediment" to presidential authority. *Id.* at 215, 238 (emphasis added); *accord Free Enter. Fund v. PCAOB*, 561 U.S. 477, 483-84 (2010) (declining "to reexamine any … precedents"); *Collins v. Yellen*, 594 U.S. 220, 250-51 (2021) (*Seila Law* merely declined to "extend [the Court's] precedents").

**B.     *Seila Law* Rested on Three Features Unique to Single-Director Independent Agencies, None of Which Characterize the NLRB.**

*Seila Law* discussed three aspects of single-director leadership that the Court concluded made removal limits untenable in that context: it was a historical anomaly, 591 U.S. at 220-23; it introduced new barriers to presidential oversight, *id.* at 204; and it concentrated power in the hands of one person, *id.*  None of those concerns applies to the NLRB.

**1.  *Historical Anomaly***

*Seila Law* stressed that the CFPB's single-Director structure was an "almost wholly unprecedented" "innovation with no foothold in history or tradition." *Id.* at 220-22; *accord Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 260 (2011) ("Lack of historical precedent can indicate a constitutional infirmity" because

novelty "is often the consequence of past constitutional doubts."). In "only a handful of isolated" and "controversial" incidents had Congress "provided good-cause tenure to principal officers who wield power alone." *Seila Law*, 591 U.S. at 220-21 (quotation marks omitted).

But multimember independent agencies are not novel. Members of expert boards have enjoyed removal protection since the 1887 establishment of the Interstate Commerce Commission. *See* An Act to Regulate Commerce, Pub. L. No. 49-104, ch. 104, § 11, 24 Stat. 379, 383 (1887). The NLRB bears the hallmarks of these traditional agencies. *Compare id.* (ICC has five Commissioners, serving six-year terms, removable for cause), *with* 29 U.S.C. § 153(a) (NLRB has five Members, serving five-year terms, removable for cause). Indeed, Congress created the NLRB less than two months after the Supreme Court upheld the FTC's similar structure in *Humphrey's Executor*. *Compare Humphrey's Ex'r*, 295 U.S. 602 (1935) (decided May 27, 1935), *with* National Labor Relations Act, ch. 372, 49 Stat. 449 (1935) (signed July 5, 1935).

### 2. *Greater Encroachment on Presidential Oversight*

*Seila Law* also concluded that removal protections for agency heads who serve alone constitute a "novel impediment to the President's oversight of the Executive Branch." 591 U.S. at 215. A single-director structure "forecloses certain indirect methods of Presidential control" available for multimember boards.

*Id.* at 225.  For instance, the President could not appoint other leaders who would "help bring the agency in line with the President's preferred policies."  *Id.*  And because the CFPB Director serves a five-year term, some Presidents would "*never*" appoint a director.  *Id.*

These concerns do not apply to the NLRB.  Its five members serve staggered terms, and the President appoints the Board's chairperson, *see* 29 U.S.C. § 153(a), so each President can shape the agency's leadership.  The President can further influence the NLRB by removing the General Counsel at will, *see Exela Enter. Sols., Inc. v. NLRB*, 32 F.4th 436, 441-42 (5th Cir. 2022), as Trump has done, Danielle Kaye & Rebecca Davis O'Brien, *Trump Firings at Labor Board Paralyze the Agency*, N.Y. Times (Jan. 28, 2025), https://www.nytimes.com/2025/01/28/us/politics/trump-nlrb-jennifer-abruzzo.html.

And, while the NLRB may not have the 1935 FTC's partisan balancing requirements, the President's ability to fill the NLRB exclusively with members of his own party will typically *augment* his power rather than diminish it.  The Court has therefore never mandated partisan balancing for independent agencies.  *See Wiener v. United States*, 357 U.S. 349, 351 (1958) (removal protections permissible for agency with no partisan balancing requirements).

### 3. Concentration of Power

Finally, *Seila Law* rested on the CFPB Director's status as "a unilateral actor insulated from Presidential control." 591 U.S. at 204. According to the Court, with "the sole exception of the Presidency, [the Constitution's] structure scrupulously avoids concentrating power in the hands of any single individual." *Id.* at 222-23. "With no colleagues to persuade," the CFPB Director could "unilaterally" wield executive authority. *Id.* at 225.

