No. 25-5057

# IN THE UNITED STATES COURT OF APPEALS
# FOR DISTRICT OF COLUMBIA

_____

GWYNNE WILCOX,
*Plaintiff-Appellee,*
v.
DONALD TRUMP, IN HIS OFFICIAL CAPACITY, ET AL.,
*Defendants-Appellants.*

_____

*On Appeal from the Judgment of the United States District Court for the District of Columbia (1:25-cv-334-BAH)*

---

## Amicus Curiae Brief of the State of Tennessee in Support of Defendants' Emergency Motion for Stay Pending Appeal

---

JONATHAN SKRMETTI
  *Attorney General*
WHITNEY HERMANDORFER
  *Director of Strategic Litigation*
JOSEPH M. FIORILE
  *Strategic Litigation Fellow*
Office of Tennessee Attorney General
P.O. Box 20207
Nashville, TN 37202
(615) 741-7403
Whitney.Hermandorfer@ag.tn.gov
Joseph.Fiorile@ag.tn.gov

*Counsel for the State of Tennessee*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), undersigned counsel certifies the following:

### Parties, Intervenors, and Amici

All parties, intervenors, and amici appearing before the district court and in this Court are listed in Appellants' stay application, except the State of Tennessee as *amicus* before this Court.

### Rulings Under Review

References to the rulings at issue appear in Appellants' stay application.

### Related Cases

All related cases appear in Appellants' stay application.

*/s/ Whitney Hermandorfer*

WHITNEY HERMANDORFER
(DC Bar #888314222)

# TABLE OF CONTENTS

INTRODUCTION AND INTERESTS OF AMICUS CURIAE ................ 1

ARGUMENT ....................................................................... 4

  I.  Article II requires plenary presidential supervision
of subordinate executive officials. ................................... 4

  II.  For-cause removal protections for the Board and
like agencies violate Article II. ...................................... 9

CONCLUSION ..................................................................... 13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Boyd v. United States,*
116 U.S. 616 (1886) ................................................................ 7

*City of Arlington v. FCC,*
569 U.S. 290 (2013) ........................................................ 2, 5, 10

*Cochran v. SEC,*
20 F.4th 194 (5th Cir. 2021) ................................................ 2

*Collins v. Yellen,*
594 U.S. 220 (2021) ...................................................... 3, 11, 12

*Dellinger v. Bessent,*
No. 25-5052 (D.C. Cir.) ..................................................... 12

*Free Enterprise Fund v. PCAOB,*
561 U.S. 477 (2010) ...................................................... 8, 10

*Garcia v. San Antonio Metro. Transit Auth.,*
469 U.S. 528 (1985) ........................................................ 1, 2

*Ex parte Grossman,*
267 U.S. 87 (1925) .............................................................. 7

*Humphrey's Executor v. United States,*
295 U.S. 602 (1935) ....................................................... 9, 10

*Jarkesy v. SEC,*
34 F.4th 446 (5th Cir. 2022) ............................................ 12

*Morrison v. Olson,*
487 U.S. 654 (1988) ............................................................ 4

*Myers v. United States,*
272 U.S. 52 (1926) ....................................................... 4, 7, 9

*Schick v. United States,*
   195 U.S. 65 (1904) ............................................................. 7

*Seila Law LLC v. CFPB,*
   591 U.S. 197 (2020) ........................................ 1, 2, 8, 10, 11

*Trump v. United States,*
   603 U.S. 593 (2024) .................................................... 7, 11

*United States v. Arthrex, Inc.,*
   594 U.S. 1 (2021) ............................................................. 4

*VHS Acquisition Subsidiary No. 7 v. NLRB,*
   No. 1:24-cv-02577, 2024 WL 5056358
   (D.D.C. Dec. 10, 2024) ..................................................... 5

## Constitution, Statutes, and Rules

U.S. Const.
   art. II, § 1 .................................................... 1, 4, 7
   art. II, § 2 ........................................................... 8

29 U.S.C. § 153(a) ................................................... 2

Federal Rules of Appellate Procedure
   29(a)(5) ............................................................ 14
   32(a)(5)-(6) ....................................................... 14

