# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

GWYNNE A. WILCOX,

Plaintiff-Appellee,

v.

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS
PRESIDENT OF THE UNITED STATES, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Columbia (No. 25-cv-334)
The Honorable Judge Beryl A. Howell

## BRIEF OF AMICI CURIAE MINNESOTA, ILLINOIS, ARIZONA, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, MARYLAND, MASSACHUSETTS, MICHIGAN, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, OREGON, RHODE ISLAND, VERMONT, WASHINGTON, AND WISCONSIN IN SUPPORT OF PLAINTIFF-APPELLEE AND IN OPPOSITION TO DEFENDANTS' MOTION FOR STAY PENDING APPEAL

KEITH ELLISON
Attorney General
State of Minnesota

LIZ KRAMER
Solicitor General
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101
(651) 757-1010
liz.kramer@ag.state.mn.us

KWAME RAOUL
Attorney General
State of Illinois

JANE ELINOR NOTZ
Solicitor General
ALEX HEMMER
Deputy Solicitor General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-5526
alex.hemmer@ilag.gov

*(Additional counsel on signature page)*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to this Court's Rule 28(a)(1), I hereby certify that:

## A.    Parties and Amici

Except for the following, all parties, intervenors, and amici that appeared before the district court or are appearing before this Court are identified in defendants' stay application:  Amici States Minnesota, Illinois, Arizona, California, Colorado, Connecticut, Delaware, District of Columbia, Hawaii, Maryland, Massachusetts, Michigan, Nevada, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, Washington, and Wisconsin.

## B.    Rulings Under Review

References to the rulings at issue appear in the stay application.

## C.    Related Cases

We are not aware of any related cases within the meaning of this Court's Rule 28(a)(1)(C).

/s/ Alex Hemmer
ALEX HEMMER

March 12, 2025

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES . i

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION AND  IDENTITY AND INTEREST OF AMICI
    STATES .............................................................................................1

ARGUMENT .............................................................................................2

    The Stay Motion Should Be Denied. ...............................................2

    A.    The Board provides critical support for American workers
          and the economy.......................................................................3

    B.    States need an effective NLRB to regulate labor relations
          and adjudicate labor disputes..................................................5

    C.    Invalidating the NLRA's removal protection would
          needlessly destabilize federal labor law.................................8

CONCLUSION ..........................................................................................12

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Amalgamated Ass'n of St., Elec. Ry. And Motor Coach Emp. Of America v. Lockridge*, 403 U.S. 274 (1971) ........................................... 6

*Barbieri v. United Techs. Corp.*,
771 A.2d 915 (Conn. 2001) .................................................... 7

*Glacier Northwest, Inc. v. Int'l Brotherhood of Teamsters Local Union No. 174*, 598 U.S. 771 (2023) ................................................. 9

*Humphrey's Ex'r v. United States*,
295 U.S. 602 (1935) .................................................... 10, 12

*Midwest Motor Exp., Inc. v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Local 120*, 512 N.W.2d 881 (Minn. 1994) ................................................................. 7

*New Process Steel, L.P. v. NLRB*,
560 U.S. 674 (2010) ............................................................. 9

*Nken v. Holder*,
556 U.S. 418 (2009) ........................................................... 2

*Rieth-Riley Constr. Co. v. NLRB*,
114 F.4th 519 (6th Cir. 2024) ............................................. 11

*San Diego Building Trades Council v. Garmon*,
359 U.S. 236 (1959) ............................................................. 6

*Sears, Roebuck & Co. v. San Diego Cnty. Dist. Council of Carpenters*,
436 U.S. 180 (1978) ............................................................. 3

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
591 U.S. 197 (2020) ...................................................... 10, 11

# CONSTITUTIONAL, STATUTORY, AND REGULATORY PROVISIONS

U.S. Const. art. II, § 3 .................................................................. 11

29 U.S.C.
   § 151 ................................................................................. 3, 5, 9
   § 153 ..................................................................... 9, 10, 11, 12
   § 156 ........................................................................................ 6
   § 157 ........................................................................................ 7
   § 158 ........................................................................................ 8
   § 160 ........................................................................................ 9

