## ORAL ARGUMENT SCHEDULED FOR MAY 16, 2025

### No. 25-5057

## IN THE UNITED STATES COURT OF APPEALS FOR DISTRICT OF COLUMBIA

———————

GWYNNE WILCOX,
*Plaintiff-Appellee,*

v.

DONALD TRUMP, IN HIS OFFICIAL CAPACITY, ET AL.,
*Defendants-Appellants.*

———————

*On Appeal from the Judgment of the United States District Court for the District of Columbia (1:25-cv-334-BAH)*

## Amicus Curiae Brief of the State of Tennessee in Support of Defendants-Appellants

JONATHAN SKRMETTI
  *Attorney General & Reporter*
WHITNEY HERMANDORFER
  *Director of Strategic Litigation*
JOSEPH M. FIORILE
  *Strategic Litigation Fellow*
Office of Tennessee Attorney General
P.O. Box 20207
Nashville, TN 37202
(615) 741-7403
Whitney.Hermandorfer@ag.tn.gov
Joseph.Fiorile@ag.tn.gov

*Counsel for the State of Tennessee*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), undersigned counsel certifies the following:

### Parties, Intervenors, and Amici

All parties, intervenors, and amici appearing before the district court and in this Court are listed in Appellants' Brief as filed on March 27, 2025.

### Rulings Under Review

References to the rulings at issue appear in Appellants' Brief.

### Related Cases

All related cases appear in Appellants' Brief.

/s/ Whitney Hermandorfer

WHITNEY HERMANDORFER
(DC Bar #888314222)

i

# TABLE OF CONTENTS

INTERESTS OF AMICUS CURIAE ........................................................1

INTRODUCTION ...............................................................................3

ARGUMENT .....................................................................................5

   I.   Article II requires plenary presidential supervision of
      subordinate executive officials.......................................................5

   II.   For-cause removal protections for the Board and like agencies
      violate Article II. ......................................................................10

   III. Shielding executive agencies from presidential supervision
      harms the States. ......................................................................14

CONCLUSION ................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bond v. United States,*
   564 U.S. 211 (2011) ......................................................................... 1

*Boyd v. United States,*
   116 U.S. 616 (1886) ........................................................................ 8

*Chamber of Com. of U.S. v. NLRB,*
   723 F. Supp. 3d 498 (E.D. Tex. 2024)............................................ 17

*City of Arlington v. FCC,*
   569 U.S. 290 (2013) ................................................................ 2, 6, 11

*Cochran v. SEC,*
   20 F.4th 194 (5th Cir. 2021) ........................................................... 2

*Collins v. Yellen,*
   594 U.S. 220 (2021) ........................................................ 4, 11, 12, 13

*DeCanas v. Bica,*
   424 U.S. 351 (1976) .................................................................. 16, 17

*Dellinger v. Bessent,*
   No. 25-5052 (D.C. Cir.) .................................................................. 13

*Free Enterprise Fund v. PCAOB,*
   561 U.S. 477 (2010) ........................................................ 9, 11, 16, 20

*Garcia v. San Antonio Metro. Transit Auth.,*
   469 U.S. 528 (1985) ..................................................................... 2, 3

*Gregory v. Ashcroft,*
   501 U.S. 452 (1991) ........................................................................ 14

*Ex parte Grossman,*
   267 U.S. 87 (1925) ........................................................................... 8

*Humphrey's Executor v. United States*,
    295 U.S. 602 (1935) ............................................................ 1, 4, 10, 11

*Jarkesy v. SEC*,
    34 F.4th 446 (5th Cir. 2022) .............................................................. 13

*Metro. Life Ins. Co. v. Massachusetts*,
    471 U.S. 724 (1985) ............................................................................ 16

*Morrison v. Olson*,
    487 U.S. 654 (1988) .............................................................................. 5

*Myers v. United States*,
    272 U.S. 52 (1926) ......................................................................... 8, 10

*NLRB v. Starbucks Corp.*,
    125 F.4th 78 (3d Cir. 2024) ............................................................... 17

*Retail Clerks Int'l Ass'n, Loc. 1625 v. Schermerhorn*,
    373 U.S. 746 (1963) ............................................................................ 16

