**MERITS ORAL ARGUMENT SCHEDULED MAY 16, 2025**
**No. 25-5057**

# In the United States Court of Appeals for the District of Columbia Circuit

―――――――――――――――

GWYNNE A. WILCOX,
*Plaintiff-Appellee,*

v.

DONALD J. TRUMP, in his official capacity as President
of the United States, et al.,
*Defendants-Appellants.*

―――――――――――――――

On Appeal from the United States District Court
for the District of Columbia
Case No. 25-334 (The Hon. Beryl A. Howell)

―――――――――――――――

## MOTION FOR EMERGENCY ADMINISTRATIVE STAY PENDING REQUEST FOR INITIAL HEARING EN BANC

JENNIFER D. BENNETT
GUPTA WESSLER LLP
505 Montgomery Street
Suite 625
San Francisco, CA 94111
(415) 573-0336
jennifer@guptawessler.com

DEEPAK GUPTA
MATTHEW W.H. WESSLER
GREGORY A. BECK
ALISA C. PHILO*
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
deepak@guptawessler.com

March 28, 2025                    *Counsel for Plaintiff-Appellee*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### (A) Parties and Amici

Gwynne A. Wilcox – Plaintiff-Appellee

Donald J. Trump – Defendant-Appellant

Marvin E. Kaplan – Defendant-Appellant

Law Professors John C. Coates, Jeffrey N. Gordon, Kathryn Judge, and Lev Menand – Amici curiae

Florida, Alabama, Arkansas, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Oklahoma, South Carolina, South Dakota, Texas, Utah, West Virginia, and the Arizona legislature – Amici curiae

American Federation of Labor and Congress of Industrial Organizations – Amici curiae

Constitutional Accountability Center – Amici curiae

Former National Labor Relations Board Members – Amici curiae

State of Tennessee – Amicus curiae

Minnesota, Illinois, Arizona, California, Colorado, Connecticut, Delaware, District of Columbia, Hawaii, Maryland, Massachusetts, Michigan, Nevada, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, Washington, and Wisconsin – Amicus curiae

Ariana Cortes and Logan Karam – Amicus curiae

Separation of Powers Clinic – Amicus curiae

Jed H. Shugerman – Amicus curiae

### (B) Rulings Under Review

03/06/2025 Order (Judge Beryl A. Howell) – Dkt. 34.

03/06/2025 Memorandum Opinion (Judge Beryl A. Howell) – Dkt. 35.

i

**(C) Related Cases**

This case was before the district court as case No. 1:25-cv-00334-BAH. The government appealed the district court's grant of summary judgment, and that appeal is before this Court as No. 25-5057. The special panel consolidated this case with *Harris v. Bessent*, No. 25-5055 (D.C. Cir.) for oral argument on the government's stay motion .

March 28, 2025

Respectfully submitted,

*/s/ Deepak Gupta*
DEEPAK GUPTA
*Counsel of Record*
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*deepak@guptawessler.com*

## MOTION FOR AN ADMINISTRATIVE STAY

Plaintiff Gwynne A. Wilcox seeks an administrative stay of the special panel's order staying the order of the district court. The panel's order, in Judge Millett's words, "is an unprecedented and … wholly unwarranted use of this court's stay power." Order at 61 (attached as Appendix A) (Millett, J., dissenting).

A brief administrative stay of that order will allow Ms. Wilcox the opportunity to take a step that she does not take lightly, but that is warranted under the extraordinary circumstances of this case and the suite of related cases. A stay will allow Ms. Wilcox (and Ms. Harris in her case) to expeditiously file a petition for initial en banc review, and will give the full Court the necessary "time to deliberate" on this critically important matter. *United States v. Texas*, 144 S. Ct. 797, 798 (2024) (Barrett, J., concurring); *see, e.g., Cobell v. Norton*, 2004 WL 603456, at *1 (D.C. Cir. 2004) (per curiam) (issuing an "administrative stay … to give the court sufficient opportunity to consider" the merits of a motion without suggesting any view on the ultimate disposition). If the panel denies this motion, Ms. Wilcox requests that the en banc Court grant the same relief. Given the urgency of the situation and the vitally important issues at stake, we respectfully request that the Court resolve this motion by Monday, March 31.[1]

---

[1] Counsel for the government states that the government opposes this motion. The government has previously conceded, however, "that there is a compelling interest in resolving these matters swiftly." Mar. 18, 2025 Tr. 96.

This case challenges President Trump's unprecedented and illegal removal of Ms. Wilcox from her position as a duly confirmed member of the National Labor Relations Board—a move that not only violated the plain language of the National Labor Relations Act, but also deprived the Board of a quorum, putting an end to its critical, congressionally mandated work. Mem. Op. at 5, *Wilcox v. Trump*, No. 25-334 (D.D.C. 2025) (attached as Appendix B). On March 6, 2025, the district court entered summary judgment for Ms. Wilcox and issued a permanent injunction allowing her to resume her duties and the NLRB to regain its quorum. And over the following twenty-two days, Ms. Wilcox and the NLRB did indeed resume their work—issuing 18 decisions (nearly one per day) since the date of the district court's order.[2] By staying that order, the special panel effectively shut the agency down once again, using "a hurried and preliminary first-look ruling … to trap in legal limbo millions of employees and employers." App. A at 62 (Millett, J., dissenting).

Far from showing a substantial likelihood of success on the merits, the government's position is "flat wrong" under binding Supreme Court precedent. ECF 35 at 5. The government admits that the President removed Ms. Wilcox without

---

[2] *See Dumbo 301 LLC*, 374 NLRB 22 (Mar. 21, 2025), *Starbucks Corp.*, 374 NLRB 23 (Mar. 27, 2025), and *Pacific Bell Tel. Co.*, 374 NLRB 24 (Mar. 28, 2025), *available at https://www.nlrb.gov/cases-decisions/decisions/board-decisions* (3 decisions after Mar. 6, 2025); *see also Unpublished Board Decisions*, Nat'l Lab. Rels. Bd. (last visited Mar. 28, 2025), https://www.nlrb.gov/cases-decisions/decisions/unpublished-board-decisions (15 decisions after Mar. 6, 2025).

identifying any "neglect of duty or malfeasance in office," and without providing "notice and [a] hearing," as the National Labor Relations Act requires. 29 U.S.C. § 153(a). And the constitutionality of the NLRA's removal limit is established by ninety years of Supreme Court precedent, starting with *Humphrey's Executor v. United States*, which upheld a virtually identical limit on the President's removal power. 295 U.S. 602 (1935). The government hasn't made *any* showing that it is likely to succeed, much less the "*strong* showing" necessary to entitle it to the "extraordinary remedy" of an emergency stay pending appeal. *KalshiEX LLC v. CFTC*, 119 F.4th 58, 63 (D.C. Cir. 2024) (emphasis added). Simply put, there is no "emergency" requiring this Court to upend decades of tradition and precedent to allow the President to fire an NLRB member for the first time in its ninety-year history—before the Supreme Court has even had the opportunity to consider for itself whether its longstanding precedent should be upended.

The government has attempted to justify its admitted violation of the NLRA's unambiguous statutory terms with an aggressive new interpretation of Article II, under which the President "has authority to fire whomever he wants within the Executive branch, overriding any congressionally mandated law in his way." App. B at 4. But this argument, as the district court recognized, is directly "contrary to Supreme Court precedent and over a century of practice." *Id.* at 10. Indeed, Congress created the NLRB just months after *Humphrey's Executor* and modeled it

closely on the provisions upheld there—just as it has done for dozens of agencies responsible for many of the government's critical functions.

By nevertheless accepting the government's position, the panel's stay decision "rewr[o]te controlling Supreme Court precedent and ignore[d] binding rulings of this court, all in favor of putting this court in direct conflict with at least two other circuits." App. A at 61 (Millett, J., dissenting). The panel's decision effectively overturns *Humphrey's Executor*, defies the Supreme Court's repeated, express instructions that *Humphrey's Executor* remains good law, and "openly calls into question the constitutionality of dozens of federal statutes conditioning the removal of officials on multimember decision-making bodies—everything from the Federal Reserve Board and the Nuclear Regulatory Commission to the National Transportation Safety Board and the Court of Appeals for Veterans Claims." *Id.* As Judge Millett put it, the panel decision "announce[s] a revolution in the law that the Supreme Court has expressly avoided." App. A at 62 (Millett, J., dissenting).

En banc consideration is warranted here to "resolve for the circuit" important questions on which reasonable judges disagree. *Am. Meat Inst. v. U.S. Dep't of Agric.*, 746 F.3d 1065, 1073 n.1 (D.C. Cir. 2014) (calling for en banc consideration), *reh'g granted, op. vacated*, 2014 WL 2619836 (D.C. Cir. 2014) (per curiam), *judgment reinstated*, 760 F.3d 18 (D.C. Cir. 2014) (en banc). After the panel's decision, the need for the en banc Court's authoritative resolution of the issues could not be clearer. Judge Millett

would have joined four judges on the U.S. District Court for the District of Columbia in finding the issue squarely controlled by Supreme Court precedent. App. B at 10 (Howell, J.) (NLRB); *Harris v. Bessent*, No. 25-412, 2025 WL 521027, at *3 (D.D.C. Feb. 18, 2025) (Contreras, J.) (MSPB); *Grundmann v. Trump*, No. 25-425, 2025 WL 782665, at *10 (D.D.C. Mar. 12, 2025) (Sooknanan, J.) (FLRA); *Dellinger v. Bessent*, No. 25-385, 2025 WL 471022, at *5-6 (D.D.C. Mar. 1, 2025) (Jackson, J.) (Office of Special Counsel).

Panels of the Fifth and Tenth Circuits have likewise agreed that *Humphrey's Executor* "remains binding law." *Leachco, Inc. v. CPSC*, 103 F.4th 748, 761-62 (10th Cir. 2024), *cert denied*, 2025 WL 76435 (Jan. 13, 2025); *see also Consumers' Rsch. v. CPSC*, 91 F.4th 342, 352 (5th Cir. 2023), *reh'g and reh'g en banc denied*, 98 F.4th 646 (Apr. 16, 2024). In contrast, Judge Walker held that the Supreme Court's precedents require the opposite conclusion. App. A at 3. And Judge Henderson staked out a middle position, finding the government's likelihood of success on the merits to be a "slightly closer call" that warranted writing separately to highlight "murky" areas of precedent. App. A at 51.

Two more cases raising the same question, concerning the Federal Trade Commission and the Federal Labor Relations Act, are likely to soon find themselves before this Court. The sharply divided opinions in this order make clear that, absent en banc review now, those cases will likely result in divergent panel decisions.

Although "initial hearing en banc is not favored," Fed. R. App. P. 40(g), it is appropriate in cases where the questions presented are of "exceptional importance," *see e.g.*, *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1125 (10th Cir. 2013) (noting that the court had granted the plaintiffs' motion for initial en banc consideration). Given the scope of the national interests at stake in this case, there is a special need for clarity and uniformity in this Court's decisions. The en banc Court's initial consideration of the merits in this case is the most efficient path to resolving this critically important issue with finality and consistency.

For these reasons, the panel or the en banc Court should grant this request for an administrative stay pending a decision on Ms. Wilcox's forthcoming petition for initial en banc review.

Respectfully submitted,

*/s/ Deepak Gupta*
DEEPAK GUPTA
MATTHEW W.H. WESSLER
GREGORY A. BECK
ALISA C. PHILO*
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
deepak@guptawessler.com

*Practicing under the direct supervision of members of the D.C. Bar pursuant to Local Rule 49(c)(8) while application to the D.C. Bar is pending*

JENNIFER D. BENNETT
GUPTA WESSLER LLP
505 Montgomery Street
Suite 625
San Francisco, CA 94111
(415) 573-0336
*jennifer@guptawessler.com*

March 28, 2025                    *Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(g)(1)

I hereby certify that my word processing program, Microsoft Word, counted 1,414 words in the foregoing motion, exclusive of the portions excluded by Rule 32(f). The document also complies with the typeface requirements of Fed. R. App. P. 32(a)(6) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in proportionally spaced typeface in 14-point Baskerville font.

*/s/ Deepak Gupta*
Deepak Gupta

## CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2025, I electronically filed the foregoing motion with the Clerk of the Court for the U.S. Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Deepak Gupta*
Deepak Gupta

# Appendix A

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

## No. 25-5037

**September Term, 2024**

**1:25-cv-00412-RC**

**Filed On:** March 28, 2025

Cathy A. Harris, in her personal capacity and
in her official capacity as Member of the Merit
Systems Protection Board,

      Appellee

    v.

Scott Bessent, in his official capacity as
Secretary of the Treasury, et al.,

      Appellants

------------------------------

Consolidated with 25-5055

------------------------------

## No. 25-5057

**1:25-cv-00334-BAH**

Gwynne A. Wilcox,

      Appellee

    v.

Donald J. Trump, in his official capacity as
President of the United States and Marvin E.
Kaplan, in his official capacity as Chairman of
the National Labor Relations Board,

      Appellants

**BEFORE:**   Henderson, Millett[*], and Walker, Circuit Judges

## O R D E R

      Upon consideration of the emergency motions for stay filed in Nos. 25-5055 and
25-5057, the oppositions thereto, the replies, and the briefs filed by amici curiae
regarding the stay motions; it is

------------------------------

[*] Judge Millett dissents from the grant of the emergency motions for stay.

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 25-5037**                    **September Term, 2024**

   **ORDERED** that the emergency motions for stay be granted.  Separate concurring statements of Judge Walker and Judge Henderson and a dissenting statement of Judge Millett are attached.

**<u>Per Curiam</u>**

                              **FOR THE COURT:**
                              Clifton B. Cislak, Clerk

          BY:     /s/
                  Daniel J. Reidy
                  Deputy Clerk

WALKER, *Circuit Judge*, concurring:

Article II of the Constitution vests the "executive Power" in "a President of the United States" and requires him to "take Care that the Laws be faithfully executed."[1]  "To protect individual liberty, the Framers . . . created a President independent from the Legislative Branch."[2]  "To further safeguard liberty, the Framers insisted upon accountability for the exercise of executive power," so they "lodged full responsibility for the executive power in a President of the United States, who is elected by and accountable to the people."[3]

Executive branch agencies do not disrupt that design when they are accountable to the President.  "But consent of the governed is a sham if an administrative agency, by design, does not meaningfully answer for its policies to either of the elected branches."[4]  That's why the Supreme Court has said that Congress cannot restrict the President's removal authority over agencies that "wield substantial executive power."[5]

That Court's precedents control this court's case.  Under those precedents, the Government is likely to succeed in showing that the statutory removal protections for National Labor Relations Board commissioners and Merit Systems Protection Board members are unconstitutional.  The Government has also shown that it will suffer irreparable harm each day the President is deprived of the ability to control the executive branch.  Conversely, the removed officials suffer no

---

[1] U.S. Const., art. II, §§ 1, 3.

[2] *Free Enterprise Fund v. PCAOB*, 537 F.3d 667, 689 (D.C. Cir. 2008) (Kavanaugh, J., dissenting).

[3] *PHH Corp. v. CFPB*, 881 F.3d 75, 164 (D.C. Cir. 2018) (en banc) (Kavanaugh, J., dissenting).

[4] *Id.* at 137 (Henderson, J., dissenting).

[5] *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2199-2200 (2020).

2

cognizable irreparable harm during the pendency of these appeals, nor do the agencies where they previously worked until the President fired them. Finally, the public interest also supports a stay. The people elected the President to enforce the nation's laws, and a stay serves that purpose by allowing the people's chosen officer to control the executive branch.

I therefore support granting the motions for a stay pending appeal in *Harris v. Bessent* (25-5055) and *Wilcox v. Trump* (25-5057).

## I. Background

The National Labor Relations Board and the Merit Systems Protection Board are executive branch agencies. By the terms of statutes that the Government argues are unconstitutional, their members may be removed only for cause.[6]

On January 27, 2025, President Donald Trump removed Gwynne Wilcox from the NLRB prior to her term's expiration in 2028. In an explanatory letter, the President informed Wilcox that the NLRB had not "been operating in a manner consistent with the objectives of [his] administration."[7] Citing several recent Board decisions, he expressed concern that Wilcox was "unduly disfavoring the interests of employers."[8]

Wilcox sued for reinstatement on February 5, 2025. Five days later, she moved for summary judgment on an expedited basis. After a hearing on March 5, the district court granted

---

[6] 5 U.S.C. § 1202(d) (MSPB); 29 U.S.C § 153(a) (NLRB).

[7] Pl.'s Ex. A at 2, *Wilcox v. Trump*, No. 25-cv-334 (D.D.C. Feb. 20, 2025), ECF No. 10-4.

[8] *Id.*

3

summary judgment to Wilcox, declaring that she remained a member of the NLRB and permanently enjoining the NLRB's Chair and his subordinates from effectuating the President's removal order.

A similar chain of events occurred in *Harris v. Bessent*. On February 10, 2025, the President removed Cathy Harris from the MSPB prior to her term's expiration in 2028. Unlike Wilcox, Harris did not receive an explanatory letter.

Harris sued for reinstatement on February 11, 2025. Seven days later, the district court granted her request for a temporary restraining order, effectively reinstating her to the MSPB. A few weeks later, the court granted summary judgment for Harris, declaring that she remained a member of the MSPB and permanently enjoining various government officials from executing the President's removal order.

In defending these removals, the Government has not argued that the President met the statutory criteria for removal.[9] Instead, it has insisted that those provisions are unconstitutional infringements on the President's Article II removal power — a position consistent with the President's recent executive order regarding independent agencies.[10]

---

[9] *See* 5 U.S.C. § 1202(d) (removal "only for inefficiency, neglect of duty, or malfeasance in office"); 29 U.S.C. § 153(a) (removal only "upon notice and hearing, for neglect of duty or malfeasance in office, but for no other cause").

[10] Exec. Order No. 14,215, Ensuring Accountability for All Agencies (Feb. 18, 2025), https://www.federalregister.gov/d/2025-03063.

The Government also maintains that federal district courts lack the equitable power to reinstate an officer who has been removed by the President. Because this court grants the Government's stay application on alternative grounds, I have no occasion to address this

4

On that basis, the Government appealed both orders and moved for emergency stays pending appeal. We considered the two motions together and heard oral argument on March 18, 2025.

## II. The Presidential Removal Power

Before addressing the stay factors, it is prudent to address the text, history, and precedents that control this preliminary merits determination.

### A. History

I begin with a review of our nation's founding period, the creation of our Constitution, and the historical practice in the decades that followed.

#### 1. The Energetic Executive

Under the Articles of Confederation, the early Republic experienced the perils of having a weak executive. With "no executive separate from Congress,"[11] the federal government had to rely on the states' good graces to carry out national policies.[12] And it was powerless to respond to national

---

argument. *Cf. Bessent v. Dellinger*, 145 S. Ct. 515, 517 (2025) (Gorsuch, J., dissenting) (observing that "by the 1880s [the Supreme] Court considered it 'well settled that a court of equity has no jurisdiction over the appointment and removal of public officers'" (quoting *In re Sawyer*, 124 U.S. 200, 212 (1888))); *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *14 (D.C. Cir. Feb. 15, 2025) (Katsas, J., dissenting) (reinstating a principal officer is "virtually unheard of").

[11] William P. Barr, *The Role of the Executive*, 43 Harv. J.L. & Pub. Pol'y 605, 607 (2020).

[12] *Printz v. United States*, 521 U.S. 898, 919 (1997).

5

emergencies, like the 1786 Shays' Rebellion.[13]  As Henry Knox put it, the federal government was but "a shadow without power, or effect."[14]

So when "the Framers met in Philadelphia in the summer of 1787, they sought to create a cohesive national sovereign in response to the failings of the Articles of Confederation."[15] But the Framers also understood that a strong federal government could be abused.  They recognized that "structural protections" — most significantly, the separation of powers — "were critical to preserving liberty."[16] By splitting the legislative, executive, and judicial powers, and "giving to those who administer each department the necessary constitutional means and personal motives to resist encroachments of the others," the federal government could avoid the "gradual concentration of the several powers in the same department."[17]

After their experience with parliamentary supremacy, the Framers were particularly concerned about the concentration of legislative power.[18]  For example, Gouverneur Morris warned delegates at the Constitutional Convention that the "Legislature will continually seek to aggrandize & perpetuate

---

[13] Max Farrand, The Fathers of the Constitution 95 (1921).

[14] Letter from Henry Knox to George Washington (March 19, 1787), https://perma.cc/9UCC-ZYAP.

[15] *PennEast Pipeline Co. v. New Jersey*, 141 S. Ct. 2244, 2263 (2021).

[16] *Bowsher v. Synar*, 478 U.S. 714, 730 (1986).

[17] The Federalist No. 51 (James Madison).

[18] *Free Enterprise Fund v. PCAOB*, 537 F.3d 667, 689 (D.C. Cir. 2008) (Kavanaugh, J., dissenting).

6

themselves."[19]    Drawing on well-established political traditions, the Framers divided Congress "into two Chambers: the House of Representatives and the Senate."[20]

Whereas the Framers *divided* the Legislative Power, they *unified* the Executive.  They were concerned that "the weakness of the executive may require . . . that it should be fortified."[21]  After the "humiliating weakness" of the Articles of Confederation, the "Framers deemed an energetic executive essential to 'the protection of the community against foreign attacks,' 'the steady administration of the laws,' 'the protection of property,' and 'the security of liberty.'"[22]

The Framers debated how to achieve that objective while also avoiding the dangers of monarchy or tyranny.  Some delegates proposed a plural executive to limit the concentration of power in any one person.  For example, Edmund Randolph pressed for a three-member executive representing different

---

[19] James Madison's Notes of the Constitutional Convention (July 19, 1787), https://perma.cc/HU54-J7SU.

[20] *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2203 (2020).

[21] The Federalist No. 51.

[22] First quoting *Myers*, 272 U.S. 52, 117 (1926); then quoting *Seila Law*, 140 S. Ct. at 2203 (quoting The Federalist No. 70); *see also* Adam White, Chevron *Deference v. Steady Administration*, Yale J. Reg.: Notice & Comment (Jan. 24, 2024), https://perma.cc/8GLE-2JX4 ("Energetic presidents aren't inherently good.  Rather, presidential energy is good for a few important things—especially, Hamilton argued, for 'the steady administration of the laws.'").

7

regions of the country.[23]   And some proposed that Congress should choose the Executive — whether singular or plural.[24]

Ultimately, though, the Framers "'insisted' upon 'unity in the Federal Executive' to 'ensure both vigor and accountability' to the people."[25]   So they settled on a single executive, the President of the United States, who "would be personally responsible for his branch."[26]

That unity affords the President "[d]ecision, activity, secrecy, and dispatch," and it guards against a plural executive's tendency "to conceal faults and destroy responsibility."[27]   It also avoids "the 'habitual feebleness and dilatoriness' that comes with a 'diversity of views and opinions.'"[28]

At the same time, the Framers understood the risks posed by a strong executive.  Their solution?  Making "the President the most democratic and politically accountable official in Government," subject to election "by the entire Nation" every

---

[23] Daniel A. Farber & Suzanna Sherry, A History of the American Constitution 124 (3d ed. 2013).

[24] *Id.* at 118, 127-28.

[25] *Seila Law*, 140 S. Ct. at 2212 (Thomas, J., concurring in part and dissenting in part) (quoting *Printz*, 521 U.S. at 922) (cleaned up).

[26] Akhil Reed Amar, America's Constitution: A Biography 197 (2005); *see also Clinton v. Jones*, 520 U.S. 681, 712 (1997) (Breyer, J., concurring in the judgment) ("Article II makes a single President responsible for the actions of the Executive Branch in much the same way that the entire Congress is responsible for the actions of the Legislative Branch, or the entire Judiciary for those of the Judicial Branch.").

[27] The Federalist No. 70 (Alexander Hamilton).

[28] *Seila Law*, 140 S. Ct. at 2203 (quoting The Federalist No. 70).

8

four years.[29]    The "resulting constitutional strategy is straightforward: divide power everywhere except for the Presidency, and render the President directly accountable to the people through regular elections."[30]

### 2.  Original Understanding of the Removal Power

Against that backdrop, the Constitution assigns a lofty role to the President.  Article II vests the "executive Power" in the "President of the United States of America."[31]  And it charges the President to "take Care that the Laws be faithfully executed."[32]

Of course, the President cannot carry out his duties "alone and unaided" — he must enlist the "assistance of subordinates."[33]    The Framers envisioned a "chain of dependence" in the executive branch, where "the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President."[34]  The Vesting Clause empowers the President to direct and control those officials.  As James Madison explained, "if any power whatsoever is in its nature executive, it is the power of appointing, overseeing, and controlling those who execute the laws."[35]

---

[29] *Id.*

[30] *Id.*

[31] U.S. Const. art. II, § 1.

[32] *Id.* § 3.

[33] *Myers*, 272 U.S. at 117.

[34] 1 Annals of Congress 499 (1789) (James Madison).

[35] *Id.* at 463; *see also* Neomi Rao, *Removal: Necessary and Sufficient for Presidential Control*, 65 Ala. L. Rev. 1205, 1215 (2014) ("The text and structure of Article II provide the President with the power to control subordinates within the executive branch.").

9

That includes "a power to oversee executive officers through removal."[36]  Because the Constitution provided no textual limits on that "traditional executive power," "it remained with the President."[37]

Founding-era history confirms that understanding.  The First Congress encountered the question directly, and its debate and decision — now called "the Decision of 1789" — provides "contemporaneous and weighty evidence of the Constitution's meaning since many of the Members of the First Congress had taken part in framing that instrument."[38]

During the summer of 1789 "ensued what has been many times described as one of the ablest constitutional debates which has taken place."[39]  The topic of the President's removal power came up "during consideration of a bill establishing certain Executive Branch offices and providing that the officers

---

[36] *Free Enterprise Fund*, 561 U.S. at 492 (quoting Letter from James Madison to Thomas Jefferson (June 30, 1789), *in* 16 Documentary History of the First Federal Congress 893 (2004)).

[37] *Id.* (cleaned up).

The absence of a "removal clause" does not mean the President lacks a removal power, just as the absence of a "'separation of powers clause' or a 'federalism clause'" does not undercut those "foundational doctrines."  *Seila Law*, 140 S. Ct. at 2205.  As the Supreme Court has "explained many times before, the President's removal power stems from Article II's vesting of the 'executive Power' in the President."  *Id.*

[38] *Bowsher*, 478 U.S. at 723-24 (internal quotation marks omitted).

[39] *Parsons v. United States*, 167 U.S. 324, 329 (1897).

10

would be subject to Senate confirmation and 'removable by the President.'"[40]

The House debated various theories, including that Congress could specify the President's removal authority on an office-by-office basis, that officers could be removed only through impeachment, that removal required the advice and consent of the Senate, and that the "executive power" conferred plenary removal authority to the President.[41]

The last view, advocated by James Madison, prevailed: The "executive power included a power to oversee executive officers through removal."[42]   To avoid giving the impression that Congress had any say in the President's removal decisions, the House deleted the bill's provision making officers "removable by the President."[43]

In retrospect, the Decision of 1789 has been viewed as "a legislative declaration that the power to remove officers appointed by the President and the Senate [is] vested in the President alone."[44]

---

[40] *Free Enterprise Fund*, 537 F.3d at 691 (Kavanaugh, J., dissenting) (quoting *Myers*, 272 U.S. at 111).

[41] Aditya Bamzai & Saikrishna Prakash, *The Executive Power of Removal*, 136 Harv. L. Rev. 1756, 1774 (2023).

[42] *Free Enterprise Fund*, 561 U.S. at 492.

[43] *Myers*, 272 U.S. at 113-14.

[44] *Id.* at 114; *see also id.* at 144 (the Decision of 1789 "has ever been considered as a full expression of the sense of the legislature on this important part of the American constitution" (quoting 5 John Marshall, The Life of George Washington 200 (1807)).

The district court in *Wilcox* took a different view of the Decision of 1789.   *Wilcox v. Trump*, No. 25-334, 2025 WL 720914, at *12 (D.D.C. Mar. 6, 2025).   To the extent the Decision of 1789 is

11

### 3. Historical Practice

The understanding that the President holds unrestricted removal power "became widely accepted during the first 60 years of the Nation."[45]  George Washington removed "almost twenty officers, including a consul, diplomats, tax collectors, surveyors, and military officers."[46]   What's more, his commissions typically stated that officeholders served during "the pleasure of the President," indicating Washington's apparent belief that he could dismiss officers at will.[47]  Then-Secretary of State Timothy Pickering — the official in charge of signing commissions — confirmed the meaning of that language: "In all cases except that of the Judges, it has been established from the time of organizing the Government, that

---

susceptible to multiple interpretations, I follow the Supreme Court's. *See Myers*, 272 U.S. at 114; *Parsons*, 167 U.S. at 328-30; *Bowsher*, 478 U.S. at 723; *Free Enterprise Fund*, 561 U.S. at 492; *Seila Law*, 140 S. Ct. at 2197.

At least one amicus disputes the Supreme Court's settled view of the historical evidence.  Constitutional Accountability Center Br. at 10-12.  Although Alexander Hamilton originally took the position that Senate consent would be required to remove an officer, The Federalist No. 77 (Alexander Hamilton), he "later abandoned" that "initial" view, *Seila Law*, 140 S. Ct. 2205.  Likewise, "whatever Madison may have meant" by his statement in Federalist No. 39 that "the 'tenure' of 'ministerial offices generally will be a subject of legal regulation,'" he later "led the charge" in defending the President's removal authority during the Decision of 1789.  *Seila*, 140 S. Ct. at 2205 n.10.  Finally, the Court has "reject[ed]" Chief Justice Marshall's statement in *Marbury* that some officers are not "removable at the will of the executive" as "ill-considered dicta." *Id.* at 2205 (citing *Myers*, 272 U.S. at 136-39, 142-44).

[45] *Free Enterprise Fund*, 537 F.3d at 692 (Kavanaugh, J., dissenting).

[46] Bamzai & Prakash, *The Executive Power of Removal*, at 1777.

[47] *Id.* at 1777-78.

12

removals from offices should depend on the pleasure of the Executive power."[48]

Subsequent Presidents also dismissed officers at will, often based on political disagreements. John Adams removed Secretary Pickering over a disagreement about America's alignment with France.[49] (Yes, the same Pickering who defended Washington's removal power.) James Madison "compelled the resignation of" Secretary of War John Armstrong following the War of 1812.[50] Andrew Jackson removed Treasury Secretary William Duane for his refusal to withdraw federal deposits from the Second Bank of the United States.[51] William Henry Harrison intended to remove scores of Jacksonian officials but died before he had the chance — just one month after entering office.[52] His successor, John Tyler, quickly carried out Harrison's removal plans.[53] Not to be outdone, Millard Filmore dismissed Zachary Taylor's entire cabinet as his "first act in office."[54]

To be sure, these removals sometimes prompted minor opposition from Congress. For example, after Jackson removed Surveyor General Gideon Fitz, "the Senate adopted a resolution requesting the President to communicate" his

---

[48] *Id.* at 1778 (quoting Letter from James Monroe to Timothy Pickering (July 31, 1797), *in* 3 The Writings of James Monroe 73, 75 n.1 (Stanislaus Murray Hamilton ed., 1969) (quoting a letter from Pickering to Monroe)).

[49] Steven G. Calabresi & Christopher S. Yoo, The Unitary Executive 62 (2008).

[50] *Id.* at 79.

[51] *Id.* at 106, 108.

[52] *Id.* at 131-32.

[53] *Id.* at 135.

[54] *Id.* at 148.

13

reasons for firing Fitz to aid in the Senate's "constitutional action upon the nomination of his successor."[55]  Jackson refused to comply with what he deemed "unconstitutional demands."[56]  Presidents in our nation's first hundred years faced other similarly halfhearted resolutions in response to their exercise of the removal power.[57]

One exceptional case was the impeachment of Andrew Johnson, following his removal of Secretary of War Edwin Stanton.[58]  The impeachment charged Johnson with violating the 1867 Tenure of Office Act, which required Senate consent to remove officers.[59]  Much of Johnson's defense centered on his view that the Act was unconstitutional,[60] a view the Supreme Court later endorsed.[61]

The Senate narrowly acquitted Johnson.[62]  "The contentious Johnson episode ended in a way that discouraged congressional restrictions on the President's removal power and helped preserve Presidential control over the Executive

---

[55] *Myers*, 272 U.S. at 287 n.77 (Brandeis, J., dissenting).

