ORAL ARGUMENT SCHEDULED MAY 16, 2025

**No. 25-5057**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

GWYNNE A. WILCOX,
*Plaintiff-Appellee*,

vs.

DONALD J. TRUMP, in his official capacity as President of the United States;
MARVIN E. KAPLAN, in his official capacity as Chairman of the National Labor
Relations Board,
*Defendants-Appellants.*

On Appeal from the United States District Court for the District of Columbia,
No. 1:25-cv-00334-BAH, Hon. Beryl A. Howell

**BRIEF OF *AMICUS CURIAE* THE CHAMBER OF COMMERCE
OF THE UNITED STATES OF AMERICA IN SUPPORT OF
DEFENDANTS-APPELLANTS AND REVERSAL**

MICHAEL H. MCGINLEY
BRIAN A. KULP
CORY J. KOPICKI
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104

JORDAN L. VON BOKERN
MARIA C. MONAGHAN
U.S. CHAMBER LITIGATION
CENTER
1615 H Street, NW
Washington, DC 20062

STEVEN A. ENGEL
  *Counsel of Record*
RILEY D. COMPTON
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
(202) 261-3369
steven.engel@dechert.com

*Counsel for the Chamber of Commerce of the United States of America*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Cir. R. 28.1, the undersigned counsel certifies the following:

**(A) Parties and *Amici***

Except for *amicus curiae* the Chamber of Commerce of the United States of America, all parties, intervenors, and *amici* appearing before the district court and in this Court are listed in the Brief for Defendants-Appellants.

**(B) Rulings Under Review**

As stated in the Brief for Defendants-Appellants, the ruling under review is a summary-judgment order (Dkt. 34) and opinion (Dkt. 35) that the district court issued on March 6, 2025.

**(C) Related Cases**

This case has not previously been before this Court.  Counsel is not aware of any related cases other than those listed in the Brief for Defendants-Appellants.


Dated: March 29, 2025                    */s/ Steven A. Engel*
                                          Steven A. Engel
                                          DECHERT LLP
                                          1900 K Street, NW
                                          Washington, DC 20006
                                          (202) 261-3369
                                          steven.engel@dechert.com

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and D.C. Cir. R. 26.1, the undersigned counsel certifies that the Chamber of Commerce of the United States of America ("Chamber") is a nonprofit, tax-exempt organization incorporated in the District of Columbia.  The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.


Dated: March 29, 2025                    */s/ Steven A. Engel*
                                          Steven A. Engel
                                          DECHERT LLP
                                          1900 K Street, NW
                                          Washington, DC 20006
                                          (202) 261-3369
                                          steven.engel@dechert.com

## TABLE OF CONTENTS

INTEREST OF *AMICUS CURIAE*...........................................................................1

PERTINENT STATUTES AND REGULATIONS..................................................2

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................2

ARGUMENT ...........................................................................................................7

I.    Congress Cannot Shield the NLRB's Board Members from the President's Removal Authority. ..................................................................7

    A.    No Exception to the President's Removal Authority Applies. ............8

    B.    The District Court's Contrary Conclusion Is Untenable....................12

II.   Ruling for the President Would Not Imperil the Independence of the Federal Reserve. ...............................................................................15

    A.    The Federal Reserve's Structure Differs from Other Agencies.........18

    B.    The Sinking Fund Commission Supports the Constitutionality of Removal Protections for the Federal Reserve................................19

    C.    The First and Second National Banks Similarly Suggest that the Federal Reserve Is Constitutionally Distinct from the NLRB...........22

CONCLUSION .....................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*,
121 F.4th 1314 (D.C. Cir. 2024)..................................................................16

*Am. Med. Response of Conn., Inc. v. NLRB*,
93 F.4th 491 (D.C. Cir. 2024)......................................................................11

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
601 U.S. 416 (2024)...............................................................................6, 17

*Chamber of Com. of U.S. v. NLRB*,
723 F. Supp. 3d 498 (E.D. Tex. 2024).........................................................11

*Cmty. for Creative Non-Violence v. Pierce*,
786 F.2d 1199 (D.C. Cir. 1986)...................................................................11

*Collins v. Yellen*,
594 U.S. 220 (2021).............................................................................13, 15

*Comm. of Monetary Reform v. Bd. of Govs. of the Fed. Rsrv. Sys.*,
766 F.2d 538 (D.C. Cir. 1985).....................................................................18

*Consumers' Rsch. v. Consumer Prod. Safety Comm'n*,
98 F.4th 646 (5th Cir. 2024) ...........................................................5, 16, 26

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010)...............................................................3, 7, 12, 13, 15

*Ex parte Hennen*,
38 U.S. (13 Pet.) 230 (1839)........................................................................13

*Humphrey's Executor v. United States*,
295 U.S. 60 (1935).........................................................................4, 8–10, 14

---

\* Authorities on which we chiefly rely are marked with asterisks.

*Lion Elastomers, L.L.C. v. NLRB*,
    108 F.4th 252 (5th Cir. 2024) ...............................................................11

*Marbury v. Madison*,
    5 U.S. (1 Cranch) 137 (1803) ...............................................................15

*McCulloch v. Maryland*,
    17 U.S. (4 Wheat.) 316 (1819) .............................................................17

*McLaren Macomb*,
    372 NLRB No. 58, 2023 WL 2158775 (Feb. 21, 2023).....................11

*Melcher v. Fed. Open Mkt. Comm.*,
    644 F. Supp. 510 (D.D.C. 1986) ..........................................................18

*Morrison v. Olson*,
    487 U.S. 654 (1988).................................................................................8

*Myers v. United States*,
    272 U.S. 52 (1926)...................................................................3, 7, 12, 15

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
    597 U.S. 1 (2022)..................................................................................13

*NLRB v. Curtin Matheson Sci., Inc.*,
    494 U.S. 775 (1990).................................................................................9

*NLRB v. Starbucks Corp.*,
    125 F.4th 78 (3d Cir. 2024) .................................................................10

*Overstreet ex rel. NLRB v. El Paso Disposal, L.P.*,
    625 F.3d 844 (5th Cir. 2010) ...............................................................11

*PHH Corp. v. CFPB*,
    881 F.3d 75 (D.C. Cir. 2018) .........................................................18, 26

*Printz v. United States*,
    521 U.S. 898 (1997)..............................................................................17

*Seila Law LLC v. CFPB*,
    591 U.S. 197 (2020)............................................. 3, 4, 6–9, 12, 13, 15, 18, 24–26

*Thryv, Inc. v. NLRB*,
　　102 F.4th 727 (5th Cir. 2024) ...............................................................10

*TransUnion LLC v. Ramirez*,
　　594 U.S. 413 (2021) ..............................................................................11

