ORAL ARGUMENT SCHEDULED ON MAY 16, 2025

No. 25-5057

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

GWYNNE A. WILCOX,
*Plaintiff-Appellee,*

v.

DONALD J. TRUMP, et al.,
*Defendants-Appellants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA
No. 1:25-cv-334

---

BRIEF OF *AMICUS CURIAE* COALITION FOR A DEMOCRATIC
WORKPLACE IN SUPPORT OF DEFENDANTS-APPELLANTS

---

Kevin F. King
  *Counsel of Record*
Matthew J. Glover
Eli Nachmany
Brad J. Grisenti*
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000
kking@cov.com

* Admission application pending

March 29, 2025                    *Counsel for Amicus Curiae*

### CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), *amicus curiae* Coalition for a Democratic Workplace counsel certifies as follows:

**A.     Parties and *Amici*.**     Coalition for a Democratic Workplace is participating as an *amicus curiae* before this court.  All other parties appearing to date in this Court are contained or referenced in the Opening Brief for Appellants, Doc. No. 2108077, filed on March 27, 2025.

**B.  Rulings Under Review.**  The ruling under review is the March 6, 2025 district court order and accompanying memorandum opinion granting Plaintiff-Appellee Gwynne A. Wilcox's motion for summary judgment and denying the cross-motion for summary judgment filed by Defendants-Appellants Donald J. Trump et al.  The order is entry 34 on the district court docket and is available in the joint appendix at JA137.  The citation for the opinion is *Gwynne A. Wilcox v. Donald J. Trump et al.*, No. 1:25-cv-334, 2025 WL 720914 (D.D.C. Mar. 6, 2025).  The opinion is entry 35 on the district court docket and is available in the joint appendix at JA139.

**C.  Related Cases.**  To *amicus curiae*'s knowledge, the only related cases are *Cathy Harris v. Scott Bessent, et al.*, No. 25-5037 (D.C. Cir.), which has been consolidated with this case, and *Rebecca Slaughter et al. v. Donald J. Trump et al.*, No. 1:25-cv-909 (D.D.C.).

s/ Kevin F. King
Kevin F. King
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000
kking@cov.com

March 29, 2025

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

TABLE OF AUTHORITIES ................................................................... iv

CORPORATE DISCLOSURE STATEMENT AND  RULE 29 STATEMENTS ................................................................. viii

INTEREST OF *AMICUS CURIAE* .......................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................... 2

ARGUMENT ................................................................................. 3

I.      The *Humphrey's Executor* Exception Applies Only to Multimember Agencies That Do Not Exercise Substantial Executive Power. ..................... 4

    A.      By Its Terms, *Humphrey's Executor* Applies Only to Agencies Closely Resembling the 1935 Federal Trade Commission. ................. 5

    B.      The Supreme Court Has Since Confirmed the Limited Scope of the *Humphrey's Executor* Exception. .................................................. 7

II.     Because the Board Wields Substantial Executive Power, Its Members Are Subject to the President's Unrestricted Removal Authority. ................ 12

    A.      The Board Exercises Substantial Executive Power. .......................... 13

    B.      *Humphrey's Executor* Did Not Bless Restrictions on the Removal of Officers Wielding the Powers Possessed by the Board's Members. ............................................................ 21

CONCLUSION ................................................................................ 25

CERTIFICATE OF COMPLIANCE ........................................................... 26

CERTIFICATE OF FILING AND SERVICE .................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*AFL-CIO v. NLRB,*
   57 F.4th 1023 (D.C. Cir. 2023)...........................................................14

*Am. Meat Inst. v. USDA,*
   760 F.3d 18 (D.C. Cir. 2014)..............................................................14

*Bell Aerospace Co. v. NLRB,*
   475 F.2d 485 (2d Cir. 1973)...............................................................14

*Bowsher v. Synar,*
   478 U.S. 714 (1986)............................................................................14

*Browning-Ferris Indus. of California, Inc. v. NLRB,*
   911 F.3d 1195 (D.C. Cir. 2018)..........................................................14

*City of Arlington v. FCC,*
   569 U.S. 290 (2013)..............................................................................8

*Cmty. for Creative Non-Violence v. Pierce,*
   786 F.2d 1199 (D.C. Cir. 1986)..........................................................19

*Collins v. Yellen,*
   594 U.S. 220 (2021)......................................................................10, 14

*Consol. Commc'ns, Inc. v. NLRB,*
   837 F.3d 1 (D.C. Cir. 2016)................................................................20

*CP Anchorage Hotel 2, LLC v. NLRB.,*
   98 F.4th 314 (D.C. Cir. 2024).............................................................17

*FEC v. NRA Political Victory Fund,*
   6 F.3d 821 (D.C. Cir. 1993)................................................................12

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
   561 U.S. 477 (2010)....................................................................5, 8, 9

*Heckler v. Chaney,*
   470 U.S. 821 (1985)............................................................................19

iv

*Humphrey's Executor v. United States*,
  295 U.S. 602 (1935)................................................ 2, 4, 5, 6, 7, 11, 20, 21, 22

*Int'l Union of Operating Eng'rs, Stationary Eng'rs, Loc. 39 v. NLRB*,
  127 F.4th 58 (9th Cir. 2025) ...................................................18

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
  512 U.S. 821 (1994)..................................................................23

*Kuretski v. Comm'r*,
  755 F.3d 929 (D.C. Cir. 2014)....................................................8

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024)..................................................................15

*Mathew Enter., Inc. v. NLRB*,
  771 F.3d 812 (D.C. Cir. 2014) ...................................................9

*Morrison v. Olson*,
  487 U.S. 654 (1988) ...................................................................9

