**No. 25-5057**

═══════════════════════

**In the United States Court of Appeals
for the District of Columbia Circuit**

────────────────

GWYNNE WILCOX,
*Plaintiff-Appellee*,

v.

DONALD TRUMP, *et al.*,
*Defendants-Appellants*.

────────────────

**On Appeal from the United States District Court for
the District of Columbia**

────────────────

**Brief *Amicus Curiae* of
America's Future,
Gun Owners of America, Inc.,
Gun Owners Foundation,
Gun Owners of California,
Public Advocate of the United States,
Public Advocate Foundation,
U.S. Constitutional Rights Legal Defense Fund, and
Conservative Legal Defense and Education Fund
in Support of Defendants-Appellants and Reversal**

────────────────

JEFFREY TUOMALA
  114 Creekside Lane
  Winchester, VA 22602-2429

WILLIAM J. OLSON*
JEREMIAH L. MORGAN
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue W., Suite 4
  Vienna, VA  22180-5615
  (703) 356-5070
  wjo@mindspring.com
  Counsel for *Amicus Curiae*

March 29, 2025
*Attorney of Record

═══════════════════════

## CERTIFICATE AS TO
## PARTIES, RULINGS, AND RELATED CASES

### Parties and *Amicus*

Except for the following, all parties, intervenors, and *amici curiae* appearing

before the district court below and this Court are listed in the Briefs for the parties:

*amici curiae* America's Future, Gun Owners of America, Inc., Gun Owners

Foundation, Gun Owners of California, Public Advocate of the United States,

Public Advocate Foundation, U.S. Constitutional Rights Legal Defense Fund, and

Conservative Legal Defense and Education Fund.

### Ruling under Review

References to the ruling at issue appear in the Defendants-Appellants' Brief.

### Related Cases

Counsel adopt and incorporate by reference parties' statements with respect

to related cases.

ii

## CORPORATE DISCLOSURE STATEMENT

The *amici curiae* herein, America's Future, Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of California, Public Advocate of the United States, Public Advocate Foundation, U.S. Constitutional Rights Legal Defense Fund, and Conservative Legal Defense and Education Fund, through their undersigned counsel, submit this Corporate Disclosure Statement pursuant to Rules 26.1(b) and 29(c) of the Federal Rules of Appellate Procedure, and Rule 26.1 of the Rules of the United States Court of Appeals for the District of Columbia Circuit.

These *amici curiae* are non-stock, not-for-profit corporations, which have no parent company, and no person or entity owns them or any part of them.

These *amici curiae* are represented herein by William J. Olson, counsel of record, and Jeremiah L. Morgan, of William J. Olson, P.C., 370 Maple Avenue West, Suite 4, Vienna, VA 22180-5615, and Jeffrey Tuomala, 114 Creekside Lane, Winchester, VA 22602-2429.

*/s/ William J. Olson*
William J. Olson

iii

# TABLE OF CONTENTS

<u>Page</u>

Certificate as to Parties, Rulings, and Related Cases . . . . . . . . . . . . . . . . . . . . . . . . .  i

Corporate Disclosure Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Glossary of Abbreviations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

Interest of *Amicus Curiae*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT

I.   THE DISTRICT COURT HAS ATTEMPTED TO PUT THE ISSUE PRESENTED INTO A CONTRIVED, POLITICAL CONTEXT . . . . . . . . . . . . . . . . . . . . . . . . 3

II.  THE NATURE OF THE PRESIDENT'S POWER TO REMOVE IS BEST UNDERSTOOD AND SUPPORTED BY *MYERS V. UNITED STATES* . . . . . . . . . . . 6

III. THE PRESIDENT'S POWER OF REMOVAL MAY NOT BE EXPRESSLY STATED IN THE CONSTITUTION, BUT IT IS NEVERTHELESS SOLIDLY GROUNDED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

     A.   The Constitutional Role of a President . . . . . . . . . . . . . . . . . . . . . . . . 9

     B.   The Necessity of Implicit Powers . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

IV.  THE EXPANSION OF FEDERAL POWERS HAS INCENTIVIZED CONGRESS TO LIMIT THE PRESIDENT'S REMOVAL POWER, BUT THAT DOES NOT MAKE IT CONSTITUTIONAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

V.   REMOVAL IN *WILCOX V. TRUMP* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

iv

A.    *Humphrey's Executor* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

B.    *Morrison v. Olson* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

C.    Recent Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

v

# TABLE OF AUTHORITIES

Page

**CONSTITUTION**

Article I, § 2, cl. 6. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
Article I, § 3, cl. 6-7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
Article I, § 8, cl. 18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
Article II, § 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10
Article II, § 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 17
Article II, § 3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
Article II, § 4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 17

**STATUTES**

29 U.S.C. § 153 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

**CASES**

*Cooper v. Aaron*, 358 U.S. 1 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
*Dred Scott v. Sandford*, 60 U.S. 383 (1857) . . . . . . . . . . . . . . . . . . . . . . . . 14
\**Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561
   U.S. 477 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 19, 22, 26
*Helvering v. Davis*, 301 U.S. 619 (1937). . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
\**Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565
   U.S. 171 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
*Humphrey's Executor v. United States*, 295 U.S. 602 (1935). . . . . . .  2, 7-9, 21-26
*Korematsu v. United States*, 323 U.S. 214 (1944). . . . . . . . . . . . . . . . . . . . . . 14
*Marbury v. Madison*, 5 U.S. 137 (1803) . . . . . . . . . . . . . . . . . . . . . . . . . 16-18
*Mistretta v. United States*, 488 U.S. 361 (1989) . . . . . . . . . . . . . . . . . . . 21, 25
*Morrison v. Olson*, 487 U.S. 654 (1988) . . . . . . . . . . . . . . . . . . . . . . . 7-9, 23-26
\**Myers v. United States*, 272 U.S. 52 (1926). . . . . . . . . . . .  4, 6-8, 17, 19, 23-26
*NFIB v. Sebelius*, 567 U.S. 519 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
*Roe v. Wade*, 410 U.S. 113 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
*Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197
   (2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 17, 26
*Trump v. United States*, 603 U.S. 593 (2024) . . . . . . . . . . . . . . . . . . . . . . . . . 5
\**Trustees of Dartmouth College v. Woodward*, 17 U.S. 518 (1819) . . . . . . . . . . 16
*United States v. Lopez*, 514 U.S. 549 (1995). . . . . . . . . . . . . . . . . . . . . . . 14, 21
*Wickard v. Filburn*, 317 U.S. 111 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . 14, 21

