**ORAL ARGUMENT SCHEDULED MAY 16, 2025**
**No. 25-5057**

# In the United States Court of Appeals for the District of Columbia Circuit

GWYNNE A. WILCOX,
*Plaintiff-Appellee,*

v.

DONALD J. TRUMP, in his official capacity as President
of the United States, et al.,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Columbia
Case No. 25-334 (The Hon. Beryl A. Howell)

## BRIEF FOR PLAINTIFF-APPELLEE

JENNIFER D. BENNETT
GUPTA WESSLER LLP
505 Montgomery Street
Suite 625
San Francisco, CA 94111
(415) 573-0336
jennifer@guptawessler.com

DEEPAK GUPTA
MATTHEW W.H. WESSLER
GREGORY A. BECK
ALISA C. PHILO*
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
deepak@guptawessler.com

April 7, 2025

*Counsel for Plaintiff-Appellee*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

**(A) Parties and Amici**

Gwynne A. Wilcox − Plaintiff-Appellee

Donald J. Trump − Defendant-Appellant

Marvin E. Kaplan − Defendant-Appellant

American Federation of Labor and Congress of Industrial Organizations (AFL-CIO) − Amicus curiae

Americans for Prosperity Foundation − Amicus curiae

America's Future, Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of California, Public Advocate of the United States, Public Advocate Foundation, U.S. Constitutional Rights Legal Defense Fund, and Conservative Legal Defense and Education Fund − Amici curiae

Ariana Cortes and Logan Karam − Amici curiae

Chamber of Commerce of the United States − Amicus curiae

Constitutional Accountability Center − Amicus curiae

Democratic Workplace − Amicus curiae

Florida, Alabama, Arkansas, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Oklahoma, South Carolina, South Dakota, Texas, Utah, West Virginia, and the Arizona legislature − Amici curiae

Former National Labor Relations Board Members − Amici curiae

Jed H. Shugerman − Amicus curiae

Law Professors John C. Coates, Jeffrey N. Gordon, Kathryn Judge, and Lev Menand − Amici curiae

Minnesota, Illinois, Arizona, California, Colorado, Connecticut, Delaware, District of Columbia, Hawaii, Maryland, Massachusetts, Michigan, Nevada, New Jersey,

New Mexico, New York, Oregon, Rhode Island, Vermont, Washington, and Wisconsin – Amici curiae

Separation of Powers Clinic – Amicus curiae

State of Tennessee – Amicus curiae

**(B) Rulings Under Review**

03/06/2025 Order (Judge Beryl A. Howell) – Dkt. 34, JA137-38

03/06/2025 Memorandum Opinion (Judge Beryl A. Howell) – Dkt. 35, JA 139-76

**(C) Related Cases**

This case was before the District Court as case No. 1:25-cv-00334-BAH. The government appealed the District Court's grant of summary judgment, and that appeal is before this Court as No. 25-5057. The special panel consolidated this case for oral argument on the government's stay motion alongside *Harris v. Bessent*, No. 25-5055 (D.C. Cir.).

April 7, 2025                                       Respectfully submitted,

*/s/ Deepak Gupta*
                                       DEEPAK GUPTA
                                                *Counsel of Record*
                                       GUPTA WESSLER LLP
                                       2001 K Street, NW
                                       Suite 850 North
                                       Washington, DC 20006
                                       (202) 888-1741
                                       *deepak@guptawessler.com*

# TABLE OF CONTENTS

Table of authorities.................................................................................. v

Glossary ................................................................................................... xiii

Introduction ................................................................................................ 1

Statement of the issues ............................................................................. 4

Statutes....................................................................................................... 4

Statement of the case ................................................................................ 5

    I.    Legal background..............................................................................5

        A.    The Supreme Court has long recognized Congress's authority to limit the presidential removal power......................5

        B.    Congress created the NLRB as an independent, multimember adjudicatory body ............................................. 9

    II.    Factual and procedural background .................................................. 14

Summary of argument............................................................................. 16

Argument .................................................................................................. 19

    I.    The district court was correct to reject the President's attempt to use Article II to justify his blatantly illegal firing of Ms. Wilcox ......................................................................................... 19

        A.    The Board's removal restrictions are constitutional ................ 19

        B.    The government's contrary arguments are wrong on the law and the facts.................................................................... 27

    II.    The district court did not abuse its discretion in awarding declaratory and injunctive relief..........................................................34

        A.    At a minimum, Ms. Wilcox is entitled to a declaratory judgment ................................................................................34

        B.    Since the time of Blackstone, courts have recognized their authority to remedy illegal removal .......................................... 35

C.    The district court did not abuse its discretion in finding
an injunction appropriate here ................................................. 41

Conclusion ........................................................................................ 48

# TABLE OF AUTHORITIES

## Cases

*Amalgamated Utility Workers v. Consololidated Edison Co. of New York*,
　　309 U.S. 261 (1940) ................................................................ 9

*American Hospital Association v. NLRB*,
　　499 U.S. 606 (1991) .............................................................. 14

*American School of Magnetic Healing v. McAnnulty*,
　　187 U.S. 94 (1902) ............................................................... 37

*Anatol Zukerman & Charles Krause Reporting, LLC v. United States Postal Service*,
　　64 F.4th 1354 (D.C. Cir. 2023) ........................................... 34, 41

*Armstrong v. Exceptional Child Center, Inc.*,
　　575 U.S. 320 (2015) .............................................................. 37

*Berry v. Reagan*,
　　1983 WL 538, (D.D.C. 1983) ...................................... 41-43, 46, 47

*Berry v. Reagan*,
　　732 F.2d 949 (D.C. Cir. 1983) ................................................ 41

*Browning-Ferris Industries of California, Inc. v. NLRB*,
　　911 F.3d 1195 (D.C. Cir. 2018) .............................................. 14

*Center for Biological Diversity v. Ross*,
　　480 F. Supp. 3d 236 (D.D.C. 2020) ........................................ 41

*Chamber of Commerce of U.S. v. NLRB*,
　　721 F.3d 152 (4th Cir. 2013) .......................................... 11, 12, 14

*Clinton v. Jones*,
　　520 U.S. 681 (1997) .......................................................... 17, 34

*Collins v. Yellen*,
　　594 U.S. 220 (2021) .............................................................. 23

*Consumers' Research v. CPSC*,
　　91 F.4th 342 (5th Cir. 2024) .............................................. 24, 32

*Dish Network Corp. v. NLRB,*
    953 F.3d 370 (5th Cir. 2020) .................................................................. 28

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ................................................................................ 34

*Free Enterprise Fund v. Public Company Accounting Oversight Board,*
    561 U.S. 477 (2010) .......................................................................... 21, 30

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.,*
    527 U.S. 308 (1999) ............................................................................... 37

*Horn & Hardart Co. v. National Rail Passenger Corp.,*
    843 F.2d 546 (D.C. Cir. 1988) ............................................................... 38

*Humphrey's Executor v. United States,*
    295 U.S. 602 (1935) ............................................ 2, 7, 15, 16, 21, 25, 28

*In re NLRB,*
    304 U.S. 486 (1938) ............................................................................... 13

*In re Sawyer,*
    124 U.S. 200 (1888) ............................................................................... 36

*Juliana v. United States,*
    947 F.3d 1159 (9th Cir. 2020) ............................................................... 36

*Kalbfus v. Siddons,*
    42 App. D.C. 310 (D.C. Cir. 1914) ................................................... 39, 40

*Leachco, Inc. v. CPSC,*
    103 F.4th 748 (10th Cir. 2024) ......................................................... 24, 31

*League of Women Voters of United States v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ............................................................. 44, 46

*Loper Bright Enterprises v. Raimondo,*
    603 U.S. 369 (2024) ............................................................................... 29

*Mackie v. Bush,*
    809 F. Supp. 144 (D.D.C.) ................................................................ 42, 47

*Mackie v. Clinton,*
  10 F.3d 13 (D.C. Cir. 1993) ................................................................42

*Magnetsafety.org v. CPSC,*
  129 F.4th 1253 (10th Cir. 2025) ..........................................................24

*Marbury v. Madison,*
  5 U.S. (1 Cranch) 137 (1803) ..................................................... 3, 6, 39

*Meta Platforms, Inc. v. FTC,*
  2024 WL 1549732 (D.C. Cir. Mar. 29, 2024)........................................24

*Mistretta v. United States,*
  488 U.S. 361 (1989) ............................................................................. 19

*Morrison v. Olson,*
  487 U.S. 654 (1988) ..........................................................................8, 30

*Myers v. United States,*
  272 U.S. 52 (1926) ...........................................................................5, 19

*National Association of Manufacturers v. NLRB,*
  717 F.3d 947 (D.C. Cir. 2013) ............................................................. 13

*National Security Archive v. CIA,*
  104 F.4th 267 (D.C. Cir. 2024) ................................................. 3, 24, 31

*New Process Steel, L.P. v. NLRB,*
  560 U.S. 674 (2010) ............................................................................42

*Nken v. Holder,*
  556 U.S. 418 (2009) ............................................................................44

*NLRB v. Fansteel Metallurgical Corp.,*
  306 U.S. 240 (1939) ............................................................................. 9

*NLRB v. Noel Canning,*
  573 U.S. 513 (2014)............................................................................20

*Noble v. Union River Logging Railroad Co.,*
  147 U.S. 165 (1893) ........................................................................... 40

*NLRB v. United Food & Commercial Workers Union, Local 23, AFL-CIO*,
　484 U.S. 112 (1987) ............................................................................ 10, 11

*Powell v. McCormack*,
　395 U.S. 486 (1969) ........................................................................... 38

*R. v. Blooer* (1760)
　97 Eng. Rep. 697 (KB) ...................................................................... 39

*R. v. Mayor and Alderman of Doncaster* (1752)
　96 Eng. Rep. 795 (KB) ...................................................................... 39

*R. v. Mayor of Liverpool* (1759)
　97 Eng. Rep. 533 (KB) ...................................................................... 39

*Salleh v. Christopher*,
　85 F.3d 689 (D.C. Cir. 1996) ............................................................ 34

*Salleh v. Christopher*,
　876 F. Supp. 297 (D.D.C. 1995) ........................................................ 34

*Sampson v. Murray*,
　415 U.S. 61 (1974) .................................................................. 35, 37, 43

*Seila Law LLC v. CFPB*,
　591 U.S. 197 (2020) ........................ 8, 15, 16, 19, 21-23, 26, 30, 31

*Severino v. Biden*,
　71 F.4th 1038 (D.C. Cir. 2023) ................................... 3, 18, 35, 36

*Soucie v. David*,
　448 F.2d 1067 (D.C. Cir. 1971) ....................................................... 35

