No. 25-5057

# In the United States Court of Appeals for the District of Columbia Circuit

————

GWYNNE A. WILCOX,

*Plaintiff-Appellee*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States,
MARVIN E. KAPLAN, in his official capacity as Chairman of the National Labor
Relations Board

*Defendants-Appellants*.

————

On Appeal from the United States District Court
for the District of Columbia

————

**BRIEF OF FORMER MEMBERS OF THE NATIONAL LABOR
RELATIONS BOARD AS *AMICI CURIAE* IN SUPPORT OF APPELLEE**

————

DENNIS FAN, *Director*
BENNETT LUNN, *Student*
ALICE PARK, *Student*
APPELLATE LITIGATION CLINIC,
   COLUMBIA LAW SCHOOL
MORNINGSIDE HEIGHTS
   LEGAL SERVICES, INC.
435 West 116th St.
New York, NY 10027
(212) 854-4291
dfan@columbialawclinics.org

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.      Parties and Amici

All parties, intervenors, and *amici* appearing before the district court and in this Court are listed in plaintiff Gwynne Wilcox's brief. *Amici* submitting this brief in opposition to that motion are former Members of the National Labor Relations Board Lauren McFerran, Mark Gaston Pearce, Wilma Liebman, Nancy Schiffer, Dennis P. Walsh, Sarah Fox, Charles Cohen, and John E. Higgins, Jr.

### B.      Rulings Under Review

The rulings under review are the March 6, 2025 order of the district court (ECF No. 34) and the accompanying memorandum opinion (ECF No. 35).

### C.      Related Cases

This case has not previously been before this Court.

Dated:         April 9, 2025                    */s/ Dennis Fan*
                                               Dennis Fan
                                               Counsel for *Amici Curiae*

## CERTIFICATE OF COUNSEL
## REGARDING AUTHORITY TO FILE

Pursuant to Federal Rule of Appellate Procedure 29(a)(2), all parties have consented to the filing of this brief. Pursuant to D.C. Circuit Rule 29(d), *amici* state that a separate *amicus* brief is needed due to the unique experiences and perspectives of former Members of the National Labor Relations Board, as outlined in the section titled "Interests of *Amici Curiae*" and explained in this brief.

Dated:      April 9, 2025                         */s/ Dennis Fan*
                                                 Dennis Fan
                                                 Counsel for *Amici Curiae*

ii

# TABLE OF CONTENTS

INTERESTS OF AMICI CURIAE.........................................................................1

INTRODUCTION AND
SUMMARY OF ARGUMENT...........................................................................3

ARGUMENT ...................................................................................................5

I.    THE NATIONAL LABOR RELATIONS BOARD IS AN INDEPENDENT BODY
      PROPERLY FORMED IN THE MOLD OF *HUMPHREY'S EXECUTOR* .....................5

      A.    The Branches Recognized the Need for a Legal Mechanism
            Based on Neutral Adjudication to Resolve Labor Disputes ................5

      B.    The Present National Labor Relations Board Codifies an
            Interbranch Consensus That an Independent Adjudicatory
            Body Is Necessary for Labor Peace .......................................................8

II.   THE PRESIDENT MAINTAINS SUBSTANTIAL CONTROL OVER THE
      NATIONAL LABOR RELATIONS BOARD'S EXECUTIVE FUNCTIONS ..............11

      A.    The General Counsel Ensures Presidential Control Over the
            Board's Executive Functions, While Removal Protections
            for Members Guarantee Fair and Impartial Adjudications...............11

      B.    Protecting Impartial Adjudications by the Board
            Safeguards Due Process and Confidence in the Board......................15

      C.    The Government Is Wrong That Presidential Control of
            Board Adjudications Is Constitutionally Mandated ..........................21

III.  ELIMINATING REMOVAL PROTECTIONS UPENDS THE BOARD'S
      FUNCTIONS AND IMPERILS THE NATION'S HARD-WON LABOR PEACE .......24

CONCLUSION..............................................................................................28

CERTIFICATE OF COMPLIANCE ................................................................29

CERTIFICATE OF SERVICE..........................................................................30

# TABLE OF AUTHORITIES

**Cases**                                                                    **Pages(s)**

*Allentown Mack Sales & Serv., Inc. v. NLRB,*
    522 U.S. 359 (1998) ............................................................................16

*Amazon.com Servs. LLC v. NLRB,*
    No. 24-cv-9564, 2025 WL 466262 (C.D. Cal. Feb. 5, 2025) ............................26

*Amazon.com Servs. LLC v. NLRB,*
    No. 24-50761, Doc. No. 46-2 (5th Cir. Sept. 30, 2024) .....................................26

*American Hosp. Ass'n v. NLRB,*
    899 F.2d 651 (7th Cir. 1990) ...............................................................23

*Associated Builders & Contractors of Texas, Inc. v. NLRB,*
    826 F.3d 215 (5th Cir. 2016) ...............................................................23

*Auciello Iron Works, Inc. v. NLRB,*
    517 U.S. 781 (1996) ...........................................................................17

*Berkshire Emps. Ass'n of Berkshire Knitting Mills v. NLRB,*
    121 F.2d 235 (3d Cir. 1941) ...............................................................20

*Boys Markets, Inc. v. Retail Clerks,*
    398 U.S. 235 (1970) .............................................................................6

*Brooks v. NLRB,*
    348 U.S. 96 (1954) ...............................................................................8

*Caperton v. A.T. Massey Coal Co.,*
    556 U.S. 868 (2009) ...........................................................................19

*Carey v. Piphus,*
    435 U.S. 247 (1978) ...........................................................................19

*Chamber of Com. of United States v. NLRB,*
    723 F. Supp. 3d 498 (E.D. Tex. 2024) ..................................................23

**Cases**                                                                 **Pages(s)**

*Chamber of Com. of United States v. NLRB,*
   856 F. Supp. 2d 778 (D.S.C. 2012),
   *aff'd*, 721 F.3d 152 (4th Cir. 2013) ........................................................24

*Cinderella Career & Finishing Schs., Inc. v. Federal Trade Comm'n,*
   425 F.2d 583 (D.C. Cir. 1970) ............................................................20

*Collins v. Yellen,*
   594 U.S. 220 (2021) ...................................................................14, 25

*Dish Network Corp. v. NLRB,*
   953 F.3d 370 (5th Cir. 2020) ...............................................................10

*Exela Enter. Sols., Inc. v. NLRB,* 32 F.4th 436 (5th Cir. 2022) ...................12

