No. 25-5057

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

GWYNNE A. WILCOX,

Plaintiff-Appellee,

v.

DONALD J. TRUMP, et al.,

Defendants-Appellants.

_____

On Appeal from the United States District Court
for the District of Columbia (No. 25-cv-334)
The Honorable Judge Beryl A. Howell

## BRIEF OF AMICI CURIAE MINNESOTA, ILLINOIS, ARIZONA, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OREGON, RHODE ISLAND, VERMONT, WASHINGTON, AND WISCONSIN IN SUPPORT OF PLAINTIFF-APPELLEE AND AFFIRMANCE

KEITH ELLISON
Attorney General
State of Minnesota

LIZ KRAMER
Solicitor General
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101
(651) 757-1010
liz.kramer@ag.state.mn.us

KWAME RAOUL
Attorney General
State of Illinois

JANE ELINOR NOTZ
Solicitor General
ALEX HEMMER
Deputy Solicitor General
R. SAM HORAN
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-5526
alex.hemmer@ilag.gov

*(Additional counsel on signature page)*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to this Court's Rule 28(a)(1), I hereby certify that:

## A.    Parties and Amici

Except for the following, all parties, intervenors, and amici that appeared before the district court or are appearing before this Court are identified in the Brief for Plaintiff-Appellee:  Amici States of Maine and North Carolina.

## B.    Rulings Under Review

References to the rulings at issue appear in the Brief for Appellants.

## C.    Related Cases

We are not aware of any related cases within the meaning of this Court's Rule 28(a)(1)(C).


/s/ Alex Hemmer
ALEX HEMMER

April 9, 2025

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .i

TABLE OF AUTHORITIES .................................................................iv

GLOSSARY ......................................................................................ix

INTRODUCTION AND INTERESTS OF AMICI CURIAE ....................1

SUMMARY OF ARGUMENT .................................................................2

ARGUMENT .......................................................................................4

I.  The Purported Removal Would Harm Amici States and the American Economy in Both the Short and Long Terms.................5

    A.  The Board benefits employers, workers, States, and the broader economy. ...................................................................6

    B.  States cannot fully compensate for the loss of an effective NLRB. ......................................................................................10

    C.  Invalidating the NLRA's removal protection would needlessly destabilize labor law in both the short and long terms. .........................................................................................14

II.  The NLRA's Removal Protection Is Constitutional, and the District Court Entered an Appropriate Remedy............................16

    A.  The courts of appeals agree that removal protections for similar officers are constitutional. ........................................17

    B.  Defendants' erroneous remedial argument would vastly enlarge presidential power. ...................................................21

CONCLUSION .................................................................................24

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Alivio Med. Ctr. v. Abruzzo,*
No. 24-cv-7217, 2024 WL 4188068 (N.D. Ill. Sept. 13, 2024) ........17

*Amalgamated Ass'n of St., Elec. Ry. &*
*Motor Coach Emps. of Am. v. Lockridge,*
403 U.S. 274 (1971) ...................................................................11, 12

*Blinder, Robinson & Co. v. SEC,*
489 U.S. 1033 (1989) ........................................................................21

*Consumers' Rsch. v. CPSC,*
145 S. Ct. 414 (2024) ........................................................................20

*Consumers' Rsch. v. CPSC,*
91 F.4th 342 (5th Cir. 2024)......................................................19, 20

*District of Columbia v. Straus,*
590 F.3d 898 (D.C. Cir. 2010) .........................................................22

*eBay Inc. v. MercExchange, L.L.C.,*
547 U.S. 388 (2006) ................................................................4, 5, 16

*FEC v. NRA Pol. Victory Fund,*
6 F.3d 821 (D.C. Cir. 1993) ......................................................18, 19

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
561 U.S. 477 (2010) ...................................................................18, 20

*Glacier Nw., Inc. v. Int'l Brotherhood of*
*Teamsters Loc. Union No. 174,*
598 U.S. 771 (2023) ...................................................................11, 12

*Humphrey's Ex'r v. United States,*
295 U.S. 602 (1935) ............................................................3, 16, 17

*Leachco, Inc. v. CPSC,*
 No. 24-156, 2025 WL 76435 (U.S. Jan. 13, 2025) .......................... 20

*Leachco, Inc. v. CPSC,*
 103 F.4th 748 (10th Cir. 2024) ................................................. 19, 20

*Magnetsafety.org v. CPSC,*
 129 F.4th 1253 (10th Cir. 2025) ..................................................... 19

*Kerwin v. Trinity Health Grand Haven Hosp.,*
 No. 24-cv-445, 2024 WL 4594709 (W.D. Mich. Oct. 25, 2024) ....... 17

*New Process Steel, L.P. v. NLRB,*
 560 U.S. 674 (2010) ........................................................................ 14

*NLRB v. Noel Canning,*
 573 U.S. 513 (2014) ........................................................................ 24

*Overstreet v. Lucid USA Inc.,*
 No. 24-cv-1356, 2024 WL 5200484 (D. Ariz. Dec. 23, 2024) .......... 17

*Republic Steel Corp. v. NLRB,*
 311 U.S. 7 (1940) ...................................................................... 18, 19

*San Diego Bldg. Trades Council v. Garmon,*
 359 U.S. 236 (1959) .................................................................. 11, 12

