MERITS ORAL ARGUMENT SCHEDULED MAY 16, 2025

**No. 25-5057**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

GWYNNE A. WILCOX,

*Plaintiff-Appellee*,

v.

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE
UNITED STATES, ET AL.,

*Defendants-Appellants*.

---

*On Appeal from the United States District Court
for the District of Columbia*

---

**BRIEF OF AMICUS CURIAE
PROFESSOR PETER CONTI-BROWN
IN SUPPORT OF PLAINTIFF-APPELLEE**

---

William Pittard
Daniel Csigirinszkij
KAISER PLLC
1099 14th Street NW, 8th Floor West
Washington, D.C. 20005
(202) 640-2850
wpittard@kaiserlaw.com
dcsigirinszkij@kaiserlaw.com

*Counsel for Amicus Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

### I.      Parties, Intervenors, and *Amici*

Except for the *amicus* submitting this brief and *amici* who submitted briefs in the days since the parties' briefs, all parties, intervenors, and *amici* appearing before the district court and this Court are listed in the Brief for Plaintiff-Appellee and Briefs for Defendants-Appellants. The additional *amici* are listed on this Court's docket.

### II.     Rulings Under Review

The rulings at issue before this Court appear in the Brief for Plaintiff-Appellee and Briefs for Defendants-Appellants.

### III.    Related Cases

This case has not previously been before this Court. Except for the cases identified in the Brief for Plaintiff-Appellee and Briefs for Defendants-Appellants, counsel are unaware of any related cases within the meaning of Circuit Rule 28(a)(1)(C).

Dated: April 9, 2025                                     */s/ William Pittard*
                                                          William Pittard

                                                          *Counsel for Amicus Curiae*

## CERTIFICATE OF COUNSEL REGARDING AUTHORITY TO FILE

Pursuant to Rule 29(a)(2) of the Federal Rules of Appellate Procedure, all parties consented to the filing of this brief.

Pursuant to Circuit Rule 29(d), *amicus* states that a separate brief is necessary due to his distinct expertise and qualifications, as set forth below in the section entitled "Interest of *Amicus Curiae*."

Dated: April 9, 2025                                    */s/ William Pittard*
                                                          William Pittard

                                                          *Counsel for Amicus Curiae*

# TABLE OF CONTENTS

**CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES** ................................................................. i

**CERTIFICATE OF COUNSEL REGARDING AUTHORITY TO FILE** ....... ii

**TABLE OF CONTENTS** ...................................................... iii

**TABLE OF AUTHORITIES** ................................................. iv

**STATUTES AND REGULATIONS** ....................................... 1

**INTEREST OF AMICUS CURIAE** ....................................... 1

**INTRODUCTION AND SUMMARY OF ARGUMENT** ................ 2

**ARGUMENT** ..................................................................... 4

    I.     Congress redesigned the Federal Reserve System in 1935 both to be simultaneously sensitive to democratic accountability and also insulated from partisan control ............................................................ 4

    II.    Monetary policy is difficult to distinguish from other forms of regulatory policy .............................................................. 11

        A.    The lack of historical precedent ................................. 13

        B.    Monetary policy is accomplished through regulation and supervision .......................................................... 14

    III.    The consequences for the Fed in a world without *Humphrey's Executor* .......................................................... 17

**CERTIFICATE OF COMPLIANCE** ..................................... 20

**CERTIFICATE OF SERVICE** ............................................. 21

# TABLE OF AUTHORITIES

**Cases**

*Humphrey's Executor v. United States*, 295 U.S. 602 (1935) ...... 2, 7, 10, 14, 17, 18

**Statutes**

12 U.S.C. § 343 ................................................................................................16

Depository Institutions Deregulation and Monetary Control Act of 1980, Pub. L.
No. 96-221, 94 Stat. 132 (1980) ...........................................................15

**Regulations**

Extensions of Credit by Federal Reserve Banks, 80 Fed. Reg. 78, 959 (Dec. 18,
2015) ................................................................................................16

Guidelines for Evaluating Account and Services Requests, 87 Fed. Reg. 51, 099
(Aug. 19, 2022) ..............................................................................16

