# In the United States Court of Appeals for the District of Columbia Circuit

GWYNNE A. WILCOX,
*Plaintiff-Appellee*,

v.

DONALD J. TRUMP, in his official capacity as President
of the United States, et al.,
*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Columbia
Case No. 25-334 (The Hon. Beryl A. Howell)

## PETITION FOR REHEARING EN BANC

DEEPAK GUPTA
GREGORY A. BECK
ALISA C. PHILO
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*deepak@guptawessler.com*

January 5, 2026                    *Counsel for Plaintiff-Appellee*

# TABLE OF CONTENTS

Table of authorities ...................................................................................... ii

Glossary ......................................................................................................... vi

Introduction and Rule 40(b) Statement ................................................... 1

Statement of the case ................................................................................. 5

    A.    Statutory background ......................................................... 5

    B.    Factual and procedural background ................................. 6

Reasons for granting en banc review ....................................................... 9

    I.    The panel majority's decision conflicts with binding
        Supreme Court precedent .................................................. 9

    II.    The exceptional importance and recurring nature of the
        issue presented cries out for the full Court's conclusive
        disposition ........................................................................ 18

Conclusion .................................................................................................. 19

Addendum under Circuit Rule 40(C) ...................................................... a

# TABLE OF AUTHORITIES

**Cases**

*Allentown Mack Sales & Service, Inc. v. NLRB,*
  522 U.S. 359 (1998) ........................................................................ 11

*American Federation of Labor v. NLRB,*
  308 U.S. 401 (1940) ........................................................................ 17

*American Hospital Association v. NLRB,*
  499 U.S. 606 (1991) ........................................................................ 17

*Browning-Ferris Industries of California, Inc. v. NLRB,*
  911 F.3d 1195 (D.C. Cir. 2018) ...................................................... 14

*Chamber of Commerce of U.S. v. NLRB,*
  723 F. Supp. 3d 498 (E.D. Tex. 2024) ........................................... 14

*Chamber of Commerce v. NLRB,*
  721 F.3d 152 (4th Cir. 2013) ............................................. 11, 13, 14

*Clark-Cowlitz Joint Operating Agency v. FERC,*
  826 F.2d 1074 (D.C. Cir. 1987) ...................................................... 14

*Dish Network Corp. v. NLRB,*
  953 F.3d 370 (5th Cir. 2020) .............................................. 3, 12, 16

*Garner v. Teamsters, Chauffeurs & Helpers Local Union 776,*
  346 U.S. 485 (1953) .......................................................................... 6

*Harris v. Bessent,*
  2025 WL 980278 (U.S. Mar. 28, 2025) ............................................ 7

*Humphrey's Executor v. United States,*
  295 U.S. 602 (1935) ...................................................................... 1, 9

*Mistretta v. United States,*
  488 U.S. 361 (1989) ........................................................................ 13

*NLRB v. Fansteel Metallurgical Corp.,*
  306 U.S. 240 (1939) .......................................................................... 5

*NLRB v. Sears, Roebuck & Co.,*
    421 U.S. 132 (1975) ........................................................ 11

*NLRB v. United Food & Commercial Workers Union,*
    *Local 23, AFL-CIO,*
    484 U.S. 112 (1987) ............................................ 2, 5, 10, 11

*Northwest Airlines, Inc. v. Transportation Workers Union of*
    *America, AFL-CIO,*
    451 U.S. 77 (1981) ........................................................ 14

*PHH Corp. v. CFPB,*
    881 F.3d 75 (D.C. Cir. 2018) ........................................ 19

*Republic Steel Corp. v. NLRB,*
    311 U.S. 7 (1940) .......................................................... 15

*Shalala v. Guernsey Memorial Hospital,*
    514 U.S. 87 (1995) ........................................................ 13

*St. Amant v. Thompson,*
    390 U.S. 727 (1968) ...................................................... 14

*Trump v. Wilcox,*
    145 S. Ct. 1415 (2025) .................................................... 1

*United States v. Arthrex, Inc.,*
    594 U.S. 1 (2021) .......................................................... 18

*United States v. Western Electric Co.,*
    46 F.3d 1198 (D.C. Cir. 1995) ...................................... 15

*Wiener v. United States,*
    357 U.S. 349 (1958) ................................................ 1-3, 9, 11

*Wilcox v. Trump,*
    2025 WL 720914 (D.D.C. 2025) .................................... 5

*Wilcox v. Trump,*
    No. 25-319 (U.S. Sept. 22, 2025) .................................. 4

## Statutes and Regulations

29 U.S.C. § 153.................................................................2, 5-7, 10, 11

29 U.S.C. § 154.................................................................................12

29 U.S.C. § 156.................................................................................12

29 U.S.C. § 157...................................................................................5

29 U.S.C. § 158...................................................................................5

29 U.S.C. § 159..............................................................................5, 16

29 U.S.C. § 160.........................................................2, 5, 11, 12, 15, 16

29 C.F.R. § 103.1..............................................................................13

29 C.F.R. § 103.2..............................................................................13

29 C.F.R. § 103.3..............................................................................13

## Other Authorities

Kirti Datla & Richard L. Revesz,
  *Deconstructing Independent Agencies (and Executive Agencies)*,
  98 Cornell L. Rev. 769 (2013)............................................................6

Jeffrey S. Lubbers,
  *The Potential of Rulemaking by the NLRB*,
  5 FIU L. Rev. 411 (2010).........................................................12, 13

NLRB,
  *10(j) Injunctions*.........................................................................16

NLRB,
  *Casehandling Manual § 10310.2 (Aug. 2025)*............................16

NLRB, 1 *Legislative History of the National Labor Relations Act*
  (1949).........................................................................................6, 18

NLRB, *First Annual Report of the NLRB* (1936)............................10

Arnold Ordman,
    *Fifty Years of the NLRA: An Overview*, 88 W. Va. L. Rev. 15
    (1985)..................................................................................................18

Daniel B. Rice & Jack Boeglin,
    *Confining Cases to Their Facts*,
    105 Va. L. Rev. 865 (2019) ...............................................................4

Franklin D. Roosevelt,
    Statement on Signing the National Labor Relations Act (July 5,
    1935).....................................................................................................10

S. Rep. No. 573,
    74th Cong., 1st Sess. (1935) ...........................................................17

## GLOSSARY

NLRA          National Labor Relations Act

NLRB          National Labor Relations Board

## INTRODUCTION AND RULE 40(B) STATEMENT

A sharply divided panel in this case upheld the President's removal of plaintiff Gwynne A. Wilcox—a duly confirmed member of the National Labor Relations Board—in violation of a for-cause removal provision that had stood unchallenged for 90 years. That decision directly conflicts with *Wiener v. United States*, 357 U.S. 349 (1958), and *Humphrey's Executor v. United States*, 295 U.S. 602 (1935). As this Court explained in its earlier en banc order vacating a stay of the district court's injunction, the Supreme Court has "unanimously upheld removal restrictions for government officials on multimember adjudicatory boards" like the NLRB. En Banc Op. 2-3 (citing *Wiener*, 357 U.S. at 356).

Although the Supreme Court subsequently reinstated the stay, it pointedly did not disturb those precedents. *See* S. Ct. Stay Op. 1. The Supreme Court instead recognized that the President's removal power is limited by the "exceptions recognized by our precedents." *Id.* And it declined the government's request to grant certiorari before judgment, leaving it to this Court to decide "after full briefing and argument" whether the NLRB "falls within such a recognized exception." *Trump v. Wilcox*, 145 S. Ct. 1415, 1415-16 (2025).

This Court should grant en banc review and hold that the NLRB, as an adjudicatory tribunal akin to an Article I court, falls squarely within the established exception for adjudicatory agencies. With the NLRB, Congress imposed a unique "separation of powers within the agency." *NLRB v. United Food & Com. Workers Union, Loc. 23, AFL-CIO*, 484 U.S. 112, 118 n.5 (1987). That structure expressly reserves prosecutorial functions to the General Counsel, who serves at the pleasure of the President and is "independent of the Board's supervision." *Id.* at 117-18 & n.5; *see* 29 U.S.C. § 153(d). By contrast, the agency's five-member Board—of which Ms. Wilcox was appointed and confirmed as a member—is structured like a court in both form and function, with members acting as a panel of appellate judges, issuing mostly unanimous decisions by applying federal labor law to the record in the cases that come before it. *See* 29 U.S.C. § 160.

Like the War Claims Commission in *Wiener*, the NLRB's five-member Board is an independent "adjudicatory body" performing "intrinsic judicial" functions. 357 U.S. at 355-56. Just as life tenure allows Article III judges to decide cases free from political pressure or the threat of removal for unpopular decisions, the Board's removal protections ensure its legitimacy as a neutral arbiter of labor disputes. As Judge Pan explained in dissent to the panel's

decision (at 1), "courts of law and other adjudicators that apply legal standards to facts must be impartial." And as the Supreme Court recognized in *Wiener*, an adjudicative body can't be expected to impartially apply the law with "the Damocles' sword of removal" hanging over its head. 357 U.S. at 355.

The panel majority nevertheless concluded that the NLRB's five-member Board exercises "substantial executive authority" beyond adjudication. But the opposite is true: The Board has extremely limited rulemaking power that is subordinate to its role as an adjudicatory body; it has no authority to initiate prosecutions; it cannot impose penalties beyond restoring the status quo; and—as Judge Oldham has observed—it "may be the only agency that needs [an Article III] court's imprimatur to render its orders enforceable." *Dish Network Corp. v. NLRB*, 953 F.3d 370, 375 n.2 (5th Cir. 2020). Even if some aspect of the NLRB's authority raised separation-of-powers concerns, the remedy would be to sever the problematic provision—not to compromise the independence of neutral adjudicators.

The panel majority recognized the importance of preserving purely adjudicatory agencies. But despite the panel's "attempt to couch [its] analysis in narrow terms," its reasoning, as Judge Pan recognized (at 2), "suggests that no agencies can be independent." The panel's decision, if allowed to stand,

would thus extend far beyond the NLRB—implicating the independence of agencies from the Nuclear Regulatory Commission to the Court of Appeals for Veterans Claims. It is "hard to imagine" a holding that "could more radically upend existing institutions." Daniel B. Rice & Jack Boeglin, *Confining Cases to Their Facts*, 105 Va. L. Rev. 865, 917 (2019).

The Supreme Court's grant of certiorari in *Trump v. Slaughter*, No. 25-332 (U.S.), only strengthens the need for en banc review. Multiple justices suggested at oral argument that, however the Court resolves the case, it will likely leave adjudicatory agencies unaffected. *See, e.g.*, Oral Argument Tr. 15-16, *Trump v. Slaughter*, No. 25-332 (U.S.) (Roberts, C.J.); *id.* at 26 (Alito, J.); *id.* at 49 (Kavanaugh, J.). And the Supreme Court declined to hear Ms. Wilcox's case in conjunction with *Slaughter*—once again leaving it for this Court to decide. *See* Order, *Wilcox v. Trump*, No. 25-319 (U.S. Sept. 22, 2025). Because the Supreme Court is unlikely to issue its decision until after the en banc deadline, this Court should grant review now and hold the case pending *Slaughter* so that it can apply whatever test the Supreme Court adopts to this case.

## STATEMENT OF THE CASE

### A.     Statutory background

Ninety years ago, Congress established the NLRB "in response to a long and violent struggle for workers' rights." *Wilcox v. Trump*, 2025 WL 720914, at *3 (D.D.C. 2025) (attached as Addendum A, at 5).[1] To promote "industrial peace," *NLRB v. Fansteel Metallurgical Corp.*, 306 U.S. 240, 257 (1939), Congress gave the NLRB exclusive jurisdiction to adjudicate unfair labor practices and labor disputes, *see* 29 U.S.C. §§ 157-60.

Congress designed the NLRB as a "bifurcated agency" that separates prosecutorial and adjudicatory functions. Add. A at 6; *see NLRB v. United Food & Com. Workers Union, Local 23, AFL-CIO*, 484 U.S. 112, 117-18 (1987). On one side, Congress created an independent quasi-judicial Board charged with adjudicating appeals from administrative law judges. Add. A at 6. The Board consists of five members who serve staggered five-year terms. 29 U.S.C. § 153(a). On the other side of the divide is the General Counsel, who prosecutes unfair labor practices and enforces labor law. Add. A at 6; *see* 29

---

[1] Unless otherwise noted, all internal quotation marks, citations, alterations, brackets, and ellipses have been omitted from quotations throughout this brief.

U.S.C. § 153(d). The General Counsel is "independent of the Board's control." Add. A at 6.

Although the President can remove the General Counsel at will, he is authorized to remove a Board member only "upon notice and hearing, for neglect of duty or malfeasance in office." *Id.* § 153(a). Congress designed these protections to ensure the Board could operate as an independent and impartial adjudicative body "acting in the public interest." *Garner v. Teamsters, Chauffeurs & Helpers Loc. Union 776*, 346 U.S. 485, 493-94 (1953). The independence of Board members was critical to protect them "from being subject to immediate political reactions at elections." NLRB, 1 *Legislative History of the National Labor Relations Act*, at 1467 (1949); *see also* Kirti Datla & Richard L. Revesz, *Deconstructing Independent Agencies (and Executive Agencies)*, 98 Cornell L. Rev. 769, 770-71 (2013) (describing the NLRB as a classic example of an agency designed to be independent).

