No. 25-5057

# In the United States Court of Appeals for the District of Columbia Circuit

GWYNNE A. WILCOX,
*Plaintiff-Appellee,*

v.

DONALD J. TRUMP, in his official capacity as President
of the United States, et al.,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Columbia
Case No. 25-334 (The Hon. Beryl A. Howell)

## PETITION FOR REHEARING EN BANC

DEEPAK GUPTA
GREGORY A. BECK
ALISA C. PHILO
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*deepak@guptawessler.com*

January 5, 2026                    *Counsel for Plaintiff-Appellee*

# TABLE OF CONTENTS

Table of authorities ..........................................................................................ii

Glossary ...........................................................................................................vi

Introduction and Rule 40(b) Statement ..............................................................1

Statement of the case ..........................................................................................5

    A.    Statutory background.........................................................................5

    B.    Factual and procedural background...................................................6

Reasons for granting en banc review ..................................................................9

    I.    The panel majority's decision conflicts with binding
        Supreme Court precedent..................................................................9

    II.    The exceptional importance and recurring nature of the
        issue presented cries out for the full Court's conclusive
        disposition ......................................................................................18

Conclusion........................................................................................................19

Addendum under Circuit Rule 40(C) ..................................................................a

## TABLE OF AUTHORITIES

**Cases**

*Allentown Mack Sales & Service, Inc. v. NLRB,*
    522 U.S. 359 (1998) ........................................................................... 11

*American Federation of Labor v. NLRB,*
    308 U.S. 401 (1940) ........................................................................... 17

*American Hospital Association v. NLRB,*
    499 U.S. 606 (1991) ........................................................................... 17

*Browning-Ferris Industries of California, Inc. v. NLRB,*
    911 F.3d 1195 (D.C. Cir. 2018) ........................................................ 14

*Chamber of Commerce of U.S. v. NLRB,*
    723 F. Supp. 3d 498 (E.D. Tex. 2024) .............................................. 14

*Chamber of Commerce v. NLRB,*
    721 F.3d 152 (4th Cir. 2013) ................................................ 11, 13, 14

*Clark-Cowlitz Joint Operating Agency v. FERC,*
    826 F.2d 1074 (D.C. Cir. 1987) ........................................................ 14

*Dish Network Corp. v. NLRB,*
    953 F.3d 370 (5th Cir. 2020) ................................................. 3, 12, 16

*Garner v. Teamsters, Chauffeurs & Helpers Local Union 776,*
    346 U.S. 485 (1953) ............................................................................. 6

*Harris v. Bessent,*
    2025 WL 980278 (U.S. Mar. 28, 2025) ............................................. 7

*Humphrey's Executor v. United States,*
    295 U.S. 602 (1935) ......................................................................... 1, 9

*Mistretta v. United States,*
    488 U.S. 361 (1989) ........................................................................... 13

*NLRB v. Fansteel Metallurgical Corp.,*
    306 U.S. 240 (1939) ............................................................................. 5

*NLRB v. Sears, Roebuck & Co.,*
    421 U.S. 132 (1975) ........................................................ 11

*NLRB v. United Food & Commercial Workers Union,*
    *Local 23, AFL-CIO,*
    484 U.S. 112 (1987) ........................................... 2, 5, 10, 11

*Northwest Airlines, Inc. v. Transportation Workers Union of*
    *America, AFL-CIO,*
    451 U.S. 77 (1981) ........................................................ 14

*PHH Corp. v. CFPB,*
    881 F.3d 75 (D.C. Cir. 2018) ...................................... 19

*Republic Steel Corp. v. NLRB,*
    311 U.S. 7 (1940) .......................................................... 15

*Shalala v. Guernsey Memorial Hospital,*
    514 U.S. 87 (1995) ........................................................ 13

*St. Amant v. Thompson,*
    390 U.S. 727 (1968) ...................................................... 14

*Trump v. Wilcox,*
    145 S. Ct. 1415 (2025) .................................................... 1

*United States v. Arthrex, Inc.,*
    594 U.S. 1 (2021) .......................................................... 18

*United States v. Western Electric Co.,*
    46 F.3d 1198 (D.C. Cir. 1995) .................................... 15

*Wiener v. United States,*
    357 U.S. 349 (1958) ............................................ 1-3, 9, 11

*Wilcox v. Trump,*
    2025 WL 720914 (D.D.C. 2025) .................................... 5

*Wilcox v. Trump,*
    No. 25-319 (U.S. Sept. 22, 2025) .................................. 4

**Statutes and Regulations**

29 U.S.C. § 153................................................................2, 5-7, 10, 11

29 U.S.C. § 154....................................................................12

29 U.S.C. § 156....................................................................12

29 U.S.C. § 157.....................................................................5

29 U.S.C. § 158.....................................................................5

29 U.S.C. § 159..................................................................5, 16

29 U.S.C. § 160................................................2, 5, 11, 12, 15, 16

29 C.F.R. § 103.1 ..................................................................13

29 C.F.R. § 103.2 ..................................................................13

29 C.F.R. § 103.3 ..................................................................13

**Other Authorities**

Kirti Datla & Richard L. Revesz,
*Deconstructing Independent Agencies (and Executive Agencies)*,
98 Cornell L. Rev. 769 (2013) .......................................... 6

Jeffrey S. Lubbers,
*The Potential of Rulemaking by the NLRB*,
5 FIU L. Rev. 411 (2010) ........................................ 12, 13

NLRB,
*10(j) Injunctions* ......................................................... 16

NLRB,
*Casehandling Manual § 10310.2 (Aug. 2025)* ..................... 16

NLRB, 1 *Legislative History of the National Labor Relations Act*
(1949)............................................................................ 6, 18

NLRB, *First Annual Report of the NLRB* (1936) ........................... 10

Arnold Ordman,
    *Fifty Years of the NLRA: An Overview*, 88 W. Va. L. Rev. 15
    (1985) ............................................................................................ 18

Daniel B. Rice & Jack Boeglin,
    *Confining Cases to Their Facts*,
    105 Va. L. Rev. 865 (2019) ............................................................ 4

Franklin D. Roosevelt,
    Statement on Signing the National Labor Relations Act (July 5,
    1935) .......................................................................................... 10

S. Rep. No. 573,
    74th Cong., 1st Sess. (1935) ......................................................... 17

**GLOSSARY**

NLRA          National Labor Relations Act

NLRB          National Labor Relations Board

## INTRODUCTION AND RULE 40(B) STATEMENT

A sharply divided panel in this case upheld the President's removal of plaintiff Gwynne A. Wilcox—a duly confirmed member of the National Labor Relations Board—in violation of a for-cause removal provision that had stood unchallenged for 90 years. That decision directly conflicts with *Wiener v. United States*, 357 U.S. 349 (1958), and *Humphrey's Executor v. United States*, 295 U.S. 602 (1935). As this Court explained in its earlier en banc order vacating a stay of the district court's injunction, the Supreme Court has "unanimously upheld removal restrictions for government officials on multimember adjudicatory boards" like the NLRB. En Banc Op. 2-3 (citing *Wiener*, 357 U.S. at 356).

Although the Supreme Court subsequently reinstated the stay, it pointedly did not disturb those precedents. *See* S. Ct. Stay Op. 1. The Supreme Court instead recognized that the President's removal power is limited by the "exceptions recognized by our precedents." *Id.* And it declined the government's request to grant certiorari before judgment, leaving it to this Court to decide "after full briefing and argument" whether the NLRB "falls within such a recognized exception." *Trump v. Wilcox*, 145 S. Ct. 1415, 1415-16 (2025).

1

This Court should grant en banc review and hold that the NLRB, as an adjudicatory tribunal akin to an Article I court, falls squarely within the established exception for adjudicatory agencies. With the NLRB, Congress imposed a unique "separation of powers within the agency." *NLRB v. United Food & Com. Workers Union, Loc. 23, AFL-CIO*, 484 U.S. 112, 118 n.5 (1987). That structure expressly reserves prosecutorial functions to the General Counsel, who serves at the pleasure of the President and is "independent of the Board's supervision." *Id.* at 117-18 & n.5; *see* 29 U.S.C. § 153(d). By contrast, the agency's five-member Board—of which Ms. Wilcox was appointed and confirmed as a member—is structured like a court in both form and function, with members acting as a panel of appellate judges, issuing mostly unanimous decisions by applying federal labor law to the record in the cases that come before it. *See* 29 U.S.C. § 160.

Like the War Claims Commission in *Wiener*, the NLRB's five-member Board is an independent "adjudicatory body" performing "intrinsic judicial" functions. 357 U.S. at 355-56. Just as life tenure allows Article III judges to decide cases free from political pressure or the threat of removal for unpopular decisions, the Board's removal protections ensure its legitimacy as a neutral arbiter of labor disputes. As Judge Pan explained in dissent to the panel's

decision (at 1), "courts of law and other adjudicators that apply legal standards to facts must be impartial." And as the Supreme Court recognized in *Wiener*, an adjudicative body can't be expected to impartially apply the law with "the Damocles' sword of removal" hanging over its head. 357 U.S. at 355.

The panel majority nevertheless concluded that the NLRB's five-member Board exercises "substantial executive authority" beyond adjudication. But the opposite is true: The Board has extremely limited rulemaking power that is subordinate to its role as an adjudicatory body; it has no authority to initiate prosecutions; it cannot impose penalties beyond restoring the status quo; and—as Judge Oldham has observed—it "may be the only agency that needs [an Article III] court's imprimatur to render its orders enforceable." *Dish Network Corp. v. NLRB*, 953 F.3d 370, 375 n.2 (5th Cir. 2020). Even if some aspect of the NLRB's authority raised separation-of-powers concerns, the remedy would be to sever the problematic provision—not to compromise the independence of neutral adjudicators.

The panel majority recognized the importance of preserving purely adjudicatory agencies. But despite the panel's "attempt to couch [its] analysis in narrow terms," its reasoning, as Judge Pan recognized (at 2), "suggests that no agencies can be independent." The panel's decision, if allowed to stand,

would thus extend far beyond the NLRB—implicating the independence of agencies from the Nuclear Regulatory Commission to the Court of Appeals for Veterans Claims. It is "hard to imagine" a holding that "could more radically upend existing institutions." Daniel B. Rice & Jack Boeglin, *Confining Cases to Their Facts*, 105 Va. L. Rev. 865, 917 (2019).

The Supreme Court's grant of certiorari in *Trump v. Slaughter*, No. 25-332 (U.S.), only strengthens the need for en banc review. Multiple justices suggested at oral argument that, however the Court resolves the case, it will likely leave adjudicatory agencies unaffected. *See, e.g.*, Oral Argument Tr. 15-16, *Trump v. Slaughter*, No. 25-332 (U.S.) (Roberts, C.J.); *id.* at 26 (Alito, J.); *id.* at 49 (Kavanaugh, J.). And the Supreme Court declined to hear Ms. Wilcox's case in conjunction with *Slaughter*—once again leaving it for this Court to decide. *See* Order, *Wilcox v. Trump*, No. 25-319 (U.S. Sept. 22, 2025). Because the Supreme Court is unlikely to issue its decision until after the en banc deadline, this Court should grant review now and hold the case pending *Slaughter* so that it can apply whatever test the Supreme Court adopts to this case.

## STATEMENT OF THE CASE

### A.    Statutory background

Ninety years ago, Congress established the NLRB "in response to a long and violent struggle for workers' rights." *Wilcox v. Trump*, 2025 WL 720914, at *3 (D.D.C. 2025) (attached as Addendum A, at 5).[1] To promote "industrial peace," *NLRB v. Fansteel Metallurgical Corp.*, 306 U.S. 240, 257 (1939), Congress gave the NLRB exclusive jurisdiction to adjudicate unfair labor practices and labor disputes, *see* 29 U.S.C. §§ 157-60.

Congress designed the NLRB as a "bifurcated agency" that separates prosecutorial and adjudicatory functions. Add. A at 6; *see NLRB v. United Food & Com. Workers Union, Local 23, AFL-CIO*, 484 U.S. 112, 117-18 (1987). On one side, Congress created an independent quasi-judicial Board charged with adjudicating appeals from administrative law judges. Add. A at 6. The Board consists of five members who serve staggered five-year terms. 29 U.S.C. § 153(a). On the other side of the divide is the General Counsel, who prosecutes unfair labor practices and enforces labor law. Add. A at 6; *see* 29

---

[1] Unless otherwise noted, all internal quotation marks, citations, alterations, brackets, and ellipses have been omitted from quotations throughout this brief.

U.S.C. § 153(d). The General Counsel is "independent of the Board's control." Add. A at 6.

Although the President can remove the General Counsel at will, he is authorized to remove a Board member only "upon notice and hearing, for neglect of duty or malfeasance in office." *Id.* § 153(a). Congress designed these protections to ensure the Board could operate as an independent and impartial adjudicative body "acting in the public interest." *Garner v. Teamsters, Chauffeurs & Helpers Loc. Union 776*, 346 U.S. 485, 493-94 (1953). The independence of Board members was critical to protect them "from being subject to immediate political reactions at elections." NLRB, 1 *Legislative History of the National Labor Relations Act*, at 1467 (1949); *see also* Kirti Datla & Richard L. Revesz, *Deconstructing Independent Agencies (and Executive Agencies)*, 98 Cornell L. Rev. 769, 770-71 (2013) (describing the NLRB as a classic example of an agency designed to be independent).

## B.    Factual and procedural background

The Senate confirmed Ms. Wilcox as a member of the NLRB on September 6, 2023, for a second term of five years. Pl.'s Statement of Material Facts at ¶ 2, ECF 10-1 (No. 25-334). In open disregard of the NLRA's for-cause removal provision, a letter sent by email to Ms. Wilcox on behalf of the

President informed her that she was "hereby removed from the office of Member[] of the [NLRB]"—more than three years before her term expired—without identifying any neglect of duty or malfeasance by Ms. Wilcox and without providing her with notice or a hearing. *Id.* ¶ 3.

The district court found that the President's termination of Ms. Wilcox was a "blatant violation" of the National Labor Relations Act, 29 U.S.C. § 153(a). Add. A at 5. Indeed, the government never attempted to argue otherwise. Instead, it tried to justify its admitted violation of the NLRA's unambiguous statutory terms with an aggressive new interpretation of Article II, under which the President "has authority to fire whomever he wants within the Executive branch, overriding any congressionally mandated law in his way." Add. A at 4. Finding the government's argument to be "contrary to Supreme Court precedent and over a century of practice," the district court granted summary judgment to Ms. Wilcox. *Id.* at 10.

The government appealed to this Court and sought an emergency stay pending appeal. On March 28, 2025, a divided special panel granted the government's emergency motion over a dissent by Judge Millett, who concluded that the NLRB's five-member Board is "predominantly an adjudicatory body." *Harris v. Bessent*, 2025 WL 980278, at *31 (U.S. 2025)

7

(Millett, J., dissenting). The en banc Court vacated the stay, explaining that the Supreme Court in *Humphrey's Executor* and *Wiener* "unanimously upheld removal restrictions for government officials on multimember adjudicatory boards." Op. 2.

The government then asked the Supreme Court to reinstate the stay and grant certiorari before judgment. The Supreme Court refused the government's request to grant certiorari before judgment, but stayed the case "pending the disposition of the appeal" in this Court. S. Ct. Stay Op. 2. The Supreme Court recognized that the President's removal power was "subject to narrow exceptions recognized by [its] precedents," but declined to "ultimately decide in this posture whether the NLRB … falls within such a recognized exception." S. Ct. Stay Op. 1.

Back in this Court, a sharply divided panel ruled for the government on the merits. Judge Katsas's majority opinion acknowledged Supreme Court precedent upholding removal protections for "purely adjudicatory bodies like the War Claims Commission at issue in *Wiener*." Op. 19. And it recognized that the "NLRB conducts formal adjudications to resolve unfair-labor-practice complaints presented to it." *Id.* at 9. But it nevertheless held the agency's removal protections unconstitutional based on its conclusion that

8

"Congress has vested the NLRB with several executive powers." *Id.* at 24. Judge Pan dissented, concluding that the NLRB is "predominantly adjudicatory, like the independent War Claims Commission that was approved in *Wiener*." *Id.* at 16.

## REASONS FOR GRANTING EN BANC REVIEW

### I.     The panel majority's decision conflicts with binding Supreme Court precedent.

**A.** The Supreme Court has "unanimously upheld removal restrictions for government officials on multimember adjudicatory boards." En Banc Order 2. In *Wiener*, for example, the Court readily upheld removal protections for members of the War Claims Commission, a multimember independent adjudicative agency like the NLRB, despite the absence of an express for-cause removal requirement. *Wiener*, 357 U.S. at 354, 356. As the Court recognized, government officials acting in judicial roles "require absolute freedom from Executive interference," "[f]or it is quite evident … that one who holds his office only during the pleasure of another, cannot be depended upon to maintain an attitude of independence against the latter's will." *Id.* at 353. Congress thus necessarily has authority, "in creating … quasi judicial agencies, to require them to act in discharge of their duties independently of executive control." *Humphrey's Executor*, 295 U.S. at 629.

9

The NLRB is one such "independent quasi-judicial body." Franklin D. Roosevelt, Statement on Signing the National Labor Relations Act (July 5, 1935). From the beginning, Congress designed the Board to be "a non-partisan, quasi-judicial board … independent of any other department of the Government." NLRB, *First Ann. Rep. of the NLRB*, at 10 (1936). And unlike other agencies, Congress has taken additional steps with the NLRB to resolve any remaining separation-of-powers concerns. Although the NLRA as originally enacted gave the Board "plenary authority over all aspects of unfair labor practice disputes," Congress changed that with the Taft-Hartley Act, creating a unique internal "separation of powers within the agency." *United Food & Com. Workers*, 484 U.S. at 117, 118 n.5. As a consequence, the NLRB's adjudicatory and prosecutorial functions are now divided between the Board, whose five members act like a panel of appellate judges and can only be removed for cause, and a General Counsel, who is "independent of the Board's supervision and review" and removable by the President at will. *Id.* at 118; *see* 29 U.S.C § 153(a), (d).

As the panel recognized (at 9), the five-member Board's primary responsibility is to "conduct[] formal adjudications to resolve unfair-labor-practice complaints presented to it." Like the War Claims Commission at issue

10

in *Wiener*, claims before the NLRB are "adjudicated according to law … on the merits of each claim, supported by evidence and governing legal considerations." 357 U.S. at 355. In doing so, the Board acts "rather like a common-law court," *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 393 (1998) (Breyer, J., concurring), making "findings of fact" and issuing an "opinion" on whether an unfair labor practice has occurred, 29 U.S.C. § 160(c).

By contrast, the NLRB's power to investigate, to initiate complaints, and to prosecute violations is housed not with the Board, but with the General Counsel. *See* 29 U.S.C. § 153(d). Board members cannot investigate or prosecute violations on their own. *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 138 (1975). Rather, the Board can act only after a charge is filed and the General Counsel (who is removable by the President) decides to issue a complaint—a decision that the Board lacks any authority to review. *See United Food & Com. Workers*, 484 U.S. at 119. "Because of the reactive nature of the Board's functions," it has "no roving investigatory powers." *See Chamber of Com. v. NLRB*, 721 F.3d 152, 156 (4th Cir. 2013). And the NLRB also "may be the only agency that needs a court's imprimatur to render its orders

enforceable"; the Board must seek enforcement in a federal court of appeals. *Dish Network*, 953 F.3d at 375 n.2 (Oldham, J.); see 29 U.S.C. §§ 154, 160(e).

**B.** In nevertheless holding the Board's removal restrictions unconstitutional, the panel ignored the agency's history and structure and focused instead only on whether the agency can be said to wield "substantial executive power." The Board fails that test, the panel concluded (at 9), because its members wield several "substantial powers that are both executive in nature and different from the powers that *Humphrey's Executor* deemed to be merely quasi-legislative or quasi-judicial." None of the powers that the panel identified cast doubt on the Board's essentially adjudicatory nature.

*First*, the panel relied on the NLRB's rarely used rulemaking authority. Congress, however, tightly "circumscribed" that authority, Dissent at 21 n.12, by limiting it only to "such rules and regulations as may be *necessary* to carry out the provisions of [the NLRA]," 29 U.S.C. § 156 (emphasis added). The Board's limited rulemaking authority primarily allows it to issue internal "rules of practice before the Board and other procedural and housekeeping measures" necessary to carry out its adjudicatory function. Jeffrey S. Lubbers, *The Potential of Rulemaking by the NLRB*, 5 FIU L. Rev. 411, 413 n.19 (2010). In that regard, the Board's authority does not meaningfully

distinguish it from courts, which likewise adopt rules of procedure to carry out their judicial functions. *See Mistretta v. United States*, 488 U.S. 361, 386-88 (1989).[2]

The Board's rulemaking authority, however, does not "allow the Board to impose duties upon employers proactively," because such rules are not "necessary to carry out" the NLRA's provisions. *Chamber of Com.*, 721 F.3d at 163-64. Thus, although the agency has issued a handful of rules stating its interpretation of parts of the NLRA, such rules—which just "advise the public of the agency's construction of the statutes and rules which it administers," *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995)—are not binding and are subject to de novo judicial review. Courts have thus reviewed de novo, and declined to follow, the agency's "joint employer" and workplace-notice rules.

---

[2] As the district court observed, the Board "hardly engages in rulemaking" beyond establishing procedures for bringing and adjudicating cases. Add. A at 16-17. Other than a rule on health care bargaining units and the joint-employer rule, discussed below, "the Board's CFR chapter only contains three other substantive rules," covering "jurisdictional standards for colleges and universities, and two relatively insignificant workplaces—symphony orchestras, and horse/dog racing." Lubbers, *The Potential of Rulemaking by the NLRB*, 5 FIU L. Rev. at 413; see 29 C.F.R. §§ 103.1, 103.2, 103.3. Even those rules are aimed at the Board's adjudicatory functions, by determining whether it will adjudicate labor disputes at certain workplaces or how it will evaluate certain evidence.

*See Browning-Ferris Indus. of Cal., Inc. v. NLRB*, 911 F.3d 1195 (D.C. Cir. 2018); *Chamber of Com. of U.S. v. NLRB*, 723 F. Supp. 3d 498, 507 (E.D. Tex. 2024); *Chamber of Com.*, 721 F.3d at 155 (striking down a workplace notice rule as exceeding the Board's rulemaking authority).

*Second*, the panel majority noted that the Board may develop the law through adjudication. But so can Article III courts, and that does not make them executive agencies. The "outer limits" of "many legal standards"—whether "provided by the Constitution, statutes, or case law"—are "marked out through case-by-case adjudication." *St. Amant v. Thompson*, 390 U.S. 727, 730-31 (1968). These "[b]roadly worded constitutional and statutory provisions"—like the phrase "unfair labor practice" in the NLRA—"necessarily have been given concrete meaning and application by a process of case-by-case judicial decision in the common-law tradition." *Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*, 451 U.S. 77, 95 (1981). An agency's authority to interpret a statute it administers is thus, as this Court has explained, just "an incident of its adjudicatory function." *Clark-Cowlitz Joint Operating Agency v. FERC*, 826 F.2d 1074, 1081 (D.C. Cir. 1987).

*Third*, the majority concluded (at 28) that "the NLRB may award substantially broader remedies than the FTC could in 1935." But the Board's

remedial authority is in fact unusually restricted. Unlike other agencies, it cannot issue penalties for violations, but is limited to ordering equitable relief intended to restore the status quo. *See* 29 U.S.C. § 160(c); *Republic Steel Corp. v. NLRB*, 311 U.S. 7, 10 (1940). Moreover, the Board's power to issue remedies is limited by its reliance on the General Counsel to bring complaints and the courts to enforce its orders.

The only "broader" remedial power that the panel majority identified (at 28) is the power to order "affirmative" equitable relief instead of just "negative restriction[s]." The panel did not explain, however, why this distinction is one of constitutional significance. As this Court has recognized in other contexts, the historical "line between mandatory and prohibitory injunction" is illusory: "The 'mandatory' injunction has not yet been devised that could not be stated in 'prohibitory' terms." *United States v. W. Elec. Co.*, 46 F.3d 1198, 1206 (D.C. Cir. 1995). To the extent the distinction matters, the NLRB's authority more resembles the power to issue prohibitory injunctions, since it cannot impose new duties, but is limited to preserving the status quo. *See Republic Steel*, 311 U.S. at 10.

*Fourth*, the majority held (at 28-29) that "the NLRB has broad[] litigating authority" because, "while the General Counsel has 'final authority'

15

to prosecute unfair-labor-practice complaints before the NLRB, … the NLRA gives the Board itself control over litigation" to enforce its own orders in federal court. *See* 29 U.S.C. § 160(e). But far from demonstrating the Board's broad authority, the Board's need to ask the courts to enforce its orders is a unique *limitation* on its authority. *See Dish Network*, 953 F.3d at 375 n.2.

The panel (at 28) also relied on the Board's "authority to seek interim relief in district courts." But that authority is essentially adjudicative—akin to a court's power to "preserve or restore the status quo" while a "case is pending." NLRB, *Casehandling Manual* § 10310.2 (Aug. 2025).[3] The Board's power to preserve its jurisdiction is the minimum necessary to "ensure that Board decisions will be meaningful." NLRB, *10(j) Injunctions*.[4]

*Finally*, the panel (at 29-30) pointed to the Board's power to answer questions of representation by determining the appropriate bargaining unit and by certifying the results of union elections. *See* 29 U.S.C. § 159(b), (c). These powers, however, are again essentially adjudicative. The first, in section 159(b), provides that "whenever there is a disagreement about" the appropriate bargaining unit, "the Board shall resolve the dispute." *Am. Hosp.*

---

[3] *Available at* https://perma.cc/Y4NC-A7RX.

[4] *Available at* https://perma.cc/A54L-SEHP.

*Ass'n v. NLRB*, 499 U.S. 606, 611 (1991). Congress concluded that a decision by an "impartial government agency, the Board," was "the only possible workable arrangement" for making that determination. *Id.* at 614.

Likewise, section 159(c) gives the Board authority to adjudicate the outcome of union elections and certify a winner. But the Board's certification "does not itself command action." *Am. Fed'n of Lab. v. NLRB*, 308 U.S. 401, 408 (1940). It merely determines whether a majority of employees in a unit have selected a particular representative. *See* S. Rep. No. 573, 74th Cong., 1st Sess. 5 (1935) (certification is "in reality merely a preliminary determination of fact"). The employer's duty to bargain with the selected representative, however, can be enforced only if the General Counsel pursues a complaint for unfair labor practices. *See Am. Fed'n Lab.* 308 U.S. at 409.

\*     \*     \*

Even if one of the powers identified by the majority could be considered an "executive power," as *Humphrey's Executor* used that term, it would not be a "substantial" one. And even if this Court were to conclude otherwise, the proper course would be to sever that power—not to strip the Board of the independence necessary to its impartial review of the disputes coming before it. *See United States v. Arthrex, Inc.*, 594 U.S. 1, 25 (2021).

17

II.   **The exceptional importance and recurring nature of the issue presented cries out for the full Court's conclusive disposition.**

This case—and the growing list of related cases challenging removal protections for independent agencies—presents an extraordinary situation that requires the en banc Court's immediate review to prevent chaos for federal agencies and their stakeholders. Congress created the NLRB in response to escalating riots and other violence between employers and employees. *See* Arnold Ordman, *Fifty Years of the NLRA: An Overview*, 88 W. Va. L. Rev. 15, 15-16 (1985). And it understood that the NLRB's independence was essential to allowing the agency to resolve those disputes by maintaining its credibility with both sides. As Senator Wagner, the NLRA's sponsor, explained, only an independent tribunal—"detached from any particular administration that happens to be in power"—can fairly adjudicate disputes between employers and employees. NLRB, 1 *Legislative History of the National Labor Relations Act*, at 1428. The majority's decision threatens to end the independence not only of the NLRB, but—as Judge Pan noted in dissent—numerous other independent agencies that Congress created in reliance on the Supreme Court's longstanding precedent.

This Court has previously granted en banc review of a similar removal question. *See PHH Corp. v. CFPB*, 881 F.3d 75 (D.C. Cir. 2018) (en banc). And

the situation this time is far more dire. Numerous removal cases involving other independent agencies are already pending in the courts. And with the President continuing to announce new firings, the question is bound to arise again and again. Only by granting en banc review can this Court ensure that it speaks with a unified voice on a constitutional question of exceptional importance that threatens the functioning of large swaths of the administrative state.

## CONCLUSION

This Court should grant en banc review.

Respectfully submitted,

/s/ Deepak Gupta
DEEPAK GUPTA
GREGORY A. BECK
ALISA C. PHILO
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
deepak@guptawessler.com

January 5, 2026                    Counsel for Plaintiff-Appellee

19

## CERTIFICATE OF COMPLIANCE WITH RULE 32(g)(1)

I hereby certify that my word processing program, Microsoft Word, counted 3,901 words in the foregoing brief, exclusive of the portions excluded by Rule 32(f). The document also complies with the typeface requirements of Fed. R. App. P. 32(a)(6) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in proportionally spaced typeface in 14-point Century Expanded font.

*/s/ Deepak Gupta*
Deepak Gupta

## CERTIFICATE OF SERVICE

I hereby certify that on January 6, 2026, I electronically filed the foregoing petition with the Clerk of the Court for the U.S. Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Deepak Gupta*
Deepak Gupta

# ADDENDUM UNDER CIRCUIT RULE 40(C)

## ADDENDA TABLE OF CONTENTS

A.    *Wilcox v. Trump*, 2025 WL 720914 (D.D.C. 2025)

B.    Opinion (D.C. Cir. No. 25-5037, Dec. 5, 2025)

C.    Certificate of Parties and Amici

# ADDENDUM A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GWYNNE A. WILCOX,

　　　　　　Plaintiff,

　　v.