The Court found this arrangement a far cry from the "multimember body of experts" it previously approved. *Id.* at 216. But the NLRB matches that traditional profile. *See Hearing on S. 195 Before the S. Comm. on Educ. & Lab.*, 74th Cong. 64-65, 138 (1935) (Sen. La Follette) (division of power increases stability).

* * *

In sum, *Seila Law* held that *Humphrey's Executor* did not support the CFPB's unique structure. But the Supreme Court was explicit that "we do not revisit *Humphrey's Executor* or any other precedent." 591 U.S. at 228. And lower courts must "follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Mallory*, 600 U.S. at 136 (quotation marks omitted).

7

## II.    Established Practice Confirms the Validity of Multimember Independent Agencies.

"[T]raditional ways of conducting government … give meaning to the Constitution."  *Mistretta v. United States*, 488 U.S. 361, 401 (1989) (quotation marks omitted).  The Court therefore "put[s] significant weight upon historical practice" in separation-of-powers cases, *Zivotofsky*, 576 U.S. at 23 (quotation marks omitted), "even when the nature or longevity of that practice is subject to dispute, and even when that practice began after the founding era," *Noel Canning*, 573 U.S. at 525.  Judges "must hesitate to upset the compromises and working arrangements that the elected branches of Government themselves have reached." *Id.* at 526.

Congress began assigning authority to independent multimember agencies nearly 150 years ago with the Interstate Commerce Commission (ICC).  *See* 24 Stat. at 383.  The ICC had authority over the railroad industry, including the power to issue cease-and-desist orders, require payment of reparations, and enforce its orders in court.  *See id.* at 383-87.  By 1906, it could promulgate regulations.  *See* Act of June 29, 1906, ch. 3591, § 4, 34 Stat. 584, 589.

In the early twentieth century, "a multitude of new agencies," including the Federal Reserve Board, "were established using the ICC as their prototype." Marshall J. Breger & Gary J. Edles, *Established by Practice: The Theory and Operation of Independent Federal Agencies*, 52 Admin. L. Rev. 1111, 1116 & n.14

8

(2000).  For generations, these agencies have wielded executive power.  For instance, at the time of *Humphrey's Executor*, the FTC could adjudicate charges against private parties in administrative hearings, issue cease-and-desist orders, and enforce those orders in court.  *See Humphrey's Ex'r v. United States*, 295 U.S. 602, 620 (1935); *see also* An Act to Create a Federal Trade Commission, ch. 311, § 5, 38 Stat. 717, 719-20 (1914).  Although the Supreme Court initially conceived of these powers as "quasi-legislative or quasi-judicial," rather than executive, *Seila Law*, 591 U.S. at 216 & n.2 (quotation marks omitted), it now recognizes that enforcement, adjudication, and rulemaking are "exercises of … the 'executive Power,'" *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013).  Thus, beginning with *Humphrey's Executor*, the Supreme Court has consistently upheld removal protections for multimember agencies with powers that "at the present time" are "considered executive."  *Morrison v. Olson*, 487 U.S. 654, 689 n.28 (1988) (quotation marks omitted).

In *Free Enterprise* and *Seila Law*, the Court confirmed the validity of removal protections for multimember bodies.  Article II was satisfied when the members of the Public Company Accounting Oversight Board were shielded from removal by "a single level of good-cause tenure," making them adequately "subject … to Presidential oversight."  *Free Enter. Fund*, 561 U.S. at 509.  And the Court said Congress could cure the CFPB's constitutional defect while preserving

removal limits by "converting [it] into a multimember agency." *Seila Law*, 591 U.S. at 237.

Thus, for nearly a century, an unbroken line of decisions has approved a governmental structure pioneered another half-century earlier. Congress has relied on this precedent to create "some two-dozen multimember independent agencies" with for-cause removal protections. *Id.* at 230. This "practical exposition" of the Constitution is, by now, "too strong and obstinate to be shaken." *Stuart v. Laird*, 5 U.S. 299, 309 (1803).

## III.    Constitutional Text and History Underscore the Legitimacy of Multimember Independent Agencies.

The Constitution's original meaning also supports Congress's authority to temper the President's exercise of removal authority.