## Other Authorities

Aditya Bamzai & Saikrishna Prakash, *The Executive Power
   of Removal*, 136 Harv. L. Rev. 1756 (2023) ..................... 5, 8

Avalon Zoppo, *'Unfettered Removal Power'? Judge Presses
   Lawyers on Trump's Firing of NLRB Member*,
   National Law Journal (Mar. 5, 2023 5:30 pm) ..................... 6

*The Federalist Papers* (Clinton Rossiter ed., 1961)
   No. 70 .............................................................. 1
   No. 78 .............................................................. 4

Michael W. McConnell,
    *The President Who Would Not Be King* (2020)....................................5

# INTRODUCTION AND INTERESTS OF AMICUS CURIAE

The Constitution's enduring genius lies in its structural choice to separate the legislative, executive, and judicial powers and place each in its own branch. Article II, for its part, vests the "executive Power" in a single, nationally elected president able to act with "energy" and "dispatch." *The Federalist* No. 70, at 424 (Alexander Hamilton) (Clinton Rossiter ed., 1961). Part and parcel of the President's law-execution duty is the power to supervise those within Article II's chain-of-command.

The Framers' careful form had vital functions. They "deemed an energetic executive essential to 'the protection of the community against foreign attacks,' 'the steady administration of the laws,' 'the protection of property,' and 'the security of liberty.'" *Seila Law LLC v. CFPB*, 591 U.S. 197, 223-24 (2020) (quoting *The Federalist* No. 70, at 471 (Alexander Hamilton)). So too, the broader "structure of the Federal Government," which "gave the States a role" in selecting both the Executive and Legislative branches, "was designed in large part to protect the States from overreaching by Congress." *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 550-51 (1985). Limits on congressional overstepping were thus a feature of a new republic that "viewed the legislative power

1

as a special threat to individual liberty"—not a bug Congress could beat by licensing backdoor encroachment on the Chief Executive by a bureaucratic Fourth Branch. *Seila Law*, 591 U.S. at 223.

Yet the National Labor Relations Board, as an independent agency, comprises principal officers removable only "upon notice and hearing, for neglect of duty or malfeasance in office, but for no other cause." 29 U.S.C. § 153(a). This is by design. Independent agencies reflect a desire to "ditch the Founders' tripartite system and their checks and balances for a 'more efficient separation of politics and administration.'" *Cochran v. SEC*, 20 F.4th 194, 218 (5th Cir. 2021) (Oldham, J., concurring) (citation omitted). Among the collateral damage? States, which lack political power to affect independent agencies when they short-circuit the bicameral lawmaking process and the elected President. *Cf. Garcia*, 469 U.S. at 550-51.

Tennessee files this amicus curiae brief in support of Defendants' ability to align the Executive Branch with Article II first principles. In a range of areas, the "headless fourth branch of government" spearheaded by independent agencies has hamstrung States like Tennessee with regulations no democratically elected actor has adopted. *See City of*

*Arlington v. FCC*, 569 U.S. 290, 314 (2013) (Roberts, C.J., dissenting) (citation omitted). That dynamic traces back to the 1935 decision in *Humphrey's Executor*, which carved out an aberrant exception from the constitutional rule of presidential supervision of executive officials.

Whatever *Humphrey's* reasoning used to be worth, subsequent Supreme Court cases have repudiated it. Instead, the requirement of at-will removal applies "*whenever* an agency does important work" of the Executive Branch, regardless of its "size or role." *Collins v. Yellen*, 594 U.S. 220, 252 (2021) (emphasis added). That describes the Board to a T: It claims power to promulgate rules regulating employment and prosecute private parties through its own in-house adjudicative system and in courts. So whether because *Humphrey's* is wrong or just inapplicable, the Board's for-cause removal restrictions violate Article II. A stay should issue.