29 C.F.R. § 101.12 ........................................................................ 9

# OTHER AUTHORITIES

Feiveson, Laura, *Labor Unions and the U.S. Economy*, U.S. Dep't of the Treasury (Aug. 28, 2023), https://home.treasury.gov/news/featured-stories/laborunions-and-the-us-economy ............................. 4

Gittleman, Maury & Morris M. Kleiner, *Wage Effects of Unionization and Occupational Licensing Coverage in the United States*, 69 ILR Rev. 142 (2016) .................................................................... 5

Hourahan, Walter, *Collective Bargaining*, *in* 1 *Historical Encyclopedia of American Labor Law* 92 (Robert E. Weir & James P. Hanlan eds., 2004) ............................................................................................ 5

*Investigate Charges*, Nat'l Lab. Rel. Bd., https://www.nlrb.gov/about-nlrb/whatwe-do/investigate-charges (last visited Mar. 9, 2025) ...................................................................................................... 8

*The NLRB Process*, Nat'l Lab. Rel. Bd., https://www.nlrb.gov/resources/nlrbprocess (last visited Mar. 9, 2025) ................................. 8

U.S. Dep't of the Treasury, *Labor Unions and the Middle Class* (August 2023), https://home.treasury.gov/system/files/136/Labor-Unions-And-The-MiddleClass.pdf .............................................................................. 4

Whole Foods Market Group, Inc.'s Objections to Conduct Affecting the Results of Election, *Whole Foods Market Group, Inc.*, No. 04-RC-355267 (N.L.R.B. Feb. 3, 2025) .......................................................... 10

## INTRODUCTION AND
## IDENTITY AND INTEREST OF AMICI STATES

The amici States of Minnesota, Illinois, Arizona, California, Colorado, Connecticut, Delaware, District of Columbia, Hawaii, Maryland, Massachusetts, Michigan, Nevada, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, Washington, and Wisconsin (collectively, "amici States") submit this brief in support of Plaintiff-Appellee Gwynne A. Wilcox.

For 90 years the National Labor Relations Act ("NLRA" or "the Act") has strengthened the American economy—and supported workers and employers alike—by enabling workers to join together to negotiate for higher wages, better health and retirement benefits, and improved working conditions. The National Labor Relations Board ("NLRB" or "the Board") is the independent federal agency charged with administering and enforcing the NLRA, and it plays an integral part in safeguarding the ability of everyday Americans to advance their workplace interests through collective action. Defendants' unlawful removal of Wilcox from the Board not only immediately prevents it from performing several of its most important functions but also contravenes

the legal protections intended to preserve the Board's independence and legitimacy in the long term.

Amici States have a unique interest in a fully functional and independent NLRB. The States have a powerful interest in having a well-functioning labor relations system for their workers, union and nonunion alike. And because the NLRA vests the Board with a wide range of oversight authority over federal labor law, the absence of a functioning Board could create a regulatory vacuum that would harm workers in amici States. The States thus have a powerful stake in ensuring that federal labor laws remain effective. Defendants' stay motion would imperil that interest by disrupting the status quo and rendering the Board inoperative, diminishing its ability to support amici States' workers and employers alike.

## ARGUMENT

### The Stay Motion Should Be Denied.

As Wilcox explains, Opp. 8-19, defendants' stay motion should be denied because they are highly unlikely to prevail on the merits, among other reasons. *See Nken v. Holder*, 556 U.S. 418, 526 (2009). Amici States agree with those arguments and write to emphasize the ways in

which the balance of equities and public interest tilt strongly against entry of a stay pending appeal.

## A.     The Board provides critical support for American workers and the economy.

For almost a century, the Board has aided workers and the economy by protecting workers' collective-bargaining rights.  In enacting the NLRA, and creating the Board to administer it, "Congress expressly recognized that collective organization of segments of the labor force into bargaining units capable of exercising economic power comparable to that possessed by employers may produce benefits for the entire economy in the form of higher wages, job security, and improved working conditions."  *Sears, Roebuck & Co. v. San Diego Cnty. Dist. Council of Carpenters*, 436 U.S. 180, 190 (1978); *see* 29 U.S.C. § 151.