*Schick v. United States*,
    195 U.S. 65 (1904) ................................................................................ 8

*Seila Law LLC v. CFPB*,
    591 U.S. 197 (2020) .................................................... 3, 4, 9, 10, 11, 12

*Thryv, Inc.*,
    372 NLRB No. 22, 2022 WL 17974951 (Dec. 13, 2022) ...................... 17

*Trump v. United States*,
    603 U.S. 593 (2024) ......................................................................... 9, 12

*United States v. Arthrex, Inc.*,
    594 U.S. 1 (2021) .................................................................................. 6

*VHS Acquisition Subsidiary No. 7 v. NLRB*,
    No. 1:24-cv-02577, 2024 WL 5056358
    (D.D.C. Dec. 10, 2024) ......................................................................... 6

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ............................................................................ 15

**Constitution, Statutes, and Rules**

U.S. Const.
    art. II, § 1.................................................................................. 1, 4, 7
    art. II, § 2........................................................................................ 9

Tenn. Const. art. 11, § 19 ................................................................ 18

National Labor Relations Act, 29 U.S.C. § 151 *et seq.* ............................ 16
    § 164(b) ....................................................................................... 17

Title VII of the Civil Rights Act of 1964,
    42 U.S.C. § 2000e *et seq.* ...................................................... 19

Tenn. Code Ann. § 50-1-201 ................................................................ 18

Executive Order 14168,
    90 Fed. Reg. 8615 (Jan. 20, 2025) ...................................................... 20

29 C.F.R. § 103.40 (2024) ................................................................ 17

Federal Rules of Appellate Procedure
    29(a)(2)............................................................................................ 1
    29(a)(5)........................................................................................... 14
    32(a)(5)-(6) ................................................................................... 14

Equal Employment Opportunity Commission,
    *Enforcement Guidance on Harassment in the Workplace*
    (Apr. 29, 2024), https://perma.cc/KJ3Y-6CRZ ................................... 19

**Other Authorities**

Aditya Bamzai & Saikrishna Prakash, *The Executive Power
    of Removal*, 136 Harv. L. Rev. 1756 (2023)................................... 6, 7, 9

Bradford R. Clark, *Separation of Powers as a Safeguard of
    Federalism*, 79 Tex. L. Rev. 1321 (2001)........................................... 14

*The Federalist Papers* (Clinton Rossiter ed., 1961)
  No. 62.................................................................................15
  No. 70...................................................................................1
  No. 78...................................................................................5

Michael D. LaFaive & Todd Nesbit, *The Impact of Right-to-Work Laws; A Spatial Analysis of Border Counties* (2022) ...............18

Michael W. McConnell,
  *The President Who Would Not Be King* (2020) .....................................6

Jocelyn Samuels (@JSamuelsEEOC),
  X (Jan. 21, 2025, 3:33 PM), https://perma.cc/E7WT-HUCD .............20

Tenn. Sec'y of State, *Tennessee Marks 10 Years of New Business Growth* (Feb. 16, 2022), https://bit.ly/3SYL0El..................18

Alex Seitz-Wald & Jo Yurcaba, *Trump Vows to 'Stop' Gender-Affirming Care for Minors if Re-elected President*, NBC News (Jan. 31, 2023, 3:27 PM), https://perma.cc/FQW4-B5P4 ..............................................................19

Avalon Zoppo, *'Unfettered Removal Power'? Judge Presses Lawyers on Trump's Firing of NLRB Member*, National Law Journal (Mar. 5, 2023 5:30 pm) .....................................7

## INTERESTS OF AMICUS CURIAE

Tennessee files this amicus curiae brief in support of Defendants-Appellants under Rule 29(a)(2).

The Constitution's balance of powers both "preserves the integrity, dignity, and residual sovereignty of the States" and protects "individual liberty." *Bond v. United States*, 564 U.S. 211, 221, 223 (2011). The State of Tennessee and its citizens thus maintain a weighty interest in proper application of separation-of-powers limits on federal agencies' authority.