[56] *Id.*

[57] *See, e.g.*, *id.* at 279-81 & nn. 64 & 67 (Brandeis, J., dissenting) (discussing proposals to require "the President to give the number and reasons for removals").

[58] Calabresi & Yoo, The Unitary Executive, at 185.

[59] *Id.* at 179.

[60] David Miller DeWitt, The Impeachment and Trial of Andrew Johnson 445 (1903).

[61] *See Myers*, 272 U.S. at 176 (declaring the Tenure of Office Act "invalid" "in so far as it attempted to prevent the President from removing executive officers who had been appointed by him by and with the advice and consent of the Senate").

[62] Calabresi & Yoo, The Unitary Executive, at 186.

14

Branch."[63]  It now "stands as one of the most important events in American history in maintaining the separation of powers ordained by the Constitution."[64]

A few decades later, another removal dispute arose when Grover Cleveland dismissed U.S. Attorney Lewis Parsons prior to the conclusion of Parsons' statutory four-year term.[65] Parsons argued that the President could not remove him until the four-year term elapsed.[66]  The Court disagreed.  After recounting the Decision of 1789 and the "continued and uninterrupted practice" of plenary presidential removal, the Court construed Parsons' four-year term as a ceiling for how long he could remain in office — not as a restriction on the President's power to remove him sooner.[67]

As this history demonstrates, the Founders understood that the President had inherent, inviolable, and unlimited authority to remove principal officers exercising substantial executive authority, and Presidents have exercised that authority since the very beginning of the Republic, beginning with George Washington.

## B.   Precedent

With those historical underpinnings, I turn to the Supreme Court's more recent precedents.  The Court has reaffirmed the President's inherent removal power on several occasions,

---

[63] *Free Enterprise Fund*, 537 F.3d at 692 (Kavanaugh, J., dissenting).

[64] *Id.* at 692-93.

[65] *Parsons*, 167 U.S. at 327-28.

[66] *Id.* at 328.

[67] *Id.* at 338-39, 340.

15

relying often on the historical evidence recounted in the preceding section.

That is not to say the Court's removal-power jurisprudence has always been consistent.  Though the Court in *Myers* reaffirmed the President's unilateral removal power, *Humphrey's Executor* created an exception to the rule.  It left future courts to decide when that exception might apply.  To the extent that *Humphrey's* created a showdown between the *Myers* rule and the *Humphrey's* exception, the Court's recent decisions have been unequivocal: *Humphrey's* has few, if any, applications today.  To discern the Supreme Court's rule, I review the Court's holdings, beginning with *Myers*.

### 1. *Myers*

In 1920, President Woodrow Wilson removed postmaster Frank Myers from office.[68]  Myers sought backpay, relying on a statute that required the President to obtain Senate approval before removing him — something the President had indisputably not done.[69]  The question before the Court was whether the Constitution permitted such a restriction.

Writing for the Court, Chief Justice Taft undertook a deep historical survey, concluding that the statutory provision denying the President the "unrestricted power of removal" was "in violation of the Constitution and invalid."[70]  That survey highlighted much of the history recounted above, including the Decision of 1789.  The Court focused on four points advanced

---

[68] *Myers*, 272 U.S. at 106.

[69] *Id.* at 107-08.

[70] *Id.* at 176.

16

by James Madison and his allies during that congressional debate.

First, *Myers* stressed that the President's supervisory power over officers is crucial for protecting the separation of powers: "If there is any point in which the separation of the legislative and executive powers ought to be maintained with great caution, it is that which relates to officers and offices."[71] It further explained that to "take care that the laws be faithfully executed," the President must be able to "select those who were to act for him under his direction" and remove "those for whom he cannot continue to be responsible."[72]    The Court's conclusion: "[N]o express limit was placed on the power of removal by the executive" and "none was intended."[73]

Second, the Court considered whether the Senate's role in presidential appointments carried with it a corresponding role in removals.  It concluded that history would not support that inference.  The power of removal "is different in its nature from that of appointment," as was "pointed out" in the First Congress's debate.[74]  That's because a Senate veto of a removal "is a much greater limitation upon the executive branch, and a much more serious blending of the legislative with the executive, than a rejection of a proposed appointment."[75]  So where the Constitution does not directly provide Congress any power over removals, that power "is not to be implied."[76]

---

[71] *Id.* (quoting 1 Annals of Congress 581 (1789) (James Madison)).

[72] *Id.* at 117, 122.

[73] *Myers*, 272 U.S. at 118.

[74] *Id.* at 121.

[75] *Id.*

[76] *Id.*

17

Third, the Court observed that Congress's power to create offices did not carry a corresponding power to limit the President's removal power over them. The "legislative power" is "limited to" the powers "enumerated" under Article I of the Constitution; the "executive power" is a "more general grant."[77] Thus, the Court found it "reasonable to suppose" that if the Founders "intended to give to Congress power to regulate or control removals," they would have included those powers "among the specifically enumerated legislative powers in article 1, or in the specified limitations on the executive power in article 2."[78]

Fourth and finally, the Court noted the threat that Congress could "thwart[] the executive in the exercise of his great powers and in the bearing of his great responsibility by fastening upon him . . . men who" might render his faithful execution of the laws "difficult or impossible" — be it "by their inefficient service under him, by their lack of loyalty to the service, or by their different views of policy."[79] To avoid this possibility, the moment that the President "loses confidence in the intelligence, ability, judgment, or loyalty of any one of [his subordinates], he must have the power to remove him without delay."[80]

The Court specifically included within that authority the power to remove executive officers whose duties include those "of a quasi judicial character."[81] Though the Court noted that "the President cannot . . . properly influence or control" the discharge of such duties, he may still "consider the decision

---

[77] *Id.* at 128.

[78] *Myers*, 272 U.S. at 128.

[79] *Id.* at 131.

[80] *Id.* at 134.

[81] *Id.* at 135.

18

after its rendition as a reason for removing the officer. . . . Otherwise he does not discharge his own constitutional duty of seeing that the laws be faithfully executed."[82]

*Myers* was a landmark decision. It established that the President's removal power is grounded in the Constitution's text and history and bolstered by tradition. It is essential to the constitutional separation of powers and to the President's ability to "take Care that the Laws be faithfully executed."[83]

### 2. *Humphrey's Executor*

Then came *Humphrey's Executor*.[84] It reaffirmed the core holding of *Myers* — that the President holds an "illimitable power of removal" over "purely executive officers."[85] But "in six quick pages devoid of textual or historical precedent for the novel principle it set forth,"[86] *Humphrey's* carved out an exception for agencies that wield "no part of the executive power."[87]

According to the Court, that exception permitted Congress to insulate officers of the relevant agency, the Federal Trade Commission, from at-will removal. That exception rested on the Court's characterization of the FTC as an entity that exercised "no part of the executive power" and that in no way acted as "an arm or an eye of the executive."[88] Instead, the

---

[82] *Id.*

[83] U.S. Const. art. I, § 3.

[84] *Humphrey's Executor v. United States*, 295 U.S. 602 (1935).

[85] *Id.* at 627-28.

[86] *Morrison v. Olson*, 487 U.S. 654, 726 (1988) (Scalia, J., dissenting).

[87] *Humphrey's Executor*, 295 U.S. at 628.

[88] *Id.*

19

Court viewed the agency as "wholly disconnected from the executive department" — "an agency of the legislative and judicial departments."[89]

Confronted with the 1935 FTC's role in investigating and reporting violations of the law — responsibilities typically associated with the executive branch — the Court insisted that the 1935 FTC did not wield "executive power in the constitutional sense," even if it performed an "executive function."[90]  To justify the distinction, it classified the agency's work as "neither political nor executive, but predominantly quasi judicial and quasi legislative."[91]

The *Humphrey's* Court conceded the ambiguity inherent in its ruling, acknowledging a potential "field of doubt" between *Myers* — where presidential removal power over purely executive officers was absolute — and *Humphrey's*, which permitted removal restrictions only if an agency "exercise[d] no part of the executive power."[92]  Rather than clarifying the boundaries between these categories, the Court explicitly deferred such questions for "future consideration and determination."[93]

---

[89] *Id.* at 630.

[90] *Id.* at 28.

I say the "1935 FTC" to distinguish it from the 2025 FTC, which exercises greater power than the 1935 FTC.  *See, e.g.*, *Collins v. Yellen*, 141 S. Ct. 1761, 1806 (2021) (Sotomayor, J., concurring in part and dissenting in part) ("1935 FTC did not [have] the power to impose fines").

[91] *Id.* at 624.

[92] *Id.* at 628, 632.

[93] *Id.* at 632.

20

As the rest of this survey will show, subsequent decisions by the Supreme Court have come close to closing the gap that *Humphrey's* left. The Court has consistently declined to extend *Humphrey's* beyond its facts and has instead reaffirmed *Myers* as the default rule that occupies the "field of doubt" for any agency that wields the substantial executive power that *Humphrey's* understood the 1935 FTC not to exercise.

### 3. *Wiener*

One might say *Humphrey's* had "one good year" in 1958, when the Court applied it in *Wiener v. United States*.[94] There, the Court "read a removal restriction into the War Claims Act of 1948" because the War Claims Commission "was an adjudicatory body."[95]

The *Wiener* opinion took for granted that the Commission was purely an adjudicatory body. Indeed, the Commission's entire responsibility, in the Court's view, consisted of "receiv[ing] and adjudicat[ing] . . . three classes of claims" defined by statute.[96] Nothing more. So in *Wiener*, the *Humphrey's* exception continued unchanged: Officers of agencies that do not exercise executive power may be insulated from presidential removal.

---

[94] 357 U.S. 349 (1958); *cf.* Cass Sunstein, *Nondelegation Canons*, 67 U. Chi. L. Rev. 315, 322 (2000).

[95] *Collins*, 141 S. Ct. 1761, 1783 n.18.

[96] *Wiener*, 357 U.S. at 354 (quoting War Claims Act of 1948, Pub. L. No. 80-896, ch. 826, § 3, 62 Stat. 1240, 1241 (codified at 50 U.S.C. § 4102)).

21

### 4. *Free Enterprise Fund*

The Court declined to extend *Humphrey's* in *Free Enterprise Fund v. PCAOB*.[97] That case involved a challenge to the Public Company Accounting Oversight Board's double-layer removal protections — its members were removable only for cause by SEC commissioners who in turn were removable only for cause.[98]

Reversing a panel decision of this court, the Supreme Court rejected the Board's structure as a violation of the Vesting Clause, the Take Care Clause, and the Constitution's separation of powers.[99] Multi-layered removal protections rendered the President helpless to "oversee the faithfulness of the officers who execute" the law.[100] If an inferior officer performed poorly, the President could not remove him; nor could the President remove the poor performer's supervisor for failing to carry out the desired removal.[101] As a result, the President had no way to hold officers accountable in the executive branch.

According to *Free Enterprise Fund*, the Founders created a unitary executive in part to ensure political accountability to the people. Because citizens "do not vote for the 'Officers of the United States,'" they must instead "look to the President to guide the 'assistants or deputies . . . subject to his

---

[97] 561 U.S. 477 (2010).

[98] *Id.* at 487.

[99] *Id.* at 484, 492.

[100] *Id.* at 484.

[101] *Id.*

22

superintendence."[102]  Without this "clear and effective chain of command," voters cannot identify "on whom the blame or the punishment" should fall when the government errs.[103]

The Court stressed that its decision did not constrain the size of the executive branch but instead safeguarded its accountability.  The larger and more complex the executive branch becomes, the greater the risk that it will "slip from the Executive's control, and thus from that of the people."[104]  As the executive branch expands — wielding "vast power and touch[ing] almost every aspect of daily life" — its accountability to a democratically elected President is even more essential.[105]

Where did *Free Enterprise Fund* leave *Myers*?  It called *Myers* a "landmark."[106]  And it reaffirmed *Myers'* "principle that Article II confers on the President 'the general administrative control of those executing the laws,'" including the removal power.[107]

And *Humphrey's*?  The Court declined to extend that decision to "a new type of restriction."[108]  So *Free Enterprise*

---

[102] *Free Enterprise Fund*, 561 U.S. at 497-98 (first quoting U.S. Const. art I, § 2, cl. 2, then quoting The Federalist No. 72 (Alexander Hamilton)).

[103] *Id.* at 498 (quoting The Federalist No. 70 (Alexander Hamilton)).

[104] *Id.* at 499.

[105] *Id.*

[106] *Id.* at 492.

[107] *Free Enterprise Fund*, 561 U.S. at 492 (quoting *Myers*, 272 U.S. at 164).

[108] *Id.* at 514.

23

*Fund*'s reasoning "is in tension with" *Humphrey's*,[109] including *Humphrey's* departure from *Myers*' "traditional default rule" that "removal is incident to the power of appointment."[110]  For any future case about an agency in the "field of doubt" between *Myers* and *Humphrey's*, the Court directed us to apply *Myers*, not *Humphrey's*.

### 5.  *Seila Law*

The Court again declined to extend *Humphrey's* in *Seila Law LLC v. CFPB*.[111]  That case presented another "new situation": "an independent agency," the Consumer Financial Protection Bureau, "led by a single Director and vested with significant executive power."[112]

As in *Free Enterprise Fund*, the Supreme Court repudiated a decision of this court.[113]  And as in *Free Enterprise Fund*, the Supreme Court took the President's absolute removal power as expressed in *Myers* as "the rule," with *Humphrey's* as a limited exception.[114]  The Court explained that *Humphrey's* represents "the *outermost* constitutional limits of permissible congressional restrictions on the President's removal power,"

---

[109] *PHH Corp. v. CFPB*, 881 F.3d 75, 194 n.18 (D.C. Cir. 2018) (en banc) (Kavanaugh, J., dissenting) (citing *In re Aiken County*, 645 F.3d 428, 444-46 (D.C. Cir. 2011) (Kavanaugh, J., concurring)); *see also* Rao, *Removal*, at 1208.

[110] *Free Enterprise Fund*, 561 U.S. at 509.

[111] 140 S. Ct. 2183, 2203 (2020).

[112] *Id.* at 2201.

[113] *See id.* at 2194 (discussing *PHH Corp. v. CFPB*, 881 F.3d 75 (D.C. Cir. 2018) (en banc)).

[114] *Id.* at 2201.

24

and it declined to extend *Humphrey's* to the novel agency structure at issue in *Seila Law*.[115]

The Court fashioned a clear rule for the *Humphrey's* exception: It applies only to "multimember expert agencies that do not wield substantial executive power."[116]

Once again, *Seila Law* confirmed that in cases falling in the "field of doubt" between *Myers* and *Humphrey's*, *Myers* controls.

### 6. *Collins*

*Collins v. Yellen* applied *Seila Law*'s holding to another independent agency led by a single top officer — the Federal Housing Finance Authority.[117]  In doing so, the Court doubled down on its prior reasoning and has been understood by some — including Justice Kagan — to have gone even further than *Seila Law* in affirming the *Myers* default rule.[118]

First, the Court rejected the argument that FHFA's more limited authority justified its removal protection.[119]  Instead, the Court reaffirmed the President's removal power as serving "vital purposes" regardless of an agency's scope or power.[120]

---

[115] *Id.* at 2200 (quoting *PHH Corp.*, 881 F.3d at 196 (Kavanaugh, J., dissenting)) (emphasis added).

[116] *Id.* at 2200-01.

[117] *See* 141 S. Ct. 1761, 1783-87 (2021).

[118] *Id.* at 1801 (Kagan, J., concurring in part and concurring in the judgment) (noting the majority jettisoned "significant executive power" from the test in *Seila Law*).

[119] *Id.* at 1784-85.

[120] *Id.* at 1784.

25

Second, the Court rejected the argument that the FHFA doesn't exercise executive power given its role as a conservator or receiver, in which it sometimes acts as "a private party."[121] To the contrary, the FHFA derived its power from a statute and was tasked with interpreting and implementing that statute — "the very essence of execution of the law."[122] The FHFA's ability to issue binding orders further confirmed that it "clearly exercises executive power."[123]

Third, the Court asked whether an agency that does not regulate "purely private actors" might avoid the presidential removal rule.[124] Again, the Court answered in the negative. Once more, it emphasized the "important purposes" served by the removal power, regardless of whether an agency regulates private actors directly.[125] The implication: If an agency "can deeply impact the lives of millions of Americans" through its decisions, even indirectly, it is an agency that the President must be able to control.[126]

Finally, the Court addressed whether the "modest" nature of the FHFA director's tenure protection — less restrictive than other removal clauses — warranted a different outcome.[127] Again, the Court rejected the distinction, holding

---

[121] *Id.* at 1785-86.

[122] *Collins*, 141 S. Ct. at 1785 (cleaned up).

[123] *Id.* at 1786.

[124] *Id.*

[125] *Id.*

[126] *Id.*

[127] *Collins*, 141 S. Ct. at 1786.

26

that the Constitution "prohibits even 'modest restrictions'" on the President's removal power.[128]

Once again, *Myers* occupied the "field of doubt" between the (by now exceptionally broad) *Myers* rule and the (by now exceptionally narrow) *Humphrey's* exception.

### C. The State of the Doctrine Today

Text, history, and precedent are clear: The Constitution vests the "entire 'executive Power'" in the President.[129] That power "includes the ability to remove executive officials."[130] Without such power, it would be "impossible for the President . . . to take care that the laws be faithfully executed."[131]

The Supreme Court has "left in place two exceptions to the President's unrestricted removal power."[132] Each of them is binding on lower courts, even if each of them is also on jurisprudential life support. One of them — *Morrison v. Olson* — is not relevant here.[133]

The second exception is *Humphrey's*. It allows Congress to restrict the President's removal power for "a multimember body of experts, balanced along partisan lines, that perform[s] legislative and judicial functions" and exercises "no part of the

---

[128] *Id.* at 1787 (quoting *Seila Law*, 140 S. Ct. at 2205).

[129] *Seila Law*, 140 S. Ct. at 2197.

[130] *Id.*

[131] *Id.* at 2198 (quoting *Myers*, 272 U.S. at 164).

[132] *Id.*

[133] 487 U.S. 654 (1988); *cf. Seila Law*, 140 S. Ct. at 2200 (*Morrison* covers "inferior officers with limited duties and no policymaking or administrative authority").

27

executive power."[134]  Under modern Supreme Court precedent, that exception stretches no further than partisan-balanced "multimember expert agencies that do not wield substantial executive power."[135]

For a court to conclude that an executive agency wields substantial executive power, it need not assemble a fact-intensive catalog of the agency's executive functions.  The default: *Executive* agencies exercise *executive* power.  The exception covers only an agency materially indistinguishable from the 1935 FTC, as *Humphrey's* understood the 1935 FTC.

Why did the Supreme Court narrow *Humphrey's* so severely in *Seila Law* and *Collins*?

Perhaps it was because *Humphrey's* "authorize[s] a significant intrusion on the President's Article II authority to exercise the executive power and take care that the laws be faithfully executed."[136]

Or perhaps it was because *Humphrey's* "did not pause to examine how a purpose to create a body 'subject only to the people of the United States' — that is, apparently, beyond control of the constitutionally defined branches of

---

[134] *Id.* at 2198-99 (second part quoting *Humphrey's Executor*, 295 U.S. at 628).

[135] *Id.* at 2199-2200.

Although the CFPB does not conduct adjudications, it's clear that *Seila*'s "substantial executive power" test applies to adjudicatory agencies like the MSPB and NLRB.  After all, *Seila* was describing the exception in *Humphrey's*, which dealt with an adjudicatory agency — the 1935 FTC.

[136] *Free Enterprise Fund*, 537 F.3d at 696 (Kavanaugh, J., dissenting).

28

government — could itself be sustained under the Constitution."[137]

Or perhaps it was because *Humphrey's* relied on inconsistent separation-of-powers logic, which fails to account for how "an agency can at the same moment reside in both the legislative and the judicial branches" without infringing on "the 'fundamental necessity of maintaining each of the three general departments of government entirely free from the control or coercive influence . . . of either of the others.'"[138]

Or perhaps still it was because *Humphrey's* made incomprehensible distinctions "between 'executive function' and 'executive power.'"[139]  "Of course the commission was carrying out laws Congress had enacted; in that sense its functions could hardly have been characterized as other than executive, whatever procedures it employed to accomplish its ends."[140]

Whatever the reason, without overturning *Humphrey's*, the Supreme Court has seemed "keen to prune . . . *Humphrey's*."[141]    The Court's recent opinions have "characterized the 'independent agencies' as executive and

---

[137] Peter L. Strauss, *The Place of Agencies in Government: Separation of Powers and the Fourth Branch*, 84 Colum. L. Rev. 573, 611-12 (1984).

[138] *Id.* at 612 (quoting *Humphrey's Executor*, 295 U.S. at 629).

[139] *Id.*

[140] *Id.*

[141] Aditya Bamzai & Saikrishna Bangalore Prakash, *The Executive Power of Removal*, 136 Harv. L. Rev. 1756, 1759 (2023).

29

have rejected the notion that these agencies exercise quasi-legislative or quasi-judicial powers."[142]

No wonder that *Humphrey's* has been mostly ignored in recent years by Supreme Court majorities — like a benched quarterback watching *Myers* (and the original meaning of the Constitution) from the sideline.

To be clear, this court must "follow the case which directly controls, leaving to th[e] [Supreme] Court the prerogative of overruling its own decisions."[143]   We cannot overrule

---

[142] *Id.*

Recent Supreme Court precedents have "doubted Congress's ability to vest *any* judicial power (whether 'quasi' or not) in an executive agency." *Severino v. Biden*, 71 F.4th 1038, 1050 (D.C. Cir. 2023) (Walker, J., concurring) (citing *Oil States Energy Services, LLC v. Greene's Energy Group, LLC*, 138 S. Ct. 1365, 1372-73 (2018)).  And "congress cannot delegate legislative power to the president." *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892); *cf. Mistretta v. United States*, 488 U.S. 361, 419 (1989) (Scalia, J., dissenting) ("Strictly speaking, there is *no* acceptable delegation of legislative power.").  As a result, while specifically listing an executive agency's executive functions is a sufficient basis for concluding the President may remove that agency's principal officers, it is not a necessary basis.  *See Collins*, 141 S. Ct. at 1801 (Kagan, J., concurring in part and concurring in the judgment) (arguing that *Collins* "broaden[ed]" *Seila Law* by clarifying that "the constitutionality of removal restrictions does not hinge on the nature and breadth of an agency's authority" (cleaned up)).  If it's not exercising executive power, what is it doing in the executive branch? *Cf. Severino*, 71 F.4th at 1050 (Walker, J., concurring) ("[I]t might be that little to nothing is left of the *Humphrey's* exception to the general rule that the President may freely remove his subordinates.").

[143] *Mallory v. Norfolk Southern Railway Co.*, 143 S. Ct. 2028, 2038 (2023) (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989)).

30

*Humphrey's*.  And if the agency in question is the identical twin of the 1935 FTC (as *Humphrey's* understood the 1935 FTC) then *Humphrey's* controls.

But as Judge Henderson wrote in 2018, we should "be loath to cede *any* more of Article II than *Humphrey's Executor* squarely demands."[144]  Since then, *Seila Law* and *Collins* have turned that wisdom into a binding command on the lower courts.  As in the context of *Bivens* — like *Humphrey's*, a precedent not overruled but severely narrowed by subsequent decisions — "[e]ven a modest extension is still an extension."[145]  And because the Supreme Court has forbidden extensions of *Humphrey's* to any new contexts, we cannot extend *Humphrey's* — not even an inch.

### III. Stay Factors

To determine whether a stay pending appeal is appropriate, "we ask (1) whether the applicant is likely to succeed on the merits, (2) whether it will suffer irreparable injury without a stay, (3) whether the stay will substantially injure the other parties interested in the proceedings, and (4) where the public interest lies."[146]  "The first two factors . . . are the most critical."[147]

---

[144] *PHH Corp.*, 881 F.3d at 156 (Henderson, J., dissenting).

[145] *Id.* (Henderson, J., dissenting) (quoting *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1864 (2017)).

[146] *Ohio v. EPA*, 144 S. Ct. 2040, 2052 (2024) (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

[147] *Nken*, 556 U.S. at 434.

31

## A. Likelihood of Success on the Merits

Under binding Supreme Court precedent, Congress cannot restrict the President's power to remove the principal officers of agencies that "wield substantial executive power."[148]  And for the reasons explained below, the NLRB and the MSPB "exercis[e] substantial executive authority" — as then-Judge Kavanaugh said in a dissent later vindicated by *Seila Law*.[149]

Because those agencies exercise "substantial executive power,"[150] the Government is likely to prevail in its contention that the President may fire NLRB commissioners and MSPB members.

### 1.    *Wilcox v. Trump*

The NLRB is an executive branch agency that administers federal labor law.[151]  It has five members who are "appointed by the President by and with the advice and consent of the Senate."[152]  They serve five-year terms, and the President chooses "one member to serve as Chairman."[153]  The statute purports to restrict the President's removal power.[154]

---

[148] *Seila Law v. CFPB*, 140 S. Ct.2183, 2199-2200 (2020).

[149] *PHH Corp. v. CFPB*, 881 F.3d 75, 173 (D.C. Cir. 2018) (en banc) (Kavanaugh, J., dissenting).

[150] *Seila Law*, 140 S. Ct. at 2199-2200.

[151] 29 U.S.C. §§ 153(a), 160(a).

[152] *Id.* § 153(a).

[153] *Id.*

[154] *See id.* § 153(a) ("Any member of the Board may be removed by the President, upon notice and hearing, for neglect of duty or malfeasance in office, but for no other cause.").

32

By law, the NLRB is "empowered . . . to prevent any person from engaging in any unfair labor practice."[155]  Like other executive agencies, it carries out this law enforcement mission by promulgating rules, overseeing adjudications, issuing cease-and-desist orders, ordering backpay, and seeking enforcement orders and injunctions in federal court.[156]

These are "exercises of . . . the 'executive Power.'"[157]  When Congress validly authorizes agencies to promulgate rules, their rulemaking is "the very essence of execution of the law" because it requires the agency to "interpret[] a law enacted by Congress to implement the legislative mandate."[158]  Likewise, when agencies choose whether to bring enforcement actions in federal court, their "discretion encompasses the Executive's power to decide whether to initiate charges for legal wrongdoing and to seek punishment, penalties, or sanctions against individuals or entities who violate federal law."[159]  And when agencies seek monetary relief like backpay "against private parties on behalf of the United States in federal court," they exercise a "quintessentially executive power not considered in *Humphrey's Executor*."[160]

---

[155] *Id.* § 160(a).

[156] *Id.* §§ 156, 160(b)-(e), (j).

[157] *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013) (quoting U.S. Const., art. II, § 1, cl. 1).

[158] *Collins v. Yellen*, 141 S. Ct. 1761, 1785 (2021) (cleaned up).

[159] *In re Aiken County*, 725 F.3d 255, 266 (D.C. Cir. 2013).

[160] *Seila Law*, 140 S. Ct. at 2200 (2020).

33

The NLRB does all that and more.  It is not a "mere legislative or judicial aid."[161]  Instead, it is a (strong) arm of the executive branch and wields substantial executive power.[162]

To reinstate Wilcox, the district court relied on an overbroad reading of *Humphrey's* and a misplaced emphasis on twentieth-century history.

*First*, beginning with *Humphrey's*, the district court compared the NLRB to the 1935 FTC, arguing that they share similar functions and authorities.[163]  But the two agencies are far from identical.  For one thing, the NLRB is not subject to a statutorily imposed partisan-balance requirement.[164]  And the NLRB exercises authorities that the 1935 FTC did not.  For example, it has the power to go directly to federal court to seek injunctions against employers or unions while a case is pending.[165]  And the NLRB's ability to seek monetary relief like backpay "against private parties on behalf of the United

---

[161] *Id.*

[162] True, as the district court pointed out, the General Counsel (removable at will) leads investigations and prosecutions "on behalf of the Board."  *Wilcox v. Trump*, No. 25-cv-334, 2025 WL 720914, at *7 (D.D.C. Mar. 6, 2025) (citing 29 U.S.C. § 153(d)).  But the General Counsel is subservient to the NLRB, which possesses the sole power to seek enforcement of its orders in federal court, pursue injunctive relief, and approve certain settlements.  29 U.S.C. § 160(e), (j); *NLRB v. United Food & Commercial Workers Union, Local 23, AFL-CIO*, 484 U.S. 112, 121 (1987).

[163] *Wilcox,* 2025 WL 720914 at *8-10 & n.11.

[164] Brian D. Feinstein & Daniel J. Hemel, *Partisan Balance with Bite*, 118 Colum. L. Rev. 9, 32 (2018).

[165] 29 U.S.C. § 160(j).

34

States in federal court" is a "quintessentially executive power not considered in *Humphrey's Executor*."[166]

I suppose it is conceivable that the *Humphrey's* Court would have upheld removal restrictions for the NLRB had it heard the case in 1935. But it is not our job to ask, "What would the 1935 Court do?" Rather, we must ask what the Supreme Court *has done* — in *Humphrey's* yes, but also in *Seila Law*, *Collins*, and the Court's other precedents (guided by the original meaning of the Constitution when binding precedent does not answer the question).[167]

Under *Seila Law*, "the *Humphrey's Executor* exception depend[s]" on "the set of powers the [*Humphrey's*] Court considered as the basis for its decision, not any latent powers that the agency may have had not alluded to by the Court."[168] Under *Collins*, "the President's removal power serves important purposes regardless of whether the agency in question affects ordinary Americans by directly regulating them or by taking actions that have a profound but indirect effect on their lives."[169]

The district court did not grapple with these developments, instead fixating on *Humphrey's*. Opposing the Government's stay motion, Wilcox supports that approach, repeating the uncontroversial statement that *Humphrey's* is "good law," as if that requires us to read it broadly when the Supreme Court's

---

[166] *See Seila Law*, 140 S. Ct. at 2200.

[167] *See id.* at 2198-99; *Collins*, 141 S. Ct. at 1784-86.

[168] *Seila Law*, 140 S. Ct. at 2198, 2200 n.4.

[169] *Collins*, 141 S. Ct. at 1786.

35

more recent precedents command us to read it narrowly.[170] That approach does not faithfully apply precedent.

Under a faithful application of *Seila Law* and *Collins*, *Humphrey's* controls only if an agency is materially indistinguishable from the 1935 FTC. *Humphrey's* covers nothing more than that because the reasoning in *Seila Law* and *Collins* requires a reading of *Humphrey's* that covers nothing more than that. In other words, *Humphrey's* can cover only an agency that exercises no "substantial executive power." The district court "chants [*Humphrey's Executor*] like a mantra, but no matter how many times it repeats those words, it cannot give [*Humphrey's Executor*] substance" that *Seila Law* and *Collins* say "that it lacks."[171]

Strikingly, the district court gave short shrift to *Collins*, dismissing it in a footnote because it involved a single-headed agency and the Court "reaffirmed it 'did not revisit its prior decisions.'"[172] *Of course* neither *Seila Law* nor *Collins* overruled *Humphrey's*. But we are not free to ignore the Supreme Court's binding *interpretation* of its precedent simply because the Court didn't *overrule* that precedent.

After *Seila Law*, a removal restriction is valid only if it (1) applies to a "multimember expert agenc[y], balanced along partisan lines" that (2) does not "wield substantial executive power."[173] Though the FHFA in *Collins* clearly failed the first prong, the Court also addressed the second prong. When *Collins* did so, it arguably "broaden[ed]" *Seila Law* and

---

[170] Wilcox Opp. 1, 15, 16.

[171] *SEC v. Jarkesy*, 144 S. Ct. 2117, 2138 (2024).

[172] *Wilcox*, 2025 WL 720914, at *11 n.13 (quoting *Collins*, 141 S. Ct. at 1761) (cleaned up).

[173] *Seila Law*, 140 S. Ct. at 2199-2200.

36

narrowed *Humphrey's* even more, by asking not whether an agency exercises "significant executive power" but only whether an agency exercises *any* "executive power."[174]

*Second*, history does not support Wilcox either. The district court found it persuasive that no President before President Trump removed an NLRB commissioner.[175] But Supreme Court precedent, not twentieth-century history, resolves this case. And as the district court said, Congress's widespread use of independent, multimember boards and commissions did not begin until the early 1900s.[176] So even if we were evaluating the original meaning of Article II on a blank slate, which we aren't, that twentieth-century history would be of limited value for discerning the Constitution's original meaning.[177]

Finally, the district court described the President's removal of Wilcox as a "power grab" and "blatantly illegal."[178] But unconstitutional statutes are void ab initio because

---

[174] *Id.* at 1801 (Kagan, J., concurring in part and concurring in the judgment).