*Trump v. United States*,
　　603 U.S. 593 (2024) .....................................................................2, 3, 13

*United States v. Arthrex, Inc.*,
　　594 U.S. 1 (2021) ....................................................................................8

*Valley Hosp. Med. Ctr., Inc. v. NLRB*,
　　100 F.4th 994 (9th Cir. 2024) ...............................................................10

**Constitutional Provisions**

U.S. Const. art. I, § 6, cl. 2 ...................................................................21

*U.S. Const. art. II, § 1, cl. 1 ............................................................3, 6, 7

*U.S. Const. art. II, § 3 ....................................................................3, 6, 7

**Statutes**

12 U.S.C. § 241 ....................................................................................18

12 U.S.C. § 242 ....................................................................................18

12 U.S.C. § 248(f) ...............................................................................19

12 U.S.C. § 263(a) .........................................................................18, 19

12 U.S.C. § 263(b) ...............................................................................22

12 U.S.C. § 282 ....................................................................................19

15 U.S.C. § 77s(b)(1) ...........................................................................16

29 U.S.C. § 153(a) ..........................................................................4, 10

29 U.S.C. § 160(a) ...............................................................................11

29 U.S.C. § 160(b) ...............................................................................11

29 U.S.C. § 160(j) ...................................................................11

29 U.S.C. § 161 ......................................................................11

Act of Apr. 10, 1816, ch. 44, 3 Stat. 266 .........................................24, 25

Act of Aug. 12, 1790, ch. 47, 1 Stat. 186 .....................................17, 19, 20

Act of Feb. 25, 1791, ch. 10, 1 Stat. 191 ............................................24

An Act to Establish the Treasury Department, ch. 12, 1 Stat. 65 (1789) ...............13

**Other Authorities**

1 *Annals of Cong.* (Joseph Gales ed., 1834) ..........................................7

*Appointment and Removal of Federal Reserve Bank Members of the
    Federal Open Market Committee*,
    43 Op. O.L.C. 263 (2019) ........................................................18

Aditya Bamzai & Aaron L. Nielson, *Article II and the Federal
    Reserve*, 109 Cornell L. Rev. 843 (2024) ...............................17, 18, 23–26

Aditya Bamzai, *Tenure of Office and the Treasury: The Constitution
    and Control over National Financial Policy, 1787 to 1867*, 87
    Geo. Wash. L. Rev. 1299 (2019) ..............................................21, 25

James J. Brudney, *Isolated and Politicized: The NLRB's Uncertain
    Future*, 26 Comp. Lab. L. & Pol'y J. 221 (2004) ...............................10

Steven G. Calabresi & Christopher S. Yoo, *The Unitary Executive
    During the Second Half-Century*, 26 Harv. J.L. & Pub. Pol'y 667
    (2003) .........................................................................14

Christine Kexel Chabot, *Is the Federal Reserve Constitutional? An
    Originalist Argument for Independent Agencies*, 96 Notre Dame L.
    Rev. 1 (2020) ...............................................................19–22

Robert E. Cushman, *The Independent Regulatory Commissions* (1941) ...............14

Zev J. Eigen & Sandro Garofolo, *Less Is More: A Case for Structural
    Reform of the National Labor Relations Board*, 98 Minn. L. Rev.
    1879 (2014) ....................................................................10

Federal Reserve Bank of Philadelphia, *The First Bank of the United States, A Chapter in the History of Central Banking* (2021).......................23, 24

Federal Reserve Bank of Philadelphia, *The Second Bank of the United States: A Chapter in the History of Central Banking* (2021) ............................24

Lawrence Lessig & Cass R. Sunstein, *The President and the Administration*, 94 Colum. L. Rev. 1 (1994).......................................................25

Letter from James Madison to Thomas Jefferson (June 30, 1789), in 16 *Documentary History of the First Federal Congress* 893 (2004) .................12

Letter from Sarah Harris, Acting Solicitor General, U.S. Department of Justice, to Senator Richard J. Durbin, Ranking Member, Judiciary Committee, U.S. Senate (Feb. 12, 2025), https://tmsnrt.rs/3FHYQH6 .................................................................4

Peter Margulies, *Reform and Removal at the Federal Reserve: Independence, Accountability, and the Separation of Powers in U.S. Central Banking*, 108 Marquette L. Rev. 117 (2024).....................16, 19, 20

Jerry L. Mashaw, *Creating the Administrative Constitution: The Lost One Hundred Years of American Administrative Law* (2012) ...........................23

Aaron L. Nielsen & Christopher J. Walker, *The Early Years of Congress's Anti-Removal Power*, 63 Am. J. Legal. His. 219 (2023)...........21, 22

U.S. Chamber of Commerce, *The Biden Administration's "Whole of Government" Approach to Promoting Labor Unions* (2023), bit.ly/4d3RuZk ....................................................................................................10

## GLOSSARY

| | |
|---|---|
| FOMC | Federal Open Market Committee |
| FTC | Federal Trade Commission |
| ICC | Interstate Commerce Commission |
| CFPB | Consumer Financial Protection Board |
| NASDAQ | National Association of Securities Dealers Automatic Quotation System |
| NLRA | National Labor Relations Act |
| NLRB | National Labor Relations Board |

## INTEREST OF *AMICUS CURIAE*[1]

The Chamber of Commerce of the United States of America ("Chamber") is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

The National Labor Relations Board ("NLRB" or "Board") and other federal agencies frequently subject the Chamber's members to administrative enforcement actions and regulate their day-to-day activities through rulemakings. The Chamber therefore has a significant interest in ensuring that those actions respect the Constitution's structural limitations. But because the analysis may differ depending on the federal agency in question, the Chamber submits this brief to address two points. First, under the Supreme Court's existing precedent, insulating NLRB Members from the President's oversight violates Article II. *See* Chamber Amicus

---

[1] No counsel for any party authored this brief in whole or in part and no entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. Counsel for all parties have consented to the filing of this brief.

Br., Doc. 121, *Space Expl. Techs. Corp. v. NLRB*, Nos. 24-50627, 24-40533, 24-10855 (5th Cir. Dec. 18, 2024) (urging Fifth Circuit to hold that NLRB Members are unconstitutionally shielded from presidential removal).  Second, and contrary to the position taken by other *amici curiae* in this case, *see* Law Profs. Br., Doc. #2104853 (Mar. 10, 2025), such a holding would not undermine the independence of the Federal Reserve System's ("Federal Reserve" or "Fed") supervision of the country's money supply.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes are reproduced in the Addendum to this Brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Congress may not bar the President from supervising the officers who exercise executive power on his behalf, including by the threat of removal.  The statute purporting to restrict the President's ability to remove the NLRB's Board Members is thus unconstitutional.  The district court erred by enforcing that law to nullify the President's "conclusive and preclusive" removal authority.  *Trump v. United States*, 603 U.S. 593, 609 (2024) (citation omitted).  This Court should reverse.