*Myers v. United States*,
  272 U.S. 52 (1926)..................................................................5, 8

*Nat'l Ass'n of Mfrs. v. NLRB*,
  717 F.3d 947 (D.C. Cir. 2013) .................................................14

*Nat'l Ass'n of Mfrs. v. SEC*,
  800 F.3d 518 (D.C. Cir. 2015)..................................................12

*NLRB v. Bell Aerospace Co. Div. of Textron*,
  416 U.S. 267 (1974)............................................................14, 15

*NLRB v. Curtin Matheson Sci., Inc.*,
  494 U.S. 775 (1990)............................................................13, 22

*NLRB v. Starbucks Corp.*,
  125 F.4th 78 (3d Cir. 2024) .....................................................18

*NLRB v. Wyman-Gordon Co.*,
  394 U.S. 759 (1969)..................................................................15

*PHH Corp. v. CFPB*,
  881 F.3d 75 (D.C. Cir. 2018) .................................................................9, 11, 19

*Seila Law LLC v. CFPB*,
  591 U.S. 197 (2020) ....................... 2, 4, 7, 8, 9, 10, 11, 12, 13, 15, 16, 19, 21, 22

*Severino v. Biden*,
  71 F.4th 1038 (D.C. Cir. 2023) ............................................................8

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944) ...........................................................................15

*Starbucks Corp. v. McKinney*,
  602 U.S. 339 (2024)............................................................................18

*Trump v. United States*,
  603 U.S. 593 (2024)......................................................................17, 19

*United Food & Com. Workers Union Loc. 204 v. NLRB*,
  447 F.3d 821 (D.C. Cir. 2006) ...........................................................17

*Valley Hosp. Med. Ctr., Inc. v. NLRB*,
  100 F.4th 994 (9th Cir. 2024) ............................................................16

*Wiener v. United States*,
  357 U.S. 349 (1958).....................................................................10, 11, 16

*Wilcox v. Trump*,
  No. 25-5057 (D.C. Cir. Mar. 28, 2025) (slip op.)...........................3, 19

## Constitutional Provisions

U.S. Const. art. II, § 1, cl. 1 ......................................................................5, 8

## Statutes

29 U.S.C. § 151 *et seq.*................................................................................13

29 U.S.C. § 153(d) ......................................................................................15

29 U.S.C. § 156............................................................................................14

29 U.S.C. § 159............................................................................................20

29 U.S.C. § 160 ............................................................................13, 17, 18

29 U.S.C. § 161 ...........................................................................................19

42 U.S.C. § 9601 *et seq.* ..........................................................................20

49 U.S.C. § 106 ...........................................................................................20

Federal Trade Commission Act of 1914, Pub. L. No. 63-203, 38 Stat.
    717 (1914) ..........................................................................................22, 23

**Regulations**

Standard for Determining Joint Employer Status, 88 Fed. Reg. 58,076
    (Aug. 25, 2023) ......................................................................................14

Representation-Case Procedures, 88 Fed. Reg. 73,946 (Oct. 27, 2023) ................14

**Administrative Decisions**

*Cemex Constr. Materials Pac., LLC*,
    372 NLRB No. 130, 2023 WL 5506930 (2023)....................................21

*Home Depot USA, Inc.*,
    373 NLRB No. 25, 2024 WL 726240 (Feb. 21, 2024).........................17

*Metro Health Inc. d/b/a Hospital Metrpolitano Rio Peidras*,
    373 NLRB No. 89, 2024 WL 3916103 (Aug. 22, 2024).............................16, 17

*Miller Plastic Products, Inc.*,
    372 NLRB No. 134, 2023 WL 5669331 (Aug. 25, 2023)...................16

*Thryv, Inc.*,
    372 NLRB No. 22, 2022 WL 17974951 (Dec. 13, 2022) ...................18

## CORPORATE DISCLOSURE STATEMENT AND
## RULE 29 STATEMENTS

All parties have consented to the filing of this *amicus* brief.

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and Circuit Rule 29(b), undersigned counsel states that the Coalition for a Democratic Workplace is not a publicly traded corporation.  It is an informal coalition whose members are listed at www.myprivateballot.com and which affiliates with the Employer Policy Network Association, and no publicly held company has 10% or greater ownership in the organization.

Pursuant to Circuit Rule 29(d), a separate *amicus* brief is necessary because the highly expedited briefing schedule ordered by the Court has made coordination with other *amici* on a single brief impracticable.  Additionally, *amicus* is unaware of entities or individuals intending to participate as *amici* in this matter that offer the unique perspective of an employer organization whose members are regulated by the National Labor Relations Board.

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amicus* certifies that no counsel for any party authored this brief in whole or in part and no entity or person, aside from *amicus*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

## INTEREST OF *AMICUS CURIAE*

*Amicus* the Coalition for a Democratic Workplace is composed of hundreds of organizations representing millions of businesses that employ tens of millions of workers nationwide in nearly every industry.  Members of the Coalition are joined by their mutual concern over regulatory overreach by the National Labor Relations Board that threatens employees, employers, and economic growth.  The Coalition addresses these concerns through litigation, legislation, and the regulatory process, and it works to advance policies that protect the rights of employees, foster the American Dream, and strengthen the economy.

Through its experiences with the Board, the Coalition has developed particularized expertise about the Board's functions and authorities.  The Coalition files this brief to assist this Court as it considers the nature of the Board's duties— and the resulting implications for presidential removal power.  As entities regulated by the Board, the Coalition's members bring a unique perspective to the issues presented in this case.