\* Authorities upon which we chiefly rely are marked with asterisks.

vi

**MISCELLANEOUS**

K. Cheney, "Federal judges in Jan. 6 cases slam Trump's pardons," *Politico*
     (Jan. 22, 2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
Federalist No. 41. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
Federalist No. 45. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
Federalist No. 47. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21
E. Fitz & K. Saunders, "Distrusting the Process: Electoral Trust, Operational
     Ideology, and Nonvoting Political Participation in the 2020 American
     Electorate," 88 *Public Opinion Quarterly* 843 (July 16, 2024) . . . . . . . . 11

\* Authorities upon which we chiefly rely are marked with asterisks.

vii

## GLOSSARY OF ABBREVIATIONS

FTC         Federal Trade Commission

NLRA        National Labor Relations Act

NLRB        National Labor Relations Board

## INTEREST OF *AMICUS CURIAE*[1]

*Amici curiae* America's Future, Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of California, Public Advocate of the United States, Public Advocate Foundation, U.S. Constitutional Rights Legal Defense Fund, and Conservative Legal Defense and Education Fund are nonstock, not-for-profit organizations, exempt from federal income taxation under sections 501(c)(3) or 501(c)(4) of the Internal Revenue Code. These *amici* have filed numerous *amicus* briefs in constitutional and public policy cases.

## STATEMENT OF THE CASE

National Labor Relations Board ("NLRB") members are appointed by the President with the advice and consent of the Senate. 29 U.S.C. § 153. The NLRB was created by Congress in 1935 as an "independent agency." *See Wilcox v. Trump*, 2025 U.S. Dist. LEXIS 40651 at *11 (D.D.C. 2025) ("*Wilcox*"). On January 27, 2025, President Donald Trump terminated Gwynne Wilcox as a member of NLRB without asserting a basis under the requirement of the National Labor Relations Act ("NLRA") which provides Board members may be removed

---

[1] All parties have consented to the filing of this brief *amicus curiae*. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than the *amicus curiae*, its members or its counsel contributed money that was intended to fund preparing or submitting this brief.

2

only for "neglect of duty or malfeasance in office, but for no other cause."  29 U.S.C. § 153(a).  President Trump asserts that the NLRA requirements impose an unconstitutional restriction on his Article II powers to remove principal officers who exercise executive powers.

Wilcox sued, alleging that the President did not have power to remove her without cause.  *Wilcox* at *12.  The government argued, *inter alia*, that *Humphrey's Executor* was based on an error, "that the FTC [was understood] at the time not to exercise any 'executive power' ... and that the NLRB today clearly 'wield[s] substantial executive power.'"  As a result, the government argued, the President had authority to fire Wilcox.  *Wilcox* at *21.

The district court relied heavily on *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), for the proposition that Congress may "create such expert commissions with quasi-legislative and quasi-judicial authority [with] 'power to fix the period during which they shall continue, and to forbid their removal for except for cause in the meantime.'"  *Wilcox* at *18 (quoting *Humphrey's Executor* at 629).  The district court rejected the government's position, ruling that "cases since *Humphrey's Executor* ha[ve] reinforced the constitutionality of removal restrictions on multimember expert boards" and that the President did not have authority to fire Wilcox.  *Id.* at *25.  It ordered her reinstatement.  *Id.* at *49.

3

This court granted the Government's motions for stay of the district court orders on March 28, 2025.  *See Harris v. Bessent*, 2025 U.S. App. LEXIS 7301 (D.C. Cir. 2025).

On appeal, the NLRB case was consolidated with another involving the Merit Systems Protection Board, but in this brief, these *amici* only address the NLRB dispute.  Two of the three issues the Government has presented for resolution relate to the NLRB case:

> 1. Whether the President has authority under Article II of the Constitution to remove a Member of the National Labor Relations Board without first having to bear the burden of establishing neglect of duty or malfeasance in office.
>
> 3. Whether the district courts exceeded their remedial authority in ordering the reinstatement of principal officers the President determined should no longer be entrusted with executive power.

**ARGUMENT**

**I.     THE DISTRICT COURT HAS ATTEMPTED TO PUT THE ISSUE PRESENTED INTO A CONTRIVED, POLITICAL CONTEXT.**

The district court was presented with an important issue of constitutional law with important legal arguments presented on both sides.  Yet the court felt it necessary to denigrate President Trump's position by characterizing the President's exercise of his removal power as an arbitrary act of a megalomaniacal "Man Who Would Be King."

4

> [T]he Framers made clear that no one in our system of government was meant to be **king** — the **President** included — and not just in name only.  *See* U.S. Const. art. I, § 9, cl. 8 ("No **Title of Nobility** shall be granted by the United States.").  [*Wilcox at* \*3 (emphasis added).]

Continuing the stream of political accusations bordering on invective, the court writes:  "Luckily, the Framers, anticipating such a **power grab**, vested in Article III, not Article II, the power to interpret the law,[2] including resolving conflicts about congressional checks on presidential authority.  The President's interpretation of the scope of his constitutional power — or, more aptly, **his aspiration** — is **flat wrong**."  *Id.* at \*6-7 (bolding added).  The court derides the President's legitimate constitutional arguments as "excuse[s]" for "**blatantly illegal**" action.  *Id.* at \*14 (emphasis added).  The court insults the President's arguments, writing that:  "They are again **misguided**.  While the *Myers* Court made clear that the President has a general removal power for executive officials,

---

[2]  The district court's view that the President has no "power to interpret the law" is an extreme position, especially since the Constitution requires only the President, and not federal judges, to swear an Oath to "preserve, protect and defend the Constitution of the United States."  Article II, § 4.  It would be even worse if the district court by this language meant to endorse the once expressed, but never repeated, assertion that a Supreme Court's interpretation of the Constitution constitutes "the supreme law of the land."  *See Cooper v. Aaron*, 358 U.S. 1, 18 (1958).