*Starbucks Co. v. McKinney*,
　602 U.S. 339 (2024) .......................................................................... 13

*Stern v. South Chester Tube Co.*,
　390 U.S. 606 (1968) ......................................................................... 40

*Swan v. Clinton*,
　100 F.3d 973 (D.C. Cir. 1996) ............................................. 18, 35, 36, 40

*UAW v. Russell,*
    356 U.S. 634 (1958) ................................................................46

*United States v. Wilson,*
    290 F.3d 347 (D.C. Cir. 2002)...........................................34

*Vaca v. Sipes,*
    386 U.S. 171 (1967) ......................................................11, 25

*Vitarelli v. Seaton,*
    359 U.S. (1959)...................................................................37

*White v. Berry,*
    171 U.S. 366 (1898) .....................................................36, 38

*Wiener v. United States,*
    357 U.S. 349 (1958) .........................................8, 16, 22, 25, 27

*Wilkinson v. Legal Services Corp.,*
    27 F. Supp. 2d 32 (D.D.C. 1998)......................................45

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) .....................................................20, 34

*Zivotofsky v. Kerry,*
    576 U.S. 1 (2015) ...............................................................19

## Constitutional provisions

U.S. Const. art. II, § 2, cl. 2 ..................................................5

## Statutes and regulations

28 U.S.C. § 2201..................................................................34

28 U.S.C. § 2202..................................................................38

29 C.F.R. § 103.1..................................................................14

29 C.F.R. § 103.2..................................................................14

29 C.F.R. § 103.3..................................................................14

29 U.S.C. § 153........................................ 1, 4, 8-12, 15, 24-26, 28

29 U.S.C. § 154 ..................................................................................... 12

29 U.S.C. § 156 ........................................................................ 13, 25, 29

29 U.S.C. § 157 ........................................................................................ 9

29 U.S.C. § 158 ........................................................................................ 9

29 U.S.C. § 159 ........................................................................................ 9

29 U.S.C. § 160 ........................................................... 9, 12, 13, 25, 28

29 U.S.C. § 661 ........................................................................................ 8

30 U.S.C. § 823 ........................................................................................ 8

39 U.S.C. § 202 ........................................................................................ 8

39 U.S.C. § 502 ........................................................................................ 8

42 U.S.C. § 1975 ...................................................................................... 8

42 U.S.C. § 5841 ...................................................................................... 8

42 U.S.C. § 7171 ...................................................................................... 8

42 U.S.C. § 7412 ...................................................................................... 8

45 U.S.C. § 154 ........................................................................................ 8

46 U.S.C. § 46101 .................................................................................... 8

49 U.S.C. § 1111 ...................................................................................... 8

49 U.S.C. § 1301 ...................................................................................... 8

5 U.S.C. § 1202 ........................................................................................ 8

5 U.S.C. § 7104 ........................................................................................ 8

Federal Reserve Act,
     Pub. L. No. 63-43,
     ch. 6, § 10, 38 Stat. 251 (1913) ................................................... 6

Federal Trade Commission Act,
　　Pub. L. No. 63-203, ch. 311, § 1, 38 Stat. 717 (1914)...................................................7

Interstate Commerce Act,
　　Pub. L. No. 49-41, ch. 104, § 11, 24 Stat. 379 (1887)..........................................6, 20

**Board decisions**

*East Freight Logistics, LLC,*
　　373 NLRB 7 (2023) ...............................................................46

*IAMAW, District Lodge No. 160,*
　　373 NLRB 39 (2024) ...............................................................46

*North Atlantic States Regional Council of Carpenters,*
　　373 NLRB 27 (2024) ...............................................................46

*Regional Ready Mix, LLC & Brand X, LLC,*
　　373 NLRB 56 (2024) ...............................................................46

*RFO808,*
　　373 NLRB 60 (2024) ...............................................................46

**Other authorities**

1 Annals of Congress (1834) (Joseph Gales ed., 1834) .................................................. 6

3 William Blackstone,
　　*Commentaries* ...............................................................18, 39

Emma Barudi,
　　*An Assumed Tradition: How the 3-2 Balance of the NLRB Is More Than the*
　　*Sum of Its Appointments and an Argument for Its Continuation,*
　　26 N.Y.U. J. Legis. & Pub. Pol'y 817 (2023) ........................................................ 10

Marshall J. Breger & Gary J. Edles,
　　*Established by Practice: The Theory and Operation of Independent Federal*
　　*Agencies,* 52 Admin. L. Rev. 1111 (2000) ...............................................................20

Collective-Bargaining Units in the Health Care Industry,
　　54 Fed. Reg. 16336-01 (May 22, 1989) ................................................................ 14

Kirti Datla & Richard L. Revesz,
  *Deconstructing Independent Agencies (and Executive Agencies)*,
  98 Cornell L. Rev. 769 (2013) ........................................................ 6, 7, 9, 12, 24

Louis Jaffe & Edith Henderson,
  *Judicial Review and the Rule of Law: Historical Origins*,
  72 L.Q. Rev. 345 (1956) .................................................................... 39

Jeffrey S. Lubbers,
  *The Potential of Rulemaking by the NLRB*,
  5 FIU L. Rev. 411 (2010) ................................................................... 13, 14

J. Warren Madden,
  *Origin and Early Years of the National Labor Relations Act*,
  18 Hastings L.J. 571 (1967) ............................................................... 8

NLRB,
  1 *Legislative History of the National Labor Relations Act* (1949) ..................................... 12

NLRB,
  20 Fed. Reg. 2175 (Apr. 6, 1955) ....................................................... 28

NLRB,
  *First Annual Report of the National Labor Relations Board* (1936) ..................... 21, 25, 29

Arnold Ordman,
  *Fifty Years of the NLRA: An Overview*,
  88 W. Va. L. Rev. 15 (1985) .............................................................. 9, 11

Franklin D. Roosevelt,
  President of the United States, Statement on Signing the National
  Labor Relations Act (July 5, 1935) ................................................... 21, 24

Jonathan B. Rosenblum,
  *A New Look at the General Counsel's Unreviewable Discretion Not to Issue a
  Complaint under the NLRA*,
  86 Yale L.J. 1349 (1977) ................................................................. 26

The Federalist No. 77 ......................................................................... 6

Harry S. Truman,
  President of the United States, Veto of the Taft-Hartley Labor Bill
  (June 20, 1947) ............................................................................. 29

# GLOSSARY

| | |
|---|---|
| **CFPB** | Consumer Financial Protection Bureau |
| **FTC** | Federal Trade Commission |
| **ICC** | Interstate Commerce Commission |
| **JA** | Joint Appendix |
| **NLRA** | National Labor Relations Act |
| **NLRB** | National Labor Relations Board |

# INTRODUCTION

This case challenges President Trump's unlawful removal of plaintiff Gwynne Wilcox from her position as a duly confirmed member of the National Labor Relations Board—the first time "in the ninety years since the NLRB's founding" that a member has been removed. JA148. President Trump's unprecedented decision to fire Ms. Wilcox openly defies the plain language of the National Labor Relations Act, ninety years of Supreme Court precedent, and more than a century of settled practice. It also deprives the Board of a quorum, upsetting the status quo and putting an immediate end to the agency's critical, congressionally mandated work.

The government admits that the President fired Ms. Wilcox without identifying any "neglect of duty or malfeasance in office," and without providing "notice and [a] hearing," as the NLRA requires. 29 U.S.C. § 153(a). It has thus rightly "concede[d] that removal of plaintiff as a Board Member violates the terms of the applicable statute." JA143. The government attempts to justify its "blatant violation" of the statute, *id.*, with an aggressive new interpretation of Article II, under which the President "has authority to fire whomever he wants within the Executive branch, overriding any … law in his way." JA142. But this argument, as the district court recognized, is directly "contrary to Supreme Court precedent and over a century of practice." JA148. Indeed, Congress created the NLRB shortly after the Supreme Court in *Humphrey's Executor v. United States* upheld a virtually identical limit on the

President's removal power, 295 U.S. 602, 619 (1935). Congress modeled the new agency on those upheld provisions—just as it has for dozens of agencies responsible for many of the government's critical functions.

We recognize that a majority of the special panel concluded that *Humphrey's Executor* likely does not apply here. But it did so by constraining *Humphrey's Executor* to its specific facts—effectively holding that the decision is no longer good law. As Judge Millett put it, the panel decision "rewrite[s] controlling Supreme Court precedent" and "announce[s] a revolution in the law that the Supreme Court has expressly avoided." Stay Op. at 62 (Millett, J., dissenting).[1] The decision also "put[s] this court in direct conflict with" the Fifth and Tenth Circuits and "openly calls into question the constitutionality of dozens of federal statutes conditioning the removal of officials on multimember decision-making bodies—everything from the Federal Reserve Board and the Nuclear Regulatory Commission to the National Transportation Safety Board and the Court of Appeals for Veterans Claims." *Id.*

Any such revolution in the law—which would create chaos by upending ninety years of precedent on which Congress structured dozens of federal agencies—must come, if at all, from the Supreme Court. But the "Supreme Court has repeatedly stated that it was not overturning the precedent established in *Humphrey's*

---

[1] For ease of reference, we refer to the PDF pagination of the special panel's Order.

*Executor* and *Wiener* for multimember adjudicatory bodies." En Banc Order at 2. This Court "is charged with following case law that directly controls a particular issue, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Nat'l Sec. Archive v. CIA*, 104 F.4th 267, 272 n.1 (D.C. Cir. 2024). Because the Supreme Court has gone out of its way not to overrule *Humphrey's Executor*, this Court is "obligated to follow" it. *Id.*

As to relief, the government does not question this Court's authority to grant Ms. Wilcox's request for a declaratory judgment that the removal was unlawful. Opening Br. 40 n.7. There is thus no dispute that—assuming Ms. Wilcox prevails on the merits—this Court should affirm that portion of the final judgment. And the government's argument that the district court lacked authority to enforce the law is (like its merits argument) foreclosed by precedent. As this Court has held, a district court has the power to "enjoin subordinate executive officials to reinstate a wrongly terminated official." *Severino v. Biden*, 71 F.4th 1038, 1042-1043 (D.C. Cir. 2023). The existence of such a remedy has been recognized—whether in law or in equity—since Blackstone and *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 173 (1803).

Finally, the district court didn't abuse its discretion in finding the criteria for an injunction satisfied here, where a "nakedly illegal" removal effectively shuts down a federal agency. JA39. Employers have already seized on the NLRB's lack of a quorum to argue that the agency lacks authority to recognize unions even when a

majority of workers voted to unionize. To prevent further needless disruption to protections essential to workers, employers, and the broader public, this Court should affirm the decision below.