*ExxonMobil Rsch. & Eng'g Co., Inc. v. NLRB,*
   No. 23-60495, 2025 WL 782692 (5th Cir. Mar. 12, 2025) .................19

*Fall River Dyeing & Finishing Corp. v. NLRB,*
   482 U.S. 27 (1987) .......................................................................8, 17

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.,*
   537 F.3d 667 (D.C. Cir. 2008) ............................................................10

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.,*
   561 U.S. 477 (2010) ...........................................................................9

*Golden State Bottling Co. v. NLRB,*
   414 U.S. 168 (1973) .........................................................................22

*Humphrey's Executor v. United States,*
   295 U.S. 602 (1935) ...........................................................................4

*In re Lindsey,*
   158 F.3d 1263 (D.C. Cir. 1998) .........................................................18

*In re Murchison,*
   349 U.S. 133 (1955) .........................................................................19

| Cases | Pages(s) |
|---|---|

*Kokesh v. Securities & Exch. Comm'n,*
581 U.S. 455 (2017)..................................................................22

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024)..................................................................23

*Marshall v. Jericho, Inc.,*
446 U.S. 238 (1980)..............................................................19, 20

*NLRB v. Aakash, Inc.,*
58 F.4th 1099 (9th Cir. 2023) ...................................................12

*NLRB v. Federal Lab. Rels. Auth.,*
613 F.3d 275 (D.C. Cir. 2010)..................................................12

*NLRB v. Jones & Laughlin Steel Corp.,*
301 U.S. 1 (1937)........................................................................5

*NLRB v. Noel Canning,*
573 U.S. 513 (2014)................................................................8, 25

*NLRB v. P*I*E Nationwide, Inc.,*
894 F.2d 887 (7th Cir. 1990) ....................................................22

*NLRB v. Sears, Roebuck & Co.,*
421 U.S. 132 (1975)..................................................................14

*NLRB v. SW Gen., Inc.,*
580 U.S. 288 (2017)...........................................................12, 13, 22

*NLRB v. United Food & Com. Workers Union, Loc. 23, AFL-CIO,*
484 U.S. 112 (1987)............................................................12, 13

*Pillsbury Co. v. Federal Trade Comm'n,*
354 F.2d 952 (5th Cir. 1966) ....................................................20

*Republic Steel v. NLRB,*
311 U.S. 7 (1940)......................................................................23

**Cases**                                                                  **Pages(s)**

*Schweiker v. McClure,*
 456 U.S. 188 (1982)................................................................19

*Securities & Exch. Comm'n v. Jarkesy,*
 603 U.S. 109 (2024)................................................................21

*Seila Law LLC v. Consumer Fin. Prot. Bureau,*
 591 U.S. 197 (2020)..........................................10, 13, 22, 23, 24

*Starbucks Corp. v. McKinney,*
 602 U.S. 339 (2024)..........................................................13, 25

*Trans World Airlines, Inc. v. Civil Aeronautics Bd.,*
 254 F.2d 90 (D.C. Cir. 1958).................................................19

*Wiener v. United States,*
 357 U.S. 349 (1958)................................................................27

*Withrow v. Larkin,*
 421 U.S. 35 (1975)................................................................19

*Youngstown Sheet & Tube Co. v. Sawyer,*
 343 U.S. 579 (1952)................................................................17


**Statutes**                                                              **Pages(s)**

29 U.S.C. § 151 ........................................................................5

29 U.S.C. § 153 ....................................................9, 12, 13, 14, 21

29 U.S.C. § 156 ......................................................................23

29 U.S.C. § 158 ......................................................................13

29 U.S.C. § 159 ......................................................................16

29 U.S.C. § 160 ................................................9, 13, 14, 16, 24

## Statutes                                                      Pages(s)

Labor Management Relations Act, Pub. L. No. 80-101, 61 Stat. 136 (1947)........11

National Labor Relations Act, Pub. L. No. 74-198, 49 Stat. 449 (1935) ..............5, 8

Pub. Res. No. 44, 73d Cong. (1934)........................................................................7


## Regulations                                                   Pages(s)

29 C.F.R. § 101.10 ...............................................................................................16

29 C.F.R. § 101.11 ...............................................................................................16

29 C.F.R. § 101.12 ...............................................................................................16

29 C.F.R. § 101.15 ...............................................................................................22

29 C.F.R. § 101.4 .................................................................................................13

29 C.F.R. § 101.8 .................................................................................................13

29 C.F.R. § 102.126 .............................................................................................20

29 C.F.R. § 102.127 .............................................................................................20


## Executive Orders                                               Pages(s)

Exec. Order No. 14,215, *Ensuring Accountability for All Agencies*,
    90 Fed. Reg. 10,447 (Feb. 18, 2025)...................................................................18

Exec. Order No. 6511 (Dec. 16, 1933)...................................................................6

## Other Authorities                                                    Pages(s)

Adrian Vermeule, *Conventions of Agency Independence*,
113 COLUM. L. REV. 1163 (2013) ................................................................15, 19

David P. Berry, Inspector General, NLRB,
*Report of Investigation − OIG-I-468* (Mar. 19, 2012) .................................20

Franklin D. Roosevelt, *Statement Accompanying Executive Order 6763* (June 29, 1934) ...7

Franklin D. Roosevelt, *Statement on Signing the National Labor Relations Act* (July 5, 1935) ...........................................................................................................9

Franklin D. Roosevelt, *Statement on the Appointment of the First National Labor Board* (Aug. 5, 1933) ............................................................................................6

Fred B. Jacob & Anne Marie Lofaso, *Beyond Loper Bright: Iterative Construction at the National Labor Relations Board*,
77 U.C.L.J. (forthcoming 2025).........................................................................16

JAMES A. GROSS, THE MAKING OF THE NATIONAL LABOR RELATIONS BOARD: A STUDY IN ECONOMICS, POLITICS, AND THE LAW 1933−1937 (1974) ...................7

Jonathan B. Rosenblum, *A New Look at the General Counsel's Unreviewable Discretion Not to Issue a Complaint Under the NLRA*,
86 YALE L.J. 1349 (1977)....................................................................................18

Kate Andrias, *Constitutional Clash: Labor, Capital, and Democracy*,
118 NW. U. L. REV. 985 (2024) ...........................................................................6

Memorandum from Theodore B. Olson, Ass't Att'y Gen.,
Off. of Legal Counsel, U.S. Dep't of Justice, to Att'y Gen. (Feb. 10, 1982)........18