*Sears, Roebuck & Co. v. San Diego Cnty.*
 *Dist. Council of Carpenters,*
 436 U.S. 180 (1978) .......................................................................... 6

*SEC v. Blinder, Robinson & Co.,*
 855 F.2d 677 (10th Cir. 1988) .................................................. 20, 21

*Seila Law LLC v. Consumer Fin. Prot. Bureau,*
 591 U.S. 197 (2020) .................................................................. 15, 16

*Severino v. Biden,*
 71 F.4th 1038 (D.C. Cir. 2023) ....................................................... 24

*Swan v. Clinton,*
100 F.3d 973 (D.C. Cir. 1996) ................................................... 23, 24

*YAPP USA Auto. Sys., Inc. v. NLRB,*
748 F. Supp. 3d 497 (E.D. Mich. 2024) ........................................ 17

## STATUTES

2 U.S.C.
§ 437d (1994) ........................................................................ 18
§ 437g (1994) ........................................................................ 18

15 U.S.C.
§ 78u (1988) .......................................................................... 21
§ 78u-1 (1988) ....................................................................... 21
§ 78w (1988) .......................................................................... 21
§ 2056 ................................................................................... 19
§ 2057 ................................................................................... 19
§ 2064 ................................................................................... 19
§ 2069 ................................................................................... 19
§ 2071 ................................................................................... 19
§ 2076 ................................................................................... 19

29 U.S.C.
§ 151 ........................................................................ 6, 8, 9, 15
§ 153 ..................................................................... 14, 15, 22
§ 160 ..................................................................... 13, 14, 18

52 U.S.C.
§ 30107 ................................................................................. 18
§ 30109 ................................................................................. 18

## OTHER AUTHORITIES

U.S. Const. art. III, § 1 ............................................................. 23

29 C.F.R. § 101.12 .................................................................... 14

S. Rep. No. 74-573 (1935),
  *reprinted in* 2 NLRB, *Legislative History
  of the National Labor Relations Act, 1935*, at 2300 (1959),
  https://babel.hathitrust.org/cgi/pt?id=uiug.30112002476288 ......... 8

David Brady et al., *When Unionization Disappears: State-Level
  Unionization and Working Poverty in the United States*,
  78 Am. Socio. Rev. 872 (2013) .......................................................... 9

Archibald Cox, *Federalism in the Law of Labor Relations*,
  67 Harv. L. Rev. 1297 (1954) ........................................................ 10

Arindrajit Dube et al., *Nurse Unions and Patient Outcomes*,
  69 ILR Rev. 803 (2016) .................................................................... 9

Henry S. Farber et al., *Unions and Inequality over the
  Twentieth Century: New Evidence from Survey Data*,
  136 Q.J. Econ. 1325 (2021) .............................................................. 9

Maury Gittleman & Morris M. Kleiner, *Wage Effects of
  Unionization and Occupational Licensing
  Coverage in the United States*,
  69 ILR Rev. 142 (2016) ..................................................................... 7

Walter Hourahan, *Collective Bargaining*, *in* 1 *Historical
  Encyclopedia of American Labor* 92
  (Robert E. Weir & James P. Hanlan eds., 2004) ............................. 9

William W. Olney, *A Race to the Bottom? Employment
  Protection and Foreign Direct Investment*,
  91 J. Int'l Econ. 191 (2013) ........................................................... 10

Jake Rosenfeld et al., *Union Decline Lowers Wages of
  Nonunion Workers* (2016), https://files.epi.org/pdf/112811.pdf ....... 8

U.S. Dep't of the Treasury, *Labor Unions and the Middle
  Class* (2023), https://home.treasury.gov/system/files/
  136/Labor-Unions-And-The-Middle-Class.pdf .................... 6, 7, 8, 9

vii

Whole Foods Market Group, Inc.'s Objections to Conduct
    Affecting the Results of Election,
    *Whole Foods Market Group, Inc.*,
    No. 04-RC-355267 (N.L.R.B. Feb. 3, 2025).....................................15

*Board Decisions Issued*, NLRB.,
    https://www.nlrb.gov/reports/agency-performance/
    board-decisions-issued (last visited Apr. 9, 2025)..........................13

*Investigate Charges*, NLRB,
    https://www.nlrb.gov/about-nlrb/what-we-do/
    investigate-charges (last visited Apr. 9, 2025).............................13

*Members of the NLRB Since 1935*, NLRB,
    https://www.nlrb.gov/about-nlrb/who-we-are/
    the-board/members-of-the-nlrb-since-1935
    (last visited Apr. 9, 2025)................................................14

*The NLRB Process*, NLRB,
    https://www.nlrb.gov/resources/
    nlrb-process (last visited Apr. 9, 2025) .........................................13

*Work Stoppages*, U.S. Bureau of Lab. Stat. (Feb. 20, 2025),
    https://www.bls.gov/web/wkstp/annual-listing.htm ........................9

# GLOSSARY

| | |
|---|---|
| ALJ | Administrative Law Judge |
| CPSC | Consumer Product Safety Commission |
| FEC | Federal Election Commission |
| NLRA | National Labor Relations Act |
| NLRB | National Labor Relations Board |
| SEC | Securities and Exchange Commission |

# INTRODUCTION AND INTERESTS OF AMICI CURIAE

The amici States of Minnesota, Illinois, Arizona, California, Colorado, Connecticut, Delaware, District of Columbia, Hawaii, Maine, Maryland, Massachusetts, Michigan, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Washington, and Wisconsin (collectively, "amici States") submit this brief in support of Plaintiff-Appellee Gwynne A. Wilcox and affirmance.