**Other Authorities**

Aditya Bamzai & Aaron L. Nielson, *Article II and the Federal Reserve*, 109
CORNELL L. REV. 843 (2024) ..................................................... 11, 12

ALLAN H. MELTZER, A HISTORY OF THE FEDERAL RESERVE, VOLUME 1: 1913–1951
(2003) ................................................................................................6

Ana Carolina Garriga & Cesar M. Rodriguez, *More effective than we thought:
Central bank independence and inflation in developing countries,* 85 ECONOMIC
MODELING 87-105 (2020) ..................................................................18

Brett M. Kavanaugh, *Separation of Powers During the Forty-Fourth Presidency
and Beyond*, 93 Minn. L. Rev. 1454, 1474 (2009) ...............................11

CARTER GLASS, AN ADVENTURE IN CONSTRUCTIVE FINANCE (Doubleday, Page &
Co. 1927) ...........................................................................................4

Chris Walker (@chris_j_walker), X (Feb. 12, 2025, 9:27 PM),
https://x.com/chris_j_walker/status/1889863935765127588 ..............11

Daniel K. Tarullo, *The Federal Reserve and the Constitution*, 97 S. CAL. L. REV. 1,
5 (2024) ............................................................................................12

Donald F. Kettl, Leadership at the Fed 74 (1986) ...................................................8

E.W. Kemmerer, Banking Reform in the United States, *3 Am. Econ. Rev.* 52 (Supp. Mar. 1913)...................................................................................................4

Gary Richardson & David W. Wilcox, *Federal Reserve Independence and Congressional Intent: A Reappraisal of Marriner Eccles' Role in the Reformulation of the Fed in 1935* (Nat'l Bureau of Econ. Rsch. Working Paper No. 33174, 2024) ...................................................................................8

Gary Richardson & William Troost, *Monetary Intervention Mitigated Banking Panics During the Great Depression: Quasi-Experimental Evidence from the Federal Reserve District Border in Mississippi, 1929 to 1933*, 117 J. Pol. Econ. 1031-73 (2009)....................................................................................6

Jeanna Smialek, *Powell Highlights Fed's Limits. Trump Labels Him an 'Enemy*, N.Y. TIMES (Aug. 23, 2019), https://www.nytimes. com/2019/08/23/business/powell-fed-interest-rates-trump.html..........................10

Jeanna Smialek, *Trump Says He Could Demote Fed Chair Powell, Risking More Market Turmoil*, N.Y. TIMES (Mar. 14, 2020), https://www.nytimes.com/2020/03/14/business/economy/trump-powell-fed-chair.html ................................................................................................11

Letter from Benjamin Strong Jr., Fed. Reserve Bank of N.Y., to Carter Glass, Sen. of Va. (Mar. 21, 1927) (on file with Woodrow Wilson Presidential Library & Museum) ...................................................................................................5

*Meet the Researchers*, U.S. FED. RSRV. SYS., https://www.federalreserve.gov/econres/public-economics-f.htm (last updated Apr. 7, 2025)..................................................................................................15

Memorandum from Marriner Eccles to President Franklin D. Roosevelt (Nov. 3, 1934) (on file with the Franklin D. Roosevelt Library) .........................................7

Memorandum from Ramsey Clark, Deputy Attorney General, to Lyndon Johnson, "Confidential Memos re the Board of Governors of the Federal Reserve System," July 6, 1965, Lyndon Johnson Presidential Library ...............................................9

PETER CONTI-BROWN & SEAN H. VANATTA, PRIVATE FINANCE, PUBLIC POWER: A HISTORY OF BANK SUPERVISION IN AMERICA (Princeton Univ. Press, forthcoming 2025) .....................................................................................................1, 14

PETER CONTI-BROWN, RICHARD SCOTT CARNELL, JONATHAN R. MACEY & GEOFFREY P. MILLER, THE LAW OF FINANCIAL INSTITUTIONS (7th ed. Aspen Publishing 2021) ...................................................................................1