**B.  Factual and procedural background**

The Senate confirmed Ms. Wilcox as a member of the NLRB on September 6, 2023, for a second term of five years. Pl.'s Statement of Material Facts at ¶ 2, ECF 10-1 (No. 25-334). In open disregard of the NLRA's for-cause removal provision, a letter sent by email to Ms. Wilcox on behalf of the

President informed her that she was "hereby removed from the office of Member[] of the [NLRB]"—more than three years before her term expired—without identifying any neglect of duty or malfeasance by Ms. Wilcox and without providing her with notice or a hearing. *Id.* ¶ 3.

The district court found that the President's termination of Ms. Wilcox was a "blatant violation" of the National Labor Relations Act, 29 U.S.C. § 153(a). Add. A at 5. Indeed, the government never attempted to argue otherwise. Instead, it tried to justify its admitted violation of the NLRA's unambiguous statutory terms with an aggressive new interpretation of Article II, under which the President "has authority to fire whomever he wants within the Executive branch, overriding any congressionally mandated law in his way." Add. A at 4. Finding the government's argument to be "contrary to Supreme Court precedent and over a century of practice," the district court granted summary judgment to Ms. Wilcox. *Id.* at 10.

The government appealed to this Court and sought an emergency stay pending appeal. On March 28, 2025, a divided special panel granted the government's emergency motion over a dissent by Judge Millett, who concluded that the NLRB's five-member Board is "predominantly an adjudicatory body." *Harris v. Bessent*, 2025 WL 980278, at *31 (U.S. 2025)

(Millett, J., dissenting). The en banc Court vacated the stay, explaining that the Supreme Court in *Humphrey's Executor* and *Wiener* "unanimously upheld removal restrictions for government officials on multimember adjudicatory boards." Op. 2.

The government then asked the Supreme Court to reinstate the stay and grant certiorari before judgment. The Supreme Court refused the government's request to grant certiorari before judgment, but stayed the case "pending the disposition of the appeal" in this Court. S. Ct. Stay Op. 2. The Supreme Court recognized that the President's removal power was "subject to narrow exceptions recognized by [its] precedents," but declined to "ultimately decide in this posture whether the NLRB … falls within such a recognized exception." S. Ct. Stay Op. 1.

Back in this Court, a sharply divided panel ruled for the government on the merits. Judge Katsas's majority opinion acknowledged Supreme Court precedent upholding removal protections for "purely adjudicatory bodies like the War Claims Commission at issue in *Wiener*." Op. 19. And it recognized that the "NLRB conducts formal adjudications to resolve unfair-labor-practice complaints presented to it." *Id.* at 9. But it nevertheless held the agency's removal protections unconstitutional based on its conclusion that

"Congress has vested the NLRB with several executive powers." *Id.* at 24. Judge Pan dissented, concluding that the NLRB is "predominantly adjudicatory, like the independent War Claims Commission that was approved in *Wiener*." *Id.* at 16.

## REASONS FOR GRANTING EN BANC REVIEW

## I. The panel majority's decision conflicts with binding Supreme Court precedent.

**A.** The Supreme Court has "unanimously upheld removal restrictions for government officials on multimember adjudicatory boards." En Banc Order 2. In *Wiener*, for example, the Court readily upheld removal protections for members of the War Claims Commission, a multimember independent adjudicative agency like the NLRB, despite the absence of an express for-cause removal requirement. *Wiener*, 357 U.S. at 354, 356. As the Court recognized, government officials acting in judicial roles "require absolute freedom from Executive interference," "[f]or it is quite evident … that one who holds his office only during the pleasure of another, cannot be depended upon to maintain an attitude of independence against the latter's will." *Id.* at 353. Congress thus necessarily has authority, "in creating … quasi judicial agencies, to require them to act in discharge of their duties independently of executive control." *Humphrey's Executor*, 295 U.S. at 629.

The NLRB is one such "independent quasi-judicial body." Franklin D. Roosevelt, Statement on Signing the National Labor Relations Act (July 5, 1935). From the beginning, Congress designed the Board to be "a non-partisan, quasi-judicial board … independent of any other department of the Government." NLRB, *First Ann. Rep. of the NLRB*, at 10 (1936). And unlike other agencies, Congress has taken additional steps with the NLRB to resolve any remaining separation-of-powers concerns. Although the NLRA as originally enacted gave the Board "plenary authority over all aspects of unfair labor practice disputes," Congress changed that with the Taft-Hartley Act, creating a unique internal "separation of powers within the agency." *United Food & Com. Workers*, 484 U.S. at 117, 118 n.5. As a consequence, the NLRB's adjudicatory and prosecutorial functions are now divided between the Board, whose five members act like a panel of appellate judges and can only be removed for cause, and a General Counsel, who is "independent of the Board's supervision and review" and removable by the President at will. *Id.* at 118; *see* 29 U.S.C § 153(a), (d).

As the panel recognized (at 9), the five-member Board's primary responsibility is to "conduct[] formal adjudications to resolve unfair-labor-practice complaints presented to it." Like the War Claims Commission at issue

in *Wiener*, claims before the NLRB are "adjudicated according to law … on the merits of each claim, supported by evidence and governing legal considerations." 357 U.S. at 355. In doing so, the Board acts "rather like a common-law court," *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 393 (1998) (Breyer, J., concurring), making "findings of fact" and issuing an "opinion" on whether an unfair labor practice has occurred, 29 U.S.C. § 160(c).

By contrast, the NLRB's power to investigate, to initiate complaints, and to prosecute violations is housed not with the Board, but with the General Counsel. *See* 29 U.S.C. § 153(d). Board members cannot investigate or prosecute violations on their own. *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 138 (1975). Rather, the Board can act only after a charge is filed and the General Counsel (who is removable by the President) decides to issue a complaint—a decision that the Board lacks any authority to review. *See United Food & Com. Workers*, 484 U.S. at 119. "Because of the reactive nature of the Board's functions," it has "no roving investigatory powers." *See Chamber of Com. v. NLRB*, 721 F.3d 152, 156 (4th Cir. 2013). And the NLRB also "may be the only agency that needs a court's imprimatur to render its orders

enforceable"; the Board must seek enforcement in a federal court of appeals. *Dish Network*, 953 F.3d at 375 n.2 (Oldham, J.); see 29 U.S.C. §§ 154, 160(e).

**B.** In nevertheless holding the Board's removal restrictions unconstitutional, the panel ignored the agency's history and structure and focused instead only on whether the agency can be said to wield "substantial executive power." The Board fails that test, the panel concluded (at 9), because its members wield several "substantial powers that are both executive in nature and different from the powers that *Humphrey's Executor* deemed to be merely quasi-legislative or quasi-judicial." None of the powers that the panel identified cast doubt on the Board's essentially adjudicatory nature.

*First*, the panel relied on the NLRB's rarely used rulemaking authority. Congress, however, tightly "circumscribed" that authority, Dissent at 21 n.12, by limiting it only to "such rules and regulations as may be *necessary* to carry out the provisions of [the NLRA]," 29 U.S.C. § 156 (emphasis added). The Board's limited rulemaking authority primarily allows it to issue internal "rules of practice before the Board and other procedural and housekeeping measures" necessary to carry out its adjudicatory function. Jeffrey S. Lubbers, *The Potential of Rulemaking by the NLRB*, 5 FIU L. Rev. 411, 413 n.19 (2010). In that regard, the Board's authority does not meaningfully

distinguish it from courts, which likewise adopt rules of procedure to carry out their judicial functions. *See Mistretta v. United States*, 488 U.S. 361, 386-88 (1989).[2]

The Board's rulemaking authority, however, does not "allow the Board to impose duties upon employers proactively," because such rules are not "necessary to carry out" the NLRA's provisions. *Chamber of Com.*, 721 F.3d at 163-64. Thus, although the agency has issued a handful of rules stating its interpretation of parts of the NLRA, such rules—which just "advise the public of the agency's construction of the statutes and rules which it administers," *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995)—are not binding and are subject to de novo judicial review. Courts have thus reviewed de novo, and declined to follow, the agency's "joint employer" and workplace-notice rules.

---

[2] As the district court observed, the Board "hardly engages in rulemaking" beyond establishing procedures for bringing and adjudicating cases. Add. A at 16-17. Other than a rule on health care bargaining units and the joint-employer rule, discussed below, "the Board's CFR chapter only contains three other substantive rules," covering "jurisdictional standards for colleges and universities, and two relatively insignificant workplaces—symphony orchestras, and horse/dog racing." Lubbers, *The Potential of Rulemaking by the NLRB*, 5 FIU L. Rev. at 413; see 29 C.F.R. §§ 103.1, 103.2, 103.3. Even those rules are aimed at the Board's adjudicatory functions, by determining whether it will adjudicate labor disputes at certain workplaces or how it will evaluate certain evidence.

*See Browning-Ferris Indus. of Cal., Inc. v. NLRB*, 911 F.3d 1195 (D.C. Cir. 2018); *Chamber of Com. of U.S. v. NLRB*, 723 F. Supp. 3d 498, 507 (E.D. Tex. 2024); *Chamber of Com.*, 721 F.3d at 155 (striking down a workplace notice rule as exceeding the Board's rulemaking authority).

*Second*, the panel majority noted that the Board may develop the law through adjudication. But so can Article III courts, and that does not make them executive agencies. The "outer limits" of "many legal standards"— whether "provided by the Constitution, statutes, or case law"—are "marked out through case-by-case adjudication." *St. Amant v. Thompson*, 390 U.S. 727, 730-31 (1968). These "[b]roadly worded constitutional and statutory provisions"—like the phrase "unfair labor practice" in the NLRA— "necessarily have been given concrete meaning and application by a process of case-by-case judicial decision in the common-law tradition." *Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*, 451 U.S. 77, 95 (1981). An agency's authority to interpret a statute it administers is thus, as this Court has explained, just "an incident of its adjudicatory function." *Clark-Cowlitz Joint Operating Agency v. FERC*, 826 F.2d 1074, 1081 (D.C. Cir. 1987).

*Third*, the majority concluded (at 28) that "the NLRB may award substantially broader remedies than the FTC could in 1935." But the Board's

remedial authority is in fact unusually restricted. Unlike other agencies, it cannot issue penalties for violations, but is limited to ordering equitable relief intended to restore the status quo. *See* 29 U.S.C. § 160(c); *Republic Steel Corp. v. NLRB*, 311 U.S. 7, 10 (1940). Moreover, the Board's power to issue remedies is limited by its reliance on the General Counsel to bring complaints and the courts to enforce its orders.

The only "broader" remedial power that the panel majority identified (at 28) is the power to order "affirmative" equitable relief instead of just "negative restriction[s]." The panel did not explain, however, why this distinction is one of constitutional significance. As this Court has recognized in other contexts, the historical "line between mandatory and prohibitory injunction" is illusory: "The 'mandatory' injunction has not yet been devised that could not be stated in 'prohibitory' terms." *United States v. W. Elec. Co.*, 46 F.3d 1198, 1206 (D.C. Cir. 1995). To the extent the distinction matters, the NLRB's authority more resembles the power to issue prohibitory injunctions, since it cannot impose new duties, but is limited to preserving the status quo. *See Republic Steel*, 311 U.S. at 10.

*Fourth*, the majority held (at 28-29) that "the NLRB has broad[] litigating authority" because, "while the General Counsel has 'final authority'

to prosecute unfair-labor-practice complaints before the NLRB, … the NLRA gives the Board itself control over litigation" to enforce its own orders in federal court. *See* 29 U.S.C. § 160(e). But far from demonstrating the Board's broad authority, the Board's need to ask the courts to enforce its orders is a unique *limitation* on its authority. *See Dish Network*, 953 F.3d at 375 n.2.

The panel (at 28) also relied on the Board's "authority to seek interim relief in district courts." But that authority is essentially adjudicative—akin to a court's power to "preserve or restore the status quo" while a "case is pending." NLRB, *Casehandling Manual* § 10310.2 (Aug. 2025).[3] The Board's power to preserve its jurisdiction is the minimum necessary to "ensure that Board decisions will be meaningful." NLRB, *10(j) Injunctions*.[4]

*Finally*, the panel (at 29-30) pointed to the Board's power to answer questions of representation by determining the appropriate bargaining unit and by certifying the results of union elections. *See* 29 U.S.C. § 159(b), (c). These powers, however, are again essentially adjudicative. The first, in section 159(b), provides that "whenever there is a disagreement about" the appropriate bargaining unit, "the Board shall resolve the dispute." *Am. Hosp.*

---

[3] *Available at* https://perma.cc/Y4NC-A7RX.

[4] *Available at* https://perma.cc/A54L-SEHP.

*Ass'n v. NLRB*, 499 U.S. 606, 611 (1991). Congress concluded that a decision by an "impartial government agency, the Board," was "the only possible workable arrangement" for making that determination. *Id.* at 614.

Likewise, section 159(c) gives the Board authority to adjudicate the outcome of union elections and certify a winner. But the Board's certification "does not itself command action." *Am. Fed'n of Lab. v. NLRB*, 308 U.S. 401, 408 (1940). It merely determines whether a majority of employees in a unit have selected a particular representative. *See* S. Rep. No. 573, 74th Cong., 1st Sess. 5 (1935) (certification is "in reality merely a preliminary determination of fact"). The employer's duty to bargain with the selected representative, however, can be enforced only if the General Counsel pursues a complaint for unfair labor practices. *See Am. Fed'n Lab.* 308 U.S. at 409.

\*    \*    \*

Even if one of the powers identified by the majority could be considered an "executive power," as *Humphrey's Executor* used that term, it would not be a "substantial" one. And even if this Court were to conclude otherwise, the proper course would be to sever that power—not to strip the Board of the independence necessary to its impartial review of the disputes coming before it. *See United States v. Arthrex, Inc.*, 594 U.S. 1, 25 (2021).