DONALD J. TRUMP, *in his official capacity as President of the United States*

and

MARVIN E. KAPLAN, *in his official capacity as Chairman of the National Labor Relations Board*,

　　　　　　Defendants.

Civil Action No. 25-334 (BAH)

Judge Beryl A. Howell

## <u>MEMORANDUM OPINION</u>

Scholars have long debated the degree to which the Framers intended to consolidate executive power in the President. The "unitary executive theory"—the theory, in its purest form, that, under our tri-partite constitutional framework, executive power lodges in a single individual, the President, who may thus exercise complete control over all executive branch subordinates without interference by Congress—has been lauded by some as the hallmark of an energetic, politically accountable government, while rebuked by others as "anti-American," a "myth," and "invented history."[1] Both sides of the debate raise valid concerns, but this is no

---

[1] *Compare, e.g.*, Steven G. Calabresi & Christopher S. Yoo, *The Unitary Executive: Presidential Power from Washington to Bush* (2008), Saikrishna B. Prakash, *Imperial from the Beginning: The Constitution of the Original Executive* (2015), *and* Steven G. Calabresi & Saikrishna B. Prakash, *The President's Power to Execute the Laws*, 104 YALE L.J. 541, 597 (1994); *with, e.g.*, Allen Shoenberger, *The Unitary Executive Theory is Plainly Wrong and Anti-American: "Presidents are Not Kings*,*"* 85 ALB. L. REV. 837, 837 (2022), Christine Kexel Chabot, *Interring the Unitary Executive*, 98 NOTRE DAME L. REV. 129 (2022), *and* Lawrence Lessig & Cass R. Sunstein, *The President and the Administration*, 94 COLUM. L. REV. 1, 4 (1994) ("Any faithful reader of history must conclude that the unitary executive . . . is just myth."); Cass R. Sunstein, *This Theory is Behind Trump's Power Grab*, N.Y. TIMES (Feb. 26, 2025), https://www.nytimes.com/2025/02/26/opinion/trump-roberts-unitary-executive-theory.html; *see*

mere academic exercise.[2]  The outcome of this debate has profound consequences for how we Americans are governed.  On the one hand, democratic principles militate against a "headless fourth branch"[3] made up of politically unaccountable, independent government entities that might become agents of corrupt factions or private interest groups instead of the voting public. Additionally, at least theoretically, empowering a President with absolute control over how the Executive branch operates, including the power to "clean house" of federal employees, would promote efficient implementation of presidential policies and campaign promises that are responsive to the national electorate.  On the other hand, the advantages of impartial, expert-driven decision-making and congressional checks on executive authority favor some agency independence from political changes in presidential administrations, with the concomitant benefits of stability, reliability, and moderation in government actions.  No matter where these pros and cons may lead, the crucial question here is, what does the U.S. Constitution allow?

To start, the Framers made clear that no one in our system of government was meant to be king—the President included—and not just in name only.  *See* U.S. CONST. art. I, § 9, cl. 8 ("No Title of Nobility shall be granted by the United States.").  Indeed, the very structure of the Constitution was designed to ensure no one branch of government had absolute power, despite

---

*also* Julian Davis Mortenson, *The Executive Power Clause*, 168 U. PA. L. REV. 1269, 1334 (2020) (describing "the exercise of executive power" as "fully subordinate to instructions by its legislative principal" at the founding).

[2]      The academy has provided various formulations of the "unitary executive" theory.  *See, e.g.*, Steven G. Calabresi & Kevin H. Rhodes, *The Structural Constitution: Unitary Executive, Plural Judiciary*, 105 HARV. L. REV. 1153, 1158 (1992) ("Unitary executive theorists claim that all federal officers exercising executive power must be subject to the direct control of the President."); Lessig & Sunstein, *supra*, at 2 ("Many think that under our constitutional system, the President must have the authority to control all government officials who implement the laws."); Chabot, *supra*, at 129 (2022) (describing the "unitary executive" theory as the idea that the Constitution gave the President "plenary removal power" affording him "'exclusive control over subordinates' exercise of executive power").

[3]      Peter L. Strauss, *The Place of Agencies in Government: Separation of Powers and the Fourth Branch*, 84 COLUM. L. REV. 573, 578 (1974) (quoting The President's Comm. on Admin. Mgmt., Administrative Management in the Government of the United States 30 (1937)).

the perceived inefficiencies, inevitable delays, and seemingly anti-democratic consequences that may flow from the checks and balances foundational to our constitutional system of governance.

The Constitution provides guideposts to govern inter-branch relations but does not fully delineate the contours of the executive power or the degree to which the other two branches may place checks on the President's execution of the laws. As pertinent here, the Constitution does not, even once, mention "removal" of executive branch officers. The only process to end federal service provided in the Constitution is impeachment, applicable to limited offices (like judges and the President) after a burdensome political process. *See, e.g.*, *id.* art. II, § 4 (impeachment of President); *id.* art. III, § 1 (impeachment of federal judges). This constitutional silence on removal perplexed the First Congress, bedeviled a President shortly thereafter and a second President after the Civil War during Reconstruction (leading to condemnation of the former and impeachment proceedings against the latter), and has beset jurists and scholars in our modern era. *See infra* Part III.A.3.b.[4]

Yet, in assessing separation of powers, the Constitution itself is not the only available guide. Historical practice and a body of case law are, respectively, instructive and binding. *See infra* Part III.A.1; *e.g.*, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 23 (2015) ("In separation of powers cases this Court has often 'put significant weight upon historical practice.'" (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014))). Both make clear that textual

---

[4]    In 1834, President Andrew Jackson fired two Secretaries of the Treasury when each refused his order to remove U.S. funds from the Second National Bank, which Jackson viewed as having "resist[ed] his reelection in part with bank funds," and these removal actions triggered a congressional condemnation resolution for an abuse of power. *See* Lessig & Sunstein, *supra* n.1, at 78-80. Jackson's replacement as Secretary at Treasury, Roger Taney, did as ordered and was later appointed Chief Justice. *Id.* at 79. The resolution condemning President Jackson was ultimately expunged, in 1837, but not without significant debate and Jackson's reputational decline. *See id.* at 81-83.

    Over thirty years later, in 1867, President Andrew Johnson's removal of the Secretary of War in defiance of a congressional statute led to his impeachment and near conviction. Richard Murphy, 32 FED. PRAC. & PROC. JUD. REV. § 8128 (2d ed.) (2024).

silence regarding removal does not confer absolute authority on a President to willy-nilly override a congressional judgment that expertise and insulation from direct presidential control take priority when a federal officer is tasked with carrying out certain adjudicative or administrative functions.  As Justice Louis Brandeis eloquently opined, "[c]hecks and balances were established in order that this should be 'a government of laws and not of men,'" observing further that the separation of powers was not adopted "to promote efficiency but to preclude the exercise of arbitrary power.  The purpose was, not to avoid friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments, to save the people from autocracy."  *Myers v. United States*, 272 U.S. 52, 292-93 (1926) (Brandeis, J., dissenting).

A President who touts an image of himself as a "king" or a "dictator,"[5] perhaps as his vision of effective leadership, fundamentally misapprehends the role under Article II of the U.S. Constitution.  In our constitutional order, the President is tasked to be a conscientious custodian of the law, albeit an energetic one, to take care of effectuating his enumerated duties, including the laws enacted by the Congress and as interpreted by the Judiciary.  U.S. CONST. art. II, § 3 ("[H]e shall take Care that the Laws be faithfully executed . . . .").  At issue in this case, is the President's insistence that he has authority to fire whomever he wants within the Executive branch, overriding any congressionally mandated law in his way.  *See* Letter from Sarah Harris, Acting Solicitor General, to Sen. Richard Durbin on Restrictions on the Removal of Certain

---

[5]    *See* @WhiteHouse, X (Feb. 19, 2025, 1:58 PM), https://perma.cc/V9Y2-SWRD ("LONG LIVE THE KING!"); WSJ News, *Trump Says He Won't Be a Dictator "Except for Day One" if Re-Elected*, YOUTUBE (DEC. 6, 2023), https://www.youtube.com/watch?v=dQkrWL7YuGk; *see also* @realDonaldTrump, X (Feb. 15, 2025, 1:32 PM), https://perma.cc/S5GR-BXF5 ("He who saves his Country does not violate any Law.").  Some of defendants' supporting amici also draw analogies to the British monarchy; Tennessee has described the tradition of the British king's "'prerogative power to remove' executive officers 'at will,'" which "carried into the United States." Tennessee's Amicus Br. at 5-6 (quoting Michael W. Connell, *The President Who Would Not Be King* 162 (2020)). In a democracy created to repudiate that very regime, that analogy has little purchase.

Principal Officers of the United States ("Letter from Acting SG") (Feb. 12, 2025),

https://perma.cc/D67G-FKK4 (describing the Trump administration's view of the removal

power).  Luckily, the Framers, anticipating such a power grab, vested in Article III, not Article

II, the power to interpret the law, including resolving conflicts about congressional checks on

presidential authority.  The President's interpretation of the scope of his constitutional power—

or, more aptly, his *aspiration*—is flat wrong.

The President does not have the authority to terminate members of the National Labor

Relations Board at will, and his attempt to fire plaintiff from her position on the Board was a

blatant violation of the law.  Defendants concede that removal of plaintiff as a Board Member

violates the terms of the applicable statute, *see* Motions H'rg (Mar. 5, 2025), Rough Tr. at 51:12-

13, and because this statute is a valid exercise of congressional power, the President's excuse for

his illegal act cannot be sustained.

## I.    BACKGROUND

The statutory and procedural background relevant to resolving this dispute is summarized

below.

### A.    *Statutory Background*

The National Labor Relations Board ("NLRB") was established ninety years ago by

Congress in the National Labor Relations Act ("NLRA") in response to a long and violent

struggle for workers' rights.  *See generally*, J. Warren Madden, *Origin and Early Years of the

National Labor Relations Act*, 18 HASTINGS L.J. 571 (1967); Arnold Ordman, *Fifty Years of the

NLRA*: *An Overview*, 88 W. VA. L. REV. 15, 15-16 (1985).  Congress sought to protect industrial

peace and stability in labor relations and thus created a board to resolve efficiently labor disputes

and protect the rights of employees to "self-organization, to form, join, or assist labor

organizations [and] to bargain collectively through representatives of their own choosing."  29

U.S.C. §157; *see also id.* § 151; *Crey v. Westinghouse Elec. Corp.*, 375 U.S. 261, 271 (1964)

(describing these goals); *Colgate-Palmolive-Peet Co. v. NLRB*, 338 U.S. 355, 362 (1949) (same).

The NLRB is a "bifurcated agency" consisting, on one side, of a five-member, quasi-

judicial "Board" that adjudicates appeals of labor disputes from administrative law judges

("ALJs"), and on the other, of a General Counsel ("GC") and several Regional Directors who

prosecute unfair labor practices and enforce labor law and policy. *See* NLRB, *Who We Are*,

https://perma.cc/9RLA-FSYL; 29 U.S.C. §§ 153(a), (d), 160; *Starbucks v. McKinney*, 602 U.S.

339, 357 (2024) (Jackson, J., concurring in part and dissenting in part). The two sides operate

independently, with the GC independent of the Board's control. *NLRB v. United Food & Com.*

*Workers Union, Local 23, AFL-CIO*, 484 U.S. 112, 117-18 (1987) (describing how the Labor

Management Relations Act of 1947 amended the NLRA to separate the prosecutorial and

adjudicatory functions between the Board and General Counsel).

The NLRB generally addresses labor disputes as follows: Upon the filing of a "charge"

by an employer, employee, or labor union, a team working under the Regional Director will

investigate and decide whether to pursue the allegation as a formal complaint. *See* NLRB,

*Investigate Charges*, https://perma.cc/CU82-KU4V.[6] If the parties do not settle and the Director

formally pursues the complaint, the Director will issue notice of a hearing before an ALJ. *Id.*; 29

U.S.C. § 160(b); 29 C.F.R. § 101.10; *Starbucks*, 602 U.S. at 342-43.[7]  If necessary, after

issuance of a complaint, the Board may seek temporary injunctive relief in federal district court

while the dispute is pending at the NLRB. 29 U.S.C. § 160(j); *Starbucks*, 602 U.S. at 342. The

---

[6]    The initial request made by the employee, union, or employer is referred to as a "charge"; only the Director issues a "complaint."    NLRB, *What We Do*, https://perma.cc/CU82-KU4V.

[7]    If the parties do formally settle after issuance of a complaint, Board approval is required. *NLRB*, 484 U.S. at 120.

ALJ then gathers evidence and presents "a proposed report, together with a recommended order to the Board." 29 U.S.C. § 160(c). That order will become the order of the Board unless the parties file "exceptions." *Id.*; 29 C.F.R. §§ 101.11-.12. If the parties file exceptions requesting the Board's review, the Board will consider the ALJ's recommendation, gather additional facts as necessary, and issue a decision. 29 U.S.C. § 160(c); 29 C.F.R. § 101.12. The Board may craft relief, such as a cease-and-desist order to halt unfair labor practices or an order requiring reinstatement of terminated employees. 29 U.S.C. § 160(c). These orders, however, are not independently enforceable; the Board must seek enforcement in a federal court of appeals (and may appoint attorneys to do so). *Id.* §§ 154, 160(e); *In re NLRB*, 304 U.S. 486, 495 (1938) (noting compliance with a Board order is not obligatory until entered as a decree by a court). Aside from adjudicating disputes, the Board may also conduct and certify the outcome of union elections, 29 U.S.C. § 159, and promulgate rules and regulations to carry out its statutory duties, *id.* § 156.

Although both the Board members and the GC are appointed by the President with "advice and consent" from the Senate, *id.* §§ 153(a), (d), only the Board is protected from removal at-will by the President, who is authorized to remove a Board member "upon notice and hearing, for neglect of duty or malfeasance in office, but for no other cause," *id.* § 153(a). Such restrictions were intentional; much like many other multimember entities, the Board was designed to be an independent panel of experts that could impartially adjudicate disputes. *See* 29 U.S.C. § 153(a); Kirti Datla & Richard L. Revesz, *Deconstructing Independent Agencies (and Executive Agencies)*, 98 CORNELL L. REV. 76, 770-71 (2013) (describing the NLRB as a classic example of an agency designed to be independent). Board members serve staggered five-year terms, and the President is authorized to designate one board member as Chairman. 29 U.S.C.

§ 153(a).  In practice, the Board is partisan-balanced based on longstanding norms, though such a balance is not statutorily mandated.  *See* Brian D. Feinstein & Daniel J. Hemel, *Partisan Balance with Bite*, 118 COLUM. L. REV. 9, 54-55 (2018).

### B.    *Factual Background*

As set out in plaintiff's complaint and statement of material facts, and undisputed by defendants, plaintiff Gwynne Wilcox was nominated by President Biden and confirmed by the U.S. Senate to a second five-year term as member of the NLRB in September 2023.  Pl.'s Mot. for Expedited Summ. J. ("Pl.'s Mot."), Statement of Material Facts ("Pl.'s SMF") ¶ 2, ECF No. 10-1; Defs.' Cross-Mot. for Summ. J. and Opp'n to Pls.' Mot. for Summ. J., Statement of Undisputed Material Facts ("Defs.' SUMF") ¶ 2, ECF No. 23-2.  She was designated Chair of the Board in December 2024.  Complaint ¶ 12, ECF No. 1.

Shortly after taking office, President Trump moved Marvin Kaplan, a then-sitting Board member and a defendant in this case, into the position of Chair, replacing plaintiff.  *Id*. ¶ 13.  President Trump then, on January 27, 2025, terminated plaintiff from her position on the Board via an email sent shortly before 11:00 PM, by the Deputy Director of the White House Presidential Personnel Office.  Pl.'s Decl., Ex. A, ECF No. 10-4; Pl.'s SMF ¶ 3; Defs.' SUMF ¶ 3.  The termination was not preceded by "notice and hearing," nor was any "neglect of duty or malfeasance" identified, despite the explicit restrictions to removal of a Board member in the NLRA.  Pl.'s Decl. ¶¶ 3-4; Pl.'s SMF ¶¶ 4-5; Defs.' SUMF ¶ 5 (regarding lack of notice and hearing); Motions H'rg (Mar. 5, 2025), Rough Tr. at 51:10-17.  The email instead cited only political motivations—that plaintiff does not share the objectives of the President's administration—and asserted, in a footnote, that the restriction on the President's removal authority is unconstitutional as "inconsistent with the vesting of the executive Power in the President."  Pl.'s Decl. ¶ 3; Ex. A.

The NLRB's Director of Administration, who reports directly to Mr. Kaplan, began the termination process, cutting off plaintiff's access to her accounts and instructing her to clean out her office. Pl.'s Decl. ¶¶ 5-6. The Board already had two vacancies, and now, without plaintiff, it is reduced to only two sitting members—one short of the three-member quorum required to operate. Compl. ¶ 18; 29 U.S.C. § 153(b). Removal of plaintiff has thus stymied the functioning of the Board.

Plaintiff filed the instant suit, challenging her removal and requesting injunctive relief against Mr. Kaplan so that she may resume her congressionally mandated role. *See* Compl. ¶¶ 21-22. Recognizing that this case involves a pure question of law, plaintiff moved for expedited summary judgment, on February 10, 2025, Pl.'s Mot., ECF No. 10, and defendants responded with a cross-motion for summary judgment, with briefing completed on a condensed schedule. *See* Defs.' Cross-Mot. for Summ. J. and Opp'n to Pls.' Mot. for Summ. J. ("Defs.' Opp'n"), ECF No. 23; Pl.'s Opp'n to Defs.' Cross-Mot. and Reply in Supp. of Mot. for Summ. J. ("Pl.'s Reply"), ECF No. 27; Defs.' Reply in Supp. of Cross-Mot. for Summ. J. ("Defs.' Reply"), ECF No. 30. Interested parties also weighed in as amici.[8] Following a hearing, held on March 5, 2025, the parties' cross-motions for summary judgement are ready for resolution.

## II.    LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is only "'material' if a dispute over it might affect the outcome of a suit under the

---

[8]    Amici include: the Constitutional Accountability Center ("CAC") and a cohort of nineteen states and the District of Columbia, led by Minnesota, writing in support of plaintiff, *see* CAC's Amicus Br., ECF No. 15; Nineteen States & D.C.'s Amicus Br., ECF No. 31; and Tennessee and a cohort of twenty states, led by Florida, writing in support of defendants, *see* Tennessee's Amicus Br., ECF No. 18; Twenty States' Amicus Br., ECF No. 26.

governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary

judgment determination." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The dispute is only "genuine" if

"the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

(quoting *Anderson*, 477 U.S. at 248).

A plaintiff "seeking a permanent injunction . . . must demonstrate: (1) that it has suffered

an irreparable injury; (2) that remedies available at law, such as monetary damages, are

inadequate to compensate for that injury; (3) that, considering the balance of hardships between

the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest

would not be disserved by a permanent injunction." *Monsanto Co v. Geertson Seed Farms*, 561

U.S. 139, 156-57 (2010) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

## III.    DISCUSSION

In the ninety years since the NLRB's founding, the President has never removed a

member of the Board.  Pl.'s Mem. in Supp. of Pl.'s Mot. ("Pl.'s Mem.") at 4, ECF No. 10-2.  His

attempt to do so here is blatantly illegal, and his constitutional arguments to excuse this illegal

act are contrary to Supreme Court precedent and over a century of practice.  For the reasons

explained below, plaintiff's motion is granted.  Plaintiff's termination from the Board was

unlawful, and Mr. Kaplan and his subordinates are ordered to permit plaintiff to carry out all of

her duties as a rightful, presidentially-appointed, Senate-confirmed member of the Board.

### A.    *Humphrey's Executor* and its Progeny are Binding on this Court.

The Board is a paradigmatic example of a multimember group of experts who lead an

independent federal office.  Since the early days of the founding of this country, Congress, the

President, and the Supreme Court all understood that Congress could craft executive offices with

some independence, as a check on presidential authority.  That understanding has not changed

over the 150-year history of independent, multimember commissions, nor over the 90-year history of the NLRB.  The Supreme Court recognized this history and tradition in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), in upholding removal protections for such boards or commissions, and this precedent remains not only binding law, but also a well-reasoned reflection of the balance of power between the political branches sanctioned by the Constitution.

> **1.    *Removal Restrictions on Board Members are Well-Grounded in History and Binding Precedent.***

As a textual matter, the Constitution is silent as to removals.  *See In re Hennen*, 38 U.S. 230, 258 (1839).  Consequently, though Article II grants the President authority over some appointments—with advice and consent of the Senate—and vests in him the "executive power," Article II contains no express authority from which to infer an absolute removal power. *Compare* U.S. CONST. art. II, § 1, cl. 1 (vesting clause), *and id.*, § 2, cl. 2 (appointments clause); *to id.* art. I, § 8, cl. 18 (clause granting *Congress* the authority "to make all laws" "necessary and proper" for carrying out its powers and "all other Powers vested . . . in the Government").  The Supreme Court has held that a general power to remove executive officers can be inferred from Article II, *see Myers,* 272 U.S. at 163-64, yet the contours of that removal power and the extent to which Congress may impose constraints are nowhere clearly laid out.

The courts in such cases must therefore turn to established precedent—judicial decisions as well as general practice and tradition.  The Supreme Court has repeatedly recognized that "'traditional ways of conducting government . . . give meaning' to the Constitution." *Mistretta v. United States*, 488 U.S. 361, 401 (1989) (alteration in original) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring)).  Thus, "[i]n separation-of-powers cases this Court has often 'put significant weight upon historical practice.'"

*Zivotofsky*, 576 U.S. at 23 (quoting *Noel Canning*, 573 U.S. at 524). Even when the validity of a particular power is in question, the Court will, "in determining the . . . existence of [that] power," give weight to "the usage itself," *United States v. Midwest Oil Co.*, 236 U.S. 459, 473 (1915), and "hesitate to upset the compromises and working arrangements that the elected branches of Government themselves have reached," *Noel Canning*, 573 U.S. at 526. Justice Frankfurter in his seminal concurring opinion in *Youngstown* declared that "systematic, unbroken" practice could even "be treated as a gloss on 'executive Power' vested in the President." 343 U.S. at 610-11.

Not only are the removal protections on members of the independent, multimember boards like the NLRB supported by over a century of unbroken practice, but they have also been expressly upheld in clear Supreme Court precedent. Since 1887, Congress has created multiple independent offices led by panels whose members are appointed by the President but removable only for cause. *See, e.g.*, Interstate Commerce Act, Pub. L. No. 49-41, ch. 104, § 11, 24 Stat. 379, 383 (1887) (creating the Interstate Commerce Commission, with restrictions on officers' removal except for "inefficiency, neglect of duty, or malfeasance"); Federal Reserve Act, Pub. L. No. 63-64, ch. 6, § 10, 38 Stat. 251, 260-61 (1913) (creating the Federal Reserve Board, whose members are removable only "for cause"). In 1914, Congress established the Federal Trade Commission ("FTC") with an "inefficiency, neglect of duty, or malfeasance in office" removal restriction for its five commissioners. FTC Act, Pub. L. No. 63-203, ch. 311, § 1, 38 Stat. 717, 717-18 (1914).

The Supreme Court explicitly upheld removal restrictions for such boards when considering removal protections for the commissioners of the FTC in *Humphrey's Executor* in 1935, while also recognizing the President's general authority over removal of executive branch

officials.  The Court noted that commissioners of the FTC, "like the Interstate Commerce Commission" "are called upon to exercise the trained judgment of a body of experts 'appointed by law and informed by experience.'"  *Id.* at 624 (quoting *Ill. Cent. R.R. Co. v. Interstate Com. Comm'n*, 206 U.S. 441, 454 (1907)).  Congress, having the power to create such expert commissions with quasi-legislative and quasi-judicial authority, must also have, "as an appropriate incident, power to fix the period during which they shall continue, and to forbid their removal for except for cause in the meantime."  *Id.* at 629.

Two months later, with the guidance supplied in *Humphrey's Executor* and following the model of the FTC as endorsed by the Supreme Court there, Congress established the National Labor Relations Board.  *See* Madden, *supra*, at 572-73; *Yapp USA Auto. Sys., Inc. v. NLRB*, --F. Supp. 3d--, No. 24-cv-12173, 2024 WL 4119058, at *5 (E.D. Mich. Sep. 9, 2024).  Both entities—the FTC and NLRB—have five-member leadership boards with staggered terms of several years, minimizing instability and allowing for expertise to accrue.  *See* 29 U.S.C. § 153(a); *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 216 (2020).  Both were intended to exercise impartial judgment.  *See* Datla & Revesz, *supra*, at 770-71 (describing independence of the NLRB); *Seila L.*, 591 U.S. at 215-16 (describing the FTC as "designed to be 'non-partisan' and 'to act with entire impartiality'" (quoting *Humphrey's Ex'r*, 295 U.S. at 624)).  The Board, like the FTC, is "predominately quasi judicial and quasi legislative" in nature, with the primary responsibility of impartially reviewing decisions made by ALJs.  *Humphrey's Ex'r*, 292 U.S. at 624; *see* 29 U.S.C. § 160.  In fact, the Board does not prosecute labor cases nor enforce its rulings.  The side of the NLRB managed by the General Counsel—who is removable at-will by the President—carries out those more "executive" powers.  *See* 29 U.S.C. § 153(d) (describing the General Counsel's "final authority, on behalf of the Board" over "the

investigation of charges and issuance of complaints . . . and . . . the prosecution of such

complaints before the Board").  As plaintiff correctly states, the Board closely resembles the

FTC and is thus "squarely at the heart of the rule adopted in *Humphrey's Executor*."  Pl.'s Mem.

at 9.

Numerous other offices have followed the mold of the NLRB and FTC with

multimember independent leadership boards protected from at-will removal by the President.

*See* Pl.'s Mem. at 7 n.2 (listing, *e.g.*, the Merit Systems Protection Board, 5 U.S.C. § 1202(d); the

Federal Labor Relations Authority, 5 U.S.C. § 7104(b); and the Federal Energy Regulatory

Commission, 42 U.S.C. § 7171(b)(1)).  "Since the Supreme Court's decision in *Humphrey's

Executor*, the constitutionality of independent [multimember] agencies, whose officials possess

some degree of removal protection that insulates them from unlimited and instantaneous political

control, has been uncontroversial."  *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th

748, 760 (10th Cir. 2024), *cert. denied* No. 24-156, 2025 WL 76435 (U.S. Jan. 13, 2025); *see

also The Pocket Veto Case*, 279 U.S. 655, 689 (1929) ("Long settled and established practice is a

consideration of great weight in a proper interpretation of constitutional" issues of separation of

powers.).[9]

Recent consideration of the constitutionality of the removal protections for NLRB

members have accordingly upheld those constraints on presidential removal authority under

*Humphrey's Executor.  See, e.g.*, *Overstreet v. Lucid USA Inc.*, No. 24-cv-1356, 2024 WL

5200484, at *10 (D. Ariz. Dec. 23, 2024); *Company v. NLRB*, No. 24-cv-3277, 2024 WL

---

[9]    Defendants protest the reliance on history and tradition because independent multimember commissions
date back only to the late 1880s.  Defs.' Reply at 4-5.  "[S]uch a practice comes far too late to provide reliable
evidence of the original public meaning of Article II or the Constitution's separation of powers," in defendants'
view.  Defs.' Reply at 4-5.  That in no way invalidates the significance of longstanding tradition, however, which is
probative "[e]ven when the nature of or longevity of [the] practice is subject to dispute, and even when that practice
began after the founding era."  *Noel Canning*, 573 U.S. at 525; *see id.* at 528-29 (relying on a post- Civil War
practice of intra-recess appointments); CAC's Amicus Br. at 11, ECF No. 15 (making this point).

5004534, at *6 (W.D. Mo. Nov. 27, 2024); *Kerwin v. Trinity Health Grand Haven Hosp.*, No. 24-cv-445, 2024 WL 4594709, at *7 (W.D. Mich. Oct. 25, 2024); *Alivio Med. Ctr. v. Abruzzo*, No. 24-cv-2717, 2024 WL 4188068, at *9 (N.D. Ill. Sep. 13, 2024); *YAPP USA Automotive Sys.*, 2024 WL 4119058, at *7. Courts have also recently upheld restrictions on removal under *Humphrey's Executor* for other multimember boards, such as the Consumer Product Safety Commission ("CPSC"). *See, e.g.*, *Leachco*, 103 F.4th at 761-62; *Consumers' Rsch. v. CPSC*, 91 F.4th 342, 352 (5th Cir. 2024); *United States v. SunSetter Prods. LP*, No. 23-cv-10744, 2024 WL 1116062, at *4 (D. Mass. Mar. 14, 2024). The same has been true for the FTC. *See, e.g.*, *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1046-47 (5th Cir. 2023); *Meta Platforms, Inc. v. FTC*, 723 F. Supp. 3d 64, 87 (D.D.C. 2024). A court in this district has also upheld removal protections for the Merit Systems Protection Board. *See Harris v. Bessent*, No. 25-cv-412 (RC), 2025 WL 679303, at *7 (D.D.C. Mar. 4, 2025). The 150-year history and tradition of multimember boards or commissions and 90-year precedent from the Supreme Court approving of removal protections for their officers dictates the same outcome for the NLRB here.