At the Founding, removal authority was not "an inherent attribute of the 'executive power' as it was understood in England," where Parliament "exercised significant control over the tenure of officers appointed to execute the laws, including officers appointed by the King." Daniel D. Birk, *Interrogating the Historical Basis for a Unitary Executive*, 73 Stan. L. Rev. 175, 182, 220 (2021).

The Constitution "is silent with respect to the power of removal." *Hennen*, 38 U.S. at 258. Presidential removal authority was not discussed at the Constitutional Convention, though both Alexander Hamilton and James Madison soon after asserted that Congress could regulate the removal of officers. *See The*

10

*Federalist No. 77*, at 459 (Hamilton) (Clinton Rossiter ed., 1961); *The Federalist No. 39*, at 242 (Madison) (Clinton Rossiter ed., 1961).

The Framers rejected a plan to specify in the Constitution that certain department heads would serve "during pleasure." 2 *Records of the Federal Convention of 1787*, at 335-36 (Max Farrand ed., 1911). Instead, the text empowers Congress to shape the federal government, U.S. Const. art. II, § 2, and to enact laws necessary and proper "for carrying into Execution … *all … Powers*" of the government, U.S. Const. art. I, § 8, cl. 18 (emphasis added)—without referencing presidential removal.

Because of the Constitution's silence on removal, the question came to the fore in the "Decision of 1789," when Congress established the Foreign Affairs Secretary. Disagreement arose about whether the President could remove the new Secretary from office. *See* David P. Currie, *The Constitution in Congress: The First Congress and the Structure of Government, 1789–1791*, 2 U. Chi. L. Sch. Roundtable 161, 196-201 (1995). Views differed about whether the Constitution gave inherent removal power to the President, the Senate, both, or neither. *Id.*; *see Hennen*, 38 U.S. at 233. The final legislation allowed the President to remove the Secretary, without specifying whether this power was statutory or constitutional. *See* Act of July 27, 1789, ch. 4, § 2, 1 Stat. 28, 29.

Despite its ambiguities, the Decision of 1789 was taken as establishing that "the constitution vested the power of removal in the President alone," rather than jointly with the Senate.  1 Annals of Cong. 398 (1789) (Rep. Vining).  Whether Congress could limit the President's removal authority was not addressed, Saikrishna Prakash, *New Light on the Decision of 1789*, 91 Cornell L. Rev. 1021, 1072 (2006), nor whether the President would enjoy that power when the "nature of th[e] office differed" from the positions being debated, 1 Annals of Cong. 636-38 (1789) (Rep. Madison) (proposing that different rules could apply to an office that was "of a judiciary quality as well as executive").

Subsequently, removal authority "was not regarded … as embracing officers with fixed term[s]," except perhaps for certain officers who exercised inherent presidential authority.  Edward S. Corwin, *Tenure of Office and the Removal Power Under the Constitution*, 27 Colum. L. Rev. 353, 379 (1927).  In *Marbury v. Madison*, for example, the Court observed that Congress could make certain officers "not removable at the will of the executive."  5 U.S. 137, 162 (1803).  In the nineteenth century, Congress began limiting presidential removal, *e.g.*, Act of Feb. 25, 1863, ch. 58, § 1, 12 Stat. 665, 665-66, without any serious constitutional objections.  *E.g.*, *Parsons v. United States*, 167 U.S. 324, 334 (1897).

Constitutional text and history, therefore, do not support Appellants' assertion that good-cause tenure for NLRB Members violates Article II.

## CONCLUSION

For the foregoing reasons, this Court should deny Appellants' motion.

Respectfully submitted,

*/s/ Brianne J. Gorod*
Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Brian R. Frazelle (DC Bar No. 1014116)
Smita Ghosh (DC Bar No. 1767180)
Margaret Hassel (DC Bar No. 90029057)
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

Dated: March 11, 2025

13

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 2,597 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

Executed this 11th day of March, 2025.


/s/ Brianne J. Gorod
Brianne J. Gorod

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of March, 2025, I electronically filed the foregoing document using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

Dated: March 11, 2025

/s/ Brianne J. Gorod
Brianne J. Gorod