**ARGUMENT**

## I. Article II requires plenary presidential supervision of subordinate executive officials.

**A.** Our system of government contemplates three powers held by federal officials. The legislative power "prescribes the rules" of the community. *The Federalist* No. 78, at 465 (Alexander Hamilton) (Clinton Rossiter ed., 1961). The executive power is the "sword of the community." *Id.* And the judicial power, "declare[s] the sense of the law." *Id.* at 469. The Framers "viewed the principle of separation of" those powers as "the absolutely central guarantee of a just Government." *Morrison v. Olson*, 487 U.S. 654, 697 (1988) (Scalia, J., dissenting).

Article II, at issue here, directs that "[t]he executive Power shall be vested in a President of the United States." U.S. Const. art. II, § 1. Yet the Framers understood that, as a practical matter, "the President alone and unaided could not execute the laws." *Myers v. United States*, 272 U.S. 52, 117 (1926). So the Constitution contemplates that the President will enjoy "the assistance of subordinates" selected through required appointment processes. *Id.* Such subordinate officials include the heads of administrative agencies, who, having no superior other than the President, are principal officers. *See United States v. Arthrex, Inc.*, 594

U.S. 1, 12-13 (2021). And given "our constitutional structure," the activities of officials Wilcox and other Board members "*must be* exercises" of "the 'executive Power.'" *City of Arlington*, 569 U.S. at 304 n.4 (quoting U.S. Const. art. II, § 1).

As Tennessee's *amicus* brief explained below, centuries of Anglo-American legal history support that the "executive power" includes plenary authority to remove subordinate executive officials. *See VHS Acquisition Subsidiary No. 7 v. NLRB*, No. 1:24-cv-02577, 2024 WL 5056358, at *3-4 (D.D.C. Dec. 10, 2024) (collecting historical examples); Michael W. McConnell, *The President Who Would Not Be King* 162 (2020) ("The king had the prerogative power to remove" executive officers "at will."). To be sure, scholarship of "Disunitarians" has sought to dispute this history. Aditya Bamzai & Saikrishna Prakash, *The Executive Power of Removal*, 136 Harv. L. Rev. 1756, 1761 (2023); *cf.* Mem. Op., Dkt. 35, at 1 n.1 (collecting sources). But best read, "early endorsements, declarations, and exercises"—from "James Madison, George Washington, Thomas Jefferson, Alexander Hamilton, and … many others"—evince that "the Constitution grant[s] Presidents the power to remove executive officers at pleasure." Bamzai & Prakash, *supra*, at 1761.

**B.** The district court trained fire on *amicus* Tennessee and its historical arguments about the removal power. At the preliminary-injunction hearing, the district court reportedly questioned why Tennessee "went way back to the monarch," continuing, "it just made me wonder: Is the tradition of the British king, with unfettered removal power … Is that the model? … Maybe Tennessee is recommending it for us Americans. But is that the model?" Avalon Zoppo, *'Unfettered Removal Power'? Judge Presses Lawyers on Trump's Firing of NLRB Member*, National Law Journal (Mar. 5, 2023 5:30 pm), https://perma.cc/4GSL-XRU7. Again in its opinion, the district court dismissed Tennessee's discussion of the executive power in Britain as having "little purchase" in a system that repudiated the "British monarchy." *See* Mem. Op., Dkt. 35, at 4 n.5.

But Tennessee is no would-be Royalist. Its point below, instead, was that the political concept of "executive power" preexisted the Constitution. Those in the Founding Era thus would have shared some common understanding about the contours of the "executive power" when they vested that power in the President via Article II. And as with other

constitutional terms,[1] that pre-existing understanding of "executive power" in turn reflected drafters and ratifiers' prior experience with the British system. *See, e.g., Myers*, 272 U.S. at 118 ("In the British system, the crown, which was the executive, had the power of appointment and removal of executive officers, and it was natural, therefore, for those who framed our Constitution to regard the words 'executive power' as including both."). Tennessee's taking stock of that shared, pre-Founding understanding of "executive power" reflects mainstream interpretive methods—not "autocracy" apologism. Mem. Op., Dkt. 35, at 36.