Studies confirm that, as Congress predicted, the unionization facilitated by the Act improves wages, benefits, and working conditions for American workers and, indeed, the American economy more broadly.  Unionization and collective bargaining have been central to improving the economies of amici States and the welfare of their workforces.  The evidence shows that unionized workers generally earn higher wages than non-unionized workers.  According to the Treasury Department,

union members make approximately 10 to 15 precent more than their non-member peers, with larger wage benefits for longer-tenured union workers.[1]  Union workers are also generally offered more non-wage benefits than are non-members, including better retirement benefits, health and life insurance, and paid leave.[2]  Indeed, more than 90 percent of union workers are offered sick leave, compared to 77 percent of non-union workers.[3]  And studies show that unionized workplaces generally have better systems for addressing employee grievances, stronger protections for more senior employees, and better workplace safety practices.[4]

But the benefits secured by the Act extend beyond unionized workplaces to the economy as a whole.  By providing an accessible administrative forum for labor disputes, the NLRB has reduced the "industrial strife and unrest" that can disrupt "the free flow of

---

[1]  Laura Feiveson, *Labor Unions and the U.S. Economy*, U.S. Dep't of the Treasury (Aug. 28, 2023), https://home.treasury.gov/news/featured-stories/laborunions-and-the-us-economy.

[2]  *Id.*

[3]  U.S. Dep't of the Treasury, *Labor Unions and the Middle Class* 16-17 (August 2023), https://home.treasury.gov/system/files/136/Labor-Unions-And-The-MiddleClass.pdf.

[4]  *Id.* at 18.

commerce," 29 U.S.C. § 151, whether workers ultimately decide to unionize or not. *See* Walter Hourahan, *Collective Bargaining*, *in* 1 *Historical Encyclopedia of American Labor Law* 92, 93 (Robert E. Weir & James P. Hanlan eds., 2004) (crediting NLRA with increasing "stability" of labor-management relations). And all workers, not just those in unionized workplaces, benefit from the expansion of collective bargaining that the Act secures: By creating competition for workers, for instance, unions increase wages for nonmembers, too, as non-union employers follow suit to remain competitive in the labor market.[5] All of these benefits—for union and nonunion workers alike, as well as the States' economies more broadly—would be threatened by the indefinite incapacitation of the Board.

### B. States need an effective NLRB to regulate labor relations and adjudicate labor disputes.

Because the NLRA confers primary authority on the Board to regulate in the area of labor law and to adjudicate most federal labor

---

[5] *Id.* at 19; *see also, e.g.*, Maury Gittleman & Morris M. Kleiner, *Wage Effects of Unionization and Occupational Licensing Coverage in the United States*, 69 ILR Rev. 142, 145, 164 (2016).

disputes, amici States, their workers, and the businesses that operate within them would all suffer if the NLRB were rendered inoperative.

The NLRA grants the Board broad authority over the conduct of labor relations and preempts States from regulating in that area. The Supreme Court has held that, subject to certain exceptions, the Board maintains exclusive oversight over conduct that is even "arguably protected or prohibited" by the Act. *Amalgamated Ass'n of St., Elec. Ry. And Motor Coach Emp. Of America v. Lockridge*, 403 U.S. 274, 276 (1971) (citing *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959)); *see Glacier Northwest, Inc. v. Int'l Brotherhood of Teamsters Local Union No. 174*, 598 U.S. 771, 776 (2023) (noting that *Garmon* preemption "goes beyond the usual preemption rule").

In particular, the Court held that "[w]hen an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board." *Garmon*, 359 U.S. at 245. Those sections, which the Board is empowered to advance through its rulemaking authority, *see* 29 U.S.C. § 156, contain the heart of the NLRA's protections. For instance, section 7 guarantees employees "the right to self-organization, to form,

join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." *Id.* § 157. Section 8, in turn, bars employers from engaging in a host of unfair labor practices, including threatening workers for engaging in union activity or refusing to bargain with union representatives. *See id.* § 158(a). This principle can prevent States, including state courts, from regulating core labor areas that are within the exclusive province of the NLRB's rulemaking authority. *See, e.g.*, *Barbieri v. United Techs. Corp.*, 771 A.2d 915, 931 (Conn. 2001); *Midwest Motor Exp., Inc. v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Local 120*, 512 N.W.2d 881, 887 (Minn. 1994).[6]

Likewise, the NLRA confers broad and generally exclusive authority on the Board to adjudicate labor disputes. *See Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359, 574 (1998). Parties to labor disputes—employees, employers, and unions alike—file over

---

[6] Of course, absent a functioning Board, there might arise a serious question whether this exclusive authority would have preemptive effect on state regulatory authority over labor matters.