By operating outside our Framers' three-branch structure, independent agencies like the National Labor Relations Board present an especially grave danger to the States and their citizens. This is by design. Independent agencies emerged out of a desire to "ditch the Founders' tripartite system and their checks and balances for a 'more efficient separation of politics and administration.'" *Cochran v. SEC*, 20 F.4th 194, 218 (5th Cir. 2021) (Oldham, J., concurring) (quoting Ronald J. Pestritto, *Woodrow Wilson and the Roots of Modern Liberalism* 227 (2005)); *see id.* at 219-21. The goal was to vest policy decisions in "a body of experts … which shall be independent of executive authority[.]" *Humphrey's Ex'r v. United States*, 295 U.S. 602, 625 (1935). Left out in

the cold? States—which lack power to affect many independent agencies' actions through the bicameral lawmaking process. *Cf. Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 550-51 (1985).

The threat to States from independent agencies is not hypothetical. Employment policy rests within States' traditional police-power oversight. Tennessee has chosen to exercise this power by enacting pro-growth business policies. Yet the Board claims authority to target Tennessee employers for enforcement via in-house agency proceedings that override core state prerogatives. *See* Br. of Amicus Curiae in Supp. of Pet'r, *Starbucks Corp. v. McKinney*, No. 23-367 (U.S. Feb. 28, 2024). The Equal Employment Opportunity Commission, as another example, has ignored a direct presidential instruction to rescind Title VII guidance that harms the States as employers.

In these and other ways, a "headless fourth branch of government" has for too long subjected States to regulations no democratically elected actor has adopted. *City of Arlington v. FCC*, 569 U.S. 290, 314 (Roberts, C.J., dissenting) (citation omitted). Ensuring proper presidential supervision will protect States' sovereign prerogatives from independent agencies' anti-democratic policies.

2

## INTRODUCTION

The Constitution's enduring genius lies in its structural choice to separate the legislative, executive, and judicial powers and place each in its own branch.  Article II, for its part, vests the "executive Power" in a single, nationally elected president able to act with "energy" and "dispatch."  *The Federalist* No. 70, at 424 (Alexander Hamilton) (Clinton Rossiter ed., 1961).  Part and parcel of the President's law-execution duty is the power to supervise those within Article II's chain-of-command.

The Framers' careful form had vital functions.  They "deemed an energetic executive essential to 'the protection of the community against foreign attacks,' 'the steady administration of the laws,' 'the protection of property,' and 'the security of liberty.'"  *Seila Law LLC v. CFPB*, 591 U.S. 197, 223-24 (2020) (quoting *The Federalist* No. 70, at 471 (Alexander Hamilton)).  So too, the broader "structure of the Federal Government," which "gave the States a role" in selecting both the Executive and Legislative branches, "was designed in large part to protect the States from overreaching by Congress."  *Garcia*, 469 U.S. at 550-51.  Limits on congressional overstepping were thus a feature of a new republic that "viewed the legislative power as a special threat to individual liberty"—

3

not a bug Congress could beat via backdoor encroachment by a bureaucratic Fourth Branch. *Seila Law*, 591 U.S. at 223.

Restricting the President's ability to dismiss agency heads thus violates Article II's vesting of the "executive Power" solely in the President. Yet since 1935, *Humphrey's Executor* has carved out an aberrant exception from the default rule of presidential supervision. Whatever *Humphrey's* reasoning used to be worth, subsequent Supreme Court cases have repudiated it. Instead, the requirement of at-will removal applies "*whenever* an agency does important work" of the Executive Branch, regardless of its "size or role." *Collins v. Yellen*, 594 U.S. 220, 252 (2021) (emphasis added). That describes the Board to a T: It claims power to promulgate rules regulating employment and prosecute private parties through its own in-house adjudicative system and in courts. So whether because *Humphrey*'s is wrong or just inapplicable, the Board's for-cause removal restrictions violate Article II.

States have a large stake in the independent-agency debate. The Supremacy Clause contemplated laws moving through bicameralism and presentment, thereby ensuring States have a voice in the federal lawmaking process. Yet in the world of independent agencies, neither

4

bicameral lawmaking nor elections can check federal rules that whipsaw States each year.  Tennessee, for its part, is experiencing here-and-now harm from that disconnect.  More harm will follow if important Executive Branch policies may continue to reside outside the President's purview.