[175] *Wilcox*, 2025 WL 720914, at *5.

[176] *See id.* at *6.

[177] Similarly unpersuasive is Wilcox's assertion that Congress specifically designed the NLRB to be independent. Wilcox Opp. 5-6. That may well be true, but it does not bear on whether Article II, as interpreted by the Supreme Court, renders NLRB removal restrictions invalid. After all, "Members of Congress designed the PCAOB to have 'massive power, unchecked power.'" *Free Enterprise Fund v. PCAOB*, 537 F.3d 667, 687 (D.C. Cir. 2008) (Kavanaugh, J., dissenting). That did not win the day at the Supreme Court.

[178] *Wilcox*, 2025 WL 720914, at *3, *5.

37

Congress lacks the authority to enact them.[179]  Such statutes are
not law, so it is not "illegal" for the President to violate them.[180]
And under the Supreme Court's precedents, the President's
actions within the executive branch cannot amount to a "power
grab" because "[t]he entire 'executive Power' belongs to the
President alone."[181]

*    *    *

The NLRB exercises "substantial executive power."[182]
Therefore, the Government is likely to prevail in its argument
that the NLRB's removal protections are unconstitutional.

## 2.  *Harris v. Bessent*

The Merit Systems Protection Board is an executive
agency that resolves intra-branch disputes under the Civil

---

[179] *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

[180] Oral Arg. Tr. 77-78 (Question: "If [the statutory removal
restrictions] are not constitutional, then would it be legal for the
President to fire Ms. Wilcox?"  Counsel for Wilcox: "I mean, I think
you're asking a very simple question. . . . You're saying if we lose
on everything and the statute is unconstitutional, does the President
have the ability?  Yes, of course."  Question: "And if the provisions
are unconstitutional, they were always unconstitutional, right?  They
were void ab initio, right?"  Counsel for Wilcox: "Yes, I think that's
the right way to think about the Constitution."  Question: "I do think
these are simple questions, but I ask because the district court said
that the President's action was 'blatantly illegal' because the statute
prohibits it.  Well, if it's an unconstitutional statute, then a statutory
prohibition against it is not something that would make it 'blatantly
illegal.'"  Counsel for Wilcox: "Yes . . . .").

[181] *See Seila Law*, 140 S. Ct. at 2197.

[182] *Id.* at 2199-2200.

38

Service Reform Act.[183]  It has three members "appointed by the President, by and with the advice and consent of the Senate."[184] They serve seven-year terms, and only two members "may be adherents of the same political party."[185]  The Act also purports to restrict the President's removal power.[186]

Under the Civil Service Reform Act, the MSPB's powers are four-fold.[187]

1. It can "hear" and "adjudicate," and ultimately "take final action," on a wide range of matters, including removals, suspensions, furloughs, and demotions; rights or benefits for servicemembers; whistleblower complaints; Hatch Act violations; and other prohibited personnel practices.[188]

2. It can "order any Federal agency or employee to comply with any order or decision issued by the [MSPB] . . . and enforce compliance with any such order."[189]

3. It can "conduct . . . special studies relating to the civil service and to other merit systems in the executive branch, and report to the President and to the Congress as to whether the public interest in a civil service free

---

[183] 5 U.S.C. § 1204(a).

[184] *Id.* § 1201.

[185] *Id*. §§ 1201(d), 1202(a).

[186] *Id.* § 1202 ("Any member may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office.").

[187] *Id.* § 1204(a).

[188] *Id.* § 1204(a)(1); *see id.* §§ 1214(a)(3), 1221, 1216(a), (c), 2302(b), 4303(e), 7513(d); 38 U.S.C §§ 4322, 4324(a)(1).

[189] *Id.* § 1204(a)(2).

39

of prohibited personnel practices is being adequately protected."[190]

4. It can "review . . . rules and regulations of the Office of Personnel Management" and "declare such provision[s] . . . invalid" if it would cause an employee to commit a prohibited personnel practice.[191]

These are "exercises of . . . the 'executive Power.'"[192] Plus, the MSPB also represents itself in federal court — a "quintessentially executive function."[193] And a single MSPB member can unilaterally stay an agency's personnel action — or 6,000 such actions, as it turns out[194] — for 45 days without participation from the other members.[195] That stay can then be extended "for any period which the Board considers appropriate."[196]

Harris disagrees. She emphasizes the MSPB's "adjudicatory nature," likening it to an "Article III court." But

_____

[190] *Id.* § 1204(a)(3).

[191] *Id.* § 1204(a)(4), (f); *id.* § 2302(b).

[192] *City of Arlington*, 569 U.S. at 304 n.4 (quoting U.S. Const., art. II, § 1, cl. 1).

[193] *Seila Law*, 140 S. Ct. at 2200; 5 U.S.C. § 7703(a)(2).

[194] Order on Stay Request, *Special Counsel ex rel John Doe v. Department of Agriculture*, No. CB-1208-25-0020-U-1 (MSPB Mar. 5, 2025), https://perma.cc/3F45-PKG5.

[195] 5 U.S.C. § 1214(b)(1)(A)(i).

As Judge Henderson notes, there is tension between that unilateral authority and Harris's declaration, in which she claims she "cannot issue adjudication decisions unilaterally." J. Henderson Op. 5 n.1 (quoting Harris Decl. ¶ 26, *Harris v. Bessent*, No. 25-cv-412 (D.D.C. Feb. 23, 2025), ECF No. 22-3).

[196] *Id.* § 1214(b)(1)(B)(i).

40

the MSPB is not like the Federal Trade Commission in *Humphrey's* or the War Claims Commission in *Wiener* because it resolves disputes *within* the executive branch.[197]   That distinguishes it from the 1935 FTC and the War Claims Commission, both of which adjudicated disputes between the government and the public.   MSPB adjudication is nothing more than intra-branch dispute resolution.   That's an exercise of executive (not quasi-judicial) power.

In additional ways, the MSPB is not like the 1935 FTC as understood by *Humphrey's*.   It reviews the removal and discipline of federal employees and has the power to directly override other executive agencies' disciplinary actions.[198]   That gives it a significant authority that the FTC never had. Additionally, the MSPB has the power to issue binding orders and "enforce compliance with any such order."[199]   The 1935 FTC lacked that power.   It could issue cease-and-desist orders, but if those were disobeyed, the agency had to petition to a federal court to enforce its orders.[200]

Nor is the MSPB like the War Claims Commission in *Wiener*.   The MSPB is a *permanent* body, unlike the *temporary* War Claims Commission, which served the limited purpose of assigning distributions from a compensation fund.[201]   More importantly, the MSPB's powers far outstrip the War Claims Commission's in a critical way — it can force the President to

---

[197] *See Frazier v. MSPB*, 672 F.2d 150, 154 (D.C. Cir. 1982) (the MSPB adjudicates "conflicts between federal workers and their employing agencies").

[198] 5 U.S.C. § 7701.

[199] *Id.* § 1204(a)(1)-(2).

[200] *See Humphrey's Executor*, 295 U.S. at 620-21 (citing 15 U.S.C. § 45).

[201] *Wiener v. United States*, 357 U.S. 349, 350 (1958).

41

work with thousands of employees he doesn't want to work with, an unquestionable exercise of "substantial executive power."[202]

It's also clear that the MSPB does not exercise quasi-legislative functions. To the extent its ability to invalidate certain regulations resembles legislative activity, that authority does not involve public-facing regulation.[203] So again, even under a broad reading of *Humphrey's*, the MSPB's functions do not align with those of the 1935 FTC or the War Claims Commission. The MSPB "is hardly a mere legislative or judicial aid."[204] It does far more than merely make "reports and recommendations to Congress, as the 1935 FTC did."[205]

The district court recognized that the MSPB "preserves power within the executive branch by charging presidentially appointed [MSPB] members with mediation and initial adjudication of federal employment disputes."[206] But the district court erred in concluding that the MSPB's "features" made any effect on the President's exercise of the executive power "limited."[207] To the contrary, as one member of the Supreme Court has already acknowledged, the preserved power within the MSPB is "substantial executive authority."[208]

In Harris's tenure alone, the MSPB resolved thousands of cases involving "allegations that federal agencies engaged in

---

[202] *Seila Law*, 140 S. Ct. at 2200.

[203] *See* 5 U.S.C. § 1204(f).

[204] *Seila Law*, 140 S. Ct. at 2200.

[205] *Id.*

[206] *Harris v. Bessent*, No. 25-cv-412, 2025 WL 679303, at *6 (D.D.C. Mar. 4, 2025) (emphasis omitted).

[207] *Id.*

[208] *PHH Corp.*, 881 F.3d at 173 (Kavanaugh, J., dissenting).

42

prohibited personnel practices, such as targeting of federal employees based on political affiliation; retaliation against whistleblowers reporting violations of law, waste, fraud and abuse; discrimination; and [Uniformed Services Employment and Reemployment Rights Act] violations, among others."[209]

Those cases highlight that the MSPB's focus on internal-dispute resolution does not mean it is an insignificant or nonexecutive agency. Just because a CEO may informally adjudicate an internal employee dispute does not mean the CEO is any less the chief *executive* officer. It's part of the job. What's more, Harris has been a productive member of the MSPB, participating "in nearly 4,500 decisions" between June 1, 2022, and February 10, 2025.[210] In short, the district court's self-contradictory assertion that the MSPB "does not wield substantial executive power, but rather spends nearly all of its time adjudicating inward-facing personnel matters involving federal employees," tends to show that the MSPB *does indeed* exercise substantial executive power.[211]

Finally, the position of the Department of Justice two years ago in *Severino v. Biden*, supports at-will removal of MSPB members.[212] There, DOJ argued that the President's unrestricted removal power did not extend to the Administrative Conference of the United States because the Conference "does not resolve or commence matters for the Executive Branch or determine anyone's rights or obligations."[213] The MSPB, in contrast, does "resolve . . .

---

[209] *Harris*, 2025 WL 679303, at *14.

[210] *Id.* at *2.

[211] *Id.* at *6 (cleaned up).

[212] 71 F.4th 1038 (D.C. Cir. 2023).

[213] Appellee Supplemental Brief at 5, *Severino v. Biden*, 71 F.4th 1038 (D.C. Cir. 2023) (No. 22-5047).

43

matters for the Executive Branch"[214] — sometimes several thousands of them in one day.[215]  So even according to the understanding of presidential removal power asserted by DOJ in *Severino*, the removal protections for MSPB members are unconstitutional.

*   *   *

In sum, the Government is likely to prevail on its claim that MSPB members must be removable by the President at will and consequently that the relevant removal restrictions are unconstitutional.

## B.  Irreparable Harm

A stay applicant must show that it will be irreparably harmed absent a stay.[216]

Here, the Government contends that the President suffers irreversible harm each day the district courts' injunctions remain in effect because he is deprived of the constitutional authority vested in him alone.  I agree.

Article II vests the President with the "entire 'executive Power,'" which "generally includes the ability to remove executive officials."[217]  The district courts' orders effectively nullify that power.  That level of interference is "virtually unheard of," and "it impinges on the 'conclusive and preclusive' power through which the President controls the

---

[214] *Id.*

[215] Order on Stay Request, *Special Counsel ex rel John Doe v. Department of Agriculture*, No. CB-1208-25-0020-U-1 (MSPB Mar. 5, 2025), https://perma.cc/3F45-PKG5.

[216] *Nken*, 556 U.S. at 434.

[217] *Seila Law*, 140 S. Ct. at 2197.

44

Executive Branch that he is responsible for supervising."[218]  If the President "loses confidence in the intelligence, ability, judgment, or loyalty of any one of [his subordinates], he must have the power to remove him *without delay*."[219]

To be clear, this is not an abstract constitutional injury; it is a serious, concrete harm.  Each year, the NLRB oversees tens of thousands of unfair labor practice charges and decides (on average) roughly 200 cases.[220]  Additionally, the NLRB lacks a quorum without Wilcox, meaning the district court's order tips the scales in favor of political appointees that do not share the President's policy objectives.  The President's removal power, properly understood, avoids that result.[221]

As for the MSPB, just this month, upon the motion of a judicially reinstated Special Counsel, Harris (also judicially reinstated) stayed the termination of roughly 6,000 probationary employees.[222]  Now, in opposing the Government's stay motion, Harris assures us that we need not worry about such actions because the President (after action by this court) replaced the Special Counsel.  But even if Harris no longer has the opportunity to stay personnel actions, she

---

[218] *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *14, *16 (D.C. Cir. Feb. 15, 2025) (Katsas, J., dissenting) (quoting *Trump v. United States*, 144 S. Ct. 2312, 2327-28 (2024)).

[219] *Myers*, 272 U.S. at 134 (emphasis added).

[220] *Wilcox*, 2025 WL 720914, at *17; *Board Decisions Issued*, NLRB, perma.cc/T9XE-TF8M.

[221] Such disagreement on policy is not mere speculation; the President cited the NLRB's recent policy decisions as a partial basis for Wilcox's removal.

[222] Order on Stay Request at 11, *Special Counsel ex rel John Doe v. Department of Agriculture*, No. CB-1208-25-0020-U-1 (MSPB Mar. 5, 2025), https://perma.cc/3F45-PKG5.

45

continues to play an ongoing role in resolving intra-branch, employee-employer clashes, against the wishes of the "one person" who is "responsible for *all* decisions made by and in the Executive Branch."[223]

The Government has established a likelihood of irreparable harm.

## C.  Harm to Removed Officials

Although the two "most critical" factors support issuing stays, I also consider whether those stays "will substantially injure the other parties interested in the proceeding."[224]

They will not.  Harris and Wilcox identify harms that are either incognizable or outweighed by the irreparable harm suffered by the Government under the district courts' injunctions.[225]

First, Wilcox and Harris assert a statutory right to remain in office.  According to Harris, a stay will prevent her "from fulfilling her duties while removed," which she says is irreparable because she "took an oath of office to fulfill specific statutory functions set out by Congress."[226]  Similarly, Wilcox

---

[223] *Free Enterprise Fund*, 537 F.3d at 689 (Kavanaugh, J., dissenting).

[224] *Nken*, 556 U.S. at 434.

[225] Vague assertions about presidential removal committing "violence to the statute Congress enacted" will not suffice — even setting aside that an unconstitutional statutory provision cannot be validly enacted.  *See* Harris Opp. 23.

[226] Harris Opp. 23.

46

suggests that her removal "prevents her from carrying out the duties Congress has assigned to her."[227]

The assertion of a "statutory right" is, of course, entangled with the merits because a statutory right exists only if the statute is constitutional.  I've explained why the removal provisions here are likely not constitutional.  And I assume that Wilcox and Harris each took an oath to "support and defend the Constitution."[228]  So I'm not convinced that their removals inflict any irreparable harm.

Second, both Harris and Wilcox allege that if we issue a stay, their agencies will be harmed.  Specifically, Wilcox argues that she (and the other NLRB commissioners) will be "deprived of the ability to carry out their congressional mandate in protecting labor rights" and "suffer an injury due to the loss of the office's independence."[229]  She adds that her removal "eliminated a quorum, . . . bringing an immediate and indefinite halt to the NLRB's critical work."[230]  For her part, Harris contends "a stay would mar the very independence that Congress afforded Harris and the other members of the Board."[231]

To begin, those are institutional interests, not personal interests, so we may take them into account only as they relate to the public interest.  Even then, this court recently doubted its ability to "balance [one agency's] asserted public interest against the public interest asserted by the rest of the executive

---

[227] Wilcox Opp. 21 (quoting *Harris v. Bessent*, No. 25-cv-412, 2025 WL 521027, at *8 (D.D.C. Feb. 18, 2025)).

[228] 5 U.S.C. § 3331.

[229] *Wilcox*, 2025 WL 720914, at *15-16.

[230] Wilcox Opp. 21.

[231] Harris Opp. 23.

47

branch."[232]    Even assuming a court could weigh those conflicting governmental interests, Wilcox admits the President "could easily establish a majority on the Board by appointing members to fill its two vacant positions," solving the quorum problem.[233]  And if that were not the case, "the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution."[234]

## D.  Public Interest

Staying these cases pending appeal is in the public interest.  The people elected the President, not Harris or Wilcox, to execute the nation's laws.[235]

The forcible reinstatement of a presidentially removed principal officer disenfranchises voters by hampering the President's ability to govern during the four short years the people have assigned him the solemn duty of leading the executive branch.[236]  One may honestly believe that labor disputes and personnel matters are more conveniently or efficiently resolved by an independent agency, but

---

[232] Order at 7, *Dellinger v. Bessent*, No. 25-5052 (D.C. Cir. Mar. 10, 2025).

[233] Wilcox Opp. 20.

[234] *INS v. Chadha*, 462 U.S. 919, 944 (1983).

[235] *See Seila Law*, 140 S. Ct. at 2203 ("Only the President (along with the Vice President) is elected by the entire Nation."); *see also* Andrew Jackson, Presidential Proclamation, 11 Stat. 771, 776 (Dec. 10, 1832) ("We are *one people* in the choice of President and Vice-President.").

[236] *PHH Corp.*, 881 F.3d at 137 (Henderson, J., dissenting).

48

"[c]onvenience and efficiency are not the primary objectives—
or the hallmarks—of democratic government."[237]

## IV. Conclusion

The district courts did their level best in rushed circumstances to follow Supreme Court precedent. But their fidelity to that precedent was unduly selective. By reading *Humphrey's Executor* in an expansive manner, they read it in a manner that *Seila Law* and *Collins* preclude. Though those cases did not overturn *Humphrey's Executor*, their holdings relied on an exceptionally narrow reading of it.

Even the most casual reader will have guessed by now that I agree with how *Seila Law* and *Collins* read *Humphrey's Executor*. But even if I disagreed with them, this court would lack the authority to undo what they did. For a lower court like us, *that* would be a "power grab."[238]

---

[237] *Chadha*, 462 U.S. at 944.

[238] *Wilcox*, 2025 WL 720914, at *3.

KAREN LECRAFT HENDERSON, *Circuit Judge*, concurring in the grants of stay:  I agree with many of the general principles in Judge Walker's opinion about the contours of presidential power under Article II of the Constitution, although I view the government's likelihood of success on the merits as a slightly closer call.  Whatever the continuing vitality of *Humphrey's*, I agree that we should not extend it in this preliminary posture during the pendency of these highly expedited appeals.  I write separately to highlight areas of the merits inquiry that remain murky and to emphasize that the government has easily carried its burden of showing irreparable harm—the second of the two "most critical" stay factors.  *Nken v. Holder*, 556 U.S. 418, 434 (2009).

## A.

I do not repeat at length here my views on the presidential removal power doctrine pre-*Seila Law LLC v. CFPB*, 591 U.S. 197 (2020), which I expressed in *PHH Corp. v. CFPB*, 881 F.3d 75, 138 (D.C. Cir. 2018) (en banc) (Henderson, J., dissenting).  Instead, I emphasize certain ways in which *Seila Law* left unclear where the rule from *Myers v. United States*, 272 U.S. 52 (1926), ends and the exception from *Humphrey's Executor*, 295 U.S. 602 (1935), begins.

*Seila Law* described the scope of the *Humphrey's Executor* exception as applying to "multimember expert agencies that do not wield substantial executive power."  591 U.S. at 218.  The Court first observed that the CFPB is not a multimember expert agency because it "is led by a single Director who cannot be described as a 'body of experts' and cannot be considered 'non-partisan' in the same sense as a group of officials drawn from both sides of the aisle."  *Id.*  The Court then distinguished the CFPB from the 1935 FTC—which had been characterized as a "mere legislative or judicial aid"—based on three sets of powers.  *Id.*  Those powers "*must be* exercises of" the "executive Power" under our constitutional structure but they

2

can "take 'legislative' and 'judicial' forms."  *Id.* at 216 n.2
(quoting *City of Arlington v. FCC*, 569 U.S. 290, 305 n.4
(2013)).

First, in terms of executive power with a legislative form
the CFPB Director "possesses the authority to promulgate
binding rules fleshing out 19 federal statutes, including a broad
prohibition on unfair and deceptive practices in a major
segment of the U.S. economy."  *Seila Law*, 591 U.S. at 218.
Second, as to executive power with a judicial form, "the
Director may unilaterally issue final decisions awarding legal
and equitable relief in administrative adjudications." *Id.* at 219.
Third, regarding purely executive power, "the Director's
enforcement authority includes the power to seek daunting
monetary penalties against private parties on behalf of the
United States in federal court—a quintessentially executive
power not considered in *Humphrey's Executor*." *Id.*  Based on
the breadth of those three powers, and before going on to raise
other concerns about the novelty of the CFPB's structure, the
Court held that the CFPB was "[u]nlike the New Deal-era FTC
upheld [in *Humphrey's*]." *Id.* at 218.

The next question becomes what kind of agency—single-
or multi-headed—falls on either side of *Seila Law*'s
"substantial executive power" dividing line.  On the one hand,
a plurality of the *Seila Law* court mused in its discussion of
severability that "[o]ur severability analysis does not foreclose
Congress from pursuing alternative responses to the problem—
for example, converting the CFPB into a multimember
agency." *Id.* at 237 (Roberts, C.J.).  But simply converting the
CFPB into a multi-headed agency could not have sufficed
because the Court had earlier explained that the CFPB failed
the *Humphrey's* "substantial executive power" test.  *See Seila
Law*, 591 U.S. at 218–19 (maj. op.) (explaining why the CFPB
itself falls outside the *Humphrey's* exception).  Perhaps the

3

plurality's dictum in another section of the opinion meant that such a response would be a necessary but not sufficient condition. Conversely, *Seila Law*'s gloss on *Humphrey's* did use the same phrase—"substantial executive power"—as Justice Kavanaugh's dissent in *PHH* when he was a judge on this court. 881 F.3d at 167 (Kavanaugh, J., dissenting). That opinion listed both the NLRB and the MSPB as "agencies exercising substantial executive authority." *Id.* at 173.

In *Collins v. Yellen*, the Court further explained that "the nature and breadth of an agency's authority is not dispositive in determining whether Congress may limit the President's power to remove its head." 594 U.S. 220, 251–52 (2021). Instead, "[c]ourts are not well-suited to weigh the relative importance of the regulatory and enforcement authority of disparate agencies, and we do not think that the constitutionality of removal restrictions hinges on such an inquiry." *Id.* at 253; *see also id.* at 273 (Kagan, J., concurring in part and concurring in the judgment) (recognizing *Collins'* "broadening" of *Seila Law*); *id.* at 293 (Sotomayor, J., concurring in part and dissenting in part) (same). However, *Collins* did not discuss *Humphrey's* and the Court characterized its decision as a "straightforward application of our reasoning in *Seila Law*" because the agency there was also "led by a single Director." *Id.* at 251 (maj. op.). Thus, it is not clear that *Collins'* instruction not to weigh up the nature and breadth of an agency's authority extends to multimember boards.

Accordingly, reasonable minds can—and often do—disagree about the ongoing vitality of the *Humphrey's* exception. *See, e.g.*, *Consumers' Rsch. v. CPSC*, 98 F.4th 646 (5th Cir.) (mem.) (splitting 9–8 on whether to grant rehearing en banc on the constitutionality of the Consumer Product Safety Commission's removal restrictions). But simply

4

applying *Seila Law*'s test and examining both the NLRB's and the MSPB's executive powers—regardless of their legislative, judicial and executive forms—the government has satisfied its burden of showing a strong likelihood that they are substantial. Both Wilcox and Harris concede that their agencies wield substantial power of an "adjudicative" form—indeed, that is how they hope to fall within the *Humphrey's* exception. We must therefore consider those powers that are of a legislative and executive form.

The NLRB has traditionally preferred to set precedent by adjudicating, *Wilcox v. Trump*, 2025 WL 720914, at *9 (D.D.C. Mar. 6, 2025), but it retains broad authority of a legislative form to promulgate "such rules and regulations as may be necessary to carry out" its statutory mandate, 29 U.S.C. § 156. Moreover, its regulatory authority over labor relations affects a "major segment of the U.S. economy." *Seila Law*, 591 U.S. at 218. Indeed, the district court explained that the NLRB was established by the Congress "in response to a long and violent struggle for workers' rights," *Wilcox*, 2025 WL 720914, at *3, and emphasized its indisputably "important work," *id.* at *17. Granted, the NLRB's executive power is partly bifurcated because the General Counsel investigates charges and prosecutes complaints before the Board. *See* 29 U.S.C. § 153(d). However, as Judge Walker points out, the Board retains the power to "seek monetary relief like backpay 'against private parties on behalf of the United States in federal court,' [which is] a 'quintessentially executive power not considered in *Humphrey's Executor*.'" Op. (Walker, J.) at 32 (quoting *Seila Law*, 591 U.S. at 219).

The MSPB's powers are relatively more circumscribed. In terms of power of a legislative form, its rulemaking authority is limited to issuing "such regulations as may be necessary for the performance of its functions." 5 U.S.C. § 1204(h).

5

However, it possesses the negative power, even if rarely used, to review sua sponte and invalidate regulations issued by the Office of Personnel Management. *Id.* § 1204(f).  As to power of an executive form, at least in certain circumstances it represents itself litigating in federal court.  *See* Harris Decl. ¶ 33 (Harris Opp'n App. B at 7–8); 5 U.S.C. §§ 1204(i), 7703(a)(2).  As the Supreme Court stated in *Buckley v. Valeo*, 424 U.S. 1, 139–40 (1976), the "responsibility for conducting civil litigation in the courts of the United States for vindicating public rights" is one of the "executive functions."  The MSPB's litigation power also distinguishes it from other agencies that cannot be respondents in federal court.  *See, e.g.*, *Oil, Chem. & Atomic Workers Int'l Union v. OSHRC*, 671 F.2d 643, 651–53 (D.C. Cir. 1982) (explaining that the Occupational Safety and Health Review Commission cannot be a respondent in federal court and contrasting it with the NLRB).  And Harris as a single MSPB member recently wielded considerable power *over* the executive by temporarily reinstating thousands of probationary employees.  Order on Stay Request (Mar. 5, 2025) (Harris Opp'n App. C).[1]

Granted, in *Seila Law* the Court distinguished the Office of the Special Counsel from the CFPB in part because the OSC "does not bind private parties," 591 U.S. at 221, and the MSPB similarly operates entirely within the executive branch.  But it may be that the Court was simply highlighting that the CFPB posed more of a threat to individual liberty than the OSC rather than diminishing the constitutional problem of dividing power within the executive branch.  *Compare PHH*, 881 F.3d at 183 (Kavanaugh, J., dissenting) (emphasizing the CFPB's structure

---

[1] Indeed, Harris's declaration recites that she "cannot issue adjudication decisions unilaterally," Harris Decl. ¶ 26 (Harris Opp'n App. B at 5), thereby conceding that perhaps her most expansive action to date—"staying" the termination of executive branch employees by the thousands—is not in fact adjudicative.

6

as a threat to individual liberty), *with Seila Law*, 591 U.S. at 223 (explaining that the Framers sought to "divide" the legislative power and "fortif[y]" the executive power) (quoting The Federalist No. 51 (J. Madison)).

Accordingly, the first *Nken* factor is a somewhat closer call in my view than in Judge Walker's but the government has met its "strong showing" burden at this stage because of the substantial executive power that the NLRB and MSPB both wield.

**B.**

In addition, the government has more than satisfied its burden to show irreparable harm that far outweighs any harm to Harris and Wilcox from a stay. As Harris concedes, the "question of whether the government will prevail is distinct from whether the government will suffer irreparable harm absent a stay." Harris Opp'n 19. Thus, we consider whether any harm suffered by the government can be undone *if it prevails*.

As this panel explained in *Dellinger v. Bessent*, "it is impossible to unwind the days during which a President is 'directed to recognize and work with an agency head whom he has already removed.'" *Dellinger v. Bessent*, No. 25-5052, slip op. at 6 (D.C. Cir. Mar. 10, 2025) (alterations omitted) (quoting *Dellinger v. Bessent*, 2025 WL 559669, at *16 (D.C. Cir. Feb. 15, 2025) (Katsas, J., dissenting)). Such a requirement encroaches on the President's "conclusive and preclusive" power to supervise those wielding executive power on his behalf. *Trump v. United States*, 603 U.S. 593, 608–09 (2024) (citing *Seila Law*, 591 U.S. at 204; *Myers*, 272 U.S. at 106).

Harris is also wrong to downplay the government's injury as a "vague assertion of harm to the separation of powers."

7

Harris Opp'n 20. In addition to the concrete actions by the NLRB and the MSPB that Judge Walker details, Op. (Walker, J.) at 45, the *executive branch*—not merely the separation of powers—is harmed through (1) a "[d]iminution of the Presidency" and (2) a "[l]ack of accountability," *see PHH*, 881 F.3d at 155–60 (Henderson, J., dissenting).

First, as the Supreme Court explained in *Free Enterprise Fund v. PCAOB*, 561 U.S. 477, 499 (2010), our "Constitution was adopted to enable the people to govern themselves, through their elected leaders." The growth of the "headless Fourth Branch" of government, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 525–26 (2009) (Scalia, J.), "heightens the concern that [the Executive Branch] may slip from the Executive's control, and thus from that of the people, *Free Enter. Fund*, 561 U.S. at 499. It is incongruous with the President's duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, that he be "fasten[ed]" with principal officers who "by their different views of policy might make his taking care that the laws be faithfully executed most difficult or impossible," *Myers*, 272 U.S. at 131. It makes no difference that the President can appoint the chair or other members of a board to reduce the magnitude or duration of this diminution—it is a diminution nonetheless. *See PHH*, 881 F.3d at 156–57 (Henderson, J., dissenting) ("Even assuming the CFPB violates Article II only some of the time—a year here, a couple years there—that is not a strong point in its favor.").

Second, the Framers decided to check the President's uniquely concentrated power by making him "the most democratic and politically accountable official in Government." *Seila Law*, 591 U.S. at 224. That accountability is "enhanced by the solitary nature of the Executive Branch, which provides 'a single object for the jealousy and

8

watchfulness of the people.'" *Id.* (quoting The Federalist No. 70 (A. Hamilton)). Accordingly, the President "cannot delegate ultimate responsibility or the active obligation to supervise that goes with it . . . ." *Id.* (quoting *Free Enter. Fund*, 561 U.S. at 496–97). Without the power to remove principal officers, "the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." *Free Enter. Fund*, 561 U.S. at 514. That the buck would stop with members of a board rather than a solitary agency head obstructing his agenda does not eliminate his injury.

Conversely, both Harris and Wilcox assert harm from their inability to perform their official functions in addition to any backpay to which they may be entitled if they prevail. *See* Wilcox Opp'n 21 (arguing harm of deprivation of "statutory right to function") Harris Opp'n 23 (arguing stay will "prevent Harris from fulfilling her duties"). Indeed, the district courts found injuries to Harris and Wilcox in being deprived of the "statutory right to function" as well as distinct injuries to their agencies. *Harris v. Bessent*, 2025 WL 679303, at *13 (D.D.C. Mar. 13, 2025) (quoting *Berry v. Reagan*, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983), *vacated as moot*, 732 F.2d 949 (D.C. Cir. 1983) (per curiam)); *see also Wilcox*, 2025 WL 720914, at *15–16 (citing *Berry*, 1983 WL 538, at *5). Needless to say, we are not bound by a vacated district court decision from 40 years ago. At this stage at least, it is far from clear that Harris or Wilcox may assert rights against the executive branch on behalf of their offices or agencies as opposed to themselves personally. *See* Op. (Walker, J.) at 46–48.

For its part, the government cites *Raines v. Byrd*, 521 U.S. 811, 820 (1997), for the proposition that "public officials have no individual right to the powers of their offices." Harris Gov't Mot. 3; Wilcox Gov't Mot. 3. The Supreme Court in *Raines*

9

pointed out that if a federal court were to have heard a dispute between the President and the Congress about the constitutionality of restrictions on the presidential removal power, it "would have been improperly and unnecessarily plunged into the bitter political battle being waged between" them. *Raines*, 521 U.S. at 827. Instead, Presidents wait for "a suit brought by a plaintiff with traditional Article III standing." *Id.* Here, we are being asked to enter a political battle between the institutional offices of the NLRB, the MSPB and other executive-branch officials, including the President.