The Framers adopted a unitary executive structure that maintains accountability for Executive Branch actions by placing ultimate authority in a single President.  Specifically, Article II of the Constitution vests "[t]he executive Power" in one elected President, who "shall take Care that the Laws be faithfully executed."

2

U.S. Const. art. II, § 1, cl. 1; *id.* § 3.  That entrustment of sole executive authority to the President ensures that a leader "chosen by the entire Nation" will "oversee the execution of the laws."  *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 499 (2010).

Yet, the President can hardly ensure that the laws are faithfully executed "if he cannot oversee the faithfulness of the officers who execute them."  *Id.* at 484. Article II therefore grants the President the "prerogative to remove executive officials."  *Seila Law LLC v. CFPB*, 591 U.S. 197, 214 (2020).  Indeed, "[s]ince 1789, the Constitution has been understood to empower the President to keep [his] officers accountable—by removing them from office, if necessary."  *Free Enter. Fund*, 561 U.S. at 483.  And "Congress lacks authority to control the President's 'unrestricted power of removal'" for these Officers.  *Trump*, 603 U.S. at 608–09 (quoting *Myers v. United States*, 272 U.S. 52, 176 (1926)).  To hold otherwise would hamstring his ability to supervise the Executive Branch and would vest executive power in unaccountable actors.

The law here runs roughshod over these structural safeguards.  The Board Members serve as principal officers, and they run the show at the NLRB.  There is also little doubt that the NLRB exercises substantial executive power through its administration and enforcement of the National Labor Relations Act ("NLRA"), including before the federal courts.  Yet the NLRB's Members are statutorily

insulated from the President's removal authority.  *See* 29 U.S.C. § 153(a).  The result threatens to ensconce a body of agency leaders who are "neither elected by the people nor meaningfully controlled (through the threat of removal) by someone who is."  *Seila Law*, 591 U.S. at 224–25.  Without such meaningful control, the President cannot take care that the laws be faithfully executed in a sprawling segment of the federal government.  That violates Article II.

The district court countered that the NLRB's tenure protections fall "within the scope of *Humphrey's Executor* [*v. United States*, 295 U.S. 60 (1935)]."  Dist. Ct. Dkt. 35 ("Op.") at 19.  Outside this case, the Department of Justice has indicated that it intends to urge the Supreme Court to overrule *Humphrey's Executor*.  *See, e.g.*, Letter from Sarah Harris, Acting Solicitor General, U.S. Department of Justice, to Senator Richard J. Durbin, Ranking Member, Judiciary Committee, U.S. Senate (Feb. 12, 2025), https://tmsnrt.rs/3FHYQH6.  But this Court need not anticipate any overruling or modification of that decision, because the district court here has overread it.

The Board lacks several of the key attributes necessary for the narrow *Humphrey's Executor* exception to apply.  "*Humphrey's Executor* permitted Congress to give for-cause removal protections to a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise any executive power."  *Seila Law*, 591 U.S. at 216.  The

Board is not statutorily required to be balanced along partisan lines. It acts in a highly politicized manner. And it unquestionably exercises core executive power. The statutory scheme thus does not find any sanction in *Humphrey's Executor*.

This conclusion does not clear away all for-cause protections for heads of government entities, because not all of those entities exercise "executive Power." Judge Millett, for instance, recently expressed concern in dissenting from the Court's grant of an emergency motion for a stay of the order under appeal, that a ruling against the Plaintiff-Appellee, might threaten the independence of the Federal Reserve. *See* Doc. #2108335, at 52–53 & n.7 (Millett, J., dissenting from stay order). Yet the Federal Reserve's control over the Nation's "money supply is not an *executive* function," and so lodging that power in an entity insulated from presidential control "does not offend the traditional principle that all executive power is vested in the President." *Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 98 F.4th 646, 657 (5th Cir. 2024) (Oldham, J., dissenting from denial of rehearing en banc) (emphasis added).

That understanding finds support in history as well. The First Congress created the Sinking Fund Commission to direct open market purchases of U.S. securities, and the President had no ability to remove or control two of its five members. In addition, both the First and Second Banks of the United States—which were public-private hybrids and precursors to the Federal Reserve—set monetary

policy and operated outside of executive control. These early examples of Congress limiting the President's authority over federal fiscal policy "provide[] contemporaneous and weighty evidence of the Constitution's meaning." *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 432 (2024) (citation omitted). That is, they may support unconventional structures, including removal protections, of government-created bodies that do not perform executive powers.[2]

But whatever may be the scope of the *Humphrey's Executor* exception, there is no similar text or history that could support the removal protections for NLRB Members. The district court did not dispute that the Board exercises "executive Power." U.S. Const. art. II, § 1, cl. 1. It did not deny that the Board's removal protections undermine the President's "take Care" authority. *Id.* § 3. And it did not identify any historical analogs for such a scheme from the early Republic. The decision thus cannot stand. Insulating the NLRB from the President "has no basis in history and no place in our constitutional structure." *Seila Law*, 591 U.S. at 220.

---

[2] This appeal thus need not address the constitutionality of for-cause removal protections beyond the NLRB, since there may be other agencies, like the Federal Reserve, which perform functions whose historical pedigree suggest that they may be insulated from presidential removal.

## ARGUMENT

## I. Congress Cannot Shield the NLRB's Board Members from the President's Removal Authority.

Article II provides that "[t]he executive Power shall be vested in a President." U.S. Const. art. II, § 1, cl. 1. "The entire 'executive Power' belongs to the President alone." *Seila Law*, 591 U.S. at 213. But because the President "alone and unaided" cannot perform all of the Nation's executive functions, he necessarily must rely on "the assistance of subordinates." *Myers*, 272 U.S. at 117.

At the same time, "[t]hese lesser officers must remain accountable to the President, whose authority they wield." *Seila Law*, 591 U.S. at 213. After all, it is the President's solemn duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. And because "[t]he buck stops with the President," he "must have some 'power of removing those for whom he can not continue to be responsible.'" *Free Enter. Fund*, 561 U.S. at 493 (quoting *Myers*, 272 U.S. at 117). The Framers quickly embraced this understanding in the "decision of 1789," concluding after "great debate" that the President's ability to remove executive officials was "essential to the executive power." *Myers*, 272 U.S. at 121, 142. Without that ability, it would be "impossible for the President" to fulfill his constitutional prerogative, and to "keep [his] officers accountable" to the law and the people whom he serves. *Seila Law*, 591 U.S. at 214–15 (citations omitted); *see* 1 *Annals of Cong.* 518 (1789) (Joseph Gales ed., 1834) (James Madison) (explaining that the

7

President's removal power is necessary to preserve "the chain of dependence" and ensure that "the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community").