President Trump removed Gwynne Wilcox from the Board as part of a broader effort to bring the Board's personnel and actions in line with his administration's priorities.  The President's deregulatory agenda has a positive effect on the Coalition's members, which support the President's approach to the work of the Board.  The statutory tenure protections for Board members stand in the way of the

1

President's implementation of his agenda through the personnel makeup of the Board, to say nothing of their inconsistency with Article II of the Constitution. The Coalition thus supports the President's removal order and files this brief to explain why it is lawful.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The National Labor Relations Board is an Executive Branch agency. And generally, as part of the executive power vested in him alone, the President enjoys unrestricted authority to supervise officials who exercise executive power on his behalf—including, if he sees fit, by removing those officials at will.

In *Humphrey's Executor v. United States*, 295 U.S. 602, 624 (1935), the Supreme Court recognized a limited exception to that general rule. The Court held that Congress *may* constitutionally restrict the President's removal of officers of certain multimember agencies—those that, like the Federal Trade Commission at the time, perform quasi-legislative and quasi-judicial functions, and are not understood to exercise executive power. But the Court expressly limited its holding to such agencies, leaving those with broader powers for further consideration in future cases. In recent decisions involving such agencies, the Supreme Court has clarified that the *Humphrey's Executor* exception does *not* apply to agencies that possess substantial executive power. *See Seila Law LLC v. CFPB*, 591 U.S. 197, 216–18 (2020).

The Board is just such an agency.  As Judges Henderson and Walker have already determined in granting the government's emergency motion for stay, *see Wilcox v. Trump*, No. 25-5057, slip op. at 3–4 (D.C. Cir. Mar. 28, 2025) (Henderson, J., concurring in grant of stay); *id.* at 31–37 (Walker, J., concurring in grant of stay), and as the Coalition elaborates below, the Board's powers—from fleshing out a broad statutory mandate to prevent unfair labor practices, to ordering wide-ranging remedies for such practices, to seeking enforcement of those orders in federal court and supervising union elections—are quintessentially executive.  And in exercising those powers, the Board bears direct responsibility for significant coercive impacts on regulated employers.  In those respects and others, the Board's authority sweeps well beyond the powers of the 1935 Federal Trade Commission considered in *Humphrey's Executor*.  The Board, in short, is exactly the sort of agency over which the President *must* enjoy unfettered removal power.

President Trump's order removing Ms. Wilcox from the Board was thus a lawful exercise of his executive power, and *Humphrey's Executor* does not apply here.  Because the district court concluded otherwise, this Court should reverse.

## ARGUMENT

As an umbrella organization representing employers regulated by the Board, the Coalition is all too familiar with the powers the Board brings to bear against the entities it regulates.  Those powers often have a coercive effect on employers, and

they affect nearly every segment of the economy, reinforcing the conclusion that the Board possesses substantial executive power.  Because that is so, the limited exception established in *Humphrey's Executor* does not apply here.  Instead, the general rule applies:  The President's executive power includes the authority to remove the Board's members at will.  President Trump's position is correct, and this Court should uphold his removal of Ms. Wilcox, in full.

## I.  The *Humphrey's Executor* Exception Applies Only to Multimember Agencies That Do Not Exercise Substantial Executive Power.

In *Humphrey's Executor*, the Supreme Court established a limited exception to the general rule that it is "the President's prerogative to remove executive officials."  *Seila Law LLC v. CFPB*, 591 U.S. 197, 214 (2020).  That exception was based on the Court's narrow understanding of the functions and duties of the agency at issue in that case: the Federal Trade Commission, as it existed in 1935.  The Court viewed the Commission as exercising "no part of the executive power vested by the Constitution in the president."  *Humphrey's Executor*, 295 U.S. at 628.  Instead, it understood the Commission to "ac[t] in part quasi-legislatively and in part quasi-judicially," and in some instances as a legislative or judicial agent.  *Id.*  The Court thus upheld a law that barred the President from removing the agency's commissioners except for cause.  *Id.* at 629.  But cases both before and after *Humphrey's Executor* confirm that the exception is limited to agencies like the 1935

Commission—namely, multimember agencies that do not exercise substantial (or perhaps any) executive power.

### A.   By Its Terms, *Humphrey's Executor* Applies Only to Agencies Closely Resembling the 1935 Federal Trade Commission.

In 1789, the First Congress, in rejecting a role for itself in the removal of Executive Branch officers, confirmed that "[t]he executive Power"—vested by the recently ratified Constitution in the President alone, Art. II, § 1, cl. 1—"included a power to oversee executive officers through removal." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492 (2010).  And more than a century later, in its landmark decision in *Myers v. United States*, the Supreme Court embraced that understanding, holding that Article II "grants to the President" the "general administrative control of those executing the laws, including the power of appointment *and removal* of executive officers."  272 U.S. 52, 163–64 (1926) (emphasis added).  Without the "power of removing those for whom he cannot continue to be responsible," the Court explained, it would be "impossible for the President . . . to take care that the laws be faithfully executed," as Article II requires. *Id.* at 117, 164.

That was the state of the law when the Court decided *Humphrey's Executor*. In that case, the Court confronted the question whether Congress could constitutionally prohibit the President from removing commissioners of the Federal Trade Commission except for cause.  295 U.S. at 619, 626.  Notwithstanding the

5

First Congress's action in 1789 and *Myers*, the Court held that Congress could impose such a restriction on the President's removal power.

But the Court did not do so because it disputed the basic premise of *Myers*. Instead, it determined that the statutory restriction was lawful because the Commission, as the Court saw it then, "exercise[d] *no* part of the executive power vested by the Constitution in the President" and could not "in any proper sense be characterized as an arm or an eye of the executive." *Id.* at 628 (emphasis added).