5

defendants' **myopic** focus on this case loses sight of the limitations in its holding,

a point driven home in *Humphrey's Executor....*" *Id.* at 29-30 (emphasis added).

The court compares the President's constitutional argument, which she says

would lead to "**absolutist**" presidential power and a federal government with

"**widespread corruption**," and "**inefficiency**," to that of a former President with a

"controversial legacy." *Id*. at *35, n.17 (emphasis added), and worse:

> The President seems intent on **pushing the bounds of his office** and
> exercising his power in a manner **violative of clear statutory law** to
> **test how much the courts will accept** the notion of a presidency that
> is **supreme** ... with the result that the President need not be subject to
> criminal *or civil* legislative constraints.[3]  The courts are now again
> forced to determine how much **encroachment on the legislature** our
> **Constitution can bear** and face a **slippery slope** toward endorsing a
> presidency that is **untouchable by the law**.  The President has given
> no sufficient reason to accept that path here....  Defendants'
> **hyperbolic characterization** that legislative and judicial checks on
> executive authority, as invoked by plaintiff, present "extraordinary
> intrusion[s] on the executive branch," is both **incorrect and
> troubling**.  Under our constitutional system, such checks, by design,
> guard against executive **overreach** and the risk such overreach would
> pose of **autocracy**.  An American **President is not a king**—not even
> an "elected" one....  [*Id.* at *47-48 (citations omitted) (bolding
> added).]

Such disparaging comments from a district court are inappropriate,

demonstrate animus, and only serve to diminish the reputation of the courts in the

---

[3] Here, the district court appears to be criticizing the Supreme Court's
decision in *Trump v. United States*, 603 U.S. 593 (2024).

6

eyes of the public.[4]  These *amici* urge this court to reject the district court's

inflammatory and partisan rhetoric which is more suitable for a political diatribe

than a judicial opinion.

## II.     THE NATURE OF THE PRESIDENT'S POWER TO REMOVE IS BEST UNDERSTOOD AND SUPPORTED BY *MYERS V. UNITED STATES.*

President Trump has exercised the power of the Presidency to remove at-

will any principal officer of the United States exercising executive power.  That

act of the President may violate the terms of a statute, but it is well supported,

particularly by *Myers v. United States*, 272 U.S. 52 (1926).  There, the Supreme

Court ruled that Congress could not condition the removal of a principal officer

exercising executive power on the advice and consent of the Senate.  The general

principle that should be drawn from that case is that Congress may place no

conditions on his power to remove principal officers who exercise executive

power, including as with the NLRA.

---

[4]  Judge Beryl Howell's comments about January 6 protestors have been widely reported.  *See, e.g.,* K. Cheney, "Federal judges in Jan. 6 cases slam Trump's pardons," *Politico* (Jan. 22, 2025) ("'No "national injustice" occurred here, just as no outcome-determinative election fraud occurred in the 2020 presidential election,' U.S. District Judge Beryl Howell wrote in an eight-page order in the case of two Jan. 6 defendants who pleaded guilty to felonies.  'No "process of national reconciliation" can begin when poor losers, whose preferred candidate loses an election, are glorified for disrupting a constitutionally mandated proceeding in Congress and doing so with impunity.'").

7

In reaching the conclusion that Congress could not place restrictions on the President's power to remove principal officers who exercise executive powers, the *Myers* Court provided a detailed historical survey of the drafting and early Congressional interpretation of the President's powers of appointment and removal. From this survey, the Court identified two rationales for reaching its conclusion.

The first rationale is that the President would be unable to fulfil his constitutional duty to ensure that the laws are faithful executed unless he has the power to remove officers who have lost his confidence. *Id*. at 117. The Court in *Myers*, and others since then, have convincingly supported this rationale.

The second rationale offered by the *Myers* Court is that the power to remove is "incident to the power of appointment." *Id*. at 122. This *amicus* brief principally focuses on this second rationale.

Thereafter, the Supreme Court lost sight of the basic principles set out in *Myers* when deciding two cases that should be consider outliers — *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), and *Morrison v. Olson*, 487 U.S. 654 (1988). Those two cases attempted to justify limits placed on Presidents' removal power, although the rationales provided in the two cases are at odds not

8

only with *Myers*, but with each other.  These departures from *Myers* reflect two major deviations from the fundamental design of the U.S. Constitution, whose hallmarks are the separation of powers among the three branches of government and the limited number of enumerated powers of the federal government.

President Trump ably and correctly argues that this case can be resolved in favor of his power to remove principal officers who exercise executive power without overruling either *Humphrey's Executor* or *Morrison*, and as a lower federal court, that may be all that this court can do.  However, as this case moves toward the U.S. Supreme Court, these *amici* urge that it be viewed as an opportunity to set out constitutionally correct principles in order to lay the groundwork to correct the departure from the *Myers* path taken in *Humphrey's Executor* and *Morrison*.

The district court incorrectly asserts that "an unbroken line of cases since *Humphrey's Executor* has reinforced the constitutionality of removal restrictions on multimember expert boards...."  *Wilcox* at *25.  However, in the past 15 years, the Supreme Court has taken small but important steps to return to the principles undergirding *Myers*.  In *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010), the Court ruled that Congress could not impose two layers of for-cause removal restrictions.  In *Seila Law LLC v.*

9

*Consumer Financial Protection Bureau*, 591 U.S. 197 (2020), the Court ruled that

Congress could not create an independent agency headed by one person removable

only for cause.  Neither of these decisions formally overruled *Humphrey's*

*Executor* or *Morrison*, but they certainly did not reaffirm *Humphrey's Executor*, as

incorrectly asserted by the district court.  *See Wilcox* at \*25.  Rather, these two

cases should be, at minimum, viewed as harbingers of a return to first principles of

constitutional interpretation, calling into question the continuing validity of

*Humphrey's Executor* and *Morrison*.

## III.   THE PRESIDENT'S POWER OF REMOVAL MAY NOT BE EXPRESSLY STATED IN THE CONSTITUTION, BUT IT IS NEVERTHELESS SOLIDLY GROUNDED.