## STATEMENT OF THE ISSUES

1. Can Congress constitutionally limit the President's removal of Board members of the NLRB to cases of "neglect of duty or malfeasance in office"?

2. Does the district court have authority to remedy the President's violation of the law?

## STATUTES

29 U.S.C. § 153(a) provides:

> **Creation, composition, appointment, and tenure; Chairman; removal of members** – The National Labor Relations Board (hereinafter called the "Board") created by this subchapter prior to its amendment by the Labor Management Relations Act, 1947 [29 U.S.C. 141 et seq.], is continued as an agency of the United States, except that the Board shall consist of five instead of three members, appointed by the President by and with the advice and consent of the Senate. Of the two additional members so provided for, one shall be appointed for a term of five years and the other for a term of two years. Their successors, and the successors of the other members, shall be appointed for terms of five years each, excepting that any individual chosen to fill a vacancy shall be appointed only for the unexpired term of the member whom he shall succeed. The President shall designate one member to serve as Chairman of the Board. Any member of the Board may be removed by the President, upon notice and hearing, for neglect of duty or malfeasance in office, but for no other cause.

29 U.S.C. § 153(d) provides:

> **General Counsel; appointment and tenure; powers and duties; vacancy** – There shall be a General Counsel of the Board who

4

shall be appointed by the President, by and with the advice and consent of the Senate, for a term of four years. The General Counsel of the Board shall exercise general supervision over all attorneys employed by the Board (other than administrative law judges and legal assistants to Board members) and over the officers and employees in the regional offices. He shall have final authority, on behalf of the Board, in respect of the investigation of charges and issuance of complaints under section 160 of this title, and in respect of the prosecution of such complaints before the Board, and shall have such other duties as the Board may prescribe or as may be provided by law. In case of a vacancy in the office of the General Counsel the President is authorized to designate the officer or employee who shall act as General Counsel during such vacancy, but no person or persons so designated shall so act (1) for more than forty days when the Congress is in session unless a nomination to fill such vacancy shall have been submitted to the Senate, or (2) after the adjournment sine die of the session of the Senate in which such nomination was submitted.

## STATEMENT OF THE CASE

### I.    Legal background

### A.    The Supreme Court has long recognized Congress's authority to limit the presidential removal power.

**1.** The Constitution provides explicit procedures for the "Appointments" of "Officers of the United States." U.S. Const. art. II, § 2, cl. 2. But "[t]here is no express provision respecting removals." *Myers v. United States*, 272 U.S. 52, 109 (1926).[2] The authority to remove executive-branch officials (at least by means other than impeachment) was not discussed at the Constitutional Convention. *Id.* at 109-110. And

---

[2] Unless otherwise noted, all internal quotation marks, citations, alterations, brackets, and ellipses have been omitted from quotations throughout this brief.

the Constitution likewise says nothing about the number and structure of executive-branch departments—leaving those details to Congress.

The founders understood, however, that Congress could impose limits on the President's discretion to remove certain officers. Hamilton assumed that the advice and consent of the Senate "would be necessary to displace as well as to appoint" officers. The Federalist No. 77, at 407. Although Madison disagreed that the Senate played such a direct role, he believed that an executive-branch official exercising adjudicative functions "should not hold his office at the pleasure of the executive." 1 Annals of Cong. 481-82, 636 (1834) (Joseph Gales ed., 1834). And in *Marbury v. Madison*, Chief Justice Marshall, backed by a unanimous Supreme Court, wrote that not all executive officers must be "removable at the will of the Executive." 5 U.S. (1 Cranch) at 162.

**2.** Reflecting this understanding, Congress has a long tradition of creating impartial, expert-driven agencies that are "insulated from outside influence through structural features such as specified terms of tenure and bipartisan membership requirements." Kirti Datla & Richard L. Revesz, *Deconstructing Independent Agencies (and Executive Agencies)*, 98 Cornell L. Rev. 769, 770 (2013). Beginning nearly 150 years ago with the Interstate Commerce Commission, Congress has restricted the President's ability to remove these officers absent "inefficiency, neglect of duty, or malfeasance

in office." Interstate Commerce Act, Pub. L. No. 49-41, ch. 104, § 11, 24 Stat. 379, 383 (1887).

When Congress established the Federal Reserve Board in 1913, for example, it provided that Board members may only be "removed for cause." Federal Reserve Act, Pub. L. No. 63-43, ch. 6, § 10, 38 Stat. 251, 260-61 (1913). Likewise, in creating the Federal Trade Commission in 1914, Congress specified that the agency's members could be removed only "for inefficiency, neglect of duty, or malfeasance in office." Federal Trade Commission Act, Pub. L. No. 63-203, ch. 311, § 1, 38 Stat. 717, 717-18 (1914). Over the following decades, Congress established numerous additional independent agencies with similar for-cause removal protections, including, among others, the Federal Radio Commission in 1927, the Federal Power Commission in 1930, and the Federal Communications Commission in 1934. *See* Datla & Revesz, *Deconstructing Independent Agencies*, 98 Cornell L. Rev. at 771 n.2.

For half a century, these removal protections operated to protect independent agencies without controversy. In 1935, the Supreme Court in *Humphrey's Executor v. United States* unanimously upheld the constitutionality of such protections, holding that Congress had the power to require the President to show "inefficiency, neglect of duty, or malfeasance in office" to remove FTC Commissioners. 295 U.S. at 619. Congress's authority to create multimember regulatory agencies like the FTC, the Court explained, "includes, as an appropriate incident, power to fix the period

7

during which [its members] shall continue, and to forbid their removal except for cause in the meantime." *Id.* at 629.

In the ninety years since *Humphrey's Executor*, the Supreme Court has repeatedly reaffirmed it. In *Wiener v. United States*, the Court unanimously rejected a presidential claim to at-will removal authority over the War Claims Commission. 357 U.S. 349 (1958). And in *Morrison v. Olson*, a nearly unanimous Court rejected a challenge to a removal restriction on an Independent Counsel. 487 U.S. 654 (1988); *see also, e.g.*, *Seila Law LLC v. CFPB*, 591 U.S. 197, 204 (2020) ("[W]e need not and do not revisit our prior decisions allowing certain limitations on the President's removal power."). Congress has relied on that precedent to structure dozens of additional multimember agencies headed by officers protected from at-will removal, including the NLRB—which Congress established just over a month after *Humphrey's Executor* and modeled on the agency structure upheld there. *See* J. Warren Madden, *Origin and Early Years of the National Labor Relations Act*, 18 Hastings L.J. 571, 572 (1967).[3]

---

[3] *See, e.g.*, 42 U.S.C. § 7412(r)(6)(B) (Chemical Safety and Hazard Investigation Board); 42 U.S.C. § 1975(e) (Commission on Civil Rights); 42 U.S.C. § 7171(b)(1) (Federal Energy Regulatory Commission); 5 U.S.C. § 7104(b) (Federal Labor Relations Authority); 46 U.S.C. § 46101(b)(5) (Federal Maritime Commission); 5 U.S.C. § 1202(d) (Merit Systems Protection Board); 30 U.S.C. § 823(b)(1) (Mine Safety and Heath Review Commission); 29 U.S.C. § 153(a) (National Labor Relations Board); 45 U.S.C. § 154 (National Mediation Board); 49 U.S.C. § 1111(c) (National Transportation Safety Board); 42 U.S.C. § 5841(e) (Nuclear Regulatory Commission); 29 U.S.C. § 661(b) (Occupational Safety and Health Review Commission); 39 U.S.C. § 502(a) (Postal Regulatory Commission); 49 U.S.C. § 1301(b)(3) (Surface

### B.    Congress created the NLRB as an independent, multimember adjudicatory body.

**1.** Congress established the National Labor Relations Board "in response to a long and violent struggle for workers' rights." JA143. "In the latter part of the nineteenth century and the early decades of the present century, … the American labor scene was often a sordid spectacle of violence, rioting, demonstrations, and sit-ins." Arnold Ordman, *Fifty Years of the NLRA: An Overview*, 88 W. Va. L. Rev. 15, 15-16 (1985). "The use of armed guards, police, and the military was an all too familiar phenomenon." *Id.* For "the promotion of industrial peace," *NLRB v. Fansteel Metallurgical Corp.*, 306 U.S. 240, 257 (1939), Congress created the NLRB as an independent and impartial adjudicative body working "in the public interest," *Amalgamated Util. Workers v. Consol. Edison Co. of New York*, 309 U.S. 261, 265 (1940), with exclusive jurisdiction to adjudicate labor disputes and to protect both employers and employees from unfair labor practices, *see* 29 U.S.C. §§ 157-60.

The NLRB "is a paradigmatic example of a multimember group of experts who lead an independent federal office." JA148-49. "[M]uch like many other multimember entities, the Board was designed to be an independent panel of experts that could impartially adjudicate disputes." JA145; *see* 29 U.S.C. § 153(a). Congress imbued the Board with the hallmarks of an independent agency, including statutory

---

Transportation Board); 39 U.S.C. § 202(a)(1) (United States Postal Service Board of Governors).

removal protection, specified tenure, a multimember structure, and adjudication authority. *See* Datla & Revesz, *Deconstructing Independent Agencies*, 98 Cornell L. Rev. at 825.[4]

As originally enacted, the NLRA "granted the Board plenary authority over all aspects of unfair labor practice disputes: the Board controlled not only the filing of complaints, but their prosecution and adjudication." *NLRB v. United Food & Com. Workers Union, Loc. 23, AFL-CIO*, 484 U.S. 112, 117 (1987). But Congress later changed that structure in the Labor Management Relations Act, dividing the Board's "prosecutorial and adjudicatory functions between two entities." *Id.* at 117-18 & n.5. The House version of the bill would have created a separate agency responsible for prosecuting unfair labor practice complaints while retaining the Board to adjudicate disputes. *Id.* Although the final bill "did not go so far as to create a new agency," it did "determine that the General Counsel of the Board should be independent of the Board's supervision and review." *Id.* The Act thus imposed a form of "separation of powers within the agency," dividing the agency's prosecutorial functions from its adjudicatory ones. *Id.* at 118 n.5 (citing legislative history).

----

[4] Unlike some independent agencies, the NLRB does not have a mandatory bipartisanship requirement. Nevertheless, the agency has a long history and tradition of bipartisanship. The "NLRB has consistently held a 3-2 breakdown in membership: three Board members from the president's party and two Board members from the opposing party." Emma Barudi, *An Assumed Tradition: How the 3-2 Balance of the NLRB Is More Than the Sum of Its Appointments and an Argument for Its Continuation*, 26 N.Y.U. J. Legis. & Pub. Pol'y 817, 819 (2023).