NLRB, 2 *Legislative History of the National Labor Relations Act* (1949) ...........5, 10, 25, 26

NLRB, *First Annual Report of the National Labor Relations Board* (1936) ........................10

Philip Taft & Philip Ross, *American Labor Violence: Its Causes, Character, and Outcome*, *in* VIOLENCE IN AMERICA: HISTORICAL AND COMPARATIVE PERSPECTIVES (1969) .................................................................................................................6

## Other Authorities                                                        Pages(s)

Robert Iafolla, *Whole Foods Bid to Repel Union Swipes at Hobbled Labor Board*,
    Bloomberg Law (Feb. 11, 2025), https://news.bloomberglaw.com/daily-
    labor-report/whole-foods-bid-to-repel-union-swipes-at-hobbled-labor-board ...26

*SuperShuttle DFW, Inc.*,
    367 NLRB No. 75 (Jan. 25, 2019) .....................................................................20

Harry S. Truman, *Veto of the Taft–Hartley Labor Bill* (June 20, 1947) .......................12

Walter Gellhorn & Seymour L. Linfield, *Politics and Labor Relations: An Appraisal of
    Criticisms of NLRB Procedure*,
    39 Colum. L. Rev. 339 (1939) ........................................................................11

White House, *President Donald J. Trump Announces Intent to Nominate and Appoint
    Individuals to Key Administration Posts* (Mar. 20, 2020),
    https://trumpwhitehouse.archives.gov/presidential-actions/president-donald-j-
    trump-announces-intent-nominate-appoint-individuals-key-administration-posts-
    32/ ................................................................................................................14

## INTERESTS OF AMICI CURIAE[1]

*Amici curiae* are former Members of the National Labor Relations Board who served across Republican and Democratic presidential administrations and who come from backgrounds representing both labor and management. Collectively, *amici* took part in thousands of Board decisions issued between 1988 and 2024. *Amici* are therefore well positioned to explain how the Board's statutory for-cause removal protections in practical terms foster the neutrality central to the Board's adjudicatory functions and result in independence from the White House's direction. Based on their experience, *amici* also have a unique understanding of the importance of fairly and impartially adjudicating cases involving labor disputes to the Nation's economy and interstate commerce. *Amici* are the following individuals:

**Lauren McFerran** was appointed by President Barack Obama and served as a Board Member from December 2014 to December 2019. She was reappointed by defendant President Donald J. Trump and served as a Board Member from July 2020 to January 2021, when she was designated as Chairman by President Joe Biden and after which she served as Chairman until December 2024.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4), counsel for *amici curiae* represent that they authored this brief in its entirety and that none of the parties or their counsel, nor any other person or entity other than *amici* or their counsel, made a monetary contribution intended to fund preparing or submitting this brief.

**Mark Gaston Pearce** was appointed by President Obama and served as a Board Member from April 2010 to August 2018, including serving as Chairman from August 2011 to January 2017.

**Wilma Liebman** was appointed by President Bill Clinton and served as a Board Member from November 1997 to August 2011. She was reappointed in 2002 and 2006 by President George W. Bush. She was designated as Chairman by President Obama in January 2009, after which she served as Chairman until August 2011.

**Nancy Schiffer** was appointed by President Obama and served as a Board Member from August 2013 to December 2014.

**Dennis P. Walsh** was appointed by President Clinton and served as a Board Member from December 2000 to December 2001. He was reappointed in December 2002 by President George W. Bush and served until December 2004, and again in January 2006 by President Bush, serving until December 2007.

**Sarah Fox** was appointed by President Clinton and served as a Board Member from February 1996 to December 2000.

**Charles Cohen** was appointed by President Clinton and served as a Board Member from March 1994 to August 1996.

**John E. Higgins, Jr.** was appointed in August 1988 by President Ronald Reagan and served until November 1989. He was reappointed by President Clinton

in September 1996 and served until November 1997. He also served as Acting General Counsel of the Board in May 2001 and June 2005.

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

For the past ninety years, the National Labor Relations Board has safeguarded the Nation's labor peace and industrial stability. Congress designed the agency as a bifurcated entity: its General Counsel is charged with investigating and prosecuting unfair labor practices; the five Members of the Board are charged with adjudicating cases involving labor disputes. Congress gave the President control and unfettered removal powers over the General Counsel, while implementing for-cause removal protections for Board Members to ensure fair and impartial adjudications.

That statutory design is the culmination of nearly fifty years of struggle by all branches of the federal government to respond to widespread economic disruption caused by sometimes violent disputes between labor and management. The Board's structure reflects an interbranch consensus, achieved through painful national experience, that labor peace is best secured by creating a legal mechanism—centered on neutral, independent adjudication—for resolving labor disputes peacefully and fairly. At the same time, the structure ensures that the President can appropriately exercise his constitutional control of the policy direction and agenda of the Board,

3

through appointment of the General Counsel, designation of the Chairman, and the appointment of Board Members as vacancies arise.

*Amici curiae* thus agree with the contention of plaintiff Member Gwynne Wilcox and the dissenting opinion of Judge Millett at the stay stage that the Board's removal protections are constitutional under the agency model that the Supreme Court endorsed in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), which was handed down a mere forty days before Congress established the Board. *See* Br. for Appellee at 21 (Apr. 7, 2025); Millett Op. at 6 (Mar. 28, 2025); *see also* En Banc Stay Order (Apr. 7, 2025). As former Members of the Board, *amici* also stress the need for independence in the Members' adjudicatory responsibilities to preserve due process for all parties with cases before the Board.

It is the Board Members' function as adjudicators that makes their independence so essential. The loss of for-cause removal protections threatens the ability of individual Members to decide cases based solely on their legal merits. Indeed, it raises the specter that the President could act directly to influence or alter the adjudication of particular cases to favor friends, punish foes, or achieve political aims—all at the expense of due process. It also threatens the integrity of the Board as a neutral adjudicator to which both labor and management have turned to resolve their disputes through the law. The Board has achieved industrial peace by demonstrating to all parties that its proceedings and decisions will comport with due process. Without

removal protections, the confidence of labor and management in the Board is threatened, as is the promise of labor peace so painfully secured after decades of unrest.