For 90 years, the National Labor Relations Act ("NLRA" or "Act") has strengthened the American economy and benefitted both employers and workers by stabilizing labor-management relations and enabling workers to join together to negotiate for higher wages, better benefits, and improved working conditions. The National Labor Relations Board ("NLRB" or "Board"), the independent federal agency charged with administering the Act, plays an integral part in effectuating this statutory scheme. Defendants' unlawful removal of Wilcox from the Board, if allowed to take effect, would not only immediately prevent the agency from performing several of its most important functions but also threaten the NLRB's legitimacy and stability in the long term.

Those results would injure amici States, which have a unique interest in a fully functional Board. The States depend on a well-functioning labor-relations system to prevent industrial strife and protect their employers and workers, union and nonunion alike. And because the NLRA vests the Board with a wide range of oversight authority over labor law, the absence of a functioning Board could create a regulatory vacuum that would harm employers and workers in amici States — and that, because of the NLRA's broad preemptive effect, amici States would often be unable to fill. Amici States thus have a significant stake in ensuring that the NLRB remains effective. Wilcox's putative dismissal would imperil that interest by disrupting the status quo and rendering the Board inoperative, diminishing its ability to support amici States' employers and workers.

## SUMMARY OF ARGUMENT

The Board's administration of the NLRA creates multiple important benefits for employers, workers, States, and the broader economy. For example, by safeguarding collective-bargaining rights and providing an accessible administrative forum for labor disputes, the Board helps both to improve wages and working conditions for workers

and to protect employers' operations against disruptions caused by labor strife. It also benefits States by preventing an interstate race to the bottom in labor standards. Only the Board can play this role, since States and the federal courts cannot independently enforce the Act's requirements or, in many circumstances, impose their own analogous protections. Wilcox's putative dismissal, which would deprive the Board of the quorum it requires to act, would thus seriously harm the public by nullifying the Act's protections for the foreseeable future and, in the longer term, undermining the Board's legitimacy and stability as a multimember, expert agency.

Defendants' argument that Article II empowers the President to inflict these harms by removing Wilcox is meritless, as is their contention that the district court lacked the authority to enter an injunction allowing Wilcox to perform her duties as a Board member. The courts of appeals, including this Court, have uniformly recognized that removal protections for members of similar multimember independent agencies are constitutional under *Humphrey's Executor v. United States*, 295 U.S. 602 (1935). And because Wilcox is, as a matter of law, still a member of the Board, the district court had the authority

to issue a routine injunction requiring executive officers to comply with the law by treating her as such. Defendants' view that the President can effectively exercise removal authority that he does not possess as long as he is willing to pay the unlawfully removed officer backpay is irreconcilable with both the text of the NLRA and our constitutional order.

## ARGUMENT

Wilcox's unlawful dismissal, if allowed to take effect, would seriously harm the public by essentially shutting down the Board's operations. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (requiring consideration of "public interest" in evaluating request for permanent injunction). That shutdown would deprive employers, workers, and States of the NLRA's benefits in the short term and damage the agency's legitimacy and stability in the long term.

Fortunately, nothing in Article II requires that result, as Wilcox's brief, Pl. Br. 19-33, and the district court's decision, JA148-67, explain. In addition to addressing the importance of this case to the public, amici States write separately to emphasize two points. First, defendants' efforts to distinguish *Humphrey's Executor* based on a handful of the

Board's statutory powers is contrary to the consensus among multiple courts of appeals, including this Court, that have uniformly upheld removal protections for officers of multimember agencies that exercise the same or more expansive powers. Second, defendants' remedial argument — that, even if the President lacked authority to remove Wilcox, he did so anyway, and the federal courts can, at most, award backpay — misunderstands both the relief Wilcox seeks and the nature of the President's authority. For these reasons, as well as those discussed in Wilcox's brief, the Court should affirm.

## I. The Purported Removal Would Harm Amici States and the American Economy in Both the Short and Long Terms.

The Board's stable, expert administration of the NLRA benefits numerous stakeholders, including employers, workers, and the States. And because of the Act's broad preemptive effect, only the NLRB can play the agency's assigned role. As a result, by effectively rendering the Board inoperative, the purported removal would destabilize labor law and seriously harm the millions of Americans who rely on the NLRA's protections. The public interest therefore tilts heavily in Wilcox's favor. *See MercExchange*, 547 U.S. at 391.

**A.   The Board benefits employers, workers, States, and the broader economy.**

For almost a century, the Act has aided employers, workers, and States by protecting workers' collective-bargaining rights, stabilizing labor-management relations, and creating a uniform national system of labor law.  The loss of a functional Board able to administer the Act would jeopardize those gains.