PETER CONTI-BROWN, THE POWER AND INDEPENDENCE OF THE FEDERAL RESERVE (Princeton Univ. Press, 2016) ..................................................... 1, 6, 17

ROBERT P. BREMNER, CHAIRMAN OF THE FED: WILLIAM MCCHESNEY MARTIN JR. AND THE CREATION OF THE MODERN AMERICAN FINANCIAL SYSTEM 91 (Yale Univ. Press 2004) ....................................................................................9

*The Fed Explained: What the Central Bank Does*, U.S. FED. RSRV. SYS. (Aug. 2021), https://www.federalreserve.gov/aboutthefed/files/the-fed-explained.pdf..... ....................................................................................................15

## STATUTES AND REGULATIONS

Except for 12 U.S.C. § 343 (the Federal Reserve Act), all pertinent statutes

and regulations are contained in the Brief for Plaintiff-Appellee.

## INTEREST OF AMICUS CURIAE[1]

Professor Peter Conti-Brown ("Amicus") is a financial historian and legal

scholar with specific expertise on the United States Federal Reserve System and its

place within the United States government. Professor Conti-Brown is the Class of

1965 Associate Professor of Financial Regulation at The Wharton School of the

University of Pennsylvania. He is the author of numerous books and articles on the

structure, functions, and history of the Federal Reserve, including PETER CONTI-

BROWN, THE POWER AND INDEPENDENCE OF THE FEDERAL RESERVE (Princeton

Univ. Press, 2016), PETER CONTI-BROWN & SEAN H. VANATTA, PRIVATE FINANCE,

PUBLIC POWER: A HISTORY OF BANK SUPERVISION IN AMERICA (Princeton Univ.

Press, forthcoming 2025) , and PETER CONTI-BROWN, RICHARD SCOTT CARNELL,

JONATHAN R. MACEY & GEOFFREY P. MILLER, THE LAW OF FINANCIAL

INSTITUTIONS (7th ed. Aspen Publishing 2021). He received academic degrees

from Harvard College, Stanford Law School, and a Ph.D. from Princeton

University.

---

[1] No counsel for a party authored the brief in whole or in part, and no person other than *amicus* or their counsel made a monetary contribution to the preparation or submission of this brief.

1

Amicus writes separately to explain the impact that *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), has had on the relationship between the President of the United States and the United States Federal Reserve System. Amicus argues that the Federal Reserve's monetary policy functions are deeply and inseparably linked to its regulatory and supervisory functions. Amicus argues further that overturning *Humphrey's Executor* could lead to the immediate erosion of the independence of the Federal Reserve in ways that would be devastating to United States capital and financial markets, the strength of the United States dollar, and the operation of Congress's design of the United States central bank. No other amicus in front of this Court has presented similar arguments regarding the potential outcomes of the issues facing the court, nor would any other amicus in front of this Court have comparable expertise to present these insights.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Amicus Professor Conti-Brown writes to offer his expert view that the independence of the U.S. Federal Reserve ("the Fed")—a keystone of American economic prosperity—relies in large part on Congress's ability to limit presidential removal of central bankers to the narrow bases identified in *Humphrey's Executor*. He also writes to explain that efforts to distinguish the Fed from the independent regulators in this case fail because (1) the proffered distinction—that agencies of "monetary policy" are uniquely outside a President's removal authority—does not

withstand scrutiny, including because central banking in 2025 bears almost no resemblance to the functions of the Banks of the United States in the 18th and 19th centuries; and (2) even if there were such an exception, monetary policy is itself effectuated through regulatory and supervisory policy that is closely related to the kinds of regulation and supervision we see in other agencies.

To illustrate these arguments, Professor Conti-Brown draws on the Fed's history—especially since Congress reorganized it to make it more accountable to Congress and to the President in 1935—to show that conflicts between United States Presidents and central bankers are inevitable, exactly as Congress anticipated they would be. The key mechanism for navigating those conflicts has been the same over 90 years: to permit the President to appoint, and the Senate to approve, new members of the Federal Reserve's Board of Governors as those vacancies properly become open.