**II.  The exceptional importance and recurring nature of the issue presented cries out for the full Court's conclusive disposition.**

This case—and the growing list of related cases challenging removal protections for independent agencies—presents an extraordinary situation that requires the en banc Court's immediate review to prevent chaos for federal agencies and their stakeholders. Congress created the NLRB in response to escalating riots and other violence between employers and employees. *See* Arnold Ordman, *Fifty Years of the NLRA: An Overview*, 88 W. Va. L. Rev. 15, 15-16 (1985). And it understood that the NLRB's independence was essential to allowing the agency to resolve those disputes by maintaining its credibility with both sides. As Senator Wagner, the NLRA's sponsor, explained, only an independent tribunal—"detached from any particular administration that happens to be in power"—can fairly adjudicate disputes between employers and employees. NLRB, 1 *Legislative History of the National Labor Relations Act*, at 1428. The majority's decision threatens to end the independence not only of the NLRB, but—as Judge Pan noted in dissent—numerous other independent agencies that Congress created in reliance on the Supreme Court's longstanding precedent.

This Court has previously granted en banc review of a similar removal question. *See PHH Corp. v. CFPB*, 881 F.3d 75 (D.C. Cir. 2018) (en banc). And

the situation this time is far more dire. Numerous removal cases involving other independent agencies are already pending in the courts. And with the President continuing to announce new firings, the question is bound to arise again and again. Only by granting en banc review can this Court ensure that it speaks with a unified voice on a constitutional question of exceptional importance that threatens the functioning of large swaths of the administrative state.

## CONCLUSION

This Court should grant en banc review.

Respectfully submitted,

/s/ Deepak Gupta
DEEPAK GUPTA
GREGORY A. BECK
ALISA C. PHILO
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
deepak@guptawessler.com

January 5, 2026

Counsel for Plaintiff-Appellee

**CERTIFICATE OF COMPLIANCE WITH RULE 32(g)(1)**

I hereby certify that my word processing program, Microsoft Word, counted 3,901 words in the foregoing brief, exclusive of the portions excluded by Rule 32(f). The document also complies with the typeface requirements of Fed. R. App. P. 32(a)(6) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in proportionally spaced typeface in 14-point Century Expanded font.

*/s/ Deepak Gupta*
Deepak Gupta

**CERTIFICATE OF SERVICE**

I hereby certify that on January 5, 2026, I electronically filed the foregoing petition with the Clerk of the Court for the U.S. Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Deepak Gupta*
Deepak Gupta

# ADDENDUM UNDER CIRCUIT RULE 40(C)

**ADDENDA TABLE OF CONTENTS**

A.   *Wilcox v. Trump*, 2025 WL 720914 (D.D.C. 2025)

B.   Certificate of Parties and Amici

# ADDENDUM A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GWYNNE A. WILCOX,

                    Plaintiff,

          v.

DONALD J. TRUMP, *in his official capacity as President of the United States*

and

MARVIN E. KAPLAN, *in his official capacity as Chairman of the National Labor Relations Board*,

                    Defendants.

Civil Action No. 25-334 (BAH)

Judge Beryl A. Howell

## <u>MEMORANDUM OPINION</u>

Scholars have long debated the degree to which the Framers intended to consolidate executive power in the President. The "unitary executive theory"—the theory, in its purest form, that, under our tri-partite constitutional framework, executive power lodges in a single individual, the President, who may thus exercise complete control over all executive branch subordinates without interference by Congress—has been lauded by some as the hallmark of an energetic, politically accountable government, while rebuked by others as "anti-American," a "myth," and "invented history."[1] Both sides of the debate raise valid concerns, but this is no

---

[1] *Compare, e.g.*, Steven G. Calabresi & Christopher S. Yoo, *The Unitary Executive: Presidential Power from Washington to Bush* (2008), Saikrishna B. Prakash, *Imperial from the Beginning: The Constitution of the Original Executive* (2015), *and* Steven G. Calabresi & Saikrishna B. Prakash, *The President's Power to Execute the Laws*, 104 YALE L.J. 541, 597 (1994); *with, e.g.*, Allen Shoenberger, *The Unitary Executive Theory is Plainly Wrong and Anti-American: "Presidents are Not Kings*,*"* 85 ALB. L. REV. 837, 837 (2022), Christine Kexel Chabot, *Interring the Unitary Executive*, 98 NOTRE DAME L. REV. 129 (2022), *and* Lawrence Lessig & Cass R. Sunstein, *The President and the Administration*, 94 COLUM. L. REV. 1, 4 (1994) ("Any faithful reader of history must conclude that the unitary executive . . . is just myth."); Cass R. Sunstein, *This Theory is Behind Trump's Power Grab*, N.Y. TIMES (Feb. 26, 2025), https://www.nytimes.com/2025/02/26/opinion/trump-roberts-unitary-executive-theory.html; *see*

mere academic exercise.[2]  The outcome of this debate has profound consequences for how we Americans are governed.  On the one hand, democratic principles militate against a "headless fourth branch"[3] made up of politically unaccountable, independent government entities that might become agents of corrupt factions or private interest groups instead of the voting public. Additionally, at least theoretically, empowering a President with absolute control over how the Executive branch operates, including the power to "clean house" of federal employees, would promote efficient implementation of presidential policies and campaign promises that are responsive to the national electorate.  On the other hand, the advantages of impartial, expert-driven decision-making and congressional checks on executive authority favor some agency independence from political changes in presidential administrations, with the concomitant benefits of stability, reliability, and moderation in government actions.  No matter where these pros and cons may lead, the crucial question here is, what does the U.S. Constitution allow?

To start, the Framers made clear that no one in our system of government was meant to be king—the President included—and not just in name only.  *See* U.S. CONST. art. I, § 9, cl. 8 ("No Title of Nobility shall be granted by the United States.").  Indeed, the very structure of the Constitution was designed to ensure no one branch of government had absolute power, despite

---

*also* Julian Davis Mortenson, *The Executive Power Clause*, 168 U. PA. L. REV. 1269, 1334 (2020) (describing "the exercise of executive power" as "fully subordinate to instructions by its legislative principal" at the founding).

[2]    The academy has provided various formulations of the "unitary executive" theory.  *See, e.g*., Steven G. Calabresi & Kevin H. Rhodes*, The Structural Constitution: Unitary Executive, Plural Judiciary*, 105 HARV. L. REV. 1153, 1158 (1992) ("Unitary executive theorists claim that all federal officers exercising executive power must be subject to the direct control of the President."); Lessig & Sunstein, *supra*, at 2 ("Many think that under our constitutional system, the President must have the authority to control all government officials who implement the laws."); Chabot, *supra*, at 129 (2022) (describing the "unitary executive" theory as the idea that the Constitution gave the President "plenary removal power" affording him "'exclusive control over subordinates' exercise of executive power").

[3]    Peter L. Strauss, *The Place of Agencies in Government: Separation of Powers and the Fourth Branch*, 84 COLUM. L. REV. 573, 578 (1974) (quoting The President's Comm. on Admin. Mgmt., Administrative Management in the Government of the United States 30 (1937)).

the perceived inefficiencies, inevitable delays, and seemingly anti-democratic consequences that may flow from the checks and balances foundational to our constitutional system of governance.

The Constitution provides guideposts to govern inter-branch relations but does not fully delineate the contours of the executive power or the degree to which the other two branches may place checks on the President's execution of the laws.  As pertinent here, the Constitution does not, even once, mention "removal" of executive branch officers.  The only process to end federal service provided in the Constitution is impeachment, applicable to limited offices (like judges and the President) after a burdensome political process.  *See, e.g.*, *id.* art. II, § 4 (impeachment of President); *id.* art. III, § 1 (impeachment of federal judges).  This constitutional silence on removal perplexed the First Congress, bedeviled a President shortly thereafter and a second President after the Civil War during Reconstruction (leading to condemnation of the former and impeachment proceedings against the latter), and has beset jurists and scholars in our modern era.  *See infra* Part III.A.3.b.[4]

Yet, in assessing separation of powers, the Constitution itself is not the only available guide.  Historical practice and a body of case law are, respectively, instructive and binding.  *See infra* Part III.A.1; *e.g.*, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 23 (2015) ("In separation of powers cases this Court has often 'put significant weight upon historical practice.'" (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014))).  Both make clear that textual

---

[4]     In 1834, President Andrew Jackson fired two Secretaries of the Treasury when each refused his order to remove U.S. funds from the Second National Bank, which Jackson viewed as having "resist[ed] his reelection in part with bank funds," and these removal actions triggered a congressional condemnation resolution for an abuse of power.  *See* Lessig & Sunstein, *supra* n.1, at 78-80.  Jackson's replacement as Secretary at Treasury, Roger Taney, did as ordered and was later appointed Chief Justice.  *Id.* at 79.  The resolution condemning President Jackson was ultimately expunged, in 1837, but not without significant debate and Jackson's reputational decline.  *See id.* at 81-83.

Over thirty years later, in 1867, President Andrew Johnson's removal of the Secretary of War in defiance of a congressional statute led to his impeachment and near conviction.  Richard Murphy, 32 FED. PRAC. & PROC. JUD. REV. § 8128 (2d ed.) (2024).

silence regarding removal does not confer absolute authority on a President to willy-nilly override a congressional judgment that expertise and insulation from direct presidential control take priority when a federal officer is tasked with carrying out certain adjudicative or administrative functions. As Justice Louis Brandeis eloquently opined, "[c]hecks and balances were established in order that this should be 'a government of laws and not of men,'" observing further that the separation of powers was not adopted "to promote efficiency but to preclude the exercise of arbitrary power. The purpose was, not to avoid friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments, to save the people from autocracy." *Myers v. United States*, 272 U.S. 52, 292-93 (1926) (Brandeis, J., dissenting).

A President who touts an image of himself as a "king" or a "dictator,"[5] perhaps as his vision of effective leadership, fundamentally misapprehends the role under Article II of the U.S. Constitution. In our constitutional order, the President is tasked to be a conscientious custodian of the law, albeit an energetic one, to take care of effectuating his enumerated duties, including the laws enacted by the Congress and as interpreted by the Judiciary. U.S. CONST. art. II, § 3 ("[H]e shall take Care that the Laws be faithfully executed . . . ."). At issue in this case, is the President's insistence that he has authority to fire whomever he wants within the Executive branch, overriding any congressionally mandated law in his way. *See* Letter from Sarah Harris, Acting Solicitor General, to Sen. Richard Durbin on Restrictions on the Removal of Certain

---

[5]    *See* @WhiteHouse, X (Feb. 19, 2025, 1:58 PM), https://perma.cc/V9Y2-SWRD ("LONG LIVE THE KING!"); WSJ News, *Trump Says He Won't Be a Dictator "Except for Day One" if Re-Elected*, YOUTUBE (DEC. 6, 2023), https://www.youtube.com/watch?v=dQkrWL7YuGk; *see also* @realDonaldTrump, X (Feb. 15, 2025, 1:32 PM), https://perma.cc/S5GR-BXF5 ("He who saves his Country does not violate any Law."). Some of defendants' supporting amici also draw analogies to the British monarchy; Tennessee has described the tradition of the British king's "'prerogative power to remove' executive officers 'at will,'" which "carried into the United States." Tennessee's Amicus Br. at 5-6 (quoting Michael W. Connell, *The President Who Would Not Be King* 162 (2020)). In a democracy created to repudiate that very regime, that analogy has little purchase.

Principal Officers of the United States ("Letter from Acting SG") (Feb. 12, 2025), https://perma.cc/D67G-FKK4 (describing the Trump administration's view of the removal power). Luckily, the Framers, anticipating such a power grab, vested in Article III, not Article II, the power to interpret the law, including resolving conflicts about congressional checks on presidential authority. The President's interpretation of the scope of his constitutional power— or, more aptly, his *aspiration*—is flat wrong.

The President does not have the authority to terminate members of the National Labor Relations Board at will, and his attempt to fire plaintiff from her position on the Board was a blatant violation of the law. Defendants concede that removal of plaintiff as a Board Member violates the terms of the applicable statute, *see* Motions H'rg (Mar. 5, 2025), Rough Tr. at 51:12- 13, and because this statute is a valid exercise of congressional power, the President's excuse for his illegal act cannot be sustained.

## I.    BACKGROUND

The statutory and procedural background relevant to resolving this dispute is summarized below.

### A.    *Statutory Background*

The National Labor Relations Board ("NLRB") was established ninety years ago by Congress in the National Labor Relations Act ("NLRA") in response to a long and violent struggle for workers' rights. *See generally*, J. Warren Madden, *Origin and Early Years of the National Labor Relations Act*, 18 HASTINGS L.J. 571 (1967); Arnold Ordman, *Fifty Years of the NLRA*: *An Overview*, 88 W. VA. L. REV. 15, 15-16 (1985). Congress sought to protect industrial peace and stability in labor relations and thus created a board to resolve efficiently labor disputes and protect the rights of employees to "self-organization, to form, join, or assist labor organizations [and] to bargain collectively through representatives of their own choosing." 29

U.S.C. §157; *see also id.* § 151; *Crey v. Westinghouse Elec. Corp.*, 375 U.S. 261, 271 (1964) (describing these goals); *Colgate-Palmolive-Peet Co. v. NLRB*, 338 U.S. 355, 362 (1949) (same).