### 2. *Defendants' Argument that* Humphrey's Executor *Does Not Control Fails.*

Discounting this robust history, defendants posit that the President's removal power is fundamentally "unrestricted" and that only two, narrow "exceptions" have been recognized: one for "inferior officers with narrowly defined duties," as established in *Morrison v. Olson*, 487 U.S. 654 (1988), and the other for "multimember bod[ies] of experts, balanced along partisan lines, that performed legislative and judicial functions and [do not] exercise any executive power," as established in *Humphrey's Executor*. Defs.' Opp'n at 5-6 (second passage quoting *Seila L.*, 591 U.S. at 216). According to defendants, neither exception applies to the Board. *Id.* at 6. Putting aside to address later whether congressional authority to constrain the President's

removal authority is characterized fairly by defendants as a narrow "exception" to the rule of "unrestricted" removal power, *see infra* Part III.A.3.b, *Humphrey's Executor* plainly controls.

Defendants emphasize that *Humphrey's Executor* understood the FTC at the time not to exercise any "executive power," which was key to its "exception," and that the NLRB today clearly "wield[s] substantial executive power." Defs.' Opp'n at 6-8 (relying on *Seila L.*, 591 U.S. at 216 n.2, 218); *see also* Defs.' Reply at 3. They do not, however, meaningfully distinguish between the authority of the FTC in 1935, as recognized in *Humphrey's Executor*, and the authority of the NLRB today. The FTC in 1935 had powers mimicking those of both the Board and the NLRB's GC. The FTC had broad powers of investigation and could issue a complaint and hold a hearing for potential unfair methods of competition. *See Humphrey's Ex'r*, 295 U.S. at 620, 621; *see also* 15 U.S.C. § 49 (authorizing the FTC's subpoena power). The FTC, upon finding a violation, could issue a cease-and-desist order and then go to the Court of Appeals for enforcement. *Humphrey's Ex'r*, 295 U.S. at 620-21; *see also* FTC Act, ch. 311, § 5, 38 Stat. at 719-20. The party subject to the order could also appeal to that court. *Humphrey's Ex'r*, 295 U.S. at 621. Further, the FTC could issue rules and regulations regarding unfair and deceptive acts. *See* FTC Act, § 6, 38 Stat. at 722; Hon. R. E. Freer, Member of the FTC, Remarks on the FTC, its Powers and Duties at 2 (1940), https://www.ftc.gov/system/files/documents/public_statements/676771/19400827_freer_remarks_._rational_association_of_credit_jewelers.pdf.

The NLRB's collective authority, though comparable, *see supra* Part I.A (describing the NLRB's GC's authority to investigate and pursue enforcement against unfair labor practices and the Board's adjudicatory authority and power to issue unenforceable cease-and-desist orders), is, if anything, less extensive than that of the FTC. The NLRB hardly engages in rulemaking (other

16

than to establish its own procedures), instead relying on adjudications for the setting of precedential guidance. *See Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) ("The [NLRB], uniquely among major federal administrative agencies, has chosen to promulgate virtually all the legal rules in its field through adjudication rather than rulemaking."). Moreover, the aspects of the NLRB's authority most executive in nature—prosecutorial authority to investigate and bring civil enforcement actions—are tasks assigned to the GC instead of the Board itself. *See* 29 U.S.C. § 153(d).[10]

Even though the Supreme Court of 1935 may have not referred to these classic administrative powers as "executive" and the Supreme Court today would, *see, e.g.*, *Seila Law*, 591 U.S. at 216 n.2, the substantive nature of authority granted to these two independent government entities does not significantly differ. If the Supreme Court has determined that removal restrictions on officers exercising substantially the same authority do not impermissibly intrude upon presidential authority, *Humphrey's Executor* cannot be read to allow a different outcome here. That is especially true considering that the Supreme Court, in its next major decision addressing removal protections for executive branch officers, rejected the notion that the permissibility of "'good cause'-type restriction[s] . . . turn[s] on whether or not th[e] official"

---

[10]        Defendants suggest that because the NLRB makes "significant decisions shaping the rights and obligations of Americans" and "set[ting] federal labor policy," the "constitutional calculus" is different, and the *Humphrey's Executor* "exception" cannot apply. Defs.' Reply at 3, 5; Motions H'rg (Mar. 5, 2025), Rough Tr. at 54:1-7 (citing *NLRB v. Curtin Matheson Sci., Inc.*, 494 U.S. 775, 786 (1990) ("[T]he NLRB has the primary responsibility for developing and applying national labor policy.")). Defendants do not, however, explain how applying federal law in individual adjudications establishes "federal labor policy" any more than the rulemaking and adjudications of the FTC in *Humphrey's Executor* do, nor do they explain why subsequent caselaw—*see supra* Part III.A.3.a—should be read as putting such a gloss on the holding of *Humphrey's*. Plaintiff contributed little to the debate about the scope of the NLRB's powers that may be considered "executive," simply tying its authorities closely to the FTC in 1935, despite the NLRB's bifurcated structure, resulting in a more cabined exercise of any executive authority by the Board itself. *See* Pl.'s Reply at 3-5; *see also* Motions H'rg (Mar. 5, 2025), Tr. at 23:5-13 (plaintiff's counsel stating, "answering the question about exactly what 'executive' means and what those terms 'quasi-legislative' and 'quasijudicial' mean, it's not the easiest thing in the world. I think, for purposes of this motion that's before you, I think what matters is that . . . *Humphrey's Executor* is binding.").

is classified as "purely executive" or exercising quasi-legislative or quasi-judicial functions. *See Morrison*, 487 U.S. at 689.[11]

Defendants make a final, superficial distinction between the NLRB and the FTC to argue that the precedent of *Humphrey's Executor* should not apply. Defs.' Opp'n at 10. The NLRB, they note, has stricter removal protections because its members cannot be removed for "inefficiency," whereas FTC members can. *Id.* In both *Consumers' Research*, 91 F.4th at 346, 355-56, and *Leachco*, 103 F.4th at 761-63, however, courts of appeals upheld removal protections that did not include an exception for "inefficiency." "Inefficiency" does not differ in substance from "neglect of duty," so omitting "inefficiency" as a grounds for removal cannot be a dispositive difference in the President's ability to exercise his Article II powers over the NLRB. *See* Jane Manners & Lev Menand, *The Three Permissions: Presidential Removal and the Statutory Limits of Agency Independence*, 121 COLUM. L. REV. 1, 8, 69 (2021) (explaining

---

[11] Defendants' argument about the exercise of "executive power" is ultimately tautological and leaves *Humphrey's Executor* completely devoid of force. They reason that because the NLRB is housed within the executive branch, the Board inherently exercises "executive power." Defs.' Opp'n at 7 (citing *Seila L.*, 591 U.S. at 216 n.2 (quoting *City of Arlington v. FCC*, 569 U.S. 290, 305 n.4 (2013))). Reading *Humphrey's Executor* to allow removal protections only for offices that do not exercise "executive power," defendants then conclude that the NLRB does not fit within *Humphrey's Executor*. The necessary implication of such reasoning is that *no board or commission placed with the executive branch* could, as a constitutional matter, be legally subject to removal protections duly enacted by Congress. Yet, defendants dodge that extraordinary result and contradictorily suggest that removal protections on the Federal Reserve Board are acceptable because that Board does not exercise an "executive function." Defs.' Reply at 5; *see also* Motions H'rg (Mar. 5, 2025), Rough Tr. at 59-60 (defense counsel declining to discuss Federal Reserve Board or the Federal Open Market Committee or why these entities should be treated differently than the NLRB as to presidential removal power).
Recognizing that the exercise of "executive power" could not be dispositive, the Fifth Circuit in *Consumers' Research* agreed with the plaintiffs there that the CPSC "wields substantial executive power" but still held that the CPSC was constitutional under *Humphrey's Executor*. 91 F.4th at 353-55 ("Having concluded that the Commission exercises substantial executive power (in the modern sense), we must next consider whether that characteristic—standing alone—removes the Commission from the *Humphrey*'s exception. We conclude that it does not . . . ."). The Fifth Circuit examined the other factors in *Seila Law* to conclude that the removal protections for CPSC members were constitutionally sound: The CPSC does not have a novel structure or present a historically unprecedented situation; the CPSC does not have a single director but rather a multimember board; and the CPSC does not have any of the other features that concerned the Court in *Seila Law*, such as the receipt of funds outside the appropriation process or the inability of the President to influence the office's leadership through the appointment power. *See id.*
Regardless whether the NLRB exercises "substantial executive power," "executive power," or "quasi-legislative and quasi-judicial power," the NLRB does not sufficiently differ from the FTC to warrant a departure from *Humphrey's Executor*.

that the absence of "inefficiency" as a ground for removal does not unconstitutionally interfere with the President's authority). Defendants offer no reason to suggest otherwise. The NLRB fits well within the scope of *Humphrey's Executor*.

### 3. *Defendants' Argument that* Humphrey's Executor *Has Been "Repudiated" and is No Longer Good Law Is Not Persuasive.*

Fundamentally, the position of defendants and their supporting state amici urging this Court not to apply *Humphrey's Executor* stems from a reading of the Supreme Court's subsequent case law as "repudiat[ing]" the precedent. Defs.' Opp'n at 9 (quoting *Seila L.*, 591 U.S. at 239 (Thomas, J., concurring in part)); Tennessee's Amicus Br. at 7-10, ECF No. 18 (arguing forcefully that *Humphrey's Executor* was wrongly decided and has been "narrowed . . . nearly out of existence"); Twenty States' Amicus Br. at 3-8, ECF No. 26. Defendants therefore argue that *Humphrey's Executor* must be read extremely narrowly, despite that "whatever little remains" is binding on this Court. Defs.' Opp'n at 8 n.2. To the contrary, an unbroken line of cases since *Humphrey's Executor* has reinforced the constitutionality of removal restrictions on multimember expert boards, and the pre-*Humphrey's Executor* history demonstrates that this decision was well-grounded in accepted principles of checks and balances.

### a. *Post-*Humphrey's Executor *Case Law Reinforces its Central Holding.*

In every case following *Humphrey's Executor*, the Supreme Court has preserved the constitutionality of removal protections on independent, multimember boards and commissions. Shortly following *Humphrey's Executor*, in *Wiener v. United States*, 357 U.S. 349 (1958), the Court held that the Constitution did not grant the President authority to remove members of the multimember War Claims Commission "for no reason other than that he preferred to have on that Commission men of his own choosing." *Id.* at 355-56. Thirty years later, in *Morrison*, the Court again recognized the exception to the President's removal power for officers with

adjudicatory powers, but further explained that the permissibility of removal restrictions did not

turn on whether the officers' functions were "quasi-legislative and quasi-judicial," as opposed to

executive in nature, instead looking to the degree to which they impeded the President's ability

to execute the laws.  *See* 487 U.S. at 691-93 (upholding removal protections for independent

counsel contained in the Ethics in Government Act).

Then, in *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477

(2010), the Court reiterated its holding in *Humphrey's Executor* that "Congress can, under

certain circumstances, create independent agencies run by principal officers appointed by the

President, whom the President may not remove at will but only for good cause" and declined to

reexamine that precedent.  *Id.* at 483 (striking down double for-cause removal protections); *see*

*also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 537 F.3d 667, 686 (D.C. Cir. 2008)

(Kavanaugh, J., dissenting) (describing the defendants as attempting to compare the office's

removal protections to that of "the FCC, the FTC, and the NLRB," which were understood to be

"permissible under the Supreme Court's 1935 decision in *Humphrey's Executor*").

Most recently, in *Seila Law*, the Supreme Court likewise declined to "revisit [its] prior

decisions allowing certain limitations on the President's removal power."  591 U.S. at 204.

While defendants make much of dicta in this decision, such as that the FTC's powers would now

be considered executive, Defs.' Opp'n at 9; *see also* Tennessee's Amicus Br. at 9, *Seila Law*

made key distinctions between single-head offices and multimember boards or commissions that

reinforce why placing restrictions on removal of leaders of the latter is not problematic under our

Constitution, *see* 591 U.S. at 224-26.  Despite restrictions on removal, the President can exercise

more control over a multimember board through his *appointment power* as vacancies arise, and

with staggered terms, some Board vacancies arise during each administration.  *See id.* at 225.

Those new appointees can restrain the Board member the President might otherwise prefer to remove, and no President will be "saddled" with a single "holdover Director from a competing political party who is dead set *against*" his agenda. *Id.* at 225 (emphasis in original). That is particularly the case here, where President Trump could exercise near total control over the NLRB by appointing two members of his choosing to the Board to join Mr. Kaplan, whom the President appointed during his first term and recently elevated to Chairman, creating a majority of Trump appointees, and by appointing a General Counsel of his choice. *See* NLRB, *Members of the NLRB Since 1935*, https://www.nlrb.gov/about-nlrb/who-we-are/the-board/members-of-the-nlrb-since-1935 (last visited Mar. 5, 2025); 29 U.S.C. § 153(d) (allowing the General Counsel to be removed at will).[12]

Moreover, the multimember structure prevents the public from being subject to decisions made unilaterally by an unelected official, who could become captured by private interests. The distribution of power among several individuals on the Board "avoids concentrating power in the hands of any single individual." *Seila L.*, 591 U.S. at 222-23. Lastly, unlike single-head offices, entities led by multimember boards have a robust basis—more than even a "foothold"—in "history [and] tradition." *Id.* at 222. For these reasons, when the Court ultimately invalidated the removal restrictions on the CFPB's director as a *single* head of the bureau, Chief Justice Roberts expressly suggested that "converting the CFPB into a multimember agency" would solve "the problem." *Id.* at 237.[13]

---

[12]    Instead, by bringing the Board to a complete halt, the President has foreclosed his own ability to see his Board appointees effectuate his agenda and has frozen the functioning of an important government office.

[13]    The Supreme Court's most recent removal protections case, *Collins v. Yellen*, 594 U.S. 220 (2021), was likewise about an office led by a single director, and the Court there reaffirmed it "did 'not revisit [its] prior decisions allowing certain limitations on the President's removal power'" in *Seila Law*. *Id.* at 250-51 (quoting *Seila L.*, 591 U.S. at 204).

Finally, two months ago, the Supreme Court denied certiorari in *Leachco*, where the Tenth Circuit upheld removal protections for commissioners on the Consumer Product Safety Commission under *Humphrey's Executor*—once again, declining to revisit that precedent.  *See* 103 F.4th 748 (10th Cir. 2024), *cert. denied* No. 24-156, 2025 WL 76435 (U.S. Jan. 13, 2025).

### b.    *Presidential Removal Power Has Never Been Viewed as Unrestricted.*

Defendants and their supporting states' amici go even further in suggesting that not only has *Humphrey's Executor* been repudiated over time but the opinion was also wrong at the time it was decided.  Defs.' Opp'n at 8 n.2, 9; Tennessee's Amicus Br. at 7; *see* Twenty States' Amicus Br. at 6-7.  Defendants read *Humphrey's* predecessor, *Myers v. United States*, 272 U.S. 52 (1926), as formalizing the President's "unrestricted removal power," which ultimately derives from the "vesting" clause in Article II establishing a "unitary" executive.  Defs.' Reply at 1-2 (first passage quoting *Seila L.*, 591 U.S. at 215); Motions H'rg (Mar. 5, 2025), Rough Tr. at 30:22-31:4 (plaintiff's counsel describing *Myers* as a "building block" in the unitary executive theory).  They are again misguided.  While the *Myers* Court made clear that the President has a general removal power for executive officials, defendants' myopic focus on this case loses sight of the limitations in its holding, a point driven home in *Humphrey's Executor* decided less than a decade later.  Nothing in the Constitution or the historical development of the removal power has suggested the President's removal power is absolute.  In fact, the history upon which *Myers* relies and the immediately following Supreme Court decisions undercut any view that Congress, when exercising its constitutional authority to shape executive offices, is completely barred from conditioning the President's exercise of his removal authority.

In *Myers*, Chief Justice Taft—the only person to have served both as the President and a Justice of the Supreme Court—recounted and relied on the history of the Decision of 1789, a

congressional debate about the President's removal powers during the First Congress, to declare

unconstitutional a statute requiring the "advice and consent of the Senate" for both appointment

*and* removal of federal postmasters.  *See* 272 U.S. at 107, 111-36, 176-77.[14]  The First Congress

had created the first three executive departments, the Departments of Foreign Affairs, War, and

Treasury, and after much debate, ultimately granted plenary removal power to the President over

the Secretary of Foreign Affairs and crafted that agency to be an arm of the President.  *Id.* at 145;

*see also* Lawrence Lessig & Cass R. Sunstein, *The President and the Administration*, 94 COLUM.

L. REV. 1, 25-29 (1994).  The First Congress did not make clear whether that decision—to grant

the President plenary removal authority over the Secretary of Foreign Affairs—derived from the

Constitution or rather was granted by Congress's own prerogative.  *See Myers*, 272 U.S. at 285

n.75 (Brandeis, J., dissenting); Lessig & Sunstein, 94 COLUM. L. REV. at 26-28; *Seila L.*, 591

U.S. at 271 (Kagan, J., dissenting in part and concurring in part) ("The summer of 1789 thus

ended without resolution of the critical question: Was the removal power 'beyond the reach of

congressional regulation'?" (quoting Saikrishna Prakash, *New Light on the Decision of 1789*, 91

CORNELL L. REV. 1021, 1072 (2006))).  Some clarity in the First Congress's view may be

gleaned, however, by the disparate approach that the Congress took with respect to the

Department of the Treasury.  Seeing the Treasury as a department less intrinsically tied to core

executive powers enumerated in Article II like that over foreign policy, Congress gave far more

direction to the structure of that department, specifying in detail its offices and functions and

granting independence from unfettered presidential removal power to the Comptroller.  *See*

Lessig & Sunstein, *supra*, at 27-28.  In short, the executive branch was not treated as strictly

---

[14]    The statute regarding removal of the postmasters read: "Postmasters of the first, second, and third classes shall be appointed and may be removed by the President by and with the advice and consent of the Senate, and shall hold their offices for four years unless sooner removed or suspended according to law."  *Myers*, 272 U.S. at 107.

unitary, but rather as a branch with units of varying degrees of independence and generally subject to congressional direction through checks and balances—including on its personnel. *See* John F. Manning, *Separation of Powers as Ordinary Interpretation*, 124 HARV. L. REV. 1939, 1964 n.135 (2011).

Chief Justice Taft in *Myers* cherry-picked only one portion of that 1789 story by highlighting what the First Congress did with the Department of Foreign Affairs. *See* 272 U.S. at 113-36; *Seila L.*, 591 U.S. at 277 (Kagan, J., dissenting in part and concurring in part) (describing how scholars have "rejected Taft's one-sided history"). Despite the structure of the Post Office far more closely resembling the Treasury Department of 1789 than the Department of Foreign Affairs, Chief Justice Taft ignored the actual nuances reflected in the Decision of 1789 as to congressional power to condition the President's removal power reflected in the treatment of the new Treasury Department and instead read this history "through executive-colored glasses" to support "his strong preconceptions" as former President "about presidential removal power," to reach the conclusion that a regional postmaster could not be subject to removal protections. Robert Post, *Tension in the Unitary Executive: How Taft Constructed the Epochal Opinion of* Myers v. United States, 45 J. SUP. CT. HIST. 167, 172 & n.56 (2020) (first passage quoting Hayden Smith to William H. Taft (Sep. 1, 1925) (Taft Papers)); *Myers*, 272 U.S. at 176; Lessig & Sunstein, *supra*, at 25-30.[15] Dicta in the lengthy *Myers* majority opinion made broad pronouncements about the importance of the presidential removal power that were both contradictory and inapposite: While Chief Justice Taft promoted the benefits of recognizing vast

---

[15] Notably, Chief Justice Taft reached this conclusion over three dissents, including from Justices Holmes and Brandeis. *Myers*, 272 U.S. at 178-295. Justice Brandeis, in particular, espoused a view of checks and balances that emphasized the interdependence of the executive and legislative branches, vindicated in Justice Jackson's concurring opinion in *Youngstown*, 343 U.S. at 634. *See Myers*, 272 U.S. at 240-95.

presidential removal authority on one hand, he recognized that Congress could legislate around appointment and removal of principal officers, in some circumstances, and inferior officers, refusing to threaten protections for the civil service, on the other. *Id.* at 127, 134-35, 161-62, 183, 186 ("[T]here may be duties of a quasi judicial character imposed on executive officers and members of executive tribunals whose decisions after hearing affect interests of individuals, the discharge of which the President cannot in a particular case properly influence or control. . . . [Moreover,] [the appointments clause] give[s] to Congress the power to limit and regulate removal of such inferior officers by heads of departments when it exercises its constitutional power to lodge the power of appointment with them.").[16]

Only nine years later, in *Humphrey's Executor*, the Supreme Court—consisting of six of the same justices who participated in the *Myers* decision (*i.e.,* Justices Sutherland, Van Devanter, Brandeis, Stone, McReynolds, and Butler)—unanimously retreated, denouncing the idea of "illimitable" removal authority and disavowing *Myers'* abundant dicta. *Morrison*, 487 U.S. at 687 ("In *Humphrey's Executor*, we found it 'plain' that the Constitution did not give the President 'illimitable power of removal' over the officers of independent agencies." (quoting 292 U.S. at 629)). Justice Sutherland, who authored *Humphrey's* despite joining the majority opinion in *Myers*, limited *Myers* to "the narrow point" that "the President had power to remove a postmaster of the first class, without the advice and consent of the Senate as required by act of Congress" and wrote that other "expressions . . . are beyond the point involved and therefore do not come within the rule of stare decisis. In so far as they are out of harmony with the views here set forth, these expressions are disapproved." *Humphrey's Ex'r*, 292 U.S. at 626-27.

---

[16]    The bold position taken by the current administration, *see* Exec. Order No. 14215, 90 Fed. Reg. 10447 (2025), that the President has supreme control over *all* of his subordinates threatens to upend limits on the removal power over *inferior* officers, expressly acknowledged in *Myers*.

*Humphrey's Executor*, consistent with the dissents in *Myers*, did not foreclose that the President may have total authority over removal of some officials (like "high political officers," *Myers*, 272 U.S. at 241 (Brandeis, J., dissenting)), but it made clear that his removal authority may certainly be limited by Congress in other circumstances.[17]  *Humphrey's Ex'r*, 292 U.S. at 629-32.

The takeaway from *Myers* is therefore discrete and uncontroversial: While Congress may structure executive branch offices via statute and legislate about the roles of executive branch officers, including standards for their removal, Congress cannot reserve for itself an active role in the removal decision.  The problem in *Myers* was that the statute required Senate advice and consent to remove postmasters and that encroached on the presidential power of removal.  272 U.S. at 107.  It cannot be gainsaid that the President has the power of removal of executive branch officers.  When Congress has statutorily provided a for-cause removal requirement, this means that the President has the authority to determine whether the for-cause requirement

---

[17]        Justice Brandeis's dissent in *Myers* was not so broad as to authorize Congress to restrict presidential authority over removal of anyone in the executive branch.  *See Myers*, 272 U.S. at 240-42 (Brandise, J., dissenting). Rather, he focused on the fact that the postmaster was an *inferior officer*, very unlike that of the Secretary of Foreign Affairs, and the mischief that would result if the majority decision were read to endorse absolute presidential removal authority for all officials.  *Id.* at 241, 247, 257 ("Power to remove, as well as to suspend, a high political officer, might conceivably be deemed indispensable to democratic government and, hence, inherent in the President. But power to remove an inferior administrative officer appointed for a fixed term cannot conceivably be deemed an essential of government."); *see also id.* at 181-82, 187, 193 (McReynolds, dissenting) (resisting *Myers'* overbroad dicta suggesting that *all* executive officers must serve at the pleasure of the President).  In the dissenters' views, a functional analysis into an office's role and responsibilities—like that in *Humphrey's Executor*—was necessary, but only for principal officers.

In the face of the current administration's push for a more absolutist presidential removal power, history provides significant cautions: Protections for inferior federal officers came about to counter the extensive "spoils system" that characterized the executive branch in the early 1800s—particularly during the presidency of Andrew Jackson, whose controversial legacy is due in part to his association with widespread corruption.  *See Myers*, 272 U.S. at 276-83 (McReynolds, J., dissenting); *id.* at 272 U.S. at 250-52 (Brandeis, J., dissenting).  Congress having a hand in executive appointments and removal was seen as an antidote to corruption.  Such provisions set the stage for the development of the modern civil service system.  *See id.*; Katherine Shaw, *Partisanship Creep*, 118 Nw. Univ. L. Rev. 1563, 1573 & n. 48 ("[A] few decades after Andrew Jackson's administration, strong discontent with the corruption and inefficiency of the patronage system of public employment eventuated in the Pendleton Act, the foundation of modern civil service." (quoting *Elrod v. Burns*, 427 U.S. 347, 354 (1976))).

prescribed by Congress has been met.  As the Supreme Court has since repeatedly articulated, "the essence" of "*Myers* was the judgment that the Constitution prevents Congress from draw[ing] to itself the" power to remove.  *Morrison*, 487 U.S. at 686 (citing *Bowsher v. Synar*, 478 U.S. 714 (1986), for that interpretation).  That holding is completely compatible with *Humphrey's Executor*.  Little more can be gleaned from the unreliable historical retelling and prolix *Myers* majority opinion.[18]

In short, neither the Founding-era history nor *Myers* can carry the heavy weight that the current President has thrust upon it.  *See* Letter from Acting SG ("In *Myers* . . ., the Supreme Court recognized that Article II of the Constitution gives the President an 'unrestricted' power of 'removing executive officers.'").  Neither supports the view that the President's removal power is "illimitable."  Whatever the benefits of unrestricted removal authority under certain circumstances, "[t]he Framers did not constitutionalize presidential control over all that is now considered 'executive'; they did not believe that the President must have plenary power over all we now think of as administration," Lessig & Sunstein, *supra*, at 118, and neither did the early twentieth century Supreme Court.

---

[18]    At the motions hearing, defense counsel argued that this interpretation of both *Myers* and *Humphrey's Executor* had been rejected by the Supreme Court in *Seila Law*, 591 U.S. at 228.  Motions H'rg (Mar. 5, 2025), Rough Tr. at 62:1-17.  That is not so.  In *Seila Law*, amicus had distilled the Court's precedent as follows:

> *Humphrey's Executor* and *Morrison* establish a general rule that Congress may impose "modest" restrictions on the President's removal power, with only two limited exceptions. . . . Congress may not reserve a role *for itself* in individual removal decisions (as it attempted to do in *Myers* and *Bowsher*). And it may not eliminate the President's removal power altogether (as it effectively did in *Free Enterprise Fund*). Outside those two situations, amicus argues, Congress is generally free to constrain the President's removal power.

*Seila L.*, 591 U.S. at 228 (emphasis in original) (internal citations omitted).  Rather than reject that reconciliation of *Myers* and *Humphrey's Executor*, the Court simply restated the principle, uncontroverted in either precedent, that "the President's removal power is the rule, not the exception," *id.*, and then declined to revisit these precedents or to "elevate [*Humphrey's Executor*] into a freestanding invitation for Congress to impose additional restrictions on the President's removal authority," *id.*  In other words, the Supreme Court neither constrained *Humphrey's Executor* by expanding *Myers* beyond its holding nor endorsed an expansion of *Humphrey's Executor* itself.  In short, *Seila Law*, on this matter, had frankly little to add.

The holding in *Humphrey's Executor*, that Congress could create boards or commissions with elements of independence from the President, was therefore not at all a "fiction" or an aberration, as defendants have supposed.  Defs.' Opp'n at 9.[19]  *Humphrey's Executor*, and thus NLRB Board members' removal protections, are consistent with the text and historical understandings of Article II, as well as the Supreme Court's most recent pronouncements.  That Congress can exert a check on the President by imposing for-cause restrictions on the removal of leaders of multimember boards or commissions is a stalwart principle in our separation of powers jurisprudence.

### c.    **Humphrey's Executor** *Remains Binding.*

In any case, *Humphrey's Executor* remains binding on this Court, as defendants rightly acknowledge.  *See* Defs.' Opp'n at 8 n.2; *Illumina*, 88 F.4th at 1047 ("[T]he question of whether . . . *Humphrey's Executor* [is] no longer binding" is for the Supreme Court alone to answer.).  As the Supreme Court has made clear, "[i]f a precedent . . . has direct application in a case, yet appears to rely on reasons rejected in some other line of decisions," the lower courts should still "leav[e] to the [Supreme] Court the prerogative of overruling its own decisions."  *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989); *see also Nat'l Sec. Archive v. CIA*, 104 F.4th 267, 272 n.1 (D.C. Cir. 2024) ("This court is charged with following case law that directly controls a particular issue, 'leaving to [the Supreme] Court the prerogative of overruling its own decisions.'" (alterations in original) (quoting *Mallory v. Norfolk S. Ry. Co.*,

---

[19]    Nor can *Humphrey's Executor* be fairly described as an "exception[]" to the general rule of presidential removal authority.  *Contra Seila L.*, 591 U.S. at 198.  As explained, a careful reading of the history and the scope of the dispute in *Myers* confirms that *Humphrey's Executor* was not some exception to an otherwise absolute presidential removal power previously established in *Myers.*  To the extent *Myers* extolled such an absolute presidential removal power in overbroad dicta, it was in short order rejected by a unanimous Supreme Court.  *Myers* simply established that the President alone may exercise removal authority over principal officers, and *Humphrey's Executor* explained that Congress can set standards, without conferring the exercise of that power to itself, to cabin the President's singular exercise of that authority in the circumstances presented.

600 U.S. 122, 136 (2023))); *Meta Platforms*, 723 F. Supp. 3d at 87 ("It is certainly not this Court's place to deem a long-standing Supreme Court precedent obsolete . . . and thus no longer binding." (internal quotation marks and citation omitted)).  This Court would be bound to conclude that plaintiff's termination was unlawful even were the conclusion reached—and this Court adamantly has not—that *Humphrey's Executor* was, by today's measure, ill-reasoned or wrongly decided.