It proves nothing that "[a]s a textual matter, the Constitution is silent as to removals." Mem. Op., Dkt. 35, at 11. Article II's Vesting Clause, by referencing the "executive Power," entails a correspondent grant of removal authority. Silence on removal, then, if anything indicates the Constitution does not limit that authority. *See Trump v.*

---

[1] *Cf., e.g., Ex parte Grossman*, 267 U.S. 87, 110 (1925) (interpreting pardon power in light of how it "had been exercised by the king, as chief executive," at "the time of our separation from Great Britain" ); *Schick v. United States*, 195 U.S. 65, 69-70 (1904) (using Blackstone's definition of "crimes" to inform analysis of the Sixth Amendment and concluding that misdemeanors are not "crimes"); *Boyd v. United States*, 116 U.S. 616, 628 (1886) (quoting English common law for the proposition that visual surveillance is not a "search" under the Fourth Amendment because "the eye cannot by the laws of England be guilty of trespass").

*United States*, 603 U.S. 593, 608 (2024) (describing the removal power as "the President's … constitutional power[]"); *cf.* U.S. Const. art. II, § 2 (limiting appointment power "by and with the Advice and Consent of the Senate").  And Congress "lacks the generic power to modify the Constitution's separation of powers."  Bamzai & Prakash, *supra*, at 1791.

The district court nonetheless gauged any default-removal rule as granting too much power to the President.  Mem. Op., Dkt. 35, at 35-36.  To be sure, some Supreme Court Justices have echoed that critique in recent Article II cases.  They've tended to be in dissent.  *See, e.g.*, *Seila Law*, 591 U.S. at 267 (Kagan, J., concurring in part and dissenting part) ("the President, needless to say, wasn't supposed to be a king").  A different take on Article II emerges from the majorities:  "The Framers did not rest our liberties on such bureaucratic minutiae" as "whether particular *unelected* officials support or 'resist' the President's policies." *Free Enterprise Fund v. PCAOB*, 561 U.S. 477, 499-500 (2010) (quoting *id.* at 526 (Breyer, J., dissenting)).  Just so here.

## II. For-cause removal protections for the Board and like agencies violate Article II.

Surveying the Constitution's text, structure, and history, the Supreme Court in *Myers* held that Article II "grants to the President" the power of "removal of executive officers." 272 U.S. at 163-64. *Myers*'s detailed analysis of the President's power to remove executive officials soon met motivated opposition in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935). But that case was wrongly decided. And its reasoning does not extend to the Board regardless.

*Humphrey's* examined the Federal Trade Commission Act, which limited the President's removal of FTC commissioners to cases of "inefficiency, neglect of duty, or malfeasance in office." *Id.* at 619. In a short opinion, the Supreme Court upheld the FTC's removal restrictions against a constitutional challenge.

The *Humphrey's* Court rested its reasoning on an assessment that "the duties" of the commission at issue were "neither political nor executive, but predominantly quasi judicial and quasi legislative." *Id.* at 624. In so holding, the Court described the FTC as "an administrative body created by Congress to carry into effect legislative policies embodied in the statute and in accordance with the legislative standard therein

prescribed, and to perform other specified duties as a legislative or as a judicial aid." *Id.* at 628.

*Humphrey's* branch-busting reasoning was wrong the day it was rendered. To "carry into effect legislative policies" and "perform other specified duties" is, by definition, to *execute* a law. *See supra* Section I.A. Executive agency officials wield the executive power, even when doing things that look like legislating and adjudicating. *See City of Arlington*, 569 U.S. at 304 n.4. *Humphrey's*, then, thwarts our constitutional structure.

Given its flaws, it is no surprise that subsequent cases have narrowed *Humphrey's* nearly out of existence:

- *Free Enterprise Fund* exhaustively detailed Article II's design to permit agencies to be "fully accountable" to the President for their conduct. Applying that rule, the Court held that the Public Company Accounting Oversight Board's "dual for-cause limitations on the removal of Board members contravene the Constitution's separation of powers." 561 U.S. at 492.