20,000 unfair labor practice charges each year.[7] Although many aspects of the NRLA's adjudicative system are handled by administrative law judges ("ALJs") and other agency officials, the Board itself retains responsibility for reviewing those officials' determinations on appeal.[8] Indeed, the Board itself reviews hundreds of cases each year, and over the last decade has issued nearly 3,000 decisions in cases presenting questions about unfair labor practices, elections, and representation. The NLRA likewise generally precludes the States from adjudicating claims that touch on these matters, *see supra* p. 6, and, as a result, the absence of a functioning Board would engender substantial uncertainty about the adjudication of labor disputes, to the detriment of amici States, their workers, and the businesses that employ them.

### C. Invalidating the NLRA's removal protection would needlessly destabilize federal labor law.

As discussed, *supra* pp. 3-5, the States and their workers, employers, and broader economies, depend on the Board in multiple ways, including that it fairly adjudicates critical labor disputes between

---

[7] *See Investigate Charges*, Nat'l Lab. Rel. Bd., https://www.nlrb.gov/about-nlrb/whatwe-do/investigate-charges (last visited Mar. 9, 2025).

[8] *See The NLRB Process*, Nat'l Lab. Rel. Bd., https://www.nlrb.gov/resources/nlrbprocess (last visited Mar. 9, 2025).

employees and employers and that it regulates to improve the lives of workers and bolster the national economy. Wilcox's putative removal threatens these interests.

By depriving the Board of a quorum, Wilcox's dismissal threatens to effectively nullify the NLRA's protections for the foreseeable future. Parties cannot sue to enforce the Act in federal or state court; instead, unfair-practice complaints must begin before the agency. *See* 29 U.S.C. § 160; *Glacier Nw.*, 598 U.S. at 776-77. And the Board cannot act without a quorum of at least three members, *see* 29 U.S.C. § 153; *see also New Process Steel, L.P. v. NLRB*, 560 U.S. 674, 680 (2010), which Wilcox's putative dismissal renders unavailable.[9] Defendants' unlawful attempt to remove Wilcox—and any stay of the judgment in her favor— would therefore seriously undermine the Act's protections, depriving workers, employers, and States of the benefits discussed above and creating "industrial strife and unrest." 29 U.S.C. § 151. Indeed, parties

---

[9] Although many NLRA administrative proceedings are heard by ALJs in the first instance, an ALJ's decision can become final without Board action only if no party appeals. *See* 29 U.S.C. § 160(c); 29 C.F.R. § 101.12. Thus, any party that allegedly violated the Act can attempt to forestall final agency action for as long as the Board lacks a quorum by appealing any adverse ALJ decision.

have already cited the lack of a quorum in challenging administrative proceedings under the NLRA.  Mere days after defendants purported to remove Wilcox from the Board, Whole Foods asserted in a pending enforcement proceedings that a regional official lacked statutory authority to certify the results of an election at one of its stores because of the absence of a quorum at the NLRB.[10]

Wilcox's unlawful dismissal affects not only the Board's current enforcement of federal labor laws, but also the long-term stability and legitimacy of the NLRB as a multi-member agency made up of experts. By limiting the permissible grounds for removal and giving Board members staggered five-year terms, *see* 29 U.S.C. § 153, Congress intended to create a stable body of labor law through an agency that would "accumulate technical expertise and avoid a 'complete change' in leadership 'at any one time.'"  *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 216 (2020) (quoting *Humphrey's Ex'r v. United States*, 295 U.S. 602, 624 (1935)).  Those provisions similarly reflect Congress's intent that the Board be "'non-partisan' and . . . 'act with

---

[10]  *See* Whole Foods Market Group, Inc.'s Objections to Conduct Affecting the Results of Election, *Whole Foods Market Group, Inc.*, No. 04-RC-355267 (N.L.R.B. Feb. 3, 2025).

entire impartiality'" in adjudicating cases, *id.* (quoting *Humphrey's Ex'r*, 295 U.S. at 624), a goal further advanced by the Board's tradition of partisan balance. Defendants' attempt to remove Wilcox—and their request to stay the judgment in her favor—would defeat these congressional purposes.