## ARGUMENT

### I.  Article II requires plenary presidential supervision of subordinate executive officials.

**A.**  Our system of government contemplates three powers held by federal officials.  The legislative power "prescribes the rules" of the community.  *The Federalist* No. 78, at 465 (Alexander Hamilton) (Clinton Rossiter ed., 1961).  The executive power is the "sword of the community." *Id.*  And the judicial power, "declare[s] the sense of the law." *Id.* at 469. The Framers "viewed the principle of separation of" those powers as "the absolutely central guarantee of a just Government."  *Morrison v. Olson*, 487 U.S. 654, 697 (1988) (Scalia, J., dissenting).

Article II, at issue here, directs that "[t]he executive Power shall be vested in a President of the United States."  U.S. Const. art. II, § 1.  Yet the Framers understood that, as a practical matter, "the President alone and unaided could not execute the laws."  *Myers v. United States*, 272 U.S. 52, 117 (1926).  So the Constitution contemplates that the President

5

will enjoy "the assistance of subordinates" selected through required appointment processes.  *Id.*  Such subordinate officials include the heads of administrative agencies, who, having no superior other than the President, are principal officers.  *See United States v. Arthrex, Inc.*, 594 U.S. 1, 12-13 (2021).  And given "our constitutional structure," the activities of officials Wilcox and other Board members "*must be* exercises" of "the 'executive Power.'"  *City of Arlington*, 569 U.S. at 304 n.4 (quoting U.S. Const. art. II, § 1).

As Tennessee's *amicus* brief explained below, centuries of Anglo-American legal history support that the "executive power" includes plenary authority to remove subordinate executive officials.  *See VHS Acquisition Subsidiary No. 7 v. NLRB*, No. 1:24-cv-02577, 2024 WL 5056358, at *3-4 (D.D.C. Dec. 10, 2024) (collecting historical examples); Michael W. McConnell, *The President Who Would Not Be King* 162 (2020) ("The king had the prerogative power to remove" executive officers "at will.").  To be sure, scholarship of "Disunitarians" has sought to dispute this history.  Aditya Bamzai & Saikrishna Prakash, *The Executive Power of Removal*, 136 Harv. L. Rev. 1756, 1761 (2023); *cf.* Mem. Op., Dkt. 35, at 1 n.1 (collecting sources).  But best read, "early endorsements,

6

declarations, and exercises"—from "James Madison, George Washington, Thomas Jefferson, Alexander Hamilton, and … many others"—evince that "the Constitution grant[s] Presidents the power to remove executive officers at pleasure."  Bamzai & Prakash, *supra*, at 1761.

**B.**    The district court trained fire on *amicus* Tennessee and its historical arguments about the removal power.  At the preliminary-injunction hearing, the district court reportedly questioned why Tennessee "went way back to the monarch," continuing, "it just made me wonder:  Is the tradition of the British king, with unfettered removal power … Is that the model? … Maybe Tennessee is recommending it for us Americans.  But is that the model?"  Avalon Zoppo, *'Unfettered Removal Power'? Judge Presses Lawyers on Trump's Firing of NLRB Member*, National Law Journal (Mar. 5, 2023 5:30 pm), https://perma.cc/4GSL-XRU7.  Again in its opinion, the district court dismissed Tennessee's discussion of the executive power in Britain as having "little purchase" in a system that repudiated the "British monarchy."  *See* Mem. Op., Dkt. 35, at 4 n.5.

But Tennessee is no would-be Royalist.  Its point below, instead, was that the political concept of "executive power" preexisted the

7

Constitution.  Those in the Founding Era thus would have shared some common understanding about the contours of the "executive power" when they vested that power in the President via Article II.  And as with other constitutional terms,[1] that pre-existing understanding of "executive power" in turn reflected drafters and ratifiers' prior experience with the British system.  *See, e.g.*, *Myers*, 272 U.S. at 118 ("In the British system, the crown, which was the executive, had the power of appointment and removal of executive officers, and it was natural, therefore, for those who framed our Constitution to regard the words 'executive power' as including both.").  Tennessee's taking stock of that shared, pre-Founding understanding of "executive power" reflects mainstream interpretive methods—not "autocracy" apologism.  Mem. Op., Dkt. 35, at 36.