The district court in *Harris* sought to distinguish *Raines* by observing that it addressed whether legislators had standing to challenge a vote that did not go their way, that the injury was diffused across members of the Congress and that "the legislators did not claim injury arising from 'something to which they *personally* are entitled.'" 2025 WL 679303, at *13 (quoting *Raines*, 521 U.S. at 821). But the next clause of the quoted language reads: "such as their seats as Members of Congress after their constituents had elected *them*." *Raines*, 521 U.S. at 821. Here, voters elected the President, not Harris or Wilcox. As in *Raines*, Harris's and Wilcox's "injury thus runs (in a sense) with the Member's seat, a seat which the Member holds (it may quite arguably be said) as trustee . . . , not as a prerogative of personal power." *Id.* (citing The Federalist No. 62 (J. Madison)). Moreover, in *Raines* the legislators "had not been authorized to represent their respective Houses of Congress in th[e] action, and indeed both Houses actively oppose[d] their suit." *Id.* at 829. Here, there is at least a serious question whether Harris and Wilcox seek to vindicate personal rights or only those of the office and agency, and their suits are actively opposed by their own branch of government.

10

As we recently explained in *Dellinger*, "[a]t worst" Harris and Wilcox "would remain out of office for a short period of time." *Dellinger*, slip op. at 7. Because we have ordered highly expedited merits briefing with the agreement of the parties, that period is particularly brief. *See* Order, *Wilcox v. Trump*, No. 25-5057 (D.C. Cir. Mar. 18, 2025); Order, *Harris v. Bessent*, No. 25-5037 & 25-5055 (D.C. Cir. Mar. 18, 2025). "By contrast, the potential injury to the government of . . . having to try and unravel [Harris's and Wilcox's] actions is substantial." *Dellinger*, slip op. at 7. Thus, even if the first *Nken* factor is not a lead-pipe cinch, the injury-focused factors plainly favor a stay.

## C.

In terms of the public interest, and as we explained in *Dellinger*, it is not clear how we could balance Harris's and Wilcox's asserted public interest on behalf of the MSPB and NLRB continuing to function as the Congress intended against the public interest asserted by the rest of the executive branch. *See Dellinger*, slip op. at 7. And of course, "[o]nly the President (along with the Vice President) is elected by the entire Nation." *Seila Law*, 591 U.S. at 224. At minimum, this factor does not weigh in Harris's and Wilcox's favor.

\* \* \*

Accordingly, the government has met its burden for grants of a stay during the pendency of these appeals.

MILLETT, Circuit Judge, dissenting: The two opinions voting to grant a stay rewrite controlling Supreme Court precedent and ignore binding rulings of this court, all in favor of putting this court in direct conflict with at least two other circuits. The stay decision also marks the first time in history that a court of appeals, or the Supreme Court, has licensed the termination of members of multimember adjudicatory boards statutorily protected by the very type of removal restriction the Supreme Court has twice *unanimously* upheld.

What is more, the stay order strips the National Labor Relations Board and the Merit Systems Protection Board of the quora that the district courts' injunctions preserved, disabling agencies that Congress created and funded from acting for as long as the President wants them out of commission. That decision will leave languishing hundreds of unresolved legal claims that the Political Branches jointly and deliberately channeled to these expert adjudicatory entities. In addition, the majority decisions' rationale openly calls into question the constitutionality of dozens of federal statutes conditioning the removal of officials on multimember decision-making bodies—everything from the Federal Reserve Board and the Nuclear Regulatory Commission to the National Transportation Safety Board and the Court of Appeals for Veterans Claims.

That would be an extraordinary decision for a lower federal court to make under any circumstances. But what makes it even more striking is that all we are supposed to decide today is whether a stay pending appeal should issue. As to that narrow question, the stay decision is an unprecedented and, in my view, wholly unwarranted use of this court's stay power, which is meant only to maintain the status quo pending an appeal. *See Nken v. Holder*, 556 U.S. 418, 429 (2009) ("A stay simply suspend[s] judicial alteration of the status quo," which is defined as "the state of affairs before the removal order[s] [were] entered.") (citation omitted);

2

*Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977) (A stay pending appeal is "preventative, or protective; it seeks to maintain the status quo pending a final determination of the merits of the suit."); *see also Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733–734 (D.C. Cir. 2022) ("[T]he status quo [i]s 'the last peaceable uncontested status' existing between the parties before the dispute developed.") (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948 (3d ed. 1998)).

I cannot join a decision that uses a hurried and preliminary first-look ruling by this court to announce a revolution in the law that the Supreme Court has expressly avoided, and to trap in legal limbo millions of employees and employers whom the law says must go to these boards for the resolution of their employment disputes. I would deny a stay.

# I

## A

These cases arise out of the summary termination, without notice, of two members of multimember adjudicatory bodies that Congress created to resolve disputes impartially and free of political influence for reasons of grave national importance.

Cathy Harris is a member of the Merit Systems Protection Board ("MSPB"). The MSPB is an adjudicatory body that primarily reviews federal employees' appeals alleging that their government employer discriminated against them based on their race, color, gender, political affiliation, religion, national origin, age, disability, or marital status; retaliated against them for whistleblowing; failed to comply with protections for veterans; or otherwise subjected them to an

3

adverse employment action, such as termination, suspension, or a reduction in pay grade, 5 U.S.C. §§ 1204(a)(1); 1221; 2302(b)(1), (8)–(9); 3330a(d); 7512.

The MSPB has three members who are appointed by the President with the advice and consent of the Senate to serve seven-year terms. 5 U.S.C. §§ 1201, 1202(a)–(c). No more than two members of the MSPB may belong to the same political party. *Id.* § 1201. The President can also appoint one of the members, with the advice and consent of the Senate, as the Chair of the MSPB. *Id.* § 1203(a). MSPB members may be removed only for "inefficiency, neglect of duty, or malfeasance in office." *Id*. § 1202(d).

Gwynne Wilcox is a member, and former Chair, of the National Labor Relations Board ("NRLB"), which Congress charged with "prevent[ing] any person from engaging in any unfair labor practice[.]" 29 U.S.C. § 160(a). The NLRB has two distinct parts. The five-member Board, on which Wilcox sits, adjudicates appeals of labor disputes from administrative law judges. *Id.* § 153(a). Separately, the NLRB General Counsel prosecutes unfair labor-practice charges. *Id.* § 153(d); *see also NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 139 (1975). These two divisions of the Board operate independently. *NLRB. v. United Food & Com. Workers Union, Loc. 23, AFL-CIO*, 484 U.S. 112, 118 (1987).

When reviewing administrative law judge decisions, the NLRB reviews the entire record, receives briefing, and issues its own decision on both the facts and the law. 29 U.S.C. § 160(c); 29 C.F.R. § 101.12. The Board may issue a cease-and-desist order to halt unfair labor practices, or it may issue an order requiring reinstatement of terminated employees, with or without backpay, and similar equitable remedies. 29 U.S.C.

4

§ 160(c).  These orders, however, are not self-executing.  They are enforceable only by a federal court.  *Id.* § 160(e).

The President appoints NLRB members with the advice and consent of the Senate, and the members serve staggered five-year terms.  29 U.S.C. § 153(a).  The President also designates one of the members to serve as Chair.  *Id.*  Congress limited the President's power to remove a Board member to "neglect of duty or malfeasance in office," and required advance notice and a hearing.  *Id.*  In contrast, the President may remove the General Counsel at will.  *See id.* § 153(d).

**B**

**1**

Cathy Harris began her seven-year term as a member of the MSPB in June 2022.  On February 10, 2025, Harris received an email from the White House Office of Presidential Personnel stating:  "On behalf of President Donald J. Trump, I am writing to inform you that your position on the Merit Systems Protection Board is terminated, effective immediately."  Declaration of Cathy Harris ("Harris Decl.") ¶ 4.  The email did not allege any inefficiency, neglect of duty, or malfeasance on Harris's part.

Harris filed suit on February 11th, challenging her removal as *ultra vires*, unconstitutional, and a violation of the Administrative Procedure Act.  She sought relief under the Declaratory Judgment Act, issuance of a writ of mandamus, and equitable relief.  The district court awarded summary judgment to Harris and granted a permanent injunction and declaratory relief maintaining her in office.  *Harris v. Bessent*, __ F. Supp. 3d __, No. 25-cv-412 (RC), 2025 WL 679303, at *3 (D.D.C. March 4, 2025).  The court added that, if equitable

5

relief were "unavailable[,]" it would issue a writ of mandamus "as an alternative remedy at law." *Id.* at *15.

**2**

Gwynne Wilcox was confirmed in September 2023 for her second term as a member of the NLRB. President Biden designated her Chair of the Board in December 2024. On January 27, 2025, Wilcox received an email from the White House Office of Presidential Personnel stating that she was "hereby removed from the office of Member[] of the National Labor Relations Board." Declaration of Gwynne Wilcox Ex. A, at 1. Wilcox did not receive the statutorily required advance notice of her termination, and the email did not offer Wilcox a hearing or claim any neglect of duty or malfeasance on her part. *Id.*; *see also* Motions Hearing Tr. 51:6–14 (March 5, 2025) (government acknowledging that Wilcox was not "removed for any neglect or malfeasance").

Wilcox sued President Trump and the new Board Chairman, Marvin Kaplan, on February 5th, alleging that her removal violated the National Labor Relations Act. Her complaint sought an injunction directing Kaplan to reinstate her as a member of the Board. Because the suit involved only questions of law, Wilcox promptly moved for expedited summary judgment. The district court granted summary judgment for Wilcox, holding that her removal was unlawful and issued a permanent injunction maintaining her in office. *Wilcox v. Trump*, __ F. Supp. 3d__, No. 25-cv-334 (BAH), 2025 WL 720914, at *5, 18 (D.D.C. Mar. 6, 2025).

6

**3**

The government appealed the judgments in both Harris's and Wilcox's cases and seeks a stay of the district courts' judgments.

**II**

A stay pending appeal is an "extraordinary" remedy. *Citizens for Resp. & Ethics in Washington v. Federal Election Comm'n*, 904 F.3d 1014, 1017 (D.C. Cir. 2018) (per curiam). To obtain such exceptional relief, the stay applicant must (1) make a "strong showing that [it] is likely to succeed on the merits" of the appeal; (2) demonstrate that it will be "irreparably injured" before the appeal concludes; (3) show that issuing a stay will not "substantially injure the other parties interested in the proceeding"; and (4) establish that "the public interest" favors a stay. *Nken*, 556 U.S. at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

The government has satisfied none of those stay factors. First, the government has failed to make any showing, let alone a "strong showing[,] that [it] is likely to succeed on the merits" in its appeal to this court. *Nken*, 556 U.S. at 434; *see also id.* (the likelihood of success on the merits and irreparable injury are the "most critical" factors). Controlling Supreme Court precedents—*Humphrey's Executor v. United States*, 295 U.S. 602 (1935), and *Wiener v. United States*, 357 U.S. 349 (1958)—establish that the MSPB and NLRB's for-cause removal protections are constitutional. Circuit precedent binds this panel to that same conclusion. In addition, the government's efforts to de-constitutionalize those statutory protections are unlikely to succeed given the long tradition of removal limitations and their particular justifications.

7

Second, the government has not identified any irreparable harm that would arise from a stay while these appeals are expeditiously decided.  Its argument that the President's removal power is irreparably impaired depends entirely on this court overturning Supreme Court rulings holding that these removal protections do not unconstitutionally encroach on the President's power.

Third, the balance of harms to the plaintiffs and the public interest weighs strongly against a stay.

**III**

**A**

The Supreme Court's decisions in *Humphrey's Executor* and *Wiener* squarely foreclose the government's arguments on appeal.  In those cases, the Supreme Court unanimously held that for-cause removal protections like those applicable to MSPB and NLRB members were constitutional as applied to officials on multimember independent agencies that exercise quasi-adjudicatory and quasi-legislative functions within the Executive Branch—just like those undertaken by the MSPB and NLRB.  *Humphrey's Executor*, 295 U.S. at 624; *Wiener*, 357 U.S. at 355–356.

In *Humphrey's Executor*, the Supreme Court upheld for-cause removal protections for members of the Federal Trade Commission ("FTC").  295 U.S. at 620.  The Court reasoned that, as a five-member board with no more than three commissioners from the same political party, the FTC was designed to be "nonpartisan" and "act with entire impartiality." *Id.* at 619–620, 624.  In addition, the FTC was "charged with the enforcement of no policy except the policy of the law."  *Id.* at 624.

8

In that way, the FTC's functions were held to be "predominantly quasi-judicial and quasi-legislative." *Humphrey's Executor*, 295 U.S. at 624. The Commission's functions were quasi-judicial because it could hold "hearing[s]" on claims alleging "unfair methods of competition," prepare "report[s] in writing stating its findings as to the facts," and "issue * * * cease and desist order[s,]" which only federal courts (and not the FTC itself) could enforce. *Id.* at 620–622, 628. The FTC was quasi-legislative, in that the Commission "fill[ed] in and administer[ed] the details" of the Federal Trade Commission Act and made "investigations and reports * * * for the information of Congress[.]" *Id.* at 628.

The Supreme Court reaffirmed *Humphrey's Executor* two decades later. In *Wiener*, the Court upheld for-cause removal protections for members of the War Claims Commission—a three-member body that adjudicated Americans' injury and property claims against Nazi Germany and its allies. 357 U.S. at 350. The Court concluded that the Commission could not accomplish its adjudicatory function—fairly applying "evidence and governing legal considerations" to the "merits" of claims—without some protection against removal. *Id.* at 355–356. The Constitution, the Court held, permitted sheathing "the Damocles' sword of removal" by instituting for-cause protections for Commission members. *Id.* at 356.

The *Wiener* Court also clarified what qualifies as a "quasi-judicial" function. It explained that, even though the Commission was part of the Executive Branch, its role was purely adjudicatory because Congress "chose to establish a Commission to 'adjudicate according to law' the classes of claims defined in the statute[.]" *Wiener*, 357 U.S. at 355. That

9

demonstrated the "intrinsic judicial character of the task with which the Commission was charged." *Id.*

**B**

*Humphrey's Executor* and *Wiener* are precedential decisions that bind this court. Even as the Supreme Court has rejected more modern and novel constraints on the removal of single heads of agencies exercising substantial executive power, its modern precedent has consistently announced that *Humphrey's Executor* remains "in place[.]" *Seila Law v. CFPB*, 591 U.S. 197, 215 (2020); *see id.* at 228 ("not revisit[ing] *Humphrey's Executor*"); *Collins v. Yellen*, 594 U.S. 220, 250–251 (2021) (recognizing that *Seila Law* did "not revisit [] prior decisions") (quoting *Seila Law*, 591 U.S. at 204); *see also Morrison v. Olson*, 487 U.S. 654, 687 (1988) (in case involving restrictions on removal of an inferior officer, recognizing that *Humphrey's Executor* remains good law); *see generally Free Enter. Fund v. Public Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010) (in case involving multimember board, declining to "reexamine" *Humphrey's Executor*); *id.* at 501 ("[W]e do not" "take issue with for-cause limitations in general[.]").

*Free Enterprise Fund*, for example, held unconstitutional double-layered for-cause removal protections. That is, Members of the Public Company Accounting Oversight Board could be removed only for cause by the Securities Exchange Commission, whose members, in turn, the Court accepted could be removed by the President only for cause. *Free Enter. Fund*, 561 U.S. at 484–487. The Supreme Court held that a twice-restricted removal power imposed too great a constraint on the President's authority. *Id.* at 492.

10

In devising a remedy, the Supreme Court left the Securities and Exchange Commission's accepted single-layer removal protections intact; only the Board's protections were stricken. *Free Enter. Fund*, 561 U.S. at 492, 495, 509. The Court found this would be a sufficient constitutional remedy because, even with the Commissioners enjoying for-cause protection, the President could "then hold the Commission to account for its supervision of the Board, to the same extent that he may hold the Commission to account for everything else it does." *Id.* at 495–496. In so ruling, the Court repeated the rule from *Humphrey's Executor* that "Congress can, under certain circumstances, create independent agencies run by principal officers appointed by the President, whom the President may not remove at will but only for good cause." *Id.* at 483.

*Seila Law* likewise repeated that *Humphrey's Executor* remains governing precedent. In that case, the Supreme Court invalidated the removal protections for the Consumer Financial Protection Bureau ("CFPB")'s single director because she had "sole responsibility to administer 19 separate consumer-protections statutes" and could "*unilaterally*, without meaningful supervision, issue final regulations, oversee adjudications, set enforcement priorities, initiate prosecutions, and determine what penalties to impose on private parties." *Seila Law*, 591 U.S. at 219, 225. Structural features of the CFPB further insulated the director from presidential control. Because the agency was headed by one director with a five-year term, "some Presidents may not have any opportunity to shape its leadership and thereby influence its activities." *Id.* at 225. The CFPB also receives its funding from the Federal Reserve Board, which is funded outside of the annual appropriations process, further diluting presidential oversight. *Id.* at 226.

11

Importantly, the Supreme Court's decision was explicit that *Humphrey's Executor* remains "in place." *Seila Law*, 591 U.S. at 215; *id*. at 228 ("[W]e do not revisit *Humphrey's Executor* or any other precedent today[.]"). In fact, in *Seila Law*, three Justices invited Congress to "remedy[] the [CFPB's] defect" by "converting the CFPB into a multimember agency," *id*. at 237 (Roberts, C.J., joined by Alito and Kavanaugh, JJ., concurring in the judgment), and four more Justices agreed that such a redesign would be constitutional, *id*. at 298 (Kagan, J., joined by Ginsburg, Breyer, and Sotomayor, JJ., concurring in the judgment with respect to severability and dissenting in part).

Most recently, the Supreme Court's decision in *Collins*, which struck down another single-headed agency performing predominantly executive functions, also acknowledged that *Humphrey's Executor* remained precedential. *Collins*, 594 U.S. at 250–251.

## C

Under the precedent set in *Humphrey's Executor* and *Wiener*, and preserved in *Free Enterprise Fund*, *Seila Law*, and *Collins*, the MSPB and NLRB removal protections are constitutional.

## 1

The MSPB is a "multimember expert agenc[y] that do[es] not wield substantial executive power[.]" *Seila Law*, 591 U.S. at 218. No more than two of its three members may hail from the same political party. 5 U.S.C. § 1201; *see also Humphrey's Executor*, 295 U.S. at 624 ("The commission is to be nonpartisan[.]"). MSPB members serve staggered seven-year terms, giving each President the "opportunity to shape [the Board's] leadership and thereby influence its activities." *Seila*

12

*Law*, 591 U.S. at 225.  President Trump, in fact, will be able to appoint at least two of the MSPB's three members.

In the government's own words, the MSPB is "predominantly an adjudicatory body."  Oral Arg. Tr. 12:19–23.  The MSPB has no investigatory or prosecutorial role.  Instead, it hears disputes between federal employees and federal agencies.  5 U.S.C. §§ 1204(a)(1), 7701(a).  As such, the MSPB is passive and must wait for appeals to be initiated either by employees who have suffered an adverse employment action, discrimination, or whistleblower retaliation, or by employing agencies or the Office of Special Counsel.  *Id.* §§ 1204(a)(1), 1214(b)(1)(a); 5 C.F.R. § 1201.3; *see Seila Law*, 591 U.S. at 219–220 (reiterating the constitutionality of removal protections for an officer who wielded "core executive power" because "that power, while significant, was trained inward to high-ranking Governmental actors identified by others, and was confined to a specified matter in which the Department of Justice had a potential conflict of interest").[1]

Like the War Claims Commission in *Wiener*, the MSPB must "'adjudicate according to law' the classes of claims defined in the statute[.]"  357 U.S. at 355.  That confirms the "intrinsic judicial character of the task with which" the MSPB is "charged."  *Id.*

---

[1] In the exercise of its adjudicatory authority, the MSPB has limited jurisdiction.  Only civil servants that fall within the statutorily defined term "employee" can seek its review.  5 U.S.C. §§ 7511(a)(1), 7701(a); *see also Roy v. MSPB*, 672 F.3d 1378, 1380 (Fed. Cir. 2012).  That definition excludes, among other categories, political appointees and civil servants in "probationary" or "trial period[s]" of employment.  5 U.S.C. § 7511(a)(1); *see also Roche v. MSPB*, 596 F.3d 1375, 1383 (Fed. Cir. 2010).

13

The history of the MSPB as a bifurcated entity reinforces its almost exclusively adjudicatory role. In 1978, Congress divided the Civil Service Commission into the Office of Personnel Management and the MSPB. Civil Service Reform Act of 1978, Pub. L. No. 95-454, § 201, 92 Stat. 1111, 1119. The Office of Personnel Management was tasked with "executing, administering, and enforcing * * * civil service rules and regulations[,]" while the MSPB—then, as now—was tasked with adjudicating disputes. *Id.* § 202, 92 Stat. at 1122.

Once the MSPB issues decisions, federal agencies and employees are expected to "comply" with its orders, 5 U.S.C. § 1204(a)(2), but the MSPB has no independent means of enforcing its orders. *Cf. Humphrey's Executor*, 295 U.S. at 620–621 (FTC cease-and-desist orders could only be enforced by application "to the appropriate Circuit Court of Appeals[.]").

In addition, most MSPB decisions are subject to Article III review. Employees can appeal to federal court any decision that "adversely affect[s] or aggrieve[s]" them, and the Director of the Office of Personnel Management can petition for judicial review of any MSPB decision that the Director believes is erroneous and "will have a substantial impact on a civil service law, rule, regulation, or policy directive." 5 U.S.C. § 7703(a)(1), (d)(1).

The MSPB has limited rulemaking authority to prescribe only those regulations "necessary for the performance of its functions," many of which are akin to the federal rules of procedure and local rules that courts adopt. 5 U.S.C. § 1204(h); *see, e.g.*, 5 C.F.R. §§ 1201.14 (electronic filing procedures), 1201.23 (computation of time for deadlines), 1201.26 (service of pleadings). It also must prepare "special studies" and "reports" on the civil service for the President and

14

Congress, 5 U.S.C. § 1204(a)(3), but these are just "recommendations[,]" carry no force of law, and are not enforced by the MSPB, Harris Decl. ¶ 30; *see Humphrey's Executor*, 295 U.S. at 621 (citing 15 U.S.C. § 46). In addition, the MSPB remains accountable to the President and Congress through the appropriations process. *See, e.g.*, Pub. L. No. 118-47, 138 Stat. 557 (2024). That affords the President an "opportunity to recommend or veto spending bills" to fund its operations. *Seila Law*, 591 U.S. at 226.

**2**

The NLRB also fits the *Humphrey's Executor* and *Wiener* mold. Indeed, Congress enacted the National Labor Relations Act, which created the NLRB, just over a month after *Humphrey's Executor* was decided and modeled the statute on the FTC's organic statute. *Compare* National Labor Relations Act, Pub. L. No. 74-198, 49 Stat. 449 (1935), *with* An Act to create a Federal Trade Commission, Pub. L. No. 63-203, 38 Stat. 717 (1914); *see also* J. Warren Madden, *Origin and Early Years of the National Labor Relations Act*, 18 HASTINGS L.J. 571, 572–573 (1967).

As designed, the NLRB is a "multimember" agency that does "not wield substantial executive power[.]" *Seila Law*, 591 U.S. at 218. It is composed of five members that serve staggered five-year terms, thus affording each President the chance to affect its composition. 29 U.S.C. § 153(a); *see also Seila Law*, 591 U.S. at 225. Though the Act does not require the Board's members to be balanced across party lines, Presidents since Eisenhower have adhered to a "tradition" of appointing no more than three members from their own party. Brian D. Feinstein & Daniel J. Hemel, *Partisan Balance with Bite*, 118 COLUM. L. REV. 9, 54–55 (2018). No one disputes

15

that continues to be the case with the current Board of which Wilcox is a member.

The NLRB is predominantly an adjudicatory body. It hears complaints alleging unfair labor practices by employers and labor unions. *Glacier Northwest v. International Bhd. of Teamsters Loc. Union No. 174*, 598 U.S. 771, 775–776 (2023). It can issue cease-and-desist orders aimed at unfair labor practices and orders requiring reinstatement or backpay. 29 U.S.C. § 160(c). These orders, however, are not independently enforceable. They must be given legal force by a federal court of appeals. *Id.* at §§ 154(a), 160(e); *see also Dish Network Corp. v NLRB*, 953 F.3d 370, 375 n.2 (5th Cir. 2020) (The NLRB "needs a court's imprimatur to render its orders enforceable."). In addition, any person "aggrieved" by an NLRB decision may obtain judicial review in federal court. 29 U.S.C. § 160(f).

Conspicuously absent from the NLRB's authority is any power to investigate or prosecute cases. That authority is left to the (removable-at-will) General Counsel. *See* 29 U.S.C. § 153(d). So the NLRB's powers are less than those of the FTC in *Humphrey's Executor* because the FTC could launch investigations "at its own instance[.]" Brief for Samuel F. Rathbun, Executor, at 46 n.21, *Humphrey's Executor*, 295 U.S. 602 (1935) (No. 667); *see Seila Law*, 591 U.S. at 219 n.4 ("[W]hat matters" for assessing *Humphrey's Executor* "is the set of powers the Court considered as the basis for its decision[.]").

Like the MSPB, the NLRB is funded through congressional appropriations. *See, e.g.*, Pub. L. No. 118-47, 138 Stat. 698 (2024). Also like the MSPB, the NLRB has circumscribed rulemaking authority. It can issue rules and regulations that are necessary to carry out its statutory duties. 29 U.S.C. § 156. As

16

part of this authority, the NLRB may promulgate interpretive rules "advis[ing] the public of [its] construction" of the National Labor Relations Act, *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1994) (citation omitted), but Article III courts review those interpretations *de novo*, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024).

**D**

All of that makes the answer to the question whether the government is likely to succeed in its appeal an easy "No." The unanimous holdings in *Humphrey's Executor* and *Wiener* that removal restrictions on multimember, non-partisan bodies engaged predominantly in adjudicatory functions are constitutional bind this court, especially in light of the Supreme Court's repeated preservation of that precedent and *Seila Law*'s express invitation for Congress to change the CFPB into a multimember body.

The government and my colleagues' opinions press two central arguments to escape this binding authority, but neither affords the government a likelihood of success on appeal.

**1**

To start, the government and the opinions of Judges Henderson and Walker try to distinguish the MSPB and NLRB from the multimember agencies at issue in *Humphrey's Executor* and *Wiener*. But those efforts do not work.

The government casts the MSPB as exercising executive authority because the MSPB "hear[s]" and "adjudicate[s]" matters, is authorized to take "final action" on those matters, "issue[s]" remedies, and orders "compliance" with its

17

decisions.  Gov't Stay Mot. in Harris 12 (quoting 5 U.S.C.
§ 1204(a)(1)–(2)).

True—the MSPB does do those things.  But those are the
hallmarks of an adjudicative body.  The War Claims
Commission was an "adjudicatory body[,]" and it issued final
and unreviewable decisions that ordered funds to be paid from
the Treasury Department's War Claims Fund.  *Wiener*, 357
U.S. at 354–356.  The decisions of the MSPB and NLRB, more
modestly, can only be enforced by a federal court.  *See* 5 U.S.C.
§§ 1204(a)(2), 7703 (MSPB); 29 U.S.C. § 160(e) (NLRB).

The government points out that the MSPB can invalidate
rules issued by the Office of Personnel Management.  Gov't
Stay Mot. in Harris 12 (citing 5 U.S.C. § 1204(f)).  But the
MSPB can invalidate only those rules that are themselves
inherently unlawful because they would require employees to
violate the law by engaging in discriminatory, retaliatory, or
other impermissible conduct.  5 U.S.C. §§ 1204(f)(2), 2302(b).
Needless to say, that type of invalidation is an "exceedingly
rare occurrence," Harris Decl. ¶ 31, and could not trench upon
any lawful exercise of the President's duty to "faithfully
execute" the laws of the United States, U.S. CONST. Art. II, § 3.
And the government nowhere disclaims its ability to obtain
judicial review of such a decision.  *See generally* 5 U.S.C.
§ 7703(d)(1).

The government also highlights that MSPB attorneys, as
opposed to lawyers from the Department of Justice, may
represent the Board in civil actions in the lower federal courts.
Gov't Mot. in Harris 12 (citing 5 U.S.C. § 1204(i)).  But that is
also true of the Federal Reserve Board, 12 U.S.C. § 248(p), and
the Securities Exchange Commission, whose removal
protections the Supreme Court took as given as part of the
constitutional remedy adopted in *Free Enterprise*, 15 U.S.C.

18

§§ 77t(b)–(c), 78u(c)–(e).   Anyhow, independent litigating authority is not uniquely executive in character.  The Political Branches have statutorily authorized the Senate Legal Counsel and the General Counsel of the House to represent the Senate and House, respectively, in court proceedings.   2 U.S.C. §§ 288c, 5571(a).

Finally, Judge Walker claims that the MSPB wields executive power because "it can force the President to work with thousands of employees he doesn't want to work with[.]" J. Walker Op. 40–41.  The assertion that the President could fire every single *employee* in the Executive Branch, as opposed to principal officers, is a breathtaking broadside on the very existence of a civil service that not even the government advances.   And Judge Walker cites no authority for that proposition, which is odd given that the only issue before us is the likelihood of the government's success on appeal on the arguments it advances.

Anyhow, his point proves the opposite.  Issuing an order that an employee was unlawfully discharged is intrinsically adjudicative.  Federal courts often conclude that employment discharges by the federal government were contrary to law and order employees reinstated.  *See, e.g.*, *Vitarelli v. Seaton*, 359 U.S. 535, 546 (1959) (reversing lower courts and ordering reinstatement of Department of Interior employee who was fired without procedurally proper notice or hearing); *Lander v. Lujan*, 888 F.2d 153, 158 (D.C. Cir. 1989) (affirming district court order reinstating Bureau of Mines employee to position he was demoted from in violation of Title VII); *American Postal Workers Union, AFL-CIO v. United States Postal Serv.*, 830 F.2d 294, 312 (D.C. Cir. 1987) (finding Postal Worker discharged in violation of the First Amendment was entitled to reinstatement and back pay).

19

Judge Walker's opinion also overlooks that the MSPB has no legal authority to "force" its decisions on anybody as it has no enforcement arm or sanctions to impose for noncompliance. Only a federal court can do that. And even then, the decisions only "force" the President to work with individuals whom the President cannot legally fire under the anti-discrimination, whistleblower-protection, and veterans-preference laws that he has sworn to uphold. So just like the FTC, the MSPB's charge is "the enforcement of no policy except the policy of the law." *Humphrey's Executor*, 295 U.S. at 624.

As for the NLRB, the government insists that the Board is not "hermetically sealed" off from the General Counsel's enforcement functions. Gov't Stay Mot. in Wilcox 16. In particular, the government argues that the Board, not the General Counsel, may seek injunctions against unfair labor practices in federal court. *Id.* (citing 29 U.S.C. § 160(j)). My colleagues' opinions likewise note that the NLRB can seek backpay against private parties in federal court. J. Walker Op. 33–34; J. Henderson Op. 4.

But the Board's power to seek injunctions in federal court mirrors the 1935 FTC's power to "apply" to circuit courts for "enforcement" of cease-and-desist orders. *Humphrey's Executor*, 295 U.S. at 620–621. In any event, the Board cannot act until the General Counsel does. The Board may seek an injunction only upon the "issuance of a complaint[,]" 29 U.S.C. § 160(j), which the General Counsel has "final authority" to issue or not, *id.* § 153(d). As for backpay, such equitable relief must be sought by the General Counsel who alone supervises the attorneys representing the NLRB in federal court. *Id.*

Lastly, Judge Walker's opinion says that having an intrinsically adjudicatory function like the War Claims Commission in *Wiener* does not count because the

20

Commission's work was "temporary."  J. Walker Op. 40.  The opinion nowhere explains why the length of an agency's mandate matters constitutionally.  If Congress established an agency to run the military, gave its directors for-cause removal protection, but limited its operation to two years, that agency would trench on the President's Article II authority far more than the NLRB or MSPB ever could.  In any event, if time matters, Harris's and Wilcox's remaining tenures in office would be shorter than those of the War Claims Commissioners. *See* War Claims Act of 1948, Pub. L. No. 80-896, § 2(a), (c)–(d), 62 Stat. 1240, 1241 (The War Claims Commissioners were originally authorized to serve up to five-year terms).