That is why "the President's removal power is the rule, not the exception." *Seila Law*, 591 U.S. at 228.  The Supreme Court has carved out "only two exceptions to [this] unrestricted removal power"—"one for multimember expert agencies that do not wield substantial executive power, and one for inferior officers with limited duties and no policymaking or administrative authority."  *Id.* at 215, 218; *see Morrison v. Olson*, 487 U.S. 654, 691–96 (1988); *Humphrey's Executor*, 295 U.S. at 628–29.  This case involves neither.

### A.     No Exception to the President's Removal Authority Applies.

The exception for "inferior officers with limited duties" plainly does not apply here.  *Seila Law*, 591 U.S. at 218.  As in *Seila Law*, "[e]veryone agrees" that the NLRB Members are "not . . . inferior officer[s]."  *Id.* at 219.  They are appointed by the President with the advice and consent of the Senate, supervise their own agency, and "have the 'power to render a final decision on behalf of the United States' without any . . . review by [a] nominal superior or any other principal officer in the Executive Branch."  *United States v. Arthrex, Inc.*, 594 U.S. 1, 14 (2021) (citation omitted).  The Board's statutory duties are also "far from limited."  *Seila Law*, 591 U.S. at 219.  Congress has charged the NLRB with the "primary responsibility for

8

developing and applying national labor policy" that affects tens if not hundreds of millions of Americans nationwide. *NLRB v. Curtin Matheson Sci., Inc.*, 494 U.S. 775, 786 (1990).

The district court erred, however, by finding that the exception for certain multimember agencies—the *Humphrey's Executor* exception—does apply. *Humphrey's Executor* involved a presidential attempt to remove a member of the Federal Trade Commission ("FTC"), which in its original form had been designed as a "non-partisan" body of "experts" that "must, from the very nature of its duties, act with entire impartiality." 295 U.S. at 624. The Court conceptualized the early FTC's duties as "neither political nor executive," but rather, as "quasi-judicial and quasi-legislative." *Id.* In other words, the FTC performed "specified duties as a legislative or as a judicial aid." *Id.* at 628. As a "legislative agency," it "ma[de] investigations and reports thereon for the information of Congress." *Id.* And as an "agency of the judiciary," it made recommendations to courts. *Id.*

The Supreme Court has since clarified that *Humphrey's Executor* should not be read expansively. It "permit[s] Congress to give for-cause removal protections to a multimember body of experts," but only where that body both (1) is statutorily "balanced along partisan lines," and (2) "perform[s] legislative and judicial functions" such that it can be "said not to exercise *any* executive power." *Seila Law*, 591 U.S. at 216 (emphasis added). The NLRB possesses neither of these attributes.

*First*, unlike the FTC, the Board is not required to be balanced along partisan lines. A new board member is instead replaced by the President each year. *See* 29 U.S.C. § 153(a). A President may thus install at least four members of his party to the five-member Board during one term. And there is nothing "non-partisan" about the NLRB. *Humphrey's Executor*, 295 U.S. at 624. It "operate[s] in an openly partisan manner." James J. Brudney, *Isolated and Politicized: The NLRB's Uncertain Future*, 26 Comp. Lab. L. & Pol'y J. 221, 223 (2004). Indeed, "[n]ewly constituted Boards have made a practice of overruling precedent created by past administrations' Boards, with each Board instituting its own set of politically-motivated rules." *Valley Hosp. Med. Ctr., Inc. v. NLRB*, 100 F.4th 994, 1003 (9th Cir. 2024) (O'Scannlain, J., concurring) (quoting Zev J. Eigen & Sandro Garofalo, *Less Is More: A Case for Structural Reform of the National Labor Relations Board*, 98 Minn. L. Rev. 1879, 1887 (2014)). And in recent years, the Board has been particularly aggressive in pushing its policy agenda to "significantly rework[] U.S. labor law" through both adjudication and rulemaking. U.S. Chamber of Commerce, *The Biden Administration's "Whole of Government" Approach to Promoting Labor Unions* 27–31 (2023), bit.ly/4d3RuZK.[3]

---

[3] For example, through adjudication the Board has imposed "a novel, consequential-damages-like labor law remedy" to deter and punish businesses, in violation of both the NLRA and the Seventh Amendment. *Thryv, Inc. v. NLRB*, 102 F.4th 727, 737 (5th Cir. 2024); *see NLRB v. Starbucks Corp.*, 125 F.4th 78, 96–97 (3d Cir. 2024).

*Second*, the Board wields quintessential executive power. Among other responsibilities, it "is empowered . . . to prevent any person from engaging in any unfair labor practice." 29 U.S.C. § 160(a). The Board possesses broad investigative authority. *See id.* § 161. It may issue complaints against employers alleged to have violated the law. *See id.* § 160(b). And its power to petition a federal court for injunctive relief is similarly "prosecutorial in nature." *Overstreet ex rel. NLRB v. El Paso Disposal, L.P.*, 625 F.3d 844, 852 (5th Cir. 2010), *abrogated on other grounds by Starbucks Corp. v. McKinney*, 602 U.S. 339 (2024); *see* 29 U.S.C. § 160(j). These "power[s] to decide when to investigate, and when to prosecute, lie[] at the core of the Executive's duty to see to the faithful execution of the laws." *Cmty. for Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986); *see also TransUnion*

---

It has also overruled precedent to hold that it is unlawful merely to offer routine confidentiality and non-disparagement provisions in a voluntary severance agreement. *See McLaren Macomb*, 372 NLRB No. 58, 2023 WL 2158775, at *1 (Feb. 21, 2023). The Board then broke from "longstanding Board precedent" to "violat[e] the NLRA's requirement that the Board enforce contracts." *Am. Med. Response of Conn., Inc. v. NLRB*, 93 F.4th 491, 496 (D.C. Cir. 2024). And in yet another case, the Board "exceeded the scope of [a federal court's] remand" and "violated . . . due-process rights" by reaching out to overrule precedent that had better protected employers' rights to maintain harassment-free workplaces—without even "providing the company an opportunity to be heard on the issue." *Lion Elastomers, L.L.C. v. NLRB*, 108 F.4th 252, 260 (5th Cir. 2024). The Board has pushed its aggressive policy agenda through rulemaking as well. For instance, in 2023, it radically expanded its joint-employer rule to broaden employer liability in a way that was both "unlawful[]" and "arbitrary and capricious." *Chamber of Com. of U.S. v. NLRB*, 723 F. Supp. 3d 498, 518 (E.D. Tex. 2024).

*LLC v. Ramirez*, 594 U.S. 413, 429 (2021) ("[T]he choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law falls within the discretion of the Executive Branch[.]"). It follows that Congress cannot insulate the Board Members from presidential control.