For example, in adjudicating in the first instance whether individuals or businesses had engaged in "unfair methods of competition" under Section 5 of the Federal Trade Commission Act, the Court understood the Commission to "ac[t] in part quasi-legislatively and in part quasi-judicially." *Id.* Likewise, "[i]n making investigations and reports thereon for the information of Congress under section 6, in aid of the legislative power," the Commission "act[ed] as a legislative agency." *Id.* In "act[ing] as a master in chancery under rules prescribed by the court," pursuant to Section 7, "it act[ed] as an agency of the judiciary"—a mere judicial adjunct. *Id.* And "[t]o the extent that [the Commission] exercise[d] any executive function, as distinguished from executive power in the constitutional sense," the Court thought the Commission did so only "in the discharge and effectuation of its quasi-legislative or quasi-judicial powers, or as an agency of the legislative or judicial departments of the government." *Id.*

Officers of a "nonpartisan . . . body of experts" so "wholly disconnected from the executive department," the Court concluded, could be rendered "independen[t]" from the "coercive influence" of the President without contravening the Constitution. *Id.* at 630. The Court thus held that "illimitable power of removal is not possessed by the President in respect of officers of the character of those just named"—that is, officers of "quasi-legislative or quasi-judicial agencies" like the 1935 Commission. *Id.* at 629.

But the Court stopped there. It expressly limited its holding to "officers of the kind [t]here under consideration," namely officers of quasi-legislative or quasi-judicial bodies exercising only powers like those the Court had catalogued. *Id.* at 632. The Court also "reaffirmed the core holding of *Myers* that the President has 'unrestrictable power . . . to remove purely executive officers.'" *Seila Law*, 591 U.S. at 217 (quoting *Humphrey's Executor*, 295 U.S. at 632). With respect to officers that might not fall into those categories, the Court identified a "field of doubt," and "l[eft] such cases as may fall within it for future consideration," based on "the character of the office" involved. *Humphrey's Executor*, 295 U.S. at 631–32.

**B.     The Supreme Court Has Since Confirmed the Limited Scope of the *Humphrey's Executor* Exception.**

Through substantial further consideration in subsequent cases, the Supreme Court has narrowed that field of doubt, so much so that it "might be that little to nothing is left of the *Humphrey*'s exception to the general rule that the President may

7

freely remove his subordinates." *Severino v. Biden*, 71 F.4th 1038, 1050 (D.C. Cir. 2023) (Walker, J., concurring).   Indeed, the apparent premise of *Humphrey's Executor*—that the 1935 Commission exercised *no* executive power—"has not withstood the test of time." *Seila Law*, 591 U.S. at 216 n.2.  To the contrary, it is now understood that even when agencies' "activities take 'legislative' and 'judicial' forms, . . . they are exercises of—indeed, under our constitutional structure they *must* be exercises of—the 'executive Power.'" *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013) (quoting Art. II, § 1, cl. 1); *see, e.g.*, *Kuretski v. Comm'r*, 755 F.3d 929, 944 (D.C. Cir. 2014).  But until the Supreme Court says otherwise, *Humphrey's Executor* remains on the books.  This Court must therefore follow it as far as it applies.  But as was clear from *Humphrey's Executor* itself—and as the Supreme Court has now indisputably confirmed—that is not very far at all.

In particular, the Court's removal decision five years ago in *Seila Law v. CFPB* leaves no doubt about *Humphrey's Executor*'s narrow scope.  By the time the Court decided that case, it had already reaffirmed ten years earlier, in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, the basic insight of *Myers*: that "[t]he President cannot 'take Care that the Laws be faithfully executed' if he cannot oversee the faithfulness of the officers who execute them," and that to do so, he "must have some 'power of removing those for whom he cannot continue to be responsible.'"  561 U.S. 477, 484, 493 (2010) (quoting *Myers*, 272

U.S. at 117).  And the Court had explained that *Humphrey's Executor* did not displace that foundational principle, but merely imposed a "limit" applicable in "certain circumstances."  *Id.* at 483.

The Court explored that limit in detail in *Seila Law*.  Tracing the President's removal power from the text of Article II and the First Congress's action in 1789 through *Myers* and *Free Enterprise Fund*, the Court explained that *Humphrey's Executor* constitutes one of "two exceptions to the President's unrestricted removal power," and a limited one at that.  *Seila Law*, 591 U.S. at 215.[1]  Specifically, the Court recognized that in light of the express qualifications adopted by the Court in *Humphrey's Executor*, "the contours of the *Humphrey's Executor* exception depend upon the characteristics of the agency before the Court" in that case—that is, "the set of powers the [*Humphrey's Executor*] Court considered as the basis for its decision."  *Id.* at 215, 219 n.4; *accord PHH Corp. v. CFPB*, 881 F.3d 75, 143 (D.C. Cir. 2018) (Henderson, J., dissenting), *abrogated by Seila Law LLC v. CFPB*, 591

---

[1] The other exception allows Congress to restrict the President's power to remove "inferior officers with limited duties and no policymaking or administrative authority."  *Seila Law*, 591 U.S. at 218; *see id.* at 217–18 (citing *Morrison v. Olson*, 487 U.S. 654 (1988)).  That exception does not apply here, because members of the Board are principal, not inferior, officers.  *See Mathew Enter., Inc. v. NLRB*, 771 F.3d 812, 813 (D.C. Cir. 2014).

U.S. 197 (2020).[2]  Recounting those powers as *Humphrey's Executor* had described them, the Court explained that "*Humphrey's Executor* permitted Congress to give for-cause removal protections to a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise any executive power."  *Seila Law*, 591 U.S. at 216; *see also Collins v. Yellen*, 594 U.S. 220, 254 (2021) (declaring unconstitutional a restriction on removal of director of agency that "clearly exercise[d] executive power").