### A.  The Constitutional Role of a President.

The President of the United States is the only official in America who is

elected by the participation of all the People.[5]  Thus, whether pundits may

characterize the magnitude of his election as sufficient to be termed a "mandate,"

the President has the authority and obligation to advance the platform on which he

ran.  Article II provides:  "The executive Power shall be vested in a President of

the United States of America."  Art. II, § 1.  One of the duties of his office is to

---

[5]  President Trump won both the Electoral College (312 to 226) and the popular vote, with over 77 million voters, and won all seven battleground states.

10

"take Care that the Laws be faithfully executed." Art. II, § 3. The President takes

an oath swearing: "I will faithfully execute the Office of President of the United

States, and will to the best of my Ability, preserve, protect and defend the

Constitution of the United States." Art. II, § 1. Presidential races are hotly

contested because of the office's vast powers. Given these vast responsibilities,

including his role often being described as leader of the free world, one would

assume that he would have all of the powers reasonably necessary to succeed.

　　The basic power a President would need to possess is the ability to recruit

and place persons in his Administration who share his vision and who could assist

him in carrying out his responsibilities. This personnel power would necessarily

include both appointing and removing subordinate officials. Without that power,

no President would be able to perform his constitutional duties to exercise

"executive power," to "take Care that the Laws be faithfully executed," and to

"preserve, protect and defend the Constitution." Yet the district court had no

problem with approving ill-advised Congressional legislation which for all too

long has usurped the legitimate powers of the President by labeling them "checks

and balances." While those serving in the bureaucracy may have cooperated with

the agenda of prior Presidents, few if any were hampered by the internal resistance

faced by President Trump. The refusal of thousands of federal officials to help

11

implement the agenda that 77 million voters supported has made it necessary for the President to take on this battle and seek to return to the original constitutional plan.

The district court colorfully describes limits on the power to remove federal officials as a way to prevent the President from reigning and ruling as a "king." Actually, it is the limits on removal which the district court so admires that have a very different and dangerous effect. Those limits render the President unable to implement the platform on which he was elected. Without the ability to clear the decks of those who disagree with him, and replace them with those who would help him carry out his agenda, there is conflict and paralysis.[6] The failure of Presidents to implement their platforms is one of the main reasons that the American People have so little faith in government, so many are disaffected, and so many do not participate. No matter for whom they vote, most policies stay the same.[7]

---

[6] The onslaught of injunctions entered by federal district judges has certainly done its part to contribute to the chaos. *See* Appendix A.

[7] *See* E. Fitz & K. Saunders, "Distrusting the Process: Electoral Trust, Operational Ideology, and Nonvoting Political Participation in the 2020 American Electorate," 88 *Public Opinion Quarterly* 843 (July 16, 2024).

12

One of the principal reasons that Presidents can be stymied in making reforms is that there exists an establishment with the power to erect many impediments to preserve their power. All courts, but particularly the Supreme Court and the courts of appeals need to ensure that those in the federal judiciary who believe that the wrong candidate was elected do not wield their vast power in a partisan manner to block the agenda of a new president. President Trump has now been in office for about 70 days, and as of the date of the preparation of this brief, the Trump Administration has been subjected to **49 known district court injunctions**, including the one challenged here. *See* Appendix A. Increasingly, it appears that many federal judges view themselves as serving the country by using their equitable powers to block the agenda of the elected President. The American people will draw their own conclusions as to whether the President elected by vote of all the people, or unelected federal judges, should be running the executive branch of government.

**B. The Necessity of Implicit Powers.**

Based on the clear, complete, and unequivocal vesting of executive power, most discussions of Presidential power are focused on his "executing" specific constitutional or statutory powers. However, authority for the President to perform many of his powers cannot be sourced to any specific constitutional

13

provision or particular section of the U.S. Code.  Utilization of these implicit

powers is essential to the operation of the Executive Branch of government.  It is

essential for a President to have such implicit powers in order to carry out his

constitutional duties as president.

Stated another way, the President is given the "executive Power" of the

federal government, but most of the President's powers enumerated in Article II

are not executive in the sense of enforcing the law.  Appointing and removing

officers does not constitute execution of the laws in the sense of enforcing them,

and thus to court apparently believed they could be limited, but they are a

necessary means to ensure that the laws are faithfully executed.

It is true that the Constitution grants Congress a before-the-fact check on the

President's appointment powers through the "advise and consent" requirement for

principal offices.  And it is true that the Constitution grants Congress an after-the-

fact check on the President's appointments through the impeachment power.

However, there is no other Constitutional power given to Congress to limit the

removal of officials exercising executive branch powers.  Although the NLRB has

been with us for 90 years, longevity does not equate to legitimacy.  *Dred Scott v.*

14

*Sandford*[8] was considered good law, and so also was *Korematsu v. United States*,[9] and more recently *Roe v. Wade* for about 50 years.[10]  None were good law, even while in effect.

It is curious that the same lawyers who would bar the President from removing those exercising power in multimember agencies have no problem with the Congress exercising powers to regulate Americans by finding penumbras and emanations in the Constitution, including giving virtually unlimited application to the Commerce Clause,[11] the Spending Power and General Welfare Clause,[12] the

---

[8]  60 U.S. 383 (1857).

[9]  323 U.S. 214 (1944).

[10]  410 U.S. 113 (1973).

[11]  *See, e.g., Wickard v. Filburn*, 317 U.S. 111 (1942), which has never been overruled, but which on one occasion was described by this Court as "perhaps the most far reaching example of Commerce Clause authority over intrastate activity" which operated to "greatly expand[] the previously defined authority of Congress under that Clause...." *United States v. Lopez*, 514 U.S. 549, 560, 556 (1995). Justice Thomas asserted that *Wickard's* "substantial effect on interstate commerce" test was "far removed from both the Constitution and from [this Court's] early case law." *Id.* at 601 (Thomas, J., concurring).

[12]  *See, e.g., Helvering v. Davis*, 301 U.S. 619, 640-42 (1937), where the Court defaulted on its obligation to rule whether a particular spending measure was for the "general welfare" by deferring to Congress's discretion — a rule still followed. *See also* Federalist No. 41 ("It has been urged and echoed, that the power 'to lay and collect taxes, duties, imposts, and excises, to pay the debts, and provide for the common defense and general welfare of the United States,' amounts to an unlimited commission to exercise every power which may be

15

Taxing Power,[13] and the Necessary and Proper Clause, discussed *infra*.