**2.** As a result, the NLRB today is a "bifurcated agency." JA144. "The two sides operate independently," with the General Counsel "independent of the Board's control." JA144; *see United Food & Com. Workers*, 484 U.S. at 117-18. On one side of the split are the General Counsel and several Regional Directors, who are charged with prosecuting unfair labor practices and enforcing labor law. JA144; *see* 29 U.S.C. § 153(d). The General Counsel is appointed by the President, removable at will, and "independent of the Board's control." JA144. The General Counsel is the "final authority, on behalf of the Board, in respect of the investigation of charges and issuance of complaints … and in respect of the prosecution of [] complaints before the Board." 29 U.S.C. § 153(d). The Supreme Court has held that the General Counsel has "unreviewable discretion to refuse to institute an unfair labor practice complaint," *Vaca v. Sipes*, 386 U.S. 171, 182 (1967), as well as exclusive authority to dismiss or informally settle charges, *United Food & Com. Workers*, 484 U.S. at 119-21.

Unlike many other agencies, the NLRB lacks authority to initiate investigatory or enforcement actions on its own. *See Chamber of Com. of U.S. v. NLRB*, 721 F.3d 152, 156 (4th Cir. 2013). "Until [] a charge is brought, the Board may take no enforcement action." *United Food & Com. Workers*, 484 U.S. at 118-19. Rather, the agency—like a court—may employ "its statutory powers only if and when its processes are invoked by the private parties who invoke those processes." Ordman, *Fifty Years of the NLRA*,

88 W. Va. L. Rev. at 18. This "reactive mandate stands in stark contrast to the proactive roles of other labor agencies." *Chamber of Com.*, 721 F.3d at 156 n.2.

**3.** On the other side of the split, Congress created an independent, quasi-judicial Board charged with adjudicating appeals of labor disputes from administrative law judges. JA144. Like many other multimember entities, the Board was designed to be an independent panel of experts that could impartially adjudicate disputes. *See* Datla & Revesz, *Deconstructing Independent Agencies*, 98 Cornell L. Rev. at 770-71 (describing the NLRB as a classic example of an agency designed to be independent). The Board is "judicial in character." *Chamber of Com.*, 721 F.3d at 155 & n.1. It consists of five members appointed by the President "with the advice and consent of the Senate" for staggered five-year terms. 29 U.S.C. § 153(a). One member, designated by the President, serves as the Board's Chair. *Id.*

The Board (unlike the General Counsel) is protected from at-will removal by the President, who is authorized to remove a Board member "upon notice and hearing, for neglect of duty or malfeasance in office, but for no other cause." *Id.* The independence of Board members, Congress concluded, was critical to protect them "from being subject to immediate political reactions at elections." NLRB, 1 *Legislative History of the National Labor Relations Act*, at 1467 (1949). The Act's sponsor, Senator Robert Wagner, explained that only an autonomous tribunal—"detached from any particular administration that happens to be in power"—could fairly adjudicate

disputes between employers and employees. *Id.* at 1428; *see* Datla & Revesz, *Deconstructing Independent Agencies*, 98 Cornell L. Rev. at 770-71 (describing the NLRB as a classic example of an agency designed to be independent).

The Board's powers are carefully circumscribed. Relief ordered by the Board is not independently enforceable; the Board must seek enforcement in a federal court of appeals. 29 U.S.C. §§ 154, 160(e). Compliance with an order of the Board is not obligatory until entered as a decree by a court. *In re NLRB*, 304 U.S. 486, 495 (1938). The Board does have authority, after issuance of a complaint by the General Counsel, to "petition any United States district court … for appropriate temporary relief or restraining order" while the dispute is pending at the NLRB—a power akin to a court's power to enter an injunction preserving its own jurisdiction. 29 U.S.C. § 160(j); *Starbucks Co. v. McKinney*, 602 U.S. 339, 342 (2024). But the relief is "temporary," and the Board lacks authority to enter or enforce such an order on its own. *See* 29 U.S.C. § 160(j).

The Board also has limited rulemaking power, authorizing it "to make, amend, and rescind, in the manner prescribed by [the Administrative Procedure Act], such rules and regulations as may be necessary to carry out the provisions of [the NLRA]." 29 U.S.C. § 156. "From its inception in 1935," however, "the Board has exhibited a 'negative attitude' toward setting down principles in rulemaking, rather than adjudication." *Nat'l Ass'n of Mfrs. v. NLRB*, 717 F.3d 947, 949 (D.C. Cir. 2013); *see*

Jeffrey S. Lubbers, *The Potential of Rulemaking by the NLRB*, 5 FIU L. Rev. 411, 413 (2010) (noting that the Board has "maintained [a] resistance to rulemaking"). Almost all the Board's rules "concern rules of practice before the Board and other procedural and housekeeping measures." *Id.* at 413 n.19.

The Board's "first venture in major, substantive rulemaking" did not come until 1989, when it issued a rule specifying the collective bargaining units in healthcare facilities. Collective-Bargaining Units in the Health Care Industry, 54 Fed. Reg. 16336-01 (May 22, 1989). The Supreme Court upheld that rule in *American Hospital Association v. NLRB*, noting it was the "first time … the Board has promulgated a substantive rule." 499 U.S. 606, 608 (1991). Since then, however, the Board's rare efforts at substantive rulemaking have been rebuffed by the courts. *See Browning-Ferris Indus. of Cal., Inc. v. NLRB*, 911 F.3d 1195 (D.C. Cir. 2018) (declining to enforce the Board's "joint employer" rule); *Chamber of Com.*, 721 F.3d at 155 (striking down a workplace notice rule as exceeding the Board's rulemaking authority).[5]

## II.     Factual and procedural background

The Senate confirmed Ms. Wilcox as a member of the Board on September 6, 2023, for a second term of five years. JA129. In open disregard of the NLRA's for-

---

[5] Other than the rule on health care bargaining units, "the Board's CFR chapter only contains three other substantive rules," covering "jurisdictional standards for colleges and universities, and two relatively insignificant workplaces—symphony orchestras, and horse/dog racing." Lubbers, *The Potential of Rulemaking by the NLRB*, 5 FIU L. Rev. at 413; *see* 29 C.F.R. §§ 103.1, 103.2, 103.3.

cause removal provision, a letter sent by email to Ms. Wilcox on behalf of the President on January 27, 2025, informed her that she was "hereby removed from the office of Member[] of the National Labor Relations Board"—more than three years before her term was to expire—without identifying any neglect of duty or malfeasance by Ms. Wilcox and without providing her with notice or a hearing. JA129-30.

By reducing the NLRB to just two remaining members, the President's removal of Ms. Wilcox eliminated a quorum—effectively paralyzing the agency's operations. *See* 29 U.S.C. § 153(b) (providing that the Board requires at least three members for a quorum).

The district court found that the President's abrupt termination of Ms. Wilcox was a "blatant violation" of the National Labor Relations Act, 29 U.S.C. § 153(a). JA143. Indeed, the government has never attempted to argue otherwise. Stay Op. at 5 (Walker, J., concurring). Instead, the government tries to justify its admitted violation of the NLRA's unambiguous statutory terms by resorting to a novel and expansive interpretation of Article II. JA142. The district court found these "constitutional arguments to excuse this illegal act [to be] contrary to Supreme Court precedent and over a century of practice." JA148. Accordingly, on March 6, 2022, the district court granted Ms. Wilcox's motion for summary judgment and entered both declaratory judgment and injunctive relief. JA137-38.

## SUMMARY OF ARGUMENT

This Court should affirm the district court's judgment. It neither erred in its conclusion on the merits nor abused its discretion in entering relief to remedy the blatant violation of law that Ms. Wilcox suffered.

**I.** The President's general authority to remove principal executive officers at will is not absolute. *Seila Law*, 591 U.S. at 218; *Humphrey's Executor*, 295 U.S. at 629. Congress has long required the President to have cause to remove officials from traditional multimember agencies, designed to be independent from political headwinds. And the Court has long upheld these types of removal restrictions for traditional independent agencies against constitutional challenge.

Beginning with *Humphrey's Executor* in 1935, the Court upheld Congress's ability to create the Federal Trade Commission as an independent "quasi legislative" and "quasi judicial" agency whose commissioners were protected from at-will removal by the Executive. 295 U.S. at 628-29. In *Wiener*, the Court applied the same logic to the War Claims Commission, discerning its primarily adjudicative function from the history of its legislation. 357 U.S. at 354-55. In *Seila Law*, the Court refused to "extend those precedents" to the novel single-member structure of the CFPB with "no basis in history and no place in our constitutional structure," 591 U.S. at 220, but explicitly refused to revisit their holdings regarding more traditional and accountable independent agencies, *id.* at 204.

16

Based on this binding precedent, the removal restrictions that Congress imposed for Board members of the NLRB are constitutional. As the district court found, "the Board was designed to be an independent panel of experts that could impartially adjudicate disputes." JA145. Its primarily adjudicative function, confirmed by its history and structure, does not encroach on substantial executive power. *See Wiener*, 357 U.S. at 356.

The government does not—and, indeed, cannot—argue that *Humphrey's Executor* and *Wiener* have been overruled. Left with this binding precedent, the government tries two approaches to avoid the obvious import of their application. First, the government accepts that Congress can impose removal restrictions for agencies who do not wield "substantial executive power," but argues incorrectly that the Board fails that test. To the contrary, its primarily adjudicative function, as well as its history and structure, confirms that the Board does not wield substantial executive power. Second, the government argues that Congress cannot impose removal restrictions for agencies who wield "any executive power," but every executive agency would fail that test. This argument would read *Humphrey's Executor* and *Wiener* out of existence and upend large swathes of the administrative state. It is inappropriate to follow this course when the Supreme Court has refused to revisit these precedents itself and unwise given that the government backs away from a full endorsement of its own theory.

17

**II.** Having found a violation of the law, the district court issued (1) declaratory relief making clear that Ms. Wilcox's removal was unlawful and (2) injunctive relief directed to subordinate officials to remedy this wrong. JA137-38. The government wisely does not contest the grant of declaratory relief. *See Clinton v. Jones*, 520 U.S. 681, 703 (1997) (recognizing that "[i]t is emphatically the province and duty of the judicial department to say what the law is"). Rather, the government confines its dispute to the availability and appropriateness of injunctive relief.