## ARGUMENT

## I. THE NATIONAL LABOR RELATIONS BOARD IS AN INDEPENDENT BODY PROPERLY FORMED IN THE MOLD OF *HUMPHREY'S EXECUTOR*

### A. The Branches Recognized the Need for a Legal Mechanism Based on Neutral Adjudication to Resolve Labor Disputes

Congress established the National Labor Relations Board in 1935 following decades of economically disruptive and sometimes violent conflict between management and labor. *See* National Labor Relations Act, Pub. L. No. 74-198, 49 Stat. 449 (1935). The Board is the result of decades of efforts by every branch of the federal government to channel this conflict into a legal system respected by all sides. The Supreme Court has, in turn, upheld this constitutional arrangement ever since the Board's inception. *See, e.g.*, *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937).

In the decades preceding the Board's creation, labor violence and industrial strife caused enormous disruptions to interstate commerce. *See* 29 U.S.C. § 151; NLRB, 2 *Legislative History of the National Labor Relations Act*, at 3046–47 (1949). Thousands of violent labor disputes broke out between 1877 and 1934, and workers seeking to join unions, organize strikes, and improve working conditions faced violent repression by corporations, private militias, police, and military forces. *See* Kate Andrias, *Constitutional Clash: Labor, Capital, and Democracy*, 118 Nw. U. L. Rev. 985,

1002 (2024); Philip Taft & Philip Ross, *American Labor Violence: Its Causes, Character, and Outcome*, *in* VIOLENCE IN AMERICA: HISTORICAL AND COMPARATIVE PERSPECTIVES 225–72 (1969). In the face of this strife, federal courts in the early twentieth century failed to provide an effective forum to resolve those disputes, as the courts "generally were regarded as allies of management in its attempt to prevent the organization and strengthening of labor unions." *Boys Markets, Inc. v. Retail Clerks*, 398 U.S. 235, 250 (1970).

In 1933, President Franklin Roosevelt in his first year in office sought to address this pressing national concern and to resolve rapidly escalating labor disputes. At first, in August 1933, President Roosevelt by presidential statement formed a National Labor Board. *See* Franklin D. Roosevelt, *Statement on the Appointment of the First National Labor Board* (Aug. 5, 1933). Without purporting to comply with the Appointments Clause, President Roosevelt unilaterally selected a chairman, three industry representatives, and three labor representatives for the hastily assembled body. NLRB, *1933 The NLB and "The Old NLRB"*, https://www.nlrb.gov/about-nlrb/who-we-are/our-history/1933-the-nlb-and-the-old-nlrb.

The National Labor Board's balanced structure reflected its initial approach of stepping into labor disputes through "mediation, conciliation, or arbitration." Exec. Order No. 6511 (Dec. 16, 1933); *see* JAMES A. GROSS, THE MAKING OF THE NATIONAL LABOR RELATIONS BOARD: A STUDY IN ECONOMICS, POLITICS, AND

THE LAW 1933–1937, at 15–17 (1974). But the National Labor Board's composition, as dictated wholly by the President, undermined confidence in its impartiality, thrusting the Board into the middle of individual labor disputes and undermining the possibility of neutral adjudication. As a result, President Roosevelt abolished the National Labor Board less than a year after its creation. Gross, *supra*, at 59–72.

Nonetheless seeing promise in this approach, Congress soon ratified the President's power to establish a National Labor Relations Board—now known as the "Old NLRB." Pub. Res. No. 44, 73d Cong. (1934); *see* Gross, *supra*, at 73. Learning from the failed National Labor Board, the Old NLRB confirmed that it would need to "sit as judges" to be effective. Gross, *supra*, at 76–77. The Old NLRB was further composed of "three impartial persons" rather than labor and management representatives, though it similarly remained under the chief executive. *See* Franklin D. Roosevelt, *Statement Accompanying Executive Order 6763* (June 29, 1934).

Absent congressional legislation, however, there was no provision for the federal courts to enforce the Old NLRB's orders. The specter of noncompliance thus doomed the Old NLRB. Gross, *supra*, at 128–30. The lesson from these early efforts was nonetheless clear. To effectively channel labor disputes into the legal system, an impartial adjudicatory body was necessary. *Id.* at 132.

**B.    The Present National Labor Relations Board Codifies an Interbranch Consensus That an Independent Adjudicatory Body Is Necessary for Labor Peace**

The current National Labor Relations Board reflects decades of back-and-forth dialogue between the President and Congress on how to bring about labor peace. These "working arrangements" between the branches inform the constitutionality of the Board and should not be lightly disturbed. *NLRB v. Noel Canning*, 573 U.S. 513, 526 (2014). This is particularly so here, where the Supreme Court in *Humphrey's Executor* confirmed the basic consensus—undisturbed for the past ninety years—that removal protections are necessary for its Members if the Board is to effectively perform its intended function.

**1.** Congress codified the experience of the National Labor Board and Old NLRB as part of the National Labor Relations Act of 1935, which empowered employees to form unions and to collectively bargain with employers. *See* National Labor Relations Act, Pub. L. No. 74-198, 49 Stat. 449 (1935). That Act manifests Congress's "overriding policy" of securing "'industrial peace.'" *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 38 (1987) (quoting *Brooks v. NLRB*, 348 U.S. 96, 103 (1954)).

Congress in the Act established the current National Labor Relations Board as a neutral arbiter of labor disputes, housed in the Executive Branch and with adjudicatory functions like those of the Judiciary. In that endeavor, "the Political

Branches concluded that the neutrality of Board members would be indispensable." *Millett Op.* at 37. Indeed, only after the Board had adjudicated a case did Congress provide for recourse to the federal courts, as the Act authorized judicial enforcement of Board decisions (fixing a problem that had plagued the Old NLRB). *See* 29 U.S.C. § 160(e).

In signing the Act, President Roosevelt thus stressed that the new Board would be "an independent quasi-judicial body." Franklin D. Roosevelt, *Statement on Signing the National Labor Relations Act* (July 5, 1935). The Board would have a predominantly "judicial function," rather than act as a "mediator or conciliator" that stepped into labor disputes (as the National Labor Board had done). *Id.* (noting these functions "should not be confused").

**2.** Critically, to ensure the neutrality that confidence in the agency required, Congress enacted statutory protections against at-will removal for Board Members. 29 U.S.C. § 153(a). Congress specifically provided that "[a]ny member of the Board may be removed by the President, upon notice and hearing, for neglect of duty or malfeasance in office, but for no other cause." *Id.*

The National Labor Relations Act thus adopted the same independent-agency model that the Supreme Court had endorsed as to the Federal Trade Commission in *Humphrey's Executor*, which was handed down a mere forty days before Congress established the Board. *See Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S.