To begin, the NLRB aids workers by protecting their collective-bargaining rights.  In enacting the NLRA and creating the Board to administer it, "Congress expressly recognized that collective organization of segments of the labor force into bargaining units capable of exercising economic power comparable to that possessed by employers may produce benefits for the entire economy in the form of higher wages, job security, and improved working conditions." *Sears, Roebuck & Co. v. San Diego Cnty. Dist. Council of Carpenters*, 436 U.S. 180, 190 (1978); *see* 29 U.S.C. § 151.  Studies confirm that, as Congress predicted, the unionization facilitated by the Act improves wages, benefits, and working conditions.[1]  For example, a review of the

---

[1] *See* U.S. Dep't of the Treasury, *Labor Unions and the Middle Class* 13-20 (2023), https://home.treasury.gov/system/files/136/Labor-Unions-

empirical literature by the U.S. Department of the Treasury found that union members earn, on average, 10 to 15 percent more than similarly situated nonunion workers, with larger wage benefits for longer-tenured union workers.[2]  Union workers also generally receive improved nonwage benefits, including better retirement benefits, health and life insurance, and paid leave.[3]  Indeed, more than 90 percent of union workers are offered sick leave, compared to 77 percent of nonunion workers.[4]  And studies show that unionized workplaces generally have better systems for addressing employee grievances, stronger protections for more senior employees, and better workplace safety practices.[5]  But the benefits of collective bargaining are not limited to union members:  by creating competition for workers, for

---

And-The-Middle-Class.pdf; *see also, e.g.*, Maury Gittleman & Morris M. Kleiner, *Wage Effects of Unionization and Occupational Licensing Coverage in the United States*, 69 ILR Rev. 142, 145, 164 (2016) (wages and benefits).

[2]  U.S. Dep't of the Treasury, *supra* note 1, at 16.

[3]  *Id.* at 16-17.

[4]  *Id.*

[5]  *Id.* at 18.

instance, unions increase wages for nonmembers, too, as nonunion employers raise pay to remain competitive in the labor market.[6]

In addition to workers, the Act benefits employers and the economy as a whole by stabilizing labor-management relations. Congress's "first objective" in enacting the NLRA was "to promote industrial peace" following several decades in which hundreds or thousands of strikes occurred annually, costing millions of workdays each year. S. Rep. No. 74-573, at 1-3 (1935);[7] *see* 29 U.S.C. § 151. Congress reasoned that, by creating the Board as an accessible administrative forum for labor disputes and providing a legal framework for collective bargaining, the Act would "remov[e] certain recognized sources of industrial strife and unrest" and facilitate labor peace. 29 U.S.C. § 151; *see* S. Rep. No. 74-573, at 2 (explaining that the Act would "remove the provocation to a large proportion of the bitterest industrial outbreaks by giving definite legal status to the procedure of

---

[6] *Id.* at 19; *see also, e.g.*, Jake Rosenfeld et al., *Union Decline Lowers Wages of Nonunion Workers* 27-28 (2016), https://files.epi.org/pdf/112811.pdf.

[7] *Reprinted in* 2 NLRB, *Legislative History of the National Labor Relations Act, 1935*, at 2300, 2300-02 (1959), https://babel.hathitrust.org/cgi/pt?id=uiug.30112002476288.

collective bargaining and by setting up machinery to facilitate it"). Congress's prediction has again proven correct:  the number of major work stoppages has fallen precipitously since the Act's enactment.[8]  The NLRA, as administered by the Board, thus protects employers' operations and ensures "the free flow of commerce."  29 U.S.C. § 151.

The Act creates other economic benefits as well.  Studies show that unions, protected by the NLRB, decrease income inequality.[9]  For example, increased unionization rates are associated with decreases in worker poverty and in the share of income going to the top 10% of earners and increases in the share of income earned by workers.[10]  And unions may increase productivity.[11]

---

[8]  *See Work Stoppages*, U.S. Bureau of Lab. Stat. (Feb. 20, 2025), https://www.bls.gov/web/wkstp/annual-listing.htm; *see also* Walter Hourahan, *Collective Bargaining*, *in* 1 *Historical Encyclopedia of American Labor* 92, 93 (Robert E. Weir & James P. Hanlan eds., 2004).

[9]  U.S. Dep't of the Treasury, *supra* note 1, at 23-25; *see also, e.g.*, Henry S. Farber et al., *Unions and Inequality over the Twentieth Century: New Evidence from Survey Data*, 136 Q.J. Econ. 1325, 1380 (2021).

[10]  *See* U.S. Dep't of the Treasury, *supra* note 1, at 24; *see also, e.g.*, David Brady et al., *When Unionization Disappears:  State-Level Unionization and Working Poverty in the United States*, 78 Am. Socio. Rev. 872, 889-92 (2013); Farber et al., *supra* note 9, at 1376-1380.

[11]  *See* U.S. Dep't of the Treasury, *supra* note 1, at 25-26; *see also, e.g.*, Arindrajit Dube et al., *Nurse Unions and Patient Outcomes*, 69 ILR Rev. 803, 830 (2016).

The national scope of the Board's activities also aids States, including amici States, by preventing a race to the bottom in labor standards. As former Solicitor General Archibald Cox explained, a lack of uniformity would "open the way to interstate competition in enacting statutes attractive to industry," threatening workers' rights. Archibald Cox, *Federalism in the Law of Labor Relations*, 67 Harv. L. Rev. 1297, 1317 (1954). Indeed, empirical evidence demonstrates the existence of this phenomenon at the international level, with countries undercutting one another's labor standards to attract foreign investment.[12]

In sum, the Act — and the Board's uniform, national administration of its requirements — benefits employers, workers, States, and the American economy as a whole. The loss of a functional NLRB would nullify those benefits.