**ARGUMENT**

I.   **Congress redesigned the Federal Reserve System in 1935 to be simultaneously sensitive both to democratic accountability and also insulated from partisan control**

The Federal Reserve System ("Fed") was founded in December 1913 during the Woodrow Wilson Administration in response to a series of devastating financial panics in the late 19th and early 20th centuries. The United States was unusual for its era in lacking central banking institutions at the time of the passage of the Federal Reserve Act. This fact was attributed by the Fed's founders to the "ghost of Andrew Jackson," whose hostility to central banks resulted in the infamous Bank Wars of the 1830s. For the 80 years after President Jackson, the United States relied on alternative frameworks for providing some of the functions that central banks like the Bank of England provided, none as effective. CARTER GLASS, AN ADVENTURE IN CONSTRUCTIVE FINANCE (Doubleday, Page & Co. 1927).

As a result of this context and tension, Congress's original design was not to create a central bank, but central banks. E.W. Kemmerer, Banking Reform in the United States, *3 Am. Econ. Rev*. 52 (Supp. Mar. 1913). The original Federal Reserve System thus consisted of twelve independent Federal Reserve Banks, spread unevenly throughout the United States based on political and economic considerations relevant in 1914; private-sector member banks, that joined each

Federal Reserve Bank as a shareholder, thus gaining access to its centralized services; and a Federal Reserve Board located in Washington, DC, chaired by the United States Secretary of the Treasury, that would supervise the Reserve Banks..

The members of the Federal Reserve Board were all appointed by the President, confirmed by the United States Senate. Two of those members were appointed *ex officio*, namely the Treasury Secretary and the Comptroller of the Currency, the latter being the chief federal banking regulator and supervisor. The other members of the Board were separately appointed by the President.

Some prominent bankers opposed the Federal Reserve System because of the inclusion of the Federal Reserve Board. Letter from Benjamin Strong Jr., Fed. Reserve Bank of N.Y., to Carter Glass, Sen. of Va. (Mar. 21, 1927) (on file with Woodrow Wilson Presidential Library & Museum). Congress settled the question of political control and private-sector independence by essentially dodging the question. While Wilson regarded the creation of the Federal Reserve Board as the System's "capstone," the Board initially had very little obvious control over the functions of the Federal Reserve Banks and thus, through that lack of control, very little control over the practice of banking and monetary policy during that period. The Federal Reserve Banks were the prime mover, including when they made starkly different decisions. Gary Richardson & William Troost, *Monetary Intervention Mitigated Banking Panics During the Great Depression: Quasi-*

*Experimental Evidence from the Federal Reserve District Border in Mississippi, 1929 to 1933*, 117 J. POL. ECON. 1031-73 (2009).

The heads of the Federal Reserve Banks, then called "Governors" in the vernacular of central banking, were not appointed by the President. The Senate had no say in their confirmation. They were instead chosen by their board of directors, which was controlled by the bankers that joined the Federal Reserve Banks as shareholders. The Board did have a kind of veto over these appointments, but it was almost never used in that era. The Banks were simultaneously the locus for the federal government's chief banking policy and also so far removed from the constitutional order that the President had very little say over that corner of policy.

The result was chaos: no one knew who was in charge of the central banking policy. ALLAN H. MELTZER, A HISTORY OF THE FEDERAL RESERVE, VOLUME 1: 1913–1951 (2003). That chaos lumbered along, with uneven questions about who controlled these vital questions, until and through the Great Depression.

After President Franklin Roosevelt's election, as part of what historians call the Second New Deal, Congress passed a law in 1935 that reorganized the Federal Reserve System almost completely, something I have called "the second Founding of the Federal Reserve." PETER CONTI-BROWN, THE POWER AND INDEPENDENCE OF THE FEDERAL RESERVE 28–32 (2016). Gone was the autonomy of the Federal Reserve Banks, whose heads were now called "presidents" to bring them closer in

line with the private-sector bank presidents. Their actions were now subject to much stricter control. The Federal Reserve Board was officially retired and replaced with the Board of Governors of the Federal Reserve System. And the chief monetary policy committee of the United States Government, the Federal Open Market Committee, now would be dominated by that Board of Governors, each one of whom appointed by the President and confirmed by the United States Senate.