The NLRB is a "bifurcated agency" consisting, on one side, of a five-member, quasi-judicial "Board" that adjudicates appeals of labor disputes from administrative law judges ("ALJs"), and on the other, of a General Counsel ("GC") and several Regional Directors who prosecute unfair labor practices and enforce labor law and policy. *See* NLRB, *Who We Are*, https://perma.cc/9RLA-FSYL; 29 U.S.C. §§ 153(a), (d), 160; *Starbucks v. McKinney*, 602 U.S. 339, 357 (2024) (Jackson, J., concurring in part and dissenting in part). The two sides operate independently, with the GC independent of the Board's control. *NLRB v. United Food & Com. Workers Union, Local 23, AFL-CIO*, 484 U.S. 112, 117-18 (1987) (describing how the Labor Management Relations Act of 1947 amended the NLRA to separate the prosecutorial and adjudicatory functions between the Board and General Counsel).

The NLRB generally addresses labor disputes as follows: Upon the filing of a "charge" by an employer, employee, or labor union, a team working under the Regional Director will investigate and decide whether to pursue the allegation as a formal complaint. *See* NLRB, *Investigate Charges*, https://perma.cc/CU82-KU4V.[6] If the parties do not settle and the Director formally pursues the complaint, the Director will issue notice of a hearing before an ALJ. *Id.*; 29 U.S.C. § 160(b); 29 C.F.R. § 101.10; *Starbucks*, 602 U.S. at 342-43.[7] If necessary, after issuance of a complaint, the Board may seek temporary injunctive relief in federal district court while the dispute is pending at the NLRB. 29 U.S.C. § 160(j); *Starbucks*, 602 U.S. at 342. The

---

[6]    The initial request made by the employee, union, or employer is referred to as a "charge"; only the Director issues a "complaint."    NLRB, *What We Do*, https://perma.cc/CU82-KU4V.

[7]    If the parties do formally settle after issuance of a complaint, Board approval is required. *NLRB*, 484 U.S. at 120.

ALJ then gathers evidence and presents "a proposed report, together with a recommended order to the Board." 29 U.S.C. § 160(c).  That order will become the order of the Board unless the parties file "exceptions."  *Id.*; 29 C.F.R. §§ 101.11-.12.  If the parties file exceptions requesting the Board's review, the Board will consider the ALJ's recommendation, gather additional facts as necessary, and issue a decision.  29 U.S.C. § 160(c); 29 C.F.R. § 101.12.  The Board may craft relief, such as a cease-and-desist order to halt unfair labor practices or an order requiring reinstatement of terminated employees.  29 U.S.C. § 160(c).  These orders, however, are not independently enforceable; the Board must seek enforcement in a federal court of appeals (and may appoint attorneys to do so).  *Id.* §§ 154, 160(e); *In re NLRB*, 304 U.S. 486, 495 (1938) (noting compliance with a Board order is not obligatory until entered as a decree by a court).  Aside from adjudicating disputes, the Board may also conduct and certify the outcome of union elections, 29 U.S.C. § 159, and promulgate rules and regulations to carry out its statutory duties, *id.* § 156.

Although both the Board members and the GC are appointed by the President with "advice and consent" from the Senate, *id.* §§ 153(a), (d), only the Board is protected from removal at-will by the President, who is authorized to remove a Board member "upon notice and hearing, for neglect of duty or malfeasance in office, but for no other cause," *id.* § 153(a).  Such restrictions were intentional; much like many other multimember entities, the Board was designed to be an independent panel of experts that could impartially adjudicate disputes.  *See* 29 U.S.C. § 153(a); Kirti Datla & Richard L. Revesz, *Deconstructing Independent Agencies (and Executive Agencies)*, 98 CORNELL L. REV. 76, 770-71 (2013) (describing the NLRB as a classic example of an agency designed to be independent).  Board members serve staggered five-year terms, and the President is authorized to designate one board member as Chairman.  29 U.S.C.

§ 153(a).  In practice, the Board is partisan-balanced based on longstanding norms, though such a balance is not statutorily mandated.  *See* Brian D. Feinstein & Daniel J. Hemel, *Partisan Balance with Bite*, 118 COLUM. L. REV. 9, 54-55 (2018).

### B.     *Factual Background*

As set out in plaintiff's complaint and statement of material facts, and undisputed by defendants, plaintiff Gwynne Wilcox was nominated by President Biden and confirmed by the U.S. Senate to a second five-year term as member of the NLRB in September 2023.  Pl.'s Mot. for Expedited Summ. J. ("Pl.'s Mot."), Statement of Material Facts ("Pl.'s SMF") ¶ 2, ECF No. 10-1; Defs.' Cross-Mot. for Summ. J. and Opp'n to Pls.' Mot. for Summ. J., Statement of Undisputed Material Facts ("Defs.' SUMF") ¶ 2, ECF No. 23-2.  She was designated Chair of the Board in December 2024.  Complaint ¶ 12, ECF No. 1.

Shortly after taking office, President Trump moved Marvin Kaplan, a then-sitting Board member and a defendant in this case, into the position of Chair, replacing plaintiff.  *Id*. ¶ 13.  President Trump then, on January 27, 2025, terminated plaintiff from her position on the Board via an email sent shortly before 11:00 PM, by the Deputy Director of the White House Presidential Personnel Office.  Pl.'s Decl., Ex. A, ECF No. 10-4; Pl.'s SMF ¶ 3; Defs.' SUMF ¶ 3.  The termination was not preceded by "notice and hearing," nor was any "neglect of duty or malfeasance" identified, despite the explicit restrictions to removal of a Board member in the NLRA.  Pl.'s Decl. ¶¶ 3-4; Pl.'s SMF ¶¶ 4-5; Defs.' SUMF ¶ 5 (regarding lack of notice and hearing); Motions H'rg (Mar. 5, 2025), Rough Tr. at 51:10-17.  The email instead cited only political motivations—that plaintiff does not share the objectives of the President's administration—and asserted, in a footnote, that the restriction on the President's removal authority is unconstitutional as "inconsistent with the vesting of the executive Power in the President."  Pl.'s Decl. ¶ 3; Ex. A.

The NLRB's Director of Administration, who reports directly to Mr. Kaplan, began the termination process, cutting off plaintiff's access to her accounts and instructing her to clean out her office.  Pl.'s Decl. ¶¶ 5-6.  The Board already had two vacancies, and now, without plaintiff, it is reduced to only two sitting members—one short of the three-member quorum required to operate.  Compl. ¶ 18; 29 U.S.C. § 153(b).  Removal of plaintiff has thus stymied the functioning of the Board.

Plaintiff filed the instant suit, challenging her removal and requesting injunctive relief against Mr. Kaplan so that she may resume her congressionally mandated role.  *See* Compl. ¶¶ 21-22.  Recognizing that this case involves a pure question of law, plaintiff moved for expedited summary judgment, on February 10, 2025, Pl.'s Mot., ECF No. 10, and defendants responded with a cross-motion for summary judgment, with briefing completed on a condensed schedule.  *See* Defs.' Cross-Mot. for Summ. J. and Opp'n to Pls.' Mot. for Summ. J. ("Defs.' Opp'n"), ECF No. 23; Pl.'s Opp'n to Defs.' Cross-Mot. and Reply in Supp. of Mot. for Summ. J. ("Pl.'s Reply"), ECF No. 27; Defs.' Reply in Supp. of Cross-Mot. for Summ. J. ("Defs.' Reply"), ECF No. 30.  Interested parties also weighed in as amici.[8]  Following a hearing, held on March 5, 2025, the parties' cross-motions for summary judgement are ready for resolution.

## II.    LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A fact is only "'material' if a dispute over it might affect the outcome of a suit under the

---

[8]    Amici include: the Constitutional Accountability Center ("CAC") and a cohort of nineteen states and the District of Columbia, led by Minnesota, writing in support of plaintiff, *see* CAC's Amicus Br., ECF No. 15; Nineteen States & D.C.'s Amicus Br., ECF No. 31; and Tennessee and a cohort of twenty states, led by Florida, writing in support of defendants, *see* Tennessee's Amicus Br., ECF No. 18; Twenty States' Amicus Br., ECF No. 26.

governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The dispute is only "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* (quoting *Anderson*, 477 U.S. at 248).

A plaintiff "seeking a permanent injunction . . . must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

## III.    DISCUSSION

In the ninety years since the NLRB's founding, the President has never removed a member of the Board.  Pl.'s Mem. in Supp. of Pl.'s Mot. ("Pl.'s Mem.") at 4, ECF No. 10-2.  His attempt to do so here is blatantly illegal, and his constitutional arguments to excuse this illegal act are contrary to Supreme Court precedent and over a century of practice.  For the reasons explained below, plaintiff's motion is granted.  Plaintiff's termination from the Board was unlawful, and Mr. Kaplan and his subordinates are ordered to permit plaintiff to carry out all of her duties as a rightful, presidentially-appointed, Senate-confirmed member of the Board.

### A.    *Humphrey's Executor* and its Progeny are Binding on this Court.

The Board is a paradigmatic example of a multimember group of experts who lead an independent federal office.  Since the early days of the founding of this country, Congress, the President, and the Supreme Court all understood that Congress could craft executive offices with some independence, as a check on presidential authority.  That understanding has not changed

over the 150-year history of independent, multimember commissions, nor over the 90-year history of the NLRB. The Supreme Court recognized this history and tradition in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), in upholding removal protections for such boards or commissions, and this precedent remains not only binding law, but also a well-reasoned reflection of the balance of power between the political branches sanctioned by the Constitution.

> **1.    *Removal Restrictions on Board Members are Well-Grounded in History and Binding Precedent.***

As a textual matter, the Constitution is silent as to removals. *See In re Hennen*, 38 U.S. 230, 258 (1839). Consequently, though Article II grants the President authority over some appointments—with advice and consent of the Senate—and vests in him the "executive power," Article II contains no express authority from which to infer an absolute removal power. *Compare* U.S. CONST. art. II, § 1, cl. 1 (vesting clause), *and id.*, § 2, cl. 2 (appointments clause); *to id.* art. I, § 8, cl. 18 (clause granting *Congress* the authority "to make all laws" "necessary and proper" for carrying out its powers and "all other Powers vested . . . in the Government"). The Supreme Court has held that a general power to remove executive officers can be inferred from Article II, *see Myers,* 272 U.S. at 163-64, yet the contours of that removal power and the extent to which Congress may impose constraints are nowhere clearly laid out.

The courts in such cases must therefore turn to established precedent—judicial decisions as well as general practice and tradition. The Supreme Court has repeatedly recognized that "'traditional ways of conducting government . . . give meaning' to the Constitution." *Mistretta v. United States*, 488 U.S. 361, 401 (1989) (alteration in original) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring)). Thus, "[i]n separation-of-powers cases this Court has often 'put significant weight upon historical practice.'"

11

*Zivotofsky*, 576 U.S. at 23 (quoting *Noel Canning*, 573 U.S. at 524).  Even when the validity of a particular power is in question, the Court will, "in determining the . . . existence of [that] power," give weight to "the usage itself," *United States v. Midwest Oil Co.*, 236 U.S. 459, 473 (1915), and "hesitate to upset the compromises and working arrangements that the elected branches of Government themselves have reached," *Noel Canning*, 573 U.S. at 526.  Justice Frankfurter in his seminal concurring opinion in *Youngstown* declared that "systematic, unbroken" practice could even "be treated as a gloss on 'executive Power' vested in the President."  343 U.S. at 610-11.

Not only are the removal protections on members of the independent, multimember boards like the NLRB supported by over a century of unbroken practice, but they have also been expressly upheld in clear Supreme Court precedent.  Since 1887, Congress has created multiple independent offices led by panels whose members are appointed by the President but removable only for cause.  *See, e.g.*, Interstate Commerce Act, Pub. L. No. 49-41, ch. 104, § 11, 24 Stat. 379, 383 (1887) (creating the Interstate Commerce Commission, with restrictions on officers' removal except for "inefficiency, neglect of duty, or malfeasance"); Federal Reserve Act, Pub. L. No. 63-64, ch. 6, § 10, 38 Stat. 251, 260-61 (1913) (creating the Federal Reserve Board, whose members are removable only "for cause").  In 1914, Congress established the Federal Trade Commission ("FTC") with an "inefficiency, neglect of duty, or malfeasance in office" removal restriction for its five commissioners.  FTC Act, Pub. L. No. 63-203, ch. 311, § 1, 38 Stat. 717, 717-18 (1914).

The Supreme Court explicitly upheld removal restrictions for such boards when considering removal protections for the commissioners of the FTC in *Humphrey's Executor* in 1935, while also recognizing the President's general authority over removal of executive branch

officials.  The Court noted that commissioners of the FTC, "like the Interstate Commerce Commission" "are called upon to exercise the trained judgment of a body of experts 'appointed by law and informed by experience.'"  *Id.* at 624 (quoting *Ill. Cent. R.R. Co. v. Interstate Com. Comm'n*, 206 U.S. 441, 454 (1907)).  Congress, having the power to create such expert commissions with quasi-legislative and quasi-judicial authority, must also have, "as an appropriate incident, power to fix the period during which they shall continue, and to forbid their removal for except for cause in the meantime."  *Id.* at 629.