### B.      Plaintiff is Entitled to Permanent Declaratory and Injunctive Relief.

For all of these reasons, plaintiff prevails on the merits and is therefore entitled to a declaratory ruling that she was unlawfully terminated from her position as a member of the Board.  Defendants concede as much.  Motions H'rg (Mar. 5, 2025), Rough Tr. at 71:23-72:1 (defense counsel stating, "We are not fighting this requested declaratory judgment.").

Plaintiff further requests injunctive relief against Mr. Kaplan, ordering him to allow plaintiff to carry out all of her duties.  Compl. at 7.  To demonstrate that injunctive relief is warranted, a plaintiff must show that (1) she has suffered an irreparable injury, (2) remedies available at law are inadequate to compensate, (3) a remedy in equity is warranted considering the balance of the hardships to each party, and (4) the public interest is not disserved.  *eBay Inc. v. MercExchange LLC*, 547 U.S. 388, 391 (2006).  Notwithstanding plaintiff's success on the merits, defendants contest her entitlement to injunctive relief.  Defs.' Opp'n at 10.

#### 1.      *Plaintiff's Irreparable Harm and Inadequate Remedies at Law*

Plaintiff is suffering irreparable harm that cannot be repaired in the absence of an injunction.[20]  Courts have recognized as irreparable harms the "unlawful removal from office by the President" and "the obviously disruptive effect" that such removal has on the organization's

---

[20]      These two factors are often considered together.  *See, e.g.*, *Ridgley v. Lew*, 55 F. Supp. 3d 89, 98 (D.D.C. 2014); *Dellinger v. Bessent*, --F. Supp. 3d--, No. 25-cv-385 (ABJ), 2025 WL 665041, at *32 (D.D.C. Mar. 1, 2025).

functioning. *Berry v. Reagan*, No. 83-cv-3182, 1983 WL 538, at * 5 (D.D.C. Nov. 14, 1983),

*vacated as moot*, 732 F.2d 949 (Mem.) (D.C. Cir. 1983).  In *Berry*, terminated members of the

Civil Rights Commission challenged President Reagan's decision to remove them. *Id.* at *1.

The Commission was "left without a quorum," and the court recognized as an irreparable injury

both the commission's inability to "fulfill its mandate" and the individuals' inability to serve

"Congress in the furtherance of civil rights." *Id.* at *5.  Likewise here, plaintiff has been

deprived of a presidentially appointed and congressionally confirmed position of high

importance, and both she and, by consequence, the NLRB have been deprived of the ability to

carry out their congressional mandate in protecting labor rights—which cannot be retroactively

cured by monetary damages. *See id.*; *Dellinger v. Bessent*, No. 25-cv-385 (ABJ), 2025 WL

471022, at *11-13 (D.D.C. Feb. 12, 2025) ("[T]he loss of the ability to do what Congress

specifically directed [her] to do cannot be remediated with anything other than equitable relief.");

*Harris v. Bessent*, --F. Supp.3d--, No. 25-cv-412 (RC), 2025 WL 521027, at *7 (D.D.C. Feb. 18,

2025) ("By vindicating [her] right to occupy th[at] office, th[is] plaintiff[] act[s] as much in [her]

own interests as those of [her] agenc[y's]. . . .  Striking at the independence of these officials

accrues harm to their offices, as well.").[21]

      Furthermore, plaintiff and the NLRB suffer an injury due to the loss of the office's

independence.  As an entity entrusted with making impartial decisions about sensitive labor

---

[21]      Defendants argue that because President Trump could restore the NLRB's quorum by appointing members
to fill the vacant seats, the harm here is not irreparable. Defs.' Opp'n at 14.  While filling the open seats would halt
the ongoing harm and prevent future harm, restoration of the NLRB's quorum would not do anything to *repair* the
past harm—the backlog of cases, the months employers and employees have spent waiting for adjudications, the
practical ramifications felt across the country (from workers' rights violations to workplace unrest) of labor disputes
left unresolved, delayed union recognition, and so forth.  The possibility that the NLRB could once again operate
may be one difference between this case and the situation of the Civil Rights Commission in *Berry*, where the
Commission was set to expire before it could fulfill its statutory mandate, *see* 1983 WL 538, at *5, but that
possibility does not make the harm here somehow reparable.  The NLRB's statutory mandate is not to—at some
point in time—operate, contrary to defendants' suggestion, Defs.' Opp'n at 14-15, but rather to have an ongoing,
efficient administration of the country's labor laws.

disputes, the NLRB's character and perception as neutral and expert-driven is damaged by plaintiff's unlawful removal. *See Humphrey's Ex'r*, 295 U.S. at 630 ("[The] coercive influence [of the removal power] threatens the independence of a commission."); *Harris*, 2025 WL 679303, at *13 ("[T]he MSPB's independence would evaporate if the President could terminate its members without cause, even if a court could later order them reinstated."). Money likewise cannot make up for that kind of intangible and reputational harm.

Defendants argue that, regardless of the injury, plaintiff's requested remedy—reinstatement to her position—is one the Court cannot grant. Defs.' Opp'n at 11. Not only have all previous cases sought back pay instead of reinstatement, defendants point out, but also reinstatement is not a remedy historically available at equity, which constrains the relief available to the Court today. *Id.* at 12 (citing *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)). Plaintiff counters, however, that she does not request the remedy of "reappointment" and does not need to be reinstated: She requests only a declaration that the President lacked authority to remove her—making the termination email void *ab initio*—and injunctive relief to enable her to carry out her position as before. *See* Pl.'s Reply at 9.

Defendants do not challenge the Court's ability to afford declaratory relief, but they do challenge an injunction running against the executive branch, even against the President's subordinates, to permit plaintiff to carry out her duties. Defs.' Opp'n at 11, 13. They contend that such relief would effectively "compel[]" the President "to retain the services of a principal officer whom he no longer believes should be entrusted with the exercise of executive power." Defs.' Opp'n at 11; *see also* Defs.' Reply at 7-8. At most, however, this argument simply restates defendants' position on the merits, because, as a general matter, courts undoubtedly have authority to constrain unlawful presidential action by enjoining the President's subordinates.

*See, e.g.*, *Youngstown*, 343 U.S. at 582, 589 (holding a presidential act unconstitutional and affirming the district court judgment which restrained Secretary of Commerce); *Chamber of Com. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("[I]t is now well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.' *Franklin v. Massachusetts*, 505 U.S. 788, 815 (1992) (Scalia, J., concurring in part and concurring in the judgment).  Even if the Secretary were acting at the behest of the President, this 'does not leave the courts without power to review the legality [of the action], for courts have power to compel subordinate executive officials to disobey illegal Presidential commands.' *Soucie v. David*, 448 F.2d 1067, 1072 n. 12 (D.C. Cir. 1971)." (alterations in original)); *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *6 n.1 (D.C. Cir. Feb. 15, 2025) (noting that a court "can unquestionably review the legality of the President's action by enjoining the officers who would attempt to enforce the President's order").

Moreover, the D.C. Circuit has held such relief is appropriate in this type of employment context: A court may, by targeting a President's subordinates, "reinstate a wrongly terminated official '*de facto*,' even without a formal presidential reappointment" that would require injunctive relief against the President himself.  *Severino v. Biden*, 71 F.4th 1038, 1042-43 (D.C. Cir. 2023) (holding that the plaintiff's injury was therefore redressable); *cf. Swan v. Clinton*, 100 F.3d 973, 980 (D.C. Cir. 1996) (holding that plaintiff's claim was redressable because injunctive relief against inferior officials, who could *de facto* reinstate plaintiff by allowing him to exercise the privileges of his office, would remedy plaintiff's harm); *see also Harris*, 2025 WL 679303, at *10-12 (holding that the court can order such relief to remedy an unlawful termination and relying on *Swan* and *Severino*);  *Dellinger v. Bessent*, --F. Supp. 3d--, No. 25-cv-385 (ABJ),

2025 WL 665041, at \*29-31 (D.D.C. Mar. 1, 2025) (same).  The Court therefore has the

authority to issue both the declaratory and injunctive remedies that plaintiff seeks.[22]

## 2.    *Balance of the Equities and the Public Interest*

The balance of the equities and the public interest also favor injunctive relief here.  *See*

*Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting that, where the government is a party, "[t]hese

two factors merge").  The public has an interest in efficient and peaceful resolution of labor

conflicts, and the Board's functioning is crucial to that goal.  In 2024, the NLRB received 20,000

to 30,000 unfair labor practice charges, and the Board reviewed 144 unfair labor practice cases

---

[22]    Defendants' arguments that plaintiff may not be "reinstated" or "reappointed" because reinstatement was not a remedy originally available at equity are not only inconsequential because relief need not be fashioned in that form, as described above, but they are also flawed.  Defendants' argument ultimately boils down to a technical distinction: Historically, requests for reinstatement were styled as writs of mandamus or *quo warranto* before courts of law instead of requests for injunctions before courts of equity, as defendants' cited cases reflect.  Defs.' Opp'n at 12; Twenty States' Amicus Br. at 3; *see In re Sawyer*, 124 U.S. 200, 212 (1888) (noting that while a court of equity does not have "jurisdiction over the appointment and removal of public officers, . . . the courts of law, . . . either by certiorari, error, or appeal, or by *mandamus*, prohibition, *quo warranto*, or information in the nature of a writ of *quo warranto*" do); *White v. Berry*, 171 U.S. 366, 377 (1898) (same).  After the merger of law and equity in the federal courts over eighty years ago, however, that distinction makes no difference and does not render improper the injunctive relief plaintiff requests.

Unsurprisingly, many courts have, therefore, reinstated federal employees to their positions or prevented their removals from taking effect.  *See, e.g.*, *Vitarelli v. Seaton*, 359 U.S. 535, 546 (1959) ("[P]etitioner is entitled to the reinstatement which he seeks."); *Pelicone v. Hodges*, 320 F.2d 754, 757 (D.C. Cir. 1963) (holding that plaintiff was "entitled to reinstatement"); *Paroczay v. Hodges*, 219 F. Supp. 89, 94 (D.D.C. 1963) (holding that, because plaintiff "was never legally separated," the court "will therefore order plaintiff's reinstatement"); *Berry*, 1983 WL 538, at \*6 (enjoining removal of members of the U.S. Commission on Civil Rights); *cf. Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974) (acknowledging that "[u]se of the court's injunctive power" may be appropriate in certain cases regarding discharge of employees).  The other cases cited by defendants for the principle that reinstatement is not available as equitable relief, Defs.' Opp'n at 12, involve the unique situation of federal courts presiding over questions about state officers' entitlement to their positions, which is wholly inapplicable here.  *See Baker v. Carr*, 369 U.S. 186, 231 (1962) (citing cases about "enjoin[ing] a state proceeding to remove a public officer"); *Walton v. House of Representatives of Okla.*, 265 U.S. 487, 489-90 (1924) (holding that the district court did not have "jurisdiction over the appointment and removal of state officers"); *Harkrader v. Wadley*, 172 U.S. 148, 165-70 (1898) (declining to enjoin a state criminal proceeding); *see also* Twenty States' Amicus Br. at 16-17 (making the inapposite argument that imposing a remedy of reinstatement of state officers invades state sovereignty).

In any case, the D.C. Circuit has "note[d] that a request for an injunction based on the general federal question statute is essentially a request for a writ of mandamus in this context, where the injunction is sought to compel federal officials to perform a statutorily required ministerial duty."  *Swan*, 100 F.3d at 976 n.1.  Indeed, plaintiff made a last-minute request in her Notice of Supplemental Authority, ECF No. 33 at 4, for a writ of mandamus in the alternative.  A writ of mandamus requires that "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff."  *Id.* at 4 n.1 (alteration accepted) (quoting *In re Nat'l Nurses United*, 47 F.4th 746, 752 n.4 (D.C. Cir. 2022) (citation omitted)).  Accordingly, if injunctive relief were not available here because of adherence to the historical dividing lines of law and equity, a writ of mandamus would likely be available, and the effective relief provided to plaintiff would be the same.  *See Harris*, 2025 WL 679303, at \*11.

and 115 election certification cases. *See* Nineteen States & D.C.'s Br. at 7, ECF No. 31 (citing

NLRB, *Investigate Charges*, https://perma.cc/CU82-KU4V; NLRB, *Board Decisions Issued*,

https:www.nlrb.gov/reports/agency-performance/board-decisions-issued (last visited Feb. 24,

2025)). Without a functioning NLRB, unfair labor practices go unchallenged, union elections go

unrecognized, and pending labor disputes go unreviewed. *See* Pl.'s Mem. at 12 (providing one

example where Whole Foods has refused to recognize a union election because it claims the

NLRB lacks the authority to certify it); Pl.'s Reply at 12 (citing an additional example where

CVS has refused to recognize a majority elected union). Incentives to comply with national

labor law may be severely undercut if no agency is available for enforcement. Employees,

employers, and bargaining units all suffer as a result. The public also has an interest in the

protection of duly enacted, constitutional laws—like the NLRA—from encroachment from other

branches. *See League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("[T]here is a

substantial public interest 'in having governmental agencies abide by the federal laws that

govern their existence and operations.'" (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th

Cir. 1994))). Reinstating plaintiff would allow the NLRB to reach a quorum, thereby allowing

the Board to carry out the important work in promoting labor stability, adjudicating labor

disputes, and protecting workers' rights, without inflicting any measurable harm on defendants.[23]

 Defendants protest that the President will indeed experience harm—by virtue of retaining

"a principal officer whom the President no longer believes should be entrusted with the exercise

of executive power," resulting in the executive branch "slip[ping] from the Executive's control,

and thus from that of the people." Defs.' Opp'n at 15 (second passage quoting *Free Enter. Fund*,

---

[23] As plaintiff's supporting state amici point out, a less partisan Board, insulated from at-will removal, is less likely to whipsaw the public by taking completely disparate approaches every four years, which has concomitant public benefits in greater stability and predictability in administration of the law. *See* Nineteen States & D.C. Br. at 9 n.21.

561 U.S. at 499).  Yet, President Trump can exercise control over the NLRB by appointing two members of his choosing to the vacant seats and appointing a General Counsel who will adopt his enforcement priorities; he simply has chosen not to do so.  In any case, whether the public will benefit more from the balance Congress has struck in preserving some independence from political whims in the administration of our national labor laws or from complete executive control goes to the core of the constitutional question underlying the merits—and thus the answer is dictated by binding precedent.

Finally, defendants predict their ultimate success before the Supreme Court, warning that if plaintiff is allowed to resume her duties on the Board now, any NLRB decisions in the meantime may be voidable, and "the NLRB will be under a heavy cloud of illegitimacy."  Defs.' Reply at 9; *see also* Defs.' Opp'n at 16; Twenty States' Amicus Br. at 16 (suggesting that "reinstatement hampers effective governance" by causing "intra-office 'chaos'" and questions about the fitness of the official).  The possibility of future changes in the law is not enough, however, to permit an unlawful termination and the halting of all Board activity in the meantime. Plaintiff's wrongful termination has caused "chaos" enough and shall not be allowed to stand based on defendants' self-serving speculation.

## IV.    CONCLUSION

The President seems intent on pushing the bounds of his office and exercising his power in a manner violative of clear statutory law to test how much the courts will accept the notion of a presidency that is supreme.  Defendants cite in their briefing *Trump v. United States*, 603 U.S. 593, 608-09 (2024) (granting the President absolute and presumptive immunity from criminal liability for "official acts"), to argue that the removal power is "conclusive and preclusive," with the result that the President need not be subject to criminal *or civil* legislative constraints.  Defs.'

Reply at 7.  The courts are now again forced to determine how much encroachment on the legislature our Constitution can bear and face a slippery slope toward endorsing a presidency that is untouchable by the law.  The President has given no sufficient reason to accept that path here.

*Humphrey's Executor* and its progeny control the outcome of this case and require that plaintiff be permitted to continue her role as Board member of the NLRB and her termination declared unlawful and void.  The Constitution and caselaw are clear in allowing Congress to limit the President's removal power and in allowing the courts to enjoin the executive branch from unlawful action.  Defendants' hyperbolic characterization that legislative and judicial checks on executive authority, as invoked by plaintiff, present "extraordinary intrusion[s] on the executive branch," Defs.' Opp'n at 1, is both incorrect and troubling.  Under our constitutional system, such checks, by design, guard against executive overreach and the risk such overreach would pose of autocracy.  *See Myers*, 272 U.S. at 293 (Brandeis, J., dissenting).  An American President is not a king—not even an "elected" one[24]—and his power to remove federal officers and honest civil servants like plaintiff is not absolute, but may be constrained in appropriate circumstances, as are present here.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  March 6, 2025

_____
**BERYL A. HOWELL**
United States District Judge

---

[24]     Motions H'rg (Mar. 5, 2025), Rough Tr. at 43:9 (plaintiff's counsel highlighting the constitutional role of other branches in checking President's authority).

# ADDENDUM B

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 16, 2025          Decided December 5, 2025

No. 25-5037

CATHY A. HARRIS, IN HER PERSONAL CAPACITY AND IN HER
OFFICIAL CAPACITY AS MEMBER OF THE MERIT SYSTEMS
PROTECTION BOARD,
APPELLEE

v.

SCOTT BESSENT, IN HIS OFFICIAL CAPACITY AS SECRETARY OF
THE TREASURY, ET AL.,
APPELLANTS

———

Consolidated with 25-5055

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:25-cv-00412)

———

*Harry Graver*, Attorney, U.S. Department of Justice,
argued the cause for appellants. On the briefs were *Eric D.
McArthur*, Deputy Assistant Attorney General, and *Mark R.
Freeman*, *Michael S. Raab*, *Joshua M. Salzman*, *Laura E.
Myron*, and *Daniel Aguilar*, Attorneys.

2

*Martin Akerman*, pro se, was on the brief for *amicus curiae* Martin Akerman in support of appellants.

*James Uthmeier*, Attorney General, Office of the Attorney General for the State of Florida, *Jeffrey Paul Desousa*, Acting Solicitor General, and *Nathan A. Forrester*, Chief Deputy Solicitor General, were on the brief for *amici curiae* State of Florida, et al. in support of appellants.

*Nathaniel A. Zelinsky* argued the cause for appellee Cathy A. Harris. With him on the brief were *Michael J. Kator*, *Jeremy D. Wright*, *Kerrie D. Riggs*, *Linda M. Correia*, *Neal Kumar Katyal*, *Kristina Alekseyeva*, and *Ezra P. Louvis*.

*Steven A. Hirsch* was on the brief for *amici curiae* Law Professors John C. Coates, et al. in support of appellee.

*Elizabeth B. Wydra*, *Brianne J. Gorod*, and *Brian R. Frazelle* were on the brief for *amicus curiae* Constitutional Accountability Center in support of appellee.

*Nicolas A. Sansone* and *Allison M. Zieve* were on the brief for *amicus curiae* Public Citizen in support of appellee.

*Anthony Schoenberg*, *Alexis Loeb*, *John Ugai*, and *Raven Quesenberry* were on the brief for *amici curiae* 253 Members of Congress in support of appellee.

*Elizabeth C. Lockwood* and *Kathryn M. Ali* were on the brief for *amici curiae* Former Board Members and General Counsel of the Merit Systems Protection Board in support of appellee.

3

*Anne E. Lopez*, Attorney General, Office of the Attorney General for the State of Hawaii, *Kaliko'onalani D. Fernandes*, Solicitor General, *Kristin K. Mayes*, Attorney General, Office of the Attorney General for the State of Arizona, *Philip J. Weiser*, Attorney General, Office of the Attorney General for the State of Colorado, *Rob Bonta*, Attorney General, Office of the Attorney General for the State of California, *William Tong*, Attorney General, Office of the Attorney General for the State of Connecticut, *Kathleen Jennings*, Attorney General, Office of the Attorney General for the State of Delaware, *Aaron M. Frey*, Attorney General, Office of the Attorney General for the State of Maine, *Andrea Joy Campbell*, Attorney General, Office of the Attorney General for the Commonwealth of Massachusetts, *Keith Ellison*, Attorney General, Office of the Attorney General for the State of Minnesota, *Matthew J. Platkin*, Attorney General, Office of the Attorney General for the State of New Jersey, *Letitia James*, Attorney General, Office of the Attorney General for the State of New York, *Kwame Raoul*, Attorney General, Office of the Attorney General for the State of Illinois, *Anthony G. Brown*, Attorney General, Office of the Attorney General for the State of Maryland, *Dana Nessel*, Attorney General, Office of the Attorney General for the State of Michigan, *Aaron D. Ford*, Attorney General, Office of the Attorney General for the State of Nevada, *Raul Torrez*, Attorney General, Office of the Attorney General for the State of New Mexico, *Jeff Jackson*, Attorney General, Office of the Attorney General for the State of North Carolina, *Dan Rayfield*, Attorney General, Office of the Attorney General for the State of Oregon, *Charity R. Clark*, Attorney General, Office of the Attorney General for the State of Vermont, *Joshua L. Kaul*, Attorney General, Office of the Attorney General for the State of Wisconsin, *Peter F. Neronha*, Attorney General, Office of the Attorney General for the State of Rhode Island, *Nicholas W. Brown*, Attorney General, Office of the Attorney General for the State of Washington, and *Brian*

4

*L. Schwalb*, Attorney General, Office of the Attorney General for the District of Columbia, were on the brief for *amici curiae* State of Hawaii, et al. in support of appellee.

*William Pittard* and *Daniel Csigirinszkij* were on the brief for *amicus curiae* Professor Peter Conti-Brown in support of appellee.

*Joseph M. Sellers* was on the brief for *amici curiae* Patrick J. Borchers, et al. in support of appellee.

*Thad M. Guyer* was on the brief for *amici curiae* Government Accountability Project, et al. in support of appellee.

*Joseph Carson*, pro se, was on the brief for *amicus curiae* Joseph Carson, PE in support of appellee.

No. 25-5057

Gwynne A. Wilcox,
Appellee

v.

Donald J. Trump, in his official capacity as President of the United States and Marvin E. Kaplan, in his official capacity as Chairman of the National Labor Relations Board,
Appellants

5

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:25-cv-00334)

———

*Harry Graver*, Attorney, U.S. Department of Justice, argued the cause for appellants.  On the briefs were *Eric D. McArthur*, Deputy Assistant Attorney General, and *Mark R. Freeman*, *Michael S. Raab*, *Joshua M. Salzman*, *Laura E. Myron*, and *Daniel Aguilar*, Attorneys.

*Daniel Z. Epstein* and *R. Trent McCotter* were on the brief for *amicus curiae* Separation of Powers Clinic in support of appellants.

*Michael Pepson* was on the brief for *amicus curiae* Americans for Prosperity Foundation in support of appellants.

*Jonathan Skrmetti*, Attorney General and Reporter, Office of the Attorney General for the State of Tennessee, and *Whitney Hermandorfer*, Director of Strategic Litigation at the time the brief was filed, were on the brief for *amicus curiae* State of Tennessee in support of appellants.

*Michael H. McGinley*, *Brian A. Kulp*, *Jordan L. Von Bokern*, and *Steven A. Engel* were on the brief for *amicus curiae* the Chamber of Commerce of the United States of America in support of appellants.

*James Uthmeier*, Attorney General, Office of the Attorney General for the State of Florida, *Jeffrey Paul Desousa*, Acting Solicitor General, and *Nathan A. Forrester*, Chief Deputy

6

Solicitor General, were on the brief for *amici curiae* State of Florida, et al. in support of appellants.

Kevin F. King, Matthew J. Glover, Eli Nachmany, and *Brad J. Grisenti* were on the brief for *amicus curiae* Coalition for a Democratic Workplace in support of appellants.

William J. Olson and *Jeremiah L. Morgan* were on the brief for *amicus curiae* America's Future, et al. in support of appellants.

Deepak Gupta argued the cause for appellee Gwynne A. Wilcox. With him on the brief were *Jennifer D. Bennett, Matthew W. H. Wessler, Gregory A. Beck*, and *Alisa C. Philo*.

Dennis Fan was on the brief for *amici curiae* Former Members of the National Labor Relations Board in support of appellee.

Steven A. Hirsch was on the brief for *amici curiae* Law Professors John C. Coates, et al. in support of appellee.

Elizabeth B. Wydra, Brianne J. Gorod, and *Brian R. Frazelle* were on the brief for *amicus curiae* Constitutional Accountability Center in support of appellee.

Nicolas A. Sansone and *Allison M. Zieve* were on the brief for *amicus curiae* Public Citizen in support of appellee.

Anthony Schoenberg, Alexis Loeb, John Ugai, and *Raven Quesenberry* were on the brief for *amici curiae* 253 Members of Congress in support of appellee.

Keith Ellison, Attorney General, Office of the Attorney General for the State of Minnesota, *Liz Kramer*, Solicitor

7

General, *Kwame Raoul*, Attorney General, Office of the Attorney General for the State of Illinois, *Jane Elinor Notz*, Solicitor General, *Alex Hemmer*, Deputy Solicitor General, *Kris Mayes*, Attorney General, Office of the Attorney General for the State of Arizona, *Philip J. Weiser*, Attorney General, Office of the Attorney General for the State of Colorado, *Kathleen Jennings*, Attorney General, Office of the Attorney General for the State of Delaware, *Rob Bonta*, Attorney General, Office of the Attorney General for the State of California, *William Tong*, Attorney General, Office of the Attorney General for the State of Connecticut, *Brian L. Schwalb*, Attorney General, Office of the Attorney General for the District of Columbia, *Anne E. Lopez*, Attorney General, Office of the Attorney General for the State of Hawaii, *Anthony G. Brown*, Attorney General, Office of the Attorney General for the State of Maryland, *Dana Nessel*, Attorney General, Office of the Attorney General for the State of Michigan, *Matthew J. Platkin*, Attorney General, Office of the Attorney General for the State of New Jersey, *Letitia James*, Attorney General, Office of the Attorney General for the State of New York, *Dan Rayfield*, Attorney General, Office of the Attorney General for the State of Oregon, *Aaron M. Frey*, Attorney General, Office of the Attorney General for the State of Maine, *Andrea Joy Campbell*, Attorney General, Office of the Attorney General for the Commonwealth of Massachusetts, *Aaron D. Ford*, Attorney General, Office of the Attorney General for the State of Nevada, *Raul Torrez*, Attorney General, Office of the Attorney General for the State of New Mexico, *Jeff Jackson*, Attorney General, Office of the Attorney General for the State of North Carolina, *Peter F. Neronha*, Attorney General, Office of the Attorney General for the State of Rhode Island, *Charity R. Clark*, Attorney General, Office of the Attorney General for the State of Vermont, *Joshua L. Kaul*, Attorney General, Office of the Attorney General for the State of Wisconsin, and *Nicholas W. Brown*, Attorney General,

8

Office of the Attorney General for the State of Washington, were on the brief for *amici curiae* State of Minnesota, et al. in support of appellee.

*Matthew Ginsburg*, *Harold Craig Becker*, and *Maneesh Sharma* were on the brief for *amicus curiae* the American Federation of Labor and Congress of Industrial Organizations (AFL-CIO) in support of appellee.

*William Pittard* and *Daniel Csigirinszkij* were on the brief for *amicus curiae* Professor Peter Conti-Brown in support of appellee.

*Joseph M. Sellers* was on the brief for *amici curiae* Patrick J. Borchers, et al. in support of appellee.

*Richard F. Griffin* and *Faaris Akremi* were on the brief for *amicus curiae* Professor Jed H. Shugerman in support of appellee.

Before: KATSAS, WALKER, and PAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

Dissenting opinion filed by *Circuit Judge* PAN.

KATSAS, *Circuit Judge*:    These appeals present the question whether Congress may constitutionally prohibit the President from removing members of the National Labor Relations Board and Merit Systems Protection Board without cause.    The district courts upheld the constitutionality of statutory removal protections for members of these boards.

We reverse.  Under *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), Congress may restrict the President's ability to remove principal officers who wield only quasi-

9

legislative or quasi-judicial powers. But under *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197 (2020), Congress may not restrict the President's ability to remove principal officers who wield substantial executive power. As explained below, the NLRB and MSPB wield substantial powers that are both executive in nature and different from the powers that *Humphrey's Executor* deemed to be merely quasi-legislative or quasi-judicial. So, Congress cannot restrict the President's ability to remove NLRB or MSPB members.

I

The National Labor Relations Board and Merit Systems Protection Board are multimember agencies with wide-ranging statutory responsibilities and with members protected by statute from presidential removal without cause.

A

The National Labor Relations Act constitutes the NLRB as an agency of five members appointed by the President with the advice and consent of the Senate. 29 U.S.C. § 153(a). The members serve five-year terms. *Id.* The NLRA purports to prohibit the President from removing a member except "for neglect of duty or malfeasance in office." *Id.*

Congress empowered the NLRB to prevent any "unfair labor practice" affecting interstate commerce. 29 U.S.C. § 160(a). The NLRB conducts formal adjudications to resolve unfair-labor-practice complaints presented to it. *Id.* § 160(b). If it finds an unfair labor practice, the NLRB must issue a cease-and-desist order. *Id.* § 160(c). It also may order affirmative relief, including reinstatement and backpay, to "effectuate the policies" of the NLRA. *Id.* Acting under these remedial authorities, the NLRB has claimed the power to award

10

compensatory and consequential-like damages. *See Thryv, Inc.*, 372 NLRB No. 22, at *9–10 (Dec. 13, 2022), *vacated in part on other grounds*, 102 F.4th 727 (5th Cir. 2024). *But see NLRB v. Starbucks Corp.*, 125 F.4th 78, 96–97 (3d Cir. 2024) (concluding such relief is *ultra vires*). In some instances, the NLRB may find speech to constitute an unfair labor practice. *See* 29 U.S.C. § 158(a)(1); *Cadillac of Naperville, Inc. v. NLRB*, 14 F.4th 703, 721–22 (D.C. Cir. 2021) (Katsas, J., concurring in part and dissenting in part). In others, it may compose and order company speech as a remedy for unfair labor practices. *See HTH Corp. v. NLRB*, 823 F.3d 668, 675–78 (D.C. Cir. 2016).