- *City of Arlington* acknowledged that *all* agency activities are exercises of the executive power—contra *Humphrey's* quasi-legislative, quasi-judicial conception of FTC. 569 U.S. at 304 n.4.

- *Seila Law* cabined *Humphrey's Executor* to allowing "for-cause removal protections to a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and [are] said not to exercise any executive power." 591 U.S. at 216. *Seila Law* noted that, even under *Humphrey's*

*Executor*, a multimember agency that "wield[s] substantial executive power" violates Article II. *Seila Law*, 591 U.S. at 218.

- In *Collins v. Yellen*, the Court held that the "Recovery Act's for-cause restriction on the President's removal authority violates the separation of powers." 594 U.S. at 250. The Recovery Act created the Federal Housing Finance Agency, "led by a single Director" removable "by the President 'for cause.'" *Id.* at 229 (citation omitted). The "FHFA clearly exercises executive power," so even "'modest restrictions' on the President's power to remove the head of an agency with a single top officer" violates the Constitution. *Id.* at 254, 256 (citation omitted). And that rule of at-will removal applies "whenever an agency does important work." *Id.* at 252.

Most recently, in last term's *Trump v. United States* decision, the Supreme Court noted that the "removal" of certain federal officers "implicates 'conclusive and preclusive' Presidential authority." 603 U.S. at 620-21. A President's exclusive power that "stem[s] … from the Constitution itself" is "conclusive and preclusive." *See id.* at 607 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952); *id.* at 638 (Jackson, J., concurring)). That includes "the President's 'unrestricted power of removal' with respect to 'executive officers of the United States whom he has appointed.'" *Id.* at 609 (quoting *Myers*, 272 U.S. at 106). The Court stated "Congress cannot act on, and courts cannot examine, the President's actions on subjects within his 'conclusive and preclusive' constitutional authority." *Id.* at 609.

All in, the Supreme Court's recent instructions leave at most a 1930s-FTC-specific exception to the general rule of at-will presidential removal. For those modern-day agencies exercising executive power, Article II prohibits statutes that purport to limit the President's ability to dismiss agency heads. *See, e.g.*, *Jarkesy v. SEC*, 34 F.4th 446, 464 n.19 (5th Cir. 2022) (discussing the interaction between *City of Arlington* and *Seila Law*), *aff'd on other grounds* 603 U.S. 109 (2024).

The district court nonetheless opted to rest on *Humphrey's* thin reed. Mem. Op., Dkt. 35, at 16. But under governing precedent, if the Board "does important work," *Collins*, 594 U.S. at 252, its heads must be removable by the President at will. And Defendants have demonstrated that the Board exercises significant executive authority over the Nation's employers. Br. at 10-11. The Board's members are thus removable at will, with no need to "weigh the relative importance of the regulatory and enforcement authority" of the Board versus that of "disparate agencies." Order & Op. 3, *Dellinger v. Bessent*, No. 25-5052 (D.C. Cir. Mar. 10, 2025) (quoting *Collins*, 594 U.S. at 253).

# CONCLUSION

This Court should stay the district court's ruling pending appeal.

JONATHAN SKRMETTI
Tennessee Attorney General
& Reporter
*/s/ Whitney D. Hermandorfer*
WHITNEY D. HERMANDORFER
(DC Bar #888314222)
  Director of Strategic Litigation
JOSEPH M. FIORILE
  Strategic Litigation Fellow
Office of the Tennessee Attorney
General and Reporter
P.O. Box 20207
Nashville, TN 37202-0207
(615) 741-3491
whitney.hermandorfer@ag.tn.gov
joseph.fiorile@ag.tn.gov

# CERTIFICATE OF COMPLIANCE

This *amicus* brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 2,383 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Century Schoolbook, a proportionally spaced typeface.

/s/ Whitney Hermandorfer

WHITNEY HERMANDORFER
(DC Bar #888314222)

**CERTIFICATE OF SERVICE**

I certify that on March 11, 2025, I caused this document to be electronically filed with the Clerk of the Court using this Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

/s/ *Whitney Hermandorfer*
WHITNEY HERMANDORFER
(DC Bar #888314222)