Fortunately, Article II does not require that result because, as Wilcox explains, the statutory removal protection for NLRB members is constitutional. That result makes good sense, since the Act leaves the President ample means to fulfill his constitutional obligation to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3; *see Seila Law*, 591 U.S. at 213. The President appoints the Board's members, designates its chairperson, and may remove members for cause. *See* 29 U.S.C. § 153(a). He also appoints—and may remove at will—the agency's general counsel, an official entrusted with the "final authority" over "investigation of charges and issuance of complaints." *See id.* § 153(d); *Rieth-Riley Constr. Co. v. NLRB*, 114 F.4th 519, 529-31 (6th Cir. 2024). This separate office, and the President's appointment and removal power over it, shows that the Board has less expansive independent powers than those wielded by the 1935 FTC, the agency

whose members' removal protection the Court upheld in *Humphrey's Executor*. While the FTC had "wide powers of investigation" and the ability to "issue . . . complaint[s]," *Humphrey's Ex'r*, 295 U.S. at 620-21, the NLRA gives "final authority . . . in respect of the investigation of charges and issuance of complaints" to a separate official who can be removed at will by the President, 29 U.S.C. § 153(d).

The NLRB plays a central role in adjudicating and regulating labor relations in our nation. Its stability, impartiality, and expertise are key to the wellbeing of both workers and employers in every state. Because the public interest and balance of the equities tip powerfully against staying the judgment below pending appeal, the Court should deny the motion for that relief.

## CONCLUSION

For these reasons, the Court should deny the motion to stay the judgment pending appeal.

Respectfully submitted,

KEITH ELLISON
Attorney General
District of Columbia

KWAME RAOUL
Attorney General
State of Illinois

LIZ KRAMER
Solicitor General

445 Minnesota Street, Ste. 600
St. Paul, Minnesota 55101
(651) 757-1010
liz.kramer@ag.state.mn.us

JANE ELINOR NOTZ
Solicitor General

/s/ Alex Hemmer
ALEX HEMMER
Deputy Solicitor General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-5526
alex.hemmer@ilag.gov

KRIS MAYES
*Attorney General*
*State of Arizona*
2005 N. Central Avenue
Phoenix, AZ 85004

ROB BONTA
*Attorney General*
*State of California*
1300 I Street
Sacramento, CA 95814

PHILIP J. WEISER
*Attorney General*
*State of Colorado*
1300 Broadway
Denver, CO 80203

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
820 N. French Street
Wilmington, DE 19801

BRIAN L. SCHWALB
*Attorney General*
*District of Columbia*
400 6th Street NW, Suite 8100
Washington, DC 20001

ANNE E. LOPEZ
*Attorney General*
*State of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

13

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of*
  *Massachusetts*
One Ashburton Place
Boston, MA 02108

AARON D. FORD
*Attorney General*
*State of Nevada*
100 North Carson Street
Carson City, NV 89701

RAÚL TORREZ
*Attorney General*
*State of New Mexico*
201 3rd Street NW
Albuquerque, NM 87109

DAN RAYFIELD
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, VT 05609

JOSHUA L. KAUL
*Attorney General*
*State of Wisconsin*
17 W. Main Street
Madison, WI 53703

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, MI 48909

MATTHEW J. PLATKIN
*Attorney General*
*State of New Jersey*
25 Market Street
Trenton, NJ 08625

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY 10005

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Maine Street
Providence, RI 02903

NICHOLAS W. BROWN
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

March 12, 2025

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitations set out in Federal Rule of Appellate Procedure 29 because it contains 2,260 words.  This brief complies with the typeface requirement of Rule 32(a)(5) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word.

/s/ Alex Hemmer
ALEX HEMMER

March 12, 2025

**CERTIFICATE OF SERVICE**

I hereby certify that on March 12, 2025, I electronically filed the foregoing Brief of Amici Curiae Minnesota et al. with the Clerk of the Court for the United States Court of Appeals for D.C. Circuit using the CM/ECF system.  I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


/s/ Alex Hemmer
ALEX HEMMER