It proves nothing that "[a]s a textual matter, the Constitution is silent as to removals."  Mem. Op., Dkt. 35, at 11.  Article II's Vesting

---

[1] *Cf., e.g.*, *Ex parte Grossman*, 267 U.S. 87, 110 (1925) (interpreting pardon power in light of how it "had been exercised by the king, as chief executive," at "the time of our separation from Great Britain" ); *Schick v. United States*, 195 U.S. 65, 69-70 (1904) (using Blackstone's definition of "crimes" to inform analysis of the Sixth Amendment and concluding that misdemeanors are not "crimes"); *Boyd v. United States*, 116 U.S. 616, 628 (1886) (quoting English common law for the proposition that visual surveillance is not a "search" under the Fourth Amendment because "the eye cannot by the laws of England be guilty of trespass").

8

Clause, by referencing the "executive Power," entails a correspondent grant of removal authority. Silence on removal, then, if anything indicates the Constitution does not limit that authority. *See Trump v. United States*, 603 U.S. 593, 608 (2024) (describing the removal power as "the President's … constitutional power[]"); *cf.* U.S. Const. art. II, § 2 (limiting appointment power "by and with the Advice and Consent of the Senate"). And Congress "lacks the generic power to modify the Constitution's separation of powers." Bamzai & Prakash, *supra*, at 1791.

The district court nonetheless gauged any default-removal rule as granting too much power to the President. Mem. Op., Dkt. 35, at 35-36. To be sure, some Supreme Court Justices have echoed that critique in recent Article II cases. They've tended to be in dissent. *See, e.g.*, *Seila Law*, 591 U.S. at 267 (Kagan, J., concurring in part and dissenting part) ("the President, needless to say, wasn't supposed to be a king"). A different take on Article II emerges from the majorities: "The Framers did not rest our liberties on such bureaucratic minutiae" as "whether particular *unelected* officials support or 'resist' the President's policies." *Free Enterprise Fund v. PCAOB*, 561 U.S. 477, 499-500 (2010) (quoting *id.* at 526 (Breyer, J., dissenting)). Just so here.

9

## II.  For-cause removal protections for the Board and like agencies violate Article II.

Surveying the Constitution's text, structure, and history, the Supreme Court in *Myers* held that Article II "grants to the President" the power of "removal of executive officers."  272 U.S. at 163-64. *Myers*'s detailed analysis of the President's power to remove executive officials soon met motivated opposition in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935).  But that case was wrongly decided.  And its reasoning does not extend to the Board regardless.

*Humphrey's* examined the Federal Trade Commission Act, which limited the President's removal of FTC commissioners to cases of "inefficiency, neglect of duty, or malfeasance in office."  *Id.* at 619.  In a short opinion, the Supreme Court upheld the FTC's removal restrictions against a constitutional challenge.

The *Humphrey's* Court rested its reasoning on an assessment that "the duties" of the commission at issue were "neither political nor executive, but predominantly quasi judicial and quasi legislative."  *Id.* at 624.  In so holding, the Court described the FTC as "an administrative body created by Congress to carry into effect legislative policies embodied in the statute and in accordance with the legislative standard therein

10

prescribed, and to perform other specified duties as a legislative or as a judicial aid." *Id.* at 628.

*Humphrey's* branch-busting reasoning was wrong the day it was rendered. To "carry into effect legislative policies" and "perform other specified duties" is, by definition, to *execute* a law. *See supra* Section I.A. Executive agency officials wield the executive power, even when doing things that look like legislating and adjudicating. *See City of Arlington*, 569 U.S. at 304 n.4. *Humphrey's*, then, thwarts our constitutional structure.

Given its flaws, it is no surprise that subsequent cases have narrowed *Humphrey's* nearly out of existence:

- *Free Enterprise Fund* exhaustively detailed Article II's design to permit agencies to be "fully accountable" to the President for their conduct. Applying that rule, the Court held that the Public Company Accounting Oversight Board's "dual for-cause limitations on the removal of Board members contravene the Constitution's separation of powers." 561 U.S. at 492.