In short, none of the government's arguments or my colleagues' opinions distinguish the MSPB or NLRB in any materially relevant way from the Supreme Court's holdings in *Humphrey's Executor* and *Wiener*.

**2**

**a**

As their second tack, the government and my colleagues' opinions take aim at *Humphrey's Executor*.  The government says that decision has effectively been overruled and confined to its facts because its conclusion about the nature of the FTC's executive power "has not withstood the test of time."  Gov't Stay Mot. in Harris 15 (quoting *Seila Law*, 591 U.S. at 216 n.2); *see also* Gov't Stay Mot. in Wilcox 14.

The Supreme Court expressly rejected this argument in *Morrison*.  *See Morrison*, 487 U.S. at 686–691, 689 n.28 (applying *Humphrey's Executor* even though the "powers of the FTC at the time of *Humphrey's Executor* would at the present time be considered 'executive,' at least to some

21

degree"). That ruling binds this court. Plus that argument has nothing to say about the controlling force of *Wiener*, which involved a predominantly adjudicatory body much more akin to the NLRB and MSPB.

It is this court's job to apply Supreme Court precedent, not to cast it aside or to declare it on "jurisprudential life support." J. Walker Op. 26. If a precedent of the Supreme Court "has direct application in a case"—as *Humphrey's Executor* and *Wiener* do here—"a lower court 'should follow the case which directly controls,'" leaving to the Supreme Court "'the prerogative of overruling its own decisions.'" *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989)).

Importantly, that rule governs "even if the lower court thinks the precedent is in tension with 'some other line of decisions.'" *Mallory*, 600 U.S. at 136 (quoting *Rodriguez de Quijas*, 490 U.S. at 484); *see also Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent."); *National Security Archive v. CIA*, 104 F.4th 267, 272 n.1 (D.C. Cir. 2024) ("This Court is charged with following case law that directly controls a particular issue[.]").[2]

Yet "tension" is the most that the government and my colleagues' opinions can claim. The government frankly admits it. At oral argument, the government, with admirable

---

[2] *See also Shea v. Kerry*, 796 F.3d 42, 54 (D.C. Cir. 2015) (quoting *Agostini*, 521 U.S. at 237); *Sierra Club v. E.P.A.*, 322 F.3d 718, 725 (D.C. Cir. 2003) (quoting *Rodriquez de Quijas*, 490 U.S. at 484).

22

candor, acknowledged no less than *four* times that it believes the constitutionality of removal protections for multimember bodies is not "clear." Oral Arg. Tr. 24:25; *see id.* at 10:24–11:5 ("[T]he Supreme Court has left the lower courts in something of a tough spot[.]"); 84:16–23 (There is, "at a minimum, a very substantial question" and "reasonable minds can differ" about the scope of *Humphrey's Executor* today.); 88:17–18 ("[T]here's some uncertainty" in the wake of *Collins*.).

Judge Henderson agrees that it is "unclear" when the *Humphrey's Executor* rule for multimember boards applies, J. Henderson Op. 1, and that "reasonable minds can—and often do—disagree" about how to apply the Supreme Court's precedent, *id.* at 3.

The reason for that lack of clarity is obvious: The Supreme Court has not overruled *Humphrey's Executor* or *Wiener*. Quite the opposite, it has expressly carved out multimember independent boards from its recent holdings on the removal power and has expressly left *Humphrey's Executor* "in place[.]" *Seila Law*, 591 U.S. at 215. That is why the concurring opinion of Justices Thomas and Gorsuch in *Seila Law* exists at all: They write to say that they would have gone *further* than the Court and struck down *Humphrey's Executor*. *Id.* at 238–239 (Thomas, J., joined by Gorsuch, J., concurring in part and dissenting in part). So Judge Walker cannot cite a single Supreme Court case saying that the Court has effectively overruled *Humphrey's Executor* or confined that opinion to its facts, never to be applied again. *See* J. Walker Op. 30.

Judge Walker's opinion, instead, presumes to do the Supreme Court's job for it. After omitting what the Supreme Court actually said about *Humphrey's Executor* in *Free Enterprise*, *Seila Law*, and *Collins*, Judge Walker discerns a clarity that everyone else has missed, announcing that the

23

Supreme Court has imposed "a binding command on the lower courts" not to extend *Humphrey's Executor* to "any new contexts," so that this court "cannot extend *Humphrey's*—not even an inch."  J. Walker Op. 30.

The problem?  The opinion never cites to Supreme Court language for that "binding obligation," nor does it quote or cite anything for the proposed requirement that any multimember board must be an "identical twin" to the FTC to be sustained.

That is because the Supreme Court has not said either thing.  Rather than take the Supreme Court at its word, Judge Walker's opinion prognosticates that the Supreme Court will in the future invalidate all removal protections for all multimember boards that exercise "any" executive power in any form.  J. Walker Op. 36.

*But that is the very job the Supreme Court has forbidden us to undertake.*  We are to apply controlling precedent, not play jurisprudential weather forecasters.  To do otherwise would be to accuse the Supreme Court of not meaning what it said when it repeatedly left *Humphrey's Executor* in place, and of engaging in a disingenuous bait-and-switch when seven Justices openly invited Congress to repair the constitutional flaw in the CFPB by reconstituting it as a multimember body.  *Seila Law*, 591 U.S. at 237 (Roberts, C.J., joined by Alito and Kavanaugh, JJ., concurring in the judgment); *id*. at 298 (Kagan, J., joined by Ginsburg, Breyer, and Sotomayor, JJ., concurring in the judgment with respect to severability and dissenting in part).

Getting out ahead of the Supreme Court that way is beyond my pay grade.  When the Supreme Court makes and expressly preserves precedent, "we [should] take its assurances seriously.  If the Justices [were] just pulling our leg, let them say so."

24

*Sherman v. Community. Consol. Sch. Dist. 21 of Wheeling Township*, 980 F.2d 437, 448 (7th Cir. 1992) (Easterbrook, J.); *see also Illinois v. Ferriero*, 60 F.4th 704, 718–719 (D.C. Cir. 2023) ("[C]arefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative.") (citation omitted).

Staying in our lane is even more vital in deciding a motion to stay. A stay pending appeal, like a preliminary injunction, is meant to be a "stopgap measure[,]" made under "conditions of grave uncertainty" and with the awareness that it may prove to be "mistaken" once the merits are decided. *Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022) (citation omitted). It is not an opportunity to effect a sea change in the law—especially one that the Supreme Court itself has repeatedly forborne.

**b**

As if Supreme Court precedent was not enough to find that the government is not likely to succeed in these appeals, binding circuit precedent doubles down on it. Prior circuit opinions are "of course binding on us under the law-of-the-circuit doctrine." *Palmer v. FAA*, 103 F.4th 798, 806 (D.C. Cir. 2024); *Campaign Legal Ctr. v. 45Committee, Inc.*, 118 F.4th 378, 386 n.* (D.C. Cir. 2024) ("'One three-judge panel' of this court 'does not have the authority to overrule another three-judge panel of the court. * * * That power may be exercised only by the full court,' either through an *en banc* decision or a so-called *Irons* footnote.") (quoting *LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (en banc)).

This court has repeatedly applied *Humphrey's Executor* as precedent, including as recently as the last two years. *See Meta Platforms, Inc. v. FTC*, No. 24-5054, 2024 WL 1549732, at *2 (D.C. Cir. Mar. 29, 2024) (per curiam); *Severino v. Biden*, 71

25

F.4th 1038, 1047 (D.C. Cir. 2023); *FEC v. NRA Political Victory Fund*, 6 F.3d 821, 826 (D.C. Cir. 1993) (noting that cases such as *Humphrey's Executor* and *Morrison* confirmed the constitutionality of the Federal Election Commission's structure). Yet both Judge Walker's and Judge Henderson's opinions ignore that binding precedent.

Other circuits too have faithfully hewed to the Supreme Court's admonition not to get out over their jurisprudential skis and have continued to apply *Humphrey's Executor*. *See Consumers' Research v. CPSC*, 91 F.4th 342, 347, 352 (5th Cir. 2024) (*Humphrey's Executor* is "still-on-the-books precedent" and "has not been overruled[.]"), *cert. denied*, 145 S. Ct. 414 (2024); *Leachco, Inc. v. CPSC*, 103 F.4th 748, 761–762 (10th Cir. 2024) ("[T]he Supreme Court in *Seila Law* clearly stated that *Humphrey's Executor* remains binding today."); *Magnetsafety.org v. CPSC*, No. 22-9578, 2025 WL 665101, at *7 (10th Cir. Mar. 3, 2025) ("*Humphrey's Executor* remains binding today.") (quoting *Leachco*, 103 F.4th at 761).

In sum, this court's duty—especially at this early stay stage—is to follow binding and dispositive Supreme Court and circuit precedent in evaluating the government's likelihood of success. And the government has not shown any likelihood of prevailing under *Humphrey's Executor* and *Wiener*, as well as circuit precedent. If the government thinks it has a likelihood of success on certiorari to the Supreme Court, it can raise that argument there. This court has no business getting ahead of that Court in these appeals. And we certainly should not cast off Supreme Court precedent, depart from circuit precedent, and create a circuit conflict just to determine the government's eligibility for a *stay* that is meant only to maintain the status quo.

26

**E**

Even if Supreme Court precedent did not dictate the answer to the likelihood-of-success question, the government's and my colleagues' efforts in their opinions to reduce *Humphrey's Executor* and *Wiener* to constitutional rubble are not likely to succeed.

**1**

This court's starting point is to presume that the Civil Service Reform Act and the National Labor Relations Act are constitutional. *United States v. Davis*, 588 U.S. 445, 463 n.6 (2019); *Mississippi Commission on Environmental Quality v. E.P.A.*, 790 F.3d 138, 182 (D.C. Cir. 2015). And with or without that presumption, the statutory removal provisions pass constitutional muster.

To start, the removal restrictions comport with the Constitution's text. Article I gives Congress the full authority to create agencies and the officer positions to run those agencies. U.S. CONST. Art. I, § 8, cl. 18 ("The Congress shall have Power * * * To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."). The Constitution also makes explicit that Congress, and not just the President, has a role in staffing the agencies and positions created by law. Under Article II's Appointments Clause, the President can appoint principal officers only "by and with the Advice and Consent of the Senate" and only as the legislature "shall * * * establish[] by Law" those positions. Art. II, § 2, cl. 2. Congress also has plenary power to vest the appointment of inferior officers "in the President alone, in the Courts of Law, or in the Heads of

27

Departments." *Id.* And, of course, it is Congress who pays, with taxpayer dollars, for everyone employed in the Executive Branch. Art. I, § 8, cl. 1.

Article II, for its part, says nothing about removal power. But it does vest in the President "[t]he executive Power" and charge the President with "tak[ing] Care that the Laws be faithfully executed[.]" U.S. Const. Art. II, §§ 1, 3. Read together, the Constitution invests both the President and Congress with coordinate responsibilities to build an effective and efficient government that serves the Nation's important interests.

History confirms that Congress may, as part of its design and staffing decisions, condition the President's removal authority when necessary to accomplish vital national goals. Congressional authority to enact for-cause removal restrictions traces back to the time of the Constitution's adoption. When Congress reenacted the Northwest Ordinance, it transferred the Confederation Congress's removal authority over territorial officials to the President, *An Act to provide for the Government of the Territory Northwest of the river Ohio*, ch. 8, § 1, 1 Stat. 50, 53 (Aug. 7, 1789), but left intact for-cause removal protections for territorial judges, *id.* at 51.[3]

Then, in 1790, Congress created the Sinking Fund Commission (the Federal Reserve's early predecessor) to perform economically critical executive and policy functions. Congress directed that two of its five directors would be officials whom the President could not remove. *An Act making*

---

[3] Territorial judges do not constitutionally enjoy tenure protection because they are not Article III judges. *American Insurance Co. v. 356 Bales of Cotton*, 26 U.S. 511, 546 (1828).

28

*provision for the reduction of the Public Debt*, ch. 47, § 2, 1 Stat. 186 (1790). As for the First and Second Banks of the United States, Congress provided the President no removal authority over members of the First Bank, *An act to incorporate the subscribers in the Bank of the United States*, ch. 10, § 4, 1 Stat. 191, 192–193 (1791), and gave the President control over only five out of twenty-five members of the Second Bank, *An Act to incorporate the subscribers to the Bank of the United States*, ch. 44, § 8, 3 Stat. 266, 269 (1816).[4]

Next, in 1855, Congress created the Court of Claims, the judges of which held office "during good behaviour," *An Act to establish a Court for the Investigation of Claims against the United States*, ch. 22, § 1, 10 Stat. 612 (1855), even though they were not Article III judges, *see Williams v. United States*, 289 U.S. 553, 563 (1933).

The list goes on. The statute creating the Comptroller of the Currency required the President to gain Senate approval before removing the Comptroller, *An Act to provide a national Currency,* ch. 58, § 1, 12 Stat. 665–666 (1863), and its successor statute, while vesting removal authority in the President, still required the President to "communicate[]" his reason "to the Senate" before exercising that authority, *An Act*

---

[4] Judge Walker's opinion makes much of the Decision of 1789. *See* J. Walker Op. 9–10. But the only thing decided in 1789 was that the President need not always consult with the Senate before removing a principal officer, a proposition that no one contests today. *E.g.*, *Myers v. United States*, 272 U.S. 52, 241 (1926) (Brandeis, J., dissenting). Rather than focusing on short snippets from legislative debates and law review articles, one can simply observe that the same Congress that apparently decided against removal restrictions also decided to create removal restrictions, just not for every principal officer.

*to provide a National Currency*, ch. 106, § 1, 13 Stat. 100 (1864).

Then, in 1887, Congress created the Interstate Commerce Commission to regulate railroads. Neither President Cleveland nor a single member of Congress raised a constitutional objection to the provision allowing the removal of Commissioners only "for inefficiency, neglect of duty, or malfeasance in office[.]" *An act to regulate commerce*, ch. 104, § 11, 24 Stat. 383 (1887).

Founding-era Supreme Court precedent documents the practice as well. In *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), the Supreme Court, through Chief Justice Marshall, recognized that some executive officers are not removable by the President:

> Where an officer is removable at the will of the executive, the circumstance which completes his appointment is of no concern; because the act is at any time revocable; and the commission may be arrested, if still in the office. But when the officer is not removable at the will of the executive, the appointment is not revocable, and cannot be annulled. It has conferred legal rights which cannot be resumed.

*Id.* at 162*; see also id.* at 172–173 (Marbury "has been appointed to an office, from which he is not removable, at the will of the executive; and being so appointed, he has a right to the commission which the secretary has received from the president for his use.").[5]

---

[5] To be sure, the Supreme Court in dicta has dismissed this discussion in *Marbury* as "ill-considered dicta." *Seila Law*, 591 U.S.

30

None of this is surprising given the Constitution's textual checking and balancing, and general opposition to the over-concentration of power in a single Branch. As Justice Scalia summarized when discussing the modern counterparts of these early agencies, "removal restrictions have been generally regarded as lawful for so-called 'independent regulatory agencies,' such as the Federal Trade Commission, * * * the Interstate Commerce Commission, * * *, and the Consumer Product Safety Commission * * *, which engage substantially in what has been called the 'quasi-legislative activity' of rulemaking[.]" *Morrison*, 487 U.S. at 724–725 (Scalia, J., dissenting). Such "'long settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions' regulating the relationship between Congress and the President." *NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014) (quoting *The Pocket Veto Case,* 279 U.S. 655, 689 (1929)).

---

at 227. But it seems to me to be wisdom and knowledge gained from firsthand experience at the time of the founding, and so cannot be brushed away so easily. John Marshall participated in the Virginia ratification debates and served in the legislative and executive branches before becoming Chief Justice. *See* Supreme Court Historical Society, *Life Story: John Marshall* (2025), https://perma.cc/JHA4-EPTH. He was joined by Justice Paterson, a delegate to the Constitutional Convention and a Senator in 1789, when the debate over removal took place. *See* Supreme Court Historical Society, *William Paterson* (2025), https://perma.cc/TL6M-7Y9M. In searching for the Constitution's original meaning, it is hard to understand the preference of Judge Walker's opinion for *Myers*—written 138 years after the Constitution's ratification—to *Marbury*, written by jurists who helped to write and to ratify the Constitution.

31

That is the historical grounding for the Supreme Court's decisions in *Humphrey's Executor* and *Wiener*. And the MSPB's and NLRB's for-cause removal protections fit that historical practice.

**a**

Start with the MSPB. In 1883, Congress created the Civil Service Commission—the MSPB's predecessor entity—to address the serious problem of a federal workforce beset by political patronage, political coercion, and instability. Presidents and their subordinates could reward their supporters with taxpayer-funded government jobs, but often had to fire those already in office to make room for their favorites. The result was administrative dysfunction. As one commentator put it, "[a]t present there is no organization save that of corruption[;] * * * no system save that of chaos; no test of integrity save that of partisanship; no test of qualification save that of intrigue." Ari Hoogenboom, *The Pendleton Act and the Civil Service*, 64 AM. HIST. REV. 301, 301 (1959) (*quoting* Julius Bing, *Our Civil Service*, PUTNAM'S MAG. 232, 236 (Aug. 1868)); *see id.* at 302 ("Contemporaries noted the cloud of fear that hovered over government workers, especially after a change of administration. It was impossible for an *esprit de corps* or for loyalty to office or agency to develop in an atmosphere of nervous tension. * * * A civil servant was loyal primarily to his patron—the local political who procured him his job.").

Concerns about this patronage system were a longstanding concern. As Mark Twain observed: "Unless you can get the ear of a Senator, or a Congressman, or a Chief of a Bureau or Department, and persuade him to use his 'influence' in your behalf, you cannot get an employment of the most trivial nature in Washington. Mere merit, fitness and capability[] are useless

32

baggage to you without 'influence.'"  MARK TWAIN & CHARLES WARNER, THE GILDED AGE 223 (1873); *see also* Mark Twain, Special Dispatch, *N.Y. Times* (Oct. 2, 1876) ("We hope and expect to sever [the civil] service as utterly from politics as is the naval and military service, and we hope to make it as respectable, too.  We hope to make worth and capacity the sole requirements of the civil service[.]").

Governmental malfunction was so disabling that President Garfield devoted a portion of his 1881 inaugural address to the problem.  He emphasized the need for tenure protections, explaining that the civil service could "never be placed on a satisfactory basis until it is regulated by law[s]" that "prescribe the grounds upon which removals shall be made during the terms for which incumbents have been appointed."  President James A. Garfield, *Inaugural Address* (March 4, 1881), https://perma.cc/B5DM-T738.    President    Garfield's assassination a few months later by a disappointed job seeker transformed concerns about the patronage system into a national crisis.  Alan Gephardt, *The Federal Civil Service and the Death of President James A. Garfield*, National Park Service (2012), https://perma.cc/3QY2-LEUT.

Two years later, "strong discontent with the corruption and inefficiency of the patronage system of public employment eventuated in the Pendleton Act, [ch. 27, 22 Stat. 403 (1883)]." *Elrod v. Burns*, 427 U.S. 347, 354 (1976).  That Act created a Civil Service Commission to eliminate the "patronage system" of governance and create a professional civil service dedicated only to working for the American people.  *Id.*  In that way, "Congress, the Executive, and the country" all agreed "that partisan political activities by federal employees must be limited if the Government is to operate effectively and fairly[.]" *United States Civil Service Comm'n v. National Association of Letter Carriers, AFL-CIO*, 413 U.S. 548, 564 (1973).

33

The MSPB's *raison d'etre* is to effectuate this governmental commitment to prioritizing merit over partisan loyalty.  Housing all employment matters in the Civil Service Commission had proven unworkable as the Commission had accumulated "conflicting responsibilities" in its roles as "a manager, rulemaker, prosecutor and judge."  President Jimmy Carter, *Fed. Civ. Serv. Reform Msg. to Cong.* (March 2, 1978), https://perma.cc/2URA-FJRR.  Its slow pace of decision-making had also confounded efforts to enforce civil service laws for both employees and employing agencies.  *See United States v. Fausto*, 484 U.S. 439, 458 (1988) (Stevens, J., dissenting).

To address the problem, the 1978 Civil Service Reform Act created the Office of Personnel Management to perform "personnel administration[,]" the Office of Special Counsel to "investigate and prosecute[,]" and the MSPB to "be the adjudicatory arm of the new personnel system."  President Carter, *Fed. Civ. Serv. Reform Msg.*; *see* Civil Service Reform Act of 1978, Pub. L. No. 95-454, § 3, 92 Stat. 1111, 1112 (The Act will provide "the people of the United States with a competent, honest, and productive Federal work force" that is governed by "merit system principles and free from prohibited personnel practices[.]").

The Reform Act provided MSPB members with some removal protection to ensure both employees and agencies that decisions would be made based on the facts and law, rather than political allegiance or fear of retribution.  The MSPB also hears claims by whistleblowers exposing waste, fraud, and abuse within federal agencies.  Removal protections offer whistleblowers assurance that their claims will be heard impartially and objectively, free from retributive political pressure.  For "it is quite evident that one who holds his office

34

only during the pleasure of another cannot be depended upon to maintain an attitude of independence against the latter's will." *Humphrey's Executor*, 295 U.S. at 629.

Said another way, if the Constitution requires that Presidents be allowed to fire members of the *Merit* Systems Protection Board for any partisan, policy, or personal reason, then Congress and the taxpayers cannot have a professional civil service based on merit. Nor could the MSPB provide the "requirement of neutrality in adjudicative proceedings" that "safeguards the * * * central concerns of procedural due process[.]" *Marshall v. Jericco*, 446 U.S. 238, 242 (1980); *see Schweiker v. McClure*, 456 U.S. 188, 195 (1982) ("[D]ue process demands impartiality on the part of those who function in judicial or quasi-judicial capacities.").

At the same time, by housing the adjudicatory authority in a multimember board, the Political Branches prevented the accumulation of power in the hands of a single individual answerable to no one. *Cf. Seila Law*, 591 U.S. at 222–226; *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) ("[T]he Constitution diffuses power the better to secure liberty[.]"). The group decision-making dynamic of the collective Board also helps to ensure that members can and will ground their decisions in the law and facts alone, which they have to justify in their judicially reviewable written decisions. That is, they have to show their work. The requirement of a politically balanced Board demonstrates the Political Branches' bipartisan commitment to creating a neutral and unbiased adjudicatory process. That contrasts sharply with the single heads of agencies in *Seila Law* and *Collins*, who were accountable to no one and did not need to be appointed in a politically neutral manner.

35

Presumably that balance is why, over the last 50 years and eight presidential administrations, there has been nary a constitutional objection in a presidential signing statement or Office of Legal Counsel opinion to the MSPB's removal restrictions. Quite the opposite. Shortly before passage of the Reform Act, the Office of Legal Counsel agreed that the MSPB was "a quasi-judicial body whose officials may be legitimately exempted from removal at the pleasure of the President." *Presidential Appointees—Removal Power—Civil Serv. Reform Act-Const. L. (Article II, S 2, Cl. 2)*, 2 Op. O.L.C. 120, 121 (1978).[6]

---

[6] The government's briefs and Judge Henderson's and Judge Walker's opinions cite nothing at all. The most I have found is that Presidents George H. Bush and Clinton noted different potential constitutional problems related to the MSPB with the Whistleblower Protection Act of 1989 and MSPB Reauthorization Act of 1994, respectively, but those had nothing to do with constitutional concerns about removal protections for MSPB members. Presidential Statement upon Signing the Whistleblower Protection Act of 1989, 25 WEEKLY COMP. PRES. DOC. 516 (Apr. 10, 1989); Presidential Statement on Signing Legislation Reauthorizing the Merit Systems Protection Board and the Office of Special Counsel, 30 WEEKLY COMP. PRES. DOC. 2202 (Oct. 29, 1994). Moreover, to my knowledge, neither OLC nor any President in a signing statement has called into doubt *Humphrey's Executor* or *Wiener* or suggested that those opinions have lost their validity. This stands in sharp contrast to removal restrictions on the four modern single-head agencies whose constitutionality was questioned from the outset. *Seila Law*, 591 U.S. at 221 (The Office of Special Counsel was the "first enduring single-leader office, created nearly 200 years after the Constitution was ratified, [and] drew a contemporaneous constitutional objection from the Office of Legal Counsel under President Carter and a subsequent veto on constitutional grounds by President Reagan."); *Collins*, 594 U.S. at 251 (These agencies

36

**b**

The critical national need for an impartial, multimember adjudicatory process applies with at least equal force to the NLRB.  Before its creation, the United States was racked by violent labor strikes and brutal repression of the strikers. Between 1877 and 1934, there were thousands of violent labor disputes, many of which required state and federal troops to control.  *See* Philip Taft & Philip Ross, *American Labor Violence:  Its Causes, Character, and Outcome, in* VIOLENCE IN AMERICA:  HISTORICAL AND COMPARATIVE PERSPECTIVES: A STAFF REPORT TO THE NATIONAL COMM'N. ON THE CAUSES AND PREVENTION OF VIOLENCE 225–272 (Hugh Graham & Ted Gurr eds.  1969) ("*National Report on Labor Violence*").  In 1934 alone, the National Guard had to be mobilized to quell strikes in Minnesota, Alabama, Georgia, North Carolina, South Carolina and California.  *Id.* at 269–272.  In addition to the human toll of the many killed and wounded, the economic costs were staggering: "the vacating of 1,745,000 jobs," the "loss of 50,242,000 working days every 12 months," and a cost to the economy of "at least $1,000,000,000 per year" in 1934 dollars, which would be approximately $23.5 billion per year now.  S. REP. NO. 74-573, at 2 (1935); *see* National Labor Relations Act, Pub. L. No. 74-198, 49 Stat. 449 (1935) ("The denial by some employers of the right of employees to organize * * * lead[s] to strikes and other forms of industrial strife or unrest, which have * * * the necessary effect of burdening or obstructing commerce[.]").

---

"lack[] a foundation in historical practice[.]") (quoting *Seila Law*, 591 U.S. at 204).

37

The inability to facilitate peaceful negotiations between employers and labor was "one of the most prolific causes of strife" and, according to the Supreme Court, was such "an outstanding fact in the history of labor disturbances that it [wa]s a proper subject of judicial notice and require[d] no citation of instances." *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 42 (1937).

Importantly, federal and state courts had proven unable to resolve these conflicts. *See* Felix Frankfurter & Nathan Greene, The Labor Injunction (1930); Howard Gillman, The Constitution Besieged 61–100 (1995). That is why Congress created the NLRB—an expert agency capable of facilitating "negotiation" and "promot[ing] [the] industrial peace[.]" *Jones & Laughlin*, 301 U.S. at 45. "Everyday experience in the administration of the [National Labor Relations Act] gives [the NLRB] familiarity with the circumstances and backgrounds of employment relationships in various industries, with the abilities and needs of the workers for self organization and collective action, and with the adaptability of collective bargaining for the peaceful settlement of their disputes with their employers." *NLRB v. Hearst Publications*, 322 U.S. 111, 130 (1944).

As with the MSPB, the Political Branches concluded that the neutrality of Board members would be indispensable to their vital role, so they had to be kept free from both the perception and the reality of direct political influence that an unalloyed removal power would permit. With "the Damocles' sword of removal by the President" hanging over the NLRB, *Wiener*, 357 U.S. at 356, employers and labor would lose faith that the NRLB is impartially administering the law rather than tacking to ever-changing political winds.

38

In addition, an unchecked removal power would cause frequent and sharp changes in how the NLRB adjudicates cases. That lack of stability in the law would make it harder for businesses and labor to enter into agreements to resolve labor disputes. One party might prefer to wait for the next election before committing to a collective bargaining agreement. Or those agreements could be shortened to mirror the terms of politically replaceable Board members. Both would spawn more breakdowns in labor relations, strikes, and economic disruption. *See International Organization of Masters, Mates & Pilots, ILA, AFL-CIO v. NLRB*, 61 F.4th 169, 180 (D.C. Cir. 2023) (discussing the importance of consistent policymaking to protect and encourage reliance interests).

Ninety years after the NLRA, it may be hard to imagine the exceptional disruption to the national economy caused by the absence of an impartial and expert administrative forum for the resolution of labor disputes. But that is because the NLRB has worked. *National Report on Labor Violence* at 292 ("The sharp decline in the level of industrial violence is one of the great achievements of the National Labor Relations Board."). And it is the indispensability of a neutral adjudicator between labor and employers that explains why the Supreme Court has said directly that the NLRB does not "offend against the constitutional requirements governing the creation and action of administrative bodies." *Jones & Laughlin*, 301 U.S. at 46–47.

**2**

In response to the Political Branches' joint and longstanding conclusions as to the critical necessity for a professional civil service and a neutral adjudicatory forum to obtain industrial peace in the national economy, the government and Judge Walker's opinion blow a one-note horn:

39

accountability.  J. Walker Op. 1, 7, 21–22; Gov't Stay Mot. in Harris 10, 13; Gov't Stay Mot. in Wilcox 9, 12.

But accountability remains.  Harris and Wilcox were nominated by the President and confirmed by the Senate.  S. Roll Call Vote No. 209, 117th Cong., 2d Sess. (2022) (Harris); S. Roll Call Vote No. 216, 118th Cong., 1st Sess. (2023) (Wilcox).  They must leave office when their terms of seven and five years respectively end.  5 U.S.C. § 1202(a) (Harris); 29 U.S.C. § 153(a) (Wilcox).  In the interim, the President can remove them for cause if they fail to "faithfully execute[]" the law, as well as for basic incompetence.  U.S. CONST. Art. II, § 3;  *see*  5 U.S.C. § 1202(d) (Harris); 29 U.S.C. § 153(a) (Wilcox).  This alone gives the President "ample authority" to ensure they are "competently performing [their] statutory responsibilities[.]"  *Morrison*, 487 U.S. at 692; *see also Free Enter. Fund*, 561 U.S. at 509 (With "a single level of good-cause tenure" between the President and the Board, "[t]he Commission is then fully responsible for the Board's actions, which are no less subject than the Commission's own functions to Presidential oversight.").  On top of this, Congress can eliminate their offices completely.  U.S. CONST. Art. I, § 8.  The public can comment on their policies.  5 U.S.C. § 553(c).  And they must regularly send reports to the President and Congress.  *Id.* § 1206 (Harris); 29 U.S.C. § 153(c) (Wilcox).  Just because a President cannot fire Harris and Wilcox for no reason or because he does not like their rulings does not mean that they wield unchecked and unaccountable authority.

Beyond that, the suggestion in Judge Walker's opinion that electoral accountability is the Constitution's lodestar for the executive branch is misplaced.  *See* J. Walker Op. 48 ("The *people* elected the President, *not* Harris *or* Wilcox, to execute the nation's laws.") (emphases added).  But there are other

40

values at stake—stability, competence, experience, efficiency, energy, and prudence, for example.  Anyhow, the members of Congress who created the MSPB and NLRB are *directly* elected by the people who are affected by the competence and stability of the federal civil service and labor disruptions.  By contrast, Americans do not directly elect the President.  Instead, they vote for delegates to the electoral college who cast votes for the President.  *See* U.S. CONST. Amend. XII.  This procedure was not designed to maximize popular accountability.  *See* THE FEDERALIST NO. 68 (Alexander Hamilton) ("It was equally desirable, that the immediate election should be made by men most capable of analyzing the qualities adapted to the station, and acting under circumstances favorable to deliberation, and to a judicious combination of all the reasons and inducements which were proper to govern their choice.  A small number of persons, selected by their fellow-citizens from the general mass, will be most likely to possess the information and discernment requisite to such complicated investigations.").  To the extent that Judge Walker's opinion's description of the presidency appears familiar, it is because it describes the presidency circa 2025, not circa 1788 when the Constitution was adopted and the roles of Congress and the President in designing the government were formulated.