### B.    The District Court's Contrary Conclusion Is Untenable.

The district court overread *Humphrey's Executor* and neglected the Supreme Court's more recent articulation of the President's removal authority under Article II. Indeed, the Court characterized the "*Myers* majority opinion" as an "unreliable historical retelling" of the President's removal power. Op. at 27. But the Supreme Court "has already considered and rejected" such efforts to "minimize[] *Myers*" and "downplay[] the decision of 1789." *Seila Law*, 591 U.S. at 231.

For good reason. As explained above, the President's removal power "was discussed extensively in Congress when the first executive departments were created." *Free Enter. Fund*, 561 U.S. at 492. "The view that 'prevailed, as most consonant to the text of the Constitution' and 'to the requisite responsibility and harmony in the Executive Department,' was that the executive power included a power to oversee executive officers through removal." *Id.* (quoting Letter from James Madison to Thomas Jefferson (June 30, 1789), in 16 *Documentary History of*

*the First Federal Congress* 893 (2004)).[4]  That has long been the "settled and well understood construction of the Constitution."  *Ex parte Hennen*, 38 U.S. (13 Pet.) 230, 259 (1839).  And the Court's articulation of this historical understanding is more than a matter of dusty precedents.  In recent years, the Supreme Court has consistently reaffirmed and underscored that the President's power of removal is a crucial aspect of his power to supervise the Executive Branch.  *See Trump*, 603 U.S. at 609; *Collins v. Yellen*, 594 U.S. 220, 252 (2021); *Seila Law*, 591 U.S. at 214; *Free Enter. Fund*, 561 U.S. at 483.

The district court blew past this binding precedent and Founding-era history, instead citing a trio of "independent" agencies from the Progressive Era.  Op. at 12.  But that effort to prop up the NLRB's removal protections with historical practice falls flat.  After all, the Supreme Court has also emphasized that congressional innovations from the late nineteenth and early twentieth centuries hardly illuminate the original understanding of the Constitution.  *See, e.g.*, *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 35 (2022).

---

[4]  The district court suggested that the First Congress took a "disparate approach" for the Treasury Department.  Op. at 23.  That is incorrect.  The legislature did not provide tenure protections for any Treasury official.  *See* An Act to Establish the Treasury Department, ch. 12, 1 Stat. 65, 65–67 (1789).  Indeed, it specifically recognized that the department head could "be removed from office by the President."  *Id.* § 7.

The district court misconstrued that later history in any event.  As to the Interstate Commerce Commission ("ICC"), "[i]t is far from clear that [its] removal provisions in any way precluded the president from removing a member of the ICC simply for disagreements over policy."  Steven G. Calabresi & Christopher S. Yoo, *The Unitary Executive During the Second Half-Century*, 26 Harv. J.L. & Pub. Pol'y 667, 797 (2003).  "Independence of executive domination seems not to have been thought of and was certainly not discussed" in creating the agency.  Robert E. Cushman, *The Independent Regulatory Commissions* 61 (1941).  As to the Federal Reserve, its control over the money supply has long been understood as constituting something other than "executive Power," and so the removal protections there posed no constitutional concerns.  *See infra* Section II.  And as to the FTC, its removal protections were upheld only because the *Humphrey's Executor* Court regarded the agency as "exercis[ing] *no part* of the executive power vested by the Constitution in the President."  295 U.S. at 628 (emphasis added).

That is the key to understanding *Humphrey's Executor*.  Its exception applies for tenured officials who are "wholly disconnected from the executive department." *Id.* at 630.  But it does not apply to those who wield the executive power vested in the President.  In fact, *Humphrey's Executor* itself conceded that an officer "in the executive department" remains "subject to the exclusive and illimitable power of removal by the Chief Executive, whose subordinate and aid he is."  *Id.* at 627.

The district court did not—and could not—dispute that the Board wields executive power.  And that should have ended the inquiry in the President's favor.  *See supra* Section I.A.  As executive officers, the NLRB's Board Members cannot be shielded from presidential oversight by for-cause protection.  *See Collins*, 594 U.S. at 250–56; *Seila Law*, 591 U.S. at 228; *Free Enter. Fund*, 561 U.S. at 497–98; *Myers*, 272 U.S. at 163–64.  The district court should have "disregard[ed]" that unlawful provision and decided this case "conformably to the [C]onstitution." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178 (1803).

\* \* \*

In short, the "removal power" helps the President maintain "control over the subordinates he needs to carry out his duties as the head of the Executive Branch," and it ensures that these Officers "serve the people effectively and in accordance with the policies that the people presumably elected the President to promote." *Collins*, 594 U.S. at 252.  By reinstating Ms. Wilcox to the NLRB's leadership against the wishes of the elected President, the district court ran afoul of Article II's commands.  Its decision should be reversed.

## II.  Ruling for the President Would Not Imperil the Independence of the Federal Reserve.

The district court's invocation of the Federal Reserve rested not only upon a misreading of *Humphrey's Executor*, but also upon a basic misunderstanding of the Federal Reserve's monetary policy functions.   The Federal Reserve's unique

15

structure, function, and history ensure that a proper application of *Humphrey's Executor* will not imperil its independence. Indeed, the Framers recognized that controlling "the money supply is not an *executive* function" at all. *Consumers' Rsch.*, 98 F.4th at 657 (Oldham, J., dissenting from the denial of rehearing en banc) (emphasis added). Accordingly, this Court's application of *Seila Law* and *Collins* to the NLRB does not implicate removal restrictions on Federal Reserve officials.[5]

Early congressional practice recognized that the management of the Nation's money supply fell outside the traditional scope of executive power. The First Congress created the Sinking Fund Commission to "facilitate orderly management of the nation's debts," and the Commission's "structure and operation reflected a substantial measure of independence from the political branches." Peter Margulies, *Reform and Removal at the Federal Reserve: Independence, Accountability, and the Separation of Powers in U.S. Central Banking*, 108 Marquette L. Rev. 117, 167 (2024). Shortly after adopting the decision of 1789 for executive agencies, Congress

---

[5] This Court's consideration of the NLRB's removal protections also implicates different considerations from those underlying the structure of self-regulatory organizations, such as the Financial Industry Regulatory Authority and NASDAQ, *see, e.g.*, *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1319–20 (D.C. Cir. 2024) (discussing history of self-regulatory organizations), or the Financial Accounting Standards Board, which the Securities and Exchange Commission relies upon to set generally accepted accounting principles, *see* 15 U.S.C. § 77s(b)(1). These private organizations are not part of the Executive Branch, and so, their structures present different constitutional issues from those at issue in this appeal.

insulated the Commission from presidential control by appointing the Chief Justice and the Vice President as two of the five members of the multimember entity charged with setting monetary policy and repaying the assumed national debt. *See* Act of Aug. 12, 1790, ch. 47, § 2, 1 Stat. 186, 186.