The exception, the Court held, was thus limited to "multimember expert agencies that do not wield substantial executive power"—or, put differently, to agencies "closely resembl[ing]" the 1935 Federal Trade Commission as the *Humphrey's Executor* Court had understood it.  *Seila Law*, 591 U.S. at 218.  As an example of such an agency, the Court pointed to the War Claims Commission, a "three-member 'adjudicatory body' tasked with resolving claims for compensation arising from World War II."  *Id.* at 216 (quoting *Wiener v. United States*, 357 U.S. 349, 356 (1958)).  Applying "[t]he philosophy of *Humphrey's Executor*," the Court had held in *Weiner* that the President could not remove members of that Commission, which merely effectuated a core congressional authority: "distribution

---

[2] Accordingly, to the extent the 1935 Commission enjoyed "any latent powers . . . not alluded to by the Court" in *Humphrey's Executor*, the existence of such powers did not broaden the exception.  *Seila Law*, 591 U.S. at 219 n.4.

among American claimants [of] funds derived from foreign sources," or (effectively) appropriation.  357 U.S. at 355; *see id.* at 355–56.[3]  As the Court noted in *Seila Law*, that holding was "[c]onsistent with" the limited scope of the *Humphrey's Executor* exception, given the Commission's circumscribed duties.  591 U.S. at 216.

In short, far from extending a "freestanding invitation for Congress to impose additional restrictions on the President's removal authority," *id.* at 228, *Humphrey's Executor* established only a limited exception applicable to multimember agencies that function effectively as legislative or judicial adjuncts and do not possess substantial executive power.  To the extent that an agency is "purely executive," the President's removal power remains, as it always has been, "unrestrictable."  *Id.* at 217 (quoting *Humphrey's Executor*, 295 U.S. at 632).  And to the extent an agency falls within the "field of doubt" that lies beyond that exception, *Humphrey's Executor*, 295 U.S. at 632, this Court's "job is to decide the agency's validity under first principles."  *PHH Corp.*, 881 F.3d at 155 (Henderson, J., dissenting).  "[T]ext, first principles, the First Congress's decision in 1789, *Myers*, and *Free Enterprise*

---

[3] Indeed, the Commission's charge merely reflected the fact that "[f]or Congress itself to have made appropriations for the claims with which it dealt under the War Claims Act was not practical in view of the large number of claimants and the diversity in the specific circumstances giving rise to the claims."  *Wiener*, 357 U.S. at 355.

*Fund* all establish that the President's removal power is the rule, not the exception."

*Seila Law*, 591 U.S. at 228.[4]

## II.    Because the Board Wields Substantial Executive Power, Its Members Are Subject to the President's Unrestricted Removal Authority.

The Coalition and its members are intimately familiar with the extraordinary power the Board wields in regulating employer-employee relationships across the Nation. The Board makes national labor policy by ordering a wide range of remedies—and, increasingly, by promulgating binding rules with broad effect. Exercising its independent litigating authority, it seeks enforcement of its orders and remedies—along with preliminary relief *before* it has adjudicated a matter—in federal court. To support these enforcement efforts, the Board employs broad

---

[4] This Court's decision in *FEC v. NRA Political Victory Fund*, 6 F.3d 821 (D.C. Cir. 1993), is "of no moment" here. *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 520 (D.C. Cir. 2015). In *NRA Political Victory Fund*, this Court determined that the Federal Election Commission lacked authority to bring an enforcement action because the Commission included certain agents of Congress as non-voting *ex officio* members. 6 F.3d at 822. Along the way, the Court suggested that the Supreme Court's decision in *Morrison* foreclosed a separate challenge to asserted removal protections for the Commission's members. *See id.* at 826. But as *Seila Law* later made clear, *Morrison* established "a second exception"—in addition to *Humphrey's Executor*—applicable only to "*inferior* officers." 591 U.S. at 217. That exception does not apply here. *See supra* n.1. Moreover, the *NRA Political Victory Fund* Court did not grapple with the critical question under *Humphrey's Executor*: whether the FEC exercises "substantial executive power." *Id.* at 218. At any rate, the Court observed that the statute's "silence [about removal] could imply that the President actually enjoys an unrestricted power of removal," *NRA Political Victory Fund*, 6 F.3d at 826, and granted relief only on the "more substantial claim" involving non-voting *ex officio* members, *id.* at 822, 826.

investigatory powers.  It even directly conducts union elections, taking ballots and certifying winners.  Collectively, those powers give the Board wide discretion to shape labor relations and coerce employers as it sees fit.

By any measure, that is "substantial executive power" as the Supreme Court now understands it, and it extends well beyond the limited, quasi-judicial and quasi-legislative powers the *Humphrey's Executor* Court considered.  *Seila Law*, 591 U.S. at 218.  The Board therefore falls outside the *Humphrey's Executor* exception, and the President is instead free to remove Board members at will.

### A.    The Board Exercises Substantial Executive Power.

Congress established the Board to administer and enforce the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*  As the Supreme Court has "emphasized often[,] the [Board] has the primary responsibility for developing and applying national labor policy."  *NLRB v. Curtin Matheson Sci., Inc.*, 494 U.S. 775, 786 (1990).  In particular, the Board's core mandate is to "prevent any person from engaging in any unfair labor practice . . . affecting commerce."  29 U.S.C. § 160(a).  That sweeping mandate alone underscores that the Board exercises substantial executive power:  If the Consumer Financial Protection Bureau's authority to "flesh[] out . . . a broad prohibition on unfair and deceptive practices in a major segment of the U.S. economy" amounts to such power, placing it outside the *Humphrey's Executor* exception, *Seila Law*, 591 U.S. at 218, then so too does the

Board's power to set the ground rules for employer-employee relations across the economy. *Cf. Collins*, 594 U.S. at 254 ("[i]nterpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law" (quoting *Bowsher v. Synar*, 478 U.S. 714, 733 (1986))).