The powers of appointment and removal are both essential means for ensuring the execution of the office of the Presidency, but they are not executive powers in the sense of enforcing the law. These powers are inherent in any organization as well as countries, but are subject to the restriction of those who are founders of an organization or of the country.

Many examples can be drawn from Article II of powers that the people have delegated to the President that are not executive by nature in the sense of enforcing the law. The power to make treaties is a foreign affairs power and is neither executive nor legislative by nature. Until a treaty is made, there is no law to enforce; and a treaty cannot be made by legislation. Similarly, the power to recommend legislation to Congress, like the veto power, is generally considered to be legislative in nature. Likewise, the powers of appointment and removal are not

———————————

alleged to be necessary for the common defense or general welfare.... For what purpose could the enumeration of particular powers be inserted, if these and all others were meant to be included in the preceding general power?").

    [13] *See NFIB v. Sebelius*, 567 U.S. 519 (2012), where even five justices (Roberts, Scalia, Kennedy, Thomas, and Alito) found the individual mandate in the Patient Protection and Affordable Care Act (known as "Obamacare") not authorized by the Commerce Clause or Necessary and Proper Clause, five justices (Roberts, Ginsburg, Breyer, Sotomayor, and Kagan) found it to be a lawful exercise of the Taxing Power.

16

executive in the sense of enforcing the laws.  Thus, they are distinct from legislative, executive, and judicial powers.  Another inherent power that each branch of government possesses is the power to make rules and regulations for their internal operation.[14]

The Supreme Court has recognized the power of organizations formed by contract, and those that preexist the state, to appoint and remove officers of their own choosing to ensure proper functioning of those organizations in pursuance of their respective missions.  In *Trustees of Dartmouth College v. Woodward*, 17 U.S. 518 (1819), the Supreme Court recognized the preexisting right or general principle of law to form a voluntary organization by contract and to appoint its officers to execute the terms of its agreement.  Similarly, in *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171, 184, 191 (2012), the Supreme Court recognized the preexisting right of churches to appoint and remove officers according to the tenets of their faith.

---

[14]  In *Marbury v. Madison*, 5 U.S. 137 (1803), Chief Justice Marshall noted that in deciding cases the Court is bound not only by the Constitution and acts of Congress but by general principles of law.  *Id*. at 170.  The Declaration of Independence identifies the source of authority for these general principles of law, also known as "the Laws of Nature and of Nature's God," as the "Creator" and "Supreme Judge of the World."

17

The people have placed certain conditions on the President's inherent power of appointment.  *See* Article II, § 2.  Otherwise, the President has the inherent power to appoint officers of his own choosing.  Similarly, he has the power to remove officers subject to limitations that the people place on him.  The only limit on his power of removal is that Congress may remove an officer through the impeachment process that the President would rather retain in office.  Article I, § 2, cl. 6; Article I, § 3, cl. 6-7; Article II, § 4.

The only possible source of a Congressional power to limit the President's removal power is the Necessary and Proper Clause.  *See, e.g.*, *Myers*, 272 U.S. at 180-81 (McReynolds, J., dissenting); *Seila Law Inc*, 591 U.S. at 267, 295-96 (Kagan, J., dissenting).  That Clause states:

> To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.  [Article I, § 8, cl. 18.]

It is generally recognized that this Clause gives Congress the power to establish the great departments of government and offices necessary to operate them.  In *Marbury*, the Court recognized the power of Congress to establish the State Department and office of Secretary of State.  Congress had the power to channel the Secretary of State's discretion in the operation of that office, as

18

evidenced by the particular laws giving Marbury a right to his commission as

justice of the peace for the District of Columbia. *Marbury*, 5 U.S. at 170. The

*Marbury* Court recognized a general principle of law that the Constitution is

supreme and paramount law because it was adopted by the people, who exercised

their original will in pursuance to their original right to adopt it. *Id*. at 176. The

general principle of law that the head of an organization has an inherent power of

appointment and removal is operative. Although Congress may believe that

independent agencies are "necessary" (*i.e.*, useful or convenient), they are, rather,

not "proper." The district court asserts that restrictions on the removal power

provide essential checks and balances, but that is only a pretext to justify allowing

Congress to usurp an inherent power of the Presidency required for real separation

of powers and federalism.

## IV.   THE EXPANSION OF FEDERAL POWERS HAS INCENTIVIZED CONGRESS TO LIMIT THE PRESIDENT'S REMOVAL POWER, BUT THAT DOES NOT MAKE IT CONSTITUTIONAL.

All officers and employees in the executive branch are duty bound to carry

out lawful policies at the chief executive's direction. The district court's fear and

consternation that so much power resides in one person is not due to the

President's constitutional power to remove officials exercising executive

authority. Rather the root problem is that Congress, with the collaboration of the

19

courts, has turned the United States government from one of enumerated powers into one of general powers.

In order to govern this legislatively created Leviathan, Congress has created the administrative state largely with a willing President and compliant judiciary, thus greatly compromising the doctrine of separation of powers.  To place some limits on the discretion of the President over such a vast enterprise, Congress created the independent agency, experimented with an office of independent counsel, and established a civil service system.  However, the desire of Congress to exceed its constitutional powers, and the willingness of the judiciary to permit it, should not justify denying to the President the rightful powers of his office, especially when they are so much in alignment with the Supreme Court's interpretation in *Myers v. United States*.

The most dramatic difference between the state governments and the federal government is that the states have hundreds of officers exercising executive power, who are elected directly by and are accountable to the people, while the federal government has just one — the President of the United States.  The federal government has a 4.4 million-strong workforce.  *See Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 520 (Breyer, J.,

20

dissenting).  Undoubtedly, most are employed in the executive branch, and, therefore, serve at the direction of the President.

It is little wonder that Congress, with the condonation of the federal courts, has devised several means designed to place some restraints on the exercise of the President's executive power.  One of the chief means, which is at issue in this case, is the invention of the independent agency.  These agencies, like the NLRB, are typically headed by a multi-membered decision-making body exercising executive, legislative, and judicial types of power.  They are denominated "independent agencies" because they do not serve at the pleasure of the President, and their principal officers or agency heads can be removed from office only for cause, yet they wield executive, legislative, and judicial power.