The government's argument regarding the availability of injunctive relief is foreclosed by binding precedent. This Court has recognized that a court can issue an injunction against a subordinate official to remedy an unlawful removal. *See Swan v. Clinton*, 100 F.3d 973, 979-81 (D.C. Cir. 1996); *Severino*, 71 F.4th at 1042-43. Pointing to cases from before the merger of law and equity, the government argues that such an injunction was not originally available in equity. But there's no denying that, even then, plaintiffs could obtain the functionally equivalent remedy of mandamus at law. 3 William Blackstone, *Commentaries* *264. And since the merger of law and equity, it is a distinction without a difference.

Given the availability of injunctive relief, the district court acted well within its discretion to use this tool to remedy Ms. Wilcox's injury. As to the irreparable-injury and adequate-remedy-at-law factors, the government fundamentally ignores that Ms. Wilcox's remedy is not merely the loss of a salary; it is the loss of her

"statutory right to function," which she endures every day that she is unlawfully kept from her office. And as to the balance-of-equities and the public-interest factors, the government can point to no harm other than the President being unable to unlawfully remove officers from their positions. On the other side of the ledger, the public is harmed every day that the NLRB is functionally disabled in Ms. Wilcox's absence.

## ARGUMENT

I.   **The district court was correct to reject the President's attempt to use Article II to justify his blatantly illegal firing of Ms. Wilcox.**

### A.   **The Board's removal restrictions are constitutional.**

Nearly 150 years of history and 90 years of precedent confirm Congress's power to limit the President's authority to remove the heads of traditional independent regulatory agencies that it creates. Given the absence of an "express provision respecting removals" in the text of the Constitution, *Myers*, 272 U.S. at 109, the President's removal authority is itself grounded purely in "history and precedent," *Seila Law*, 591 U.S. at 214. The same history and precedent establish that Congress can restrict the President's ability to remove the heads of traditional independent regulatory agencies, like the Board, without cause.

#### 1.   **Removal restrictions for independent multimember agencies are well grounded in history and tradition.**

Since 1887, Congress has relied on removal restrictions to ensure the independence of multimember expert-driven agencies that it creates. Courts have

relied on this kind of longstanding tradition to "give meaning to the Constitution." *Mistretta v. United States*, 488 U.S. 361, 401 (1989). Particularly in separation of powers cases, the Court often places "significant weight upon historical practice," *Zivotofsky v. Kerry*, 576 U.S. 1, 23 (2015), recognizing "the compromises and working arrangements that the elected branches of Governments themselves have reached," *NLRB v. Noel Canning*, 573 U.S. 513, 525-26 (2014). A "systemic" and "unbroken" practice, long known and openly accepted between the branches of government, can provide a "gloss" on the separation of powers in the Constitution. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring).

Congress first implemented removal restrictions for an independent regulatory agency when it created the Interstate Commerce Commission in 1887. There, Congress empowered the ICC to investigate complaints against common carriers, issue cease-and-desist orders, require payment of reparations, and enforce its orders in court. *See, e.g.*, Interstate Commerce Act, Pub. L. No. 49-41 ch. 104, §§ 12-16, 24 Stat. 379, 383-85. And, to guard its independence from political pressure, Congress protected the commissioners from removal absent "inefficiency, neglect of duty, or malfeasance in office." *See id.* § 11, 24 Stat. at 383. Since then, Congress has passed almost identical removal restrictions for "a multitude of new agencies … using the ICC as their prototype." Marshall J. Breger & Gary J. Edles,

*Established by Practice: The Theory and Operation of Independent Federal Agencies*, 52 Admin. L. Rev. 1111, 1116 & n.14 (2000).

The NLRB is a prime example of the longstanding consensus between the branches of government. Congress passed the NLRA in 1935, using the same model of removal restrictions from the ICC that the Supreme Court had upheld just over a month before in *Humphrey's Executor* for the FTC. *See* NLRB Amicus Br. at 8 (Mar. 11, 2025). President Franklin D. Roosevelt signed the Act into law, lauding the creation of "an independent quasi-judicial body." Franklin D. Roosevelt, President of the United States, Statement on Signing the National Labor Relations Act (July 5, 1935); *see also* NLRB, *First Annual Report of the National Labor Relations Board* at 9 n.1 (1936). Those removal restrictions have stood, unchallenged, until now.

> **2.    The Court has long confirmed the constitutionality of removal restrictions for "traditional" independent agencies.**

In an unbroken line of cases, the Court has made clear that a President's removal authority is not absolute and has provided the framework for the types of agencies for which Congress can impose removal restrictions. Though the Court has struck down "novel" removal restrictions, *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 496 (2010), and a "new configuration" for an agency's structure, *Seila Law*, 591 U.S. at 204, it has left untouched the simple and longstanding constitutional rule that Congress may "create expert agencies led by a group of principal officers

removable by the President only for good cause." *Id.* at 204 (citing *Humphrey's Executor* for this holding); *see also Free Enter. Fund*, 561 U.S. at 483 (same).

Beginning with *Humphrey's Executor* in 1935, the Supreme Court found it "plain" that the President's power of removal was not "illimitable." 295 U.S. at 629. Congress has its own authority, "in creating quasi legislative or quasi judicial agencies, to require them to act in discharge of their duties independently of executive control." *Id.* To this end, the Court upheld Congress's power to restrict the grounds for removal of an FTC Commissioner to "inefficiency, neglect of duty, or malfeasance in office." *Id.* at 619. "For it is quite evident that one who holds his office only during the pleasure of another cannot be depended upon to maintain an attitude of independence against the latter's will." *Id.* at 629.

Applying the logic of *Humphrey's Executor*, the Court in *Wiener* readily upheld similar removal protections for the War Claims Commission in 1958. 357 U.S. at 356. To determine the "nature of the function that Congress vested in the War Claims Commission," the Court looked to the history of its legislation. *Id.* at 353-55. Recognizing that the Commission was established as an adjudicating body to determine claims for injury or property damage at the hands of the enemy after World War II, the Court stressed "the intrinsic judicial character of the task with which the Commission was charged." *Id.* at 355.

In 2020, the Court further refined the functional analysis in *Seila Law*. To determine the applicability of *Humphrey's Executor* to the single director of the Consumer Financial Protection Bureau, the Court looked first and foremost to the agency's historical legacy and then to its structural accountability. *See* 591 U.S. at 220-26. The Court stressed that the Bureau's "almost wholly unprecedented" single-member structure was "an innovation with no foothold in history or tradition." *Id.* at 220, 222. And the Court worried that the agency's "unique structure" lacked accountability "[w]ith no colleagues to persuade, and no boss or electorate looking over her shoulder." *Id.* at 225. As a result, the Court "declined to extend Congress's authority to limit the President's removal power" to "principal officers who, acting alone, wield significant executive power." *Id.* at 238. One solution—to which a majority of the Justices would have agreed—would have been to "convert[] the CFPB into a multimember agency," like in *Humphrey's Executor*. *Id.* at 237 (Roberts, C.J., joined by Alito and Kavanaugh, JJ.); *see also id.* at 298 (Kagan, J., joined by Ginsburg, Breyer, and Sotomayor, JJ., concurring in the judgment with respect to severability and dissenting in part).[6]

---

[6] The government claims (at 25) that "overreading" this statement would produce "implausible results" because Congress could impose removal restrictions on the Departments of Defense, State, and Justice by simply converting them into multimember commissions. But the point isn't merely that the NLRB is a multimember agency; it is that this type of multimember body of experts exercising quasi-legislative and quasi-judicial functions has a long historical pedigree and built-

*Humphrey's Executor*, as applied in *Wiener* and interpreted in *Seila Law*, remains binding law. Indeed, the Supreme Court in *Seila Law* expressly "d[id] not revisit *Humphrey's Executor* or any other precedent" and simply determined whether to "extend those precedents" to the CFPB given its novelty and uniquely unaccountable single-member structure. 591 U.S. at 220, 228; *see also Collins v. Yellen*, 594 U.S. 220, 250-51 (2021) (recognizing same). This Court has accordingly recognized *Humphrey's Executor* as binding precedent after *Seila Law. Meta Platforms, Inc. v. FTC*, 2024 WL 1549732, at *2 (D.C. Cir. Mar. 29, 2024) (per curiam); *Severino*, 71 F.4th at 1047.[7] This Court should—and, indeed, must—follow this binding precedent here. *See Nat'l Sec. Archive*, 104 F.4th at 272 n.1.

### 3.   The Court's binding precedents mandate affirmance here.

Applying *Humphrey's Executor*, *Wiener*, and *Seila Law* to this case provides a clear outcome: The Board's removal restrictions are constitutional. As the district court found, the Board "is a paradigmatic example of a multimember group of experts who lead an independent federal office." JA148. "[M]uch like many other multimember entities, the Board was designed to be an independent panel of experts

---

in structural accountability. The same could not be said for the Secretary of Defense, the Secretary of State, or the Attorney General.

[7] The Fifth and Tenth Circuits have done the same. *Consumers' Rsch. v. CPSC*, 91 F.4th 342, 345-46 (5th Cir. 2024); *Leachco, Inc. v. CPSC*, 103 F.4th 748, 761-62 (10th Cir. 2024); *Magnetsafety.org v. CPSC*, 129 F.4th 1253, 1265-66 (10th Cir. 2025).

that could impartially adjudicate disputes." JA145; *see* 29 U.S.C. § 153(a); Datla &

Revesz, *Deconstructing Independent Agencies*, 98 Cornell L. Rev. at 770-71. Its functions,

history, and structure place it squarely within the type of independent multimember

agency for which Congress can impose removal restrictions.

The Board was designed to be an "independent quasi-judicial body."

Roosevelt, Statement on Signing the National Labor Relations Act; *see also* NLRB,

*First Annual Report of the National Labor Relations Board*, at 10 (1936). Although the Board

adjudicates labor disputes, it can only hear cases that the General Counsel chooses

to investigate, issue a complaint, and prosecute. 29 U.S.C. § 153(d); *see also Vaca*, 386

U.S. at 182. Any remedies the Board imposes are only enforceable by court order,

which, again, must be sought by attorneys supervised by the General Counsel. 29

U.S.C. §§ 153(d), 160(e). Finally, the Board's rulemaking power—rarely employed

beyond rules of practice and procedure—is limited to "such rules and regulations as

may be necessary to carry out the provisions of this [Act]." 29 U.S.C. § 156; *see also*

JA154-55.

The agency's structure as an independent quasi-judicial body is far from

unprecedented. As discussed, such multimember bodies of independent experts have

a deep historical grounding, dating back to the ICC in 1887. The Court upheld

removal restrictions for the comparable FTC in 1935 in *Humphrey's Executor*. 295 U.S.

at 629. The Board's primarily adjudicative functions are similar to those of the War

Claims Commission, for which the Court upheld removal restrictions in *Wiener* in 1958. 357 U.S. at 355-56. And across its entire lifespan, no President has ever removed a Board member in defiance of these statutory protections.