9

477, 547 (2010) (Breyer, J., dissenting); *Dish Network Corp. v. NLRB*, 953 F.3d 370, 375 n.2 (5th Cir. 2020). As Congress made clear, the Board "embodied" the *Humphrey's Executor* decision, "so as not to leave the matter open to further litigation." NLRB, 2 *Legislative History of the National Labor Relations Act*, at 3062; *see* NLRB, *First Annual Report of the National Labor Relations Board* 1, 11 (1936). Courts in the ensuing decades have reaffirmed that removal protections for "the FCC, the FTC, and the NLRB" are "permissible under the Supreme Court's 1935 decision in *Humphrey's Executor*." *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 537 F.3d 667, 686 (D.C. Cir. 2008) (Kavanaugh, J., dissenting).

Indeed, as enacted, the Board's structure mirrors the Supreme Court's view of the Federal Trade Commission in *Humphrey's Executor*. Like the Commission, the Board is "composed of five members" and is "designed to be 'non-partisan' and to 'act with entire impartiality.'" *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 216 (2020) (quoting *Humphrey's Executor*, 295 U.S. at 624). Like the Commission, the Board's adjudicatory function is "'neither political nor executive,' but instead call[s] for 'the trained judgment of a body of experts' 'informed by experience.'" *Id*. (quoting *Humphrey's Executor*, 295 U.S. at 624). And just like the Commission, the Board "perform[s] legislative and judicial functions." *Id*.

**3.** Recognizing that *Humphrey's Executor* supplies "the outermost constitutional limits of permissible congressional restrictions on the President's removal power,"

*Free Enter. Fund*, 537 F.3d at 698 (Kavanaugh, J., dissenting), Congress has only ensured *greater* presidential control over the Board in the following years. If anything, the modern Board provides for more presidential control than the model blessed in *Humphrey's Executor*.

Soon after enactment of the National Labor Relations Act, critics complained that the Board had allegedly "combine[d] within itself the roles of prosecutor, jury, and judge." Walter Gellhorn & Seymour L. Linfield, *Politics and Labor Relations: An Appraisal of Criticisms of NLRB Procedure*, 39 COLUM. L. REV. 339, 341–42, 385 (1939). In 1947, Congress (over President Harry Truman's veto) formally separated the Board's prosecutorial and adjudicatory functions by establishing the presidentially appointed General Counsel as a prosecutor, while Board Members served solely as adjudicators. *See* Labor Management Relations Act, Pub. L. No. 80-101, 61 Stat. 136 (1947). The General Counsel, in turn, was granted no removal protections. That move vested in the President unfettered control over an official who could effectively set the Board's agenda.

## II. THE PRESIDENT MAINTAINS SUBSTANTIAL CONTROL OVER THE NATIONAL LABOR RELATIONS BOARD'S EXECUTIVE FUNCTIONS

### A. The General Counsel Ensures Presidential Control Over the Board's Executive Functions, While Removal Protections for Members Guarantee Fair and Impartial Adjudications

Today, then, the National Labor Relations Board reflects not only proper removal protections for Board Members under *Humphrey's Executor*, but also substan-

11

tial presidential control over the agency as a matter of first principles. By splitting the Board's prosecutorial and adjudicatory functions, Congress ensured both presidential control over the agency's prosecutor—the General Counsel—and neutral Board adjudications. *See NLRB v. United Food & Com. Workers Union, Loc. 23, AFL-CIO*, 484 U.S. 112, 117–18 (1987); *NLRB v. Federal Lab. Rels. Auth.*, 613 F.3d 275, 278 (D.C. Cir. 2010).

**1.** As President Truman quickly recognized, the General Counsel's seemingly "unlimited authority" is now a primary feature of the Board. Harry S. Truman, *Veto of the Taft–Hartley Labor Bill* (June 20, 1947). That remains significant as a constitutional matter. The General Counsel is vested with "quintessentially prosecutorial functions," which include setting the Board's enforcement priorities, initiating investigations, and prosecuting complaints in labor disputes. *Exela Enter. Sols., Inc. v. NLRB*, 32 F.4th 436, 443 (5th Cir. 2022).

Since her position is "core to the executive function," *id*. at 444, the General Counsel is treated as a principal officer who is subject to the President's appointment and control, *see* 29 U.S.C. § 153(d); *see also NLRB v. SW Gen., Inc.*, 580 U.S. 288, 315 (2017) (Thomas, J., concurring). Courts have confirmed that the General Counsel is removable by the President at will. *See Exela*, 32 F.4th at 441; *NLRB v. Aakash, Inc.*, 58 F.4th 1099, 1105–06 (9th Cir. 2023).

The General Counsel's authority is understood to be "subject to the ongoing supervision and control of the elected President." *Seila Law*, 591 U.S. at 224. The General Counsel is the "final authority" for the agency's prosecutorial functions. 29 U.S.C. § 153(d). The President's control over those functions, moreover, is not mediated by the Board, as the federal government asserts (Br. at 28 n.6). Instead, the General Counsel acts "independent of the Board's supervision and review" in her principal functions, *United Food*, 484 U.S. at 118, and seemingly "answers to no officer inferior to the President," *SW Gen.*, 580 U.S. at 316 (Thomas, J., concurring).

Far from a middling form of presidential control, the President's removal authority over the General Counsel empowers him to directly "shape [the Board's] leadership and thereby influence its activities." *Seila Law*, 591 U.S. at 225. Those activities in effect set the enforcement direction and policy agenda for the agency. The General Counsel is responsible for investigating and prosecuting all claims of unfair labor practices before the Board. *See* 29 U.S.C. §§ 153(d), 158, 160. The General Counsel thus manages regional offices that examine charges made by private parties that an employer or a union has engaged in an unfair labor practice and that issue administrative complaints against the charged parties. *See Starbucks Corp. v. McKinney*, 602 U.S. 339, 342–43 (2024) (citing 29 C.F.R. §§ 101.4, 101.8).

**2.** The Board itself, on the other hand, is principally an adjudicatory body that acts based on whatever cases the General Counsel (under the supervision of the

President) decides to pursue. That is, the Board primarily adjudicates administrative complaints of unfair labor practices. *See* 29 U.S.C. § 160(a). But "the Board may adjudicate only upon the filing of a 'complaint'; and Congress has delegated to the Office of General Counsel on 'behalf of the Board' the unreviewable authority to determine whether a complaint shall be filed." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 138 (1975) (quoting 29 U.S.C. § 153(d)). It is thus the General Counsel, who is appointed by and serves "at the President's pleasure," who largely sets the agenda for the Board. *Collins v. Yellen*, 594 U.S. 220, 248 (2021).