## B. States cannot fully compensate for the loss of an effective NLRB.

Because the NLRA confers primary authority on the Board to interpret the Act and administer its protections, amici States, their

---

[12] *See* William W. Olney, *A Race to the Bottom? Employment Protection and Foreign Direct Investment*, 91 J. Int'l Econ. 191, 203 (2013).

workers, and the businesses that operate within them would all suffer if the NLRB were rendered inoperative.

The NLRA grants the Board exclusive jurisdiction over many aspects of labor law and generally preempts States from regulating in those areas. The Supreme Court has held that, subject to certain exceptions, the Board maintains exclusive oversight of conduct that is even "arguably protected or prohibited by the Act." *Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emps. of Am. v. Lockridge*, 403 U.S. 274, 276 (1971) (citing *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236 (1959)); *see Glacier Nw., Inc. v. Int'l Brotherhood of Teamsters Loc. Union No. 174*, 598 U.S. 771, 776 (2023) (noting that *Garmon* preemption "goes beyond the usual preemption rule"). If conduct falls within this sphere, "the States as well as the federal courts must defer to the [Board's] exclusive competence." *Garmon*, 359 U.S. at 245. Thus, "States cannot regulate conduct that the NLRA protects, prohibits, or arguably protects or prohibits," and neither state nor federal courts can hear claims alleging violations of the Act in the first instance. *Glacier Nw.*, 598 U.S. at 776 (cleaned up); *see id.* at 777 ("*Garmon* . . . tells us not just what law applies (federal law, not state law) but who applies it

(the [NLRB], not the state courts or federal district courts)." (cleaned up)).  In other words, if conduct even arguably implicates the Act, subject to certain exceptions, *see id.* at 777 n.1, any unfair practices claim arising from that conduct *must* commence before the agency.

This broad preemption regime means that, if the NLRB cannot play its assigned role, States will often be unable to fill the gap.[13]  For example, States generally would be unable, at least under current law, to replicate or extend the Act's protections in state law and enforce those protections in state courts.  *See, e.g.*, *Garmon*, 359 U.S. at 244 ("When it is clear or may fairly be assumed that the activities which a State purports to regulate are [protected or prohibited by the Act], due regard for the federal enactment requires that state jurisdiction must yield.").  Nor can States step in to adjudicate labor disputes under the Act if the Board fails to do so.  *Cf., e.g.*, *id.* at 245 (holding that state court could not adjudicate claim within Board's jurisdiction).

---

[13]  Of course, absent a functioning Board, there might arise a serious question whether the Act would preempt state law.  And, because the Supreme Court has "recognized exceptions to [*Garmon* preemption]," *Glacier Nw.*, 598 U.S. at 777 n.1, this brief takes no position about the applicability of NLRA preemption doctrine to any specific state law. But the scope of NLRA preemption is unquestionably "broad." *Lockridge*, 403 U.S. at 284.

As a practical matter, this system means that States and other stakeholders rely on the Board to adjudicate an enormous number of claims. Parties to labor disputes — employers, workers, and unions alike — file over 20,000 unfair labor practice charges each year.[14] Although many aspects of the NRLA's adjudicative system are handled by administrative law judges ("ALJs") and other agency officials, the Board retains responsibility for reviewing those officials' determinations on appeal.[15] Indeed, the Board itself reviews hundreds of cases each year, and over the last decade has issued nearly 3,000 decisions in cases presenting questions about unfair labor practices, elections, and representation.[16]

Because States generally cannot fill the NLRB's central, often exclusive role in administering labor law, even a temporary break in the Board's operations would seriously harm employers, workers, States, and the broader American economy.

---

[14] *Investigate Charges*, NLRB, https://www.nlrb.gov/about-nlrb/what-we-do/investigate-charges (last visited Apr. 9, 2025).

[15] *See* 29 U.S.C. § 160(c); *The NLRB Process*, NLRB, https://www.nlrb.gov/resources/nlrb-process (last visited Apr. 9, 2025).

[16] *Board Decisions Issued*, NLRB., https://www.nlrb.gov/reports/agency-performance/board-decisions-issued (last visited Apr. 9, 2025).

## C. Invalidating the NLRA's removal protection would needlessly destabilize labor law in both the short and long terms.

As discussed, *supra* pp. 5-13, States, their employers and workers, and the American economy as a whole depend on the Board to administer the Act's protections. Wilcox's putative removal threatens the viability of this system in both the short and long terms.

By immediately depriving the Board of a quorum, Wilcox's dismissal threatens to nullify the NLRA's protections for the foreseeable future. The NLRB cannot act without a quorum of at least three members. *See* 29 U.S.C. § 153(b); *New Process Steel, L.P. v. NLRB*, 560 U.S. 674, 688 (2010).[17] Wilcox's putative dismissal would leave the Board with only two members, and the President has taken no action to fill the two vacancies that have existed since the beginning of his term.[18] Defendants' unlawful attempt to remove Wilcox would thus

---

[17] Although many NLRA administrative proceedings are heard by ALJs in the first instance, an ALJ's decision can become final without Board action only if no party appeals. *See* 29 U.S.C. § 160(c); 29 C.F.R. § 101.12. Thus, a party to a dispute can attempt to forestall final agency action for as long as the Board lacks a quorum by appealing any adverse ALJ decision.