The aim of this reorganization was to bring the Federal Reserve much more closely in line with presidential control. *See* Memorandum from Marriner Eccles to President Franklin D. Roosevelt (Nov. 3, 1934) (on file with the Franklin D. Roosevelt Library). It worked. For fifteen years, the Fed worked very closely with the Treasury on matters as wide ranging as war reparations, bank supervision, bank resolution, war preparation, war financing, and even war policy (the Fed ceded control of its headquarters on Constitution Avenue to the Joint Chiefs of Staff, for example).

Presidential control over the Fed occurred, then, through the appointment of the Fed's Governors and its senior leadership, which consisted of the Board Chair and Vice Chair. That did not mean that Congress intended that control to be absolute. Indeed, the champion of the 1935 legislation and first modern Fed Chair, Marriner Eccles, sought precisely that level of control: he wanted to give the

President the authority to summarily dismiss the Fed Chair at his pleasure. Gary

Richardson & David W. Wilcox, *Federal Reserve Independence and*

*Congressional Intent: A Reappraisal of Marriner Eccles' Role in the*

*Reformulation of the Fed in 1935* (Nat'l Bureau of Econ. Rsch. Working Paper No.

33174, 2024). But Congress rejected that standard and permitted the Fed Chair to

retain his specified term and for Governors to be protected from that dismissal,

absent some "cause" along the lines identified in *Humphrey's Executor*.

The insulation from summary dismissal that Congress regarded as central to

its design of the central bank stymied nearly every president in efforts to pull

monetary policy in line with partisan electoral aims. President Harry Truman, for

example, tried to muscle control over the Fed by convening the Federal Open

Market Committee for the first time and the last time in the Oval Office in 1951;

he also negotiated the resignation of Thomas McCabe, the Fed Chair with whom

President Truman had had key differences. The result of Chairman McCabe's

resignation and other negotiations was a declaration by the Treasury and the Fed

that the Fed would set monetary policy on an independent basis, the so-called Fed-

Treasury Accord of 1951. *See* Donald F. Kettl, Leadership at the Fed 74 (1986).

But the new Fed Chair, William McChesney Martin, soon also struck a note of

independence from the Administration, to Truman's surprise. Because Chairman

Martin was protected by Congress from summary dismissal by President Truman,

all the President could do was fume at his appointment error. "Traitor!" he is reported to have said when they next encountered each other. *See* ROBERT P. BREMNER, CHAIRMAN OF THE FED: WILLIAM MCCHESNEY MARTIN JR. AND THE CREATION OF THE MODERN AMERICAN FINANCIAL SYSTEM 91 (Yale Univ. Press 2004).

Other presidents experienced similar constraints. Chairman Martin was reappointed as Chair by Presidents Eisenhower, Kennedy, and Johnson. The last of these regretted it, especially as the spiraling costs of the Great Society and Vietnam War pushed the Fed to tighten money at a period critical to President Johnson's political prospects. President Johnson used strong arm tactics on Chairman Martin, issued press statements, and otherwise sought to dictate the course of monetary policy. He even asked his Department of Justice to explore the potential for firing Martin. Memorandum from Ramsey Clark, Deputy Attorney General, to Lyndon Johnson, "Confidential Memos re the Board of Governors of the Federal Reserve System," July 6, 1965, Lyndon Johnson Presidential Library. But Congress's design of the Fed to require presidential accountability through four-year terms for the Chair and fourteen-year terms for the Governors provided them the space to do the jobs they had been appointed to do. Chairman Martin stayed in his job.

Other presidents faced similar dynamics. They used all legal tools available to them, some quite sharp, but did not attempt to fire a central banker. They used

the appointment power to accomplish their policy goals, which meant, for example, President Richard Nixon's appointment of a central banker in Arthur Burns who was much more amenable to President Nixon's worldview, or President Ronald Reagan's appointment of conservative darling Alan Greenspan for the same reason. What it did not mean was that Congress had given the president the ability to rewrite legislation to remove congressional checks on control over the money supply. That prerogative it had reserved for itself, through the structure of the Federal Reserve.