Two months later, with the guidance supplied in *Humphrey's Executor* and following the model of the FTC as endorsed by the Supreme Court there, Congress established the National Labor Relations Board.  *See* Madden, *supra*, at 572-73; *Yapp USA Auto. Sys., Inc. v. NLRB*, --F. Supp. 3d--, No. 24-cv-12173, 2024 WL 4119058, at *5 (E.D. Mich. Sep. 9, 2024).  Both entities—the FTC and NLRB—have five-member leadership boards with staggered terms of several years, minimizing instability and allowing for expertise to accrue.  *See* 29 U.S.C. § 153(a); *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 216 (2020).  Both were intended to exercise impartial judgment.  *See* Datla & Revesz, *supra*, at 770-71 (describing independence of the NLRB); *Seila L.*, 591 U.S. at 215-16 (describing the FTC as "designed to be 'non-partisan' and 'to act with entire impartiality'" (quoting *Humphrey's Ex'r*, 295 U.S. at 624)).  The Board, like the FTC, is "predominately quasi judicial and quasi legislative" in nature, with the primary responsibility of impartially reviewing decisions made by ALJs.  *Humphrey's Ex'r*, 292 U.S. at 624; *see* 29 U.S.C. § 160.  In fact, the Board does not prosecute labor cases nor enforce its rulings.  The side of the NLRB managed by the General Counsel—who is removable at-will by the President—carries out those more "executive" powers.  *See* 29 U.S.C. § 153(d) (describing the General Counsel's "final authority, on behalf of the Board" over "the

investigation of charges and issuance of complaints . . . and . . . the prosecution of such complaints before the Board"). As plaintiff correctly states, the Board closely resembles the FTC and is thus "squarely at the heart of the rule adopted in *Humphrey's Executor*." Pl.'s Mem. at 9.

Numerous other offices have followed the mold of the NLRB and FTC with multimember independent leadership boards protected from at-will removal by the President. *See* Pl.'s Mem. at 7 n.2 (listing, *e.g.*, the Merit Systems Protection Board, 5 U.S.C. § 1202(d); the Federal Labor Relations Authority, 5 U.S.C. § 7104(b); and the Federal Energy Regulatory Commission, 42 U.S.C. § 7171(b)(1)). "Since the Supreme Court's decision in *Humphrey's Executor*, the constitutionality of independent [multimember] agencies, whose officials possess some degree of removal protection that insulates them from unlimited and instantaneous political control, has been uncontroversial." *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 760 (10th Cir. 2024), *cert. denied* No. 24-156, 2025 WL 76435 (U.S. Jan. 13, 2025); *see also The Pocket Veto Case*, 279 U.S. 655, 689 (1929) ("Long settled and established practice is a consideration of great weight in a proper interpretation of constitutional" issues of separation of powers.).[9]

Recent consideration of the constitutionality of the removal protections for NLRB members have accordingly upheld those constraints on presidential removal authority under *Humphrey's Executor. See, e.g.*, *Overstreet v. Lucid USA Inc.*, No. 24-cv-1356, 2024 WL 5200484, at *10 (D. Ariz. Dec. 23, 2024); *Company v. NLRB*, No. 24-cv-3277, 2024 WL

---

[9]    Defendants protest the reliance on history and tradition because independent multimember commissions date back only to the late 1880s. Defs.' Reply at 4-5. "[S]uch a practice comes far too late to provide reliable evidence of the original public meaning of Article II or the Constitution's separation of powers," in defendants' view. Defs.' Reply at 4-5. That in no way invalidates the significance of longstanding tradition, however, which is probative "[e]ven when the nature of or longevity of [the] practice is subject to dispute, and even when that practice began after the founding era." *Noel Canning*, 573 U.S. at 525; *see id.* at 528-29 (relying on a post- Civil War practice of intra-recess appointments); CAC's Amicus Br. at 11, ECF No. 15 (making this point).

5004534, at *6 (W.D. Mo. Nov. 27, 2024); *Kerwin v. Trinity Health Grand Haven Hosp.*, No. 24-cv-445, 2024 WL 4594709, at *7 (W.D. Mich. Oct. 25, 2024); *Alivio Med. Ctr. v. Abruzzo*, No. 24-cv-2717, 2024 WL 4188068, at *9 (N.D. Ill. Sep. 13, 2024); *YAPP USA Automotive Sys.*, 2024 WL 4119058, at *7.  Courts have also recently upheld restrictions on removal under *Humphrey's Executor* for other multimember boards, such as the Consumer Product Safety Commission ("CPSC").  *See, e.g.*, *Leachco*, 103 F.4th at 761-62; *Consumers' Rsch. v. CPSC*, 91 F.4th 342, 352 (5th Cir. 2024); *United States v. SunSetter Prods. LP*, No. 23-cv-10744, 2024 WL 1116062, at *4 (D. Mass. Mar. 14, 2024).  The same has been true for the FTC.  *See, e.g.*, *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1046-47 (5th Cir. 2023); *Meta Platforms, Inc. v. FTC*, 723 F. Supp. 3d 64, 87 (D.D.C. 2024).  A court in this district has also upheld removal protections for the Merit Systems Protection Board.  *See Harris v. Bessent*, No. 25-cv-412 (RC), 2025 WL 679303, at *7 (D.D.C. Mar. 4, 2025).  The 150-year history and tradition of multimember boards or commissions and 90-year precedent from the Supreme Court approving of removal protections for their officers dictates the same outcome for the NLRB here.

### 2. *Defendants' Argument that* **Humphrey's Executor** *Does Not Control Fails.*

Discounting this robust history, defendants posit that the President's removal power is fundamentally "unrestricted" and that only two, narrow "exceptions" have been recognized: one for "inferior officers with narrowly defined duties," as established in *Morrison v. Olson*, 487 U.S. 654 (1988), and the other for "multimember bod[ies] of experts, balanced along partisan lines, that performed legislative and judicial functions and [do not] exercise any executive power," as established in *Humphrey's Executor*.  Defs.' Opp'n at 5-6 (second passage quoting *Seila L.*, 591 U.S. at 216).  According to defendants, neither exception applies to the Board.  *Id.* at 6.  Putting aside to address later whether congressional authority to constrain the President's

removal authority is characterized fairly by defendants as a narrow "exception" to the rule of "unrestricted" removal power, *see infra* Part III.A.3.b, *Humphrey's Executor* plainly controls.

Defendants emphasize that *Humphrey's Executor* understood the FTC at the time not to exercise any "executive power," which was key to its "exception," and that the NLRB today clearly "wield[s] substantial executive power."  Defs.' Opp'n at 6-8 (relying on *Seila L.*, 591 U.S. at 216 n.2, 218); *see also* Defs.' Reply at 3.  They do not, however, meaningfully distinguish between the authority of the FTC in 1935, as recognized in *Humphrey's Executor*, and the authority of the NLRB today.  The FTC in 1935 had powers mimicking those of both the Board and the NLRB's GC.  The FTC had broad powers of investigation and could issue a complaint and hold a hearing for potential unfair methods of competition.  *See Humphrey's Ex'r*, 295 U.S. at 620, 621; *see also* 15 U.S.C. § 49 (authorizing the FTC's subpoena power).  The FTC, upon finding a violation, could issue a cease-and-desist order and then go to the Court of Appeals for enforcement.  *Humphrey's Ex'r*, 295 U.S. at 620-21; *see also* FTC Act, ch. 311, § 5, 38 Stat. at 719-20.  The party subject to the order could also appeal to that court.  *Humphrey's Ex'r*, 295 U.S. at 621.  Further, the FTC could issue rules and regulations regarding unfair and deceptive acts.  *See* FTC Act, § 6, 38 Stat. at 722; Hon. R. E. Freer, Member of the FTC, Remarks on the FTC, its Powers and Duties at 2 (1940), https://www.ftc.gov/system/files/documents/public_statements/676771/19400827_freer_remarks _._rational_association_of_credit_jewelers.pdf.

The NLRB's collective authority, though comparable, *see supra* Part I.A (describing the NLRB's GC's authority to investigate and pursue enforcement against unfair labor practices and the Board's adjudicatory authority and power to issue unenforceable cease-and-desist orders), is, if anything, less extensive than that of the FTC.  The NLRB hardly engages in rulemaking (other

than to establish its own procedures), instead relying on adjudications for the setting of

precedential guidance.  *See Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374

(1998) ("The [NLRB], uniquely among major federal administrative agencies, has chosen to

promulgate virtually all the legal rules in its field through adjudication rather than rulemaking.").

Moreover, the aspects of the NLRB's authority most executive in nature—prosecutorial authority

to investigate and bring civil enforcement actions—are tasks assigned to the GC instead of the

Board itself.  *See* 29 U.S.C. § 153(d).[10]

Even though the Supreme Court of 1935 may have not referred to these classic

administrative powers as "executive" and the Supreme Court today would, *see, e.g.*, *Seila Law*,

591 U.S. at 216 n.2, the substantive nature of authority granted to these two independent

government entities does not significantly differ.  If the Supreme Court has determined that

removal restrictions on officers exercising substantially the same authority do not impermissibly

intrude upon presidential authority, *Humphrey's Executor* cannot be read to allow a different

outcome here.  That is especially true considering that the Supreme Court, in its next major

decision addressing removal protections for executive branch officers, rejected the notion that

the permissibility of "'good cause'-type restriction[s] . . . turn[s] on whether or not th[e] official"

---

[10]    Defendants suggest that because the NLRB makes "significant decisions shaping the rights and obligations of Americans" and "set[ting] federal labor policy," the "constitutional calculus" is different, and the *Humphrey's Executor* "exception" cannot apply.  Defs.' Reply at 3, 5; Motions H'rg (Mar. 5, 2025), Rough Tr. at 54:1-7 (citing *NLRB v. Curtin Matheson Sci., Inc.*, 494 U.S. 775, 786 (1990) ("[T]he NLRB has the primary responsibility for developing and applying national labor policy.")).  Defendants do not, however, explain how applying federal law in individual adjudications establishes "federal labor policy" any more than the rulemaking and adjudications of the FTC in *Humphrey's Executor* do, nor do they explain why subsequent caselaw—*see supra* Part III.A.3.a—should be read as putting such a gloss on the holding of *Humphrey's*.  Plaintiff contributed little to the debate about the scope of the NLRB's powers that may be considered "executive," simply tying its authorities closely to the FTC in 1935, despite the NLRB's bifurcated structure, resulting in a more cabined exercise of any executive authority by the Board itself.  *See* Pl.'s Reply at 3-5; *see also* Motions H'rg (Mar. 5, 2025), Tr. at 23:5-13 (plaintiff's counsel stating, "answering the question about exactly what 'executive' means and what those terms 'quasi-legislative' and 'quasijudicial' mean, it's not the easiest thing in the world.  I think, for purposes of this motion that's before you, I think what matters is that . . . *Humphrey's Executor* is binding.").

is classified as "purely executive" or exercising quasi-legislative or quasi-judicial functions.  *See Morrison*, 487 U.S. at 689.[11]

Defendants make a final, superficial distinction between the NLRB and the FTC to argue that the precedent of *Humphrey's Executor* should not apply.  Defs.' Opp'n at 10.  The NLRB, they note, has stricter removal protections because its members cannot be removed for "inefficiency," whereas FTC members can.  *Id.*  In both *Consumers' Research*, 91 F.4th at 346, 355-56, and *Leachco*, 103 F.4th at 761-63, however, courts of appeals upheld removal protections that did not include an exception for "inefficiency."  "Inefficiency" does not differ in substance from "neglect of duty," so omitting "inefficiency" as a grounds for removal cannot be a dispositive difference in the President's ability to exercise his Article II powers over the NLRB.  *See* Jane Manners & Lev Menand, *The Three Permissions: Presidential Removal and the Statutory Limits of Agency Independence*, 121 COLUM. L. REV. 1, 8, 69 (2021) (explaining

---

[11]    Defendants' argument about the exercise of "executive power" is ultimately tautological and leaves *Humphrey's Executor* completely devoid of force.  They reason that because the NLRB is housed within the executive branch, the Board inherently exercises "executive power."  Defs.' Opp'n at 7 (citing *Seila L.*, 591 U.S. at 216 n.2 (quoting *City of Arlington v. FCC*, 569 U.S. 290, 305 n.4 (2013))).  Reading *Humphrey's Executor* to allow removal protections only for offices that do not exercise "executive power," defendants then conclude that the NLRB does not fit within *Humphrey's Executor*.  The necessary implication of such reasoning is that *no board or commission placed with the executive branch* could, as a constitutional matter, be legally subject to removal protections duly enacted by Congress.  Yet, defendants dodge that extraordinary result and contradictorily suggest that removal protections on the Federal Reserve Board are acceptable because that Board does not exercise an "executive function."  Defs.' Reply at 5; *see also* Motions H'rg (Mar. 5, 2025), Rough Tr. at 59-60 (defense counsel declining to discuss Federal Reserve Board or the Federal Open Market Committee or why these entities should be treated differently than the NLRB as to presidential removal power).
    Recognizing that the exercise of "executive power" could not be dispositive, the Fifth Circuit in *Consumers' Research* agreed with the plaintiffs there that the CPSC "wields substantial executive power" but still held that the CPSC was constitutional under *Humphrey's Executor*.  91 F.4th at 353-55 ("Having concluded that the Commission exercises substantial executive power (in the modern sense), we must next consider whether that characteristic—standing alone—removes the Commission from the *Humphrey*'s exception. We conclude that it does not . . . .").  The Fifth Circuit examined the other factors in *Seila Law* to conclude that the removal protections for CPSC members were constitutionally sound: The CPSC does not have a novel structure or present a historically unprecedented situation; the CPSC does not have a single director but rather a multimember board; and the CPSC does not have any of the other features that concerned the Court in *Seila Law*, such as the receipt of funds outside the appropriation process or the inability of the President to influence the office's leadership through the appointment power.  *See id.*
    Regardless whether the NLRB exercises "substantial executive power," "executive power," or "quasi-legislative and quasi-judicial power," the NLRB does not sufficiently differ from the FTC to warrant a departure from *Humphrey's Executor*.