The NLRB may litigate in federal court to prevent unfair labor practices. Upon the filing of an administrative complaint, it may seek interim injunctive relief in district court. 29 U.S.C. § 160(j). And upon finding an unfair labor practice, the NLRB may petition an appropriate court of appeals to enforce its order. *Id.* § 160(e). In conducting this litigation, the NLRB acts through its own counsel, rather than that of the Justice Department. *Id.* § 154(a).

Beyond its powers to prevent unfair labor practices, the NLRB has substantial authority over matters involving union elections. Within or across employers, it must determine the "unit appropriate" for collective bargaining. 29 U.S.C. § 159(b). For such units, the NLRB also supervises elections to certify or decertify unions as the employees' bargaining representatives. *See id.* § 159(c)–(e).

Lastly, the NLRB may "from time to time … make, amend, and rescind … such rules and regulations as may be

11

necessary to carry out the provisions of" the NLRA, including the provisions outlined above. 29 U.S.C. § 156.[1]

B

The Civil Service Reform Act constitutes the MSPB as an agency of three members appointed by the President with the advice and consent of the Senate. 5 U.S.C. § 1201. The members serve seven-year terms. *Id.* § 1202(a). The CSRA purports to prohibit the President from removing a member except for "inefficiency, neglect of duty, or malfeasance in office." *Id.* § 1202(d).

The MSPB primarily manages disputes between federal employees and their employing agencies. Among other things, the MSPB may adjudicate all matters within its jurisdiction and may "take final action on any such matter." 5 U.S.C. § 1204(a)(1). It may "order any Federal agency or employee to comply with any" of its orders or decisions, and it may "enforce compliance" with them. *Id.* § 1204(a)(2). To do so, it may "order that any employee charged with complying with such [an] order," except for Senate-confirmed presidential appointees, "shall not be entitled to receive payment for service as an employee during any period that the order has not been complied with." *Id.* § 1204(e)(2)(A).

---

[1] Separate from the NLRB, Congress has created its office of General Counsel. That officer is appointed by the President, with the advice and consent of the Senate, to a four-year term. 29 U.S.C. § 153(d). Unlike NLRB members, the General Counsel has no statutory removal protection. He has "final authority" to investigate, charge, and prosecute unfair-labor-practice complaints before the NLRB. *Id.* He also supervises the NLRB's regional offices, and the Board may delegate additional powers to him. *Id.*

12

The MSPB's jurisdiction covers a wide range of federal employment disputes. The MSPB often reviews actions already taken by the employing agency. For example, federal employees may "appeal" to the MSPB disciplinary actions taken by an employer to promote "efficiency of the [civil] service." 5 U.S.C. § 7513(a), (d). Employees also may seek "corrective action" from the MSPB for any "prohibited personnel practice." *Id.* § 1221(a). Such practices include acts of discrimination made unlawful by four different statutes, granting unauthorized preferences, coercing political activity, retaliation for various protected activities, improper influence, deception, and obstruction. *Id.* § 2302(b). The MSPB also has jurisdiction to review employment actions alleged to violate statutory protections for military servicemembers or veterans. *See id.* §§ 1204(a)(1), 3330a(d)(1); 38 U.S.C. § 4324.

Sometimes, the MSPB resolves disputes in the first instance. Many such disputes involve claims presented to it by the Office of the Special Counsel. In these cases, the MSPB may order corrective action for prohibited personnel practices, 5 U.S.C. § 1214, or for violations of other statutes enforced by the Special Counsel, *id.* § 1216. The MSPB also may impose discipline for any of these violations. *Id.* § 1215(a)(3). Finally, the MSPB resolves employment disputes involving Administrative Law Judges, who cannot be removed, suspended, or demoted without "good cause" as found by the MSPB. *Id.* § 7521.

In its various adjudications, the MSPB may award a wide range of interim and final relief. Upon request by the Special Counsel, any MSPB member may "order a stay of any personnel action" reasonably believed to constitute a prohibited personnel practice. 5 U.S.C. § 1214(b)(1)(A). Such stays may last for up to 45 days initially, and the MSPB may extend them for "any period" it considers appropriate. *Id.*

13

§ 1214(b)(1)(B)(i). To remedy unwarranted discipline imposed by an employing agency, the MSPB may order affirmative relief including reinstatement and backpay. *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 6 (2012). For prohibited personnel practices, it may order "corrective action" that includes reinstatement, backpay, and compensatory damages. *Id.* §§ 1214(g), 1221(g)(1). In cases where it imposes discipline, the MSPB may order removal, demotion, debarment from federal employment for up to five years, and penalties of up to $1,000, or "any combination" of these sanctions. *Id.* § 1215(a)(3)(A).

The MSPB has its own litigating authority. Except in the Supreme Court, its attorneys "may appear for the Board, and represent the Board, in any civil action brought in connection with any function carried out by the Board." 5 U.S.C. § 1204(i). When aggrieved employees seek judicial review of its decisions, the MSPB (rather than the employing agency or official) is sometimes the respondent. *See id.* § 7703(a)(2). Specifically, it is the respondent when the employee challenges an adverse procedural ruling, *Spruill v. MSPB*, 978 F.2d 679, 684 (Fed. Cir. 1992), or when the MSPB adjudicates a dispute in the first instance, *Costello v. MSPB*, 182 F.3d 1372, 1381 (Fed. Cir. 1999).

The MSPB has three overlapping grants of rulemaking authority. It may promulgate "such regulations as may be necessary for the performance of its functions." 5 U.S.C. § 1204(h). It may promulgate "regulations to carry out the purpose" of conducting administrative appeals. *Id.* § 7701(k). And it may promulgate regulations "for the purpose of section 7521," which governs adverse employment actions against ALJs. *Id.* § 1305. The MSPB also may *sua sponte* review regulations promulgated by the Office of Personnel Management. *Id.* § 1204(f)(1). It may declare such regulations

14

invalid, on their face or as implemented, to the extent they purport to require prohibited personnel practices. *Id.* § 1204(f)(2). And it may "require any agency" to "cease compliance" with such regulations. *Id.* § 1204(f)(4)(A).

II

The President removed Gwynne Wilcox from the NLRB and Cathy Harris from the MSPB. In defense of those actions, the government does not contend that Wilcox or Harris engaged in any conduct that would support for-cause removal under the relevant statutory restrictions. Instead, it argues that the restrictions are unconstitutional.

Wilcox and Harris sued to challenge their removals. The district courts held that the statutory removal protections are constitutional under *Humphrey's Executor*; they declared that Wilcox and Harris continue to hold their respective offices; and they enjoined the government from interfering with the individuals' ability to function as board members. *Wilcox v. Trump*, 775 F. Supp. 3d 215 (D.D.C. 2025); *Harris v. Bessent*, 775 F. Supp. 3d 164 (D.D.C. 2025). The government appealed and sought interim stays pending appeal. A motions panel of this Court granted the stays, *Harris v. Bessent*, No. 25-5037, 2025 WL 980278 (D.C. Cir. Mar. 28, 2025), but the full Court vacated that decision, *Harris v. Bessent*, No. 25-5037, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025) (en banc) (per curiam).

The Supreme Court then stayed the district courts' orders pending the resolution of these appeals and any ensuing petitions for certiorari. *Trump v. Wilcox*, 145 S. Ct. 1415 (2025) (per curiam). In doing so, the Court found it likely "that both the NLRB and MSPB exercise considerable executive power," which it said would make the removal restrictions unconstitutional. *Id.* at 1415.

15

III

A

Article II of the Constitution vests "[t]he executive Power" of the United States "in a President," U.S. Const., Art. II, § 1, cl. 1, and requires him to "take Care that the Laws be faithfully executed," *id.* § 3. In *Myers v. United States*, 272 U.S. 52 (1926), the Supreme Court held that the Vesting and Take Care Clauses prevent Congress from restricting the President's ability to remove government officers who wield significant executive power on his behalf. *See id.* at 117–18, 163–64. The Court invalidated a statute requiring the Senate to provide advice and consent to effectuate the President's removal of a first-class postmaster. *See id.* at 107, 176. In later cases, the Court applied *Myers* to invalidate statutory restrictions on the President's ability to remove various principal officers. *See Collins v. Yellen*, 594 U.S. 220 (2021) (Director of Federal Housing Finance Agency); *Seila Law*, 591 U.S. 197 (Director of CFPB); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010) (members of PCAOB). More recently, the Court noted that because the President's "exclusive power of removal in executive agencies" is "conclusive and preclusive," Congress may not restrict it. *Trump v. United States*, 603 U.S. 593, 609 (2024) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 638 & n.4 (1952) (Jackson, J., concurring)).

A different line of precedent qualifies these cases. In *Humphrey's Executor*, the Supreme Court upheld the constitutionality of a statute barring the President from removing members of the Federal Trade Commission absent "inefficiency, neglect of duty, or malfeasance in office." 15 U.S.C. § 41. The Court acknowledged *Myers*'s holding that Congress cannot restrict the President's ability to remove

16

"purely executive officers." *Humphrey's Ex'r*, 295 U.S. at 627–28. But it concluded that *Myers* does not govern the removal of an officer "who exercises no part of the executive power vested by the Constitution in the President." *Id.* at 628. And it characterized the FTC's powers not as executive, but as "quasi-legislative or quasi-judicial." *Id.* In *Wiener v. United States*, 357 U.S. 349 (1958), the Court applied *Humphrey's Executor* to infer and uphold a cause requirement for removing members of the War Claims Commission, a tribunal that adjudicated claims under a statutory scheme for compensating certain Americans held by the Axis powers during World War II. *Id.* at 349–50, 355–56. Other precedents have upheld cause requirements for the removal of certain inferior officers. *Morrison v. Olson*, 487 U.S. 654 (1988); *United States v. Perkins*, 116 U.S. 483 (1886).

In *Seila Law*, the Court read *Humphrey's Executor* narrowly and expressly declined to extend it. According to the Court, "text, first principles, the First Congress's decision in 1789 [regarding removal of executive officers], *Myers*, and *Free Enterprise Fund* all establish that the President's removal power is the rule, not the exception." 591 U.S. at 228. Moreover, *Humphrey's Executor* and *Morrison* reflect "two exceptions—one for multimember expert agencies that do not wield substantial executive power, and one for inferior officers with limited duties and no policymaking or administrative authority." *Id.* at 218. Furthermore, these exceptions "represent what up to now have been the outermost constitutional limits of permissible congressional restrictions on the President's removal power." *Id.* (quoting *PHH Corp. v. CFPB*, 881 F.3d 75, 196 (D.C. Cir. 2018) (en banc) (Kavanaugh, J., dissenting)). As it had done previously, the Court declined to "extend" *Humphrey's Executor* to a "new situation." *Id.* at 220 (quoting *Free Enter. Fund*, 561 U.S. at 483).

*Seila Law* held that the *Myers* rule—not the *Humphrey's Executor* exception—governs removal of the CFPB Director. To distinguish *Humphrey's Executor*, the Court identified three significant executive powers vested in the CFPB. First, the CFPB can "promulgate binding rules" implementing the statutes that it administers. 591 U.S. at 218. Second, it can "issue final decisions awarding legal and equitable relief in administrative adjudications." *Id.* at 219. Third, it can "seek daunting monetary penalties against private parties on behalf of the United States in federal court—a quintessentially executive power not considered in *Humphrey's Executor*." *Id.*

## B

These appeals turn on whether *Humphrey's Executor* applies to the NLRB and MSPB. At first glance, that question seems to turn on whether these agencies exercise any significant *executive* power within the meaning of the Vesting Clause, which would bring this case within the rule of *Myers* and *Seila Law*; or whether the agencies exercise only *quasi-legislative* and *quasi-judicial* powers, which *Humphrey's Executor* deemed to fall outside the President's executive power under Article II. *See* 295 U.S. at 627–28. But after *Humphrey's Executor* was decided, two related developments in separation-of-powers jurisprudence made it all but impossible to distinguish executive power from quasi-legislative or quasi-judicial power.

First, the Supreme Court has broadened its understanding of what powers count as executive. In *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam), the Court held that the Federal Election Commission's "enforcement power, exemplified by its discretionary power to seek judicial relief," is an executive power entrusted to the President through the Take Care Clause. *See id.* at 138. In *Bowsher v. Synar*, 478 U.S. 714 (1986), the

Court held that the power to interpret and apply a statute requiring certain budget cuts is executive. *See id.* at 733 ("Interpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law."). In *Freytag v. Commissioner*, 501 U.S. 868 (1991), Justice Scalia explained at length that "there is nothing 'inherently judicial' about 'adjudication,'" which Article II agencies perform routinely. *Id.* at 909 (concurring in part and concurring in the judgment); *see id.* at 909–12. And in *City of Arlington v. FCC*, 569 U.S. 290 (2013), the Court explained that rulemaking and administrative adjudication "take 'legislative' and 'judicial' forms, but they are exercises of—indeed, under our constitutional structure they *must* be exercises of—the 'executive Power.'" *Id.* at 304 n.4 (quoting Article II Vesting Clause). With enforcement, rulemaking, and administrative adjudication all classed as executive powers, what is left of the assertedly discrete categories of quasi-legislative or quasi-judicial powers? In sum, "[t]he Court's conclusion [in *Humphrey's Executor*] that the FTC did not exercise executive power has not withstood the test of time." *Seila Law*, 591 U.S. at 216 n.2 (citing *City of Arlington*, 569 U.S. at 304 n.4). To the contrary, it is "hard to dispute that the powers of the FTC at the time of *Humphrey's Executor* would at the present time be considered 'executive,' at least to some degree." *Id.* (quoting *Morrison*, 487 U.S. at 690 n.28).

Second, the Supreme Court increasingly has stressed that there are only three kinds of constitutional powers, and two of them are not delegable. "Our Constitution divided the 'powers of the new Federal Government into three defined categories, Legislative, Executive, and Judicial.'" *Free Enter. Fund*, 561 U.S. at 483 (quoting *INS v. Chadha*, 462 U.S. 919, 951 (1983)). Only Congress itself may exercise the legislative power. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (Article I "permits no delegation"). And only life-tenured

19

judges may exercise the "judicial Power of the United States." *Stern v. Marshall*, 564 U.S. 462, 483–84 (2011) (quoting U.S. Const. Art. III, § 1); *see also Mistretta v. United States*, 488 U.S. 361, 425 (1989) (Scalia, J., dissenting) ("A judge may not leave the decision to his law clerk, or to a master."). So by process of elimination, if agencies may receive neither legislative nor judicial powers, what is left for them other than some portion of the executive power?

These considerations suggest that very little remains of *Humphrey's Executor*. Perhaps its most plausible application is to purely adjudicatory bodies like the War Claims Commission at issue in *Wiener*. But under today's separation-of-powers jurisprudence, even those bodies exercise the President's executive power. *See*, *e.g.*, *United States v. Arthrex, Inc.*, 594 U.S. 1, 17 (2021) (Administrative Patent Judges); *Kuretski v. Comm'r*, 755 F.3d 929, 932 (D.C. Cir. 2014) (Tax Court judges). Recall that *Seila Law* limited *Humphrey's Executor* to entities that "do not wield substantial executive power." 591 U.S. at 218. So maybe agencies with any "substantial" power—quasi-judicial, quasi-legislative, or otherwise—fall outside *Humphrey's Executor* because that power is and must be executive. *See Consumers' Rsch. v. CPSC*, 98 F.4th 646, 650–57 (5th Cir. 2024) (Oldham, J., dissenting from denial of rehearing en banc). Maybe *Humphrey's Executor* thus governs only agencies with purely advisory functions—like, say, the United States Commission on Civil Rights, *see Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *14 (D.C. Cir. Feb. 15, 2025) (Katsas, J., dissenting). And maybe the Supreme Court, which is now considering whether to overrule *Humphrey's Executor*, will soon hold as much. *See* Stay Order, *Trump v. Slaughter*, No. 25-332 (U.S. Sept. 22, 2025).

20

All of that said, we are reluctant to decide these appeals along those lines. Of course, we must apply *Humphrey's Executor* as best we can, unless and until the Supreme Court overrules it. *See Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989). Moreover, despite rejecting the reasoning of *Humphrey's Executor*, the Supreme Court has twice expressly declined to overrule it. *See Seila Law*, 591 U.S. at 228; *Free Enter. Fund*, 561 U.S. at 483. And *Seila Law* acknowledged that *Humphrey's Executor* had upheld removal restrictions for an agency with powers that "would at the present time be considered executive." 591 U.S. at 216 n.2 (quoting *Morrison*, 487 U.S. at 690 n.28). Given these considerations, maybe Congress still may restrict removal if the board at issue has only those powers that *Humphrey's Executor* deemed to be quasi-legislative or quasi-judicial, even if those powers are now recognized as executive.

Fortunately, we need not resolve all these tensions. As we explain below, the NLRB and MSPB exercise significant executive powers, which is enough to trigger the general rule of *Myers* and *Seila Law*. Moreover, many of those powers exceed ones that *Humphrey's Executor* deemed to be quasi-legislative or quasi-judicial, which makes this case fall outside any exception based on that decision.

C

So what powers did *Humphrey's Executor* deem to be quasi-legislative or quasi-judicial? That case involved powers vested in the FTC by the Federal Trade Commission Act as originally enacted in 1914. Section 5 of that Act prohibited "unfair methods of competition in commerce." Act of Sept. 26, 1914, ch. 311, § 5, 38 Stat. 717, 719–20 (codified as amended at 15 U.S.C. § 45). It authorized the Commission to adjudicate complaints alleging unfair methods of competition, to issue

21

cease-and-desist orders, and to seek judicial enforcement of those orders. *Id.* Section 6 of the Act authorized the Commission to make and file reports with other governmental entities, including Congress. *Id.* at 721–22 (codified as amended at 15 U.S.C. § 46). Section 7 authorized the Commission to act "as a master in chancery" in pending antitrust actions. *Id.* at 722 (codified at 15 U.S.C. § 47). For our purposes, "what matters is the set of powers the Court considered as the basis for its decision" in *Humphrey's Executor*. *Seila Law*, 591 U.S. at 219 n.4.

1

In distinguishing *Myers*, the Court deemed only one of the FTC's powers to be quasi-legislative: making reports for Congress. *See Humphrey's Ex'r*, 295 U.S. at 628 ("In making investigations and reports … for the information of Congress under section 6, in aid of the legislative power, it acts as a legislative agency."). That power is "investigative and informative"—one that "Congress might delegate to one of its own committees." *Buckley*, 424 U.S. at 137.

More interesting is a power that *Humphrey's Executor* did *not* describe as quasi-legislative. Section 6(g) of the FTC Act authorized the Commission "to make rules and regulations for the purpose of carrying out the provisions of this Act." 38 Stat. at 722. Yet *Humphrey's Executor* did not mention that provision, much less characterize it as conferring on the FTC the quasi-legislative power to engage in substantive rulemaking. This was hardly surprising because "the agency itself did not assert the power to promulgate substantive rules until 1962 and indeed indicated intermittently that it lacked such a power." *Nat'l Petrol. Refiners Ass'n v. FTC*, 482 F.2d 672, 693 (D.C. Cir. 1973). Before *Humphrey's Executor* was decided, the Commission had expressly disclaimed the power

22

to promulgate substantive rules governing primary conduct, as opposed to procedural rules governing the conduct of administrative adjudication under section 5. *See id.* at 693 n.27; *Annual Report of the Federal Trade Commission for the Fiscal Year Ended June 30, 1922* at 36 ("One of the most common mistakes is to suppose that the commission can issue … regulations unconnected with any proceeding before it."). For this reason, the Supreme Court cited the CFPB's power "to promulgate binding [substantive] rules" as one important power not considered in *Humphrey's Executor*—and one key reason why *Humphrey's Executor* does not apply to the CFPB. *Seila Law*, 591 U.S. at 218.

2

*Humphrey's Executor* conceived of "quasi-judicial" power as assisting the Article III courts or, at most, engaging in a restrained species of administrative adjudication modeled on how Article III judges resolve cases or controversies.

In distinguishing *Myers*, the Supreme Court expressly described only one of the FTC's powers as "quasi-judicial"— its section 7 power to assist the courts. *See* 295 U.S. at 628. That provision allowed a federal district court, if it found that equitable remedies were warranted in an antitrust case, to "refer" the case "to the commission, as a master in chancery, to ascertain and report an appropriate form of decree." 38 Stat. at 722. In that instance, the Commission would prepare and file a report, which the court could "adopt or reject" as it chose. *Id.* As *Humphrey's Executor* perceived it, "quasi-judicial" power is thus merely the power to "act[] as an agency of the judiciary." 295 U.S. at 628. Today, we might liken this power to that of a magistrate judge or a special master. *See* 28 U.S.C. § 636 (magistrate judges); Fed. R. Civ. P. 53 (special masters).

23

More generally, the Supreme Court also referenced the FTC's power to conduct administrative adjudications under section 5, which it described as "filling in and administering the details" regarding a "general" statutory prohibition of unfair methods of competition. *See* 295 U.S. at 628. According to the Court, that enterprise emphatically did *not* involve any discretionary policy judgments. Instead, the FTC was a "nonpartisan" body required to "act with entire impartiality." *Id.* at 624. And it was "charged with the enforcement of no policy except the policy of the law." *Id.* In *Wiener*, the Court similarly described administrative adjudication by the War Claims Commission: Claims before it "were to be 'adjudicated according to law,' that is, on the merits of each claim, supported by evidence and governing legal considerations." 357 U.S. at 355. These descriptions resemble Justice Scalia's minimalist account of adjudication in *Freytag*—agencies or courts "determine facts, apply a rule of law to those facts, and thus arrive at a decision." 501 U.S. at 909 (concurring in part and concurring in the judgment). These descriptions also conjure up an enduring image of how judges are supposed to adjudicate, as umpires fairly applying set rules to call balls and strikes.

Precedents contemporaneous with *Humphrey's Executor* confirm this restrained conception of FTC administrative adjudication. For one thing, the Supreme Court repeatedly had held that the meaning of "unfair methods of competition," although open-ended, was "for the courts, not the commission, ultimately to determine as [a] matter of law." *FTC v. Gratz*, 253 U.S. 421, 427 (1920); *see FTC v. Curtis Pub. Co.*, 260 U.S. 568, 579–80 (1923) (following *Gratz*). Moreover, courts discerned the meaning of that phrase not through broad or policy-laden pronouncements, but by "the gradual process of judicial inclusion and exclusion," consistent with traditional common-law adjudication. *FTC v. Raladam Co.*, 283 U.S. 643,

24

648 (1931) (cleaned up). Some of these precedents eventually were disapproved. *See FTC v. Brown Shoe Co.*, 384 U.S. 316, 320–21 (1966) (disapproving *Gratz*). But in 1935, insofar as FTC administrative adjudication was deemed a quasi-judicial power, it was at most the power to resolve disputes like judges.

\* \* \* \*

In sum, *Humphrey's Executor* laid down specific conceptions of what counts as "quasi-legislative" or "quasi-judicial" power. The former includes only legislative research functions such as investigating, writing reports, and making recommendations to Congress. The latter includes only the power to serve as a trial master or to act as a judge-like adjudicator without policymaking authority. As *Seila Law* noted, neither category encompasses the powers to promulgate substantive rules or to impose civil fines. *See* 591 U.S. at 218–19. And although *Humphrey's Executor* did not separately analyze available remedies, *Seila Law* stressed that the FTC in 1935 could only assist courts or enter cease-and-desist orders, as opposed to awarding damages or affirmative equitable relief. *See id.*

## IV

The powers of the NLRB and MSPB substantially exceed the circumscribed administrative powers that *Humphrey's Executor* deemed to be quasi-legislative or quasi-judicial.

### A

Congress has vested the NLRB with several executive powers beyond the ones addressed in *Humphrey's Executor*.

*First*, the NLRB possesses "broad rulemaking authority." *Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 613 (1991). Section 6

25

of the NLRA empowers the agency to promulgate "such rules and regulations as may be necessary to carry out the provisions" of the statute. 29 U.S.C. § 156. In *American Hospital Association*, the Supreme Court held that this authority covers not only rules establishing unfair labor practices under section 8, but also "industry-wide rule[s] delineating … appropriate bargaining units" under section 9. 499 U.S. at 611. Invoking that power, the NLRB has promulgated rules governing collective bargaining in the health care industry. 29 C.F.R. § 103.30. As *Seila Law* made clear, the power to "promulgate binding rules fleshing out" major federal statutes exceeds the powers that *Humphrey's Executor* deemed to be quasi-legislative or quasi-judicial. *See* 591 U.S. at 218. Needless to say, it is also a quintessential executive power under current constitutional standards.

Wilcox objects that the NLRB has not often engaged in substantive rulemaking. *See* 29 C.F.R. §§ 103.1–3; *Nat'l Ass'n of Mfrs. v. NLRB*, 717 F.3d 947, 949 (D.C. Cir. 2013). But that is irrelevant to our inquiry. When evaluating the constitutionality of removal restrictions, courts consider the "authority" that an agency "possesses," not the rigor with which the power is exercised. *Seila Law*, 591 U.S. at 218. So, "an agency's voluntary self-denial" of its rulemaking power "has no bearing" on our constitutional analysis. *Am. Trucking Ass'ns*, 531 U.S. at 473.

*Second*, the NLRB conducts administrative adjudications that are nothing like the model of adjudication that *Humphrey's Executor* treated as quasi-judicial. Recall that model: A "nonpartisan" body of experts acts "with entire impartiality" to undertake "the enforcement of no policy except the policy of the law." *Humphrey's Ex'r*, 295 U.S. at 624. And courts decide what the governing statutory standard means, through a neutral process of case-by-case adjudication. *See Raladam*,

283 U.S. at 648; *Gratz*, 253 U.S. at 427. In other words, courts would decide what constitutes an "unfair method of competition" or an "unfair labor practice," using familiar interpretive tools such as statutory text, structure, canons, history, and precedent. This fairly describes the functioning of purely adjudicatory bodies like the War Claims Commission, which was charged with nothing more than adjudicating claims "according to law." 357 U.S. at 355. But it does not fairly describe adjudication conducted by agencies with substantive rulemaking power, which the Administrative Procedure Act defines as including the power to "prescribe law or policy." *See* 5 U.S.C. § 551(4)–(5). For those agencies, the Supreme Court has held that "adjudication is a generally permissible mode of law-making and policymaking," precisely because the agency has been "delegated the power to make law and policy through rulemaking." *Martin v. OSHRC*, 499 U.S. 144, 154 (1991); *see SEC v. Chenery Corp.*, 332 U.S. 194, 202–03 (1947) (*Chenery II*).

The NLRB conducts the latter kind of adjudications. It is tasked with "developing and applying national labor policy." *NLRB v. Curtin Matheson Sci., Inc.*, 494 U.S. 775, 786 (1990). So, it may "announc[e] new principles in an adjudicative proceeding." *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974); *see Consol. Freightways v. NLRB*, 892 F.2d 1052, 1056 (D.C. Cir. 1989) (NLRB adjudication "enunciated a new rule," which "the Board has the authority to do"). The NLRB does this routinely, *see, e.g.*, *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 260–67 (1975); *NLRB v. Burns Int'l Sec. Servs., Inc.*, 406 U.S. 272, 284–85 (1972), creating a bevy of requirements that are akin to "statutory" rules or "one[s] established by regulation," *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 804–05 (1945).

27

Moreover, policy considerations drive NLRB adjudications. The Supreme Court has contrasted the "narrow confines of law" for the courts with the "spacious domain of policy" for the NLRB. *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 194 (1941). Likewise, this Court has held that the NLRB may "explicate why national labor policy requires" a given rule. *Retail Clerks Int'l Ass'n Loc. No. 455 v. NLRB*, 510 F.2d 802, 807 (D.C. Cir. 1975). The NLRB routinely invokes "policy" considerations not only to create rules by adjudication, but also to overrule them. *In re Lamons Gasket Co.*, 357 NLRB 739, 739 (2011); *In re IBM Corp.*, 341 NLRB 1288, 1290 (2004); *see Valley Hosp. Med. Ctr., Inc. v. NLRB*, 100 F.4th 994, 1003 (9th Cir. 2024) (O'Scannlain, J., specially concurring) (NLRB "frequently changes its mind, seesawing back and forth between statutory interpretations depending on its political composition, leaving workers, employers, and unions in the lurch"). On one recent occasion, the NLRB overruled itself for the fifth time, and this Court, barely mentioning any statutory provisions, upheld the agency's latest position as reasonably explained and thus not arbitrary. *See Hosp. Menonita de Guayama, Inc. v. NLRB*, 94 F.4th 1, 16 (D.C. Cir. 2024) (Katsas, J., concurring), *GVR*, 145 S. Ct. 982 (2024). Perhaps the NLRA will be somewhat more constraining now that *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), has overruled *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984). But it would blink reality to suppose that *Loper Bright* will eliminate the NLRB's ability to conduct policymaking through adjudication under *Chenery II*. Whatever the virtues of that modern species of administrative adjudication, it cannot fairly be described as approximating how Article III judges decide cases, or as resting on "no policy except the policy of the law." *Humphrey's Ex'r*, 295 U.S. at 624. And it plainly involves the exercise of substantial executive power. *See City of Arlington*, 569 U.S. at 304 n.4.