- *City of Arlington* acknowledged that *all* agency activities are exercises of the executive power—contra *Humphrey's* quasi-legislative, quasi-judicial conception of FTC. 569 U.S. at 304 n.4.

- *Seila Law* cabined *Humphrey's Executor* to allowing "for-cause removal protections to a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and [are] said not to exercise any executive power." 591 U.S. at 216. *Seila Law* noted that, even under *Humphrey's*

11

*Executor*, a multimember agency that "wield[s] substantial executive power" violates Article II. *Seila Law*, 591 U.S. at 218.

- In *Collins v. Yellen*, the Court held that the "Recovery Act's for-cause restriction on the President's removal authority violates the separation of powers." 594 U.S. at 250. The Recovery Act created the Federal Housing Finance Agency, "led by a single Director" removable "by the President 'for cause.'" *Id.* at 229 (citation omitted). The "FHFA clearly exercises executive power," so even "'modest restrictions' on the President's power to remove the head of an agency with a single top officer" violates the Constitution. *Id.* at 254, 256 (citation omitted). And that rule of at-will removal applies "whenever an agency does important work." *Id.* at 252.

Most recently, in last term's *Trump v. United States* decision, the Supreme Court noted that the "removal" of certain federal officers "implicates 'conclusive and preclusive' Presidential authority." 603 U.S. at 620-21. A President's exclusive power that "stem[s] ... from the Constitution itself" is "conclusive and preclusive." *See id.* at 607 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952); *id.* at 638 (Jackson, J., concurring)). That includes "the President's 'unrestricted power of removal' with respect to 'executive officers of the United States whom he has appointed.'" *Id.* at 609 (quoting *Myers*, 272 U.S. at 106). The Court stated "Congress cannot act on, and courts cannot examine, the President's actions on subjects within his 'conclusive and preclusive' constitutional authority." *Id.* at 609.

12

All in, the Supreme Court's recent instructions leave at most a 1930s-FTC-specific exception to the general rule of at-will presidential removal. For those modern-day agencies exercising executive power, Article II prohibits statutes that purport to limit the President's ability to dismiss agency heads. *See, e.g.*, *Jarkesy v. SEC*, 34 F.4th 446, 464 n.19 (5th Cir. 2022) (discussing the interaction between *City of Arlington* and *Seila Law*), *aff'd on other grounds* 603 U.S. 109 (2024).

The district court still opted to rest on *Humphrey's* thin reed. Mem. Op., Dkt. 35, at 16. But under governing precedent, if the Board "does important work," *Collins*, 594 U.S. at 252, its heads must be removable by the President at will. And Defendants have demonstrated that the Board exercises significant executive authority over the Nation's employers. Appellants' Br. at 27-31. The Board's members are thus removable at will, with no need to "weigh the relative importance of the regulatory and enforcement authority" of the Board versus that of "disparate agencies." Order & Op. 3, *Dellinger v. Bessent*, No. 25-5052 (D.C. Cir. Mar. 10, 2025) (quoting *Collins*, 594 U.S. at 253).

13

## III. Shielding executive agencies from presidential supervision harms the States.

"As every schoolchild learns, our Constitution establishes a system of dual sovereignty" that divides power "between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991). That careful vertical separation of powers was the product of hard-fought compromise among those seeking to protect States' prerogatives. Independent agencies harm States' role in our federal system in ways Tennessee's experience highlights.

**A.** Vesting executive officials with runaway power to pursue unsupervised law enforcement upsets the Framers' fundamental federal-state balance. Originally, James Madison at the Constitutional Convention proposed an expansive congressional negative that would have "empowered Congress to set aside any state law that it judged to be 'improper.'" Bradford R. Clark, *Separation of Powers as a Safeguard of Federalism*, 79 Tex. L. Rev. 1321, 1339-46 (2001). Several States objected; ultimately, States voted down the congressional negative by a vote of 7 to 3. *Id.* at 1353. Later, the Convention approved what would become the Supremacy Clause.