\* \* \* \* \*

In short, this Nation's historical practice of removal restrictions on multimember boards combined with the acute need for impartial adjudicatory bodies to give effect to civil service protections and to provide labor peace and stability together demonstrate the constitutional permissibility of the removal limitations for members of these two adjudicatory bodies.  Such a "systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned, engaged in by Presidents who have also sworn to

41

uphold the Constitution, making as it were such exercise of power part of the structure of our government, may be treated as a gloss on 'executive Power' vested in the President by § 1 of Art. II." *Youngstown Sheet & Tube Co.*, 343 U.S. at 610–611 (Frankfurter, J., concurring).

For all those reasons, at this procedural juncture, the government is not likely to succeed on the merits of its argument that the removal provisions are unconstitutional even if binding Supreme Court and circuit precedent did not already resolve the likelihood of success question in favor of Harris and Wilcox.

**F**

The government additionally has failed to demonstrate a likelihood of success on its argument that this court cannot remedy Harris's and Wilcox's injuries. "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Marbury*, 5 U.S. at 163. And it is "indisputable" that the wrongful removal from office constitutes "a cognizable injury[.]" *Severino*, 71 F.4th at 1042; *see Sampson v. Murray*, 415 U.S. 61, 91 (1974); *Wiener*, 357 U.S. at 356 (permitting suit for damages). Indeed, the government acknowledges that Harris and Wilcox have remediable injuries. Gov't. Stay Mot. in Harris 18; Gov't. Stay Mot. in Wilcox 19.

Four remedies are available in this context, should the district court judgments in favor of Harris and Wilcox be sustained on appeal.

*First*, there is no dispute that Harris and Wilcox could obtain backpay due to an unlawful firing if their wages have been disrupted. *See, e.g.*, *Myers*, 272 U.S. at 106.

42

*Second*, federal courts may preserve in office or reinstate someone fired from the Executive Branch with an injunction if the circumstances are "extraordinary." *Sampson*, 415 U.S. at 92 n.68; *see Service v. Dulles*, 354 U.S. 363, 388 (1957). The plaintiff must demonstrate "irreparable injury sufficient in kind and degree to override" the "disruptive effect" to "the administrative process[.]" *Sampson*, 354 U.S. at 83–84; *see id.* at 92 n.68.

This rule extends to officers who hold positions on multimember boards. Even though an injunction cannot restore such officeholders to office *de jure*, this court's precedent holds that a court can order their restoration to office *de facto*. In *Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996), President Clinton removed Robert Swan from the board of the National Credit Union Administration, *id.* at 974. This court held that it could grant Swan relief by enjoining the board and all other relevant executive officials subordinate to the President to treat Swan as a legitimate board member. *Id.* at 980. Similarly, in *Severino v. Biden*, this court concluded that it could issue an injunction to "reinstate a wrongly terminated official 'de facto,' even without a formal presidential reappointment." 71 F.4th at 1042–1043 (quoting *Swan*, 100 F.3d at 980).

At this juncture, the government has failed to show that, should the judgments in favor of Harris and Wilcox be sustained on appeal, there would be an insufficient basis for the injunctions that retained them in office. Harris's and Wilcox's removals would disrupt the routine administration of the Executive Branch by (1) depriving the adjudicatory bodies on which they sit of quora to function, and (2) denying the parties' whose cases Congress has channeled to the MSPB and NLRB the very impartiality and expertise in decision-making that

43

protections against removal provide. A merits panel could find that to be a severe injury to the public.

The government invokes older caselaw holding that an injunction cannot restore someone to their position in the Executive Branch. *See* Gov't Stay Mot. in Harris 19–20 (citing *In re Sawyer*, 124 U.S. 200, 212 (1888), and *White v. Berry*, 171 U.S. 366, 377 (1898)). But, as the Supreme Court itself has said: "Much water has flowed over the dam since 1898," and it is now well established that "federal courts do have authority to review the claim of a discharged governmental employee." *Sampson*, 415 U.S. at 71.

The government argues that we cannot enjoin the President. Gov't Stay Mot. in Harris 18. That argument is beside the point because Harris and Wilcox never asked the district court to enjoin the President. The district courts enjoined subordinate executive officers, not the President, consistent with circuit precedent in *Swan* that binds this panel. *Harris*, 2025 WL 679303, at *16; *Wilcox*, 2025 WL 720914 at *16, 18. Injunctions against subordinate executive officials to prevent illegal action by the Executive Branch are well known to the law. *See, e.g.*, *Youngstown Sheet & Tube Co.*, 343 U.S. at 584; *Hamdan v. Rumsfeld*, 548 U.S. 557, 567 (2006); *Swan*, 100 F.3d at 980. Nor do such injunctions "necessarily target[] the President[.]" *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *13 n.2 (D.C. Cir. Feb. 15, 2025) (Katsas, J., dissenting). The injunctions put the President under no legal obligation to recognize Harris and Wilcox as legitimate officeholders. The injunctions instead require *other* government officials to treat them as *de facto* office holders for the rest of their terms.

The government reads *Swan* and *Severino* as limited to disputes about standing. Gov't Stay Mot. in Harris 20. That

44

makes no sense. Standing is a jurisdictional prerequisite to bringing suit in federal court. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 102 (1998). To establish standing, plaintiffs must show, among other things, that their "injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 568–571 (1992); *Steel Co.*, 523 U.S. at 107. So recognizing the existence of a legal remedy is a critical precondition to resolving a lawsuit on the merits. Because jurisdiction in both *Swan* and *Severino* depended on holding that an injunction could issue, and both cases held that there was jurisdiction and went on to decide the merits, both cases necessarily held that an injunction could restore someone to office *de facto*.

*Third*, the government did not dispute in district court that Wilcox could obtain a declaratory judgment, so it has forfeited any argument as to the unavailability of that form of relief in her case. *Wilcox*, 2025 WL 720914, at *16.

The government does argue that Harris is ineligible for declaratory relief. Gov't Stay Mot. in Harris 21. That is incorrect. Declaratory relief is governed by "the same equitable principles relevant to the propriety of an injunction." *Samuels v. Mackell*, 401 U.S. 66, 73 (1971). For the same reasons that injunctions could be warranted in these cases, so too could declaratory judgments. And a declaratory judgment may issue against the President. *Clinton v. City of New York*, 524 U.S. 417, 428 (1998); *National Treasury Employees*, 492 F.2d at 616.

*Fourth*, a writ of mandamus is another available form of relief for Harris and Wilcox. A writ of mandamus is a traditional remedy at law ordering an executive official to carry out a mandatory and legally ministerial duty, *Swan*, 100 F.3d

45

at 977, which includes redressing an unlawful removal from public office, *In re Sawyer*, 124 U.S. at 212; *White*, 171 U.S. at 377.

The use of mandamus to assert title to an office was well known at the founding. *See, e.g.*, *R. v. Blooer* (1760) 97 Eng. Rep. 697, 698 (KB) (Mansfield, C.J.) ("A mandamus to restore is the true specific remedy where a person is wrongfully dispossessed of any office or function[.]"); 3 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *264 (1765) ("The writ of mandamus" is "a most full and effectual remedy" for "wrongful removal, when a person is legally possessed" of an office.); *R. v. The Mayor, Aldermen, and Common Council, of London*, (1787) 100 Eng. Rep. 96, 97–98 (KB) (Ashhurst, J.) (agreeing with counsel's argument that "[w]henever a person is improperly suspended or removed from an office * * * the Court will grant a mandamus to restore him"); *R. v. The Mayor and Alderman of Doncaster* (1752) 96 Eng. Rep. 795, 795 (KB) (restoring an alderman to office with a writ of mandamus). Indeed, Marbury—who, like Harris and Wilcox, was nominated by the President, and confirmed by the Senate, *Journal of the Executive Proceedings of the Senate*, vol. 1, at 338, 390 (1801)—sought mandamus to compel delivery of his commission to serve as a justice of the peace in Washington D.C, *see Marbury*, 5 U.S. at 155.

If no injunctive relief were available, mandamus could issue in these cases because the President violated a non-discretionary statutory duty by firing Harris and Wilcox without relevant justification, in direct violation of the governing laws' plain language. *See* 5 U.S.C. § 1202(d) (MSPB members "may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office."); 29 U.S.C. § 153(a) (The President can remove NLRB board members only with advance notice and "for neglect of duty or

46

malfeasance in office"). Although the President certainly enjoys broad discretion when making a finding of inefficiency, neglect, or malfeasance, the duty to justify removal on one of those grounds is non-discretionary under both statutes.

The government argues that the President is not amenable to mandamus. Gov't. Stay Mot. in Harris 22. While issuance of mandamus against the President would be a last-resort remedy to enforce the rule of law, binding circuit precedent says that "[m]andamus is not precluded because the federal official at issue is the President of the United States." *National Wildlife Federation v. United States*, 626 F.2d 917, 923 (D.C. Cir. 1980); *see National Treasury Employees Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974).

The government relies on *Mississippi v. Johnson*, 71 U.S. 475 (1866), but that case expressly "left open" the question whether mandamus can issue against the President. *Franklin v. Massachusetts*, 505 U.S. 788, 801–802 (1992); *see Swan*, 100 F.3d at 977. That is because *Johnson* involved the President's discretionary judgment under the Reconstruction Acts to use military force to govern the former confederate states. 71 U.S. at 499. So that decision does not speak to circuit precedent holding that mandamus is available for non-discretionary ministerial duties.

For all those reasons, the government is not likely to succeed in its argument that no remedy can be given to Harris and Wilcox, should the decisions in their favor be sustained on appeal.

**IV**

The remaining stay factors concern injury to the parties and the public interest. That balance implicates multiple competing

47

interests here because the government seeks to have provisions of duly enacted federal statutes declared unconstitutional and to prevent agencies created and funded by Congress from functioning during (at least) the pendency of these appeals, if not longer.

As the party seeking a stay, the government bears the burden of demonstrating that it will suffer an irreparable injury during the time these cases are pending before this court. *Nken*, 556 U.S. at 433–434. The government has disclaimed any argument that Harris and Wilson are incompetent or malfeasant. Instead, the sole irreparable injury asserted is that the President's asserted constitutional right to terminate Harris and Wilcox will be infringed. *See* Gov't. Stay Mot. in Harris 22; Gov't. Stay Mot. in Wilcox 22. That falls short of an irreparable injury for three reasons.

*First*, the asserted injury to the President is entirely bound up with the merits of the government's constitutional argument. And controlling Supreme Court precedent says there is no such constitutional injury. The Supreme Court in *Wiener* said specifically that "no such power" to remove a predominantly adjudicatory board official "is given to the President directly by the Constitution[.]" 357 U.S. at 356; *see Humphrey's Executor*, 295 U.S. at 629. This court is in no position to recognize an injury that the Supreme Court has twice unanimously disclaimed. *See Agostini*, 521 U.S. at 237. So the same lack of clarity that Judge Henderson's opinion sees in the merits, J. Henderson Op. 1–3, means that the asserted injury of not being able to remove Harris and Wilcox is equally uncertain to exist.

*Second*, the government itself has not manifested in this litigation the type of imminent or daily injury now claimed by the government and Judge Walker's opinion. Gov't Stay Mot.

48

in Harris 22–23; Gov't Stay Mot. in Wilcox 22–24; J. Walker Op. 43–45.  Harris's and Wilcox's cases have been pending for almost two months.  In Harris's case, the government agreed to have the district court proceed to briefing and decision on summary judgment on an expedited basis while a temporary restraining order was in place.  Joint Status Report for Harris, ECF No. 13 at 1.  In Wilcox's case, the government proposed *lengthening* the briefing schedule, requesting that its brief be due on March 10th, rather than Wilcox's proposed February 18th.  Joint Response Regarding Briefing Schedule for Wilcox, ECF No. 12 at 2.  The government has not explained why it could not similarly afford this court the time necessary to decide a highly expedited appeal.

*Third*, the notion that the presidency is irreparably weakened by not terminating Harris and Wilcox while this litigation is pending ignores that eight Presidents (including this President) have faced similar constraints in removing MSPB members for decades, and fifteen Presidents could not remove NLRB members without cause.  Yet the government points to no concrete manifestation of the harm it asserts, or even a public complaint from any preceding President.  Plus, if the government prevails on appeal, any decisions resulting from Harris's and Wilcox's presence on their Boards would have to be "completely undone" if a party requested it.  *Collins*, 594 U.S. at 259–260.  So any harm in terms of decisions made is repairable.

By contrast, the entry of a stay in these cases materially alters the status quo in an unprecedentedly injurious manner to the public as well as to Harris and Wilcox.  The point of a stay is to preserve the status quo pending litigation.  *Nken*, 556 U.S. at 429; *Ohio Citizens for Responsible Energy, Inc. v. NRC*, 479 U.S. 1312, 1312 (1986) (Scalia, J., in chambers).  And this court's precedent defines the relevant status quo as "the last

49

*uncontested* status which preceded the pending controversy[,]" which is Harris and Wilcox in office. *Huisha-Huisha*, 27 F.4th at 733 (citation omitted). So does the Supreme Court: "Although such a stay acts to 'ba[r] Executive Branch officials from removing [the applicant,] * * * it does so by returning to the status quo—the state of affairs before the removal order was entered." *Nken*, 556 U.S. at 429 (citation omitted); *cf. Lackey v. Stinnie*, 145 S. Ct. 659, 662 (2025) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.").

Yet the stay sought by the government and entered by the court today turns the status quo for the last 46 and 89 years upside down. By virtue of a preliminary and expeditiously considered order, this court has, for the first time in the Nation's history, allowed the termination of an MSPB member and an NLRB member in violation of express statutory conditions, 5 U.S.C. § 1202(d) (MSPB); 29 U.S.C. § 153(a) (NLRB), and on-point Supreme Court and circuit precedent.

In addition, this court, without any adjudication of the merits, has afforded the government relief that will disable the MSPB and NLRB from operating by depriving both boards of a quorum. 5 C.F.R. § 1200.3 (MSPB); 29 U.S.C. § 153(b) (NLRB). Far from "staying" anything, the court's order acts to kneecap two federal agencies and prevent them from performing the work assigned them by federal law and funded by Congress.

Because federal law expressly channels federal employee and labor disputes to these agencies, the stay will lead to an immediate backlog of cases. When the MSPB was deprived of a quorum between 2017 and 2022, a backlog of 3,793 cases built up. MSPB, *Lack of Quorum and the Inherited Inventory:*

50

*Chart of Cases Decided and Cases Pending* at 2 (Feb. 2025), https://perma.cc/Q58S-PLVV.

The NLRB likewise cannot decide cases without a quorum. *See* 29 U.S.C. § 153(b); *New Process Steel, L.P. v. NLRB*, 560 U.S. 674, 676 (2010). Although the NLRB can delegate some of its responsibilities, 29 C.F.R. §§ 102.178–182; *Order Contingently Delegating Authority to the General Counsel*, 76 Fed. Reg. 69,768 (Nov. 9, 2011), it cannot delegate the authority to decide cases. Hundreds of cases are already pending before the NLRB. NLRB, *Administrative Law Judge Decisions* (Mar. 18, 2025), https://perma.cc/Z5S2-4UEP.

If these Boards are deprived of quora, both employers and workers will be trapped with no other place to take their disputes for resolution. Federal courts cannot hear labor disputes in the first instance because prior review by the NLRB is a jurisdictional prerequisite for judicial review. 29 U.S.C. § 160(f); *Boire v. Greyhound Corp.*, 376 U.S. 473, 476–477 (1964). Nor can the parties resort to state court because the National Labor Relations Act preempts state procedures. *San Diego Building Trades Council, Millmen's Union, Loc. 2020 v. Garmon*, 359 U.S. 236, 245 (1959) ("[T]he States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted."). Paralyzing the peaceful resolution of labor disputes threatens the vital public interests in avoiding labor strife and the severe economic consequences it causes.

There is also a risk that these boards will be disabled for a much longer period of time. Nothing obligates the President to appoint replacement members. So by granting a stay, the majority opinion converts the President's removal authority into the power to render inoperable, potentially for years on

51

end, boards that Congress established and funded to address critical national problems. And that single-handed power to shutter agencies would render vital federal legislation a futility.

In short, whatever the scope of the non-textual constitutional removal power, it cannot license the Executive to destroy the ability of Congress to solve critical national problems and to provide Americans with neutral and impartial decision-making processes when their economic lives, property, and wellbeing are affected. The authority of two Branches is equally at stake. That is why historical practice has treated the statutory adoption of removal limitations for multimember boards and adjudicatory bodies as a matter for Congress and Presidents to work out together through the enactment and presentment process.

These are just the consequences for the two agencies before this court. But given the test proposed by Judge Walker's opinion foreclosing the exercise of "any" executive power or deviating in any trivial manner from the 1935 FTC, this stay decision admits of no cabining. *See* J. Walker Op. 10 (The Decision of 1789 eliminated "any" Congressional control over removal.), 14 ("[T]he President ha[s] inherent, inviolable, and unlimited authority to remove principal officers exercising substantial executive authority[.]"), 15 (*Humphrey's Executor* "has few, if any, applications today."), 20 (There can be no removal protections for "any agency that wields the substantial executive power that *Humphrey's* understood the 1935 FTC not to exercise."), 30 (*Humphrey's Executor* cannot be extended "to any new contexts[.]"), 36 (Removal protections are unconstitutional if the agency exercises "*any*" executive power.); *see also* J. Henderson Op. 1 (questioning "the continuing vitality of *Humphrey's*").

52

That would mean that a century-plus of politically independent monetary policy is set to vanish with a pre-merits snap of this court's fingers. A constitutional ruling that the President has unrestricted removal power over all multimember agencies exercising any executive power directly threatens the independence of numerous multimember agencies, including the Federal Reserve Board, the Open Market Committee, the Nuclear Regulatory Commission, the National Transportation Safety Board, the Chemical Safety and Hazard Investigation Board, and the National Mediation Board, among others.

The government insists that there is a special rule for the Federal Reserve Board. Gov't Reply Br. in Harris 8; Gov't Reply Br. in Wilcox 7–8. The President does not agree. While his recent Executive Order chose to exempt "the Board of Governors of the Federal Reserve System" and "the Federal Open Market Committee" from his "ongoing supervision and control," that carveout is limited only to their "conduct of monetary policy." Exec. Order No. 14,215, *Ensuring Accountability for All Agencies*, 90 Fed. Reg. 10,447, 10,448 (Feb. 24, 2025). As to all other Federal Reserve Board activities, such as bank regulation, 12 U.S.C. § 1813(q)(3), and consumer protection regulation, 15 U.S.C. § 1681m(e)(1), the Executive Order claims unlimited power to remove members of the Federal Reserve Board for any reason or no reason at all, 90 Fed. Reg. at 10,448. That part-in-part-out approach allows a President unhappy with monetary policy to fire one or all Federal Reserve members at will because he need not give any reason for a firing. By definition, a right to remove someone for no reason cannot be confined to certain reasons.

Beyond that, the Executive Order does not disclaim authority to remove members of the Federal Reserve or Federal Open Market Committee going forward, and the government's

53

position and Judge Walker's opinion here admit of no such limit. Indeed, it is difficult to understand how it could, as the theory that the President has illimitable removal authority is, by definition, a theory that there are *no* limits on the President's authority to remove every single executive official.[7]

Agencies are not the only entities at risk under the majority opinion's new regime. Given the primarily adjudicatory nature of the MSPB and the NLRB, it is difficult to understand how the majority opinion's rule does not eliminate removal restrictions on non-Article III judges, including judges of the Court of Federal Claims, the Bankruptcy Courts, the Court of Appeals for Veterans Claims, and the Court of Appeals for the Armed Forces. Apparently all of those adjudicators can now be fired based not on any constitutional decision by the Supreme Court or this court, but simply on the government's application for a stay citing nothing more than the President's inability to fire those officials as the requisite irreparable injury.

Such action fails to exhibit the normal "judicial humility" that courts adopt at a preliminary stage when there is still

---

[7] To the extent that the government suggests a potential exemption for the Federal Reserve Board given its "unique historical background" and "special arrangement sanctioned by history," *see CFPB v. Community Financial Services Association of America, Ltd.*, 601 U.S. 416, 467 n.16 (2024) (Alito, J., dissenting), that exemption applies equally to the MSPB and NLRB, given that removal restrictions on adjudicators like territorial and Claims Court judges and justices of the peace go back to the founding. Since there is no basis in the Constitution's text or separation-of-powers principles for minting an *ad hoc* exception just for certain functions of one entity, the better lesson to draw from this history is that limited removal restrictions for multimember and adjudicatory bodies are a manifestation of the Constitution's division of powers.

54

"grave uncertainty" about the merits. *Hanson v. District of Columbia*, 120 F.4th 223, 247 (D.C. Cir. 2024) (quoting *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1015 (10th Cir. 2004) (McConnell, J., concurring)).

**V**

The whole purpose of a stay is to avoid instability and turmoil. But the court's decision today creates them. I accordingly respectfully dissent from the decision to grant a stay pending appeal.

# Appendix B

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GWYNNE A. WILCOX,

               Plaintiff,

               v.

DONALD J. TRUMP, *in his official capacity as President of the United States*

and

MARVIN E. KAPLAN, *in his official capacity as Chairman of the National Labor Relations Board*,

               Defendants.

Civil Action No. 25-334 (BAH)

Judge Beryl A. Howell

## <u>MEMORANDUM OPINION</u>

Scholars have long debated the degree to which the Framers intended to consolidate executive power in the President. The "unitary executive theory"—the theory, in its purest form, that, under our tri-partite constitutional framework, executive power lodges in a single individual, the President, who may thus exercise complete control over all executive branch subordinates without interference by Congress—has been lauded by some as the hallmark of an energetic, politically accountable government, while rebuked by others as "anti-American," a "myth," and "invented history."[1] Both sides of the debate raise valid concerns, but this is no

---

[1] *Compare, e.g.*, Steven G. Calabresi & Christopher S. Yoo, *The Unitary Executive: Presidential Power from Washington to Bush* (2008), Saikrishna B. Prakash, *Imperial from the Beginning: The Constitution of the Original Executive* (2015), *and* Steven G. Calabresi & Saikrishna B. Prakash, *The President's Power to Execute the Laws*, 104 YALE L.J. 541, 597 (1994); *with, e.g.*, Allen Shoenberger, *The Unitary Executive Theory is Plainly Wrong and Anti-American: "Presidents are Not Kings*,*"* 85 ALB. L. REV. 837, 837 (2022), Christine Kexel Chabot, *Interring the Unitary Executive*, 98 NOTRE DAME L. REV. 129 (2022), *and* Lawrence Lessig & Cass R. Sunstein, *The President and the Administration*, 94 COLUM. L. REV. 1, 4 (1994) ("Any faithful reader of history must conclude that the unitary executive . . . is just myth."); Cass R. Sunstein, *This Theory is Behind Trump's Power Grab*, N.Y. TIMES (Feb. 26, 2025), https://www.nytimes.com/2025/02/26/opinion/trump-roberts-unitary-executive-theory.html; *see*

mere academic exercise.[2]  The outcome of this debate has profound consequences for how we Americans are governed.  On the one hand, democratic principles militate against a "headless fourth branch"[3] made up of politically unaccountable, independent government entities that might become agents of corrupt factions or private interest groups instead of the voting public. Additionally, at least theoretically, empowering a President with absolute control over how the Executive branch operates, including the power to "clean house" of federal employees, would promote efficient implementation of presidential policies and campaign promises that are responsive to the national electorate.  On the other hand, the advantages of impartial, expert-driven decision-making and congressional checks on executive authority favor some agency independence from political changes in presidential administrations, with the concomitant benefits of stability, reliability, and moderation in government actions.  No matter where these pros and cons may lead, the crucial question here is, what does the U.S. Constitution allow?

To start, the Framers made clear that no one in our system of government was meant to be king—the President included—and not just in name only.  *See* U.S. CONST. art. I, § 9, cl. 8 ("No Title of Nobility shall be granted by the United States.").  Indeed, the very structure of the Constitution was designed to ensure no one branch of government had absolute power, despite

---

*also* Julian Davis Mortenson, *The Executive Power Clause*, 168 U. PA. L. REV. 1269, 1334 (2020) (describing "the exercise of executive power" as "fully subordinate to instructions by its legislative principal" at the founding).

[2]      The academy has provided various formulations of the "unitary executive" theory.  *See, e.g.*, Steven G. Calabresi & Kevin H. Rhodes*, The Structural Constitution: Unitary Executive, Plural Judiciary*, 105 HARV. L. REV. 1153, 1158 (1992) ("Unitary executive theorists claim that all federal officers exercising executive power must be subject to the direct control of the President."); Lessig & Sunstein, *supra*, at 2 ("Many think that under our constitutional system, the President must have the authority to control all government officials who implement the laws."); Chabot, *supra*, at 129 (2022) (describing the "unitary executive" theory as the idea that the Constitution gave the President "plenary removal power" affording him "'exclusive control over subordinates' exercise of executive power").

[3]      Peter L. Strauss, *The Place of Agencies in Government: Separation of Powers and the Fourth Branch*, 84 COLUM. L. REV. 573, 578 (1974) (quoting The President's Comm. on Admin. Mgmt., Administrative Management in the Government of the United States 30 (1937)).

the perceived inefficiencies, inevitable delays, and seemingly anti-democratic consequences that

may flow from the checks and balances foundational to our constitutional system of governance.

The Constitution provides guideposts to govern inter-branch relations but does not fully

delineate the contours of the executive power or the degree to which the other two branches may

place checks on the President's execution of the laws.  As pertinent here, the Constitution does

not, even once, mention "removal" of executive branch officers.  The only process to end federal

service provided in the Constitution is impeachment, applicable to limited offices (like judges

and the President) after a burdensome political process.  *See, e.g.*, *id.* art. II, § 4 (impeachment of

President); *id.* art. III, § 1 (impeachment of federal judges).  This constitutional silence on

removal perplexed the First Congress, bedeviled a President shortly thereafter and a second

President after the Civil War during Reconstruction (leading to condemnation of the former and

impeachment proceedings against the latter), and has beset jurists and scholars in our modern

era.  *See infra* Part III.A.3.b.[4]

Yet, in assessing separation of powers, the Constitution itself is not the only available

guide.  Historical practice and a body of case law are, respectively, instructive and binding.  *See*

*infra* Part III.A.1; *e.g.*, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 23 (2015) ("In

separation of powers cases this Court has often 'put significant weight upon historical practice.'"

(quoting *NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014))).  Both make clear that textual

---

[4]    In 1834, President Andrew Jackson fired two Secretaries of the Treasury when each refused his order to remove U.S. funds from the Second National Bank, which Jackson viewed as having "resist[ed] his reelection in part with bank funds," and these removal actions triggered a congressional condemnation resolution for an abuse of power.  *See* Lessig & Sunstein, *supra* n.1, at 78-80.  Jackson's replacement as Secretary at Treasury, Roger Taney, did as ordered and was later appointed Chief Justice.  *Id.* at 79.  The resolution condemning President Jackson was ultimately expunged, in 1837, but not without significant debate and Jackson's reputational decline.  *See id.* at 81-83.

Over thirty years later, in 1867, President Andrew Johnson's removal of the Secretary of War in defiance of a congressional statute led to his impeachment and near conviction.  Richard Murphy, 32 FED. PRAC. & PROC. JUD. REV. § 8128 (2d ed.) (2024).

silence regarding removal does not confer absolute authority on a President to willy-nilly override a congressional judgment that expertise and insulation from direct presidential control take priority when a federal officer is tasked with carrying out certain adjudicative or administrative functions. As Justice Louis Brandeis eloquently opined, "[c]hecks and balances were established in order that this should be 'a government of laws and not of men,'" observing further that the separation of powers was not adopted "to promote efficiency but to preclude the exercise of arbitrary power. The purpose was, not to avoid friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments, to save the people from autocracy." *Myers v. United States*, 272 U.S. 52, 292-93 (1926) (Brandeis, J., dissenting)**.**

A President who touts an image of himself as a "king" or a "dictator,"[5] perhaps as his vision of effective leadership, fundamentally misapprehends the role under Article II of the U.S. Constitution. In our constitutional order, the President is tasked to be a conscientious custodian of the law, albeit an energetic one, to take care of effectuating his enumerated duties, including the laws enacted by the Congress and as interpreted by the Judiciary. U.S. Const. art. II, § 3 ("[H]e shall take Care that the Laws be faithfully executed . . . ."). At issue in this case, is the President's insistence that he has authority to fire whomever he wants within the Executive branch, overriding any congressionally mandated law in his way. *See* Letter from Sarah Harris, Acting Solicitor General, to Sen. Richard Durbin on Restrictions on the Removal of Certain

---

[5]    *See* @WhiteHouse, X (Feb. 19, 2025, 1:58 PM), https://perma.cc/V9Y2-SWRD ("LONG LIVE THE KING!"); WSJ News, *Trump Says He Won't Be a Dictator "Except for Day One" if Re-Elected*, YouTube (Dec. 6, 2023), https://www.youtube.com/watch?v=dQkrWL7YuGk; *see also* @realDonaldTrump, X (Feb. 15, 2025, 1:32 PM), https://perma.cc/S5GR-BXF5 ("He who saves his Country does not violate any Law."). Some of defendants' supporting amici also draw analogies to the British monarchy; Tennessee has described the tradition of the British king's "'prerogative power to remove' executive officers 'at will,'" which "carried into the United States." Tennessee's Amicus Br. at 5-6 (quoting Michael W. Connell, *The President Who Would Not Be King* 162 (2020)). In a democracy created to repudiate that very regime, that analogy has little purchase.

Principal Officers of the United States ("Letter from Acting SG") (Feb. 12, 2025),

https://perma.cc/D67G-FKK4 (describing the Trump administration's view of the removal

power).  Luckily, the Framers, anticipating such a power grab, vested in Article III, not Article

II, the power to interpret the law, including resolving conflicts about congressional checks on

presidential authority.  The President's interpretation of the scope of his constitutional power—

or, more aptly, his *aspiration*—is flat wrong.

The President does not have the authority to terminate members of the National Labor

Relations Board at will, and his attempt to fire plaintiff from her position on the Board was a

blatant violation of the law.  Defendants concede that removal of plaintiff as a Board Member

violates the terms of the applicable statute, *see* Motions H'rg (Mar. 5, 2025), Rough Tr. at 51:12-

13, and because this statute is a valid exercise of congressional power, the President's excuse for

his illegal act cannot be sustained.

## I.    BACKGROUND

The statutory and procedural background relevant to resolving this dispute is summarized

below.

### A.    *Statutory Background*

The National Labor Relations Board ("NLRB") was established ninety years ago by

Congress in the National Labor Relations Act ("NLRA") in response to a long and violent

struggle for workers' rights.  *See generally*, J. Warren Madden, *Origin and Early Years of the*

*National Labor Relations Act*, 18 HASTINGS L.J. 571 (1967); Arnold Ordman, *Fifty Years of the*

*NLRA*: *An Overview*, 88 W. VA. L. REV. 15, 15-16 (1985).  Congress sought to protect industrial

peace and stability in labor relations and thus created a board to resolve efficiently labor disputes

and protect the rights of employees to "self-organization, to form, join, or assist labor

organizations [and] to bargain collectively through representatives of their own choosing."  29

U.S.C. §157; *see also id.* § 151; *Crey v. Westinghouse Elec. Corp.*, 375 U.S. 261, 271 (1964) (describing these goals); *Colgate-Palmolive-Peet Co. v. NLRB*, 338 U.S. 355, 362 (1949) (same).

The NLRB is a "bifurcated agency" consisting, on one side, of a five-member, quasi-judicial "Board" that adjudicates appeals of labor disputes from administrative law judges ("ALJs"), and on the other, of a General Counsel ("GC") and several Regional Directors who prosecute unfair labor practices and enforce labor law and policy. *See* NLRB, *Who We Are*, https://perma.cc/9RLA-FSYL; 29 U.S.C. §§ 153(a), (d), 160; *Starbucks v. McKinney*, 602 U.S. 339, 357 (2024) (Jackson, J., concurring in part and dissenting in part). The two sides operate independently, with the GC independent of the Board's control. *NLRB v. United Food & Com. Workers Union, Local 23, AFL-CIO*, 484 U.S. 112, 117-18 (1987) (describing how the Labor Management Relations Act of 1947 amended the NLRA to separate the prosecutorial and adjudicatory functions between the Board and General Counsel).