In addition, the "unique historical background" of the Federal Reserve includes "the creation and demise of the First and Second Banks of the United States." *Cmty. Fin. Servs.*, 601 U.S. at 467 n.16 (Alito, J., dissenting). The First and Second Banks of the United States were structured, not as government agencies, but as chartered corporations. Both banks "used the same sorts of open-market tools to control monetary policy that the Fed does today." Aditya Bamzai & Aaron L. Nielson, *Article II and the Federal Reserve*, 109 Cornell L. Rev. 843, 901–02 (2024). "And like the Fed, the First and Second Banks had private shareholders in addition to government shareholders." *Id.* at 902.

Those early historical precedents are relevant to "fix[ing] the meaning of the Constitution" and suggest that monetary policy is not an executive function, like the enforcement of the laws. *Printz v. United States*, 521 U.S. 898, 915 n.9 (1997). In fact, nobody argued otherwise during the frequent Founding-era debates over the wisdom and constitutionality of the National Banks. *See, e.g.*, *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819). Even the Second Bank's most prominent critic and the man responsible for its demise—President Andrew Jackson—never

17

made that argument. Because the Federal Reserve likewise exercises "special functions in setting monetary policy and stabilizing the financial markets," *PHH Corp. v. CFPB*, 881 F.3d 75, 192 n.17 (D.C. Cir. 2018) (en banc) (Kavanaugh, J., dissenting), it may—unlike the NLRB—"claim a special historical status," *Seila Law*, 591 U.S. at 222 n.8.

### A.    The Federal Reserve's Structure Differs from Other Agencies.

The structure of the Federal Reserve, the entity responsible for "control[ling] the paper money supply," is unique. Bamzai & Nielson, *supra*, at 846. Unlike traditional government agencies, it "is composed of both public and private elements." *Comm. of Monetary Reform v. Bd. of Govs. of the Fed. Rsrv. Sys.*, 766 F.2d 538, 539–40 (D.C. Cir. 1985); *see also Melcher v. Fed. Open Mkt. Comm.*, 644 F. Supp. 510, 519 (D.D.C. 1986), *aff'd on other grounds*, 836 F.2d 561 (D.C. Cir. 1987).

The Federal Open Market Committee ("FOMC"), which directs U.S. monetary policy, consists of twelve members. *See generally Appointment and Removal of Federal Reserve Bank Members of the Federal Open Market Committee*, 43 Op. O.L.C. 263 (2019). Seven of those members are drawn from the Federal Reserve's Board of Governors. 12 U.S.C. § 263(a). Those members are appointed by the President with the advice and consent of the Senate, and they have statutory tenure protection. *See id.* §§ 241–42. Five members, however, are drawn from the

officers of the twelve regional Federal Reserve Banks, which are owned by the commercial banks within their regional districts. *See id.* §§ 263(a), 282. Those members are generally subject to supervision and removal by the Board of Governors. *See id.* § 248(f).

This unique structure of the Federal Reserve—which mixes private and public elements and thereby insulates monetary policy from the President—drew from historical precedents that date to the Founding.

### B. The Sinking Fund Commission Supports the Constitutionality of Removal Protections for the Federal Reserve.

Like the Federal Reserve, the Sinking Fund Commission was a Founding-era entity created, "with substantial independence from the President," to repay the national debt through open-market purchases of United States securities. Christine Kexel Chabot, *Is the Federal Reserve Constitutional? An Originalist Argument for Independent Agencies*, 96 Notre Dame L. Rev. 1, 4, 34 (2020); *see* Act of Aug. 12, 1790, ch. 47, 1 Stat. 186. The Commission also helped the United States "cope with credit crunches when financial institutions were short on cash" by buying "Treasury bonds and notes from private sources." Margulies, *supra*, at 167. "These open-market purchases . . . inject[ed] liquidity into the system" to stave off financial disaster, foreshadowing the same "actions that the Federal Reserve" would take nearly 220 years later "to address the Great Recession of 2008." *Id.* at 167–68.

The Sinking Fund Commission was proposed by Alexander Hamilton, passed by the First Congress, and signed into law by President Washington.  *See* Chabot, *supra*, at 1.   Under Hamilton's original proposal, the multimember Commission would have included five officers: the Vice President, the Chief Justice, the Speaker of the House, the Treasury Secretary, and the Attorney General.  *See id.* at 35.  At the time of this proposal, the vice presidency went to the runner up in the presidential election.  *Id.* at 37.  Thus, three of the five officers would have possessed complete independence from the President, who had no ability to direct their action and needed at least one of their votes to act.  *Id.*

Providing the Commission with this independence from executive control sought to avoid the issues that plagued earlier sinking funds in England.  The King's ministers often diverted resources for their own short-term political benefit.  *See id.* at 37–38.  The people were aware of this English experience and cognizant of "the executive branch's incentive to spend money and put more money into circulation." Margulies, *supra*, at 162.  So the "Framers, including Madison and Hamilton in the Federalist essays, understood the value of independence" for those tasked with setting monetary policy and managing the country's finances.  *Id.*  And they acted accordingly in designing the new government.

The Sinking Fund Act of 1790 modified Hamilton's proposal by replacing the Speaker of the House with the Secretary of State on the Commission.  *See* Act of

Aug. 12, 1790, § 2.  But this was not done to increase executive oversight; rather, it was thought necessary to avoid the constitutional prohibition on members of Congress holding other offices.  *See* Aditya Bamzai, *Tenure of Office and the Treasury: The Constitution and Control over National Financial Policy, 1787 to 1867*, 87 Geo. Wash. L. Rev. 1299, 1339 (2019); U.S. Const. art. I, § 6, cl. 2.

Although substituting the Secretary of State for the Speaker of the House meant that three members of the Commission were subject to removal by the President, "the Commission's structure" made it "difficult for the president to control it in the real world."  Aaron L. Nielsen & Christopher J. Walker, *The Early Years of Congress's Anti-Removal Power*, 63 Am. J. Legal. His. 219, 220, 225 (2023).  In fact, two of the Commission's original members—Thomas Jefferson and Alexander Hamilton—were "known political rivals."  Chabot, *supra*, at 41.  Because the Commission required at least three votes to approve a purchase, if these men disagreed, the vote of the entirely independent Vice President or Chief Justice would be decisive.

That happened at least once.  During the financial panic of 1792, four Commissioners met to consider purchases proposed by Hamilton, but they split, with Jefferson and Attorney General Edmund Randolph voting against Hamilton's proposal.  *Id.* at 44.  The Fifth Commissioner, Chief Justice John Jay, was absent because he was riding circuit.  *Id.*  Weeks passed before the Commission approved

purchases, and this event demonstrates the President's limited control over purchase decisions. "Even though President Washington approved purchases in response to the 1792 market crash," he did not have authority to direct the Commission to approve open-market purchases earlier, and the "Commission's independent structure prevented it from acting as quickly as it could have to address a financial panic." *Id.* at 46.