The means by which the Board generally carries out its mandate involve the exercise of executive power as well. Historically, the Board has done so primarily through adjudications of unfair labor practice complaints. *See AFL-CIO v. NLRB*, 57 F.4th 1023, 1026–27 (D.C. Cir. 2023).[5] But it may also employ its broad rulemaking authority, *see* 29 U.S.C. § 156; *NLRB v. Bell Aerospace Co. Div. of Textron*, 416 U.S. 267, 290–95 (1974); *Browning-Ferris Indus. of California, Inc. v. NLRB*, 911 F.3d 1195, 1226 (D.C. Cir. 2018) (Randolph, J., dissenting) ("Like other administrative agencies, the Board may establish standards through rulemaking or adjudication"), and it has done so in recent years, *see, e.g.*, Standard for Determining Joint Employer Status, 88 Fed. Reg. 73,946 (Oct. 27, 2023); Representation-Case Procedures, 88 Fed. Reg. 58,076 (Aug. 25, 2023).

---

[5] *See also, e.g.*, *Nat'l Ass'n of Mfrs. v. NLRB*, 717 F.3d 947, 949 (D.C. Cir. 2013) ("From its inception in 1935, the Board has exhibited a 'negative attitude' toward setting down principles in rulemaking, rather than adjudication" (quoting *Bell Aerospace Co. v. NLRB*, 475 F.2d 485, 496 (2d Cir. 1973) (Friendly, J.), *aff'd in part, rev'd in part*, 416 U.S. 267 (1974))), *overruled on other grounds by Am. Meat Inst. v. USDA*, 760 F.3d 18 (D.C. Cir. 2014)).

When it makes substantive rules, the Board exercises substantial executive power, as the Court confirmed in *Seila Law*. *See* 591 U.S. at 218. And the same is true when the Board exercises its "discretion" to "announc[e] new principles in an adjudicative proceeding" rather than a rule, *Bell Aerospace*, 416 U.S. at 294—even though the Board's interpretations in adjudications often do not reflect the "thoroughness" necessary to merit particular "weight" in judicial review. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 388 (2024) (internal quotation marks and citation omitted) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 144 (1944)). Like substantive rules, after all, the Board's adjudications "serve as vehicles for the formulation of agency policies, which are applied and announced therein," and "provide a guide to action that the agency may be expected to take in future cases." *Id.* (internal quotation marks omitted) (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 765–66 (1969) (plurality opinion)). In other words, by fleshing out the meaning of "unfair labor practices" through individual adjudications, the Board both sets national labor policy and declares enforcement priorities and positions that the Board's General Counsel—effectively the Board's in-house prosecutor, *see* 29 U.S.C. § 153(d)—may then pursue. That is not the work of "a mere legislative or

judicial aid," *Seila Law*, 591 U.S. at 218—it is the work of a high-level Executive Branch policymaker.[6]

Through these adjudications, the Board has asserted an increasingly broad oversight role in American labor relations—both in procedure and in substance. Beginning with procedure: In *Miller Plastic Products, Inc.*, 372 NLRB No. 134, 2023 WL 5669331 (Aug. 25, 2023), the Board used an adjudication to change the legal standard for determining whether employees are engaged in "concerted" activity for the purpose of collective bargaining and mutual aid or protection. The Board replaced the prior standard with a vague eye-of-the-beholder rule that undermines the ability of employers to know with certainty whether conduct is protected. *Id.* at *6. Additionally, the Board in *Metro Health Inc. d/b/a Hospital Metrpolitano Rio Peidras*, 373 NLRB No. 89, 2024 WL 3916103 (Aug. 22, 2024), overturned a substantial body of precedent when it ended the practice of accepting

---

[6] That characteristic distinguishes the Board from the War Claims Commission. Although the Board, like that Commission, conducts adjudications, its function is not ministerial; it does not straightforwardly "'adjudicate according to law' . . . classes of claims defined in [a] statute." *Wiener*, 357 U.S. at 355. Instead, it sets— and often changes from one administration to the next—national policy on important labor law questions. *See, e.g.*, *Valley Hosp. Med. Ctr., Inc. v. NLRB*, 100 F.4th 994, 1003 (9th Cir. 2024) (O'Scannlain, J., specially concurring) (noting the "troubling trend" in which the Board "frequently changes its mind, seesawing back and forth between statutory interpretations depending on its political composition, leaving workers, employers, and unions in the lurch"). And in any event, as *amicus* explains, the Board's powers extend far beyond adjudication. *See supra* p. 14; *infra* pp. 17– 21.

"consent orders" to which employers agreed—even when those orders reflected that an employer had come to a full resolution with the Board. *Id.* at *5. And on substance: The Board in *Home Depot USA, Inc.*, 373 NLRB No. 25, 2024 WL 726240 (Feb. 21, 2024), ruled that an employee had engaged in protected, "concerted activity" when displaying a "Black Lives Matter" message on a work uniform, and thus could not be terminated—notwithstanding past Board precedents allowing employers to regulate the messages and displays that employees could make while in uniform and on duty. *Id.* at *11.