The rise of these powerful agencies marks a radical departure from the foundational doctrine of the separation of powers by which the legislative, executive, and judicial powers are assigned to three separate branches of government.  Madison wrote that "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands ... may justly be pronounced the very definition of tyranny."  The Federalist No. 47.  To this principle, the courts have turned a blind eye.

21

In *Mistretta v. United States*, 488 U.S. 361, 380-81 (1989), the Supreme Court actually appealed to The Federalist No. 47 to justify a "flexible approach to separation of powers" such as it had approved in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935). Rather than confine itself to a formalistic approach to interpreting the Constitution, the Court took a functionalist approach. The powers of government need not be kept separate in accordance with the text of the Constitution, and the powers can be realigned so long as the respective powers of three branches were not unduly aggrandized or diminished. *See Mistretta*, 488 U.S. at 380-82.

The demise of the doctrine of separation of powers accompanied the evisceration of another hallmark of American constitutionalism — the doctrine of enumerated powers. Perhaps no Supreme Court case is so emblematic of the demise of federalism as *Wickard v. Filburn*, 317 U.S. 111 (1942). In *United States v. Lopez*, 514 U.S. 549 (1995), the Supreme Court started "with first principles" by quoting The Federalist No. 45: "'the powers delegated by the proposed Constitution to the federal government are few and defined.'" *Id*. at 552. Despite that promising start, the Court affirmed *Wickard*, although it offered a somewhat more restrictive version of the substantial effects test.

22

Between the Court's Commerce Clause and Tax and Spending Clause jurisprudence, there are few areas of life that Congress cannot effectively control if it desires. Justice Breyer gave a brief summary of all the subjects Congress now provides, regulates, or administers:

> taxes, welfare, social security, medicine, pharmaceutical drugs, education, highways, railroads, electricity, natural gas, nuclear power, financial instruments, banking, medical care, public health and safety, the environment, fair employment practices, consumer protection and much else besides. [*Free Enterprise Fund* at 520 (Breyer, J., dissenting).]

Nearly every subject Congress cannot reach by the Court's interpretation of the power to regulate interstate commerce, it can reach through the Court's interpretation of the power to tax and spend. Rather than being a government of few and enumerated powers, it is a government with potentially unlimited powers. Yet this expansion of powers does not justify placing unconstitutional limits on the Presidential removal power.

## V.     REMOVAL IN *WILCOX V. TRUMP.*

### A.  *Humphrey's Executor*

In *Humphrey's Executor*, the Supreme Court believed that the FTC exercised only quasi-legislative and quasi-judicial power, but not executive power. But, as the Supreme Court has subsequently acknowledged, the FTC's powers do

23

constitute executive powers as those powers are understood today.  *See Morrison* at 689 n.28.  In other words, *Humphrey's Executor* served the purpose not only of eviscerating the doctrine of separation of powers by sanctioning Congress placing all three powers of government in the same hands, but also of burdening the President's power to faithfully enforce the law.  The Court in *Humphrey's Executor* solved the problem of an apparent inconsistency with *Myers* by claiming only what was called "quasi-judicial" and "quasi-legislative" power had been delegated to the Federal Trade Commission.  In truth, there is nothing "quasi" about these judicial and legislative powers.

Wilcox has argued that the NLRB maintains a separation of executive functions, performed by its General Counsel, from its judicial and rulemaking functions, performed by the Board.  The General Counsel is removable at the President's will, while only members of the Board enjoy for-cause protection from removal.  Complicating the conceptual problem of maintaining the distinction between executive powers on one hand and judicial and legislative powers on the other, the President's counsel argues that the judicial and rulemaking functions of the NLRB are simply a means of exercising executive powers.  To counter the President's argument that the NLRA places rulemaking under the General

24

Counsel, the district court claims that, in general, rulemaking is accomplished through the process of adjudication.

President Trump asked the Court to strike the for-cause removal provision from the NLRA.  He claims that granting this relief does not require overruling *Humphrey's Executor* because it was premised on the claim that the FTC exercised only quasi-legislative and quasi-judicial powers and not executive powers.  Since the NLRB exercises all three powers of government, the facts of this case can be distinguished from *Humphrey's Executor*.

### B.  *Morrison v. Olson*

The Court's opinion in *Morrison* may have led to unintended consequences when it ruled that the Independent Counsel was an inferior officer.  This justified the appointment of the Independent Counsel by someone other than the President and without securing advice and consent of the Senate.  The *Morrison* Court also wrote that it changed its mind about its basis for distinguishing *Humphrey's Executor* from *Myers*.  The Court wrote that Congress could give officers exercising purely executive power for-cause removal protection.  To justify this conclusion, the Court said Congress could place this limit on the President so long as it did not undermine his ability to faithfully execute the law too much.

25

The President easily distinguishes the facts in *Morrison* from his case.  The Independent Counsel in *Morrison* was an inferior officer, but members of the NLRB are admittedly principal officers.  Therefore, the controlling precedent is *Myers*, which involved the removal of a principal officer exercising executive power.  Of course, one can easily distinguish the situation in *Myers* from the situation in this case, but this Court can do better by deciding based on principle.

In *Myers*, the Court had ruled that the President has the power to remove at will principal officers exercising executive powers.  Then, *Humphrey's Executor* distinguished the facts of that case from *Myers*, claiming that Congress had delegated only quasi-judicial and quasi-legislative powers to the FTC.  More recently, *Morrison* acknowledged that the FTC did in fact exercise executive powers.  Although the Independent Counsel in *Morrison* exercised purely executive power, the Supreme Court ruled that Congress could place for-cause removal power in the Attorney General so long as it did not interfere with the President's exercise of his constitutional power too much.

## C.  Recent Cases

The *Myers-Humphrey's-Morrison-Mistretta* line of cases, reasoning, and distinctions the Court has made have the feel not of an integrated body of law, but of a splendid work of sophistry unmoored by principle.  It is impossible to discern

26

whether the Supreme Court's reasoning in *Free Enterprise Fund* (prohibiting two layers of for-cause removal) and *Seila Law, Inc.* (prohibiting an independent agency headed by a single person) constitutes steps in a return to *Myers*.