Unlike the novel single-member structure of the CFPB in *Seila Law*, the Board's traditional multimember structure provides for inherent accountability. Because it is a multimember agency, 29 U.S.C. § 153(a), no Board member can act unilaterally; rather, Board members must persuade their peers. *Seila Law*, 591 U.S. at 225. And because members serve staggered five-year terms, 29 U.S.C. § 153(a), every President has the "opportunity to shape its leadership and thereby influence its activities." *Seila Law,* 591 U.S. at 225. Beyond these traditional hallmarks of independent agencies, the Labor Management Relations Act in 1947 bifurcated the agency to internally create "a formal separation of functions." *See* Jonathan B. Rosenblum, *A New Look at the General Counsel's Unreviewable Discretion Not to Issue a Complaint under the NLRA*, 86 Yale L.J. 1349, 1353 (1977). The primarily adjudicative Board was protected from removal without cause and the primarily prosecutorial General Counsel was not. A General Counsel, fully accountable to the Executive, can thus decide not to investigate a complaint or bring it before the Board. *See* 29 U.S.C. § 153(d).

In sum, the NLRB represents exactly the sort of traditional independent agency for which Congress has long imposed, and the Court has long upheld, removal restrictions.

### B.   The government's contrary arguments are wrong on the law and the facts.

Despite this long history and binding precedent, the government seeks to aggrandize the Executive's power of removal at the expense of the Legislature's authority to create traditional independent agencies. First, the government tries (at 27-32) to distinguish *Humphrey's Executor* and *Wiener* by arguing that the NLRB "wields substantial executive authority." Unable to convincingly do so, the government tries (at 26) to read *Humphrey's Executor* and *Wiener* so narrowly as to apply to no executive agency whatsoever.

### 1.   The government is incorrect that the Board wields "substantial executive authority."

In its attempt to distinguish *Humphrey's Executor* and *Wiener*, the government overstates the Board's executive functions. The government points (at 27) to the NLRB's adjudicative, rulemaking, and enforcement functions. But its arguments fail to appreciate the NLRB's unique structure as "a bifurcated agency," JA144, let alone its historical pedigree and built-in accountability mechanisms.

The government does not really dispute that the Board (as opposed to the NLRB as a whole) is a primarily adjudicative body. Instead, it labels (at 27) the

27

Board's work as "significant executive adjudication," but it's unclear what this term means (and why it wouldn't also necessarily apply to the work of Article I courts, like the Tax Court). At base, there's no denying that adjudication is a judicial function, even if performed by executive officers. This was the very holding of *Wiener*—that the executive nature of the agency "did not alter the intrinsic judicial character of the task with which the Commission was charged." 357 U.S. at 355.

The government nevertheless suggests (at 27) that the relief the Board orders in those adjudications is somehow problematic. Like their judicial counterparts, "the Board may craft relief, such as a cease-and-desist order to halt unfair labor practices or an order requiring reinstatement of terminated employees." JA145 (citing 29 U.S.C. § 160(c)). But the Board's orders lack any teeth, as they "are not independently enforceable." *Id.* Indeed, "[t]he NLRB may be the only agency that needs a court's imprimatur to render its orders enforceable." *Dish Network Corp. v. NLRB*, 953 F.3d 370, 375 n.2 (5th Cir. 2020), *as revised* (Mar. 24, 2020).

The government cites (at 28) this "enforcement authority" as further executive power, but misunderstands who wields such power within the agency. Given the bifurcated nature of the NLRB, it is the General Counsel (who is removable at will by the President) who is charged with prosecuting unfair labor practices and enforcing the Board's orders in court. *See* 29 U.S.C. § 153(d). Congress intended the General Counsel to operate "independent of the Board's control." JA144.

The government relies (at 28 n.6) on just one provision in the entire statutory scheme, under which the Board must approve litigation to seek *temporary* injunctive relief in federal district court upon issuance of a complaint by the General Counsel—essentially to preserve its jurisdiction while it adjudicates the matter. 29 U.S.C. § 160(j); National Labor Relations Board, 20 Fed. Reg. 2175, 2175 (Apr. 6, 1955). This single, ancillary, jurisdiction-preserving provision is "so obviously collateral to the main design of the act" that it cannot be fairly characterized as a "substantial" executive power. *See Humphrey's Executor*, 295 U.S. at 628 n.1.

As a final attempt, the government points (at 29) to the Board's rulemaking authority, both in adjudication and of general applicability. But, to the extent that the Board engages in rulemaking through adjudication, these cases must still be initiated by complaint from the General Counsel's office. It was partly for this reason that President Harry Truman vetoed the Labor Management Relations Act, concerned that the General Counsel's "unlimited authority" to bring charges to the Board "might usurp the Board's responsibility for establishing policy." Harry S. Truman, President of the United States, Veto of the Taft-Hartley Labor Bill (June 20, 1947).

Meanwhile, the Board's authority to issue substantive rules of general applicability is confined to those "necessary to carry out the provisions of th[e] [NLRA]." 29 U.S.C. § 156. As the district court observed, the NLRB "hardly engages

in rulemaking" beyond establishing procedures for bringing and adjudicating cases. JA154-55. The few advisory rules that the Board has issued interpreting the NLRA are not binding and are subject to de novo judicial review because the "interpretation of the meaning of statutes, as applied to justiciable controversies," is "exclusively a judicial function." *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 387 (2024).[8]

      **2.**      **The government is incorrect that *Seila Law* "repudiate[d]" *Humphrey's Executor* and *Wiener*.**

With no reasonable basis for distinguishing *Humphrey's Executor* and *Wiener*, the government tries to minimize the applicability of these cases to a null set. According to the government, the functional focus in *Humphrey's Executor* and *Wiener* has "since been 'repudiated' by the Supreme Court." Opening Br. 21. Instead, the government posits (at 26) that "any exercise of executive power subjects an agency head to the President's control." Because even "quasi-judicial" or "quasi-legislative" functions are exercises of executive power if performed by an executive officer, no executive agency (including the 1935 FTC or the 1958 War Claims Commission) would satisfy that test.

---

[8] If the Court were to believe that this limited and rarely used rulemaking authority was problematic for the separation-of-powers analysis, the correct course would be to sever this provision from the rest of the NLRA given the clear intent to create "a nonpartisan, quasi-judicial board." NLRB, *First Annual Report of the National Labor Relations Board*, at 10. If there is "a constitutional flaw in a statute," the Supreme Court has instructed courts "to limit the solution to the problem, severing any problematic portions while leaving the remainder intact." *Seila Law*, 591 U.S. at 234 (quoting *Free Enter. Fund*, 561 U.S. at 508).

The Supreme Court, however, has already rejected this formalistic critique of its precedents. In *Morrison*, the Court held that *Humphrey's Executor* remained good law even though "the powers of the FTC … would at the present time be considered 'executive.'" 487 U.S. at 689 &. n.28. As the Court explained, the terms "quasi-judicial" and "quasi-legislative" as used in *Humphrey's Executor* did not "define rigid categories of those officials who may or may not be removed at will by the President," but merely "describe the circumstances in which Congress might be more inclined" to grant an agency "a degree of independence from the Executive." *Id.* at 689, 691 n.30. The modern understanding of these terms thus has no bearing on the constitutionality of the removal provisions. *See, e.g., Leachco*, 103 F.4th at 762 (holding that "the exercise of some arguably 'executive' functions does not undermine the constitutionality of tenure protections for officers of an expert, non-partisan agency").

And although Justice Thomas believed that *Seila Law* "repudiated" *Humphrey's Executor* and *Wiener*, 591 U.S. at 239 (Thomas, J., concurring in part and dissenting in part), the majority explicitly declined to revisit those precedents, *id.* at 204. Rather than question, let alone repudiate, Congress's authority in the heartland of traditional independent agencies, the majority asked whether "to *extend* Congress's authority to limit the President's removal power to a new situation." *Id.* at 238 (emphasis added). In determining whether the CFPB fit the mold of *Humphrey's*

*Executor* and *Wiener*, the Court relied on history and structure rather than formal labels.

Nor is it appropriate for this Court to guess what the Supreme Court might do in the future. Even if the government is correct (and it is not) that the foundations of *Humphrey's Executor* and *Wiener* have eroded, this Court "is charged with following case law that directly controls a particular issue, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Nat'l Sec. Archive*, 104 F.4th at 272 n.1. Because the Supreme Court has gone out of its way *not* to overrule *Humphrey's Executor* and *Wiener*, this Court is "obligated to follow" those binding precedents. *Id.*

The Fifth Circuit in *Consumers' Research v. CPSC* recently did just that. The plaintiffs there argued, like the government here, that *Seila Law* "upended" the rule of *Humphrey's Executor* by holding "that for-cause removal *always* creates a separation-of-powers violation—at least if the agency at issue exercises substantial executive power (which nearly all agencies do)." 91 F.4th 342, 345-46 (5th Cir. 2024). The Fifth Circuit declined to "read *Seila Law* so broadly." *Id.* Even if one believes that the "logic of *Humphrey's* may have been overtaken," that court observed, "the decision has not been overruled—at least not yet." *Id.* at 346. "Until that happens, *Humphrey's* controls." *Id.*

Indeed, not even the government is willing to fully embrace the necessary repercussions of overturning *Humphrey's Executor*. If, as the government says (at 26),

"any exercise of executive power subjects an agency head to the President's control," this would destroy the independence of any agency housed in the executive branch. The President would be able to remove—and thus, have the power to control—the heads of "everything from the Federal Reserve Board and the Nuclear Regulatory Commission to the National Transportation Safety Board and the Court of Appeals for Veterans Claims." Stay Op. at 61 (Millett, J., dissenting).

Take the Federal Reserve as an example. Congress designed it as a multimember expert commission, relying on the same model of the ICC as the NLRB. From the beginning, Congress "underst[ood] that the organization's insulation from day-to-day presidential direction would enable it to exercise its vast powers in ways conducive to long-term price stability." Amicus Br. of Law Profs. at 7 (Mar. 10, 2025). Yet, under the government's proposed rule, its exercise of any executive power renders unconstitutional any removal restriction.

The government falters in its conviction, claiming that the Federal Reserve is somehow exempt from its articulation of the test. *See* Govt. Resp. to En Banc Pet. at 7. Seemingly conceding that the constitutional analysis is "illuminate[d]" by a historical understanding, the government asserts that "the Federal Reserve is 'a unique institution with a unique historical background.'" *Id.* But, as described at length above, so is the NLRB.