The branches have naturally viewed the Board's adjudicatory functions as requiring some independence. Beyond enacting for-cause protections, Congress has provided that the five Members of the Board serve staggered terms of five years— longer than a single presidential administration. *See* 29 U.S.C. § 153(a). Presidents since Roosevelt have recognized that the Board's impartiality requires nonpartisan or bipartisan appointments. Indeed, President Trump acknowledged the importance of that feature in the past, nominating both a Republican (defendant Chairman Marvin Kaplan) and a Democrat (*amicus* former Chairman McFerran) to preserve the Board's balance. *See* White House, *President Donald J. Trump Announces Intent to Nominate and Appoint Individuals to Key Administration Posts* (Mar. 2, 2020), https://trump whitehouse.archives.gov/presidential-actions/president-donald-j-trump-announces -intent-nominate-appoint-individuals-key-administration-posts-32.

14

Even with these insulating features, the Board as a whole is still subject to presidential prerogative. The President's ability to appoint Members (in addition to designating the Board's Chairman) provides a strong lever for setting the overall direction of the Board. *See* Adrian Vermeule, *Conventions of Agency Independence*, 113 COLUM. L. REV. 1163, 1180–81 (2013). Because Members' terms are staggered, with one Member's term ending each year, every President will by the end of a four-year term have the ability to appoint a majority of the Board's membership, significantly influencing the backgrounds and perspectives that will shape the Board's adjudications. This structure has provided each President with the ability to impact the doctrinal changes that inevitably occur when the Board's composition shifts.

### B.  Protecting Impartial Adjudications by the Board Safeguards Due Process and Confidence in the Board

Critically, Congress's design protects the President's prerogatives over policy direction even as it ensures due process in the adjudication of individual labor disputes. That is, the National Labor Relations Board's General Counsel is the vehicle for the President's constitutional control over the agenda for the Board, while there are safeguards to prevent the President from inserting himself into individual adjudications or influencing the day-to-day decisionmaking of individual Members.

**1.** Board Members' for-cause removal protections are central to Congress's design, as the Board's functions are fundamentally adjudicatory. Once the General

Counsel issues a complaint, administrative law judges with authority delegated by the Board preside over adjudicatory proceedings and then issue proposed reports and recommended orders to the Board for its adoption. 29 U.S.C. § 160(b)–(c); *see* 29 C.F.R. §§ 101.10–101.11. If a party appeals to the Board by filing exceptions to the administrative law judge's determination, the Board will then engage in *further* adjudicatory functions—it will assess the report and recommendation, take further testimony if necessary, and issue a final decision. 29 U.S.C. § 160(c); *see* 29 C.F.R. § 101.12(a).

Other adjudicatory functions of the Board also plainly require independence. In addition to resolving complaints of unfair labor practices, the Board is responsible for the administration of union-representation elections, which could not function fairly and effectively if the Board was not a neutral administrator and adjudicator. The Board not only oversees the election process (through powers that are delegated to its Regional Directors), but also reviews and adjudicates challenges to the conduct of union elections. *See* 29 U.S.C. § 159.

The Board thus acts "rather like a common-law court," hearing complaints of unfair labor practices and other disputes and resolving them based on factfinding. *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 393 (1998) (Breyer, J., concurring); *accord* Fred B. Jacob & Anne Marie Lofaso, *Beyond Loper Bright: Iterative Construction at the National Labor Relations Board*, 77 U.C.L.J. (forthcoming 2025). And once

Board Members issue their decisions in the matters before them—as with other court systems—those decisions become precedent for the agency that controls future cases, unless and until such precedent is specifically overturned or distinguished. *See, e.g., Auciello Iron Works, Inc. v. NLRB*, 517 U.S. 781, 786 (1996).

To be sure, like federal courts, the Board can and does revisit precedents when a majority of the Members vote to do so. But apart from these announced changes following due deliberation, the Board relies on precedent to ensure that like cases are treated similarly, preserving due process for individual litigants. That steady accumulation of precedent works to produce the "stability" that Congress envisioned. *Fall River*, 482 U.S. at 38 (citation omitted).

While Congress vested the General Counsel (under the President's control) with the responsibility to set the Board's enforcement direction and agenda, it is of paramount importance that individual adjudications are not subject to the political winds. The independence of Board Members is crucial for ensuring that parties who appear before the Board receive a fair hearing and have complaints resolved by impartial arbiters. It is anathema to the "scheme of government" to have these labor disputes resolved at the whims of the President. *Cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 613 (1952) (Frankfurter, J., concurring).

**2.** Were Board decisions in individual cases subject to the predilections of an elected President, it is difficult to see how the agency could ever afford parties the

17

due process needed for proper adjudications. The separation of a presidentially con-trolled General Counsel from the insulated Board Members was specifically designed to ensure that the statutory scheme "adequately protected the due process rights of parties before the Board." Jonathan B. Rosenblum, *A New Look at the General Counsel's Unreviewable Discretion Not to Issue a Complaint Under the NLRA*, 86 YALE L.J. 1349, 1353 (1977).

Presidential control, after all, is often in tension with impartial adjudications. The President is "expected to reflect and advance both policy views and partisan instincts" at all times. Memorandum from Theodore B. Olson, Ass'n Att'y Gen., Off. of Legal Counsel, U.S. Dep't of Justice, to Att'y Gen. 3 (Feb. 10, 1982). This is largely because "for any President the line between official and personal can be both elusive and difficult to discern," and "the Presidency is tied so tightly to the persona of its occupant." *In re Lindsey*, 158 F.3d 1263, 1286 (D.C. Cir. 1998) (Tatel, J., concurring in part and dissenting in part). Indeed, recent actions reflect how the President's authority can be wielded for political purposes, even in the context of an independent agency. *See* Exec. Order No. 14,215, *Ensuring Accountability for All Agencies*, 90 Fed. Reg. 10,447 (Feb. 18, 2025).

By contrast, the Board is designed to be an impartial tribunal. Political control by the President would undermine the core of fair and impartial Board adjudications. The Supreme Court has repeatedly held that "due process demands impartiality on

18

the part of those who function in judicial or quasi-judicial capacities." *Schweiker v. McClure*, 456 U.S. 188, 195 (1982). "It is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'" *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876 (2009) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)).