[18] *See Members of the NLRB Since 1935*, NLRB, https://www.nlrb.gov/about-nlrb/who-we-are/the-board/members-of-the-nlrb-since-1935 (last visited Apr. 9, 2025).

effectively shut down the Board and seriously undermine the Act's protections, depriving employers, workers, and States of the benefits discussed above and creating "industrial strife and unrest." 29 U.S.C. § 151. Indeed, parties have already cited the lack of a quorum in challenging administrative proceedings under the NLRA. For example, mere days after defendants purported to remove Wilcox from the Board, and before the district court entered judgment in her favor, Whole Foods asserted in a pending proceeding that a regional NLRB official lacked statutory authority to certify the results of a union election at one of its stores because the Board lacked a quorum.[19]

Wilcox's unlawful dismissal would affect not only the Board's current functionality but also its long-term stability and legitimacy as a multimember body of experts. By limiting the permissible grounds for removal and giving Board members staggered five-year terms, *see* 29 U.S.C. § 153(a), Congress intended to create a stable body of labor law through an agency that would "accumulate technical expertise and avoid a 'complete change' in leadership 'at any one time,'" *Seila Law*

---

[19] *See* Whole Foods Market Group, Inc.'s Objections to Conduct Affecting the Results of Election, *Whole Foods Market Group, Inc.*, No. 04-RC-355267 (N.L.R.B. Feb. 3, 2025).

*LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 216 (2020) (quoting *Humphrey's Ex'r*, 295 U.S. at 624).  Those provisions similarly reflect Congress's intent that the Board be "'non-partisan' and . . . 'act with entire impartiality'" in adjudicating cases, *id.* (quoting *Humphrey's Ex'r*, 295 U.S. at 624), a goal further advanced by the Board's tradition of partisan balance.  Defendants' attempt to remove Wilcox would defeat these congressional purposes and thus disserve the public interest.  *See MercExchange*, 547 U.S. at 391.

## II.  The NLRA's Removal Protection Is Constitutional, and the District Court Entered an Appropriate Remedy.

Defendants' arguments in support of Wilcox's putative removal and against the relief ordered by the district court are meritless.  The courts of appeals, including this Court, unanimously agree that similar removal protections are constitutional, and the Supreme Court has repeatedly declined to review those decisions.  And defendants' remedial argument — that, even if the purported removal was unlawful, the federal courts lack the power to meaningfully remedy the resulting injury — succeeds only in demonstrating the astonishing breadth of defendants' position.  Thus, the district court properly granted Wilcox summary judgment and awarded her appropriate relief.

## A.  The courts of appeals agree that removal protections for similar officers are constitutional.

Defendants seek to escape the controlling authority of *Humphrey's Executor* based on the Board's powers to (1) adjudicate and order remedies for unfair-practices complaints, (2) seek to enforce its orders in federal court, (3) and engage in rulemaking.  Defs. Br. 27-32.  As Wilcox explains, none of these powers distinguish this case from *Humphrey's Executor*.  Pl. Br. 27-30; *see also, e.g.*, *Humphrey's Ex'r*, 295 U.S. at 620-21 (discussing the 1935 FTC's authority to "issue . . . cease and desist order[s]" and to "apply to the appropriate Circuit Court[s] of Appeals for [those orders'] enforcement").  The courts of appeals, including this Court, have uniformly reached that same conclusion in decisions addressing other multimember expert agencies exercising similar powers.[20]  This unanimity — along with the Supreme Court's repeated

---

[20]  Several district courts have also concluded that the removal protection for NLRB members is constitutional.  *See Overstreet v. Lucid USA Inc.*, No. 24-cv-1356, 2024 WL 5200484, at *7-10 (D. Ariz. Dec. 23, 2024); *Kerwin v. Trinity Health Grand Haven Hosp.*, No. 24-cv-445, 2024 WL 4594709, at *7 (W.D. Mich. Oct. 25, 2024); *Alivio Med. Ctr. v. Abruzzo*, No. 24-cv-7217, 2024 WL 4188068, at *5-9 (N.D. Ill. Sept. 13, 2024); *YAPP USA Auto. Sys., Inc. v. NLRB*, 748 F. Supp. 3d 497, 505-08 (E.D. Mich. 2024), *appeal docketed*, No. 24-1754 (6th Cir. Sept. 9, 2024).

denials of certiorari in those cases — confirms that the Act's removal

protection is constitutional.

Start with this Court's decision upholding removal protections for

members of the Federal Election Commission ("FEC").  *See FEC v. NRA*

*Pol. Victory Fund*, 6 F.3d 821, 826 (D.C. Cir. 1993).[21]  The Court

reached that result despite that agency's exercise of each of the powers

to which defendants object, including conducting administrative

proceedings, litigating enforcement actions in federal court, and

promulgating rules.  *See* 2 U.S.C. §§ 437d(a), 437g(a) (1994) (current

versions at 52 U.S.C. §§ 30107(a), 30109(a)).  Indeed, the FEC's powers

in some respects go beyond the Board's.  For example, the FEC can seek

monetary penalties, *see id.* § 437g(a)(6) (1994) (current version at 52

U.S.C. § 30109(a)(6)), while the Board can order only make-whole relief,

such as backpay, *see* 29 U.S.C. § 160(c); *Republic Steel Corp. v. NLRB*,

---

[21]  The FEC's governing statute does not explicitly protect
Commissioners from removal without cause, but this Court concluded
that Commissioners were "likely" implicitly protected from removal
except for cause.  *NRA Pol. Victory Fund*, 6 F.3d at 826; *cf. Free Enter.
Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 487 (2010) ("The
parties agree that [SEC] Commissioners cannot . . . be removed by the
President except [for cause], and we decide the case with that
understanding." (cleaned up)).