The most famous example of a president who sought to alter this status quo is President Trump, in 2018-2019, with Chairman Jerome Powell, whom the president had appointed only months before. As the Fed continued its rate-hiking cycle to "normalize" monetary policy conditions following the zero-level interest rates of the 2010s, it raised rates in successive meetings in 2018. President Trump did not prefer this outcome, viewing it as adversarial to political incumbents (and thus why he was opposed to zero-level interest rates under Janet Yellen during the presidency of Barack Obama). Jeanna Smialek, *Powell Highlights Fed's Limits. Trump Labels Him an 'Enemy*, N.Y. TIMES (Aug. 23, 2019), https://www.nytimes. com/2019/08/23/business/powell-fed-interest-rates-trump.html. President Trump openly argued that he could demote Powell. Jeanna Smialek, *Trump Says He Could Demote Fed Chair Powell, Risking More Market Turmoil*, N.Y. TIMES (Mar.

10

14, 2020), https://www.nytimes.com/2020/03/14/business/economy/trump-powell-fed-chair.html. Lawyers within his administration appeared to disagree, citing *Humphrey's Executor*. So it is that Jerome Powell remains Fed Chair, following his reappointment under President Biden.

## II.    Monetary policy is difficult to distinguish from other forms of regulatory policy

The present case does not directly involve the Federal Reserve; it involves a different multimember commission. Some scholars, jurists, and others have tried to argue that a new legal order that should supplant *Humphrey's Executor*, and that legal order, should give the President full authority to remove anyone from any office, with only the Fed put to the side because the Fed is somehow different. *See e.g.*, Brett M. Kavanaugh, *Separation of Powers During the Forty-Fourth Presidency and Beyond*, 93 Minn. L. Rev. 1454, 1474 (2009); Chris Walker (@chris_j_walker), X (Feb. 12, 2025, 9:27 PM), https://x.com/chris_j_walker/status/1889863935765127588.

The most thorough example of this argument comes from legal scholars Aditya Bamzai and Aaron Nielson, who posit that the Fed's circumscribed institutional independence "would appear to violate Article II under modern precedent if the Fed is no different than an ordinary executive branch agency." Aditya Bamzai & Aaron L. Nielson, *Article II and the Federal Reserve*, 109 CORNELL L. REV. 843, 852 (2024). The question for these scholars and for the

court is whether the Fed is different in ways that can be meaningfully distinguished for purposes of presidential control. *Id.*

In a trivial sense, the Fed is of course different. Its statutory framework is different, and the policies Congress has attached to it are different. But the deeper question addressed by Bamzai & Nielson is whether that difference matters for purposes of presidential control. They conclude that those differences do arise, citing the precedents of the First Bank of the United States, created by Congress in the 18th century. *Id.* at 875. Other scholars have made similar arguments. *See e.g.*, Daniel K. Tarullo, *The Federal Reserve and the Constitution*, 97 S. CAL. L. REV. 1, 5 (2024).

These attempts to distinguish Fed independence from agency independence do not work for two related reasons. First, there is no history supporting that distinction—the existence of the Bank of the United States notwithstanding. Second, the idea that "monetary policy is institutionally separate," Aditya Bamzai & Aaron L. Nielson, *Article II and the Federal Reserve*, 109 CORNELL L. REV. 843, 887, fails to account for the basic fact that monetary policy is simply an end of regulatory and supervisory tools, not an epistemologically or institutionally distinct set of practices.

### A.    The lack of historical precedent

During the first Washington Administration, Treasury Secretary Alexander Hamilton designed—and Congress created—the First Bank of the United States. The idea, though, that those bare facts constitute a "central bank independence" exception to a grand constitutional requirement for absolute presidential control is not defensible. The precedent for the First Bank of the United States only exists as a kind of homonym. It is true that the Bank of the United States was modeled after the Bank of England and that both were "central banks" as those terms were used in the 18th and 19th centuries. It is also true that we refer to the Fed as a "central bank" today. But the parallels fall away almost immediately thereafter. The entities have almost no overlap in either structure or function.