18

that the absence of "inefficiency" as a ground for removal does not unconstitutionally interfere with the President's authority).  Defendants offer no reason to suggest otherwise.  The NLRB fits well within the scope of *Humphrey's Executor*.

> ### 3.     Defendants' Argument that Humphrey's Executor *Has Been "Repudiated" and is No Longer Good Law Is Not Persuasive.*

Fundamentally, the position of defendants and their supporting state amici urging this Court not to apply *Humphrey's Executor* stems from a reading of the Supreme Court's subsequent case law as "repudiat[ing]" the precedent.  Defs.' Opp'n at 9 (quoting *Seila L.*, 591 U.S. at 239 (Thomas, J., concurring in part)); Tennessee's Amicus Br. at 7-10, ECF No. 18 (arguing forcefully that *Humphrey's Executor* was wrongly decided and has been "narrowed . . . nearly out of existence"); Twenty States' Amicus Br. at 3-8, ECF No. 26.  Defendants therefore argue that *Humphrey's Executor* must be read extremely narrowly, despite that "whatever little remains" is binding on this Court.  Defs.' Opp'n at 8 n.2.  To the contrary, an unbroken line of cases since *Humphrey's Executor* has reinforced the constitutionality of removal restrictions on multimember expert boards, and the pre-*Humphrey's Executor* history demonstrates that this decision was well-grounded in accepted principles of checks and balances.

> #### a.     Post-**Humphrey's Executor** *Case Law Reinforces its Central Holding.*

In every case following *Humphrey's Executor*, the Supreme Court has preserved the constitutionality of removal protections on independent, multimember boards and commissions.  Shortly following *Humphrey's Executor*, in *Wiener v. United States*, 357 U.S. 349 (1958), the Court held that the Constitution did not grant the President authority to remove members of the multimember War Claims Commission "for no reason other than that he preferred to have on that Commission men of his own choosing."  *Id.* at 355-56.  Thirty years later, in *Morrison*, the Court again recognized the exception to the President's removal power for officers with

adjudicatory powers, but further explained that the permissibility of removal restrictions did not turn on whether the officers' functions were "quasi-legislative and quasi-judicial," as opposed to executive in nature, instead looking to the degree to which they impeded the President's ability to execute the laws.  *See* 487 U.S. at 691-93 (upholding removal protections for independent counsel contained in the Ethics in Government Act).

Then, in *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477 (2010), the Court reiterated its holding in *Humphrey's Executor* that "Congress can, under certain circumstances, create independent agencies run by principal officers appointed by the President, whom the President may not remove at will but only for good cause" and declined to reexamine that precedent.  *Id.* at 483 (striking down double for-cause removal protections); *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 537 F.3d 667, 686 (D.C. Cir. 2008) (Kavanaugh, J., dissenting) (describing the defendants as attempting to compare the office's removal protections to that of "the FCC, the FTC, and the NLRB," which were understood to be "permissible under the Supreme Court's 1935 decision in *Humphrey's Executor*").

Most recently, in *Seila Law*, the Supreme Court likewise declined to "revisit [its] prior decisions allowing certain limitations on the President's removal power."  591 U.S. at 204. While defendants make much of dicta in this decision, such as that the FTC's powers would now be considered executive, Defs.' Opp'n at 9; *see also* Tennessee's Amicus Br. at 9, *Seila Law* made key distinctions between single-head offices and multimember boards or commissions that reinforce why placing restrictions on removal of leaders of the latter is not problematic under our Constitution, *see* 591 U.S. at 224-26.  Despite restrictions on removal, the President can exercise more control over a multimember board through his *appointment power* as vacancies arise, and with staggered terms, some Board vacancies arise during each administration.  *See id.* at 225.

20

Those new appointees can restrain the Board member the President might otherwise prefer to remove, and no President will be "saddled" with a single "holdover Director from a competing political party who is dead set *against*" his agenda. *Id.* at 225 (emphasis in original). That is particularly the case here, where President Trump could exercise near total control over the NLRB by appointing two members of his choosing to the Board to join Mr. Kaplan, whom the President appointed during his first term and recently elevated to Chairman, creating a majority of Trump appointees, and by appointing a General Counsel of his choice. *See* NLRB, *Members of the NLRB Since 1935*, https://www.nlrb.gov/about-nlrb/who-we-are/the-board/members-of-the-nlrb-since-1935 (last visited Mar. 5, 2025); 29 U.S.C. § 153(d) (allowing the General Counsel to be removed at will).[12]

Moreover, the multimember structure prevents the public from being subject to decisions made unilaterally by an unelected official, who could become captured by private interests. The distribution of power among several individuals on the Board "avoids concentrating power in the hands of any single individual." *Seila L.*, 591 U.S. at 222-23. Lastly, unlike single-head offices, entities led by multimember boards have a robust basis—more than even a "foothold"—in "history [and] tradition." *Id.* at 222. For these reasons, when the Court ultimately invalidated the removal restrictions on the CFPB's director as a *single* head of the bureau, Chief Justice Roberts expressly suggested that "converting the CFPB into a multimember agency" would solve "the problem." *Id.* at 237.[13]

---

[12]    Instead, by bringing the Board to a complete halt, the President has foreclosed his own ability to see his Board appointees effectuate his agenda and has frozen the functioning of an important government office.

[13]    The Supreme Court's most recent removal protections case, *Collins v. Yellen*, 594 U.S. 220 (2021), was likewise about an office led by a single director, and the Court there reaffirmed it "did 'not revisit [its] prior decisions allowing certain limitations on the President's removal power'" in *Seila Law*. *Id.* at 250-51 (quoting *Seila L.*, 591 U.S. at 204).

Finally, two months ago, the Supreme Court denied certiorari in *Leachco*, where the Tenth Circuit upheld removal protections for commissioners on the Consumer Product Safety Commission under *Humphrey's Executor*—once again, declining to revisit that precedent. *See* 103 F.4th 748 (10th Cir. 2024), *cert. denied* No. 24-156, 2025 WL 76435 (U.S. Jan. 13, 2025).

### b. *Presidential Removal Power Has Never Been Viewed as Unrestricted.*

Defendants and their supporting states' amici go even further in suggesting that not only has *Humphrey's Executor* been repudiated over time but the opinion was also wrong at the time it was decided. Defs.' Opp'n at 8 n.2, 9; Tennessee's Amicus Br. at 7; *see* Twenty States' Amicus Br. at 6-7. Defendants read *Humphrey's* predecessor, *Myers v. United States*, 272 U.S. 52 (1926), as formalizing the President's "unrestricted removal power," which ultimately derives from the "vesting" clause in Article II establishing a "unitary" executive. Defs.' Reply at 1-2 (first passage quoting *Seila L.*, 591 U.S. at 215); Motions H'rg (Mar. 5, 2025), Rough Tr. at 30:22-31:4 (plaintiff's counsel describing *Myers* as a "building block" in the unitary executive theory). They are again misguided. While the *Myers* Court made clear that the President has a general removal power for executive officials, defendants' myopic focus on this case loses sight of the limitations in its holding, a point driven home in *Humphrey's Executor* decided less than a decade later. Nothing in the Constitution or the historical development of the removal power has suggested the President's removal power is absolute. In fact, the history upon which *Myers* relies and the immediately following Supreme Court decisions undercut any view that Congress, when exercising its constitutional authority to shape executive offices, is completely barred from conditioning the President's exercise of his removal authority.

In *Myers*, Chief Justice Taft—the only person to have served both as the President and a Justice of the Supreme Court—recounted and relied on the history of the Decision of 1789, a

congressional debate about the President's removal powers during the First Congress, to declare

unconstitutional a statute requiring the "advice and consent of the Senate" for both appointment

*and* removal of federal postmasters.  *See* 272 U.S. at 107, 111-36, 176-77.[14]  The First Congress

had created the first three executive departments, the Departments of Foreign Affairs, War, and

Treasury, and after much debate, ultimately granted plenary removal power to the President over

the Secretary of Foreign Affairs and crafted that agency to be an arm of the President.  *Id.* at 145;

*see also* Lawrence Lessig & Cass R. Sunstein, *The President and the Administration*, 94 COLUM.

L. REV. 1, 25-29 (1994).  The First Congress did not make clear whether that decision—to grant

the President plenary removal authority over the Secretary of Foreign Affairs—derived from the

Constitution or rather was granted by Congress's own prerogative.  *See Myers*, 272 U.S. at 285

n.75 (Brandeis, J., dissenting); Lessig & Sunstein, 94 COLUM. L. REV. at 26-28; *Seila L.*, 591

U.S. at 271 (Kagan, J., dissenting in part and concurring in part) ("The summer of 1789 thus

ended without resolution of the critical question: Was the removal power 'beyond the reach of

congressional regulation'?" (quoting Saikrishna Prakash, *New Light on the Decision of 1789*, 91

CORNELL L. REV. 1021, 1072 (2006))).  Some clarity in the First Congress's view may be

gleaned, however, by the disparate approach that the Congress took with respect to the

Department of the Treasury.  Seeing the Treasury as a department less intrinsically tied to core

executive powers enumerated in Article II like that over foreign policy, Congress gave far more

direction to the structure of that department, specifying in detail its offices and functions and

granting independence from unfettered presidential removal power to the Comptroller.  *See*

Lessig & Sunstein, *supra*, at 27-28.  In short, the executive branch was not treated as strictly

---

[14]    The statute regarding removal of the postmasters read: "Postmasters of the first, second, and third classes
shall be appointed and may be removed by the President by and with the advice and consent of the Senate, and shall
hold their offices for four years unless sooner removed or suspended according to law."  *Myers*, 272 U.S. at 107.

unitary, but rather as a branch with units of varying degrees of independence and generally

subject to congressional direction through checks and balances—including on its personnel.  *See*

John F. Manning, *Separation of Powers as Ordinary Interpretation*, 124 HARV. L. REV. 1939,

1964 n.135 (2011).

Chief Justice Taft in *Myers* cherry-picked only one portion of that 1789 story by

highlighting what the First Congress did with the Department of Foreign Affairs.  *See* 272 U.S.

at 113-36; *Seila L.*, 591 U.S. at 277 (Kagan, J., dissenting in part and concurring in part)

(describing how scholars have "rejected Taft's one-sided history").  Despite the structure of the

Post Office far more closely resembling the Treasury Department of 1789 than the Department

of Foreign Affairs, Chief Justice Taft ignored the actual nuances reflected in the Decision of

1789 as to congressional power to condition the President's removal power reflected in the

treatment of the new Treasury Department and instead read this history "through executive-

colored glasses" to support "his strong preconceptions" as former President "about presidential

removal power," to reach the conclusion that a regional postmaster could not be subject to

removal protections.  Robert Post, *Tension in the Unitary Executive: How Taft Constructed the

Epochal Opinion of* Myers v. United States, 45 J. SUP. CT. HIST. 167, 172 & n.56 (2020) (first

passage quoting Hayden Smith to William H. Taft (Sep. 1, 1925) (Taft Papers)); *Myers*, 272 U.S.

at 176; Lessig & Sunstein, *supra*, at 25-30.[15]  Dicta in the lengthy *Myers* majority opinion made

broad pronouncements about the importance of the presidential removal power that were both

contradictory and inapposite: While Chief Justice Taft promoted the benefits of recognizing vast

---

[15]    Notably, Chief Justice Taft reached this conclusion over three dissents, including from Justices Holmes and Brandeis.  *Myers*, 272 U.S. at 178-295.  Justice Brandeis, in particular, espoused a view of checks and balances that emphasized the interdependence of the executive and legislative branches, vindicated in Justice Jackson's concurring opinion in *Youngstown*, 343 U.S. at 634.  *See Myers*, 272 U.S. at 240-95.

presidential removal authority on one hand, he recognized that Congress could legislate around appointment and removal of principal officers, in some circumstances, and inferior officers, refusing to threaten protections for the civil service, on the other. *Id.* at 127, 134-35, 161-62, 183, 186 ("[T]here may be duties of a quasi judicial character imposed on executive officers and members of executive tribunals whose decisions after hearing affect interests of individuals, the discharge of which the President cannot in a particular case properly influence or control. . . . [Moreover,] [the appointments clause] give[s] to Congress the power to limit and regulate removal of such inferior officers by heads of departments when it exercises its constitutional power to lodge the power of appointment with them.").[16]

Only nine years later, in *Humphrey's Executor*, the Supreme Court—consisting of six of the same justices who participated in the *Myers* decision (*i.e.,* Justices Sutherland, Van Devanter, Brandeis, Stone, McReynolds, and Butler)—unanimously retreated, denouncing the idea of "illimitable" removal authority and disavowing *Myers'* abundant dicta. *Morrison*, 487 U.S. at 687 ("In *Humphrey's Executor*, we found it 'plain' that the Constitution did not give the President 'illimitable power of removal' over the officers of independent agencies." (quoting 292 U.S. at 629)). Justice Sutherland, who authored *Humphrey's* despite joining the majority opinion in *Myers*, limited *Myers* to "the narrow point" that "the President had power to remove a postmaster of the first class, without the advice and consent of the Senate as required by act of Congress" and wrote that other "expressions . . . are beyond the point involved and therefore do not come within the rule of stare decisis. In so far as they are out of harmony with the views here set forth, these expressions are disapproved." *Humphrey's Ex'r*, 292 U.S. at 626-27.