28

*Third*, the NLRB may award substantially broader remedies than the FTC could in 1935. At that time, the FTC, upon finding an unfair method of competition, could issue only a cease-and-desist order. *See Humphrey's Ex'r*, 295 U.S. at 620–21. Such orders impose only a "negative restriction." *Alberty v. FTC*, 182 F.2d 36, 39 (D.C. Cir. 1950). The NLRB, in contrast, may award various forms of affirmative relief. Upon finding an unfair labor practice, it may issue not only a cease-and-desist order, but also one "requiring" the offending employer or union "to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of" the NLRA. 29 U.S.C. § 160(c). This may include the power to award compensatory damages. *See Thryv, Inc.*, 372 NLRB No. 22, at *9–10. And it sometimes includes the power to compel employers to read NLRB-composed admissions of liability, *see Advancepierre Foods, Inc. v. NLRB*, 966 F.3d 813, 820–21 (D.C. Cir. 2020), a remedy that Judge Williams likened to the practices of Joseph Stalin and Mao Zedong, *see HTH Corp.*, 823 F.3d at 677. Whatever the merits of that comparison, the NLRB's remedial authority substantially exceeds that of the FTC in 1935. This consideration also further distinguishes *Humphrey's Executor*. *See Seila Law*, 591 U.S. at 219.

*Fourth*, the NLRB has broader litigating authority than the FTC did in 1935. Each agency may petition courts of appeals to enforce final administrative orders. *See* 29 U.S.C. § 160(e) (NLRB); 38 Stat. at 719–20 (codified as amended at 15 U.S.C. § 45) (FTC). But as noted above, NLRB remedial orders may be much broader than those of the FTC in 1935. Moreover, the NLRB has litigating authority to seek interim relief in district courts. 29 U.S.C. § 160(j). In contrast, to obtain any judicial relief besides enforcement of a final cease-and-desist order, the FTC in 1935 would have needed to ask the Attorney General to seek mandamus on its behalf. *See* 38 Stat. at 722 (codified

29

as amended at 15 U.S.C. § 49); *FTC v. Claire Furnace Co.*, 274 U.S. 160, 173–74 (1927); *Space Expl. Techs. Corp. v. NLRB*, 151 F.4th 761, 776 n.76 (5th Cir. 2025). The NLRB's greater authority to litigate on behalf of the United States both further distinguishes *Humphrey's Executor*, *see Seila Law*, 591 U.S. at 218–19, and reflects a greater degree of executive power, *see Buckley*, 424 U.S. at 138–40; *In re Aiken County*, 725 F.3d 255, 264 n.9 (D.C. Cir. 2013) (opinion of Kavanaugh, J.) ("civil enforcement decisions brought by the Federal Government are presumptively an exclusive Executive power").

Wilcox objects that NLRB litigation is conducted by its General Counsel, an executive officer removable at-will by the President. But while the General Counsel has "final authority" to prosecute unfair-labor-practice complaints before the NLRB, 29 U.S.C. § 153(d); *see NLRB v. United Food & Com. Workers Union, Loc. 23*, 484 U.S. 112, 118–19 (1987), the NLRA gives the Board itself control over litigation in court, 29 U.S.C. § 160(e), (j). The General Counsel conducts that litigation pursuant to a delegation from the Board under section 3(d), which permits the NLRB to assign to the General Counsel "such other duties as the Board may prescribe." *Id.* § 153(d). Under the terms of that delegation, the General Counsel conducts litigation "in full accordance with the directions of the Board." Authority and Assigned Responsibilities of General Counsel of National Labor Relations Board § I.B, 20 Fed. Reg. 2,175, 2,175 (Apr. 6, 1955).

*Finally*, the NLRB exercises substantial executive power in administering section 9 of the NLRA, which governs the determination of appropriate units for collective bargaining and the conduct of union elections. 29 U.S.C. § 159. Wilcox objects that elections are supervised primarily by the NLRB's regional offices, which in turn are supervised by the General Counsel. *See id.* § 153(d). Yet the NLRA clearly gives the

30

Board itself, not the General Counsel, final authority over section 9 administration. *See id.* § 159(b) ("The Board shall decide in each case … the unit appropriate for the purposes of collective bargaining …."); *id.* § 159(c) ("the Board shall investigate" petitions to conduct a union election). Indeed, the Board's most prominent substantive rule to date involved not an elaboration of unfair labor practices, but a determination of appropriate bargaining units in the health care industry. *See* 29 C.F.R. § 103.30.

Because the NLRB's rulemaking, adjudicatory, remedial, enforcement, and election-administration powers are not solely quasi-legislative or quasi-judicial, the agency falls well outside the *Humphrey's Executor* exception.

B

The MSPB likewise has more executive powers than ones that *Humphrey's Executor* deemed to be quasi-legislative or quasi-judicial.

Start with rulemaking. The CSRA empowers the MSPB to promulgate regulations "for the performance of its functions," 5 U.S.C. § 1204(h), and "for the purpose of section 7521," *id.* § 1305. Section 7521 prohibits the "removal" of ALJs without a prior MSPB determination of good cause. *Id.* § 7521(a), (b)(1). In *Tunik v. MSPB*, 407 F.3d 1326 (Fed. Cir. 2005), the Federal Circuit held these grants of rulemaking power authorize the MSPB to decide, with the force and effect of law, what constitutes a prohibited "removal." *Id.* at 1345. In other words, they permit the MSPB to define by regulation what primary conduct section 7521 prohibits, not simply to prescribe rules for the adjudication of disputes under that provision. To be sure, the MSPB's rulemaking authority with respect to section 7521 does not rival the broad rulemaking authority of the NLRB, and the contours of its other rulemaking

authorities are unclear. Nonetheless, the existence of at least some substantive rulemaking power counts as a distinction of *Humphrey's Executor* and as executive power under Article II. *See Seila Law*, 591 U.S. at 218.

As for adjudication, the MSPB may be less aggressive than the NLRB in naked appeals to shifting policy preferences, but its adjudicatory powers still exceed what *Humphrey's Executor* deemed to be quasi-judicial. This is true on at least three different dimensions—finality, breadth of jurisdiction, and breadth of remedial authority.

*Finality*. The power to "unilaterally issue final decisions" is a significant executive power that was not present in *Humphrey's Executor*. *See Seila Law*, 591 U.S. at 219. In 1935, an FTC cease-and-desist order remained ineffective unless and until the agency persuaded a court of appeals to enforce it. *FTC v. Klesner*, 280 U.S. 19, 22 (1929); *Claire Furnace*, 274 U.S. at 170. In contrast, the MSPB may "take final action on any" matter "within the jurisdiction of the Board," 5 U.S.C. § 1204(a)(1), and also may "order any Federal agency or employee to comply" with any of its orders, *id.* § 1204(a)(2). Aggrieved employees may obtain judicial review of final MSPB decisions, but the decisions remain effective unless and until a court of appeals sets them aside. *See id.* § 7703.

*Breadth of jurisdiction*. In 1935, the FTC was a specialized tribunal. At that time, section 5 of the FTC Act was limited to addressing "unfair methods of competition." *See* 38 Stat. at 719; *cf.* 15 U.S.C. § 45(a)(1) (now also addressing "unfair or deceptive acts or practices"). So, the FTC was largely directed towards antitrust enforcement, as reflected in its role as a "master in chancery" for antitrust cases. *Humphrey's Ex'r*, 295 U.S. at 628. In contrast, the MSPB is

32

more a jack-of-all-trades. In determining prohibited personnel practices, it must administer portions of Title VII, the Age Discrimination in Employment Act, the Fair Labor Standards Act, the Rehabilitation Act, and the Whistleblower Protection Act. 5 U.S.C. § 2302(b)(1), (8). And those five statutes encompass only two of 14 categories of personnel practices that the CSRA prohibits and that the MSPB must consider. *Id.* § 2302(b). The MSPB also must administer the Uniformed Services Employment and Reemployment Rights Act and the Veterans Employment Opportunities Act. *See id.* §§ 1204(a)(1), 3330a(d)(1); 38 U.S.C. § 4324. It must administer the Hatch Act, the Freedom of Information Act, and various other statutes within the prosecutorial authority of the Special Counsel. 5 U.S.C. § 1216(a). Finally, it must decide whether employing agencies have meted out appropriate discipline. *Id.* § 7513(d). To do that, the MSPB makes its own "discretionary judgment," which "is by no means" a mere legal or factual inquiry. *Douglas v. Veterans Admin.*, 5 M.S.P.B. 313, 325–26 (1981). Instead, it involves application of a non-exclusive, twelve-factor balancing test that considers, among other things, the nature of the offense, the employee's work and disciplinary record, the potential for rehabilitation, mitigating circumstances, and the adequacy of alternative sanctions. *See Conor v. Dep't of Veterans Affs.*, 8 F.4th 1319, 1324 (Fed. Cir. 2021) (citing *Douglas*, 5 M.S.P.B. at 332). According to the MSPB, this searching inquiry is "considerably broader" than one that courts would undertake. *Douglas*, 5 M.S.P.B. at 327. Thus, it cannot plausibly be described as "quasi-judicial." Likewise, it cannot fairly be characterized as involving "no policy except the policy of the law." *Humphrey's Ex'r*, 295 U.S. at 624.

*Breadth of remedial authority*. When it finds a legal violation, the MSPB can do far more than simply order the offending agency to cease and desist. For unwarranted

33

employee discipline, the MSPB may order relief "including reinstatement, backpay, and attorney's fees." *Elgin*, 567 U.S. at 6. For prohibited personnel practices, it may order corrective action that includes reinstatement, backpay, compensatory and consequential damages, medical and other costs, travel expenses, attorney's fees, expert witness fees, and interest. 5 U.S.C. §§ 1214(g), 1221(g)(1). In cases where it imposes discipline, the MSPB may order removal, demotion, debarment from federal employment for up to five years, suspension, reprimand, civil penalties of up to $1,000, or "any combination" of these sanctions. *Id.* § 1215(a)(3)(A). And for violation of its own orders, the MSPB also may order the salary of an offending official to be withheld. *Id.* § 1204(e)(2)(A). All of this sharply distinguishes *Humphrey's Executor*. The power to award "legal and equitable relief in administrative adjudications" is an executive power that was not at issue there. *See Seila Law*, 591 U.S. at 219. Moreover, if the power to "seek daunting monetary penalties" in court is also such a power, *see id.*, then so too is the power to impose such penalties unilaterally.

Unlike the FTC in 1935, the MSPB also may award interim relief in some circumstances—and may do so on a wholesale basis. Upon request by the Special Counsel, any MSPB member may "order a stay of any personnel action" that she reasonably believes to constitute a prohibited personnel practice. 5 U.S.C. § 1214(b)(1)(A). Recently, Harris herself invoked this authority to reinstate nearly 6,000 laid-off employees pending further administrative proceedings. Order on Stay Request, *Special Counsel ex rel. John Doe v. USDA*, No. CB-1208-25-0020-U-1 (MSPB Mar. 5, 2025), https://perma.cc/3F45-PKG5. That too far exceeds the FTC's remedial authority in 1935.

34

Harris objects that we should not consider the MSPB's salary-withholding power because the statute granting it is unconstitutional. This argument addresses only one of many remedial powers that were not present in *Humphrey's Executor*. In any event, the argument fails on its own terms. Harris contends that withholding a salary requires involvement of the Comptroller General, who is a legislative official. She invokes *Bowsher*, which held that Congress could not vest the Comptroller General with the executive power to decide what budget cuts a particular statute required. *See* 478 U.S. at 733–34. The argument correctly assumes that the power to withhold the salary of a government official is executive. But the Comptroller General does not exercise this power. "[T]he Board may order" that the offending employee "shall not be entitled to receive payment for service as an employee" during the period of non-compliance. 5 U.S.C. § 1204(e)(2)(A). The MSPB must "certify" its order to the Comptroller General, who is in no way authorized to review it. *Id.* So, unlike the statute at issue in *Bowsher*, the CSRA does not give the Comptroller General any discretion to bind the Executive Branch.

Finally, consider litigating authority, another executive power not addressed in *Humphrey's Executor*. The MSPB's power to appear "in any civil action brought in connection with any function carried out by the Board," 5 U.S.C. § 1204(i), contemplates MSPB control of any district-court litigation brought by or against the agency. And the MSPB sometimes is the proper respondent when its orders are challenged in a court of appeals. *See Spruill*, 978 F.2d at 684; *Costello*, 182 F.3d at 1381. That too cuts against the MSPB's position here. Purely adjudicatory agencies—ones designed to be "an independent adjudicator" with no policymaking authority—are generally not proper parties to defend their decisions on review, just as district judges are generally not proper parties to defend their decisions on appeal. *Oil Chem. & Atomic Workers Int'l*

35

*Union v. OSHRC*, 671 F.2d 643, 651–52 (D.C. Cir. 1982); *see Hinson v. NTSB*, 57 F.3d 1144, 1147 n.1 (D.C. Cir. 1995).

In sum, the MSPB has at least some substantive rulemaking power; it administers a host of wide-ranging federal statutes; it awards various kinds of affirmative, compensatory, and punitive relief; and it litigates in court on its own behalf. Taken together, these powers well exceed the powers deemed to be quasi-legislative or quasi-judicial in *Humphrey's Executor* and the powers vested in the War Claims Commission. For these reasons, Congress may not restrict the President's ability to remove MSPB members.

V

The constitutional problem in these cases arises from two features of each agency: (1) the agency has been vested with significant executive power that cannot be characterized as quasi-legislative or quasi-judicial, and (2) Congress has restricted the President's ability to remove its members. Wilcox and Harris urge us to solve the constitutional problem by stripping away agency powers, rather than by declining to enforce the removal restrictions.

We reject that proposal. When the Supreme Court encounters a statute that unconstitutionally insulates an executive officer from at-will removal, it has typically responded by disregarding the removal restriction. *See Myers*, 272 U.S. at 176; *Free Enter. Fund*, 561 U.S. at 508–10; *Seila Law*, 591 U.S. at 232–38. Our Circuit has done likewise. *Dellinger v. Bessent*, No. 25-5052, 2025 WL 717383, at *1 (D.C. Cir. Mar. 5, 2025) (per curiam). Following that well-worn path, we hold that the appropriate resolution here is to disregard the statutory removal restrictions for NLRB and

36

MSPB members, not to blue-pencil provisions from among the full panoply of the executive powers of each agency.[2]

## VI

We close by flagging three issues not resolved here.

*First*, we do not decide whether Congress may restrict the President's ability to remove officers with solely adjudicatory functions. Our analysis above has distinguished the court-like adjudication of bodies such as the War Claims Commission from the *Chenery II*-like adjudication of agencies vested with both adjudicatory and policymaking responsibilities. And we have shown that the powers vested in the NLRB and MSPB significantly exceed those vested in the FTC in 1935 and those vested in the War Claims Commission. We express no opinion regarding other agencies that may plausibly be described as purely adjudicatory.

*Second*, despite multiple amicus briefs focused on this point, we do not address whether Congress may restrict the President's ability to remove members of the Board of Governors of the Federal Reserve System. Granting a stay in this case, the Supreme Court noted that there is a "distinct historical tradition" regarding the treatment of congressionally chartered banks, which may bear on Congress's ability to restrict the removal of their officials. *Wilcox*, 145 S. Ct. at

---

[2]  The Supreme Court took a different approach in *Bowsher*. After concluding that Congress had unconstitutionally conferred executive power on a legislative officer removable only by Congress, the Court responded by stripping the officer of that power. 478 U.S. at 734–36. But this merely implemented a statutory "fallback" provision setting forth how the law at issue should operate if one of its provisions was held unconstitutional. *See id.* at 735. The NLRA and the CSRA contain no such provision.

37

1415; *see also* An Act to incorporate the subscribers to the Bank of the United States, ch. 10, § 5, 1 Stat. 191, 193 (1791) (directors of the First Bank of the United States were appointed and removed "by the stockholders"). We have no occasion here to address the scope or import of that tradition.

*Third*, because we hold that the President permissibly removed Wilcox and Harris, we do not consider whether wrongfully removed principal officers may obtain declaratory, equitable, or mandatory relief against the President or other government officials.

## VII

For the reasons set forth above, we reverse the judgments of the district courts.

*So ordered.*

PAN, *Circuit Judge*, dissenting:

The public is well served when some parts of our government are insulated from the fray of politics. That is because certain government functions are, or should be, nonpartisan. For example, courts of law and other adjudicators that apply legal standards to facts must be impartial, and their impartiality is protected when the decision-makers do not fear losing their jobs when there is a change in presidential administrations. And some agencies that employ subject-matter expertise to address technical regulatory and policy issues, such as the Federal Reserve, are better able to execute their duties and to inspire public confidence in their decision-making if they are distanced from political considerations.

Such "independent" government entities have existed in our country in some form since 1790.[1] And 138 years ago, Congress created the first nonpartisan expert independent agency, the Interstate Commerce Commission (ICC). The Supreme Court confirmed that such agencies are constitutional ninety years ago.[2] Today, approximately thirty-three independent agencies apply specialized expertise to make merit-based decisions on behalf of the American people, in diverse areas like commerce, public safety, and energy.[3] And numerous courts of law — such as the Tax Court, the Court of Appeals for the Armed Forces, and the Court of Appeals for Veterans Claims — serve as independent adjudicators, even though they are housed within the Executive Branch.

---

[1] *See* Christine Kexel Chabot, *Is the Federal Reserve Constitutional? An Originalist Argument for Independent Agencies*, 96 Notre Dame L. Rev. 1, 39–40 (2020) (describing the Sinking Fund Commission of 1790, which had two members who were not removable by the President).

[2] *See Humphrey's Executor v. United States*, 295 U.S. 602 (1935).

[3] *See infra* notes 14–20.

2

The key feature that defines a government entity's independence from political influence is its freedom from total control by the President. To safeguard that independence, Congress has limited the President's authority to remove the leaders of agencies that it has determined should be apolitical — and it has set such removal protections with the approval of Republican and Democratic Presidents alike.[4] As relevant here, Congress has specifically provided that the President may remove the leaders of certain independent agencies only "for cause," such as the leaders' inefficiency, malfeasance, or neglect of duty. For at least ninety years, it has been settled law that Congress may impose statutory for-cause removal protections in the exercise of its authority to organize and structure the Executive Branch.

But today, my colleagues make us the first court to strike down the independence of a traditional multimember expert agency: They hold that the for-cause removal protections that safeguard the political independence of the National Labor Relations Board (NLRB) and the Merit Systems Protection Board (MSPB) are unconstitutional. Under my colleagues' reasoning, it appears that no independent agencies may lawfully exist in this country: Their determination that the MSPB cannot be independent — even though it is purely adjudicatory and does not touch upon core constitutional functions assigned to the President — suggests that no agencies can be independent. Although my colleagues attempt to couch their analysis in narrow terms, they redefine the type of executive power that must be placed under the exclusive command of the President, and effectively grant him dominion over approximately thirty-three previously independent agencies.

---

[4]    *See infra* note 8.

3

This case must be viewed in the context of a broader reevaluation of how agency independence fits in our constitutional system. The Supreme Court upheld the constitutionality of independent agencies, like the MSPB and the NLRB, in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), and it has repeatedly reaffirmed the essential holding of *Humphrey's*. *See, e.g.*, *Wiener v. United States*, 357 U.S. 349, 356 (1958); *Seila Law LLC v. CFPB*, 591 U.S. 197, 218 (2020). But the Court has expressed doubts about the scope of *Humphrey's* and is poised to reconsider its ruling in that case. *See Trump v. Slaughter*, No. 25-332, slip op. at 1 (U.S. Sept. 22, 2025) (granting certiorari before judgment and setting oral argument for December 2025). The pendency of *Slaughter* places us in an unusual position: Although the constitutional arguments before us mirror those raised in *Slaughter*, the Supreme Court has rebuffed requests to hear the instant cases in conjunction with *Slaughter* and has instead left these cases for us to decide. *See Trump v. Wilcox*, 145 S. Ct. 1415, 1416–17 (2025) (declining to address the government's request for certiorari before judgment); Order Den. Cert. Before J., *Harris v. Bessent*, No. 25-312 (U.S. Sept. 22, 2025); Order Den. Cert. Before J., *Wilcox v. Trump*, No. 25-319 (U.S. Sept. 22, 2025). We, in turn, expedited the instant appeals, and we must consider them in the face of conflicting signals from the Court. *See Wilcox*, 145 S. Ct. at 1416–17 (staying lower-court injunctions favoring Wilcox and Harris based on a finding that the government is likely to succeed on the merits, but leaving intact the "narrow exceptions [to at-will removal] recognized by our precedents"). Regardless of the odd procedural posture in which we find ourselves, the bottom line is that we are duty-bound to apply *Humphrey's* until the Supreme Court overrules it, and *Humphrey's* requires us to uphold the independence of the MSPB and the NLRB.

4

The government takes the position that agency independence is unconstitutional because the President must maintain ironclad control over any government entity that is within the Executive Branch.  It openly asks the Supreme Court to overrule *Humphrey's*, and it asks this court to essentially do the same.[5]  The government's extreme view of executive power sharply departs from precedent and from prior applications of the "unitary executive theory."  Although the Supreme Court has adhered to a robust conception of executive power and the unitary executive, it has never held that the Constitution flatly prohibits the existence of independent agencies.  If courts implicitly or explicitly adopt such an extreme interpretation of the Constitution after at least 138 years of contrary practice, with the consequence of awarding even more power to a President who has pushed the limits of Article II, I fear that it will erode public confidence in the judiciary.  Because independent agencies have served our nation well for over a century — with the blessing of all three branches of government, under both Republican and Democratic leaders — the government's new argument that agency independence inflicts "a grave harm to the separation of powers" lacks credibility.  Gov't Br. 2.  That is especially so where the government's theory purports to promote democratic accountability while asking unelected judges to rewrite the constitutional order.

Neither this case nor *Slaughter* is about whether the President should be the master of all executive power wielded by the federal government.  The Supreme Court has already

---

[5]     *See* Brief for the Petitioners at 5, *Slaughter*, No. 25-332 (Oct. 10, 2025) ("If *Humphrey's Executor* is not already a dead letter, this Court should overrule it . . . ."); Gov't Br. 21 ("Because *Humphrey's Executor* rests on repudiated reasoning, the decision can be understood as precedential only as to the specific question it resolved.").

5

recognized that the Constitution vests all executive power in the President; and as a result, he *generally* is entitled to remove principal officers of the Executive Branch, such as agency leaders, in his discretion. *See Seila Law*, 591 U.S. at 215; *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 483 (2010). The current question before the courts is narrower: It is whether the Constitution *mandates* that there can be *no exceptions* to that general rule of at-will removal. Here, my colleagues implicitly agree with the government that no such exceptions exist — they adopt a vanishingly narrow view of the types of agencies that may remain independent. Meanwhile, the government asks both this court and the Supreme Court to accept its maximalist view of executive power and to abandon *Humphrey's*.

Our starting point is the Supreme Court's recognition of an exception to the President's at-will removal authority for "multimember expert agencies that do not wield substantial executive power." *Seila Law*, 591 U.S. at 218. To overrule that precedent so that the President may seize total control over all independent agencies, the government must argue that the current exception is impermissible because the Constitution compels the President's complete domination of the Executive Branch. But the government's position is logically flawed: While arguing for total presidential control in sweeping terms, the government nonetheless concedes that it may be appropriate to carve out exceptions for the Federal Reserve and Article I courts (which are situated within the Executive Branch).[6] In other words, the government argues for no

---

[6]    Reply Br. 13–15 (noting that Federal Reserve officials might not be subject to at-will removal because of the agency's history); Oral Arg. 32:29–44 ("The common thread between the Article I courts, the Fed, the Article IV courts is that, as either historical or doctrinal matter, there is a significant . . . question as to whether that

6

exceptions while conceding that exceptions are allowed. If the Constitution permits Congress to impose for-cause removal restrictions to protect the independence of Federal Reserve officials and Article I judges, there is no logical way to hold that the Constitution nevertheless forbids Congress from protecting the leaders of other government entities that have similar needs for independence (*i.e.*, because they also are impartial adjudicators or have a historical tradition of political independence).

Adoption of the government's maximalist theory of executive power (implicitly or explicitly) threatens to fundamentally change the character of our government. In essence, the government asks the courts to hold that our Constitution requires all actions and decisions made by the Executive Branch to be political. Thus, instead of relying on subject-matter expertise to make merits-based decisions for the public good, previously independent agencies must advance the political agenda of the President. Taken to its logical end, the government's theory will eliminate removal protections for all employees of the Executive Branch and place every hiring decision and agency action under the political direction of the President. But such a radical upending of the constitutional order is not supported by the text or structure of the Constitution and is inconsistent with the intent of the Framers. And while the government claims to uphold the separation of powers, its theory instead concentrates excessive power in the President and thus paves the way to autocracy.

---

governmental entity is wielding traditional executive power."); Brief for the Petitioners at 23, *Slaughter*, No. 25-332 (Oct. 10, 2025) ("No one disputes that the President's illimitable power of removal extends only to executive officers and excludes truly non-executive appointees, such as D.C. Court of Appeals judges." (cleaned up)).

7

The government urges an unprecedented interpretation of the Constitution that would lead to the full politicization of our government and a massive transfer of power to the President. My colleagues take an alternative approach in name only. Rather than expressly declaring *Humphrey's* a dead letter, they redefine *Humphrey's* "substantial executive power" exception such that it does not allow for any independent agencies. In so doing, they enable the government to achieve its goals while maintaining the appearance of judicial restraint. Under either approach, independent agencies as we know them cannot exist in this country. Because that outcome is not required by our Constitution and does harm to our nation, I respectfully dissent.

## I.

### A. Legal Background

In 1935, the Supreme Court confirmed that Congress has the power to create independent agencies in a landmark opinion: *Humphrey's Executor v. United States*. President Franklin D. Roosevelt claimed that he was entitled to remove commissioners of the Federal Trade Commission (FTC) at will, and his Administration asserted that the statute that allowed only "for cause" removal of FTC commissioners was "an unconstitutional interference with the executive power of the President." Brief for the United States at 7, 20, *Humphrey's*, 295 U.S. 602 (No. 667), 1935 WL 32965, at *7, *20. The Supreme Court unanimously rejected that argument. The Court upheld the FTC just as Congress had created it — as "a body of experts who shall gain experience by length of service" and "which shall be independent of executive authority, except in its selection, and free to exercise its judgment without the leave or hindrance of any other official or any department of the government." *Humphrey's*, 295 U.S. at 625–26. The Court emphasized that the FTC was "neither political nor executive,"

8

was "charged with the enforcement of no policy except the policy of the law," and was to be "nonpartisan" and "impartial[]." *Id.* at 624. Notably, the FTC had five members with staggered terms, and no more than three of them could be from the same political party. *Id.* at 620. The Court held that Congress had authority that "cannot well be doubted" to create "quasi legislative" or "quasi judicial" agencies, and to require them "to act in discharge of their duties independently of executive control." *Id.* at 629. Moreover, freedom from "the suspicion of partisan direction" depended on for-cause removal protection, because "one who holds his office only during the pleasure of another cannot be depended upon to maintain an attitude of independence against the latter's will." *Id.* at 625, 629.[7]

After the Supreme Court's holding in *Humphrey's*, Congress created many more independent agencies in the mold of the FTC — *i.e.*, multimember expert bodies, performing nonpartisan functions with impartiality. And each new agency's organic statute was signed into law by the then-serving President.[8] Furthermore, two decades after

---

[7] The Court distinguished its previous decision in *Myers v. United States*, 272 U.S. 52 (1926). There, the Court invalidated a statutory provision that required the Senate's advice and consent for the removal of postmasters, while making numerous comments about the scope of executive power. *Id.* at 163–64. *Humphrey's* limited *Myers* to its holding, which reached only "purely executive officers." *Humphrey's*, 295 U.S. at 627–28, 631–32.

[8] Presidents who have signed legislation creating independent agencies include: Grover Cleveland (Interstate Commerce Commission, *see* Interstate Commerce Act of 1887, Pub. L. No. 49-104, § 11, 24 Stat. 379, 383); Calvin Coolidge (National Mediation Board, *see* Railway Labor Act, Pub. L. No. 69-257, § 4, 44 Stat. 577, 579 (1926)), Franklin D. Roosevelt (National Labor Relations Board,

9

*Humphrey's*, the Supreme Court reaffirmed the legality of independent Executive Branch agencies in *Wiener v. United States*, 357 U.S. 349 (1958), extending for-cause removal protection to members of the purely adjudicatory nonpartisan War Claims Commission, even though no express statutory provision required it.    Thus, in the ninety years since *Humphrey's*, all three branches of our government have accepted the important role of apolitical independent agencies within our constitutional system.

Fast forward from 1935 to the year 2020.    In *Seila Law LLC v. Consumer Financial Protection Bureau*, the Supreme

---

*see* National Labor Relations Act of 1935, Pub. L. No. 74-198, § 3(a), 49 Stat. 449, 451); Harry Truman (War Claims Commission, *see* War Claims Act of 1948, Pub. L. No. 80-896, 62 Stat. 1240; *Wiener*, 357 U.S. at 354–56); Richard Nixon (Consumer Product Safety Commission, *see* Consumer Product Safety Act, Pub. L. No. 92-573, § 4(a), 86 Stat. 1207, 1210 (1972)), Gerald Ford (Nuclear Regulatory Commission, *see* Energy Reorganization Act of 1974, Pub. L. No. 93-438, § 201(e), 88 Stat. 1233, 1243), Jimmy Carter (Merit Systems Protection Board, *see* Civil Service Reform Act of 1978, Pub. L. No. 95-454, § 1202(d), 92 Stat. 1111, 1122), Ronald Reagan (National Indian Gaming Commission, *see* Indian Gaming Regulatory Act, Pub. L. No. 100-497, § 5(b)(6), 102 Stat. 2467, 2470 (1988)), George H.W. Bush (Chemical Safety and Hazard Investigation Board, *see* Clean Air Act Amendments of 1990, Pub. L. No. 101-549, § 112(r)(6)(B), 104 Stat. 2399, 2565), Bill Clinton (Surface Transportation Board, *see* ICC Termination Act of 1995, Pub. L. No. 104-88, § 701(b)(3), 109 Stat. 803, 932–33), George W. Bush (Department of Defense: Board of Actuaries, *see* National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 906(a)(1), 122 Stat. 3, 275–76), and Barack Obama (Consumer Financial Protection Bureau, *see* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 1011(c)(3), 124 Stat. 1376, 1964 (2010), independence invalidated by *Seila Law*, 591 U.S. at 230–38).