14

As ratified, the Supremacy Clause sets out three categories of federal laws—namely, the Constitution, "the Laws of the United States," and treaties—that trump contrary state enactments or constitutions. Notably, this scheme aimed to protect States by requiring all State-trumping laws to pass through "finely wrought" approval procedures necessitating the States' participation (the Senate's equal state representation for laws and treaties, and direct votes by States for constitutional amendments).  It is by design that "[n]o law or resolution can now be passed without . . . a majority of the States"; States thereby may foreclose "improper acts of legislation." *The Federalist* No. 62, at 378 (James Madison) (Clinton Rossiter ed., 1961).

But nowadays, "those in the Executive Branch" increasingly seek "to use pen-and-phone regulations as substitutes for laws passed by the people's representatives." *West Virginia v. EPA*, 597 U.S. 697, 752-53 (2022) (Gorsuch, J., concurring). The result reduces States' power to protect their interests through the Constitution's bicameral process of lawmaking.  Instead, States must engage with Executive Branch officials through indirect legal or political channels.  Though poor substitutes for the checks of the bicameral lawmaking process, States can at least hope

that the President and others directly accountable to the President will be sensitive to the prospect of political "blame or [] punishment" by the States and their voters. *Free Enter. Fund*, 561 U.S. 498.

**B.**     By contrast, independent-agency heads sideline any input from the parties they regulate by exercising powers in a vacuum often immune from meaningful political accountability.

The Board is case in point. "States possess broad authority under their police powers to regulate the employment relationship" within their borders. *DeCanas v. Bica*, 424 U.S. 351, 356 (1976). And States have historically exercised that authority by enacting reticulated structures governing the employment relationship—within which "[f]ederal labor law . . . is [merely] interstitial." *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985). The National Labor Relations Act, which the Board implements, imposes certain restrictions on employers related to the unionization of employees and the collective-bargaining process. But the Act did not "completely extinguish[] state power" over employment regulation. *Retail Clerks Int'l Ass'n, Loc. 1625 v. Schermerhorn*, 373 U.S. 746, 751 (1963). Just the opposite, the NLRA expressly preserved the

States' ability to prohibit union-membership requirements, for example. *See* 29 U.S.C. § 164(b).

Over the past several years, though, the Board has routinely advanced legal theories that go well beyond the text of the Act. Take its recent final rule providing that businesses will be treated as "joint employers" when they have control, even if indirect and unexercised, over a single essential term of employment. *See* 29 C.F.R. § 103.40 (2024). That broad-sweep approach infringed the States' "broad authority under their police powers to regulate the employment relationship" within their borders. *DeCanas*, 424 U.S. at 356. And a court vacated the rule because of its illegality. *Chamber of Com. of U.S. v. NLRB*, 723 F. Supp. 3d 498, 519 (E.D. Tex. 2024).

The Board also has sought to expand its remedial rights beyond traditional bounds by claiming power to recover "for all direct or foreseeable pecuniary harms" to employees, including everything from credit-card debt to out-of-pocket medical expenses. *Thryv, Inc.*, 372 NLRB No. 22, 2022 WL 17974951, at *9, *15 (Dec. 13, 2022). Again, that was unlawful. *See NLRB v. Starbucks Corp.*, 125 F.4th 78, 94 (3d Cir. 2024) (Board's remedial order "exceeds the Board's authority under the

17

NLRA"). And while the Act expressly sets certain volume-of-business limits to cabin the Board's jurisdiction, the Board has read these thresholds as "discretionary" only and disregards them at will. *See, e.g.*, Br. of NLRB at 10, *NLRB v. Valentine Painting & Wallcovering, Inc.*, 8 F. App'x 116 (2d Cir. Mar. 12, 2001) (Nos. 00-4226L, 00-4236C), 2001 WL 34094388, at *10.