The NLRB generally addresses labor disputes as follows: Upon the filing of a "charge" by an employer, employee, or labor union, a team working under the Regional Director will investigate and decide whether to pursue the allegation as a formal complaint. *See* NLRB, *Investigate Charges*, https://perma.cc/CU82-KU4V.[6] If the parties do not settle and the Director formally pursues the complaint, the Director will issue notice of a hearing before an ALJ. *Id.*; 29 U.S.C. § 160(b); 29 C.F.R. § 101.10; *Starbucks*, 602 U.S. at 342-43.[7] If necessary, after issuance of a complaint, the Board may seek temporary injunctive relief in federal district court while the dispute is pending at the NLRB. 29 U.S.C. § 160(j); *Starbucks*, 602 U.S. at 342. The

---

[6]    The initial request made by the employee, union, or employer is referred to as a "charge"; only the Director issues a "complaint." NLRB, *What We Do*, https://perma.cc/CU82-KU4V.

[7]    If the parties do formally settle after issuance of a complaint, Board approval is required. *NLRB*, 484 U.S. at 120.

ALJ then gathers evidence and presents "a proposed report, together with a recommended order

to the Board." 29 U.S.C. § 160(c). That order will become the order of the Board unless the

parties file "exceptions." *Id.*; 29 C.F.R. §§ 101.11-.12. If the parties file exceptions requesting

the Board's review, the Board will consider the ALJ's recommendation, gather additional facts

as necessary, and issue a decision. 29 U.S.C. § 160(c); 29 C.F.R. § 101.12. The Board may craft

relief, such as a cease-and-desist order to halt unfair labor practices or an order requiring

reinstatement of terminated employees. 29 U.S.C. § 160(c). These orders, however, are not

independently enforceable; the Board must seek enforcement in a federal court of appeals (and

may appoint attorneys to do so). *Id.* §§ 154, 160(e); *In re NLRB*, 304 U.S. 486, 495 (1938)

(noting compliance with a Board order is not obligatory until entered as a decree by a court).

Aside from adjudicating disputes, the Board may also conduct and certify the outcome of union

elections, 29 U.S.C. § 159, and promulgate rules and regulations to carry out its statutory duties,

*id.* § 156.

Although both the Board members and the GC are appointed by the President with

"advice and consent" from the Senate, *id.* §§ 153(a), (d), only the Board is protected from

removal at-will by the President, who is authorized to remove a Board member "upon notice and

hearing, for neglect of duty or malfeasance in office, but for no other cause," *id.* § 153(a). Such

restrictions were intentional; much like many other multimember entities, the Board was

designed to be an independent panel of experts that could impartially adjudicate disputes. *See* 29

U.S.C. § 153(a); Kirti Datla & Richard L. Revesz, *Deconstructing Independent Agencies (and*

*Executive Agencies)*, 98 CORNELL L. REV. 76, 770-71 (2013) (describing the NLRB as a classic

example of an agency designed to be independent). Board members serve staggered five-year

terms, and the President is authorized to designate one board member as Chairman. 29 U.S.C.

§ 153(a). In practice, the Board is partisan-balanced based on longstanding norms, though such a balance is not statutorily mandated. *See* Brian D. Feinstein & Daniel J. Hemel, *Partisan Balance with Bite*, 118 COLUM. L. REV. 9, 54-55 (2018).

### B.    *Factual Background*

As set out in plaintiff's complaint and statement of material facts, and undisputed by defendants, plaintiff Gwynne Wilcox was nominated by President Biden and confirmed by the U.S. Senate to a second five-year term as member of the NLRB in September 2023. Pl.'s Mot. for Expedited Summ. J. ("Pl.'s Mot."), Statement of Material Facts ("Pl.'s SMF") ¶ 2, ECF No. 10-1; Defs.' Cross-Mot. for Summ. J. and Opp'n to Pls.' Mot. for Summ. J., Statement of Undisputed Material Facts ("Defs.' SUMF") ¶ 2, ECF No. 23-2. She was designated Chair of the Board in December 2024. Complaint ¶ 12, ECF No. 1.

Shortly after taking office, President Trump moved Marvin Kaplan, a then-sitting Board member and a defendant in this case, into the position of Chair, replacing plaintiff. *Id*. ¶ 13. President Trump then, on January 27, 2025, terminated plaintiff from her position on the Board via an email sent shortly before 11:00 PM, by the Deputy Director of the White House Presidential Personnel Office. Pl.'s Decl., Ex. A, ECF No. 10-4; Pl.'s SMF ¶ 3; Defs.' SUMF ¶ 3. The termination was not preceded by "notice and hearing," nor was any "neglect of duty or malfeasance" identified, despite the explicit restrictions to removal of a Board member in the NLRA. Pl.'s Decl. ¶¶ 3-4; Pl.'s SMF ¶¶ 4-5; Defs.' SUMF ¶ 5 (regarding lack of notice and hearing); Motions H'rg (Mar. 5, 2025), Rough Tr. at 51:10-17. The email instead cited only political motivations—that plaintiff does not share the objectives of the President's administration—and asserted, in a footnote, that the restriction on the President's removal authority is unconstitutional as "inconsistent with the vesting of the executive Power in the President." Pl.'s Decl. ¶ 3; Ex. A.

The NLRB's Director of Administration, who reports directly to Mr. Kaplan, began the termination process, cutting off plaintiff's access to her accounts and instructing her to clean out her office.  Pl.'s Decl. ¶¶ 5-6.  The Board already had two vacancies, and now, without plaintiff, it is reduced to only two sitting members—one short of the three-member quorum required to operate.  Compl. ¶ 18; 29 U.S.C. § 153(b).  Removal of plaintiff has thus stymied the functioning of the Board.

Plaintiff filed the instant suit, challenging her removal and requesting injunctive relief against Mr. Kaplan so that she may resume her congressionally mandated role.  *See* Compl. ¶¶ 21-22.  Recognizing that this case involves a pure question of law, plaintiff moved for expedited summary judgment, on February 10, 2025, Pl.'s Mot., ECF No. 10, and defendants responded with a cross-motion for summary judgment, with briefing completed on a condensed schedule.  *See* Defs.' Cross-Mot. for Summ. J. and Opp'n to Pls.' Mot. for Summ. J. ("Defs.' Opp'n"), ECF No. 23; Pl.'s Opp'n to Defs.' Cross-Mot. and Reply in Supp. of Mot. for Summ. J. ("Pl.'s Reply"), ECF No. 27; Defs.' Reply in Supp. of Cross-Mot. for Summ. J. ("Defs.' Reply"), ECF No. 30.  Interested parties also weighed in as amici.[8]  Following a hearing, held on March 5, 2025, the parties' cross-motions for summary judgement are ready for resolution.

## II.    LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A fact is only "'material' if a dispute over it might affect the outcome of a suit under the

---

[8]    Amici include: the Constitutional Accountability Center ("CAC") and a cohort of nineteen states and the District of Columbia, led by Minnesota, writing in support of plaintiff, *see* CAC's Amicus Br., ECF No. 15; Nineteen States & D.C.'s Amicus Br., ECF No. 31; and Tennessee and a cohort of twenty states, led by Florida, writing in support of defendants, *see* Tennessee's Amicus Br., ECF No. 18; Twenty States' Amicus Br., ECF No. 26.

governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary

judgment determination." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The dispute is only "genuine" if

"the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Id.*

(quoting *Anderson*, 477 U.S. at 248).

A plaintiff "seeking a permanent injunction . . . must demonstrate: (1) that it has suffered

an irreparable injury; (2) that remedies available at law, such as monetary damages, are

inadequate to compensate for that injury; (3) that, considering the balance of hardships between

the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest

would not be disserved by a permanent injunction."  *Monsanto Co v. Geertson Seed Farms*, 561

U.S. 139, 156-57 (2010) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

## III.    DISCUSSION

In the ninety years since the NLRB's founding, the President has never removed a

member of the Board.  Pl.'s Mem. in Supp. of Pl.'s Mot. ("Pl.'s Mem.") at 4, ECF No. 10-2.  His

attempt to do so here is blatantly illegal, and his constitutional arguments to excuse this illegal

act are contrary to Supreme Court precedent and over a century of practice.  For the reasons

explained below, plaintiff's motion is granted.  Plaintiff's termination from the Board was

unlawful, and Mr. Kaplan and his subordinates are ordered to permit plaintiff to carry out all of

her duties as a rightful, presidentially-appointed, Senate-confirmed member of the Board.

### A.    *Humphrey's Executor* and its Progeny are Binding on this Court.

The Board is a paradigmatic example of a multimember group of experts who lead an

independent federal office.  Since the early days of the founding of this country, Congress, the

President, and the Supreme Court all understood that Congress could craft executive offices with

some independence, as a check on presidential authority.  That understanding has not changed

over the 150-year history of independent, multimember commissions, nor over the 90-year

history of the NLRB.  The Supreme Court recognized this history and tradition in *Humphrey's*

*Executor v. United States*, 295 U.S. 602 (1935), in upholding removal protections for such

boards or commissions, and this precedent remains not only binding law, but also a well-

reasoned reflection of the balance of power between the political branches sanctioned by the

Constitution.

> **1.    *Removal Restrictions on Board Members are Well-Grounded in History and Binding Precedent.***

As a textual matter, the Constitution is silent as to removals.  *See In re Hennen*, 38 U.S.

230, 258 (1839).  Consequently, though Article II grants the President authority over some

appointments—with advice and consent of the Senate—and vests in him the "executive power,"

Article II contains no express authority from which to infer an absolute removal power.

*Compare* U.S. CONST. art. II, § 1, cl. 1 (vesting clause), *and id.*, § 2, cl. 2 (appointments clause);

*to id.* art. I, § 8, cl. 18 (clause granting *Congress* the authority "to make all laws" "necessary and

proper" for carrying out its powers and "all other Powers vested . . . in the Government").  The

Supreme Court has held that a general power to remove executive officers can be inferred from

Article II, *see Myers,* 272 U.S. at 163-64, yet the contours of that removal power and the extent

to which Congress may impose constraints are nowhere clearly laid out.

The courts in such cases must therefore turn to established precedent—judicial decisions

as well as general practice and tradition.  The Supreme Court has repeatedly recognized that

"'traditional ways of conducting government . . . give meaning' to the Constitution."  *Mistretta v.*

*United States*, 488 U.S. 361, 401 (1989) (alteration in original) (quoting *Youngstown Sheet &*

*Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring)).  Thus, "[i]n

separation-of-powers cases this Court has often 'put significant weight upon historical practice.'"

*Zivotofsky*, 576 U.S. at 23 (quoting *Noel Canning*, 573 U.S. at 524). Even when the validity of a particular power is in question, the Court will, "in determining the . . . existence of [that] power," give weight to "the usage itself," *United States v. Midwest Oil Co.*, 236 U.S. 459, 473 (1915), and "hesitate to upset the compromises and working arrangements that the elected branches of Government themselves have reached," *Noel Canning*, 573 U.S. at 526. Justice Frankfurter in his seminal concurring opinion in *Youngstown* declared that "systematic, unbroken" practice could even "be treated as a gloss on 'executive Power' vested in the President." 343 U.S. at 610-11.

Not only are the removal protections on members of the independent, multimember boards like the NLRB supported by over a century of unbroken practice, but they have also been expressly upheld in clear Supreme Court precedent. Since 1887, Congress has created multiple independent offices led by panels whose members are appointed by the President but removable only for cause. *See, e.g.*, Interstate Commerce Act, Pub. L. No. 49-41, ch. 104, § 11, 24 Stat. 379, 383 (1887) (creating the Interstate Commerce Commission, with restrictions on officers' removal except for "inefficiency, neglect of duty, or malfeasance"); Federal Reserve Act, Pub. L. No. 63-64, ch. 6, § 10, 38 Stat. 251, 260-61 (1913) (creating the Federal Reserve Board, whose members are removable only "for cause"). In 1914, Congress established the Federal Trade Commission ("FTC") with an "inefficiency, neglect of duty, or malfeasance in office" removal restriction for its five commissioners. FTC Act, Pub. L. No. 63-203, ch. 311, § 1, 38 Stat. 717, 717-18 (1914).

The Supreme Court explicitly upheld removal restrictions for such boards when considering removal protections for the commissioners of the FTC in *Humphrey's Executor* in 1935, while also recognizing the President's general authority over removal of executive branch

officials.  The Court noted that commissioners of the FTC, "like the Interstate Commerce Commission" "are called upon to exercise the trained judgment of a body of experts 'appointed by law and informed by experience.'"  *Id.* at 624 (quoting *Ill. Cent. R.R. Co. v. Interstate Com. Comm'n*, 206 U.S. 441, 454 (1907)).  Congress, having the power to create such expert commissions with quasi-legislative and quasi-judicial authority, must also have, "as an appropriate incident, power to fix the period during which they shall continue, and to forbid their removal for except for cause in the meantime."  *Id.* at 629.

Two months later, with the guidance supplied in *Humphrey's Executor* and following the model of the FTC as endorsed by the Supreme Court there, Congress established the National Labor Relations Board.  *See* Madden, *supra*, at 572-73; *Yapp USA Auto. Sys., Inc. v. NLRB*, --F. Supp. 3d--, No. 24-cv-12173, 2024 WL 4119058, at *5 (E.D. Mich. Sep. 9, 2024).  Both entities—the FTC and NLRB—have five-member leadership boards with staggered terms of several years, minimizing instability and allowing for expertise to accrue.  *See* 29 U.S.C. § 153(a); *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 216 (2020).  Both were intended to exercise impartial judgment.  *See* Datla & Revesz, *supra*, at 770-71 (describing independence of the NLRB); *Seila L.*, 591 U.S. at 215-16 (describing the FTC as "designed to be 'non-partisan' and 'to act with entire impartiality'" (quoting *Humphrey's Ex'r*, 295 U.S. at 624)).  The Board, like the FTC, is "predominately quasi judicial and quasi legislative" in nature, with the primary responsibility of impartially reviewing decisions made by ALJs.  *Humphrey's Ex'r*, 292 U.S. at 624; *see* 29 U.S.C. § 160.  In fact, the Board does not prosecute labor cases nor enforce its rulings.  The side of the NLRB managed by the General Counsel—who is removable at-will by the President—carries out those more "executive" powers.  *See* 29 U.S.C. § 153(d) (describing the General Counsel's "final authority, on behalf of the Board" over "the

investigation of charges and issuance of complaints . . . and . . . the prosecution of such

complaints before the Board"). As plaintiff correctly states, the Board closely resembles the

FTC and is thus "squarely at the heart of the rule adopted in *Humphrey's Executor*." Pl.'s Mem.

at 9.

Numerous other offices have followed the mold of the NLRB and FTC with

multimember independent leadership boards protected from at-will removal by the President.

*See* Pl.'s Mem. at 7 n.2 (listing, *e.g.*, the Merit Systems Protection Board, 5 U.S.C. § 1202(d); the

Federal Labor Relations Authority, 5 U.S.C. § 7104(b); and the Federal Energy Regulatory

Commission, 42 U.S.C. § 7171(b)(1)). "Since the Supreme Court's decision in *Humphrey's*

*Executor*, the constitutionality of independent [multimember] agencies, whose officials possess

some degree of removal protection that insulates them from unlimited and instantaneous political

control, has been uncontroversial." *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th

748, 760 (10th Cir. 2024), *cert. denied* No. 24-156, 2025 WL 76435 (U.S. Jan. 13, 2025); *see*

*also The Pocket Veto Case*, 279 U.S. 655, 689 (1929) ("Long settled and established practice is a

consideration of great weight in a proper interpretation of constitutional" issues of separation of

powers.).[9]

Recent consideration of the constitutionality of the removal protections for NLRB

members have accordingly upheld those constraints on presidential removal authority under

*Humphrey's Executor*. *See, e.g.*, *Overstreet v. Lucid USA Inc.*, No. 24-cv-1356, 2024 WL

5200484, at *10 (D. Ariz. Dec. 23, 2024); *Company v. NLRB*, No. 24-cv-3277, 2024 WL

---

[9]    Defendants protest the reliance on history and tradition because independent multimember commissions date back only to the late 1880s. Defs.' Reply at 4-5. "[S]uch a practice comes far too late to provide reliable evidence of the original public meaning of Article II or the Constitution's separation of powers," in defendants' view. Defs.' Reply at 4-5. That in no way invalidates the significance of longstanding tradition, however, which is probative "[e]ven when the nature of or longevity of [the] practice is subject to dispute, and even when that practice began after the founding era." *Noel Canning*, 573 U.S. at 525; *see id.* at 528-29 (relying on a post- Civil War practice of intra-recess appointments); CAC's Amicus Br. at 11, ECF No. 15 (making this point).

5004534, at \*6 (W.D. Mo. Nov. 27, 2024); *Kerwin v. Trinity Health Grand Haven Hosp.*, No. 24-cv-445, 2024 WL 4594709, at \*7 (W.D. Mich. Oct. 25, 2024); *Alivio Med. Ctr. v. Abruzzo*, No. 24-cv-2717, 2024 WL 4188068, at \*9 (N.D. Ill. Sep. 13, 2024); *YAPP USA Automotive Sys.*, 2024 WL 4119058, at \*7.  Courts have also recently upheld restrictions on removal under *Humphrey's Executor* for other multimember boards, such as the Consumer Product Safety Commission ("CPSC").  *See, e.g.*, *Leachco*, 103 F.4th at 761-62; *Consumers' Rsch. v. CPSC*, 91 F.4th 342, 352 (5th Cir. 2024); *United States v. SunSetter Prods. LP*, No. 23-cv-10744, 2024 WL 1116062, at \*4 (D. Mass. Mar. 14, 2024).  The same has been true for the FTC.  *See, e.g.*, *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1046-47 (5th Cir. 2023); *Meta Platforms, Inc. v. FTC*, 723 F. Supp. 3d 64, 87 (D.D.C. 2024).  A court in this district has also upheld removal protections for the Merit Systems Protection Board.  *See Harris v. Bessent*, No. 25-cv-412 (RC), 2025 WL 679303, at \*7 (D.D.C. Mar. 4, 2025).  The 150-year history and tradition of multimember boards or commissions and 90-year precedent from the Supreme Court approving of removal protections for their officers dictates the same outcome for the NLRB here.

## 2. *Defendants' Argument that* Humphrey's Executor *Does Not Control Fails.*

Discounting this robust history, defendants posit that the President's removal power is fundamentally "unrestricted" and that only two, narrow "exceptions" have been recognized: one for "inferior officers with narrowly defined duties," as established in *Morrison v. Olson*, 487 U.S. 654 (1988), and the other for "multimember bod[ies] of experts, balanced along partisan lines, that performed legislative and judicial functions and [do not] exercise any executive power," as established in *Humphrey's Executor*.  Defs.' Opp'n at 5-6 (second passage quoting *Seila L.*, 591 U.S. at 216).  According to defendants, neither exception applies to the Board.  *Id.* at 6.  Putting aside to address later whether congressional authority to constrain the President's

removal authority is characterized fairly by defendants as a narrow "exception" to the rule of "unrestricted" removal power, *see infra* Part III.A.3.b, *Humphrey's Executor* plainly controls.

Defendants emphasize that *Humphrey's Executor* understood the FTC at the time not to exercise any "executive power," which was key to its "exception," and that the NLRB today clearly "wield[s] substantial executive power." Defs.' Opp'n at 6-8 (relying on *Seila L.*, 591 U.S. at 216 n.2, 218); *see also* Defs.' Reply at 3. They do not, however, meaningfully distinguish between the authority of the FTC in 1935, as recognized in *Humphrey's Executor*, and the authority of the NLRB today. The FTC in 1935 had powers mimicking those of both the Board and the NLRB's GC. The FTC had broad powers of investigation and could issue a complaint and hold a hearing for potential unfair methods of competition. *See Humphrey's Ex'r*, 295 U.S. at 620, 621; *see also* 15 U.S.C. § 49 (authorizing the FTC's subpoena power). The FTC, upon finding a violation, could issue a cease-and-desist order and then go to the Court of Appeals for enforcement. *Humphrey's Ex'r*, 295 U.S. at 620-21; *see also* FTC Act, ch. 311, § 5, 38 Stat. at 719-20. The party subject to the order could also appeal to that court. *Humphrey's Ex'r*, 295 U.S. at 621. Further, the FTC could issue rules and regulations regarding unfair and deceptive acts. *See* FTC Act, § 6, 38 Stat. at 722; Hon. R. E. Freer, Member of the FTC, Remarks on the FTC, its Powers and Duties at 2 (1940), https://www.ftc.gov/system/files/documents/public_statements/676771/19400827_freer_remarks_._rational_association_of_credit_jewelers.pdf.

The NLRB's collective authority, though comparable, *see supra* Part I.A (describing the NLRB's GC's authority to investigate and pursue enforcement against unfair labor practices and the Board's adjudicatory authority and power to issue unenforceable cease-and-desist orders), is, if anything, less extensive than that of the FTC. The NLRB hardly engages in rulemaking (other

16

than to establish its own procedures), instead relying on adjudications for the setting of

precedential guidance.  *See Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374

(1998) ("The [NLRB], uniquely among major federal administrative agencies, has chosen to

promulgate virtually all the legal rules in its field through adjudication rather than rulemaking.").

Moreover, the aspects of the NLRB's authority most executive in nature—prosecutorial authority

to investigate and bring civil enforcement actions—are tasks assigned to the GC instead of the

Board itself.  *See* 29 U.S.C. § 153(d).[10]

 Even though the Supreme Court of 1935 may have not referred to these classic

administrative powers as "executive" and the Supreme Court today would, *see, e.g.*, *Seila Law*,

591 U.S. at 216 n.2, the substantive nature of authority granted to these two independent

government entities does not significantly differ.  If the Supreme Court has determined that

removal restrictions on officers exercising substantially the same authority do not impermissibly

intrude upon presidential authority, *Humphrey's Executor* cannot be read to allow a different

outcome here.  That is especially true considering that the Supreme Court, in its next major

decision addressing removal protections for executive branch officers, rejected the notion that

the permissibility of "'good cause'-type restriction[s] . . . turn[s] on whether or not th[e] official"

---

[10] Defendants suggest that because the NLRB makes "significant decisions shaping the rights and obligations of Americans" and "set[ting] federal labor policy," the "constitutional calculus" is different, and the *Humphrey's Executor* "exception" cannot apply.  Defs.' Reply at 3, 5; Motions H'rg (Mar. 5, 2025), Rough Tr. at 54:1-7 (citing *NLRB v. Curtin Matheson Sci., Inc.*, 494 U.S. 775, 786 (1990) ("[T]he NLRB has the primary responsibility for developing and applying national labor policy.")).  Defendants do not, however, explain how applying federal law in individual adjudications establishes "federal labor policy" any more than the rulemaking and adjudications of the FTC in *Humphrey's Executor* do, nor do they explain why subsequent caselaw—*see supra* Part III.A.3.a—should be read as putting such a gloss on the holding of *Humphrey's*.  Plaintiff contributed little to the debate about the scope of the NLRB's powers that may be considered "executive," simply tying its authorities closely to the FTC in 1935, despite the NLRB's bifurcated structure, resulting in a more cabined exercise of any executive authority by the Board itself.  *See* Pl.'s Reply at 3-5; *see also* Motions H'rg (Mar. 5, 2025), Tr. at 23:5-13 (plaintiff's counsel stating, "answering the question about exactly what 'executive' means and what those terms 'quasi-legislative' and 'quasijudicial' mean, it's not the easiest thing in the world.  I think, for purposes of this motion that's before you, I think what matters is that . . . *Humphrey's Executor* is binding.").

is classified as "purely executive" or exercising quasi-legislative or quasi-judicial functions. *See Morrison*, 487 U.S. at 689.[11]

Defendants make a final, superficial distinction between the NLRB and the FTC to argue that the precedent of *Humphrey's Executor* should not apply. Defs.' Opp'n at 10. The NLRB, they note, has stricter removal protections because its members cannot be removed for "inefficiency," whereas FTC members can. *Id.* In both *Consumers' Research*, 91 F.4th at 346, 355-56, and *Leachco*, 103 F.4th at 761-63, however, courts of appeals upheld removal protections that did not include an exception for "inefficiency." "Inefficiency" does not differ in substance from "neglect of duty," so omitting "inefficiency" as a grounds for removal cannot be a dispositive difference in the President's ability to exercise his Article II powers over the NLRB. *See* Jane Manners & Lev Menand, *The Three Permissions: Presidential Removal and the Statutory Limits of Agency Independence*, 121 COLUM. L. REV. 1, 8, 69 (2021) (explaining

---

[11]    Defendants' argument about the exercise of "executive power" is ultimately tautological and leaves *Humphrey's Executor* completely devoid of force. They reason that because the NLRB is housed within the executive branch, the Board inherently exercises "executive power." Defs.' Opp'n at 7 (citing *Seila L.*, 591 U.S. at 216 n.2 (quoting *City of Arlington v. FCC*, 569 U.S. 290, 305 n.4 (2013))). Reading *Humphrey's Executor* to allow removal protections only for offices that do not exercise "executive power," defendants then conclude that the NLRB does not fit within *Humphrey's Executor*. The necessary implication of such reasoning is that *no board or commission placed with the executive branch* could, as a constitutional matter, be legally subject to removal protections duly enacted by Congress. Yet, defendants dodge that extraordinary result and contradictorily suggest that removal protections on the Federal Reserve Board are acceptable because that Board does not exercise an "executive function." Defs.' Reply at 5; *see also* Motions H'rg (Mar. 5, 2025), Rough Tr. at 59-60 (defense counsel declining to discuss Federal Reserve Board or the Federal Open Market Committee or why these entities should be treated differently than the NLRB as to presidential removal power).
    Recognizing that the exercise of "executive power" could not be dispositive, the Fifth Circuit in *Consumers' Research* agreed with the plaintiffs there that the CPSC "wields substantial executive power" but still held that the CPSC was constitutional under *Humphrey's Executor.* 91 F.4th at 353-55 ("Having concluded that the Commission exercises substantial executive power (in the modern sense), we must next consider whether that characteristic—standing alone—removes the Commission from the *Humphrey's* exception. We conclude that it does not . . . ."). The Fifth Circuit examined the other factors in *Seila Law* to conclude that the removal protections for CPSC members were constitutionally sound: The CPSC does not have a novel structure or present a historically unprecedented situation; the CPSC does not have a single director but rather a multimember board; and the CPSC does not have any of the other features that concerned the Court in *Seila Law*, such as the receipt of funds outside the appropriation process or the inability of the President to influence the office's leadership through the appointment power. *See id.*
    Regardless whether the NLRB exercises "substantial executive power," "executive power," or "quasi-legislative and quasi-judicial power," the NLRB does not sufficiently differ from the FTC to warrant a departure from *Humphrey's Executor.*

that the absence of "inefficiency" as a ground for removal does not unconstitutionally interfere

with the President's authority).  Defendants offer no reason to suggest otherwise.  The NLRB fits

well within the scope of *Humphrey's Executor*.

### 3.    *Defendants' Argument that* Humphrey's Executor *Has Been "Repudiated" and is No Longer Good Law Is Not Persuasive.*

Fundamentally, the position of defendants and their supporting state amici urging this

Court not to apply *Humphrey's Executor* stems from a reading of the Supreme Court's

subsequent case law as "repudiat[ing]" the precedent.  Defs.' Opp'n at 9 (quoting *Seila L.*, 591

U.S. at 239 (Thomas, J., concurring in part)); Tennessee's Amicus Br. at 7-10, ECF No. 18

(arguing forcefully that *Humphrey's Executor* was wrongly decided and has been "narrowed . . .

nearly out of existence"); Twenty States' Amicus Br. at 3-8, ECF No. 26.  Defendants therefore

argue that *Humphrey's Executor* must be read extremely narrowly, despite that "whatever little

remains" is binding on this Court.  Defs.' Opp'n at 8 n.2.  To the contrary, an unbroken line of

cases since *Humphrey's Executor* has reinforced the constitutionality of removal restrictions on

multimember expert boards, and the pre-*Humphrey's Executor* history demonstrates that this

decision was well-grounded in accepted principles of checks and balances.

### a.    *Post-*Humphrey's Executor *Case Law Reinforces its Central Holding.*

In every case following *Humphrey's Executor*, the Supreme Court has preserved the

constitutionality of removal protections on independent, multimember boards and commissions.

Shortly following *Humphrey's Executor*, in *Wiener v. United States*, 357 U.S. 349 (1958), the

Court held that the Constitution did not grant the President authority to remove members of the

multimember War Claims Commission "for no reason other than that he preferred to have on

that Commission men of his own choosing."  *Id.* at 355-56.  Thirty years later, in *Morrison*, the

Court again recognized the exception to the President's removal power for officers with

adjudicatory powers, but further explained that the permissibility of removal restrictions did not turn on whether the officers' functions were "quasi-legislative and quasi-judicial," as opposed to executive in nature, instead looking to the degree to which they impeded the President's ability to execute the laws.  *See* 487 U.S. at 691-93 (upholding removal protections for independent counsel contained in the Ethics in Government Act).

Then, in *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477 (2010), the Court reiterated its holding in *Humphrey's Executor* that "Congress can, under certain circumstances, create independent agencies run by principal officers appointed by the President, whom the President may not remove at will but only for good cause" and declined to reexamine that precedent.  *Id.* at 483 (striking down double for-cause removal protections); *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 537 F.3d 667, 686 (D.C. Cir. 2008) (Kavanaugh, J., dissenting) (describing the defendants as attempting to compare the office's removal protections to that of "the FCC, the FTC, and the NLRB," which were understood to be "permissible under the Supreme Court's 1935 decision in *Humphrey's Executor*").

Most recently, in *Seila Law*, the Supreme Court likewise declined to "revisit [its] prior decisions allowing certain limitations on the President's removal power."  591 U.S. at 204. While defendants make much of dicta in this decision, such as that the FTC's powers would now be considered executive, Defs.' Opp'n at 9; *see also* Tennessee's Amicus Br. at 9, *Seila Law* made key distinctions between single-head offices and multimember boards or commissions that reinforce why placing restrictions on removal of leaders of the latter is not problematic under our Constitution, *see* 591 U.S. at 224-26.  Despite restrictions on removal, the President can exercise more control over a multimember board through his *appointment power* as vacancies arise, and with staggered terms, some Board vacancies arise during each administration.  *See id.* at 225.

Those new appointees can restrain the Board member the President might otherwise prefer to remove, and no President will be "saddled" with a single "holdover Director from a competing political party who is dead set *against*" his agenda. *Id.* at 225 (emphasis in original). That is particularly the case here, where President Trump could exercise near total control over the NLRB by appointing two members of his choosing to the Board to join Mr. Kaplan, whom the President appointed during his first term and recently elevated to Chairman, creating a majority of Trump appointees, and by appointing a General Counsel of his choice. *See* NLRB, *Members of the NLRB Since 1935*, https://www.nlrb.gov/about-nlrb/who-we-are/the-board/members-of-the-nlrb-since-1935 (last visited Mar. 5, 2025); 29 U.S.C. § 153(d) (allowing the General Counsel to be removed at will).[12]

Moreover, the multimember structure prevents the public from being subject to decisions made unilaterally by an unelected official, who could become captured by private interests. The distribution of power among several individuals on the Board "avoids concentrating power in the hands of any single individual." *Seila L.*, 591 U.S. at 222-23. Lastly, unlike single-head offices, entities led by multimember boards have a robust basis—more than even a "foothold"—in "history [and] tradition." *Id.* at 222. For these reasons, when the Court ultimately invalidated the removal restrictions on the CFPB's director as a *single* head of the bureau, Chief Justice Roberts expressly suggested that "converting the CFPB into a multimember agency" would solve "the problem." *Id.* at 237.[13]

---

[12]    Instead, by bringing the Board to a complete halt, the President has foreclosed his own ability to see his Board appointees effectuate his agenda and has frozen the functioning of an important government office.

[13]    The Supreme Court's most recent removal protections case, *Collins v. Yellen*, 594 U.S. 220 (2021), was likewise about an office led by a single director, and the Court there reaffirmed it "did 'not revisit [its] prior decisions allowing certain limitations on the President's removal power'" in *Seila Law*. *Id.* at 250-51 (quoting *Seila L.*, 591 U.S. at 204).

Finally, two months ago, the Supreme Court denied certiorari in *Leachco*, where the Tenth Circuit upheld removal protections for commissioners on the Consumer Product Safety Commission under *Humphrey's Executor*—once again, declining to revisit that precedent. *See* 103 F.4th 748 (10th Cir. 2024), *cert. denied* No. 24-156, 2025 WL 76435 (U.S. Jan. 13, 2025).