The Sinking Fund Commission thus provides a weighty historical analogue to the FOMC, which similarly purchases United States securities pursuant to a statutory mandate. *See* 12 U.S.C. § 263(b). Indeed, the decision of 1789 demonstrates that "the First Congress was carefully attuned to structural constitutional concerns related to the President's ability to control executive officers," and so there is no reason to think that it then "glossed over" a removal problem with the Sinking Fund Commission. Chabot, *supra*, at 42. This history indicates "that the independent structure of the [FOMC] is consistent with the original meaning of the Constitution." *Id.* at 54.

### C.    The First and Second National Banks Similarly Suggest that the Federal Reserve Is Constitutionally Distinct from the NLRB.

The history of the First and Second Banks of the United States similarly suggests that monetary policy is different from traditional executive action. These National Banks were precursors to the Federal Reserve, and both set monetary policy while operating outside of executive control.

22

The function of the First Bank "was essentially that now served by the Federal Reserve Board in regulating the money supply."  Jerry L. Mashaw, *Creating the Administrative Constitution: The Lost One Hundred Years of American Administrative Law* 47 (2012).  "By managing its lending policies and the flow of funds through its accounts, the bank could—and did—alter the supply of money and credit in the economy and hence the level of interest rates charged to borrowers."  Federal Reserve Bank of Philadelphia, *The First Bank of the United States: A Chapter in the History of Central Banking* 9 (2021).  And the First Bank "operated more independently of congressional instruction, or indeed presidential direction, than does the Federal Reserve Board today."  Mashaw, *supra*, at 47.

The First Bank's structure fundamentally differed from a government agency. Like the Federal Reserve, it had both government and private shareholders. *See First Bank of the United States*, *supra*, at 4; Bamzai & Nielson, *supra*, at 902.  The First Bank's initial $10 million capitalization was likewise divided between the government and private investors.  *See First Bank of the United States*, *supra*, at 4. This made it "not only the largest financial institution in the new nation but also the largest corporation of any type."  *Id.*  And instead of "placing appointment of the Bank President in the U.S. President's control," Congress "prescribed who could serve as a director—specifically excluding foreign nationals."  Bamzai & Nielson, *supra*, at 875.  The First Bank's shareholders selected these twenty-five directors,

who then chose its president.  *See First Bank of the United States*, *supra*, at 5; Act of Feb. 25, 1791, ch. 10, § 12, 1 Stat. 191, 196.  The First Bank was thus privately controlled, though Congress authorized the Treasury Secretary to inspect the Bank's books and remove government deposits at any time.  Bamzai & Nielson, *supra*, at 875.  The First Bank was controversial, and Congress allowed its charter to expire in 1811.  *Id.* at 876.

Five years later, Congress chartered the Second Bank of the United States. *See* Act of Apr. 10, 1816, ch. 44, § 21, 3 Stat. 266, 276.  It was like the First in many ways.  *See* Federal Reserve Bank of Philadelphia, *The Second Bank of the United States: A Chapter in the History of Central Banking* 5–6 (2021).  "[L]ike its predecessor, the Second Bank could engage in monetary policy by using its holdings to control the amount of credit available."  Bamzai & Nielson, *supra*, at 877.  In fact, the "Second Bank possessed a greater power to control monetary policy than the First, due to its larger capitalization of thirty-five million dollars (seven of which came from the United States) and twenty-five branches."  *Id.*  It "had a greater impact on the Nation than any but a few institutions, regulating the Nation's money supply in ways anticipating what the Federal Reserve does today."  *Seila Law*, 591 U.S. at 274 (Kagan, J., concurring in part and dissenting in part).

But the Second Bank's structure differed from the First's in a key respect: Congress empowered the President to appoint five of the Second Bank's twenty-five

directors with the Senate's advice and consent. *See* Act of Apr. 10, 1816, §§ 8, 11. Still, the twenty directors not nominated by the President were elected each year by the private stockholders. *See id.* And "as with the First Bank, the President of the Second Bank was not nominated by the U.S. President, but was chosen by the bank's directors." Bamzai & Nielson, *supra*, at 877. "This unusual structure . . . mixed private and public features," prompting some to wonder whether the Second Bank was a commercial bank or a government bank. *Id.*

Despite this structure, no one argued that the Second Bank was unconstitutional because it was performing an *executive* function insulated from presidential control. Instead, most viewed the Bank to be a private entity. And those who argued that the Bank was unconstitutionally performing sovereign functions used "a variation of the modern argument that Congress may not delegate such functions to private entities." Bamzai, *supra*, at 1299.

In all these ways, the First and Second Banks were prototypes for the Federal Reserve. *See Seila Law*, 591 U.S. at 274 (Kagan, J., concurring in part and dissenting in part). Like the Federal Reserve today, the National Banks' directors made "policy decisions" that had "a dramatic effect upon the nation," yet "the vast majority of those directors were outside the control of the President." Lawrence Lessig & Cass R. Sunstein, *The President and the Administration*, 94 Colum. L. Rev. 1, 30–31 (1994).

25

Thus, the legacy of the National Banks establishes a historical practice, which has continued into the present, of employing a public-private hybrid institution to set monetary policy. Like the Banks of the United States—but unlike other modern agencies—the Federal Reserve is a "*sui generis* mishmash of the public and private sectors," Bamzai & Nielson, *supra*, at 853, tasked with carrying out "special functions in setting monetary policy and stabilizing the financial markets," *PHH Corp.*, 881 F.3d at 192 (Kavanaugh, J., dissenting). These are not traditional "executive" functions. *Consumers' Rsch.*, 98 F.4th at 657 (Oldham, J., dissenting from denial of rehearing en banc). And at the same time that they were establishing the Executive Branch, the Framers insulated these functions from direct presidential control.

Because of this, the Federal Reserve can "claim a special historical status" in its responsibility for monetary policy. *Seila Law*, 591 U.S. at 222 n.8 (majority op.). The NLRB cannot. Congress cannot insulate its principal officers from the President's oversight as they wield executive power in his name.

26

## CONCLUSION

For the foregoing reasons, the Chamber respectfully requests that this Court reverse.