The Board also acts as law enforcer—a core executive role. *See, e.g.*, *Trump v. United States*, 603 U.S. 593, 620 (2024). When it determines that an unfair labor practice has occurred, the Board may issue orders imposing a wide range of legal and equitable remedies. It may, for example, order the violator to "cease and desist from [the] unfair labor practice." 29 U.S.C. § 160(c). But it may also order the violator to "take . . . *affirmative* action including reinstatement of employees with or without back pay, as will effectuate the policies" of the Act. *Id.* (emphasis added); *see also CP Anchorage Hotel 2, LLC v. NLRB.*, 98 F.4th 314 (D.C. Cir. 2024) (quotation marks and citation omitted) (quoting *United Food & Com. Workers Union Loc. 204 v. NLRB*, 447 F.3d 821, 827 (D.C. Cir. 2006)) (describing Board's "broad discretionary" remedial authority). For example, in 2022, the Board (including Ms. Wilcox herself) asserted the authority to order wide-ranging "make-

17

whole" remedies, including compensatory and consequential damages for "direct or foreseeable pecuniary harms suffered by affected employees." *Thryv, Inc.*, 372 NLRB No. 22, 2022 WL 17974951, at *1 (Dec. 13, 2022).[7]

The Act empowers the Board to prosecute civil actions, independent of the Department of Justice, to enforce these wide-ranging remedial orders in the courts of appeals under Section 10(e) of the Act, as well as to seek preliminary injunctive relief in the district courts under Section 10(j) upon the issuance of an unfair labor practice complaint. *See* 29 U.S.C. § 160(e), (j); *Starbucks Corp. v. McKinney*, 602 U.S. 339, 342–43 (2024) (describing Board's Section 10(j) authority).[8]  As the Court explained in *Seila Law*, the power to bring such enforcement actions "on behalf of the United States in federal court," particularly for monetary relief (such as backpay), is a "quintessentially executive power not considered in *Humphrey's*

---

[7] The Coalition believes that these remedies exceed the Board's power under the National Labor Relations Act and violate the Seventh Amendment.  But the courts of appeals are divided on the propriety of such remedies, and at least the Ninth Circuit has blessed them.  *Compare Int'l Union of Operating Eng'rs, Stationary Eng'rs, Loc. 39 v. NLRB*, 127 F.4th 58, 82–84 (9th Cir. 2025), *with NLRB v. Starbucks Corp.*, 125 F.4th 78, 95–97 (3d Cir. 2024).

[8] Under the Board's operating procedures, the Board's General Counsel evaluates in the first instance whether to seek Section 10(j) relief.  *Starbucks*, 602 U.S. at 359 (Jackson, J., concurring in part and dissenting in part).  But that is beside the point: "[B]y the statute's own terms, power is left to *the Board itself*" to seek Section 10(j) relief), and indeed, "[i]t is only after the Board approves" the General Counsel's recommendation that Section 10(j) requests are filed.  *Id.* at 359–60.

*Executor.*"  591 U.S. at 219; *see also PHH Corp.*, 881 F.3d at 174 (Kavanaugh, J., dissenting) (the "authority to bring law enforcement actions against private citizens . . . is the core of the executive power").[9]

To support its adjudicatory and enforcement authorities, moreover, the Board may exercise broad investigative powers, including the authority to issue subpoenas, examine witnesses, receive evidence, and seek court orders compelling the production of evidence or provision of testimony.  29 U.S.C. § 161(1), (2).[10]  Those authorities mirror some of the "potent enforcement powers" enjoyed by the Consumer Financial Protection Bureau, and they are executive in nature.  *Seila Law*, 591 U.S. at 206; *see also Trump*, 603 U.S. at 621 (characterizing "[i]nvestigative and prosecutorial decisionmaking" as "the special province of the Executive Branch" (quoting *Heckler v. Chaney*, 470 U.S. 821, 832 (1985)); *Cmty. for Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986) (similar).

---

[9] The opinion dissenting from this Court's decision to enter a stay pending appeal does not address this guidance when asserting that the Board does not exercise substantial executive power because it must petition for judicial enforcement of its orders when parties do not voluntarily comply.  *See Wilcox v. Trump*, No. 25-5057, slip op. at 15 (D.C. Cir. Mar. 28, 2025) (Millett, J., dissenting from grant of stay).

[10] The dissent from grant of stay does not mention this authority, statutorily vested in "the Board" itself in a provision entitled "Investigatory powers of Board," in maintaining that the Board lacks "authority . . . to investigate."  *See Wilcox v. Trump*, No. 25-5057, slip op. at 15 (D.C. Cir. Mar. 28, 2025) (Millett, J., dissenting from grant of stay).

Finally, and perhaps most strikingly, the Board is statutorily charged with conducting union elections, including taking the secret ballot and certifying the results. *See* 29 U.S.C. § 159. This unique authority—one central to the Board's role—cannot be described as "quasi-legislative or "quasi-judicial." *Humphrey's Executor*, 295 U.S. at 629. It instead resembles other government functions that no one would dispute are executive in nature—such as Environmental Protection Agency supervision of cleanup actions at pollution sites and Federal Aviation Administration oversight of air traffic operations. *See* 42 U.S.C. § 9601 *et seq.* (establishing Environmental Protection Agency's authority to remedy polluted sites); 49 U.S.C. § 106 (providing for the Federal Aviation Administration's operation of air traffic control).

In exercising these executive authorities, the Board does not simply aid the legislature or judiciary; it bears direct responsibility for policy and enforcement decisions with significant coercive effect on regulated employers. Some Board reinstatement orders, for instance, have "repeatedly given refuge to conduct that is not only intolerable by any standard of decency, but also illegal in every other corner of the workplace." *Consol. Commc'ns, Inc. v. NLRB*, 837 F.3d 1, 20 (D.C. Cir. 2016) (Millett, J., concurring). And the Board has also issued orders requiring employers to bargain with unions that have not even won an election, except if the employers petition for elections themselves (giving the unions a free run at securing the

necessary support). *See Cemex Constr. Materials Pac., LLC*, 372 NLRB No. 130, 2023 WL 5506930 (2023).