Obviously, a lower court has no power to overrule *Humphrey's Executor* and *Morrison*, but it can rule for the President in this case, and it should, without running afoul of the holdings in those cases. But the lower court can highlight the implications that the Supreme Court's jurisprudence has had on the President's exercise of his removal power. The district court has faulted the President as wanting to exercise the powers of a king in claiming the right to remove officers exercising executive power at-will. No fault has been placed on Congress for the impact its laws have had of centralizing power in the federal government. The basic problem is not the President's claim of power to remove principal executive branch officers at will, but rather that he is attempting to shrink the size of a bloated government which many seek to protect.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's orders.

27

Respectfully submitted,

*/s/ William J. Olson*

_____

| | |
|---|---|
| JEFFREY TUOMALA | WILLIAM J. OLSON* |
| 114 Creekside Lane | JEREMIAH L. MORGAN |
| Winchester, VA 22602-2429 | WILLIAM J. OLSON, P.C. |
| | 370 Maple Avenue West, Suite 4 |
| | Vienna, VA 22180-5615 |
| | (703) 356-5070 |
| | wjo@mindspring.com |
| | Counsel for *Amici Curiae* |
| March 29, 2025 | *Attorney of record |

App.1

**FEDERAL COURT INJUNCTIONS AGAINST
THE TRUMP ADMINISTRATION**
(January 20, 2025 through March 28, 2025)

### BIRTHRIGHT CITIZENSHIP

1. *New Hampshire Indonesian Community Support v. Trump*, No. 1:25-cv-00038 — The District of New Hampshire enjoined any enforcement of Trump's birthright citizenship EO within the state.

2. *Washington v. Trump*, No. 2:25-cv-00127 — The District of Washington enjoined any enforcement of Trump's birthright citizenship EO nationwide.

3. *New Jersey v. Trump; Doe v. Trump*, No. 1:25-cv-10139 — The District of Massachusetts enjoined any enforcement of Trump's birthright citizenship EO within the state.

4. *CASA Inc. v. Trump*, 8:25-cv-00201 — The District of Maryland enjoined any enforcement of Trump's birthright citizenship EO nationwide.

### IMMIGRATION

5. *J.G.G. v. Trump*, 1:25-cv-00766 — D.C. district judge James Boasberg ordered flights of gang members and terrorists rerouted back to the United States, and then ordered that Trump cannot deport anyone under the Alien Enemies Act without a hearing.  Upheld by D.C. Circuit, and appealed to SCOTUS.

6. *Chung v. Trump*, No. 1:25-cv-02412 — The Southern District of New York issued a temporary restraining order preventing Trump from deporting a Columbia student for pro-Hamas activism.

7. *Phila. Yearly Meeting of The Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*, No. 8:2025-cv-00243 — Maryland district court enjoined ICE raids in houses of worship.

App.2

8. *M.K. v. Joyce*, 1:25-cv-01935— The Southern District of New York issued a temporary restraining order forbidding the removal of a prisoner from the U.S. to Venezuela until the court could rule on the merits of the removal.

9. *Parra v. Castro*, 1:24-cv-00912 — The District of New Mexico enjoined the transfer of three Venezuelans to Gitmo. They were then removed to their home country instead.

10. *Vizguerra-Ramirez v. Choate*, 1:25-cv-00881— The District of Colorado enjoined the ICE deportation of a Mexican citizen.

**TRANSGENDER**

11. *Talbott v. Trump*, No. 1:25-cv-00240 — Lesbian D.C. district court judge Ana Reyes enjoined Trump's rule preventing "transgender" persons from serving in the military. The case is on appeal to the D.C. Circuit.

12. *PFLAG v. Trump*, 8:25-cv-00337 — The Maryland district court granted an injunction against Trump's order denying federal funding to institutions performing chemical or surgical "transgender" mutilation on minors.

13. *Washington v. Trump*, No. 2:25-cv-00244 — The Washington district court also enjoined Trump's order denying federal funding to institutions performing chemical or surgical "transgender" mutilation on minors.

14. *Ireland v. Hegseth*, No. 1:25-cv-01918 — The New Jersey district court enjoined the Air Force from removing two "transgender" service members pursuant to Trump's order banning "transgender" service members.

15. *Doe v. McHenry; Doe v. Bondi*, 1:25-cv-00286 — A D.C. district judge enjoined the transfer of twelve "transgender women" to men's prisons under Trump's order, and terminating their taxpayer-funded hormone treatments.

16. *Moe v. Trump*, No. 1:25-cv-10195 — The Massachusetts district court enjoined the transfer of a "transgender woman" to a men's prison under Trump's order.

App.3

17. *Jones v. Bondi*, 1:25-cv-401 — D.C. district court enjoined the transfer of three "transgender women" to men's prisons under Trump's order, and terminated their taxpayer-funded hormone treatments.

18. *Shilling v. Trump*, 2:25-cv-00241 — The Washington district court enjoined Trump's order to remove "transgender" service members.

## GOVERNMENT OPERATIONS

19. *Dellinger v. Bessent*, No. 1:25-cv-00385 — The district court for the District of Columbia issued a restraining order invalidating Trump's firing of U.S. special counsel Hampton Dellinger. The order was upheld by the D.C. Circuit Court of Appeals and the Supreme Court, then was temporarily lifted by the Court of Appeals on March 5, pending a final decision on the merits.

20. *American Federation of Government Employees, AFL-CIO v. U.S. Office of Personnel Management*, No. 3:25-cv-01780 — The Northern District of California enjoined Trump's order for six federal agencies to dismiss thousands of probationary employees. The injunction was upheld by the Ninth Circuit.

21. *Wilcox v. Trump*, No. 1:25-cv-00334 — Judge Beryl Howell of the D.C. district court enjoined Trump's firing of Democrat National Labor Relations Board member Gwynne Wilcox, and ordered her reinstated to finish her term.

22. *Harris v. Bessent*, No. 1:25-cv-00412 — The D.C. district court enjoined Trump's firing of Merit Systems Protection Board member Cathy Harris and ordered her reinstated.

23. *American Federation of Government Employees v. Trump*, No. 1:25-cv-00352 — A Trump-appointed D.C. district court judge issued a temporary restraining order against Trump's firing of USAID employees. He later vacated the TRO and denied a preliminary injunction against the firings.