## II.   The district court did not abuse its discretion in awarding declaratory and injunctive relief.

### A.   At a minimum, Ms. Wilcox is entitled to a declaratory judgment.

The district court's order grants both declaratory and injunctive relief. Although the government contests the district court's authority to issue an injunction, it does not dispute the court's power to enter declaratory relief that the removal was unlawful. And it is right not to do so. The Supreme Court has "long held that when the President takes official action, the Court has the authority to determine whether he has acted within the law." *Clinton*, 520 U.S. at 703; *see, e.g.*, *Youngstown*, 343 U.S. 579. This is just "an application of the principle established in *Marbury v. Madison* … that '[i]t is emphatically the province and duty of the judicial department to say what the law is.'" *Clinton*, 520 U.S. at 703. And, as the Supreme Court has said, "it is substantially likely that the President … would abide by an authoritative interpretation of [a] statute," even if not "directly bound by such a determination." *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992).[9]

A "request for declaratory relief may be considered independently of whether other forms of relief are appropriate" and may be granted "whether or not further

_____

[9] Although the government accepts (at 40 n.7) the district court's grant of "declaratory relief that the removal was unlawful," it objects to the court's declaration "that plaintiff shall continue to remain a member of the NLRB." The government doesn't explain the difference. If the removal was unlawful, Ms. Wilcox remains a member of the Board.

34

relief is or could be sought." *Anatol Zukerman & Charles Krause Reporting, LLC v. United States Postal Serv.*, 64 F.4th 1354, 1366 (D.C. Cir. 2023); *see* 28 U.S.C. § 2201. Assuming that Ms. Wilcox prevails on the merits, then, she is at least entitled to a judgment in her favor declaring that the President lacked authority to remove her from the NLRB. *See Salleh v. Christopher*, 876 F. Supp. 297, 307 (D.D.C. 1995) (granting declaratory relief to Foreign Service officer illegally dismissed without cause), *aff'd*, 85 F.3d 689 (D.C. Cir. 1996); *see also United States v. Wilson*, 290 F.3d 347, 362 (D.C. Cir. 2002) (remanding with instructions to enter judgment that plaintiff was "a member of the United States Commission on Civil Rights").

### B.    Since the time of Blackstone, courts have recognized their authority to remedy illegal removal.

**1.** Binding precedent also disposes of the government's argument that the federal judiciary lacks authority to provide an effective remedy to the President's concededly unlawful removal. This Court has repeatedly recognized the availability of the injunctive remedy Wilcox received—an injunction against unlawful removal directed at a subordinate official. *See Swan*, 100 F.3d at 979-81; *Severino*, 71 F.4th at 1042-43. To remedy wrongful removal, the Court's "power to enjoin [a subordinate official] is undisputed." *Severino*, 71 F.4th at 1043; *see also Sampson v. Murray*, 415 U.S. 61, 63 (1974) ("[T]he District Court is not totally without authority to grant interim injunctive relief to a discharged Government employee."); *Soucie v. David*, 448 F.2d

1067, 1072 n.12 (D.C. Cir. 1971) ("[C]ourts have power to compel subordinate executive officials to disobey illegal Presidential commands.").[10]

The government concedes as much (at 41-42), agreeing that *Swan* and *Severino* "can be read to stand for the proposition that equitable relief might be available." Stuck with those holdings, the government tries to minimize their significance (at 43) by suggesting that they are just about standing. But establishing Article III redressability requires that the relief be "within the district court's power to award." *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020). *Swan* thus necessarily held that courts possess "the power to grant [Wilcox] the injunctive relief [s]he seeks." 100 F.3d at 977; *accord Severino*, 71 F.4th at 1042-43 ("[W]e have held it sufficient for Article III standing *if we can* enjoin subordinate executive officials to reinstate a wrongly terminated official." (emphasis added)). *Severino*'s recognition that the plaintiff "need only plausibly allege relief could be afforded" at the motion-to-dismiss stage does not, as the government claims (at 42), suggest that the court might lack remedial powers. It just reflects the fact that—in the particular circumstances of that case—there may

---

[10] The government does not contest that Wilcox's removal was unlawful. Opening Br. 40 n.7. It instead suggests that the district court's order "amount[ed] to *de jure* reinstatement." *Id.* at 40. But that would require an order directing "formal presidential reappointment." *Severino*, 71 F.4th at 1043. The district court recognized that this Court held: "A court may, by targeting a President's subordinates, 'reinstate a wrongly terminated official '*de facto*,' even without a formal presidential reappointment' that would require injunctive relief against the President himself." JA170 (quoting *Severino*, 71 F.4th at 1042-43). Therefore, it crafted an order that did not enjoin the President or mandate de jure reinstatement. JA137-38.

not have been a position left for the plaintiff to fill. Because there is no dispute that Ms. Wilcox's position remains vacant, that issue is not implicated here.

**2.** With no answer to this Court's binding precedent, the government turns instead to old cases like *White v. Berry*, 171 U.S. 366 (1898), which pre-date the merger of law and equity. *Swan* and *Severino*, it argues, ignored "the separate longstanding principle" set forth in these cases "that equitable power may not be used to 'restrain by injunction the removal of a [public] officer.'" Opening Br. 43 (quoting *In re Sawyer*, 124 U.S. 200, 212 (1888)). But this Court did not address that principle for good reason: It is no longer the law. As the Supreme Court noted in *Sampson*, "[m]uch water has flowed over the dam since 1898." 415 U.S. at 71. Today, "cases such as *Service v. Dulles*, … establish that federal courts do have authority" to grant injunctive relief to a wrongfully terminated federal employee. *Id.* at 71-72; *see also Vitarelli v. Seaton*, 359 U.S. 535 (1959) (same).

The government nevertheless insists (at 44) that "the scope of a court's equitable powers" is limited to "the scope of equity jurisdiction at the Founding." Opening Br. 44 (citing *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 322 (1999)). But *Grupo Mexicano*, on which the government relies, did not conclude that equity was frozen in amber. *See* 527 U.S. at 322 ("We do not question the proposition that equity is flexible."). All it held was that the specific relief ordered by the district court—an injunction prohibiting the "defendant[s] from transferring

assets in which no lien or equitable interest is claimed"—had "never been available before" and was "specifically disclaimed by longstanding judicial precedent." *Id.* at 310, 322. Unlike the creditors in *Grupo Mexicano*, Wilcox seeks to protect an established legal right—statutory removal protection. And the Supreme Court has "long held" that plaintiffs may seek injunctive relief from federal courts "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015); *accord Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902) (granting injunction against Postmaster General to enforce a "legal right, under the general acts of Congress").

Even assuming district courts lack *inherent* equitable power to enjoin illegal removal of public officials—despite extensive precedent saying otherwise—Congress gave federal courts an equivalent *statutory* power in the Declaratory Judgment Act. *See* 28 U.S.C. § 2202. Section 2202 provides that "necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." This includes "relief in the form of damages or an injunction." *Horn & Hardart Co. v. Nat'l Rail Passenger Corp.*, 843 F.2d 546, 549 (D.C. Cir. 1988); *accord Powell v. McCormack*, 395 U.S. 486, 499 (1969) ("A declaratory judgment can then be used as a predicate to further relief, including an injunction."). As noted, the government agrees that it "had not contested the court's entry … of declaratory relief that the

38

removal was unlawful." Opening Br. 40 n.7. Wilcox is therefore also entitled to the injunction she received under § 2202.

**3.** In any event, the government's reliance on *White* and similar cases fails by its own terms. Although those cases recognize a pre-merger limitation on relief for wrongful removal in *equity*, they also acknowledge the availability of functionally equivalent remedies at *law*. *See White*, 171 U.S. at 377 ("The jurisdiction to determine the title to a public office belongs exclusively to the courts of law, and is exercised either by certiorari, error, or appeal, or by mandamus, prohibition, quo warranto or information in the nature of a writ of quo warranto.").[11]

As the government rightly agrees (at 45), public officials had recourse to these legal remedies for wrongful removal even before the merger of law and equity. Since at least the time of Blackstone, the writ of mandamus was available as a "full and effectual remedy … for wrongful removal." 3 William Blackstone, *Commentaries* \*264. Beginning in the early seventeenth century, the English "Court of King's Bench had been granting judgments by which plaintiffs who had been unjustly removed from municipal office were restored to it." Louis Jaffe & Edith Henderson, *Judicial Review*

---

[11] Amici make much of the writ of quo warranto, but it's a red herring. Fla. Amicus Br. at 8-14 (Mar. 11, 2025). The government admits that quo warranto is inapposite because it serves "only [to] oust an unlawful office holder and does not reinstate a removed plaintiff." Opening Br. 45.

*and the Rule of Law: Historical Origins*, 72 L.Q. Rev. 345, 359 (1956).[12] And that tradition continued in the United States. *See, e.g.*, *Marbury*, 5 U.S. (1 Cranch) at 173; *Kalbfus v. Siddons*, 42 App. D.C. 310, 319 (D.C. Cir. 1914) ("The authorities are overwhelming" that mandamus is available to remedy a violation of for-cause removal protections.).

At a minimum, Wilcox is entitled to that same relief in the form of a writ of mandamus. As *Swan* noted, a President's "duty to comply with removal restrictions … is ministerial and not discretionary, for the President is bound to abide the requirements of duly enacted and otherwise constitutional statutes." 100 F.3d at 977; *see also Kalbfus*, 42 App. D.C. at 321 (enforcing statutory removal protection by mandamus). That duty is enforceable by an order directed to subordinate officials, like defendant Kaplan. *See Swan*, 100 F.3d at 980. While *Swan* held that an injunction was the appropriate tool—as this Court should—it also acknowledged that the contemplated injunction was functionally equivalent to a writ of mandamus. *See id.* at 976 n.1; *see also Noble v. Union River Logging R.R. Co.*, 147 U.S. 165, 172 (1893) ("If [an official] has no power at all to do the act complained of, he is as much subject to an injunction as he would be to a mandamus if he refused to do an act which the law

---

[12] *See, e.g.*, *R. v. Mayor and Alderman of Doncaster* (1752) 96 Eng. Rep. 795, 795 (KB) (restoring alderman removed without good cause); *R. v. Mayor of Liverpool* (1759) 97 Eng. Rep. 533, 538-40 (KB) (restoring official to Liverpool common council, in part, because his bankruptcy was insufficient cause for removal); *R. v. Blooer* (1760) 97 Eng. Rep. 697, 698 (KB) (Mansfield, C.J.) ("A mandamus to restore is the true specific remedy where a person is wrongfully dispossessed of any office or function.").

plainly required him to do."); *Stern v. S. Chester Tube Co.*, 390 U.S. 606, 609 (1968) (noting that the pre-merger distinction "between mandamus and a mandatory injunction seems formalistic in the present day and age"). Therefore, mandamus should issue if an injunction is unavailable.