These principles apply with equal force to executive agencies that perform adjudicatory functions. *See Withrow v. Larkin*, 421 U.S. 35, 46–47 (1975); *see also Trans World Airlines, Inc. v. Civil Aeronautics Bd.*, 254 F.2d 90, 91 (D.C. Cir. 1958). And that basic "requirement of neutrality in adjudicative proceedings safeguards the two central concerns of procedural due process, the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decisionmaking process." *Marshall v. Jericho, Inc.*, 446 U.S. 238, 242 (1980) (citing *Carey v. Piphus*, 435 U.S. 247, 259–62, 266–67 (1978)).

Board Members, who perform adjudicatory functions, require independence to adhere to these "rigid requirements" of fair and impartial decisionmaking. *Id.* at 248. Indeed, independence is paramount in the labor context, where the "incentives to bring political influence to bear … are overwhelming." Vermeule, *supra*, at 1181. The courts have therefore often vacated decisions where agency adjudicators were found to have been influenced or potentially influenced either by personal or financial interests, *e.g.*, *ExxonMobil Rsch. & Eng'g Co., Inc. v. NLRB*, No. 23-60495, 2025 WL 782692 (5th Cir. Mar. 12, 2025); *Cinderella Career & Finishing Schs., Inc. v. Federal*

19

*Trade Comm'n*, 425 F.2d 583 (D.C. Cir. 1970); *Berkshire Emps. Ass'n of Berkshire Knitting Mills v. NLRB*, 121 F.2d 235 (3d Cir. 1941), or by political factors, *e.g.*, *Pillsbury Co. v. Federal Trade Comm'n*, 354 F.2d 952 (5th Cir. 1966).

Of course, the principles of fair and impartial adjudication do not require stagnation, and the Board can and does change its positions from time to time, as any judicial body does. *See, e.g.*, *SuperShuttle DFW, Inc.*, 367 NLRB No. 75 (Jan. 25, 2019) (changing independent-contractor standard). But basic tenets of due process require that the Board independently adjudicate cases without the undue influence of personal biases or political influence. *Jericho*, 446 U.S. at 242. It is this evenhandedness that is safeguarded by the Board's design.

The Board's prohibition on *ex parte* communications only underscores the need for separation and independence. *See* 29 C.F.R. § 102.126. To preserve the impartiality of Board adjudications, the General Counsel is barred from making any communication to the Board "not on the public record." *Id.* § 102.127. *Amici* as Members thus never discussed deliberations in pending cases with the White House, which controls the General Counsel, as such communications would violate both standards of government ethics and standards of judicial conduct. *See* David P. Berry, Inspector General, NLRB, *Report of Investigation – OIG-I-468* (Mar. 19, 2012) (report finding that a Member's chief counsel improperly disclosed deliberative information about pending matters).

Unfettered presidential removal would make these protections all but illusory. Rather than separating the prosecutor from the decisionmaker, it "concentrate[s] the roles of prosecutor, judge, and jury in the hands of the Executive Branch." *Securities & Exch. Comm'n v. Jarkesy*, 603 U.S. 109, 140 (2024). And concentrating control of Members under the President raises serious questions of due process, when the General Counsel (who acts under the President's control) is herself a party to unfair-labor-practice cases.

### C.  The Government Is Wrong That Presidential Control of Board Adjudications Is Constitutionally Mandated

This Court's stay panel and the federal government have nonetheless insisted that presidential control of the National Labor Relation Board's individual Members via removal is required by the Constitution. In the government's view (Br. at 27), the Board "wields substantial executive authority" outside of the President's control. That position misunderstands the history, structure, and adjudicatory functions of the Board.

The government casts Board adjudications as "mak[ing] executive policy," (Br. at 29), but the relevant question is whether the Members make policy outside of the President's control. Here, the Board's ability to hear a labor dispute is contingent on the General Counsel bringing a complaint before the Board, and the General Counsel has "final authority" over any investigations. 29 U.S.C. § 153(d). The

General Counsel, in turn, "answers to no officer inferior to the President," *SW Gen.*, 580 U.S. at 316 (Thomas, J., concurring).

The government points to the Board's "robust 'enforcement authority'" and remedial powers (Br. at 27–28), but omits the numerous constraints that limit the Board's ability to unilaterally exercise those powers. Even if the General Counsel brings a complaint and the Board issues a decision, the Board's ability to enforce that decision is still contingent on a federal court. *See NLRB v. P*I*E Nationwide, Inc.*, 894 F.2d 887, 892–93 (7th Cir. 1990). And even if a court issues an order enforcing the Board's decision, the Board is dependent again on the General Counsel deciding to seek contempt (and initiating the internal process of getting the Board's approval to do so) if a party fails to comply. 29 C.F.R. § 101.15.

It is a thin reed for the government to complain of (Br. at 27–28) the Board's authority to award backpay or other relief. Backpay is nothing like the "daunting monetary penalties" that the Supreme Court has found significant in assessing the need for presidential control. *Seila Law*, 591 U.S. at 219. Where monetary penalties bring the punitive power of the United States to bear, *see Kokesh v. Securities & Exch. Comm'n*, 581 U.S. 455, 464 (2017), a backpay order simply "restore[s] the economic status quo that would have obtained" but for an unfair labor practice, *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 188–89 (1973); *see Republic Steel v. NLRB*, 311 U.S. 7 (1940) (holding that the Board has no authority to issue punitive orders).

The government asserts that the Board has issued "substantive rules of general applicability governing employer-employee relations." Br. at 29–30. But those rules are necessarily in direct aid of its principal adjudicatory functions, and not the "vast rulemaking" condemned in *Seila Law*. 591 U.S. at 203. The Board issues "such rules and regulations as may be necessary to carry out the provisions of this subchapter," meaning the National Labor Relations Act. 29 U.S.C. § 156. And to the extent that the Board oversteps in asserting rulemaking authority, it would face "Article III courts [that] review those interpretations *de novo*." Millett Op. at 16 (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024)). Historically, the courts have conducted meaningful judicial review of the Board's rare forays into rulemaking to ensure that any use of this authority falls properly within the scope of the Act's authorization. *Compare American Hosp. Ass'n v. NLRB*, 899 F.2d 651 (7th Cir. 1990) (upholding rule delineating appropriate bargaining units in acute-care hospitals); *Associated Builders & Contractors of Texas, Inc. v. NLRB*, 826 F.3d 215 (5th Cir. 2016) (upholding rules governing representation election procedures), *with Chamber of Com. of United States v. NLRB*, 723 F. Supp. 3d 498 (E.D. Tex. 2024) (invalidating the Board's joint-employer rule); *Chamber of Com. of United States v. NLRB*, 856 F. Supp. 2d 778 (D.S.C. 2012), *aff'd*, 721 F.3d 152 (4th Cir. 2013) (invalidating rule requiring notification of employee rights).