311 U.S. 7, 10-11 (1940). Yet this Court had no difficulty approving the FEC's structure as a "classic independent regulatory agency sanctioned . . . in *Humphrey's Executor*." *NRA Pol. Victory Fund*, 6 F.3d at 826. That reasoning applies equally here.

The Fifth and Tenth Circuits recently reached the same conclusion regarding the statutory removal protection for members of the Consumer Product Safety Commission ("CPSC"). *See Consumers' Rsch. v. CPSC*, 91 F.4th 342, 351-56 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 414 (2024); *Leachco, Inc. v. CPSC*, 103 F.4th 748, 760-63 (10th Cir. 2024), *cert. denied*, No. 24-156, 2025 WL 76435 (U.S. Jan. 13, 2025); *see also Magnetsafety.org v. CPSC*, 129 F.4th 1253, 1265-66 (10th Cir. 2025) (following *Leachco*). The CPSC, too, shares each of the powers that defendants contend distinguish this case from *Humphrey's Executor*: it may "[conduct] administrative proceedings, issue . . . relief, . . . commence civil actions in federal court," and promulgate rules. *Consumers' Rsch.*, 91 F.4th at 346 (citing 15 U.S.C. §§ 2056(a), 2057, 2064, 2069(a)-(b), 2071(a), 2076). In fact, its powers go beyond the Board's — for example, in its ability to seek monetary penalties. *See* 15 U.S.C. § 2069. But both the Fifth and Tenth Circuits held that

Congress could constitutionally protect CPSC Commissioners from removal without cause, *see Consumers' Rsch.*, 91 F.4th at 351-56; *Leachco*, 103 F.4th at 760-63, and the Supreme Court declined to review either decision, *Leachco, Inc. v. CPSC*, No. 24-156, 2025 WL 76435, at *1 (U.S. Jan. 13, 2025) (mem.); *Consumers' Rsch. v. CPSC*, 145 S. Ct. 414, 414 (2024) (mem.).

The Tenth Circuit's holding aligned with that court's earlier decision concerning removal protections for Securities and Exchange Commission ("SEC") Commissioners. *See SEC v. Blinder, Robinson & Co.*, 855 F.2d 677, 681-82 (10th Cir. 1988), *cert. denied*, 489 U.S. 1033 (1989).[22] The plaintiffs in that case presented a different framing of the same constitutional question raised here, asserting that the Commissioners' for-cause removal protection meant they could not "constitutionally exercise civil enforcement authority." *Blinder*, 855 F.2d at 681; *see id.* at 682. That enforcement authority includes, again,

_____

[22] SEC Commissioners, like FEC Commissioners, do not have explicit statutory removal protection, but the Tenth Circuit "accept[ed] [the parties'] assertions . . . that it is commonly understood that the President may remove [an SEC] [C]ommissioner only for [cause]." *Blinder*, 855 F.2d at 681. The Supreme Court later took the same approach in *Free Enterprise Fund*. *See* 561 U.S. at 487.

each of the powers defendants cite here — the ability to conduct administrative proceedings, litigate in federal court, and promulgate and enforce rules, *see* 15 U.S.C. §§ 78u, 78w (1988) — and more besides, *see, e.g.*, *id.* § 78u-1 (1988) (authorizing civil penalties).  The Tenth Circuit, however, rejected the constitutional challenge, *Blinder*, 855 F.2d at 682, and the Supreme Court denied review, *Blinder, Robinson & Co. v. SEC*, 489 U.S. 1033, 1033 (1989) (mem.).

This unanimous body of case law confirms that the NLRA's removal protection is constitutional under *Humphrey's Executor*, as Wilcox explains.  Holding otherwise would require not only breaking from this Court's own precedent but also diverging from decisions of the Fifth and Tenth Circuits that the Supreme Court declined to review. Nothing in Article II requires this Court to take that step.

**B.  Defendants' erroneous remedial argument would vastly enlarge presidential power.**

As the district court's opinion, *see* JA169-71, JA171 n.22, and Wilcox's brief, *see* Pl. Br. 34-41, explain, defendants' argument concerning the federal courts' remedial power fails for multiple reasons, including that it misapprehends the nature of the relief Wilcox seeks

and conflicts with this Court's settled precedent.[23]  But it does highlight the extremity of defendants' position.  Essentially, defendants assert that, even if the President did not have the power to remove Wilcox from office, he did so anyway, and there is nothing the federal courts can do about it — except, perhaps, award backpay.  That is not, and cannot be, the law.