Functionally, the Bank of the United States accomplished the task of managing a reserve of currency through its transaction-based supervision with bank counterparties. It managed portions of the public fisc on behalf of the government, and its notes circulated as one medium of exchange (among many at the time). It was not, however, an agency of the government in any meaningful sense. It did not manage a fiat currency, since its management was backed by commodity-based currencies. It lacked enforcement authority against its bank counterparties. There was no meaningful system of consumer deposits constituting the national money supply. The Bank of the United States was, above all else, a

functioning bank. It had shareholders, paid dividends, lent money for profit, and otherwise played the role of the 19th century central bank. PETER CONTI-BROWN & SEAN H. VANATTA, PRIVATE FINANCE, PUBLIC POWER: A HISTORY OF BANK SUPERVISION IN AMERICA (Princeton Univ. Press forthcoming 2025).

Structurally, the Federal Reserve is also categorically different. The Fed today consists of two government agencies: the Board of Governors, whose members are appointed by the President and confirmed by the United States Senate; and the Federal Open Market Committee, which consists of that Board plus five presidents of the Federal Reserve Banks (four of whom rotate; the fifth is the president of the Federal Reserve Bank of New York). Both are agencies of government; the legal authority to accomplish the tasks Congress designated for the Federal Reserve lies in the hands of those agencies. The quasi-private Federal Reserve Banks act only on instruction from those agencies.

### B.    Monetary policy is accomplished through regulation and supervision

Another key difference between the Banks of the United States and the Federal Reserve is that, over the course of the 20th and 21st centuries, Congress has given the Federal Reserve ever more regulatory and supervisory authority that in some cases overlaps with that of agencies that have no oversight of the nation's money supply. CONTI-BROWN & VANATTA, CHAPTER 9. *See generally*, *The Fed Explained: What the Central Bank Does*, U.S. FED. RSRV. SYS. (Aug. 2021),

https://www.federalreserve.gov/aboutthefed/files/the-fed-explained.pdf. In a few instances, Congress has reversed course and created new entities to regulate, supervise, and enforce areas of law and policy it previously had given to the Fed. In the overwhelming majority of instances, however, Congress has expanded the Fed's authority.

Some have attempted to argue that the key to this removal and constitutionality question for the Federal Reserve is to somehow ring-fence the Fed's monetary policy, which deserves an exception to *Humphrey's Executor*, as opposed to its regulatory and supervisory authority, which cannot be so insulated. This is an impossible task. The Federal Reserve is a complex ecosystem, but its many functions are inseparably connected. Such divisions are impossible because the Fed's functions are inseverable.

Consider some examples. The Federal Reserve's monetary policy is supported by a vast research arm, including the employment of over 400 Ph.D. economists throughout the system. *Meet the Researchers*, U.S. FED. RSRV. SYS., https://www.federalreserve.gov/econres/public-economics-f.htm (last updated Apr. 7, 2025). How would their compensation and supervision be divided?

Consider another. Under the Depository Institutions Deregulation and Monetary Control Act of 1980, the Federal Reserve provides payment services to depository institutions, including those that it does not supervise. Depository

Institutions Deregulation and Monetary Control Act of 1980, Pub. L. No. 96-221, 94 Stat. 132 (1980). The provision of these services—including loans, payments, transfers, and more—was once the *sine qua non* of monetary policy, but is today much more associated with crisis response. Is the provision of payment services supervisory? Regulatory? Monetary?

Another: In determining what kind of qualifications depository institutions must have to receive payment services, the Fed engages in searching assessments of the qualifications of those entities, including about legality and monetary policy. Guidelines for Evaluating Account and Services Requests, 87 Fed. Reg. 51,099 (Aug. 19, 2022). Are those efforts regulatory, supervisory, or monetary?