---

[16]    The bold position taken by the current administration, *see* Exec. Order No. 14215, 90 Fed. Reg. 10447 (2025), that the President has supreme control over *all* of his subordinates threatens to upend limits on the removal power over *inferior* officers, expressly acknowledged in *Myers*.

*Humphrey's Executor*, consistent with the dissents in *Myers*, did not foreclose that the President may have total authority over removal of some officials (like "high political officers," *Myers*, 272 U.S. at 241 (Brandeis, J., dissenting)), but it made clear that his removal authority may certainly be limited by Congress in other circumstances.[17]  *Humphrey's Ex'r*, 292 U.S. at 629-32.

The takeaway from *Myers* is therefore discrete and uncontroversial: While Congress may structure executive branch offices via statute and legislate about the roles of executive branch officers, including standards for their removal, Congress cannot reserve for itself an active role in the removal decision.  The problem in *Myers* was that the statute required Senate advice and consent to remove postmasters and that encroached on the presidential power of removal.  272 U.S. at 107.  It cannot be gainsaid that the President has the power of removal of executive branch officers.  When Congress has statutorily provided a for-cause removal requirement, this means that the President has the authority to determine whether the for-cause requirement

---

[17]    Justice Brandeis's dissent in *Myers* was not so broad as to authorize Congress to restrict presidential authority over removal of anyone in the executive branch.  *See Myers*, 272 U.S. at 240-42 (Brandise, J., dissenting).  Rather, he focused on the fact that the postmaster was an *inferior officer*, very unlike that of the Secretary of Foreign Affairs, and the mischief that would result if the majority decision were read to endorse absolute presidential removal authority for all officials.  *Id.* at 241, 247, 257 ("Power to remove, as well as to suspend, a high political officer, might conceivably be deemed indispensable to democratic government and, hence, inherent in the President.  But power to remove an inferior administrative officer appointed for a fixed term cannot conceivably be deemed an essential of government."); *see also id.* at 181-82, 187, 193 (McReynolds, dissenting) (resisting *Myers'* overbroad dicta suggesting that *all* executive officers must serve at the pleasure of the President).  In the dissenters' views, a functional analysis into an office's role and responsibilities—like that in *Humphrey's Executor*—was necessary, but only for principal officers.

    In the face of the current administration's push for a more absolutist presidential removal power, history provides significant cautions: Protections for inferior federal officers came about to counter the extensive "spoils system" that characterized the executive branch in the early 1800s—particularly during the presidency of Andrew Jackson, whose controversial legacy is due in part to his association with widespread corruption.  *See Myers*, 272 U.S. at 276-83 (McReynolds, J., dissenting); *id.* at 272 U.S. at 250-52 (Brandeis, J., dissenting).  Congress having a hand in executive appointments and removal was seen as an antidote to corruption.  Such provisions set the stage for the development of the modern civil service system.  *See id.*; Katherine Shaw, *Partisanship Creep*, 118 Nw. Univ. L. Rev. 1563, 1573 & n. 48 ("[A] few decades after Andrew Jackson's administration, strong discontent with the corruption and inefficiency of the patronage system of public employment eventuated in the Pendleton Act, the foundation of modern civil service." (quoting *Elrod v. Burns*, 427 U.S. 347, 354 (1976))).

prescribed by Congress has been met.  As the Supreme Court has since repeatedly articulated, "the essence" of "*Myers* was the judgment that the Constitution prevents Congress from draw[ing] to itself the" power to remove.  *Morrison*, 487 U.S. at 686 (citing *Bowsher v. Synar*, 478 U.S. 714 (1986), for that interpretation).  That holding is completely compatible with *Humphrey's Executor*.  Little more can be gleaned from the unreliable historical retelling and prolix *Myers* majority opinion.[18]

In short, neither the Founding-era history nor *Myers* can carry the heavy weight that the current President has thrust upon it.  *See* Letter from Acting SG ("In *Myers* . . ., the Supreme Court recognized that Article II of the Constitution gives the President an 'unrestricted' power of 'removing executive officers.'").  Neither supports the view that the President's removal power is "illimitable."  Whatever the benefits of unrestricted removal authority under certain circumstances, "[t]he Framers did not constitutionalize presidential control over all that is now considered 'executive'; they did not believe that the President must have plenary power over all we now think of as administration," Lessig & Sunstein, *supra*, at 118, and neither did the early twentieth century Supreme Court.

---

[18]    At the motions hearing, defense counsel argued that this interpretation of both *Myers* and *Humphrey's Executor* had been rejected by the Supreme Court in *Seila Law*, 591 U.S. at 228.  Motions H'rg (Mar. 5, 2025), Rough Tr. at 62:1-17.  That is not so.  In *Seila Law*, amicus had distilled the Court's precedent as follows:

> *Humphrey's Executor* and *Morrison* establish a general rule that Congress may impose "modest" restrictions on the President's removal power, with only two limited exceptions. . . . Congress may not reserve a role *for itself* in individual removal decisions (as it attempted to do in *Myers* and *Bowsher*). And it may not eliminate the President's removal power altogether (as it effectively did in *Free Enterprise Fund*). Outside those two situations, amicus argues, Congress is generally free to constrain the President's removal power.

*Seila L.*, 591 U.S. at 228 (emphasis in original) (internal citations omitted).  Rather than reject that reconciliation of *Myers* and *Humphrey's Executor*, the Court simply restated the principle, uncontroverted in either precedent, that "the President's removal power is the rule, not the exception," *id.*, and then declined to revisit these precedents or to "elevate [*Humphrey's Executor*] into a freestanding invitation for Congress to impose additional restrictions on the President's removal authority," *id.*  In other words, the Supreme Court neither constrained *Humphrey's Executor* by expanding *Myers* beyond its holding nor endorsed an expansion of *Humphrey's Executor* itself.  In short, *Seila Law*, on this matter, had frankly little to add.

The holding in *Humphrey's Executor*, that Congress could create boards or commissions with elements of independence from the President, was therefore not at all a "fiction" or an aberration, as defendants have supposed. Defs.' Opp'n at 9.[19]  *Humphrey's Executor*, and thus NLRB Board members' removal protections, are consistent with the text and historical understandings of Article II, as well as the Supreme Court's most recent pronouncements.  That Congress can exert a check on the President by imposing for-cause restrictions on the removal of leaders of multimember boards or commissions is a stalwart principle in our separation of powers jurisprudence.

### c.    Humphrey's Executor *Remains Binding.*

In any case, *Humphrey's Executor* remains binding on this Court, as defendants rightly acknowledge.  *See* Defs.' Opp'n at 8 n.2; *Illumina*, 88 F.4th at 1047 ("[T]he question of whether . . . *Humphrey's Executor* [is] no longer binding" is for the Supreme Court alone to answer.).  As the Supreme Court has made clear, "[i]f a precedent . . . has direct application in a case, yet appears to rely on reasons rejected in some other line of decisions," the lower courts should still "leav[e] to the [Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989); *see also Nat'l Sec. Archive v. CIA*, 104 F.4th 267, 272 n.1 (D.C. Cir. 2024) ("This court is charged with following case law that directly controls a particular issue, 'leaving to [the Supreme] Court the prerogative of overruling its own decisions.'" (alterations in original) (quoting *Mallory v. Norfolk S. Ry. Co.*,

---

[19]    Nor can *Humphrey's Executor* be fairly described as an "exception[]" to the general rule of presidential removal authority.  *Contra Seila L.*, 591 U.S. at 198.  As explained, a careful reading of the history and the scope of the dispute in *Myers* confirms that *Humphrey's Executor* was not some exception to an otherwise absolute presidential removal power previously established in *Myers.*  To the extent *Myers* extolled such an absolute presidential removal power in overbroad dicta, it was in short order rejected by a unanimous Supreme Court.  *Myers* simply established that the President alone may exercise removal authority over principal officers, and *Humphrey's Executor* explained that Congress can set standards, without conferring the exercise of that power to itself, to cabin the President's singular exercise of that authority in the circumstances presented.

28

600 U.S. 122, 136 (2023))); *Meta Platforms*, 723 F. Supp. 3d at 87 ("It is certainly not this Court's place to deem a long-standing Supreme Court precedent obsolete . . . and thus no longer binding." (internal quotation marks and citation omitted)).  This Court would be bound to conclude that plaintiff's termination was unlawful even were the conclusion reached—and this Court adamantly has not—that *Humphrey's Executor* was, by today's measure, ill-reasoned or wrongly decided.

### B.    Plaintiff is Entitled to Permanent Declaratory and Injunctive Relief.

For all of these reasons, plaintiff prevails on the merits and is therefore entitled to a declaratory ruling that she was unlawfully terminated from her position as a member of the Board.  Defendants concede as much.  Motions H'rg (Mar. 5, 2025), Rough Tr. at 71:23-72:1 (defense counsel stating, "We are not fighting this requested declaratory judgment.").

Plaintiff further requests injunctive relief against Mr. Kaplan, ordering him to allow plaintiff to carry out all of her duties.  Compl. at 7.  To demonstrate that injunctive relief is warranted, a plaintiff must show that (1) she has suffered an irreparable injury, (2) remedies available at law are inadequate to compensate, (3) a remedy in equity is warranted considering the balance of the hardships to each party, and (4) the public interest is not disserved.  *eBay Inc. v. MercExchange LLC*, 547 U.S. 388, 391 (2006).  Notwithstanding plaintiff's success on the merits, defendants contest her entitlement to injunctive relief.  Defs.' Opp'n at 10.

#### 1.    *Plaintiff's Irreparable Harm and Inadequate Remedies at Law*

Plaintiff is suffering irreparable harm that cannot be repaired in the absence of an injunction.[20]  Courts have recognized as irreparable harms the "unlawful removal from office by the President" and "the obviously disruptive effect" that such removal has on the organization's

---

[20]    These two factors are often considered together.  *See, e.g.*, *Ridgley v. Lew*, 55 F. Supp. 3d 89, 98 (D.D.C. 2014); *Dellinger v. Bessent*, --F. Supp. 3d--, No. 25-cv-385 (ABJ), 2025 WL 665041, at *32 (D.D.C. Mar. 1, 2025).

functioning.  *Berry v. Reagan*, No. 83-cv-3182, 1983 WL 538, at * 5 (D.D.C. Nov. 14, 1983), *vacated as moot*, 732 F.2d 949 (Mem.) (D.C. Cir. 1983).  In *Berry*, terminated members of the Civil Rights Commission challenged President Reagan's decision to remove them.  *Id.* at *1.  The Commission was "left without a quorum," and the court recognized as an irreparable injury both the commission's inability to "fulfill its mandate" and the individuals' inability to serve "Congress in the furtherance of civil rights."  *Id.* at *5.  Likewise here, plaintiff has been deprived of a presidentially appointed and congressionally confirmed position of high importance, and both she and, by consequence, the NLRB have been deprived of the ability to carry out their congressional mandate in protecting labor rights—which cannot be retroactively cured by monetary damages.  *See id.*; *Dellinger v. Bessent*, No. 25-cv-385 (ABJ), 2025 WL 471022, at *11-13 (D.D.C. Feb. 12, 2025) ("[T]he loss of the ability to do what Congress specifically directed [her] to do cannot be remediated with anything other than equitable relief."); *Harris v. Bessent*, --F. Supp.3d--, No. 25-cv-412 (RC), 2025 WL 521027, at *7 (D.D.C. Feb. 18, 2025) ("By vindicating [her] right to occupy th[at] office, th[is] plaintiff[] act[s] as much in [her] own interests as those of [her] agenc[y's]. . . .  Striking at the independence of these officials accrues harm to their offices, as well.").[21]

Furthermore, plaintiff and the NLRB suffer an injury due to the loss of the office's independence.  As an entity entrusted with making impartial decisions about sensitive labor

---

[21]    Defendants argue that because President Trump could restore the NLRB's quorum by appointing members to fill the vacant seats, the harm here is not irreparable.  Defs.' Opp'n at 14.  While filling the open seats would halt the ongoing harm and prevent future harm, restoration of the NLRB's quorum would not do anything to *repair* the past harm—the backlog of cases, the months employers and employees have spent waiting for adjudications, the practical ramifications felt across the country (from workers' rights violations to workplace unrest) of labor disputes left unresolved, delayed union recognition, and so forth.  The possibility that the NLRB could once again operate may be one difference between this case and the situation of the Civil Rights Commission in *Berry*, where the Commission was set to expire before it could fulfill its statutory mandate, *see* 1983 WL 538, at *5, but that possibility does not make the harm here somehow reparable.  The NLRB's statutory mandate is not to—at some point in time—operate, contrary to defendants' suggestion, Defs.' Opp'n at 14-15, but rather to have an ongoing, efficient administration of the country's labor laws.

disputes, the NLRB's character and perception as neutral and expert-driven is damaged by plaintiff's unlawful removal. *See Humphrey's Ex'r*, 295 U.S. at 630 ("[The] coercive influence [of the removal power] threatens the independence of a commission."); *Harris*, 2025 WL 679303, at *13 ("[T]he MSPB's independence would evaporate if the President could terminate its members without cause, even if a court could later order them reinstated."). Money likewise cannot make up for that kind of intangible and reputational harm.

Defendants argue that, regardless of the injury, plaintiff's requested remedy—reinstatement to her position—is one the Court cannot grant. Defs.' Opp'n at 11. Not only have all previous cases sought back pay instead of reinstatement, defendants point out, but also reinstatement is not a remedy historically available at equity, which constrains the relief available to the Court today. *Id.* at 12 (citing *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)). Plaintiff counters, however, that she does not request the remedy of "reappointment" and does not need to be reinstated: She requests only a declaration that the President lacked authority to remove her—making the termination email void *ab initio*—and injunctive relief to enable her to carry out her position as before. *See* Pl.'s Reply at 9.