10

Court confronted a newly created independent agency with a novel leadership structure: the CFPB. 591 U.S. at 207, 220. "Congress tasked the CFPB with implementing and enforcing a large body of financial consumer protection laws . . . ." *Id.* at 206 (cleaned up). The CFPB could issue "binding regulations" and exercise "extensive adjudicatory authority." *Id.* at 206–07. It also possessed "potent enforcement powers," including "the authority to conduct investigations, issue subpoenas and civil investigative demands, initiate administrative adjudications, and prosecute civil actions in federal court." *Id.* at 206 (citing 12 U.S.C. §§ 5562, 5564(a), (f)). The Supreme Court observed that the CFPB was "almost wholly unprecedented" and differed from the "traditional" multileader expert agency examined in *Humphrey's* in important respects. *Id.* at 207, 220. In particular, the CFPB had a single Director who enjoyed a five-year term, which meant that the for-cause removal protection might prevent a President with only a four-year term from ever appointing the agency's leader. *Id.* at 225. Furthermore, the CFPB had a unique funding arrangement — it was funded by the Federal Reserve and therefore not subject to the appropriations process controlled by Congress and the President. *Id.* at 207–08. Citing those unusual structural features, the Supreme Court determined that the CFPB concentrated too much power in one person — the CFPB Director — who was accountable to no one. *Id.* at 204–05, 224–25. The Court thus struck down the for-cause removal protection for the Director, holding that it was unconstitutional and violated the separation of powers. It addressed this constitutional infirmity by making the CFPB Director removable at the President's will. *Id.* at 230–38.

In disapproving the unprecedented structure of the CFPB, the Court noted that although Presidents by default have "at will" removal authority over principal officers within the Executive Branch, *Humphrey's* established an exception to that

11

rule for "multimember expert agencies that do not wield substantial executive power." *Seila Law*, 591 U.S. at 218. The Court did not specify what would constitute "substantial executive power" under its test. *Id.* But the Court made clear that it would "not revisit" *Humphrey's* and would leave it "in place," even though it declined to "extend" the *Humphrey's* exception to a novel, single-director government agency. *Id.* at 215, 220, 228. Thus, the Court expressly left intact its prior approval of "traditional" multileader independent agencies. *Id.* at 207. Indeed, seven members of the Court endorsed the notion that Congress could address the "problem" posed by the CFPB's lack of accountability by "converting the CFPB into a multimember agency." *Id.* at 237 (Roberts, C.J., joined by Alito & Kavanaugh, JJ., concurring in the judgment); *id.* at 298 (Kagan, J., joined by Ginsburg, Breyer & Sotomayor, JJ., concurring in the judgment in part and dissenting in part). That holding was consistent with other cases, before and since, that also addressed the President's authority to remove agency leaders and left *Humphrey's* untouched. *See Free Enter. Fund*, 561 U.S. at 483–84 (striking down two layers of for-cause removal protection for an official but declining to "reexamine" *Humphrey's*); *Collins v. Yellen*, 594 U.S. 220, 250–51 (2021) (striking down the independence of an agency headed by a single person, regardless of whether the executive power it wielded was significant, but recognizing that *Seila Law* did "not revisit our prior decisions" (cleaned up)).

## B. Procedural Background

The President dismissed MSPB Chair Cathy Harris and NLRB Member Gwynne Wilcox in violation of the for-cause removal statutes that safeguard the independence of their respective agencies. The government claims that those for-cause removal statutes are unconstitutional and that the President therefore need not abide by them. Specifically, the

12

government asserts that *Humphrey's* allowed for-cause removal protections only for agencies that exercise "no part of the executive power," and "*any* exercise of executive power subjects an agency head to the President's control." Gov't Br. 22, 26–27 (emphasis added). According to the government, the MSPB and the NLRB wield "substantial executive power" even if their functions are largely adjudicatory, and an agency's exercise of *any* executive power requires it to be placed under the control of the President. In sum, the government's position is that the President is entitled to remove as he pleases any and all principal officers of any executive agency — including the MSPB and the NLRB. Otherwise, the theory goes, the separation of powers will be violated.

Two judges of the district court rejected the government's arguments. *See Harris v. Bessent* (*Harris I*), 775 F. Supp. 3d 164 (D.D.C. 2025) (Contreras, J.); *Wilcox v. Trump* (*Wilcox I*), 775 F. Supp. 3d 215 (D.D.C. 2025) (Howell, J.). They held that *Humphrey's* and *Wiener* are controlling Supreme Court precedents that required them to uphold the for-cause removal protections for members of the MSPB and the NLRB, which are traditional multimember expert agencies. Judge Contreras and Judge Howell issued permanent injunctions that effectively restored Harris and Wilcox to their positions and required the government to comply with the applicable for-cause removal statutes. *See Harris I*, 775 F. Supp. 3d at 189; *Wilcox I*, 775 F. Supp. 3d at 240–41. The government appealed.

During the pendency of the instant appeals, the government moved to stay the district court's injunctions, and this court ultimately denied the government's request. *See Harris v. Bessent* (*Harris III*), Nos. 25-5037, 25-5057, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025) (en banc) (per curiam), *vacating Harris v. Bessent* (*Harris II*), 2025 WL 980278 (D.C. Cir. Mar. 28, 2025) (per curiam). The government then asked

13

the Supreme Court to stay the district court's injunctions pending appeal and to grant a writ of certiorari before judgment. We heard oral argument in these cases — on an expedited schedule — on May 16. On May 22, the Supreme Court issued an order staying the district court's judgments pending final disposition of the cases. *See Wilcox*, 145 S. Ct. 1415. In so doing, the Court held that the government would likely succeed on the merits because "the NLRB and MSPB [likely] exercise considerable executive power." *Id.* at 1416. However, it expressly left intact the "narrow exceptions [to at-will removal] recognized by [its] precedents." *Id.* (citing *Seila Law*, 591 U.S. at 215–18). The Court did not address the government's request for a writ of certiorari before judgment. *See id.* at 1416–17.

Parallel to Harris's and Wilcox's cases, the government has been litigating the President's removal of FTC Commissioner Rebecca Slaughter. After the President removed Slaughter without cause, the district court relied on *Humphrey's* to order Slaughter's reinstatement. This court denied the government's motion for a stay of the district court's order pending appeal. *See Slaughter v. Trump*, No. 25-5261, 2025 WL 2551247 (D.C. Cir. Sept. 2, 2025). The government then asked the Supreme Court for a stay of the district court's judgment in *Slaughter* and petitioned for a writ of certiorari before judgment.

Before the Supreme Court ruled on the *Slaughter* applications, Harris and Wilcox filed separate petitions for writs of certiorari before judgment. Petition for a Writ of Certiorari Before Judgment, *Harris v. Bessent*, No. 25-312 (U.S. Sept. 15, 2025); Petition for a Writ of Certiorari Before Judgment, *Wilcox v. Trump*, No. 25-319 (U.S. Sept. 15, 2025). They argued that their cases and *Slaughter* present similar legal issues and that the Court, should it grant certiorari before

14

judgment in *Slaughter*, should also grant certiorari before judgment in *Harris* and *Wilcox* and consolidate the three cases. The Court granted a stay of the district court's injunction in *Slaughter* and granted a writ of certiorari before judgment in that case. But the Court denied both Harris's and Wilcox's petitions for certiorari before judgment, thus leaving the instant cases for this court to decide. The Court now is poised to hear oral arguments in *Slaughter*.

Meanwhile, we are called upon to decide (1) whether the government's constitutional challenge to the for-cause removal protections afforded to leaders of the MSPB and the NLRB is foreclosed by *Humphrey's* and *Wiener*; and (2) if it is not, whether the Supreme Court's precedents and the Constitution require us to adopt the expansive view of executive authority urged by the government. The government also argues that the district court lacked authority to effectively reinstate Harris and Wilcox to their posts at their respective agencies.

## II.

### A.  Applying Existing Precedents

Just five years after *Seila Law* was decided, the government comes before us to argue that the MSPB and the NLRB — two traditional multileader expert agencies — are unconstitutional in their current forms. Although *Seila Law* held that the President generally has at-will removal authority over all principal officers in the Executive Branch, it recognized a long-standing exception for "multimember expert agencies that do not wield substantial executive power" — and it expressly left *Humphrey's* on the books. *See Seila Law*, 591 U.S. at 204–05, 215–18. The most sensible interpretation of *Seila Law*'s holding is that an agency with features and functions like those approved by the Court in *Humphrey's*

15

passes muster and, by implication, does not exercise "substantial executive power." The MSPB and the NLRB meet that test.

The government contends, however, that the MSPB and the NLRB may not be placed beyond the President's total control because each wields "executive power." The government takes the position that all Executive Branch entities wield executive power and that "*any* exercise of executive power subjects an agency head to the President's control." Gov't Br. 26 (emphasis added). According to the government, because the MSPB and the NLRB are within the Executive Branch, their predominantly adjudicatory functions are exercises of executive power, and they therefore must be controlled by the President. That theory departs from the Supreme Court's holding in *Seila Law*, which preserved the independence of multileader expert agencies that do not wield "*substantial* executive power," not "*any* executive power." In short, *Humphrey's* allows the existence of independent multimember expert agencies that exercise no greater powers than did the 1935 FTC; but the government suggests that zero independent agencies are constitutional. And because the government's theory leaves no room in any corner of the Executive Branch for any exceptions to the President's at-will removal authority, it eviscerates *Humphrey's*. The government thus does not ask us to abide by *Humphrey's*, but instead effectively asks us to overrule it, which we are not at liberty to do.

As I see it, the MSPB and the NLRB fall squarely within the exception to the President's at-will removal authority that the Supreme Court acknowledged in *Humphrey's* and left "in place" in *Seila Law*. *Humphrey's* and *Wiener* control this case because the MSPB and the NLRB are multimember expert agencies that (1) exercise no more executive power than did the

16

1935 FTC that was approved in *Humphrey's*, and (2) are predominantly adjudicatory, like the independent War Claims Commission that was approved in *Wiener*. They are therefore "multimember expert agencies that do not wield substantial executive power." *Seila Law*, 591 U.S. at 218. Accordingly, for-cause removal protections for leaders of the MSPB and the NLRB are constitutional.

As previously discussed, *Humphrey's* upheld the constitutionality of for-cause removal protections for commissioners of the 1935 FTC. The "set of powers" exercised by the FTC that were "the basis for [the *Humphrey's*] decision," *Seila Law*, 591 U.S. at 219 n.4, included the authority to issue and then adjudicate complaints charging unfair competition; to exercise "wide powers of investigation" and "report to Congress with recommendations"; and to recommend remedies in antitrust suits brought by the Attorney General in federal court, *Humphrey's*, 295 U.S. at 620–21 (citing Federal Trade Commission Act, Pub. L. No. 62-203, §§ 5–7, 38 Stat. 717, 719–22 (1914)).

The *Humphrey's* Court described key features of the FTC that demonstrated its nonpartisanship and its need for independence. Notably, the FTC was led by multiple commissioners serving staggered, seven-year terms and balanced along partisan lines. *See Humphrey's*, 295 U.S. at 620, 624. Moreover, it was intended to be an "independent" "body of experts" that was "charged with the enforcement of no policy except the policy of the law." *Id.* at 624–25. The Court also observed that the FTC's functions were "neither political nor executive, but predominantly quasi judicial and quasi legislative," and any executive functions thus were merely ancillary. *Id.* at 624, 628 & n.1. The Supreme Court also addressed adjudicatory functions in *Wiener*, where the Court held that the President had no power to "remove a

17

member of an adjudicatory body like the War Claims Commission merely because he wanted his own appointees on such a Commission." 57 U.S. at 356. At bottom, the constitutionality of removal restrictions "will depend upon the character of the office." *Humphrey's*, 295 U.S. at 624, 631. As relevant here, both the MSPB and the NLRB are predominantly adjudicative and share many of the key characteristics of the 1935 FTC and the War Claims Commission that justified their independence.

The MSPB functions more like a court than a regulator. It is "predominantly an adjudicatory body," as the government concedes. Oral Arg. 12:19–23, *Harris II*, 2025 WL 980278 (No. 25-5037); *see also* 5 U.S.C. § 1204(a)(1). President Jimmy Carter proposed the MSPB as "the adjudicatory arm of the new personnel system," with a bipartisan multimember structure that would "guarantee independent and impartial protection to employees." Federal Civil Service Reform Message to the Congress, 1 Pub. Papers 445 (Mar. 2, 1978). Thus, the MSPB's mission is "to adjudicate federal employment disputes." *Harrow v. Dep't of Def.*, 601 U.S. 480, 482 (2024). Specifically, it hears appeals of adverse employment actions brought by federal workers. *See* 5 U.S.C. §§ 7701(a), 7512, 7513(d). It also resolves in the first instance a handful of other matters, such as cases brought by the Office of Special Counsel for "corrective action" concerning "prohibited personnel practice[s]" by agencies. *Id.* § 1214(b)(2)(C); *see also id.* §§ 1214(b)(4)(B)(i), 1215(a)(1), 3592(a)(2), 7521(b).

The structure of the MSPB is "patterned on the classic independent regulatory agency sanctioned" in *Humphrey's*. *FEC v. NRA Pol. Victory Fund*, 6 F.3d 821, 826 (D.C. Cir. 1993). As in *Humphrey's*, the President may remove a member of the MSPB "only for inefficiency, neglect of duty, or

18

malfeasance in office."  5 U.S.C. § 1202(d); *Humphrey's*, 295 U.S. at 622.  And like the 1935 FTC, the three members of the MSPB must be drawn from different political parties, and they serve staggered terms of seven years.  5 U.S.C. §§ 1201, 1202(a)–(c); *Humphrey's*, 295 U.S. at 620.

The MSPB is passive and must wait for appeals and cases to be initiated by federal employees, employer agencies, or the Office of Special Counsel.  *Harris II*, 2025 WL 980278, at *30 (Millett, J., dissenting) (citing 5 U.S.C. §§ 1204(a)(1), 1214(b)(1)(a); 5 C.F.R. § 1201.3).  Notably, it is the Office of Special Counsel that investigates and prosecutes certain kinds of misconduct by federal agencies and then petitions the MSPB for corrective action.  *See* 5 U.S.C. § 1212.  As a *de facto* matter, the Special Counsel now answers to the President.[9] Moreover, the MSPB does not regulate through rulemaking because its rulemaking authority is limited to "such regulations as may be necessary for the performance of its functions."  5 U.S.C. § 1204(h).[10]

---

[9]     The Special Counsel is appointed by the President with the advice and consent of the Senate.  Although a statute confers for-cause removal protection on the Special Counsel, *see* 5 U.S.C. § 1211, the President deemed that statute unconstitutional and fired the former Special Counsel, Hampton Dellinger.  Although the district court ordered the government to reinstate Dellinger, a special panel of this court stayed the district court's order pending appeal, *Dellinger v. Bessent*, No. 25-5052, 2025 WL 887518 (D.C. Cir. Mar. 10, 2025) (per curiam), and Dellinger subsequently dropped his suit.  As a result, the President has *de facto* authority to appoint a Special Counsel of his own choosing.  *See* Defendants' Notice of the President's Designation of Acting Special Counsel, *Dellinger v. Bessent*, No. 25-cv-385 (D.D.C. Feb. 12, 2025), ECF No. 13.

[10]    The responsibility of enforcing civil-service regulations and laws and "aiding the President" in preparing civil-service rules and policies is assigned to the Office of Personnel Management, a separate agency.  5 U.S.C. § 1103(a)(7).

19

As the district court explained, the MSPB "spends nearly all of its time adjudicating inward-facing personnel matters involving federal employees." *Harris I*, 775 F. Supp. 3d at 176 (cleaned up). The MSPB's adjudicatory process is "designed to reach consensus based on established MSPB and federal case law," as decisions are drafted by career attorneys without MSPB members directing the results in advance. *See* Brief for Former Board Members and General Counsel of the MSPB as Amici Curiae Supporting Appellee 8. Like the War Claims Commission in *Wiener*, the MSPB hears claims that are "'adjudicated according to law,' that is, on the merits of each claim, supported by evidence and governing legal considerations"; and it serves as "a body that [is] 'entirely free from the control or coercive influence [of the President], direct or indirect.'" 357 U.S. at 355 (quoting *Humphrey's*, 295 U.S. at 629). In short, the MSPB is so clearly adjudicatory and free of quintessential executive responsibilities that if it exercises "substantial executive power," then every agency does.[11]

---

[11]    My colleagues' discussion of the MSPB's supposedly substantial "executive" powers is unconvincing. They suggest that the MSPB exercises substantial executive power because (1) it issues "final decisions," (2) it has "jack-of-all-trades" jurisdiction that is less "specialized" than the 1935 FTC, and (3) it has the power to award "legal and equitable relief in administrative adjudications." Maj. Op. 31–33 (citations omitted). But in *Wiener*, the Supreme Court upheld for-cause removal protections for the leaders of the War Claims Commission, which enjoyed "finality of determination" over a "large number of claimants [with a] diversity in the specific circumstances giving rise to the[ir] claims," and which could order "compensat[ion for] internees, prisoners of war, and religious organizations." 357 U.S. at 350, 354–55. Moreover, my colleagues do not explain why the features they highlight represent the exercise of "executive" power. In fact, many courts issue final decisions,

20

Congress created the NLRB to enforce the National Labor Relations Act of 1935 (NLRA), which encourages collective bargaining and protects the rights of workers. Pub. L. No. 74-198, 49 Stat. 449 (codified as amended at 29 U.S.C. §§ 151–169). In designing the NLRB, Congress relied on *Humphrey's*: It enacted the NLRA "just over a month after *Humphrey's Executor* was decided and modeled the statute on the FTC's organic statute." *Harris II*, 2025 WL 980278, at *31 (Millett, J., dissenting) (citing the two agencies' organic statutes).

The Board of the NLRB closely resembles the *Humphrey's* model. It consists of five members, appointed by the President with the advice and consent of the Senate, who serve staggered five-year terms. 29 U.S.C. § 153(a). A member "may be removed by the President, upon notice and hearing, for neglect of duty or malfeasance in office, but for no other cause." *Id.* Although no statutory provision requires a partisan balance in the NLRB Board's membership, "Presidents since Eisenhower have adhered to a 'tradition' of appointing no more than three members from their own party." *Harris II*, 2025 WL 980278, at *31 (Millett, J., dissenting) (quoting Brian D. Feinstein & Daniel J. Hemel, *Partisan Balance with Bite*, 118 Colum. L. Rev. 9, 54–55 (2018)).

The Board of the NLRB is "predominantly an adjudicatory body." *Harris II*, 2025 WL 980278, at *31 (Millett, J., dissenting). It decides disputes about unfair labor practices and resolves union-representation questions. 29 U.S.C. § 159(b), (c)(1)(A). The Board's remedial authority includes issuing cease-and-desist orders and orders to employers or unions to

---

under many different statutes, and award legal and equitable relief, which suggests that those functions should be considered quasi-judicial under *Humphrey's*.

21

take "affirmative action," such as "reinstatement of employees with or without back pay." *Id.* § 160(c). But to enforce its orders, the Board must petition a federal court of appeals. *Id.* § 160(e); *see also Dish Network Corp. v. NLRB*, 953 F.3d 370, 375 n.2 (5th Cir. 2020) ("The NLRB may be the only agency that needs a court's imprimatur to render its orders enforceable."). Judicial review of a Board order is also available for "[a]ny person aggrieved by a final order of the Board." 29 U.S.C. § 160(f).

Importantly, the investigation and prosecution of unfair labor practices are performed by the General Counsel of the NLRB, who brings cases before the Board for adjudication. The General Counsel is appointed by the President, with the advice and consent of the Senate, and is removable by the President at will. 29 U.S.C. § 153(d). As a result, all investigative and prosecutorial functions — hallmarks of executive power — are wielded by an official accountable to the President. *Cf. Morrison v. Olson*, 487 U.S. 654, 706 (1988) (Scalia, J., dissenting) ("Governmental investigation and prosecution of crimes is a quintessentially executive function."). Thus, "the character" of the Board is "predominantly" adjudicative. *Humphrey's*, 295 U.S. at 624, 631.[12]

---

[12]  The Board has only "circumscribed" rulemaking authority. *Harris II*, 2025 WL 980278, at *31 (Millett, J., dissenting). True, it has "authority . . . to make, amend, and rescind, in the manner prescribed by [the Administrative Procedure Act], such rules and regulations as may be necessary to carry out the provisions of [the NLRA]." 29 U.S.C. § 156. But in practice, the Board does not "promulgate binding rules," in contrast to the CFPB. *Seila Law*, 591 U.S. at 218. "From its inception in 1935, the Board has exhibited a negative attitude toward setting down principles in rulemaking, rather than adjudication." *Nat'l Ass'n of Mfrs. v. NLRB*, 717 F.3d

22

There is no denying "the intrinsic judicial character of the task[s]" that are performed by the MSPB and the NLRB: They apply law to facts and resolve cases. *Wiener*, 357 U.S. at 355. They do not perform any quintessentially executive functions, such as investigating and prosecuting cases to execute the law. Nor do they touch upon subject areas that are expressly in the President's bailiwick, such as foreign affairs or national defense. Moreover, the quasi-judicial duties of the MSPB and the NLRB do not interfere with the President's exercise of executive power or impede the President's ability to faithfully execute the laws. *See Morrison*, 487 U.S. at 689–90 ("The analysis contained in our removal cases is designed . . . to ensure that Congress does not interfere with the President's exercise of the 'executive power' and his constitutionally appointed duty to 'take care that the laws be faithfully executed' under Article II.").

Because both the MSPB and the NLRB are predominantly adjudicatory, they wield less executive power than did the 1935 FTC, which had "wide powers of investigation" and authority to issue complaints that it then adjudicated. *Humphrey's*, 295 U.S. at 620–21; *see also U.S. ex rel. Milwaukee Soc. Democratic Publ'g Co. v. Burleson*, 255 U.S. 407, 427–28 (1921) (explaining that when an executive official is "making

947, 949 (D.C. Cir. 2013) (cleaned up), *overruled on other grounds by Am. Meat Inst. v. Dep't of Agric.*, 760 F.3d 18 (D.C. Cir. 2014) (en banc). Although the government asserts that "the NLRB . . . promulgates substantive rules of general applicability governing employer-employee relations," Gov't Br. 29, the entire corpus of substantive NLRB rules is limited to: (1) a rule concerning collective bargaining units in healthcare facilities, 29 C.F.R. § 103.30; (2) a rule addressing joint-employer status, *id.* § 103.40; and (3) jurisdictional standards for colleges and universities, symphony orchestras, and dog- or horse-racing industries, *id.* §§ 103.1, 103.2, 103.3.

23

[a] determination [in which] he must, like a court or a jury, form a judgment whether certain conditions prescribed by Congress exist, on controverted facts or by applying the law[,] . . . [t]he function is a strictly judicial one, although exercised in administering an executive office").  Thus, although the MSPB and the NLRB may exercise *some* "executive power" because they are housed within the Executive Branch, they do not wield "substantial executive power."  *Cf. City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013) (noting that when agencies "conduct adjudications," their activities take "judicial forms," yet "they are exercises of — indeed, under our constitutional structure they *must be* exercises of — the executive power" (cleaned up) (emphasis in original)).

In sum, the MSPB and the NLRB fall safely within *Humphrey's* exception to the President's at-will removal authority.  Both agencies have nonpartisan multimember leadership structures that allow every President to select at least some of their members.  *See Humphrey's*, 295 U.S. at 625–26 (noting that the 1935 FTC was "independent of executive authority, except in its selection" of commissioners).  They also conduct apolitical adjudicatory work that requires independence and expertise; and they receive their funding through the normal appropriations process.  At bottom, they are traditional multimember expert agencies that wield less executive power than did the 1935 FTC, and they therefore do not wield "substantial executive power."

If the meaning of "substantial executive power" has changed since *Seila Law* was decided, or if it is different from what was approved in *Humphrey's*, or if there is no longer a test of "substantial" power at all, the Supreme Court must tell us so.  *See Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989).  We should follow the lead of other courts of appeals and our own en banc court, which have

24

determined that *Humphrey's* remains good law, despite the parts of *Seila Law* that have been perceived to undermine its reasoning. *See Harris III*, 2025 WL 1021435, at *1; *Meta Platforms, Inc. v. FTC*, No. 24-5054, 2024 WL 1549732, at *2 (D.C. Cir. Mar. 29, 2024) (per curiam); *Severino v. Biden*, 71 F.4th 1038, 1047 (D.C. Cir. 2023); *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 762–63 (10th Cir. 2024); *Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 91 F.4th 342, 346 (5th Cir. 2024). *Humphrey's* and *Wiener* require us to affirm the judgments entered by the district court. In the alternative, we should hold these cases in abeyance and await further instructions from the Supreme Court in *Slaughter*.

### B. Departing from Existing Precedents

My colleagues break new ground in determining the type and extent of executive power that must be controlled by the President through the tool of at-will removal. Although *Seila Law* recognized an exception to the President's at-will removal authority for "multimember expert agencies that do not wield substantial executive power," 591 U.S. at 218, my colleagues essentially eliminate that exception by redefining what counts as "substantial executive power." They apply that term so broadly that it encompasses the work of even adjudicatory agencies that have little or nothing to do with traditional executive functions. While my colleagues' analysis is steeped in details about the powers of the agencies at issue, and how those powers compare with the responsibilities of the 1935 FTC, the bottom line is this: If the Constitution cannot tolerate the independence of the purely adjudicatory MSPB, which functions as a court in the specialized realm of employment law, there is no agency that can escape total presidential control. My colleagues hold, in substance, that the existence of independent agencies is incompatible with our Constitution.

25

The government reaches the same end point — the elimination of independent agencies — by taking a different route. The government urges the more direct approach of replacing the Supreme Court's test of "substantial executive power" with a new standard that gives the President total control over agencies that wield "any executive power." The government claims that all Executive Branch entities wield executive power, and *any* executive power must be supervised by the President through at-will removal, because the Constitution vests all executive power in him. Thus, because independent agencies are within the Executive Branch, the President must have total control over them, and there are no constitutionally permissible independent agencies.

The government's position is based on a new, maximalist version of the "unitary executive theory." Although that theory stands for the proposition that all executive power must be placed in the hands of the President, no court has ever applied it to abolish all independent agencies. The government claims that there can be no exceptions to the President's general at-will removal authority because at-will removal assures that agencies are accountable to the people: According to the government, voters elected the President and would want him to direct all the affairs of the Executive Branch. Other methods of presidential control — such as the appointment of agency leaders, for-cause removal, and the appropriations process — are considered insufficient.

Under the government's maximalist theory, our duly elected representatives in Congress who determined that independent agencies serve the public interest were powerless to do what they thought was best for the nation. Instead, the government has suddenly realized, the Constitution requires us to eradicate the independence of all Executive Branch agencies. The government takes that position even though the

26

Founders approved a commission with members who were not subject to the President's at-will removal (the Sinking Fund Commission) in 1790; multimember expert agencies have existed since the ICC was established in 1877; and independent agencies with certain features — including multimember structures, bipartisanship, and the task of applying expertise to address nonpolitical issues — were upheld by the Supreme Court in *Humphrey's* and left intact by *Seila Law*.

Given our long-standing acceptance of some agency independence in our constitutional scheme, we should view with suspicion the government's insistence that an immediate, drastic change to our government is necessary. Over the 138 years in which expert independent agencies have operated within our constitutional system, our nation has not perceptibly experienced any harms from the asserted lack of sufficient political accountability.[13] I am concerned that our implicit adoption of the government's radical view of executive authority will enable the President to claim and consolidate too much power, and that will cause the public to lose faith in the impartiality of the judiciary. It may be difficult to persuade members of the public that the Constitution really requires that all appointments and decisions made within the Executive Branch be political, when that has never been the country's experience or understanding.

---

[13] When the government was asked at oral argument to explain how our country has been tangibly harmed by the alleged widespread constitutional problem posed by agency independence, it had no real response. Government counsel spoke of "the blurring of the lines of accountability" and "disabl[ing] the will of the people" — but he could identify no actual detriment to the functioning of our government and its ability to serve the public. Oral Arg. 8:23–24, 11:20–21.

27

The implicit or explicit adoption of a constitutional theory that effectively outlaws independent agencies will have profound effects on the governance of our nation. It threatens to impair the work of approximately thirty-three agencies that Congress has entrusted with important, apolitical missions, like promoting public safety,[14] facilitating commerce,[15] serving the legal system,[16] helping the disadvantaged,[17] protecting

---

[14]  The National Transportation Safety Board (49 U.S.C. § 1111(c)), the Occupational Safety and Health Review Commission (29 U.S.C. § 661(b)), the Consumer Product Safety Commission (15 U.S.C. § 2053(a)), the National Advisory Council on the National Health Service Corps (42 U.S.C. §254j(b)(1)), the Federal Mine Safety and Health Review Commission (30 U.S.C. § 823(b)(1)(B)), the Institute of Peace (22 U.S.C. § 4605(f)), the Chemical Safety and Hazard Investigation Board (42 U.S.C. § 7412(r)(6)(B)), and the Federal Aerospace Management Advisory Council (49 U.S.C. § 106(p)(6)(E)).