The Board's continued power creep inflicts particularized harm on business-friendly States like Tennessee. By adopting "right to work" and other pro-growth policies,[2] Tennessee has seen an explosion in new-business growth as well as favorable outcomes on manufacturing, construction, personal-income, and business-development metrics. *See generally* Tenn. Sec'y of State, *Tennessee Marks 10 Years of New Business Growth* (Feb. 16, 2022), https://bit.ly/3SYL0El; Michael D. LaFaive & Todd Nesbit, *The Impact of Right-to-Work Laws; A Spatial Analysis of Border Counties* 9-10 (2022). Unaccountable Board regulation risks thwarting these gains by saddling States with policies that largely favor labor unions and related interest groups.

---

[2] *See* Tenn. Code Ann. § 50-1-201; Tenn. Const. art. 11, § 19 (approved Nov. 8, 2022).

Other assertedly independent agencies have harmed Tennessee, too. Chief among them is the Equal Employment Opportunity Commission, which has long considered itself independent from the President despite lacking statutory removal protections. In 2024, the Commission by a vote of 3-2 promulgated a sweeping enforcement document under Title VII of the Civil Rights Act of 1964. In it, the Commission directed that Title VII requires employers like Tennessee to adopt and police a series of unprecedented gender-identity mandates in the workplace ranging from access to restrooms and locker rooms to "preferred pronoun" usage. *See* Equal Employment Opportunity Commission, *Enforcement Guidance on Harassment in the Workplace* (Apr. 29, 2024), https://perma.cc/KJ3Y-6CRZ.

Tennessee, leading a coalition of States, challenged the Commission's enforcement document as unlawful; during his campaign, President Trump promised to end federal imposition of similar gender-identity requirements. *See, e.g.*, Alex Seitz-Wald & Jo Yurcaba, *Trump Vows to 'Stop' Gender-Affirming Care for Minors if Re-elected President*, NBC News (Jan. 31, 2023, 3:27 PM), https://perma.cc/FQW4-B5P4 ("He said he would also prohibit any federal agency from working to 'promote

the concept of sex and gender transition at any age.'").  So upon assuming office, President Trump immediately directed, *inter alia*, the Commission to rescind the Title VII enforcement document as contrary to the proper reading of Title VII and administration policy.  *See* Executive Order 14168, 90 Fed. Reg. 8615, 8618, § 7(c)(iv) (Jan. 20, 2025).

No rescindment followed.  Instead, through a public statement, all three members of the Commission's 3-1 Democratic majority refused the presidential directive.  *See* Jocelyn Samuels (@JSamuelsEEOC), X (Jan. 21, 2025, 3:33 PM), https://perma.cc/E7WT-HUCD.  That action leaves the enforcement document with continued, binding effect and Tennessee's litigation ongoing.  The upshot of the Board's claimed independence is stark.  Tennessee must continue to labor under—and spend time and resources litigating against—a controversial Executive Branch enforcement document that the President himself, as Chief Executive, has disavowed and instructed rescinded.

Tennessee's recent troubles raise a recurring question:  "But where, in all this, is the role for oversight by an elected President?"  *Free Enter. Fund*, 561 U.S. at 499.  The answer, when it comes to agencies like the Board, is nowhere.  And therein lies the problem.

20

## CONCLUSION

This Court should reverse the district court's order granting judgment for Wilcox.

Dated: March 28, 2025                    Respectfully submitted,

JONATHAN SKRMETTI
Tennessee Attorney General
& Reporter
*/s/ Whitney D. Hermandorfer*
WHITNEY D. HERMANDORFER
(DC Bar #888314222)
  Director of Strategic Litigation
JOSEPH M. FIORILE
  Strategic Litigation Fellow
Office of the Tennessee Attorney
General and Reporter
P.O. Box 20207
Nashville, TN 37202-0207
(615) 741-3491
whitney.hermandorfer@ag.tn.gov
joseph.fiorile@ag.tn.gov

21

## CERTIFICATE OF COMPLIANCE

This *amicus* brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 3,936 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Century Schoolbook, a proportionally spaced typeface.

*/s/ Whitney Hermandorfer*

WHITNEY HERMANDORFER
(DC Bar #888314222)

**CERTIFICATE OF SERVICE**

I certify that on March 28, 2025, I caused this document to be electronically filed with the Clerk of the Court using this Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

/s/ Whitney Hermandorfer

WHITNEY HERMANDORFER
(DC Bar #888314222)

23