### b.    *Presidential Removal Power Has Never Been Viewed as Unrestricted.*

Defendants and their supporting states' amici go even further in suggesting that not only has *Humphrey's Executor* been repudiated over time but the opinion was also wrong at the time it was decided. Defs.' Opp'n at 8 n.2, 9; Tennessee's Amicus Br. at 7; *see* Twenty States' Amicus Br. at 6-7. Defendants read *Humphrey's* predecessor, *Myers v. United States*, 272 U.S. 52 (1926), as formalizing the President's "unrestricted removal power," which ultimately derives from the "vesting" clause in Article II establishing a "unitary" executive. Defs.' Reply at 1-2 (first passage quoting *Seila L.*, 591 U.S. at 215); Motions H'rg (Mar. 5, 2025), Rough Tr. at 30:22-31:4 (plaintiff's counsel describing *Myers* as a "building block" in the unitary executive theory). They are again misguided. While the *Myers* Court made clear that the President has a general removal power for executive officials, defendants' myopic focus on this case loses sight of the limitations in its holding, a point driven home in *Humphrey's Executor* decided less than a decade later. Nothing in the Constitution or the historical development of the removal power has suggested the President's removal power is absolute. In fact, the history upon which *Myers* relies and the immediately following Supreme Court decisions undercut any view that Congress, when exercising its constitutional authority to shape executive offices, is completely barred from conditioning the President's exercise of his removal authority.

In *Myers*, Chief Justice Taft—the only person to have served both as the President and a Justice of the Supreme Court—recounted and relied on the history of the Decision of 1789, a

congressional debate about the President's removal powers during the First Congress, to declare unconstitutional a statute requiring the "advice and consent of the Senate" for both appointment *and* removal of federal postmasters. *See* 272 U.S. at 107, 111-36, 176-77.[14]  The First Congress had created the first three executive departments, the Departments of Foreign Affairs, War, and Treasury, and after much debate, ultimately granted plenary removal power to the President over the Secretary of Foreign Affairs and crafted that agency to be an arm of the President. *Id.* at 145; *see also* Lawrence Lessig & Cass R. Sunstein, *The President and the Administration*, 94 COLUM. L. REV. 1, 25-29 (1994).  The First Congress did not make clear whether that decision—to grant the President plenary removal authority over the Secretary of Foreign Affairs—derived from the Constitution or rather was granted by Congress's own prerogative. *See Myers*, 272 U.S. at 285 n.75 (Brandeis, J., dissenting); Lessig & Sunstein, 94 COLUM. L. REV. at 26-28; *Seila L.*, 591 U.S. at 271 (Kagan, J., dissenting in part and concurring in part) ("The summer of 1789 thus ended without resolution of the critical question: Was the removal power 'beyond the reach of congressional regulation'?" (quoting Saikrishna Prakash, *New Light on the Decision of 1789*, 91 CORNELL L. REV. 1021, 1072 (2006))).  Some clarity in the First Congress's view may be gleaned, however, by the disparate approach that the Congress took with respect to the Department of the Treasury.  Seeing the Treasury as a department less intrinsically tied to core executive powers enumerated in Article II like that over foreign policy, Congress gave far more direction to the structure of that department, specifying in detail its offices and functions and granting independence from unfettered presidential removal power to the Comptroller.  *See* Lessig & Sunstein, *supra*, at 27-28.  In short, the executive branch was not treated as strictly

---

[14]       The statute regarding removal of the postmasters read: "Postmasters of the first, second, and third classes shall be appointed and may be removed by the President by and with the advice and consent of the Senate, and shall hold their offices for four years unless sooner removed or suspended according to law." *Myers*, 272 U.S. at 107.

unitary, but rather as a branch with units of varying degrees of independence and generally

subject to congressional direction through checks and balances—including on its personnel. *See*

John F. Manning, *Separation of Powers as Ordinary Interpretation*, 124 HARV. L. REV. 1939,

1964 n.135 (2011).

Chief Justice Taft in *Myers* cherry-picked only one portion of that 1789 story by

highlighting what the First Congress did with the Department of Foreign Affairs. *See* 272 U.S.

at 113-36; *Seila L.*, 591 U.S. at 277 (Kagan, J., dissenting in part and concurring in part)

(describing how scholars have "rejected Taft's one-sided history"). Despite the structure of the

Post Office far more closely resembling the Treasury Department of 1789 than the Department

of Foreign Affairs, Chief Justice Taft ignored the actual nuances reflected in the Decision of

1789 as to congressional power to condition the President's removal power reflected in the

treatment of the new Treasury Department and instead read this history "through executive-

colored glasses" to support "his strong preconceptions" as former President "about presidential

removal power," to reach the conclusion that a regional postmaster could not be subject to

removal protections. Robert Post, *Tension in the Unitary Executive: How Taft Constructed the

Epochal Opinion of* Myers v. United States, 45 J. SUP. CT. HIST. 167, 172 & n.56 (2020) (first

passage quoting Hayden Smith to William H. Taft (Sep. 1, 1925) (Taft Papers)); *Myers*, 272 U.S.

at 176; Lessig & Sunstein, *supra*, at 25-30.[15] Dicta in the lengthy *Myers* majority opinion made

broad pronouncements about the importance of the presidential removal power that were both

contradictory and inapposite: While Chief Justice Taft promoted the benefits of recognizing vast

---

[15]    Notably, Chief Justice Taft reached this conclusion over three dissents, including from Justices Holmes and
Brandeis. *Myers*, 272 U.S. at 178-295. Justice Brandeis, in particular, espoused a view of checks and balances that
emphasized the interdependence of the executive and legislative branches, vindicated in Justice Jackson's
concurring opinion in *Youngstown*, 343 U.S. at 634. *See Myers*, 272 U.S. at 240-95.

presidential removal authority on one hand, he recognized that Congress could legislate around appointment and removal of principal officers, in some circumstances, and inferior officers, refusing to threaten protections for the civil service, on the other. *Id.* at 127, 134-35, 161-62, 183, 186 ("[T]here may be duties of a quasi judicial character imposed on executive officers and members of executive tribunals whose decisions after hearing affect interests of individuals, the discharge of which the President cannot in a particular case properly influence or control. . . . [Moreover,] [the appointments clause] give[s] to Congress the power to limit and regulate removal of such inferior officers by heads of departments when it exercises its constitutional power to lodge the power of appointment with them.").[16]

Only nine years later, in *Humphrey's Executor*, the Supreme Court—consisting of six of the same justices who participated in the *Myers* decision (*i.e.,* Justices Sutherland, Van Devanter, Brandeis, Stone, McReynolds, and Butler)—unanimously retreated, denouncing the idea of "illimitable" removal authority and disavowing *Myers'* abundant dicta. *Morrison*, 487 U.S. at 687 ("In *Humphrey's Executor*, we found it 'plain' that the Constitution did not give the President 'illimitable power of removal' over the officers of independent agencies." (quoting 292 U.S. at 629)). Justice Sutherland, who authored *Humphrey's* despite joining the majority opinion in *Myers*, limited *Myers* to "the narrow point" that "the President had power to remove a postmaster of the first class, without the advice and consent of the Senate as required by act of Congress" and wrote that other "expressions . . . are beyond the point involved and therefore do not come within the rule of stare decisis. In so far as they are out of harmony with the views here set forth, these expressions are disapproved." *Humphrey's Ex'r*, 292 U.S. at 626-27.

---

[16]    The bold position taken by the current administration, *see* Exec. Order No. 14215, 90 Fed. Reg. 10447 (2025), that the President has supreme control over *all* of his subordinates threatens to upend limits on the removal power over *inferior* officers, expressly acknowledged in *Myers*.

*Humphrey's Executor*, consistent with the dissents in *Myers*, did not foreclose that the President may have total authority over removal of some officials (like "high political officers," *Myers*, 272 U.S. at 241 (Brandeis, J., dissenting)), but it made clear that his removal authority may certainly be limited by Congress in other circumstances.[17]  *Humphrey's Ex'r*, 292 U.S. at 629-32.

The takeaway from *Myers* is therefore discrete and uncontroversial: While Congress may structure executive branch offices via statute and legislate about the roles of executive branch officers, including standards for their removal, Congress cannot reserve for itself an active role in the removal decision.  The problem in *Myers* was that the statute required Senate advice and consent to remove postmasters and that encroached on the presidential power of removal.  272 U.S. at 107.  It cannot be gainsaid that the President has the power of removal of executive branch officers.  When Congress has statutorily provided a for-cause removal requirement, this means that the President has the authority to determine whether the for-cause requirement

---

[17]     Justice Brandeis's dissent in *Myers* was not so broad as to authorize Congress to restrict presidential authority over removal of anyone in the executive branch.  *See Myers*, 272 U.S. at 240-42 (Brandise, J., dissenting). Rather, he focused on the fact that the postmaster was an *inferior officer*, very unlike that of the Secretary of Foreign Affairs, and the mischief that would result if the majority decision were read to endorse absolute presidential removal authority for all officials.  *Id.* at 241, 247, 257 ("Power to remove, as well as to suspend, a high political officer, might conceivably be deemed indispensable to democratic government and, hence, inherent in the President. But power to remove an inferior administrative officer appointed for a fixed term cannot conceivably be deemed an essential of government."); *see also id.* at 181-82, 187, 193 (McReynolds, dissenting) (resisting *Myers'* overbroad dicta suggesting that *all* executive officers must serve at the pleasure of the President).  In the dissenters' views, a functional analysis into an office's role and responsibilities—like that in *Humphrey's Executor*—was necessary, but only for principal officers.

     In the face of the current administration's push for a more absolutist presidential removal power, history provides significant cautions: Protections for inferior federal officers came about to counter the extensive "spoils system" that characterized the executive branch in the early 1800s—particularly during the presidency of Andrew Jackson, whose controversial legacy is due in part to his association with widespread corruption.  *See Myers*, 272 U.S. at 276-83 (McReynolds, J., dissenting); *id.* at 272 U.S. at 250-52 (Brandeis, J., dissenting).  Congress having a hand in executive appointments and removal was seen as an antidote to corruption.  Such provisions set the stage for the development of the modern civil service system.  *See id.*; Katherine Shaw, *Partisanship Creep*, 118 NW. UNIV. L. REV. 1563, 1573 & n. 48 ("[A] few decades after Andrew Jackson's administration, strong discontent with the corruption and inefficiency of the patronage system of public employment eventuated in the Pendleton Act, the foundation of modern civil service." (quoting *Elrod v. Burns*, 427 U.S. 347, 354 (1976))).

prescribed by Congress has been met.  As the Supreme Court has since repeatedly articulated, "the essence" of "*Myers* was the judgment that the Constitution prevents Congress from draw[ing] to itself the" power to remove.  *Morrison*, 487 U.S. at 686 (citing *Bowsher v. Synar*, 478 U.S. 714 (1986), for that interpretation).  That holding is completely compatible with *Humphrey's Executor*.  Little more can be gleaned from the unreliable historical retelling and prolix *Myers* majority opinion.[18]

In short, neither the Founding-era history nor *Myers* can carry the heavy weight that the current President has thrust upon it.  *See* Letter from Acting SG ("In *Myers* . . ., the Supreme Court recognized that Article II of the Constitution gives the President an 'unrestricted' power of 'removing executive officers.'").  Neither supports the view that the President's removal power is "illimitable."  Whatever the benefits of unrestricted removal authority under certain circumstances, "[t]he Framers did not constitutionalize presidential control over all that is now considered 'executive'; they did not believe that the President must have plenary power over all we now think of as administration," Lessig & Sunstein, *supra*, at 118, and neither did the early twentieth century Supreme Court.

---

[18]    At the motions hearing, defense counsel argued that this interpretation of both *Myers* and *Humphrey's Executor* had been rejected by the Supreme Court in *Seila Law*, 591 U.S. at 228.  Motions H'rg (Mar. 5, 2025), Rough Tr. at 62:1-17.  That is not so.  In *Seila Law*, amicus had distilled the Court's precedent as follows:

> *Humphrey's Executor* and *Morrison* establish a general rule that Congress may impose "modest" restrictions on the President's removal power, with only two limited exceptions. . . . Congress may not reserve a role *for itself* in individual removal decisions (as it attempted to do in *Myers* and *Bowsher*). And it may not eliminate the President's removal power altogether (as it effectively did in *Free Enterprise Fund*). Outside those two situations, amicus argues, Congress is generally free to constrain the President's removal power.

*Seila L.*, 591 U.S. at 228 (emphasis in original) (internal citations omitted).  Rather than reject that reconciliation of *Myers* and *Humphrey's Executor*, the Court simply restated the principle, uncontroverted in either precedent, that "the President's removal power is the rule, not the exception," *id.*, and then declined to revisit these precedents or to "elevate [*Humphrey's Executor*] into a freestanding invitation for Congress to impose additional restrictions on the President's removal authority," *id.*  In other words, the Supreme Court neither constrained *Humphrey's Executor* by expanding *Myers* beyond its holding nor endorsed an expansion of *Humphrey's Executor* itself.  In short, *Seila Law*, on this matter, had frankly little to add.

The holding in *Humphrey's Executor*, that Congress could create boards or commissions with elements of independence from the President, was therefore not at all a "fiction" or an aberration, as defendants have supposed.  Defs.' Opp'n at 9.[19]  *Humphrey's Executor*, and thus NLRB Board members' removal protections, are consistent with the text and historical understandings of Article II, as well as the Supreme Court's most recent pronouncements.  That Congress can exert a check on the President by imposing for-cause restrictions on the removal of leaders of multimember boards or commissions is a stalwart principle in our separation of powers jurisprudence.

### c.   **Humphrey's Executor** *Remains Binding.*

In any case, *Humphrey's Executor* remains binding on this Court, as defendants rightly acknowledge.  *See* Defs.' Opp'n at 8 n.2; *Illumina*, 88 F.4th at 1047 ("[T]he question of whether . . . *Humphrey's Executor* [is] no longer binding" is for the Supreme Court alone to answer.).  As the Supreme Court has made clear, "[i]f a precedent . . . has direct application in a case, yet appears to rely on reasons rejected in some other line of decisions," the lower courts should still "leav[e] to the [Supreme] Court the prerogative of overruling its own decisions."  *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989); *see also Nat'l Sec. Archive v. CIA*, 104 F.4th 267, 272 n.1 (D.C. Cir. 2024) ("This court is charged with following case law that directly controls a particular issue, 'leaving to [the Supreme] Court the prerogative of overruling its own decisions.'" (alterations in original) (quoting *Mallory v. Norfolk S. Ry. Co.*,

---

[19]     Nor can *Humphrey's Executor* be fairly described as an "exception[]" to the general rule of presidential removal authority.  *Contra Seila L.*, 591 U.S. at 198.  As explained, a careful reading of the history and the scope of the dispute in *Myers* confirms that *Humphrey's Executor* was not some exception to an otherwise absolute presidential removal power previously established in *Myers*.  To the extent *Myers* extolled such an absolute presidential removal power in overbroad dicta, it was in short order rejected by a unanimous Supreme Court.  *Myers* simply established that the President alone may exercise removal authority over principal officers, and *Humphrey's Executor* explained that Congress can set standards, without conferring the exercise of that power to itself, to cabin the President's singular exercise of that authority in the circumstances presented.

600 U.S. 122, 136 (2023))); *Meta Platforms*, 723 F. Supp. 3d at 87 ("It is certainly not this Court's place to deem a long-standing Supreme Court precedent obsolete . . . and thus no longer binding." (internal quotation marks and citation omitted)).  This Court would be bound to conclude that plaintiff's termination was unlawful even were the conclusion reached—and this Court adamantly has not—that *Humphrey's Executor* was, by today's measure, ill-reasoned or wrongly decided.

### B.    Plaintiff is Entitled to Permanent Declaratory and Injunctive Relief.

For all of these reasons, plaintiff prevails on the merits and is therefore entitled to a declaratory ruling that she was unlawfully terminated from her position as a member of the Board.  Defendants concede as much.  Motions H'rg (Mar. 5, 2025), Rough Tr. at 71:23-72:1 (defense counsel stating, "We are not fighting this requested declaratory judgment.").

Plaintiff further requests injunctive relief against Mr. Kaplan, ordering him to allow plaintiff to carry out all of her duties.  Compl. at 7.  To demonstrate that injunctive relief is warranted, a plaintiff must show that (1) she has suffered an irreparable injury, (2) remedies available at law are inadequate to compensate, (3) a remedy in equity is warranted considering the balance of the hardships to each party, and (4) the public interest is not disserved.  *eBay Inc. v. MercExchange LLC*, 547 U.S. 388, 391 (2006).  Notwithstanding plaintiff's success on the merits, defendants contest her entitlement to injunctive relief.  Defs.' Opp'n at 10.

### 1.    *Plaintiff's Irreparable Harm and Inadequate Remedies at Law*

Plaintiff is suffering irreparable harm that cannot be repaired in the absence of an injunction.[20]  Courts have recognized as irreparable harms the "unlawful removal from office by the President" and "the obviously disruptive effect" that such removal has on the organization's

---

[20]      These two factors are often considered together.  *See, e.g.*, *Ridgley v. Lew*, 55 F. Supp. 3d 89, 98 (D.D.C. 2014); *Dellinger v. Bessent*, --F. Supp. 3d--, No. 25-cv-385 (ABJ), 2025 WL 665041, at \*32 (D.D.C. Mar. 1, 2025).

functioning. *Berry v. Reagan*, No. 83-cv-3182, 1983 WL 538, at * 5 (D.D.C. Nov. 14, 1983),

*vacated as moot*, 732 F.2d 949 (Mem.) (D.C. Cir. 1983). In *Berry*, terminated members of the

Civil Rights Commission challenged President Reagan's decision to remove them. *Id.* at *1.

The Commission was "left without a quorum," and the court recognized as an irreparable injury

both the commission's inability to "fulfill its mandate" and the individuals' inability to serve

"Congress in the furtherance of civil rights." *Id.* at *5. Likewise here, plaintiff has been

deprived of a presidentially appointed and congressionally confirmed position of high

importance, and both she and, by consequence, the NLRB have been deprived of the ability to

carry out their congressional mandate in protecting labor rights—which cannot be retroactively

cured by monetary damages. *See id.*; *Dellinger v. Bessent*, No. 25-cv-385 (ABJ), 2025 WL

471022, at *11-13 (D.D.C. Feb. 12, 2025) ("[T]he loss of the ability to do what Congress

specifically directed [her] to do cannot be remediated with anything other than equitable relief.");

*Harris v. Bessent*, --F. Supp.3d--, No. 25-cv-412 (RC), 2025 WL 521027, at *7 (D.D.C. Feb. 18,

2025) ("By vindicating [her] right to occupy th[at] office, th[is] plaintiff[] act[s] as much in [her]

own interests as those of [her] agenc[y's]. . . . Striking at the independence of these officials

accrues harm to their offices, as well.").[21]

Furthermore, plaintiff and the NLRB suffer an injury due to the loss of the office's

independence. As an entity entrusted with making impartial decisions about sensitive labor

---

[21]    Defendants argue that because President Trump could restore the NLRB's quorum by appointing members to fill the vacant seats, the harm here is not irreparable. Defs.' Opp'n at 14. While filling the open seats would halt the ongoing harm and prevent future harm, restoration of the NLRB's quorum would not do anything to *repair* the past harm—the backlog of cases, the months employers and employees have spent waiting for adjudications, the practical ramifications felt across the country (from workers' rights violations to workplace unrest) of labor disputes left unresolved, delayed union recognition, and so forth. The possibility that the NLRB could once again operate may be one difference between this case and the situation of the Civil Rights Commission in *Berry*, where the Commission was set to expire before it could fulfill its statutory mandate, *see* 1983 WL 538, at *5, but that possibility does not make the harm here somehow reparable. The NLRB's statutory mandate is not to—at some point in time—operate, contrary to defendants' suggestion, Defs.' Opp'n at 14-15, but rather to have an ongoing, efficient administration of the country's labor laws.

disputes, the NLRB's character and perception as neutral and expert-driven is damaged by plaintiff's unlawful removal. *See Humphrey's Ex'r*, 295 U.S. at 630 ("[The] coercive influence [of the removal power] threatens the independence of a commission."); *Harris*, 2025 WL 679303, at *13 ("[T]he MSPB's independence would evaporate if the President could terminate its members without cause, even if a court could later order them reinstated."). Money likewise cannot make up for that kind of intangible and reputational harm.

Defendants argue that, regardless of the injury, plaintiff's requested remedy—reinstatement to her position—is one the Court cannot grant. Defs.' Opp'n at 11. Not only have all previous cases sought back pay instead of reinstatement, defendants point out, but also reinstatement is not a remedy historically available at equity, which constrains the relief available to the Court today. *Id.* at 12 (citing *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)). Plaintiff counters, however, that she does not request the remedy of "reappointment" and does not need to be reinstated: She requests only a declaration that the President lacked authority to remove her—making the termination email void *ab initio*—and injunctive relief to enable her to carry out her position as before. *See* Pl.'s Reply at 9.

Defendants do not challenge the Court's ability to afford declaratory relief, but they do challenge an injunction running against the executive branch, even against the President's subordinates, to permit plaintiff to carry out her duties. Defs.' Opp'n at 11, 13. They contend that such relief would effectively "compel[]" the President "to retain the services of a principal officer whom he no longer believes should be entrusted with the exercise of executive power." Defs.' Opp'n at 11; *see also* Defs.' Reply at 7-8. At most, however, this argument simply restates defendants' position on the merits, because, as a general matter, courts undoubtedly have authority to constrain unlawful presidential action by enjoining the President's subordinates.

31

*See, e.g.*, *Youngstown*, 343 U.S. at 582, 589 (holding a presidential act unconstitutional and affirming the district court judgment which restrained Secretary of Commerce); *Chamber of Com. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("[I]t is now well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.' *Franklin v. Massachusetts*, 505 U.S. 788, 815 (1992) (Scalia, J., concurring in part and concurring in the judgment).  Even if the Secretary were acting at the behest of the President, this 'does not leave the courts without power to review the legality [of the action], for courts have power to compel subordinate executive officials to disobey illegal Presidential commands.' *Soucie v. David*, 448 F.2d 1067, 1072 n. 12 (D.C. Cir. 1971)." (alterations in original)); *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *6 n.1 (D.C. Cir. Feb. 15, 2025) (noting that a court "can unquestionably review the legality of the President's action by enjoining the officers who would attempt to enforce the President's order").

Moreover, the D.C. Circuit has held such relief is appropriate in this type of employment context: A court may, by targeting a President's subordinates, "reinstate a wrongly terminated official '*de facto*,' even without a formal presidential reappointment" that would require injunctive relief against the President himself.  *Severino v. Biden*, 71 F.4th 1038, 1042-43 (D.C. Cir. 2023) (holding that the plaintiff's injury was therefore redressable); *cf. Swan v. Clinton*, 100 F.3d 973, 980 (D.C. Cir. 1996) (holding that plaintiff's claim was redressable because injunctive relief against inferior officials, who could *de facto* reinstate plaintiff by allowing him to exercise the privileges of his office, would remedy plaintiff's harm); *see also Harris*, 2025 WL 679303, at *10-12 (holding that the court can order such relief to remedy an unlawful termination and relying on *Swan* and *Severino*);  *Dellinger v. Bessent*, --F. Supp. 3d--, No. 25-cv-385 (ABJ),

2025 WL 665041, at *29-31 (D.D.C. Mar. 1, 2025) (same).  The Court therefore has the

authority to issue both the declaratory and injunctive remedies that plaintiff seeks.[22]

### 2.   *Balance of the Equities and the Public Interest*

The balance of the equities and the public interest also favor injunctive relief here.  *See*

*Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting that, where the government is a party, "[t]hese

two factors merge").  The public has an interest in efficient and peaceful resolution of labor

conflicts, and the Board's functioning is crucial to that goal.  In 2024, the NLRB received 20,000

to 30,000 unfair labor practice charges, and the Board reviewed 144 unfair labor practice cases

---

[22]   Defendants' arguments that plaintiff may not be "reinstated" or "reappointed" because reinstatement was not a remedy originally available at equity are not only inconsequential because relief need not be fashioned in that form, as described above, but they are also flawed.  Defendants' argument ultimately boils down to a technical distinction: Historically, requests for reinstatement were styled as writs of mandamus or *quo warranto* before courts of law instead of requests for injunctions before courts of equity, as defendants' cited cases reflect.  Defs.' Opp'n at 12; Twenty States' Amicus Br. at 3; *see In re Sawyer*, 124 U.S. 200, 212 (1888) (noting that while a court of equity does not have "jurisdiction over the appointment and removal of public officers, . . . the courts of law, . . . either by certiorari, error, or appeal, or by *mandamus*, prohibition, *quo warranto*, or information in the nature of a writ of *quo warranto*" do); *White v. Berry*, 171 U.S. 366, 377 (1898) (same).  After the merger of law and equity in the federal courts over eighty years ago, however, that distinction makes no difference and does not render improper the injunctive relief plaintiff requests.

Unsurprisingly, many courts have, therefore, reinstated federal employees to their positions or prevented their removals from taking effect.  *See, e.g.*, *Vitarelli v. Seaton*, 359 U.S. 535, 546 (1959) ("[P]etitioner is entitled to the reinstatement which he seeks."); *Pelicone v. Hodges*, 320 F.2d 754, 757 (D.C. Cir. 1963) (holding that plaintiff was "entitled to reinstatement"); *Paroczay v. Hodges*, 219 F. Supp. 89, 94 (D.D.C. 1963) (holding that, because plaintiff "was never legally separated," the court "will therefore order plaintiff's reinstatement"); *Berry*, 1983 WL 538, at *6 (enjoining removal of members of the U.S. Commission on Civil Rights); *cf. Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974) (acknowledging that "[u]se of the court's injunctive power" may be appropriate in certain cases regarding discharge of employees).  The other cases cited by defendants for the principle that reinstatement is not available as equitable relief, Defs.' Opp'n at 12, involve the unique situation of federal courts presiding over questions about state officers' entitlement to their positions, which is wholly inapplicable here.  *See Baker v. Carr*, 369 U.S. 186, 231 (1962) (citing cases about "enjoin[ing] a state proceeding to remove a public officer"); *Walton v. House of Representatives of Okla.*, 265 U.S. 487, 489-90 (1924) (holding that the district court did not have "jurisdiction over the appointment and removal of state officers"); *Harkrader v. Wadley*, 172 U.S. 148, 165-70 (1898) (declining to enjoin a state criminal proceeding); *see also* Twenty States' Amicus Br. at 16-17 (making the inapposite argument that imposing a remedy of reinstatement of state officers invades state sovereignty).

In any case, the D.C. Circuit has "note[d] that a request for an injunction based on the general federal question statute is essentially a request for a writ of mandamus in this context, where the injunction is sought to compel federal officials to perform a statutorily required ministerial duty."  *Swan*, 100 F.3d at 976 n.1.  Indeed, plaintiff made a last-minute request in her Notice of Supplemental Authority, ECF No. 33 at 4, for a writ of mandamus in the alternative.  A writ of mandamus requires that "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff."  *Id.* at 4 n.1 (alteration accepted) (quoting *In re Nat'l Nurses United*, 47 F.4th 746, 752 n.4 (D.C. Cir. 2022) (citation omitted)).  Accordingly, if injunctive relief were not available here because of adherence to the historical dividing lines of law and equity, a writ of mandamus would likely be available, and the effective relief provided to plaintiff would be the same.  *See Harris*, 2025 WL 679303, at *11.

and 115 election certification cases. *See* Nineteen States & D.C.'s Br. at 7, ECF No. 31 (citing

NLRB, *Investigate Charges*, https://perma.cc/CU82-KU4V; NLRB, *Board Decisions Issued*,

https:www.nlrb.gov/reports/agency-performance/board-decisions-issued (last visited Feb. 24,

2025)). Without a functioning NLRB, unfair labor practices go unchallenged, union elections go

unrecognized, and pending labor disputes go unreviewed. *See* Pl.'s Mem. at 12 (providing one

example where Whole Foods has refused to recognize a union election because it claims the

NLRB lacks the authority to certify it); Pl.'s Reply at 12 (citing an additional example where

CVS has refused to recognize a majority elected union). Incentives to comply with national

labor law may be severely undercut if no agency is available for enforcement. Employees,

employers, and bargaining units all suffer as a result. The public also has an interest in the

protection of duly enacted, constitutional laws—like the NLRA—from encroachment from other

branches. *See League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("[T]here is a

substantial public interest 'in having governmental agencies abide by the federal laws that

govern their existence and operations.'" (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th

Cir. 1994))). Reinstating plaintiff would allow the NLRB to reach a quorum, thereby allowing

the Board to carry out the important work in promoting labor stability, adjudicating labor

disputes, and protecting workers' rights, without inflicting any measurable harm on defendants.[23]

    Defendants protest that the President will indeed experience harm—by virtue of retaining

"a principal officer whom the President no longer believes should be entrusted with the exercise

of executive power," resulting in the executive branch "slip[ping] from the Executive's control,

and thus from that of the people." Defs.' Opp'n at 15 (second passage quoting *Free Enter. Fund*,

---

[23]    As plaintiff's supporting state amici point out, a less partisan Board, insulated from at-will removal, is less likely to whipsaw the public by taking completely disparate approaches every four years, which has concomitant public benefits in greater stability and predictability in administration of the law. *See* Nineteen States & D.C. Br. at 9 n.21.

561 U.S. at 499). Yet, President Trump can exercise control over the NLRB by appointing two members of his choosing to the vacant seats and appointing a General Counsel who will adopt his enforcement priorities; he simply has chosen not to do so. In any case, whether the public will benefit more from the balance Congress has struck in preserving some independence from political whims in the administration of our national labor laws or from complete executive control goes to the core of the constitutional question underlying the merits—and thus the answer is dictated by binding precedent.

Finally, defendants predict their ultimate success before the Supreme Court, warning that if plaintiff is allowed to resume her duties on the Board now, any NLRB decisions in the meantime may be voidable, and "the NLRB will be under a heavy cloud of illegitimacy." Defs.' Reply at 9; *see also* Defs.' Opp'n at 16; Twenty States' Amicus Br. at 16 (suggesting that "reinstatement hampers effective governance" by causing "intra-office 'chaos'" and questions about the fitness of the official). The possibility of future changes in the law is not enough, however, to permit an unlawful termination and the halting of all Board activity in the meantime. Plaintiff's wrongful termination has caused "chaos" enough and shall not be allowed to stand based on defendants' self-serving speculation.

## IV.    CONCLUSION

The President seems intent on pushing the bounds of his office and exercising his power in a manner violative of clear statutory law to test how much the courts will accept the notion of a presidency that is supreme. Defendants cite in their briefing *Trump v. United States*, 603 U.S. 593, 608-09 (2024) (granting the President absolute and presumptive immunity from criminal liability for "official acts"), to argue that the removal power is "conclusive and preclusive," with the result that the President need not be subject to criminal *or civil* legislative constraints. Defs.'

Reply at 7.  The courts are now again forced to determine how much encroachment on the legislature our Constitution can bear and face a slippery slope toward endorsing a presidency that is untouchable by the law.  The President has given no sufficient reason to accept that path here.

*Humphrey's Executor* and its progeny control the outcome of this case and require that plaintiff be permitted to continue her role as Board member of the NLRB and her termination declared unlawful and void.  The Constitution and caselaw are clear in allowing Congress to limit the President's removal power and in allowing the courts to enjoin the executive branch from unlawful action.  Defendants' hyperbolic characterization that legislative and judicial checks on executive authority, as invoked by plaintiff, present "extraordinary intrusion[s] on the executive branch," Defs.' Opp'n at 1, is both incorrect and troubling.  Under our constitutional system, such checks, by design, guard against executive overreach and the risk such overreach would pose of autocracy.  *See Myers*, 272 U.S. at 293 (Brandeis, J., dissenting).  An American President is not a king—not even an "elected" one[24]—and his power to remove federal officers and honest civil servants like plaintiff is not absolute, but may be constrained in appropriate circumstances, as are present here.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  March 6, 2025

_____
**BERYL A. HOWELL**
United States District Judge

---

[24]    Motions H'rg (Mar. 5, 2025), Rough Tr. at 43:9 (plaintiff's counsel highlighting the constitutional role of other branches in checking President's authority).