Respectfully Submitted,

*/s/ Steven A. Engel*

MICHAEL H. MCGINLEY          STEVEN A. ENGEL
BRIAN A. KULP                    *Counsel of Record*
CORY J. KOPICKI              RILEY D. COMPTON
DECHERT LLP                  DECHERT LLP
Cira Centre                  1900 K Street, NW
2929 Arch Street             Washington, DC 20006
Philadelphia, PA 19104       (202) 261-3369
                             steven.engel@dechert.com
JORDAN L. VON BOKERN
MARIA C. MONAGHAN
U.S. CHAMBER LITIGATION
CENTER
1615 H Street, NW
Washington, DC 20062

*Counsel for the Chamber of Commerce of the United States of America*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,309 words, excluding those portions of the brief exempted by Fed. R. App. P. 32(f) and D.C. Cir. R. 32(e)(1).  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Times New Roman 14-pt font.

Dated: March 29, 2025

*/s/ Steven A. Engel*
Steven A. Engel
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
(202) 261-3369
steven.engel@dechert.com

*Counsel of Record for the*
*Chamber of Commerce of the*
*United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing *amicus curiae* brief to be filed with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit. The Court's CM/ECF system was used to file the brief. All counsel of record were served on March 29, 2025.

Dated: March 29, 2025

*/s/ Steven A. Engel*
Steven A. Engel
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
(202) 261-3369
steven.engel@dechert.com

*Counsel of Record for the*
*Chamber of Commerce of the*
*United States of America*

# ADDENDUM

29 U.S.C. § 153(a) ...........................................................................A1

29 U.S.C. § 160(a), (b), (j) ............................................................A2

29 U.S.C. § 161 ..............................................................................A4

## 29 U.S.C. § 153(a)

**(a) Creation, composition, appointment, and tenure; Chairman; removal of members**

The National Labor Relations Board (hereinafter called the "Board") created by this subchapter prior to its amendment by the Labor Management Relations Act, is continued as an agency of the United States, except that the Board shall consist of five instead of three members, appointed by the President by and with the advice and consent of the Senate. Of the two additional members so provided for, one shall be appointed for a term of five years and the other for a term of two years. Their successors, and the successors of the other members, shall be appointed for terms of five years each, excepting that any individual chosen to fill a vacancy shall be appointed only for the unexpired term of the member whom he shall succeed. The President shall designate one member to serve as Chairman of the Board. Any member of the Board may be removed by the President, upon notice and hearing, for neglect of duty or malfeasance in office, but for no other cause.

## 29 U.S.C. § 160(a), (b), (j)

### (a) Powers of Board generally

The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 158 of this title) affecting commerce.  This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise: Provided, That the Board is empowered by agreement with any agency of any State or Territory to cede to such agency jurisdiction over any cases in any industry (other than mining, manufacturing, communications, and transportation except where predominantly local in character) even though such cases may involve labor disputes affecting commerce, unless the provision of the State or Territorial statute applicable to the determination of such cases by such agency is inconsistent with the corresponding provision of this subchapter or has received a construction inconsistent therewith.

### (b) Complaint and notice of hearing; answer; court rules of evidence inapplicable

Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board, or any agent or agency designated by the Board for such purposes, shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect, and containing a notice of hearing before the Board or a member thereof, or before a designated agent or agency, at a place therein fixed, not less than five days after the serving of said complaint: Provided, That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made, unless the person aggrieved thereby was prevented from filing such charge by reason of service in the armed forces, in which event the six-month period shall be computed from the day of his discharge.  Any such complaint may be amended by the member, agent, or agency conducting the hearing or the Board in its discretion at any time prior to the issuance of an order based thereon.  The person so complained of shall have the right to file an answer to the original or amended complaint and to appear in person or otherwise and give testimony at the place and time fixed in the complaint.  In the discretion of the member, agent, or agency conducting the hearing or the Board, any other person may be allowed to intervene in the said proceeding and to present testimony.  Any such proceeding shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the

United States under the rules of civil procedure for the district courts of the United States, adopted by the Supreme Court of the United States pursuant to section 2072 of title 28.

. . .

**(j) Injunctions**

The Board shall have power, upon issuance of a complaint as provided in subsection
(b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

## 29 U.S.C. § 161

For the purpose of all hearings and investigations, which, in the opinion of the Board, are necessary and proper for the exercise of the powers vested in it by sections 159 and 160 of this title—

### (1) Documentary evidence; summoning witnesses and taking testimony

The Board, or its duly authorized agents or agencies, shall at all reasonable times have access to, for the purpose of examination, and the right to copy any evidence of any person being investigated or proceeded against that relates to any matter under investigation or in question. The Board, or any member thereof, shall upon application of any party to such proceedings, forthwith issue to such party subpenas requiring the attendance and testimony of witnesses or the production of any evidence in such proceedings or investigation requested in such application. Within five days after the service of a subpena on any person requiring the production of any evidence in his possession or under his control, such person may petition the Board to revoke, and the Board shall revoke, such subpena if in its opinion the evidence whose production is required does not relate to any matter under investigation, or any matter in question in such proceedings, or if in its opinion such subpena does not describe with sufficient particularity the evidence whose production is required. Any member of the Board, or any agent or agency designated by the Board for such purposes, may administer oaths and affirmations, examine witnesses, and receive evidence. Such attendance of witnesses and the production of such evidence may be required from any place in the United States or any Territory or possession thereof, at any designated place of hearing.

### (2) Court aid in compelling production of evidence and attendance of witnesses

In case of contumacy or refusal to obey a subpena issued to any person, any district court of the United States or the United States courts of any Territory or possession, within the jurisdiction of which the inquiry is carried on or within the jurisdiction of which said person guilty of contumacy or refusal to obey is found or resides or transacts business, upon application by the Board shall have jurisdiction to issue to such person an order requiring such person to appear before the Board, its member, agent, or agency, there to produce evidence if so ordered, or there to give testimony touching the matter under investigation or in question; and any failure to obey such order of the court may be punished by said court as a contempt thereof.

A4

**(3) Repealed.**

**(4) Process, service and return; fees of witnesses**

Complaints, orders, and other process and papers of the Board, its member, agent, or agency, may be served either personally or by registered or certified mail or by telegraph or by leaving a copy thereof at the principal office or place of business of the person required to be served.  The verified return by the individual so serving the same setting forth the manner of such service shall be proof of the same, and the return post office receipt or telegraph receipt therefor when registered or certified and mailed or when telegraphed as aforesaid shall be proof of service of the same.  Witnesses summoned before the Board, its member, agent, or agency, shall be paid the same fees and mileage that are paid witnesses in the courts of the United States, and witnesses whose depositions are taken and the persons taking the same shall severally be entitled to the same fees as are paid for like services in the courts of the United States.

**(5) Process, where served**

All process of any court to which application may be made under this subchapter may be served in the judicial district wherein the defendant or other person required to be served resides or may be found.

**(6) Information and assistance from departments**

The several departments and agencies of the Government, when directed by the President, shall furnish the Board, upon its request, all records, papers, and information in their possession relating to any matter before the Board.