Because the Board wields "substantial executive power," *Seila Law*, 591 U.S. at 218, it falls outside the *Humphrey's Executor* exception. Instead, because "[i]n our constitutional system, the executive power belongs to the President," *id.* at 238, the President enjoys unrestricted power to remove the Board's members, as President Trump has done here.

### B.    *Humphrey's Executor* Did Not Bless Restrictions on the Removal of Officers Wielding the Powers Possessed by the Board's Members.

A comparison of the Board's powers to those of the Federal Trade Commission of 1935 confirms that conclusion. As explained above, *see supra* pp. 4–12, *Humphrey's Executor* excepts from the President's general removal power only those multimember boards whose powers closely resemble "[t]he set of powers the [*Humphrey's Executor*] Court considered as the basis for its decision," *Seila Law*, 591 U.S. at 219 n.4—*i.e.*, the powers of the Federal Trade Commission of 1935, as the *Humphrey's Executor* Court understood them. Those powers included "carry[ing] into effect legislative policies embodied in" the Commission's organic statute "in accordance with the legislative standard therein prescribed," conducting investigations and reporting the findings to Congress, and acting as a master in chancery. *Humphrey's Executor*, 295 U.S. at 628; *supra* p. 6. The Commission of 1935 was thus understood to exercise "no part of the executive power" vested in the

President, and instead to perform only duties "neither political nor executive, but predominantly quasi-judicial and quasi-legislative." *Id.* at 624, 628.

The Board does not at all resemble that sort of agency. Like the Consumer Financial Protection Bureau, its powers are unmistakably substantial and unmistakably executive: It "develop[s] and appl[ies] national labor policy," *Curtin Matheson*, 494 U.S. at 786, by issuing orders imposing wide-ranging remedies, promulgating substantive rules, and exercising its independent litigating authority and investigatory powers. *See supra* pp. 12–21; *Seila Law*, 591 U.S. at 206, 218–19. Moreover, it has the statutory duty to conduct union elections, a function requiring it to interface with regulated parties and supervise their internal affairs. That unique supervisory function has no obvious parallel in the 1935 Commission, and it cannot be described as quasi-legislative or quasi-judicial.

Even where certain powers of the Board powers might at first blush appear similar to those of the 1935 Commission, closer inspection reveals key differences. For example, the Commission, like the Board, could issue cease-and-desist orders, but it lacked the authority to order or even seek monetary penalties—a "quintessentially executive power." *Seila Law*, 591 U.S. at 219; *see* Federal Trade Commission Act of 1914, Pub. L. No. 63-203, § 5, 38 Stat. 717, 719–21 (1914). By contrast, as explained above, the Board is statutorily empowered to order monetary penalties, including back pay, and to seek enforcement of those orders in federal

court. *See supra* pp. 17–19. Some courts have gone so far as to uphold the Board's claimed authority (endorsed by Ms. Wilcox) to mandate "make-whole" remedies. *See supra* pp. 17–18.

The Board's remedial authorities likewise dwarf those of the 1935 Commission. The Commission's remedial power was limited to the issuance of a prospective cease-and-desist order, *i.e.*, an order to *refrain* from taking a prohibited action. *See* Federal Trade Commission Act, § 5, 38 Stat. at 719–21. Yet the Board can—and often does—issue orders requiring parties to take affirmative acts: reinstating employees, bargaining in good faith, and disestablishing unions, to name a few. *See supra* pp. 17–18, 20–21. The contrast reflects the longstanding distinction between prohibitory and mandatory injunctions—two entirely different remedial approaches. Courts were historically averse to issuing complex mandatory injunctions. *See Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 841–42 (1994) (Scalia, J., concurring). But the Board's statutory scheme, unlike the Commission's (as of 1935), blows past these prudential barriers.

The district court purported to apply *Humphrey's Executor* and concluded that the government did not "meaningfully distinguish between the authority of the FTC in 1935, as recognized in *Humphrey's Executor*, and the authority of the NLRB today." JA154. Yet the authorities are indeed meaningfully distinguishable. *Humphrey's Executor* does not stand for the proposition that Congress can establish

23

removal protections for the head of any multimember commission. In that case, the Court did not contemplate a multimember commission possessing the sort of quintessentially executive powers that the Board has today. Thus, the Board falls outside of the *Humphrey's Executor* exception to *Seila Law*'s general rule.

\*     \*     \*

Because the Board exercises substantial executive power—and thus does not resemble the 1935 Federal Trade Commission—*Humphrey's Executor* does not apply. Instead, Congress contravened Article II when it vested the Board with substantial executive power yet attempted to insulate its members from at-will presidential removal. President Trump's order removing Ms. Wilcox from the Board was therefore a lawful exercise of his executive power.

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of the district court.

Respectfully Submitted,

*s/ Kevin F. King*

Kevin F. King
  *Counsel of Record*
Matthew J. Glover
Eli Nachmany
Brad J. Grisenti
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000
kking@cov.com

*Counsel for Amicus Curiae*

March 29, 2025

## CERTIFICATE OF COMPLIANCE

This amicus brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 5,874 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6), as well as the recommendations of the Court in its Handbook of Practice and Internal Procedures IX.A.6, because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

*s/ Kevin F. King*
Kevin F. King
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000
kking@cov.com

March 29, 2025                                      *Counsel for Amicus Curiae*

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on this 29th day of March, 2025, I caused a true and correct copy of the foregoing brief to be filed with the Clerk of the United States Court of Appeals for the D.C. Circuit via the Court's CM/ECF system. Counsel for all parties are registered CM/ECF users and will be served by the appellate CM/ECF system.

*s/ Kevin F. King*

Kevin F. King
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000
kking@cov.com

March 29, 2025                    *Counsel for Amicus Curiae*