24. *Does 1-9 v. Department of Justice*, No. 1:25-cv-00325 — D.C. district court judge Jia Cobb enjoined Trump from releasing the names of any FBI agents who worked on the January 6 investigation.

App.4

25. *Doctors for America v. U.S. Office of Personnel Management*, No. 1:25-cv-00322 — D.C. district court judge John Banks ordered that CDC and FDA webpages that "inculcate or promote gender ideology" be restored after Trump ordered them removed.

26. *Perkins Coie v. DOJ*, No. 1:25-cv-00716 — D.C. district judge Beryl Howell enjoined Trump's directive barring government agencies doing business with Perkins Coie and banning PC attorneys from federal buildings.

27. *American Federation of Government Employees, AFL-CIO v. Ezell*, No. 1:25-cv-10276 — The District of Massachusetts issued a temporary restraining order against Trump's buyout of federal employees.  The judge later lifted the TRO and denied an injunction, allowing the buyout to go forward.

28. *Maryland v. United States Department of Agriculture*, No. 1:25-cv-00748 — The District of Maryland issued a TRO ordering 38 agencies to stop firing employees and reinstate fired employees.

29. *Does 1-26 v. Musk*, No. 8:25-cv-00462 — Maryland district court ordered DOGE to reinstate email access for fired USAID employees.

30. *American Federation of Teachers v. Bessent*, No. 8:25-cv-00430 — District of Maryland enjoined DOE and Office of Personnel Management from disclosing personal information of employees to DOGE.

31. *American Federation of State, County and Municipal Employees, AFL-CIO v. Social Security Administration*, No. 1:25-cv-00596 — The District of Maryland granted an injunction forbidding the Social Security Administration from providing personal information to DOGE.

32. *Brehm v. Marocco*, No. 1:25-cv-00660— D.C. district court issued a temporary restraining order forbidding Trump from removing Brehm from U.S. African Development Foundation, replacing with Marocco.

33. *American Oversight v. Hegseth*, No. 1:25-cv-00883 — Judge Boasberg of the D.C. district court issued an order "as agreed by the parties," for the government to

App.5

preserve all Signal communications related to the leak to an Atlantic editor of DoD conversations in Houthi strike.

## FUNDING

34. *National Treasury Employees Union v. Vought*, 1:25-cv-00381 — The D.C. district court halted Trump's budget cuts and layoffs at the Consumer Financial Protection Bureau.

35. *AIDS Vaccine Advocacy Coalition v. Department of State*, No. 1:25-cv-00400 — A D.C. district court judge ordered Trump to unfreeze and spend $2 billion in USAID funds. The Supreme Court, in a 5-4 ruling with Justices Alito, Thomas, Kavanaugh, and Gorsuch dissenting, left the order in place.

36. *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 1:25-cv-00333 — The Maryland district court enjoined Trump's order blocking federal funding for DEI programs.

37. *National Council of Nonprofits v. OMB*, No. 1:25-cv-00239 — The Maryland district court blocked Trump's order to pause federal aid while reviewing to determine that it aligned with administration policy.

38. *Massachusetts v. NIH*, No. 1:25-cv-10338 — The Massachusetts district court enjoined Trump's NIH funding cuts.

39. *New York v. Trump*, 1:25-cv-00039 — The Southern District of New York enjoined Trump's order to freeze federal spending while reviewing to determine that it aligned with administration policy.

40. *California v. Department of Education*, No. 0:25-cv-01244 — District of Massachusetts granted a temporary restraining order blocking Trump's withdrawal of funds to schools teaching DEI. The First Circuit denied a motion for stay pending appeal.

41. *RFE/RL, Inc. v. Lake*, No. 1:25-cv-00799 — The D.C. district court issued a temporary restraining order forbidding Trump from cutting funds to Voice of America.

App.6

42. *Massachusetts Fair Housing Ctr. v. HUD*, No. 3:25-cv-30041 — Massachusetts district court enjoined Trump's cuts to HUD grant funding and ordered spending reinstated.

43. *Climate United Fund v. Citibank, N.A.*, 1:25-cv-00698 — D.C. district court issued a temporary restraining order enjoining EPA's Termination of Greenhouse Gas Reduction Fund Grants.

44. *Association of American Medical Colleges v. NIH*, No. 1:25-cv-10340 — District of Massachusetts enjoined Trump's NIH grant funding cuts.

45. *American Association of Colleges for Teacher Education v. McMahon*, 1:25-cv-00702 — Maryland district court issued an injunction requiring reinstatement of terminated education grant funds.

46. *Chicago Women in Trades v. Trump*, No. 1:25-cv-02005 — The Northern District of Illinois entered a temporary restraining order commanding the reinstatement of DEI grants.

47. *Mayor and City Council of Baltimore et al. v. CFPB*, No. 1:25-cv-00458 — District of Maryland issued a TRO preventing Trump from defunding the CFPB.

48. *Association of American Universities v. Department of Health and Human Services*, No. 1:25-cv-10346 — District of Massachusetts issued a nationwide injunction against Trump's NIH funding cuts.

49. *Doe 1 v. Office of the Director of National Intelligence*, No. 1:25-cv-00300 — The Eastern District of Virginia issued an "administrative stay" against firing DEI employees with CIA and DNI.  The court then considered and rejected imposing a TRO to the same effect.

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

IT IS HEREBY CERTIFIED:

1.       That the foregoing Brief *Amicus Curiae* of America's Future, *et al.* in Support of Defendants-Appellants and Reversal complies with the type-volume limitation of Rule 29(a)(5), Federal Rules of Appellate Procedure, because this brief contains 5,879 words, excluding the parts of the brief exempted by Rule 32(f).

2.       This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using WordPerfect version 21.0.0.194 in 14-point Times New Roman.

*/s/ William J. Olson*
_____
William J. Olson
Attorney for *Amicus Curiae*

Dated: March 29, 2025

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing Brief *Amicus Curiae* of America's Future, *et al*. in Support of Defendants-Appellants and Reversal, was made, this 29th day of March 2025, by the Court's Case Management/ Electronic Case Files system upon the attorneys for the parties.

*/s/ William J. Olson*

_____

William J. Olson
Attorney for *Amicus Curiae*