### C.   The district court did not abuse its discretion in finding an injunction appropriate here.

To show entitlement to a permanent injunction, a plaintiff must "demonstrate that: (1) [she] has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction." *Ctr. for Biological Diversity v. Ross*, 480 F. Supp. 3d 236, 250 (D.D.C. 2020). Because the "decision to grant … permanent injunctive relief is an act of equitable discretion by the district court," it is "reviewable on appeal for abuse of discretion." *Anatol Zukerman & Charles Krause Reporting*, 64 F.4th at 1361. The district court's "discretion in weighing a request for injunctive relief is necessarily broad and a strong showing of abuse must be made to reverse it." *Id.* at 1366. Here, the district court did not abuse its discretion in finding these criteria satisfied.

### 1.    Ms. Wilcox is suffering an irreparable harm that backpay would not remedy.

Ms. Wilcox satisfies the first two factors because she is suffering irreparable harm that will continue every day that she lacks an injunction. An "unlawful removal from office by the President" of an independent agency's governing member is an "evident" irreparable injury. *Berry v. Reagan*, 1983 WL 538, at *5 (D.D.C. 1983), *vacated as moot*, 732 F.2d 949 (D.C. Cir. 1983). The long history, dating back to Blackstone, of courts granting relief in precisely this context makes clear that the harm is irreparable.

This injury is more than just the loss of a salary; it is the loss of a "statutory right to function." *Id.*; *see also* JA43 (finding irreparable injury where the plaintiff's illegal removal "prevent[ed] her from carrying out the duties Congress has assigned to her"). Ms. Wilcox's removal from the Board is "irrevocably disruptive" of her "legal responsibility for carrying [] out" the Board's responsibilities. *Mackie v. Bush*, 809 F. Supp. 144, 146 (D.D.C.), *vacated sub nom. Mackie v. Clinton*, 10 F.3d 13 (D.C. Cir. 1993). And it may become entirely beyond remedy. If the President nominates and the Senate confirms a new member to replace her, "neither a damages remedy nor a declaratory judgment would provide an adequate remedy" for Ms. Wilcox's lost time in office. *Id.* at 147. With each passing day, then, Ms. Wilcox loses an irretrievable and irremediable legal entitlement.

"The irreparable nature of this injury" is further "evident by the obviously disruptive effect" of Ms. Wilcox's removal on the NLRB. *Berry*, 1983 WL 538, at *5. The Board cannot "continue to operate with only two members," so Ms. Wilcox's removal brings an immediate and indefinite halt to the NLRB's critical work of adjudicating labor-relations disputes. *New Process Steel, L.P. v. NLRB*, 560 U.S. 674, 680, 687 (2010) (explaining that the NLRA requires "three participating members at all times for the Board to act"). The longer Ms. Wilcox is wrongfully kept from her position, the worse the situation will become for workers, employers, and the broader public who depend on the agency's important congressionally mandated work. This worsening interference with the Board's "ability to fulfill its mandate" is another irreparable injury that "strongly favors" an injunction. *Berry*, 1983 WL 538, at *5-6.

The government argues (at 49) that the "traditional remedy" for Ms. Wilcox's claims "has been an award of backpay." But, as explained above, injunctive relief and mandamus are also traditional remedies with long pedigrees. And the President's blatant violation of an independent agency's congressionally imposed removal limits is just the sort of "genuinely extraordinary situation" that the Supreme Court in *Sampson v. Murray*, held merits "injunctive relief to a discharged Government employee." 415 U.S. at 61, 92 n.68. Ms. Wilcox was appointed and confirmed by the Senate to a leadership role in an independent federal agency. JA146. And her removal was made in violation of removal protections "made plain by federal statute and

43

supported by ninety years of Supreme Court precedent." JA39. Given that, Ms. Wilcox's real injury isn't just a lost paycheck—it's the statutory right to function in the role to which she was appointed and duly confirmed. If an Article III judge were removed from office despite life tenure, nobody would claim that backpay is enough to remedy the judge's injury. The only difference here is that the removal protection is statutory rather than constitutional.

In similar circumstances, the court in *Berry v. Reagan* found irreparable harm where, given statutory removal protections, the President lacked "the power to remove Commissioners at his discretion." 1983 WL 538, at *5. That kind of illegal removal "represent[s] far more than grievances over backpay and routine personnel issues." JA41. To be sure, this Court is "not bound by a vacated district court decision from 40 years ago." Stay Op. at 58 (Henderson, J., concurring). Admittedly, there is virtually no precedent in this area (either for Ms. Wilcox's position or for the government's). But that's just because it is very rare for a President to remove an agency head in violation of a congressionally imposed limit. Since President Trump began doing so, however, every district judge to consider the issue has agreed with the result in *Berry*. Given that consensus among district judges, it is impossible to say that the district court abused its discretion in reaching the same result here.

### 2.    The balance of equities and the public interest also favor an injunction.

The remaining injunction factors also weigh in Ms. Wilcox's favor. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (holding that, in a motion for an injunction against the government, these two factors "merge"). The government argues that the district court's injunction "work[s] an extraordinary harm to the President's authority to exercise 'all of the executive Power' of the United States." Opening Br. 49 (quoting *Seila Law*, 590 U.S. at 203). But all that the injunction did was restore the NLRB to the norms established by ninety years of precedent and historical practice. "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

Moreover, as the district court observed, the President has ample opportunity to exercise executive authority over the agency. JA159. He has already appointed the General Counsel, who controls the NLRB's prosecutorial functions, and designated Mr. Kaplan as Chair of the Board. And he could easily establish a majority on the Board by appointing members to fill its two vacant positions. The President's choice to instead remove Ms. Wilcox does not bring the Board closer in line with his preferred policies; it prevents the agency from carrying out its congressionally mandated duties at all. The President does not, and cannot, claim any legitimate interest in disabling an agency created by Congress from fulfilling its congressionally mandated work.

Regardless, as Judge Millett explained, any "asserted injury to the President is entirely bound up with the merits of the government's constitutional argument." Stay Op. at 107 (Millett, J., dissenting). This factor, however, is relevant only after the court finds that the plaintiff has "prevailed" on the merits. *Wilkinson v. Legal Servs. Corp.*, 27 F. Supp. 2d 32, 65 (D.D.C. 1998). Because, as shown, the President has no legal right to remove Ms. Wilcox from office, he cannot claim to be irreparably injured by his inability to violate a statute whose constitutionality is "dictated by binding precedent." JA173.[13]

On the other hand, the urgent public need for clarity about whether Ms. Wilcox was wrongfully removed demonstrates that the public interest "strongly favors" an injunction in this case. *Berry*, 1983 WL 538, at *6. There is a substantial public interest in requiring the executive branch to "abide by the federal laws that govern their existence and operations." *League of Women Voters*, 838 F.3d at 12. Moreover, by depriving the Board of a quorum, the President's illegal removal causes immediate harm to the workers, employers, and broader public who depend on it to ensure "the friendly adjustment of industrial disputes," 29 U.S.C. § 151, and

---

[13] The same is true of the government's argument (at 50) that, if it prevails, future litigants could challenge Ms. Wilcox's participation. That harm only materializes if the government is right on the merits. But for purposes of this part of the test, the Court must assume that it is not.

impairs the NLRA's primary purpose: "to stop and to prevent unfair labor practices," *UAW v. Russell*, 356 U.S. 634, 643 (1958).

"Without a functioning NLRB," the district court explained, "unfair labor practices go unchallenged, union elections go unrecognized, and pending labor disputes go unreviewed." JA172. Last fiscal year, the Board adjudicated hundreds of cases. Board Decisions Issued, NLRB, https://perma.cc/A8TY-Y3XG. In recent months, for example, the Board decided unfair-labor-practice charges concerning employers who fired an employee for discussing her wages with co-workers, *RFO808*, 373 NLRB 60 (2024); who placed manure near a union picket site, *Regional Ready Mix, LLC & Brand X, LLC*, 373 NLRB 56 (2024); and who assaulted an employee who requested unpaid wages, *East Freight Logistics, LLC*, 373 NLRB 7 (2023). The Board also recently addressed unfair-labor-practice charges brought by employers against unions. *See, e.g.*, *IAMAW, Dist. Lodge No. 160*, 373 NLRB 39 (2024); *N. Atl. States Reg'l Council of Carpenters*, 373 NLRB 27 (2024). Ms. Wilcox's firing undermines the Board's capacity to review even clear NLRA violations. That is "irrevocably disruptive of the Board's function and [Ms. Wilcox's] legal responsibility for carrying it out, all to the damage of the public interest." *Mackie*, 809 F. Supp. at 146.

Those effects are now playing out in real time, as evidenced by recent arguments by employers that the NLRB's lack of a quorum renders it unable to certify union election results, despite a majority of workers voting in favor of union

representation. JA172. This delay not only stalls the collective bargaining process, but creates uncertainty and potential leverage for employers to resist unionization efforts, undermining workers' rights under the NLRA. Absent an injunction, further defiance of the Board's authority is sure to follow. The longer Ms. Wilcox is wrongfully kept from her position, the worse the situation will become for workers, employers, and the broader public who depend on the agency's important congressionally mandated work. This severe public harm "strongly favors" an injunction in this case. *Berry*, 1983 WL 538, at *6.

## CONCLUSION

This Court should affirm the district court's judgment.

Respectfully submitted,

*/s/ Deepak Gupta*
DEEPAK GUPTA
MATTHEW W.H. WESSLER
GREGORY A. BECK
ALISA C. PHILO*
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*deepak@guptawessler.com*

JENNIFER D. BENNETT
GUPTA WESSLER LLP
505 Montgomery Street
Suite 625
San Francisco, CA 94111
(415) 573-0336

48

*jennifer@guptawessler.com*

*\* Practicing under the direct supervision of members of the D.C. Bar pursuant to Local Rule 49(c)(8) while application to the D.C. Bar is pending; D.C. Circuit admission upcoming*

April 7, 2025                                        *Counsel for Plaintiff-Appellee*

**CERTIFICATE OF COMPLIANCE WITH RULE 32(g)(1)**

I hereby certify that my word processing program, Microsoft Word, counted 12,046 words in the foregoing brief, exclusive of the portions excluded by Rule 32(f). The document also complies with the typeface requirements of Fed. R. App. P. 32(a)(6) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in proportionally spaced typeface in 14-point Baskerville font.

*/s/ Deepak Gupta*
Deepak Gupta

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2025, I electronically filed the foregoing document with the Clerk of the Court for the U.S. Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Deepak Gupta*
Deepak Gupta