23

Contrary to the government's view, the Board's powers fall squarely into the parameters of constitutionally sound independence established by *Seila Law*. 591 U.S. at 218. The Board has no power to "unilaterally issue final decisions awarding legal and equitable relief," nor does it "promulgate binding rules fleshing out 19 federal statutes." *Id*. at 218–19. Instead, the Board must rely on federal courts to enforce its decisions. 29 U.S.C. § 160(e). Moreover, the Board is charged with enforcing primarily a single statute in a process controlled by the General Counsel's—and ultimately the President's—significant prosecutorial discretion. *Id*. § 160(a)–(b).

## III. ELIMINATING REMOVAL PROTECTIONS UPENDS THE BOARD'S FUNCTIONS AND IMPERILS THE NATION'S HARD-WON LABOR PEACE

Tellingly, the federal government does not even address the consequences of stripping the National Labor Relations Board of for-cause removal protections for its Members, even though its position is tantamount to overruling *Humphrey's Executor*.

All three branches of government have relied on *Humphrey's Executor* to permit removal protections for Board Members over the past century, and they have a meaningful interest in having those protections prevail. After all, Congress specifically modeled the Board after the agency upheld in the Supreme Court's decision "so as not to leave the matter open to further litigation." NLRB, 2 *Legislative History of the National Labor Relations Act*, at 3062. The Judiciary gladly got out of the fray of resolving individual labor disputes, as it only fomented distrust of Article III courts.

*See Starbucks*, 602 U.S. at 355 (Jackson, J., concurring). And Presidents since Roosevelt have leaned on the ability of the Board to handle some of the most sensitive matters in the national economy, which was only made possible by insulating the Members from partisan control.

In the short term, upholding Member Wilcox's removal could create chaos in the Board's jurisprudence, potentially compromising the Board's ability to fulfill its mission. It is not difficult to imagine that parties may respond to her removal by flooding the federal courts with challenges to prior Board decisions based on claims (whether meritorious or not) that these decisions merit revisiting because they were made by Members who operated under improper protection from removal. *See generally Collins*, 594 U.S. at 259. Indeed, in the past when the appointment or removal of a Member has been questioned, a slew of cases that challenge the Member's office resulted. *See, e.g.*, *Noel Canning*, 573 U.S. at 522.

The resulting burden on the Board's limited resources to litigate such claims—regardless of their merit—could be overwhelming. Already, some parties have sought to avoid or undermine standard Board administrative proceedings while the Board lacked a quorum. *See* Order, *Amazon.com Servs. LLC v. NLRB*, No. 24-50761, Doc. No. 46-2 (5th Cir. Sept. 30, 2024); *Amazon.com Servs. LLC v. NLRB*, No. 24-cv-9564, 2025 WL 466262 (C.D. Cal. Feb. 5, 2025). And in recent weeks, employers have brought seemingly dubious challenges to the certifications of union elections,

arguing that Regional Directors lack the authority to certify the election results absent Member Wilcox. *See, e.g.*, Robert Iafolla, *Whole Foods Bid to Repel Union Swipes at Hobbled Labor Board*, BLOOMBERG LAW (Feb. 11, 2025), https://news.bloomberglaw.com/daily-labor-report/whole-foods-bid-to-repel-union-swipes-at-hobbled-labor-board. That flood of litigation only promises to intensify if the President's removal is upheld.

In the longer term, the President's insistence that he can remove any Board Member for any reason—even if the reason is as simple as a disagreement with a particular decision in an individual adjudication—would undermine the Board's sole function. Like a common-law court, the Board's effective adjudication of disputes depends on the "confidence" of regulated parties appearing before it, as well as of the public at large. NLRB, 2 *Legislative History of the National Labor Relations Act*, at 3060. As former Chairman (of the Old NLRB) Francis Biddle acknowledged in 1935, "[t]he value and success of any quasi-judicial board dealing with labor relations lies first and foremost in its independence and impartiality." *Id.*

That signal to labor and management alike that labor disputes will no longer be resolved by measured legal deliberation but by raw politics would damage the national economy irretrievably. "[W]ith 'the Damocles' sword of removal by the President' hanging over the NLRB, employers and labor would lose faith that the NRLB is impartially administering the law rather than tacking to ever-changing

political winds." Millett Op. at 37 (quoting *Wiener v. United States*, 357 U.S. 349, 356 (1958)). Neither labor nor management would have any serious reason to engage in the resolution of their disputes before the Board, when the relevant decisionmaker sat in the White House.

The government insists that the stakes here are measured solely in terms of the President's control. But this ignores the long history of presidential interventions that led to the Board's creation as a neutral, adjudicatory agency. At-will removal that corrodes the independence of the Board in its individual adjudications threatens to return the Nation to its pre-1935 state of affairs.

We are far past the age of violent labor strikes and brutal crackdowns, or at least we should be. The Board has been functioning as an independent agency for the past ninety years to ensure industrial peace, and the fact that that nearly century-long interbranch consensus has been successful only reflects the continuing wisdom of the Board's composition pursuant to *Humphrey's Executor*.

27

## CONCLUSION

For the foregoing reasons, this Court should affirm.

Dated:      New York, NY
            April 9, 2025

                                    Respectfully submitted,

                                    /s/ *Dennis Fan*
                                    DENNIS FAN, *Director*
                                    BENNETT LUNN, *Student*
                                    ALICE PARK, *Student*
                                    APPELLATE LITIGATION CLINIC,
                                      COLUMBIA LAW SCHOOL
                                    MORNINGSIDE HEIGHTS
                                      LEGAL SERVICES, INC.
                                    435 West 116th St.
                                    New York, NY 10027
                                    (212) 854-4291
                                    dfan@columbialawclinics.org

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), this document complies with the type-volume limit of Rule 32(a)(7)(B) because, excluding the parts exempted by Rule 32(f) and D.C. Circuit Rule 32(e)(1), it contains 6,256 words. This document complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Baskerville, 14-point font.

Dated:        April 9, 2025                    */s/ Dennis Fan*
                                              Dennis Fan
                                              Counsel for *Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the Court's CM/ECF system on April 9, 2025, which will send notice of such filing to all counsel who are CM/ECF registered users.

Dated:        April 9, 2025                    */s/ Dennis Fan*
                                              Dennis Fan
                                              Counsel for *Amici Curiae*