Defendants' view — that Wilcox is no longer a member of the Board and needs a court order to "reinstate" her to that position — is impossible to square with the Act's text.  Congress specified that "[a]ny member of the Board may be removed by the President, upon notice and hearing, for neglect of duty or malfeasance in office, but for no other cause."  29 U.S.C. § 153.  Thus, the President has no power to remove a member, as he has purported to here, for grounds not identified in the Act and without following the mandated procedure.  Wilcox therefore does not need "reinstatement" to office — as a matter of law, she never

_____

[23]  Defendants have also forfeited this argument with respect to declaratory relief, as their remedial argument in the district court addressed only the availability of injunctive relief.  *See* District Ct. Doc. 23 at 10-16; District Ct. Doc. 30 at 6-9; *see also, e.g.*, *District of Columbia v. Straus*, 590 F.3d 898, 903 (D.C. Cir. 2010) (party forfeits arguments not raised before district court).

left. She instead has sought, and the district court appropriately granted, merely "*de facto*" relief that requires the relevant officers to "treat[ ] [her] as a member of the . . . Board and allow[ ] [her] to exercise the privileges of that office." *Swan v. Clinton*, 100 F.3d 973, 980 (D.C. Cir. 1996).

Defendants' contrary view would have untenable consequences in a range of other cases. For instance, all parties presumably agree that the President does not have the power to remove an Article III judge. *See* U.S. Const. art. III, § 1 ("The Judges . . . shall hold their Offices during good Behaviour . . . ."). Thus, if the President purported to remove an Article III judge, that action would have no legal effect, and the judge would not need "reinstatement" to office. But, if the Marshals Service refused to allow the judge to enter the courthouse, she might, as a practical matter, need an injunction requiring the Service to stop interfering with the performance of her duties. This commonplace type of injunction requiring government officials to comply with the law is what Wilcox sought, and the district court granted, here.

The federal courts can and should grant such injunctions. As a doctrinal matter, this "*de facto*" relief falls well within the federal

courts' remedial power.  *Severino v. Biden*, 71 F.4th 1038, 1042-43 (D.C. Cir. 2023) (cleaned up); *accord Swan*, 100 F.3d at 979-81.  And it is the only way to give meaningful effect to the Act's removal protection, since a President intent on dismissing a Board member would likely consider the short-term provision of backpay from the public fisc — the only remedy that defendants endorse — a small price to pay to enlarge his own authority.

At bottom, defendants' position requires assuming that the President's action, even if unlawful, was nonetheless effective.  That is not how our system of government works.  The President cannot expand his powers through adverse possession.  *See NLRB v. Noel Canning*, 573 U.S. 513, 557 (2014); *id.* at 593 (Scalia, J., concurring in the judgment).  In other words, while the President is free to assert that he has powers he does not, he cannot unilaterally force the federal courts to comply with that assertion.  The district court had the power to remedy the unlawful attempt to remove Wilcox.

## CONCLUSION

For these reasons, as well as those discussed in Wilcox's brief, this Court should affirm.

Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota

KWAME RAOUL
Attorney General
State of Illinois

LIZ KRAMER
Solicitor General

JANE ELINOR NOTZ
Solicitor General

/s/ Alex Hemmer
ALEX HEMMER
Deputy Solicitor General
R. SAM HORAN
Assistant Attorney General

445 Minnesota Street, Ste. 600
St. Paul, Minnesota 55101
(651) 757-1010
liz.kramer@ag.state.mn.us

115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-5526
alex.hemmer@ilag.gov

KRIS MAYES
*Attorney General*
*State of Arizona*
2005 N. Central Avenue
Phoenix, AZ 85004

ROB BONTA
*Attorney General*
*State of California*
1300 I Street
Sacramento, CA 95814

PHILIP J. WEISER
*Attorney General*
*State of Colorado*
1300 Broadway
Denver, CO 80203

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
820 N. French Street
Wilmington, DE 19801

BRIAN L. SCHWALB
*Attorney General*
*District of Columbia*
400 6th Street NW, Suite 8100
Washington, DC 20001

ANNE E. LOPEZ
*Attorney General*
*State of Hawai'i*
425 Queen Street
Honolulu, HI 96813

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, MI 48909

MATTHEW J. PLATKIN
*Attorney General*
*State of New Jersey*
25 Market Street
Trenton, NJ 08625

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY 10005

DAN RAYFIELD
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

AARON M. FREY
*Attorney General*
*State of Maine*
6 State House Station
Augusta, ME 04333

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of*
  *Massachusetts*
One Ashburton Place
Boston, MA 02108

AARON D. FORD
*Attorney General*
*State of Nevada*
100 North Carson Street
Carson City, NV 89701

RAÚL TORREZ
*Attorney General*
*State of New Mexico*
201 3rd Street NW
Albuquerque, NM 87109

JEFF JACKSON
*Attorney General*
*State of North Carolina*
114 W. Edenton Street
Raleigh, NC 27603

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Maine Street
Providence, RI 02903

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, VT 05609

JOSHUA L. KAUL
*Attorney General*
*State of Wisconsin*
17 W. Main Street
Madison, WI 53703

NICHOLAS W. BROWN
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

April 9, 2025

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations set out in Federal Rule of Appellate Procedure 29 because it contains 4,818 words.  This brief complies with the typeface requirement of Rule 32(a)(5) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word.


/s/ Alex Hemmer
ALEX HEMMER

April 9, 2025

**CERTIFICATE OF SERVICE**

I hereby certify that on April 9, 2025, I electronically filed the foregoing Brief of Amici Curiae Minnesota and Illinois et al. with the Clerk of the Court for the United States Court of Appeals for D.C. Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Alex Hemmer
ALEX HEMMER