Another: Since 2008, the Federal Reserve has largely abandoned using the "federal funds rate" as the primary tool for monetary policy. Before 2008, the FOMC would articulate a target interest rate and the Federal Reserve Bank of New York would use open-market operations to achieve that rate. Since 2008, the FOMC chooses a rate to pay banks that it supervises as an interest on reserves, a regulatory rate set by the Board of Governors and subject to regulation. Is this a regulatory, supervisory, or monetary policy for the purposes of separating the Fed from other agencies?

Yet another: the Fed's Board of Governors in "unusual and exigent circumstances," subject to several statutory restrictions that Congress overhauled

16

in 2010, approves emergency lending facilities that are not otherwise permissible. The Federal Reserve Act, 12 U.S.C. § 343 (2012). That lending is subject to a rulemaking in Regulation A. Extensions of Credit by Federal Reserve Banks, 80 Fed. Reg. 78, 959 (Dec. 18, 2015). In 2008-2010, 2020, and 2023, the Fed invoked that authority to supplement other efforts undertaken through monetary policy and to accomplish some of the goals of monetary policy. Are such emergency lending facilities regulatory, supervisory, or monetary?

We could go on. The point is that the Federal Reserve functions as a tightly-organized entity, with monetary policy as its core objective, an objective supported by all other areas of its policies. No credible division can be made to honor the idea that the Constitution permits insulation from political meddling for short-term partisan ends in some contexts, but not others.

## III.    The consequences for the Fed in a world without *Humphrey's Executor*

The independence of the Federal Reserve is not exclusively a legal tradition. PETER CONTI-BROWN, THE POWER AND INDEPENDENCE OF THE FEDERAL RESERVE 6-7 (2016). There are many "institutions" of Federal Reserve independence that depend on strong norms and traditions. Many of those norms and traditions are, in 2025, subject to profound evolution, the likes of which we have not seen in forty years.

That said, the legal protections offered by *Humphrey's Executor* are the major institutional commitment that has permitted Congress to protect the Federal Reserve Act (and the Federal Reserve) from abuse by United States Presidents.

Should *Humphrey's Executor* fall, the experience of central banking would radically transform. It is difficult to argue the counterfactual, but it is my assessment of the politics and possibilities of 2018 and 2019 that, in the absence of *Humphrey's Executor*, Jerome Powell would have been removed as Fed Chair and replaced with someone whose views on monetary policy were not only more aligned with President Trump, as the appointment power permits, but more aligned with the specific demands of that specific moment in time. It is that loyalty to the moment and to the person that Congress sought to prevent in structuring the Federal Reserve as it did, in the shadow of similar dynamic debates surrounding other independent agencies.

We need not speculate about the consequences for American prosperity to such a world. Among the best-established empirical facts of the late 20th and early 21st centuries is that central bankers insulated from summary removal are able to protect the value of their countries' currency better than those who aren't. *See, e.g.,* Ana Carolina Garriga & Cesar M. Rodriguez, *More effective than we thought: Central bank independence and inflation in developing countries,* 85 ECONOMIC MODELING 87-105 (2020).

If *Humphrey's Executor* falls, central bank independence in the United States is likely to fall with it.

Respectfully submitted,

Dated: April 9, 2025

*/s/ William Pittard*
William Pittard
Daniel Csigirinszkij
KAISER PLLC
1099 14th Street NW, 8th Floor West
Washington, D.C. 20005
(202) 640-2850
wpittard@kaiserlaw.com
dcsigirinszkij@kaiserlaw.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, and in accordance with Circuit Rule 28(c) and 32(e)(2)(B), Fed. R. App. P. 29(a)(5), 32(a)(7)(B), and (f), the undersigned counsel certifies that the accompanying brief is printed in 14-point typeface, with serifs, and consists of no more than 4,550 words, including footnotes. According to the "Word Count" feature in Microsoft Word, the word processing software program used to prepare the brief, it contains 4,053 words, excluding the cover page, table of contents, table of authorities, signature block, and certificates.

Dated: April 9, 2025                                    */s/ William Pittard*
                                                        William Pittard

                                                        *Counsel for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 9, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system, which will send the notice of electronic filing to all parties registered through CM/ECF.

Dated: April 9, 2025

*/s/ William Pittard*
William Pittard

*Counsel for Amicus Curiae*