Defendants do not challenge the Court's ability to afford declaratory relief, but they do challenge an injunction running against the executive branch, even against the President's subordinates, to permit plaintiff to carry out her duties. Defs.' Opp'n at 11, 13. They contend that such relief would effectively "compel[]" the President "to retain the services of a principal officer whom he no longer believes should be entrusted with the exercise of executive power." Defs.' Opp'n at 11; *see also* Defs.' Reply at 7-8. At most, however, this argument simply restates defendants' position on the merits, because, as a general matter, courts undoubtedly have authority to constrain unlawful presidential action by enjoining the President's subordinates.

31

*See, e.g.*, *Youngstown*, 343 U.S. at 582, 589 (holding a presidential act unconstitutional and affirming the district court judgment which restrained Secretary of Commerce); *Chamber of Com. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("[I]t is now well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.' *Franklin v. Massachusetts*, 505 U.S. 788, 815 (1992) (Scalia, J., concurring in part and concurring in the judgment). Even if the Secretary were acting at the behest of the President, this 'does not leave the courts without power to review the legality [of the action], for courts have power to compel subordinate executive officials to disobey illegal Presidential commands.' *Soucie v. David*, 448 F.2d 1067, 1072 n. 12 (D.C. Cir. 1971)." (alterations in original)); *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *6 n.1 (D.C. Cir. Feb. 15, 2025) (noting that a court "can unquestionably review the legality of the President's action by enjoining the officers who would attempt to enforce the President's order").

Moreover, the D.C. Circuit has held such relief is appropriate in this type of employment context: A court may, by targeting a President's subordinates, "reinstate a wrongly terminated official '*de facto*,' even without a formal presidential reappointment" that would require injunctive relief against the President himself. *Severino v. Biden*, 71 F.4th 1038, 1042-43 (D.C. Cir. 2023) (holding that the plaintiff's injury was therefore redressable); *cf. Swan v. Clinton*, 100 F.3d 973, 980 (D.C. Cir. 1996) (holding that plaintiff's claim was redressable because injunctive relief against inferior officials, who could *de facto* reinstate plaintiff by allowing him to exercise the privileges of his office, would remedy plaintiff's harm); *see also Harris*, 2025 WL 679303, at *10-12 (holding that the court can order such relief to remedy an unlawful termination and relying on *Swan* and *Severino*); *Dellinger v. Bessent*, --F. Supp. 3d--, No. 25-cv-385 (ABJ),

2025 WL 665041, at *29-31 (D.D.C. Mar. 1, 2025) (same).  The Court therefore has the

authority to issue both the declaratory and injunctive remedies that plaintiff seeks.[22]

### 2.    *Balance of the Equities and the Public Interest*

The balance of the equities and the public interest also favor injunctive relief here.  *See*

*Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting that, where the government is a party, "[t]hese

two factors merge").  The public has an interest in efficient and peaceful resolution of labor

conflicts, and the Board's functioning is crucial to that goal.  In 2024, the NLRB received 20,000

to 30,000 unfair labor practice charges, and the Board reviewed 144 unfair labor practice cases

---

[22]    Defendants' arguments that plaintiff may not be "reinstated" or "reappointed" because reinstatement was not a remedy originally available at equity are not only inconsequential because relief need not be fashioned in that form, as described above, but they are also flawed.  Defendants' argument ultimately boils down to a technical distinction: Historically, requests for reinstatement were styled as writs of mandamus or *quo warranto* before courts of law instead of requests for injunctions before courts of equity, as defendants' cited cases reflect.  Defs.' Opp'n at 12; Twenty States' Amicus Br. at 3; *see In re Sawyer*, 124 U.S. 200, 212 (1888) (noting that while a court of equity does not have "jurisdiction over the appointment and removal of public officers, . . . the courts of law, . . . either by certiorari, error, or appeal, or by *mandamus*, prohibition, *quo warranto*, or information in the nature of a writ of *quo warranto*" do); *White v. Berry*, 171 U.S. 366, 377 (1898) (same).  After the merger of law and equity in the federal courts over eighty years ago, however, that distinction makes no difference and does not render improper the injunctive relief plaintiff requests.

Unsurprisingly, many courts have, therefore, reinstated federal employees to their positions or prevented their removals from taking effect.  *See, e.g.*, *Vitarelli v. Seaton*, 359 U.S. 535, 546 (1959) ("[P]etitioner is entitled to the reinstatement which he seeks."); *Pelicone v. Hodges*, 320 F.2d 754, 757 (D.C. Cir. 1963) (holding that plaintiff was "entitled to reinstatement"); *Paroczay v. Hodges*, 219 F. Supp. 89, 94 (D.D.C. 1963) (holding that, because plaintiff "was never legally separated," the court "will therefore order plaintiff's reinstatement"); *Berry*, 1983 WL 538, at *6 (enjoining removal of members of the U.S. Commission on Civil Rights); *cf. Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974) (acknowledging that "[u]se of the court's injunctive power" may be appropriate in certain cases regarding discharge of employees).  The other cases cited by defendants for the principle that reinstatement is not available as equitable relief, Defs.' Opp'n at 12, involve the unique situation of federal courts presiding over questions about state officers' entitlement to their positions, which is wholly inapplicable here.  *See Baker v. Carr*, 369 U.S. 186, 231 (1962) (citing cases about "enjoin[ing] a state proceeding to remove a public officer"); *Walton v. House of Representatives of Okla.*, 265 U.S. 487, 489-90 (1924) (holding that the district court did not have "jurisdiction over the appointment and removal of state officers"); *Harkrader v. Wadley*, 172 U.S. 148, 165-70 (1898) (declining to enjoin a state criminal proceeding); *see also* Twenty States' Amicus Br. at 16-17 (making the inapposite argument that imposing a remedy of reinstatement of state officers invades state sovereignty).

In any case, the D.C. Circuit has "note[d] that a request for an injunction based on the general federal question statute is essentially a request for a writ of mandamus in this context, where the injunction is sought to compel federal officials to perform a statutorily required ministerial duty."  *Swan*, 100 F.3d at 976 n.1.  Indeed, plaintiff made a last-minute request in her Notice of Supplemental Authority, ECF No. 33 at 4, for a writ of mandamus in the alternative.  A writ of mandamus requires that "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff."  *Id.* at 4 n.1 (alteration accepted) (quoting *In re Nat'l Nurses United*, 47 F.4th 746, 752 n.4 (D.C. Cir. 2022) (citation omitted)).  Accordingly, if injunctive relief were not available here because of adherence to the historical dividing lines of law and equity, a writ of mandamus would likely be available, and the effective relief provided to plaintiff would be the same.  *See Harris*, 2025 WL 679303, at *11.

and 115 election certification cases. *See* Nineteen States & D.C.'s Br. at 7, ECF No. 31 (citing

NLRB, *Investigate Charges*, https://perma.cc/CU82-KU4V; NLRB, *Board Decisions Issued*,

https:www.nlrb.gov/reports/agency-performance/board-decisions-issued (last visited Feb. 24,

2025)). Without a functioning NLRB, unfair labor practices go unchallenged, union elections go

unrecognized, and pending labor disputes go unreviewed. *See* Pl.'s Mem. at 12 (providing one

example where Whole Foods has refused to recognize a union election because it claims the

NLRB lacks the authority to certify it); Pl.'s Reply at 12 (citing an additional example where

CVS has refused to recognize a majority elected union). Incentives to comply with national

labor law may be severely undercut if no agency is available for enforcement. Employees,

employers, and bargaining units all suffer as a result. The public also has an interest in the

protection of duly enacted, constitutional laws—like the NLRA—from encroachment from other

branches. *See League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("[T]here is a

substantial public interest 'in having governmental agencies abide by the federal laws that

govern their existence and operations.'" (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th

Cir. 1994))). Reinstating plaintiff would allow the NLRB to reach a quorum, thereby allowing

the Board to carry out the important work in promoting labor stability, adjudicating labor

disputes, and protecting workers' rights, without inflicting any measurable harm on defendants.[23]

 Defendants protest that the President will indeed experience harm—by virtue of retaining

"a principal officer whom the President no longer believes should be entrusted with the exercise

of executive power," resulting in the executive branch "slip[ping] from the Executive's control,

and thus from that of the people." Defs.' Opp'n at 15 (second passage quoting *Free Enter. Fund*,

---

[23] As plaintiff's supporting state amici point out, a less partisan Board, insulated from at-will removal, is less likely to whipsaw the public by taking completely disparate approaches every four years, which has concomitant public benefits in greater stability and predictability in administration of the law. *See* Nineteen States & D.C. Br. at 9 n.21.

561 U.S. at 499).  Yet, President Trump can exercise control over the NLRB by appointing two members of his choosing to the vacant seats and appointing a General Counsel who will adopt his enforcement priorities; he simply has chosen not to do so.  In any case, whether the public will benefit more from the balance Congress has struck in preserving some independence from political whims in the administration of our national labor laws or from complete executive control goes to the core of the constitutional question underlying the merits—and thus the answer is dictated by binding precedent.

Finally, defendants predict their ultimate success before the Supreme Court, warning that if plaintiff is allowed to resume her duties on the Board now, any NLRB decisions in the meantime may be voidable, and "the NLRB will be under a heavy cloud of illegitimacy."  Defs.' Reply at 9; *see also* Defs.' Opp'n at 16; Twenty States' Amicus Br. at 16 (suggesting that "reinstatement hampers effective governance" by causing "intra-office 'chaos'" and questions about the fitness of the official).  The possibility of future changes in the law is not enough, however, to permit an unlawful termination and the halting of all Board activity in the meantime.  Plaintiff's wrongful termination has caused "chaos" enough and shall not be allowed to stand based on defendants' self-serving speculation.

## IV.    CONCLUSION

The President seems intent on pushing the bounds of his office and exercising his power in a manner violative of clear statutory law to test how much the courts will accept the notion of a presidency that is supreme.  Defendants cite in their briefing *Trump v. United States*, 603 U.S. 593, 608-09 (2024) (granting the President absolute and presumptive immunity from criminal liability for "official acts"), to argue that the removal power is "conclusive and preclusive," with the result that the President need not be subject to criminal *or civil* legislative constraints.  Defs.'

Reply at 7.  The courts are now again forced to determine how much encroachment on the legislature our Constitution can bear and face a slippery slope toward endorsing a presidency that is untouchable by the law.  The President has given no sufficient reason to accept that path here.

*Humphrey's Executor* and its progeny control the outcome of this case and require that plaintiff be permitted to continue her role as Board member of the NLRB and her termination declared unlawful and void.  The Constitution and caselaw are clear in allowing Congress to limit the President's removal power and in allowing the courts to enjoin the executive branch from unlawful action.  Defendants' hyperbolic characterization that legislative and judicial checks on executive authority, as invoked by plaintiff, present "extraordinary intrusion[s] on the executive branch," Defs.' Opp'n at 1, is both incorrect and troubling.  Under our constitutional system, such checks, by design, guard against executive overreach and the risk such overreach would pose of autocracy.  *See Myers*, 272 U.S. at 293 (Brandeis, J., dissenting).  An American President is not a king—not even an "elected" one[24]—and his power to remove federal officers and honest civil servants like plaintiff is not absolute, but may be constrained in appropriate circumstances, as are present here.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  March 6, 2025

_____
**BERYL A. HOWELL**
United States District Judge

---

[24]    Motions H'rg (Mar. 5, 2025), Rough Tr. at 43:9 (plaintiff's counsel highlighting the constitutional role of other branches in checking President's authority).

# ADDENDUM B

**CERTIFICATE AS TO PARTIES AND AMICI**

Gwynne A. Wilcox – Plaintiff-Appellee

Donald J. Trump – Defendant-Appellant

Marvin E. Kaplan – Defendant-Appellant

American Federation of Labor and Congress of Industrial Organizations (AFL-CIO) – Amicus curiae

Americans for Prosperity Foundation – Amicus curiae

America's Future, Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of California, Public Advocate of the United States, Public Advocate Foundation, U.S. Constitutional Rights Legal Defense Fund, and Conservative Legal Defense and Education Fund – Amici curiae

Ariana Cortes and Logan Karam – Amici curiae

Chamber of Commerce of the United States – Amicus curiae

Constitutional Accountability Center – Amicus curiae

Democratic Workplace – Amicus curiae

Florida, Alabama, Arkansas, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Oklahoma, South Carolina, South Dakota, Texas, Utah, West Virginia, and the Arizona legislature – Amici curiae

Former National Labor Relations Board Members – Amici curiae

Jed H. Shugerman – Amicus curiae

Law Professors John C. Coates, Jeffrey N. Gordon, Kathryn Judge, and Lev Menand – Amici curiae

Minnesota, Illinois, Arizona, California, Colorado, Connecticut, Delaware, District of Columbia, Hawaii, Maryland, Massachusetts, Michigan, Nevada,

New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, Washington, and Wisconsin – Amici curiae

Separation of Powers Clinic – Amicus curiae

State of Tennessee – Amicus curiae


January 5, 2026                    Respectfully submitted,

                                   */s/ Deepak Gupta*
                                   DEEPAK GUPTA
                                   GUPTA WESSLER LLP
                                   2001 K Street, NW
                                   Suite 850 North
                                   Washington, DC 20006
                                   (202) 888-1741
                                   *deepak@guptawessler.com*