[15]  The Federal Trade Commission (15 U.S.C. § 41), the Federal Maritime Commission (46 U.S.C. § 46101(b)(5)), the Postal Service (39 U.S.C. § 202(a)(1)), the Postal Regulatory Commission (39 U.S.C. § 502(a)), the National Indian Gaming Commission (25 U.S.C. § 2704(b)(6)), the Surface Transportation Board (49 U.S.C. § 1301(b)(3)), the Corporation for Travel Promotion (22 U.S.C. § 2131(b)(2)(D)), and the Financial Oversight and Management Board for Puerto Rico (48 U.S.C. § 2121(e)(5)(B)).

[16]  The Sentencing Commission (28 U.S.C. § 991(a)), the State Justice Institute (42 U.S.C. § 10703(h)), the Civilian Board of Contract Appeals (41 U.S.C. § 7105(b)(3)), and the Foreign Claims Settlement Commission (22 U.S.C. §§ 1622(c), 1622b).

[17]  The Commission on Civil Rights (42 U.S.C. § 1975(e)) and the Legal Services Corporation (42 U.S.C. § 2996c(e)).

28

workers,[18] harnessing energy or natural resources,[19] and serving members of the military and veterans.[20]  Under the government's theory, judges who serve on Article I courts — such as the Tax Court, the Court of Appeals for the Armed Forces, and the Court of Appeals for Veterans Claims — also may be subject to at-will removal because those courts are situated within the Executive Branch and therefore exercise some executive power.  *See Kuretski v. Comm'r*, 755 F.3d 929, 943 (D.C. Cir. 2014) (holding that "the Tax Court exercises its authority as part of the Executive Branch"); *Edmond v. United States*, 520 U.S. 651, 664 (1997) (recognizing that the Court of Appeals for the Armed Forces is an "Executive Branch entity"); *United States v. Arthrex, Inc.*, 594 U.S. 1, 20 (2021) (describing the Court of Appeals for Veterans Claims as "an Executive Branch entity").

Although the government currently does not take the position that Article I judges and Federal Reserve officials are subject to at-will removal by the President, those arbitrary carve-outs provide little reassurance — adoption of the maximalist theory would allow the government to change its mind whenever it becomes politically expedient.  The

---

[18]    The National Labor Relations Board (29 U.S.C. §153(a)), the Merit Systems Protection Board (5 U.S.C. § 1202(d)), the National Mediation Board (45 U.S.C. § 154), the Federal Labor Relations Authority (5 U.S.C. § 7104(b)), the Foreign Service Labor Relations Board (22 U.S.C. § 4106(e)), and the Foreign Service Grievance Board (22 U.S.C. § 4135(d)).

[19]    The Nuclear Regulatory Commission (42 U.S.C. § 5841(e)), the Regional Fishery Management Councils (16 U.S.C. § 1852(b)(6)), and the Federal Energy Regulatory Commission (42 U.S.C. § 7171(b)(1)).

[20]    The Department of Defense: Medicare-Eligible Retiree Health Care Board of Actuaries (10 U.S.C. § 1114(a)(2)(A)) and the Department of Defense: Board of Actuaries (10 U.S.C. § 183(b)(3)).

29

government's theory also puts at risk inferior officers and
career civil servants employed by the Executive Branch: If the
Constitution entitles the President to exercise at-will removal
authority over all parties who wield any executive power, then
previously approved statutory protections for such employees
may well be unconstitutional. *See* Brief for the Petitioners at
20, *Slaughter*, No. 25-332 (Oct. 10, 2025) (describing a
previously recognized exception for inferior officers as
"dubious"). Thus, we may soon be living in a world in which
every hiring decision and action by any government agency
will be influenced by politics, with little regard for subject-
matter expertise, the public good, and merit-based decision-
making. Indeed, "[t]he power to remove government officials
and replace them with the chief executive's preferred people
provides a powerful weapon to convert the government from
an instrument of law into the instrument of an autocratic chief
executive" — "[a] President can simply fire conscientious
people and seek to replace them with quislings willing to do his
bidding." David M. Driesen, *The Unitary Executive Theory in
Comparative Context*, 72 Hastings L.J. 1, 42 (2020).

The impending upheaval is not required by our
Constitution, the Supreme Court's precedents, or the unitary
executive theory. The Constitution unquestionably empowers
Congress to organize and structure the Executive Branch, and
the Constitution's text and structure indicate that Congress's
creation of independent agencies is within constitutional
bounds. Moreover, the Supreme Court has been careful, thus
far, to preserve the viability of independent multileader expert
agencies. *See Seila Law*, 591 U.S. at 216–18; *Humphrey's*, 295
U.S. at 632. And that is consistent with the Court's recognition
of a strong unitary executive. Under the Court's precedents,
the President must be able to remove "purely executive"
officials, *Humphrey's*, 295 U.S. at 631–32; *see also Morrison*,
487 U.S. at 689–90, as well as leaders of single-headed

30

agencies exercising executive power, *Collins*, 594 U.S. at 253–54, and even leaders of multileader agencies that wield "substantial executive power," *Seila Law*, 591 U.S. at 218. Eliminating agency independence altogether goes far beyond what the unitary executive theory requires.

In sum, both the government's theory and my colleagues' analysis have the practical effect of outlawing independent agencies in this country. In my view, the government and my colleagues misread the Constitution and all the cases that have come before.

### 1. The Unitary Executive Theory

As the Supreme Court explained in *Seila Law*, "[u]nder our Constitution, the 'executive Power' — all of it — is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" 591 U.S. at 203 (quoting U.S. Const. art. II, §§ 1, 3). Rather than divide the power of the Executive Branch among multiple actors, the Framers concentrated all its power in a single President who would be "directly accountable to the people through regular elections." *Id.* at 224. To ensure that Executive Branch officers also answer to the people, such officers generally "must remain accountable to the President" through the President's power of at-will removal. *Id.* at 204, 213, 224. In addition, for the President to faithfully execute the laws, he must effectively supervise those who assist him in carrying out the functions of the Executive Branch, which also necessitates the general power to remove principal officers who lead Executive Branch agencies. *See id.* at 214.

The underlying premise of the unitary executive theory is that the President alone is responsible for exercising all executive power, and he therefore must have the right to control (and remove) agency leaders who assist him in doing

31

the work of the Executive Branch. That idea is uncontroversial as applied to the many agencies that perform core executive functions on the President's behalf. Core executive functions include powers related to the national defense, foreign affairs, and law enforcement. *See Nixon v. Fitzgerald*, 457 U.S. 731, 750 (1982) (noting that Article II "establishes the President as the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity," including "the enforcement of federal law[,] . . . the conduct of foreign affairs[,] . . . and management of the Executive Branch"). The Constitution plainly requires the President to have unfettered power to remove the leaders of agencies like the Defense Department, the State Department, and the Justice Department. *See Morrison*, 487 U.S. at 690 ("*Myers* was undoubtedly correct . . . in its broader suggestion that there are some 'purely executive' officials who must be removable by the President at will if he is to be able to accomplish his constitutional role." (quoting *Myers v. United States*, 272 U.S. 52, 132–34 (1926))).

But there is a continuum of government functions, and not all such functions must be treated in the same way. Walter Dellinger, when he headed the Office of Legal Counsel, identified a "spectrum" of executive power: "[A]t one end of the spectrum, restrictions on the President's power to remove officers with broad policy responsibilities in areas Congress does not or cannot shelter from presidential policy control," such as the Secretary of Defense, "clearly should be deemed unconstitutional." The Constitutional Separation of Powers Between the President and Congress, 20 Op. O.L.C. 124, 169 (1996). But "[a]t the other end of the spectrum," "officers with adjudicatory duties affecting the rights of private individuals" — such as judges appointed to serve on Article I courts — should not be subject to at-will removal because "the contention that the essential role of the executive branch would

32

be imperiled by giving a measure of independence to such officials is untenable under both precedent and principle." *Id.* The spectrum described by Dellinger recognizes that there is a correlation between the amount of executive power that an agency exercises and the amount of presidential oversight that is constitutionally required. The immediate questions here are, "Where do the MSPB and the NLRB fall on that spectrum of executive power?" and ultimately, "May Congress constitutionally create a category of agencies that need not be placed under the President's total control because their functions do not interfere with or sufficiently implicate the President's exercise of executive power?"

*Seila Law* established just five years ago that the test for constitutionally permissible independence is whether a multileader expert agency exercises "substantial executive power." 591 U.S. at 218; *see also Wilcox*, 145 S. Ct. at 1416 (referencing "considerable executive power"). Because the degree of necessary presidential supervision is commensurate with the amount of executive power that an agency wields, multimember agencies that do not exercise "substantial executive power" may enjoy for-cause removal protections because the President influences such agencies in less intrusive ways that nevertheless preserve "the President's ability to perform his constitutional duty." *Morrison*, 487 U.S. at 691; *see also* Lisa Schultz Bressman & Robert B. Thompson, *The Future of Agency Independence*, 63 Vand. L. Rev. 599, 632 (2010) (noting that independent agencies "are subject to other, well-recognized measures of presidential influence that better promote accountability").

For instance, the President influences the MSPB and the NLRB by appointing at least some of their members, *see* 5 U.S.C. § 1201 (MSPB); 29 U.S.C. § 153(a) (NLRB), and by choosing their chairpersons, *see* 5 U.S.C. § 1203(a) (MSPB);

33

29 U.S.C. § 153(a) (NLRB); *see also Humphrey's*, 295 U.S. at 625 (noting that the FTC would "be independent of executive authority, except in its selection"). The President also may ensure that agency leadership is competent and ethical by removing, or threatening to remove, an agency leader for cause. *See* 5 U.S.C. § 1202(d) (MSPB); 29 U.S.C. § 153(a) (NLRB). Moreover, these multileader independent agencies answer to both Congress and the President through the appropriations process, in which the President and Congress together determine the agencies' funding levels. Independent agencies also are held accountable by Congress's power to enact laws, signed by the President, that can affect the agencies' authority and operations. Finally, the President exercises significant control over the MSPB and the NLRB by overseeing many of the cases that are brought before them, through his power to appoint and remove the General Counsel of the NLRB and the Special Counsel. Thus, the MSPB and the NLRB are completely unlike the independent agencies that the Supreme Court has deemed insufficiently accountable, due to features like a single-head leadership structure, double layers of accountability, or insulation from the normal appropriations process. *See Free Enter. Fund*, 561 U.S. at 484; *Seila Law*, 591 U.S. at 225–26; *Collins*, 594 U.S. at 228. Instead, numerous checks on the MSPB and the NLRB ensure that they remain accountable to the President, the Congress, and the American people, even if the President does not have at-will removal authority.

Congress's creation of independent multileader expert agencies is consistent with the unitary executive theory. Although Article II vests executive power in the President, Article I commands that Congress "shall have Power To . . . make all Laws which shall be necessary and proper for carrying into Execution . . . all . . . Powers vested by this Constitution in the Government of the United States, or in any Department or

34

Officer thereof." U.S. Const. art. I, § 8. Thus, "[u]nitary executive theorists concede that Congress has broad power under the Necessary and Proper Clause to structure the executive department." Steven G. Calabresi & Kevin H. Rhodes, *The Structural Constitution: Unitary Executive, Plural Judiciary*, 105 Harv. L. Rev. 1153, 1165–68 (1992); *see also* Michael W. McConnell, *The President Who Would Not Be King* 146 (2020) (The Take Care Clause and the Commander-in-Chief Clause "place the President at the head of a hierarchical system, the substance of which is entirely within congressional control."). Indeed, it is "natural" to conclude that the Necessary and Proper Clause lets Congress make "judgment calls" about the removal of executive officers "as it enacts particular statutes that structure particular agencies." Caleb Nelson, *Special Feature: Must Administrative Officers Serve at the President's Pleasure?*, Democracy Project 2025 (Sept. 29, 2025), https://perma.cc/758B-ZCTS. Even the strongest formulations of the unitary executive theory have recognized narrow "exceptions" to the general rule that the President is entitled to remove principal officers who wield executive power. *Seila Law*, 591 U.S. at 204; *Wilcox*, 145 S. Ct. at 1416 ("Because the Constitution vests the executive power in the President, he may remove without cause executive officers who exercise that power on his behalf, subject to narrow exceptions recognized by our precedents." (citations omitted)).

The current exception to the general rule of at-will removal for independent multimember executive agencies is appropriate because such agencies do not threaten the President's leadership of the Executive Branch: They wield limited executive power, and the President can adequately supervise them using methods other than at-will removal. In particular, a strong unitary executive can coexist with an independent MSPB and NLRB, as created by Congress,

35

because those agencies: (1) are predominantly adjudicatory and therefore do not exercise substantial executive power; (2) specialize in resolving labor and employment disputes, and therefore have nothing to do with the President's core executive responsibilities; and (3) are accountable to the President through his selection of agency leadership, the appropriations and legislative processes, and his influence over the agencies' dockets of cases. Thus, the President remains strong and in command of the Executive Branch, notwithstanding the existence of these independent agencies.

In short, the unitary executive is compatible with the independence of nonpartisan multimember expert agencies that are (1) "neither political nor executive," (2) "charged with the enforcement of no policy except the policy of the law," and (3) "independent of executive authority, except in [their] selection." *Humphrey's*, 295 U.S. at 624–26. That compatibility is especially evident where the agencies in question are predominantly adjudicatory and quasi-judicial, therefore falling near the end of the executive-power spectrum occupied by courts of law. The Supreme Court has allowed traditional independent agencies to exist for at least ninety years and has approved their independence while at the same time recognizing a strong unitary executive. *See Free Enter. Fund*, 561 U.S. at 483 (explaining that Article II "has been understood to empower the President to keep [Executive Branch] officers accountable — by removing them from office, if necessary," but also holding, under *Humphrey's*, "that Congress can, under certain circumstances, create independent agencies run by principal officers appointed by the President, whom the President may not remove at will but only for good cause"); *Seila Law*, 591 U.S. at 203–04 (noting that "the executive power — all of it — is vested in a President," but also acknowledging that, under *Humphrey's*, "Congress could create expert agencies led by a group of principal officers

36

removable by the President only for good cause" (cleaned up)). Thus, the unitary executive theory does not require us to eliminate all independent multimember expert agencies.

## 2. The Maximalist Unitary Executive

The government urges us to adopt a new, maximalist formulation of the unitary executive theory that entitles the President to assert total control over all agencies that wield any executive power, without exception — and that control logically must extend to every agency, court, or entity within the Executive Branch. The President's mandatory control must be effectuated, according to the government, through at-will removal power over all the leaders of Executive Branch entities, including those that previously have been independent. The government's maximalist theory that places "*any* executive power" under absolute presidential control is a sharp departure from the Supreme Court's recognition of an exception "for multimember expert agencies that do not wield *substantial* executive power." *Seila Law*, 591 U.S. at 216, 218 (emphases added); *see also Wilcox*, 145 S. Ct. at 1415 (referencing "*considerable* executive power" (emphasis added)). Yet the government contends that its new maximalist theory is not just better than the alternative, but that the Constitution *commands* our sudden acceptance of it, despite 138 years of our nation's contrary practice and understanding.

My colleagues do not explicitly embrace the government's reasoning, but they *de facto* agree with the underlying premise of total executive control that leaves no room for political independence. Their view that even the MSPB — a purely adjudicatory agency that functions as an employment-law court — wields "substantial executive power" unmistakably implies that no Executive Branch agencies can remain independent.

37

My colleagues thus adopt their own theory of maximalist executive authority.

In considering the approaches advocated by the government and my colleagues, it is beyond debate that the President is entitled to control and to supervise the executive power of the federal government, which "generally" entitles him to remove principal Executive Branch officials at his discretion. *See Seila Law*, 591 U.S. at 213; *accord Free Enter. Fund*, 561 U.S. at 513–14. The question before us is whether the Constitution prohibits any *exception* to the general rule of at-will removal. And the available evidence indicates that the Constitution does not compel such an interpretation. *See* Caleb Nelson, *supra* ("[B]oth the text and history of Article II are far more equivocal than the current [Supreme] Court has been suggesting."). To the contrary, we should reject any theory that requires the abolition of independent agencies because that drastic action (1) is unsupported by constitutional text, structure, and original intent; and (2) violates the separation of powers.

#### i.   *Constitutional Text, Structure, and Original Intent*

The Constitution does not specifically address the removal of officers in the Executive Branch, other than by providing for impeachment under certain circumstances. But the Necessary and Proper Clause of Article I empowers Congress "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers [of Congress], and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const. art. I, § 8. That broad authority allows Congress to create and structure government agencies, and it is "natural" to conclude that Congress can make "judgment calls" about the removal of officers "as it enacts particular statutes that

38

structure particular agencies." Caleb Nelson, *supra*. The right of removal is not inherent to the executive power because that power "entails executing laws . . . , such as statutes enacted by Congress," and the President is "not in charge of the content of those laws." *Id.* Moreover, "neither the Vesting Clause nor anything else in Article II compels the inference that after officers have been duly appointed, and after the President has issued the commissions that the Constitution requires, the President must be able to terminate the appointments and rescind the commissions at will . . . ." *Id.* Thus, nothing in the Constitution's text supports the government's claim that the President's general removal power *must* be absolute and cannot be subject to exceptions.

Importantly, the Framers assumed that the President would not necessarily have the right to remove Executive Branch officials. In 1790, the First Congress established the Sinking Fund Commission to repay the country's Revolutionary War debt. The members of the Commission were "the President of the Senate [*i.e.*, the Vice President], the Chief Justice, the Secretary of State, the Secretary of the Treasury, and the Attorney General." Act of Aug. 12, 1790, ch. 47, § 2, 1 Stat. 186, 186; *see also* Chabot, *supra* note 1, at 39–40. The Vice President — who at that time, before the Twelfth Amendment, was the runner-up from the last presidential election rather than the President's running mate — and the Chief Justice were not subject to removal by the President, thus insulating the Commission from complete presidential control. Chabot, *supra* note 1, at 41. Alexander Hamilton proposed the Commission, the First Congress passed legislation that established it, and President George Washington signed the law — all of which would be surprising if the Commission's independent structure violated the very Constitution that those people had just forged. *See id.* at 42–43.

39

Nor was the Sinking Fund Commission an anomaly. *See* Christine Kexel Chabot, *Interring the Unitary Executive*, 98 Notre Dame L. Rev. 129, 133 (2022) (documenting how the First Congress "repeatedly enabled independent exercises of significant executive power that fell outside of the President's complete control and removal power"). Congress restricted the President's removal authority over the heads of the First (1791) and Second (1816) Banks of the United States, the judges of the Court of Claims (1855), and the Comptroller of the Currency (1863). *Harris II*, 2025 WL 980278, at *37 (Millett, J., dissenting). Even the government concedes that the "early Congresses . . . provided that the Banks of the United States — like the Federal Reserve — would have a degree of insulation from the President's control." Gov't Reply 15. Indeed, James Madison himself, speaking from the House floor, attested in 1789 that "because Congress may establish [executive] offices by law . . . , most certainly it is in the discretion of the Legislature to say upon what terms the office shall be held, either during good behaviour or during pleasure." 1 Annals of Cong. 374–75 (1789).

Although it is true that the First Congress voted to give the President plenary removal power over the Secretary of Foreign Affairs in 1789, the import of that event is debatable. It is unclear whether the President's removal authority in that instance was seen as granted by Congress or required by the Constitution. *Compare* Lawrence Lessig & Cass R. Sunstein, *The President and the Administration*, 94 Colum. L. Rev. 1, 25–29 (1994), *with* Saikrishna Prakash, *New Light on the Decision of 1789*, 91 Cornell L. Rev. 1021, 1021 (2006). Moreover, the First Congress's confirmation that the President has conclusive authority to remove the Secretary of Foreign Affairs — a purely executive official exercising core Article II powers — does not establish that the President necessarily must have at-will removal authority over all other agency

40

leaders in the Executive Branch, including those who do not wield substantial executive power.

In sum, a search for evidence that the Constitution compels us to accept a maximalist interpretation of executive power comes up short. The government's theory that "the President must have full control over each and every exercise of 'executive' power by the federal government (including an unlimitable ability to remove all or almost all executive officers for reasons good or bad)" gives the President "more power than any member of the founding generation could have anticipated." Caleb Nelson, *supra*.

### ii. *The Separation of Powers*

The government posits that the Constitution tolerates no exceptions to the President's at-will removal authority because the President is answerable to the people, while unelected agency heads are not. *See* Oral Arg. 4:14–9:24. Thus, the foundation of the government's maximalist theory of executive power is political accountability. And the government claims that a departure from "Article II's design . . . inflicts a constitutional harm on the country." *Id.* at 4:53–57. But once we accept that the President *generally* is entitled to remove Executive Branch officials who wield executive power, the government's theory does not effectively explain why there can be *no exceptions* to the general rule, especially where precedents recognize such exceptions. We must bear in mind that Congress duly enacted the for-cause removal statutes at issue, with the consent of the Presidents who signed the legislation in question.

Congress is "the branch of our Government most responsive to the popular will." *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 685 (1980) (Rehnquist,

41

J., concurring in the judgment).  A first-term President faces voters only when he is running for reelection after four years in office, while a second-term President is not checked by the ballot box at all.  But every member of the House and one third of Senators go before their constituents every two years.  *See* U.S. Const. art. I, §§ 2, 3.  And while the President may act unilaterally and privately, members of Congress deliberate and vote collectively and transparently.  They are also closer to their voters:  "Elected representatives solicit the views of their constituents, listen to their complaints and requests, and make a great effort to accommodate their concerns."  *Biden v. Missouri*, 595 U.S. 87, 105 (2022) (Alito, J., dissenting).  Accordingly, "[a] statute enacted by Congress expresses the will of the people of the United States in the most solemn form."  *United States v. Lee Yen Tai*, 185 U.S. 213, 222 (1902).  Respect for democracy, therefore, requires respect for the policy decisions of "those popularly chosen to legislate."  Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L Rev. 527, 545 (1947).  And because we owe "[d]ue respect for the decisions of a coordinate branch of Government," we must review acts of Congress with a "presumption of constitutionality."  *United States v. Morrison*, 529 U.S. 598, 607 (2000).  Unelected judges do not uphold the ideals of democracy and political accountability when they overturn laws that were passed by the people's representatives.

To the extent the goals of the President and Congress are in tension here, the President's power is at its "lowest ebb."  *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).  Where a President defies a law duly enacted by Congress, such a "[p]residential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system."  *Id.* at 638.  Indeed, the example that Justice Jackson used to illustrate the

42

President's relative weakness in the face of contrary congressional intent was *Humphrey's Executor*: "President Roosevelt's effort to remove a Federal Trade Commissioner was found to be contrary to the policy of Congress and impinging upon an area of congressional control, and so his removal power was cut down accordingly." *Id.* at 638 n.4. It bears emphasis that Justice Jackson observed in *Youngstown*, the Court's iconic decision on the separation of powers, that statutory for-cause removal restrictions fall within "an area of congressional control" — *i.e.*, Congress's prerogative to structure the Executive Branch. *Id.*

In the cases before us, "the equilibrium established by our constitutional system" is indeed at stake. *Youngstown*, 343 U.S. at 638 (Jackson, J., concurring). My colleagues' implicit and substantial adoption of the government's maximalist view of the unitary executive will allow the President to seize power that Congress did not intend for him to have, and thus will aggrandize the Executive Branch at the expense of the Legislative Branch. The "concentration of [so much] power in the hands of a single branch is a threat to liberty." *Clinton v. City of New York*, 524 U.S. 417, 450 (1998) (Kennedy, J., concurring). As Justice Brandeis put it, "[t]he doctrine of the separation of powers was adopted by the convention of 1787 not to promote efficiency but to preclude the exercise of arbitrary power. The purpose was not to avoid friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments, to save the people from autocracy." *Myers*, 272 U.S. at 293 (Brandeis, J., dissenting); *see also Gundy v. United States*, 588 U.S. 128, 169 (2019) (Gorsuch, J., dissenting) (warning against "accelerat[ing] the flight of power from the legislative to the executive branch, turning the latter into a vortex of authority that was constitutionally reserved for the people's representatives in order to protect their liberties"). In the face

43

of an attempted power grab that will transform our country, the role of the courts is to prevent undue concentration of power, not guarantee it.

### III.

The government argues that the district court had no authority to "reinstate" Harris and Wilcox, whether through declaratory or injunctive relief. Gov't Br. 39. I disagree.

The district court awarded substantively identical declaratory and injunctive relief to Harris and Wilcox.[21] On appeal, the government does not contest the district court's authority to declare "that the removal[s] w[ere] unlawful." Gov't Br. 40 n.7. Instead, it argues (1) that the "court's declaration[s] that [Harris and Wilcox] shall continue to remain" members of the MSPB and the NLRB amounted to "full reinstatement" and thus exceeded the district court's authority, *id.*, and (2) that the district court lacked equitable authority to reinstate Harris and Wilcox via injunctions against various subordinate executive officials, *id.* at 38.

The Supreme Court will consider similar arguments in *Slaughter*. *See* Question Presented, *Slaughter*, No. 25-332 (Sept. 22, 2025) (instructing the parties to brief "[w]hether a federal court may prevent a person's removal from public office, either through relief at equity or at law"). But in the meantime, our own precedents bind us.

We have repeatedly recognized that lower courts enjoy equitable authority to *de facto* reinstate wrongfully removed

---

[21]    In the alternative, the district court noted that Harris and Wilcox likely were entitled to mandamus relief, but it ultimately did not grant such extraordinary relief.

44

officers. *See Swan v. Clinton*, 100 F.3d 973, 980 (D.C. Cir. 1996) (recognizing the availability of a *de facto* reinstatement remedy requiring subordinate executive officials to "treat[] Swan as a member of the [agency] Board and allow[] him to exercise the privileges of that office"); *Severino v. Biden*, 71 F.4th 1038, 1042–43 (D.C. Cir. 2023) ("We can enjoin subordinate executive officials to reinstate a wrongly terminated official *de facto*, even without a formal presidential reappointment." (cleaned up)); *see also Harris II*, 2025 WL 980278, at *44 (Millett, J., dissenting) ("*Swan* and *Severino* . . . held that an injunction could restore someone to office *de facto*."); *cf. Sampson v. Murray*, 415 U.S. 61, 63 (1974) ("[T]he District Court is not totally without authority to grant interim injunctive relief to a discharged Government employee . . . ."). Consistent with our precedent, the district court properly awarded declaratory and injunctive relief to Harris and Wilcox.[22]

\*    \*    \*

For the reasons discussed, I would affirm the judgments of the district court. Unlike my colleagues, I would decline the government's invitation to radically reshape our government. As Justice Robert H. Jackson so eloquently stated:

> The actual art of governing under our Constitution does not and cannot conform to judicial definitions of the power of any of its branches based on isolated clauses or even

---

[22]    Further, it is notable that the Supreme Court has recently declined to stay several lower-court orders reinstating federal officials who were removed by the President. *See* Order, *Trump v. Cook*, No. 25A312 (U.S. Oct. 1, 2025) (member of the Federal Reserve Board); Order, *Blanche v. Perlmutter*, No. 25A478 (U.S. Nov. 26, 2025) (Registrar of Copyrights).

45

single Articles torn from context. While the
Constitution diffuses power the better to
secure liberty, it also contemplates that
practice will integrate the dispersed powers
into a workable government.

*Youngstown*, 343 U.S. at 635 (Jackson, J., concurring).
Throughout our history, the Supreme Court's precedents and
our nation's practice and tradition have allowed independent
multimember expert agencies to operate successfully within
our constitutional system; and as a result, we have reaped the
benefits of a workable government that best serves the interests
of the American people. The government now urges an
extreme view of Article II's Vesting Clause, torn from context:
It attempts to reduce the actual art of governing to an
uncompromising usurpation of power by the President, all in
defiance of Congress's authority and without regard for the
public good. My colleagues' substantial acceptance of the
government's maximalist theory of executive power brings us
closer to autocracy, harms our nation, and violates the
separation of powers. I respectfully dissent.

# ADDENDUM C

## CERTIFICATE AS TO PARTIES AND AMICI

Gwynne A. Wilcox – Plaintiff-Appellee

Donald J. Trump – Defendant-Appellant

Marvin E. Kaplan – Defendant-Appellant

American Federation of Labor and Congress of Industrial Organizations (AFL-CIO) – Amicus curiae

Americans for Prosperity Foundation – Amicus curiae

America's Future, Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of California, Public Advocate of the United States, Public Advocate Foundation, U.S. Constitutional Rights Legal Defense Fund, and Conservative Legal Defense and Education Fund – Amici curiae

Ariana Cortes and Logan Karam – Amici curiae

Chamber of Commerce of the United States – Amicus curiae

Constitutional Accountability Center – Amicus curiae

Democratic Workplace – Amicus curiae

Florida, Alabama, Arkansas, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Oklahoma, South Carolina, South Dakota, Texas, Utah, West Virginia, and the Arizona legislature – Amici curiae

Former National Labor Relations Board Members – Amici curiae

Jed H. Shugerman – Amicus curiae

Law Professors John C. Coates, Jeffrey N. Gordon, Kathryn Judge, and Lev Menand – Amici curiae

Minnesota, Illinois, Arizona, California, Colorado, Connecticut, Delaware, District of Columbia, Hawaii, Maryland, Massachusetts, Michigan, Nevada,

New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, Washington, and Wisconsin – Amici curiae

Separation of Powers Clinic – Amicus curiae

State of Tennessee – Amicus curiae


January 5, 2026                                    Respectfully submitted,

                                                   /s/ Deepak Gupta
                                                   DEEPAK GUPTA
                                                   GUPTA WESSLER LLP
                                                   2001 K Street, NW
                                                   Suite 850 North
                                                   Washington, DC 20006
                                                   (202) 888-1741
                                                   deepak@guptawessler.com